UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| R.S. BASSMAN, Derivatively on Behalf of FREDDIE MAC a/k/a Federal Home Loan Mortgage Corporation and its shareholders,<br><br>    Plaintiff,<br><br>    v.<br><br>RICHARD F. SYRON, PATRICIA L. COOK, ANTHONY S. PISZEL, EUGENE M. McQUADE, RICHARD KARL GOELTZ, STEPHEN A. ROSS, SHAUN F. O'MALLEY, ROBERT R. GLAUBER, BARBARA T. ALEXANDER, WILLIAM M. LEWIS, JR., JEFFREY M. PEEK, GEOFFREY T. BOISI, RONALD F. POE, WASHINGTON MUTUAL, INC., PRICEWATERHOUSECOOPERS, LLP, KERRY K. KILLINGER, ANTHONY R. MERLO, JR., FIRST AMERICAN CORPORATION, FIRST AMERICAN EAPPRAISEIT, COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME EQUITY LOAN TRUST, COUNTRY-WIDE BANK, FSB, COUNTRYWIDE HOME LOANS, INC., LANDSAFE, INC., and ANGELO R. MOZILO,<br><br>    Defendants,<br><br>    and<br><br>FREDDIE MAC a/k/a Federal Home Loan Mortgage Corporation,<br><br>    Nominal Defendant. | Case No. 08 CV 02423-BSJ |

## DECLARATION OF STEVEN COLE

I, Steven Cole, do hereby depose and swear as follows:

1.      I am Vice President, Division Administration & Oversight in the Human Resources & Corporate Services Division at the Federal Home Loan Mortgage Corporation ("Freddie Mac"). I submit this Declaration in support of Freddie Mac's Motion to Transfer Venue Or, Alternatively, Stay the Proceedings. I make this Declaration on the basis of personal knowledge, except as otherwise stated herein.

2.      Freddie Mac is a government-sponsored enterprise created by Congress in 1970 to, among other things, provide stability in the secondary market for residential mortgages by increasing the liquidity of mortgage investments and offering mortgage lenders greater access to private capital.

3.      Freddie Mac purchases home mortgages from lenders ("Seller/Servicers") and pools those mortgages into securities that investors can purchase.

4.      According to its Corporate Bylaws, Freddie Mac follows the Corporate governing practices and procedures of the law of the Commonwealth of Virginia, including the Virginia Stock Corporation Act, codified at VA CODE ANN. § 13.1-601 *et seq.*

5.      Freddie Mac's headquarters is located in McLean, Virginia. Twelve of the 17 offices that Freddie Mac maintains are located in or near Northern Virginia.

6.      Virtually all of Freddie Mac's business activities occur in the Eastern District of Virginia. In fact, all of the business activities alleged in the complaint (e.g., activities relating to Freddie Mac's risk management, internal controls, underwriting standards, investment decisions, credit policies, contracts with its Seller/Servicers, and financial reporting) are conducted at Freddie Mac's headquarters in Virginia.

7.      The vast majority of Freddie Mac's officers and employees work in Virginia. As of May 31, 2008, 4,752 of Freddie Mac's 5,267 employees work in Virginia. (This figure includes the 146 of Freddie Mac's 147 officers who work in Virginia.) All of the current and former officers who are named as defendants and against whom claims are asserted in this lawsuit perform (or performed) their work for Freddie Mac in Virginia. As a result, the majority of potential witnesses to this action are located in or near the Eastern District of Virginia

8.      The majority of the relevant documents are located in the Eastern District of Virginia. Freddie Mac's electronic documents are stored on servers located in Northern Virginia. Most paper documents are located within Freddie Mac's facilities in Northern Virginia, and those that are not are stored at facilities in or near Northern Virginia.

9.      The majority of Freddie Mac's investor conference calls take place from Virginia.

10.     The majority of Freddie Mac's press releases are issued from Virginia.

11.     The agencies responsible for regulating Freddie Mac's activities are the United States Department of Housing and Urban Development ("HUD") and the Office of Federal Housing Enterprise Oversight ("OFHEO"), both headquartered in Washington, D.C. (less than 15 miles from Freddie Mac's headquarters).

-2-

12.    In response to Plaintiff's December 6, 2007 Demand Letter to Freddie Mac's Board of Directors, Freddie Mac's Board of Directors formed a Special Litigation Committee ("SLC") to investigate Mr. Bassman's claims.  The SLC is comprised of three independent directors of Freddie Mac.

13.    The SLC has retained Hunton & Williams LLP, a prominent law firm with several offices in Virginia, to assist the SLC with the investigation.  The SLC's investigation, which includes an extensive review of documents and interviews of witnesses, is on-going.

14.    On March 14, 2008, Freddie Mac sent Plaintiff's counsel a letter requesting Plaintiff to withdraw this lawsuit because it was premature, or at a minimum, stay the case pending the outcome of the SLC's investigation. Attached hereto as Exhibit A is a true and accurate copy of Freddie Mac's letter to Plaintiff's counsel dated March 14, 2008. On information and belief, Plaintiff did not respond to Freddie Mac's request.

15.    Attached hereto as Exhibit B is a true and accurate copy of Freddie Mac's Annual Report dated February 28, 2008.

16.    Attached hereto as Exhibit C is a true and accurate copy of Freddie Mac's Bylaws.


Signed under the penalty of perjury that the foregoing is true and correct.


Executed this _13th_ day of June, 2008.

_____
Steven Cole

# EXHIBIT A



Robert E. Bostrom
Executive Vice President,
General Counsel & Corporate Secretary

Tel: (703) 903-2690
Fax: (703) 903-2673
robert_bostrom@freddiemac.com

8200 Jones Branch Drive
MS 200
McLean, VA 22102-3110

**VIA OVERNIGHT MAIL**

March 14, 2008

Richard D. Greenfield, Esq.
Greenfield & Goodman LLC
7426 Tour Drive
Easton, Maryland 21601

Re:    **Demand of Robert Bassman**

Dear Mr. Greenfield:

As a follow-up to my letter of January 18, 2008, I am writing to inform you of the action taken by Freddie Mac's Board of Directors in response to the November 21, 2007 demand letter that you sent to Richard Syron on behalf of the above-referenced purported shareholder.

Freddie Mac takes seriously any allegation of wrongdoing causing harm to the Company. For this reason, the Board of Directors has formed a special committee comprised of disinterested directors consistent with Virginia law to investigate the allegations set forth in your letter. The special committee has retained Ed Fuhr, Esq., of the law firm of Hunton & Williams to assist it in its investigation.

In light of the Board's decision to investigate your client's allegations, we believe your recently filed derivative action on these same issues is premature and should be withdrawn or, at a minimum, stayed, pending the outcome of the committee's investigation. We will, of course, notify you when the investigation is complete and inform you of the Board's decision whether to initiate legal action on behalf of the Company.

Should you have any questions, please feel free to contact me at (703) 903-2690, Mr. Fuhr at (804) 788-8200 or Bart Friedman at (212) 701-3304 who represents the current and former directors.

Very truly yours,

Robert Bostrom

cc:    The Board of Directors of Freddie Mac
       Eugene McQuade
       Jeffrey K. Peek
       Ronald F. Poe
       Ed Fuhr, Esq.
       Bart Friedman, Esq.

# EXHIBIT B

ANNUAL 2007 REPORT



## COMPANY OVERVIEW

.

Freddie Mac's mission is to provide liquidity, stability and
affordability to the U.S. housing and mortgage markets. That
mission—defined in our congressional charter—forms the
framework of our business lines, shapes the products we
bring to market and drives the services we provide to the
nation's housing and mortgage finance industry.

**Liquidity:** Freddie Mac serves the secondary mortgage
market by providing a stable supply of money for lenders,
which lowers rates for millions of consumers.

**Stability:** Freddie Mac plays a vital role by moderating cyclical
swings in the housing sector, equalizing the flow of mortgage
funds regionally throughout the United States and making
mortgage funds available in a variety of economic conditions.

**Affordability:** Freddie Mac provides financing options that
increase opportunities for affordable homeownership and
affordable rental housing for families across the nation.

.

FREDDIE MAC 2007 ANNUAL REPORT

# A  MESSAGE  FROM  THE  CHAIRMAN

.

**TO OUR STOCKHOLDERS:**

In 2007, our sector suffered the most severe housing correction since the Great Depression. In my 35 years as an economist, central banker, regulator and businessman, I have never witnessed a situation quite like this one—in which a housing bubble has played such a central role in bringing the world's largest economy to the brink of recession.

Freddie Mac's financial results last year were acutely affected by the extraordinary downturn in housing; later in this letter I will discuss them with you fully. But before detailing our performance, it's worth taking a closer look at *how* and *why* the housing finance environment became so challenging. If you'll bear with me, I'd like to describe what we've observed, what we've been doing about it, and what we think it means.

**WHAT HAPPENED?**

While many of the difficulties began in the subprime mortgage market, it's important to understand that what the markets face today is a broader problem of transparency and confidence. In one area after another, markets have ceased functioning as creditors have lost confidence in the portfolios of their lending partners.

Looking back over the problems of the past year, at least three factors contributed to the sharp declines we saw. First was a global glut of liquidity, resulting in part from the rapid rise of the world's largest emerging economy, China, as a net exporter of both capital and, in effect, of labor. Second were advances in technology and financial engineering that separated lending decisions from investment decisions. Third was a decline in underwriting standards, as too many lenders and borrowers threw caution to the winds.

In the process, the subprime mortgage was transformed from a niche product and used far more indiscriminately than in the past. Housing finance was stretched beyond the breaking point by ever-more exotic mortgages that enabled more home buying on the front end but carried unacceptable risks of home loss on the back end as soon as home prices stopped rising.

Of course, markets correct—and this time, they did so rapidly and viciously. Indeed, the markets may have already overcorrected in pricing and in underwriting certain products, such as jumbo mortgages, outside the conforming space. To a large extent, only the conforming market served by the housing government-sponsored enterprises (GSEs) has continued to function normally, in the process diminishing risk and saving families thousands of dollars in payments over the lifetimes of their loans.

### SOME LESSONS LEARNED

In recent months, many policymakers have discussed options to ease stresses on the housing and mortgage markets. Many of these efforts have merit, most specifically the fiscal stimulus program to avert the risk of recession. While the Federal Reserve has been creative and responsible in dealing with the problem, we also need to realize that there are very real limits to what monetary policy can do in a situation like this. It is, as often said, a very "blunt" instrument. So we should all applaud the Administration and the Congress for delivering a timely stimulus package. To my mind, *when* it was passed is more important than all the exact elements of *what* it contained.

The problems in the subprime market remind us of a longstanding truth that was nearly obscured during the last years of the long housing boom: not every family that wants to own a home is financially ready for homeownership. To understand why this is so, consider the subprime market, which can be roughly divided into three parts.

The top group of subprime loans might have been eligible for prime credit, but for one reason or another ended up in the subprime category. A middle group of loans are legitimately in subprime, but should benefit from enhanced underwriting standards and more reasonable reset terms. Finally, a sizable bottom group of subprime loans may not have been repayable in any reasonable scenario unless home prices continued to escalate.

I am an ardent proponent of the long-term benefits of homeownership. That also makes me an ardent opponent of practices that unduly raise the risk of foreclosure. We need to face the fact that, as a matter of both policy and attitude, our nation did not sufficiently question whether homeownership is the right thing for every household in America at every point in time. For

most homeowners in the bottom group of subprime today, it may be better to be renters than homeowners at this point in the cycle. That's how it was when many of us grew up.

Accordingly, some of the housing stock that is now or soon will be facing the threat of foreclosure will likely need to be converted, at least temporarily, into rental housing. So it makes sense to undertake efforts that would enable at least some of the families that briefly owned the properties to stay in them under certain circumstances, whether as ordinary renters, or on some kind of innovative shared-equity, rent-to-own or lease-to-buy basis. The specifics would have to be worked out as a matter of law and policy. But what's already clear is that the right kinds of creative solutions would be better than foreclosure—for lenders, families and neighborhoods alike.

One lesson I hope we all absorb from last year's experience is that housing finance alone cannot resolve all the housing affordability challenges facing our nation. To achieve lasting gains in affordability, advances in mortgage finance must be accompanied by changes affecting the supply side of the housing equation—such as in zoning, permitting, transportation and other policies.

In sum, we need a change of perspective, emphasizing *sustainable* homeownership—homes that families can afford to buy and keep—over mere home*buying*. Any other approach elevates statistics over human lives: the short-term satisfaction of telling ourselves the homeownership rate is increasing, when what really matters is the long-term strength of our families, our neighborhoods and our economy, as shown by the events of 2007.

That's a perspective on the extraordinary developments of the last year. Now let's take a closer look at how Freddie Mac has managed its way through them—starting with our progress in financial reporting.

### ADVANCES IN FINANCIAL REPORTING

We have reached a major milestone on Freddie Mac's road back to normalcy. With the publication of this 2007 annual report, we are again timely in our financial reporting. This has taken a lot of time, effort and resources, but the benefits are substantial. While much remains to be done, the company and its employees have taken an important step forward.

Our advances in financial reporting go beyond timeliness. We continued to strengthen our accounting and internal controls infrastructure. To enhance transparency, we have updated several key accounting policies so as to enhance our GAAP disclosures. We are debuting in this annual report a new segment measure that will more clearly convey the specific risk/reward characteristics of our three lines of business—and also enable investors to better assess this firm's performance relative to its peers.

All this progress in financial reporting brings important benefits: We can be more transparent to our investors, more comparable to other financial services companies, and more focused on our business and our mission.

#### FINANCIAL RESULTS AND KEY TRENDS

As I've said, 2007 was an especially difficult year in many ways. The worsening environment made it very hard for any company in the housing sector to be profitable. This brought even greater challenges for a GSE like Freddie Mac, whose congressional charter limits us to serving only the U.S. residential mortgage market. Unlike other financial services companies, we did not have the option of shifting our focus or withdrawing from the mortgage markets. Rather, as required by our charter, Freddie Mac provided liquidity and stability to the conforming market—even as others pulled back and provided neither. In so doing, we continued to support our customers and serve our public mission at a critical time.

As a result, only the conventional, conforming market supported by the GSEs was able to function more or less normally. Indeed, many observers made the point that if not for the GSEs in the conforming market, there would have been very little of a healthy U.S. mortgage market during this period.

However, clearly last year's weakening house prices and punishing deterioration of credit hurt Freddie Mac's results, along with those of other mortgage market participants. On a GAAP basis, based on the accounting policy changes I mentioned earlier, our 2007 net losses amounted to roughly $3.1 billion, or $5.37 per diluted share, compared with 2006 net income of $2.3 billion. These results reflected substantial losses on mark-to-market items and a higher provision for credit losses. Our mark-to-market losses of $8.1 billion mainly included $4.3 billion in interest-rate related items and $3.9 billion in credit-related items, offset by certain fees. Our provision for credit losses of $2.9 billion reflected the significant worsening of mortgage credit resulting from continued weakness in housing.

These results are plainly disappointing and put pressure on our capital, which is determined by GAAP. Looking across the U.S. financial services landscape, it's clear that a number of other financial institutions experienced larger losses relative to the size of their mortgage portfolios. But as a company that prides itself on our singular focus and expertise in managing mortgage risk, we can and must do better—even in the most challenging environments. Later in this letter, I'll describe some of the steps we are taking to do so.

It is essential to note that a significant portion of our losses were not economic, but the result of accounting conventions. Freddie Mac is committed to serving our mission for the long term and building enduring shareholder value. Yet in our business, mark-to-market accounting has the effect of increasing volatility and often requires us to book losses in excess of those that we ultimately expect to incur. Thus, a significant fraction of the credit impact from our current guarantee portfolio has already been reflected in our results. We expect a good portion of the "front-loaded" mark-to-market losses in our GAAP results will ultimately reverse over time.

There is a related dynamic at work here. Much of what Freddie Mac did in 2007 served our mission in ways that hurt our GAAP results in the short term. For example, the day we buy a loan and issue a credit guarantee, we have to mark the credit to market—and in this environment, that's generating large current-period losses (commonly called day one losses). Yet over the long run, with robust growth in our guarantee-fee business and wider spreads resulting from enhanced underwriting standards and increased guarantee fees, we expect the 2008 business we're putting on today to generate attractive returns tomorrow.

In order to communicate our business results in a manner consistent with how we manage our business—and as discussed in our *Management's Discussion and Analysis* (MD&A)—we are providing supplementary new disclosures and segment reporting in this annual report. These new disclosures show clearly the results of our underlying lines of business. Investors have asked for such an additional measure for several years, and Chief Financial Officer Buddy Piszel deserves great credit for bringing it to fruition. On the basis of the new measure (which we call Adjusted operating income, or AOI), our earnings totaled $2.1 billion for 2007, down from $3.9 billion on this basis for 2006. That decline is consistent with the credit costs we experienced. (AOI is a non-GAAP financial measure. For a reconciliation of AOI to GAAP and for more on AOI and our new segment reporting, please see the MD&A and Note 15 of this annual report.)

## BUSINESS PERFORMANCE AND PROSPECTS

Overall, I believe the market shift we saw in 2007 toward fixed-rate originations and improved pricing and credit standards positions Freddie Mac well, enabling us to build on our traditional strengths. Let me explain why.

One key reason management believes strongly in Freddie Mac's future is the quality of our book of business, which we view as among the very best in the industry. Compared to our competitors, our mortgage portfolio is low in loan-to-value, low in holdings of exotic loans, high in regional diversification and high in credit quality. For example, following a year of marked deterioration in

credit, our total single-family delinquency rate on December 31, 2007 was 65 basis points, still less than half the industry average—and well below that of our principal competitor. While we expect this to rise, it should remain substantially lower than others. As evident in our disclosures, even in a deteriorating credit environment, we believe our sound credit standards and policies will stand us in good stead.

A second positive factor involves *how* the markets have come back in our direction, in terms of quality as well as volume. Growth in total U.S. residential mortgage debt outstanding slowed to roughly 7 percent in 2007. By contrast, our total portfolio grew by 15 percent last year as Americans remembered the virtues of the American Mortgage—the long-term, fixed-rate, prepayable mortgage that remains a sweet spot for Freddie Mac. Moreover, across a range of products, much of the irresponsibility in pricing and credit began to be wrung out of the system.

The shift away from exotic mortgages and back toward long-term, fixed-rate lending and more rational underwriting standards puts your company in a solid position going forward. Our guarantee-fee income increased throughout the year, based on credit guarantee portfolio growth of almost 18 percent. At the same time as we grew volume and gained overall market share, we have also moved to raise prices in our credit guarantee business to better reflect changing credit and market conditions. As a result, we expect revenues from our guarantee business to increase materially in 2008. The aggregate price increases were substantial but they were needed—and were accompanied by tightened and more risk-based credit standards as well.

Net interest margin stabilized throughout the year, in large part a function of increased spreads and reduced average volumes. With the current illiquidity and lack of demand elsewhere in the mortgage security market, the option-adjusted spreads we are able to earn on new business have improved significantly.

Our multifamily business showed striking growth. This increasingly important part of our business—which is a "goal rich" contributor to our affordable housing goals—eclipsed its previous record set in 2006 by almost 55 percent. Consistent with the accelerating momentum of our business as a whole, the lion's share of this growth occurred in the second half of the year.

The company remains safe and sound, and we continue to enhance our capital management and financial controls. We began the year with an estimated $2.1 billion capital cushion above the 30 percent surplus directed by our regulator; at year-end, this cushion stood at an estimated $3.5 billion. Credit quality is high, as discussed, and interest rate risk management remains strong. Finally, we continued to strengthen our safety and soundness regime by taking advantage of opportunities to enhance our senior management team.

In November, facing GAAP losses that we knew would count against our regulatory capital, we faced a fundamental decision about the company's direction. We could radically shrink the firm—and thus shirk our mission—in order to conserve capital, or we could take the hard decision to raise additional capital and halve the dividend. We chose the latter course, and in the days that followed, we found that many of America's shrewdest institutional investors share our strong confidence in the future of this franchise. We were thus able to successfully raise $6 billion in a preferred stock offering that was greatly oversubscribed—and which, importantly, avoided any dilution of existing common stockholders.

We believe this additional capital will enable Freddie Mac to continue fulfilling its urgent mission and better position us to effectively manage the company going forward. In doing so, we must treat capital as a precious resource and manage it wisely. By its nature, the guarantee-fee business is less capital intensive than the investment portfolio business. Accordingly, you can anticipate that we will work to derive a greater share of Freddie Mac's value from the guarantee business going forward. Be assured that this does not represent a lack of interest in pursuing investment portfolio opportunities, but rather, is simply a matter of balance, emphasis and prudence.

Controlling G&A costs is a key to Freddie Mac's competitive prospects. We held administrative expenses flat in 2007 and actually reduced them slightly as a percentage of our total portfolio. This year, we expect to achieve further savings by shedding substantial consultant headcount associated with our accounting systems improvements, which are largely winding down. In 2009, we plan to extend these savings through voluntary attrition and other steps as necessary.

I want to turn very briefly from our efforts to save money at Freddie Mac, to our plans to invest in enhancing the capabilities of the business. In recent years we have had to devote the bulk of our new spending to upgrade our accounting infrastructure and internal controls. As that effort nears completion, we will be able to reinvigorate our efforts and our spending to improve the company's products, time to market and customer service.

Beyond that, I would single out three specific areas of focus. One, we are working to enhance our capabilities to meet all our customer needs and act as a conduit between the primary market where loans are originated and the investment world, including Wall Street. Two, we are taking steps to improve our security performance—the structure and liquidity of the currency we use to purchase mortgages. Finally, we are upgrading our systems to make Freddie Mac as easy as possible for our customers to work with. All these initiatives are intended to make us a stronger competitor when the secondary mortgage market again becomes intensely competitive.

## A MISSION-CRITICAL YEAR

If last year's turmoil in the housing finance markets had any silver lining, it was this: though it was very hard for the GSEs to be profitable, it was also very hard to deny our necessity. Freddie Mac's mission is always important, but in 2007, it plainly was essential. We provided stability and liquidity to the mortgage market, even as our private-label competitors withdrew from it. As a result, in discussions across the ideological spectrum, we are seen as a part of the solution to the subprime and broader economic challenges facing the country.

Thus, in the fiscal stimulus package signed into law on February 13, 2008, the GSEs were entrusted with the important added responsibility of bringing relief to parts of the jumbo mortgage market. Our task is to provide liquidity, stability, and help enable lower costs in high-cost areas in such states as California—where thousands of middle class families and homebuyers are struggling with mortgages above the prior conforming loan limit of $417,000. Doing so will pose a particular challenge for us in light of the capital demands of this task and the capital cushion to which we manage. But it is a task we embrace—because it is the right thing to do for our mission and for the broader economy.

Too often in recent years, as rising house prices, regional stability and easy access to products became the norm in housing finance, commentators have focused on just one aspect of our three-part mission, effectively contending that our sole responsibility was affordable housing. But in fact the importance of all three parts of our mission—especially the need for us to provide liquidity and stability to housing markets—was demonstrated very clearly last year.

Freddie Mac was created in part to cushion the impact of crises such as the one that paralyzed the markets in 2007. We have played such a role before—as we did after Hurricane Katrina, 9/11, and the implosion of Long-Term Capital Management—but the extent of last year's market turmoil was extraordinary. As a result, Freddie Mac stepped up its mortgage purchases, and by year-end had injected nearly $580 billion in liquidity into the markets.

We took early, concrete steps to stabilize the markets and cushion the negative effects of the housing downturn on borrowers and communities. In February of last year, we became the first financial institution to announce tighter underwriting standards that limit payment shock for certain subprime borrowers. This is consistent with the leadership we have shown in other efforts to combat predatory lending. In April, we made a commitment to buy $20 billion in consumer-friendly mortgages that provide better choices for subprime borrowers. Since May, we have bought roughly $43 billion of prime rate mortgages that financed borrowers who previously may have found themselves in subprime.

Freddie Mac has long led the industry in helping borrowers pursue innovative alternatives to foreclosure. The company and our servicers helped nearly 47,000 borrowers avoid foreclosure and keep their homes in 2007—bringing to more than 200,000 the number of such workouts since the beginning of 2004. We also introduced new tools to help homeowners facing foreclosure recognize and avoid mortgage fraud.

All this work is in keeping with our conviction that while preventing home loss and harm to markets and neighborhoods may be less glamorous than opening the doors of homeownership, it is no less essential—especially at this point in the cycle. I am proud, as you should be also, of this company's extensive efforts last year to prevent foreclosures, combat predatory lending and strengthen sustainable homeownership.

Freddie Mac achieved a very strong affordable performance in 2007—despite the fact that curtailed subprime credit and tightened underwriting standards put affordable mortgage financing out of reach of many borrowers. We made extraordinary efforts to meet the increasingly demanding annual affordable housing goals, and while the U.S. Department of Housing and Urban Development makes the final determination, we believe we met the three main goals. Almost 56 percent of the nearly 3.3 million homes we financed last year were affordable to low- or moderate-income families. Freddie Mac also helped more than 360,000 first-time homebuyers with their mortgage financing. And our burgeoning multifamily business provided the financing for nearly 600,000 affordable apartment units around the country.

2007 saw the expansion of Freddie Mac's multilingual financial literacy program and our anti-predatory lending educational campaign. Since their inception, these programs together have reached well over 1.5 million people with important information about credit and the homebuying process. And continuing our efforts to rebuild the Gulf Coast, Freddie Mac helped to establish a $4.5 million home renovation reserve fund in New Orleans, which will be used to rebuild hurricane-damaged properties and get families back into their homes.

### A VIEW TO THE FUTURE

A dark cloud hung over the housing sector in 2007, and it has cast a growing shadow over the U.S. economy—and increasingly, the global economy as well. Freddie Mac has shared in the pain that afflicts our sector. And we have learned important lessons that we are applying going forward.

The markets are coming back in our direction. Fixed-rate lending is in demand; GSE share of the total market is up; unsustainable pricing, credit and underwriting have mostly headed for the exits.

FREDDIE MAC 2007 ANNUAL REPORT

With that said, no one pretends this painfully deep housing recession will be easy on this or any other company in our sector. For that matter, no one can responsibly say how long the downturn will be.

But I can say this with confidence: the housing finance companies that prosper most in the long term will be those that have built the strongest foundation for the future. And Freddie Mac, albeit with some difficulty, has built such a foundation in the last several years—one whose pillars include more transparent accounting; more robust internal controls; better products and systems; stronger customer relationships and service; a higher-performing corporate culture; a stronger, broader and deeper management team; and the financial wherewithal to compete and succeed over the long term.

In all likelihood, this will be my last annual letter to you as CEO of Freddie Mac. I have entered into a transition plan with the company's board of directors, under which we have agreed to separate the roles of CEO and chairman of the board. After splitting the roles, I expect to remain at the company as executive chairman until the end of 2009. We had expected this transition to occur this past summer, until my designated successor, Eugene McQuade, decided to return to his private sector banking roots. The search for the company's next CEO is underway and we all look forward to its successful completion.

As Freddie Mac shareholders, you have shown extraordinary patience in an extraordinary time. But let's remember that for all that has changed, very important long-term aspects of demography and demand have not changed—and are positive. America remains a growing developed nation: one with relatively high rates of birth, immigration and household formation. Long-term demand for housing finance will remain strong. And now, having built a firm foundation, Freddie Mac is positioned like very few other companies to benefit from the inevitable recovery of housing in this country.

So thank you for your fortitude and confidence in Freddie Mac. During this difficult time for housing and the economy, rarely have they been as needed or as beneficial for our nation. Yet also, from my perspective, rarely as well justified.

Sincerely.

*Dick Syron*

Richard F. Syron
Chairman and Chief Executive Officer

*February 28, 2008*

**2 0 0 7** A N N U A L   R E P O R T   T O   S T O C K H O L D E R S

# FEDERAL HOME LOAN MORTGAGE CORPORATION
## FREDDIE MAC

## INFORMATION STATEMENT
### AND
## ANNUAL REPORT TO STOCKHOLDERS
### For the fiscal year ended December 31, 2007

This Information Statement contains important financial and other information about Freddie Mac. We will supplement this Information Statement periodically. You should read all available supplements together with this Information Statement. We also provide information about the securities we issue in the Offering Circular for each securities program and any supplement for each particular offering. You can obtain copies of the Information Statement, Offering Circulars, all available supplements, financial reports and other similar information by visiting our Internet website (www.freddiemac.com) or by writing or calling us at:

Freddie Mac
Investor Relations Department
Mailstop 486
8200 Jones Branch Drive
McLean, Virginia 22102-3110
Telephone: 703-903-3883 or 1-800-FREDDIE (800-373-3343)
E-mail: shareholder@freddiemac.com

Our principal offices are located at 8200 Jones Branch Drive, McLean, Virginia 22102 (telephone: 703-903-2000).

**THIS INFORMATION STATEMENT IS DATED FEBRUARY 28, 2008**

## TABLE OF CONTENTS

| | Page |
|---|---|
| BUSINESS | 1 |
| REGULATION AND SUPERVISION | 7 |
| RISK FACTORS | 13 |
| PROPERTIES | 22 |
| LEGAL PROCEEDINGS | 22 |
| MARKET FOR THE COMPANY'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 23 |
| FORWARD-LOOKING STATEMENTS | 26 |
| SELECTED FINANCIAL DATA AND OTHER OPERATING MEASURES | 28 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 29 |
|     EXECUTIVE SUMMARY | 29 |
|     CONSOLIDATED RESULTS OF OPERATIONS | 35 |
|     CONSOLIDATED BALANCE SHEETS ANALYSIS | 54 |
|     CONSOLIDATED FAIR VALUE BALANCE SHEETS ANALYSIS | 63 |
|     LIQUIDITY AND CAPITAL RESOURCES | 66 |
|     PORTFOLIO BALANCES AND ACTIVITIES | 72 |
|     OFF-BALANCE SHEET ARRANGEMENTS | 76 |
|     CONTRACTUAL OBLIGATIONS | 78 |
|     CRITICAL ACCOUNTING POLICIES AND ESTIMATES | 79 |
| QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 82 |
| CREDIT RISKS | 90 |
| OPERATIONAL RISKS | 109 |
| RISK MANAGEMENT AND DISCLOSURE COMMITMENTS | 110 |
| FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 112 |
| QUARTERLY SELECTED FINANCIAL DATA | 181 |
| CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 182 |
| CONTROLS AND PROCEDURES | 182 |
| DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 187 |
| EXECUTIVE COMPENSATION | 188 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 188 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE | 188 |
| PRINCIPAL ACCOUNTANT FEES AND SERVICES | 188 |
| RATIO OF EARNINGS TO FIXED CHARGES | 189 |
| RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS | 189 |
| ADDITIONAL INFORMATION | 189 |
| CERTIFICATIONS | 190 |

## FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

| | Page |
|---|---|
| CONSOLIDATED STATEMENTS OF INCOME | 114 |
| CONSOLIDATED BALANCE SHEETS | 115 |
| CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY | 116 |
| CONSOLIDATED STATEMENTS OF CASH FLOWS | 117 |
| NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES | 118 |
| NOTE 2: FINANCIAL GUARANTEES AND TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS | 129 |
| NOTE 3: VARIABLE INTEREST ENTITIES | 133 |
| NOTE 4: RETAINED PORTFOLIO AND CASH AND INVESTMENTS PORTFOLIO | 135 |
| NOTE 5: MORTGAGE LOANS AND LOAN LOSS RESERVES | 140 |
| NOTE 6: REAL ESTATE OWNED | 143 |
| NOTE 7: DEBT SECURITIES AND SUBORDINATED BORROWINGS | 144 |
| NOTE 8: STOCKHOLDERS' EQUITY | 146 |
| NOTE 9: REGULATORY CAPITAL | 147 |
| NOTE 10: STOCK-BASED COMPENSATION | 149 |
| NOTE 11: DERIVATIVES | 153 |
| NOTE 12: LEGAL CONTINGENCIES | 154 |
| NOTE 13: INCOME TAXES | 156 |
| NOTE 14: EMPLOYEE BENEFITS | 157 |
| NOTE 15: SEGMENT REPORTING | 161 |
| NOTE 16: FAIR VALUE DISCLOSURES | 167 |
| NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS | 172 |
| NOTE 18: MINORITY INTERESTS | 175 |
| NOTE 19: EARNINGS PER SHARE | 175 |
| NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES | 176 |

*Freddie Mac*

*This Information Statement includes forward-looking statements, which may include expectations and objectives for our operating results, financial condition, business, remediation of internal controls and trends and other matters that could affect our business. You should not unduly rely on our forward-looking statements. Actual results might differ significantly from our forecasts and expectations due to several factors that involve risks and uncertainties, including those described in "BUSINESS," "RISK FACTORS," "FORWARD-LOOKING STATEMENTS" and "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS," or MD&A. These forward-looking statements are made as of the date of this Information Statement and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date of this Information Statement, or to reflect the occurrence of unanticipated events.*

## BUSINESS

### Overview

Freddie Mac is a stockholder-owned company chartered by Congress in 1970 to stabilize the nation's residential mortgage markets and expand opportunities for homeownership and affordable rental housing. Our mission is to provide liquidity, stability and affordability to the U.S. housing market. We fulfill our mission by purchasing residential mortgages and mortgage-related securities in the secondary mortgage market and securitizing them into mortgage-related securities that can be sold to investors. We are one of the largest purchasers of mortgage loans in the U.S. Our purchases of mortgage assets provide lenders with a steady flow of low-cost mortgage fundings. We purchase single-family and multifamily mortgage-related securities for our investments portfolio. We also purchase multifamily residential mortgages in the secondary mortgage market and hold those loans for investment. We finance our purchases for our investments portfolio and our multifamily mortgage loan portfolio, and manage interest-rate and other market risks, primarily by issuing a variety of debt instruments and entering into derivative contracts in the capital markets. See "MD&A — PORTFOLIO BALANCES AND ACTIVITIES — Table 37 — Total Mortgage Portfolio and Segments Portfolio Composition" for an overview of our various portfolios.

Though we are chartered by Congress, our business is funded with private capital. We are responsible for making payments on our securities. Neither the U.S. government nor any other agency or instrumentality of the U.S. government is obligated to fund our mortgage purchase or financing activities or to guarantee our securities and other obligations.

### Our Charter and Mission

The Federal Home Loan Mortgage Corporation Act, which we refer to as our charter, forms the framework for our business activities, the products we bring to market and the services we provide to the nation's residential housing and mortgage industries. Our charter also determines the types of mortgage loans that we are permitted to purchase, as described in *"Types of Mortgages We Purchase."*

Our mission is defined in our charter:

- to provide stability in the secondary market for residential mortgages;
- to respond appropriately to the private capital market;
- to provide ongoing assistance to the secondary market for residential mortgages (including activities relating to mortgages for low- and moderate-income families involving an economic return that may be less than the return earned on other activities); and
- to promote access to mortgage credit throughout the U.S. (including central cities, rural areas and other underserved areas).

Our activities in the secondary mortgage market benefit consumers by providing lenders a steady flow of low-cost mortgage funding. This flow of funds helps moderate cyclical swings in the housing market, equalizes the flow of mortgage funds regionally throughout the U.S. and makes mortgage funds available in a variety of economic conditions. In addition, the supply of cash made available to lenders through this process reduces mortgage rates on loans within the dollar limits set in accordance with our charter. These lower rates help make homeownership affordable for more families and individuals than would be possible without our participation in the secondary mortgage market.

To facilitate our mission, our charter provides us with special attributes including:

- exemption from the registration and reporting requirements of the Securities Act and the Exchange Act. We are, however, subject to the general antifraud provisions of the federal securities laws and have committed to the voluntary registration of our common stock with the SEC under the Exchange Act;
- favorable treatment of our securities under various investment laws and other regulations;

*Freddie Mac*

- discretionary authority of the Secretary of the Treasury to purchase up to $2.25 billion of our securities; and
- exemption from state and local taxes, except for taxes on real property that we own.

### Types of Mortgages We Purchase

Our charter establishes requirements for and limitations on the mortgages and mortgage-related securities we may purchase, as described below. Within our charter parameters, the residential mortgage loans we purchase or that underlie the mortgage-related securities we purchase generally fall into one of two categories:

- *Single-Family Mortgages.* Single-family mortgages are secured by one- to four-family properties. The primary types of single-family mortgages we purchase include 40-year, 30-year, 20-year, 15-year and 10-year fixed-rate mortgages, interest-only mortgages, adjustable-rate mortgages, or ARMs, and balloon/reset mortgages.
- *Multifamily Mortgages.* Multifamily mortgages are secured by properties with five or more residential rental units. These are generally balloon mortgages with terms ranging from five to thirty years. Our multifamily mortgage products, services and initiatives are designed to finance affordable rental housing for low- and moderate-income families.

### Conforming Loan Limits

Our charter places a dollar amount cap, called the "conforming loan limit," on the original principal balance of single-family mortgage loans we purchase. This limit is determined annually each October using a methodology based on changes in the national average price of a one-family residence, as surveyed by the Federal Housing Finance Board. For 2006 to 2008, the conforming loan limit for a one-family residence was set at $417,000. Higher limits apply to two- to four-family residences. The conforming loan limits are 50% higher for mortgages secured by properties in Alaska, Guam, Hawaii and the U.S. Virgin Islands. No comparable limits apply to our purchases of multifamily mortgages. As part of the Economic Stimulus Act of 2008, these conforming loan limits were temporarily increased. See "REGULATION AND SUPERVISION — Legislation — *Temporary Increase in Conforming Loan Limits.*"

### Loan and Credit Quality

Mortgages that are not guaranteed or insured by any agency or instrumentality of the U.S. government are referred to as "conventional mortgages." Our charter requires that we obtain additional credit protection if the unpaid principal balance of a conventional single-family mortgage that we purchase exceeds 80% of the value of the property securing the mortgage. Our charter also limits our mortgage purchases, so far as practicable, to mortgages we deem to be of a quality, type and class that meet the purchase standards of private institutional mortgage investors. See "CREDIT RISKS — Mortgage Credit Risk — *Underwriting Requirements and Quality Control Standards*" for additional information.

### Residential Mortgage Debt Market

We compete in the large and growing U.S. residential mortgage debt market. This market consists of a primary mortgage market in which lenders originate mortgage loans for home buyers and a secondary mortgage market in which the mortgage loans are resold. At December 31, 2007, our total mortgage portfolio, which includes our retained portfolio and credit guarantee portfolio, was $2.1 trillion, while the total U.S. residential mortgage debt outstanding, which includes single-family and multifamily loans, was approximately $11.8 trillion. See "MD&A — PORTFOLIO BALANCES AND ACTIVITIES" for further information on the composition of our mortgage portfolios.

Growth in the U.S. residential mortgage debt market is affected by several factors, including changes in interest rates, employment rates in various regions of the country, homeownership rates, home price appreciation, lender preferences regarding credit risk and borrower preferences regarding mortgage debt. The amount of residential mortgage debt available for us to purchase and the mix of available loan products are also affected by several factors, including the volume of single-family mortgages meeting the requirements of our charter and the mortgage purchase and securitization activity of other financial institutions. See "RISK FACTORS" for additional information.

Table 1 includes important indicators for the U.S. residential mortgage market.

## Table 1 — Mortgage Market Indicators

| | Year-Ended December 31, | | |
|---|---|---|---|
| | **2007** | **2006** | **2005** |
| Home sale units (in thousands)[1] | 5,713 | 6,728 | 7,463 |
| House price appreciation[2] | (0.3)% | 4.1% | 9.6% |
| Single-family originations (in billions)[3] | $ 2,430 | $ 2,980 | $3,120 |
| Adjustable-rate mortgage share[4] | 10% | 22% | 30% |
| Refinance share[5] | 45% | 41% | 44% |
| U.S. single-family mortgage debt outstanding (in billions)[6] | $11,028 | $10,421 | $9,345 |
| U.S. multifamily mortgage debt outstanding (in billions)[7] | $ 813 | $ 751 | $ 692 |

(1) Includes sales of new and existing homes in the U.S. and excludes condos/co-ops. Source: National Association of Realtors® news release dated February 25, 2008 (sales of existing homes) and U.S. Census Bureau news release dated January 28, 2008 (sales of new homes).
(2) Source: Office of Federal Housing Enterprise Oversight's 4Q 2007 House Price Index Report dated February 26, 2008 (purchase-only U.S. index).
(3) Source: Inside Mortgage Finance estimates of originations of single-family first- and second liens dated February 8, 2008.
(4) Adjustable-rate mortgage share of the number of conventional one-family mortgages for home purchase. Data for 2007 and 2006 are annual averages of monthly figures and 2005 is an annual composite. Source: Federal Housing Finance Board's Monthly Interest Rate Survey release dated January 24, 2008.
(5) Refinance share of the number of conventional mortgage applications. Source: Mortgage Bankers Association's Mortgage Applications Survey. Data reflect annual averages of weekly figures.
(6) U.S. single-family mortgage debt outstanding as of September 30 for 2007 and December 31 for 2006 and 2005. Source: Federal Reserve Flow of Funds Accounts of the United States dated December 6, 2007.
(7) U.S. multifamily mortgage debt outstanding as of September 30 for 2007 and December 31 for 2006 and 2005. Source: Federal Reserve Flow of Funds Accounts of the United States dated December 6, 2007.

Following several years of substantial growth in the residential mortgage market, driven by historically low interest rates and a strong housing market with record home sales and significant home price appreciation, the residential mortgage market slowed in 2006 and continued to weaken in 2007. In 2007, the volume of new and existing home sales continued to decline and increased inventories of unsold homes undermined property values.

Home price appreciation is an important market indicator for us because it represents the general trend in value associated with the single-family mortgage loans underlying our Mortgage Participation Certificates, or PCs, and Structured Securities. As home prices decline, the risk of borrower defaults generally increases and the severity of credit losses also increases. Estimates of nationwide home price appreciation varied for 2006, with some estimates indicating a slight overall decline in home prices and others indicating moderate growth. Home prices registered broad declines across the nation, with prices in some markets falling sharply, particularly in the fourth quarter. Forecasts of nationwide home prices indicate a continued overall decline through the near term. Despite the slowdown in the housing market, total residential mortgage debt outstanding in the U.S. grew by an estimated 7.1% in 2007 as compared with 11.3% in 2006. We expect that the amount of total residential mortgage debt outstanding will continue to rise in 2008, though at a slower rate than in the past few years.

Credit concerns and resulting liquidity issues have recently affected the financial markets. In addition, the market for mortgage-related securities has been characterized by high levels of volatility and uncertainty, reduced demand and liquidity and significantly wider credit spreads. Mortgage-related securities, particularly those backed by non-traditional mortgage products, have been subject to various rating agency downgrades and price declines. Many lenders tightened credit standards in the second half of 2007 or elected to stop originating certain types of mortgages, resulting in higher mortgage rates for riskier mortgage products in the market, such as some types of ARMs. This has adversely affected many borrowers seeking to refinance out of ARMs scheduled to reset to higher rates, contributing to higher observed delinquencies.

The credit performance of subprime and Alt-A loans, as well as other non-traditional mortgage products, deteriorated during 2007. See "CREDIT RISKS — Mortgage Credit Risk" for additional information regarding mortgage-related securities backed by subprime and Alt-A loans.

The market for multifamily mortgage debt differs from the residential single-family market in several respects. The likelihood that a multifamily borrower will make scheduled payments on its mortgage is a function of the ability of the property to generate income sufficient to make those payments, which is affected by rent levels and the percentage of available units that are occupied. Strength in the multifamily market therefore is affected by the balance between the supply of and demand for rental housing (both multifamily and single-family), which in turn is affected not only by employment growth but also by the number of new units added to the rental housing supply, rates of household formation and the relative cost of owner-occupied housing alternatives.

Demographics for the multifamily market are favorable at present, due to high levels of immigration and high rates of household formation in parts of the population most likely to choose rental housing (ages 20-29 and 55-64). In the long term, the prospects for the balance of supply and demand are also favorable due to several barriers to entry including neighborhood opposition to new construction, rising construction costs and limited supply of appropriately zoned land

*Freddie Mac*

suitable for multifamily development. Overbuilding (a problem at times in the past) has not occurred in most markets, though supply may be increased in the near future to the extent conditions in the single-family housing markets result in conversion of owner-occupied units to rentals.

### Primary Mortgage Market — Our Customers

Our customers are predominantly lenders in the primary mortgage market that originate mortgages for homeowners and apartment owners. These lenders include mortgage banking companies, commercial banks, savings banks, community banks, credit unions, state and local housing finance agencies and savings and loan associations.

We acquire a significant portion of our mortgages from several large lenders. These lenders are among the largest mortgage loan originators in the U.S. We have contracts with a number of mortgage lenders that include a commitment by the lender to sell us a minimum percentage or dollar amount of its mortgage origination volume. These contracts typically last for one year. If a mortgage lender fails to meet its contractual commitment, we have a variety of contractual remedies, including the right to assess certain fees. As the mortgage industry has been consolidating, we, as well as our competitors, have been seeking increased business from a decreasing number of key lenders. In 2007, three mortgage lenders each accounted for 12% or more of our single-family mortgage purchase volume. These lenders collectively accounted for approximately 45% of this volume. In addition, in 2007, our top ten lenders represented approximately 79% of our single-family mortgage purchase volume. In 2007, our top three multifamily lenders collectively represented approximately 44% of our multifamily purchase volume. Our top ten multifamily lenders represented approximately 80% of our multifamily purchase volume in 2007. See "RISK FACTORS — Competitive and Market Risks" for additional information.

### Secondary Mortgage Market

We participate in the secondary mortgage market by purchasing mortgage loans and mortgage-related securities for investment and by issuing guaranteed mortgage-related securities. We do not lend money directly to homeowners. Our principal competitors are the Federal National Mortgage Association, or Fannie Mae, a similarly chartered government-sponsored enterprise, or GSE, the Federal Home Loan Banks and other financial institutions that retain or securitize mortgages, such as commercial and investment banks, dealers and thrift institutions. We compete on the basis of price, products, structure and service.

### Business Activities

We generate income through investment activities and credit guarantee activities focusing on three long-term business drivers: the profitability of new business, growth and market share. Purchases of mortgage loans benefiting low- and moderate-income families and neighborhoods are also an integral part of our mission and business. We are committed to fulfilling the needs of these borrowers and markets. Affordable housing goals and subgoals are set for us by the U.S. Department of Housing and Urban Development, or HUD. Competition, other market factors, our housing mission under our charter and the HUD affordable housing goals and subgoals require that we make trade-offs in our business that affect each of our long-term business drivers.

At December 31, 2007, we had total assets of $794.4 billion and total stockholders' equity of $26.7 billion, and for the year ended December 31, 2007, we reported a net loss of $3.1 billion.

### Securitization Activities

We securitize certain of the mortgages we have purchased and issue mortgage-related securities that can be sold to investors or held by us. We guarantee the payment of principal and interest on these mortgage-related securities in exchange for a fee, which we refer to as a guarantee fee. Our guarantee increases the marketability of our mortgage-related securities, providing additional liquidity to the mortgage market. The types of mortgage-related securities we guarantee include the following:

- PCs we issue;
- single-class and multi-class Structured Securities we issue; and
- securities related to tax-exempt multifamily housing revenue bonds.

Our PCs represent beneficial interests in trusts that own pools of mortgages we have purchased. We guarantee the payment of principal and interest to the holders of our PCs. We issue most of our PCs in transactions in which our customers sell us mortgage loans in exchange for PCs. Other investors purchase our PCs, including pension funds, insurance companies, securities dealers, money managers, commercial banks, foreign central banks and other fixed-income investors.

Our Structured Securities represent beneficial interests in pools of PCs and certain other types of mortgage-related assets. We guarantee the payment of principal and interest to the holders of our Structured Securities. By issuing Structured Securities, we seek to provide liquidity to alternative sectors of the mortgage market. We issue single-class Structured Securities and multi-class Structured Securities. Single-class Structured Securities pass through the cash flows of the

underlying mortgage-related assets. Multi-class Structured Securities divide the cash flows of the underlying mortgage-related assets into two or more classes that meet the investment criteria and portfolio needs of different investors. Our principal multi-class Structured Securities qualify for tax treatment as Real Estate Mortgage Investment Conduits, or REMICs. For purposes of this Information Statement, multi-class Structured Securities include Structured Securities backed by non-agency mortgage-related securities.

We issue many of our Structured Securities in transactions in which securities dealers or investors sell us the mortgage-related assets underlying the Structured Securities in exchange for the Structured Securities. We also sell Structured Securities to securities dealers in exchange for cash. We primarily create Structured Securities using PCs or previously issued Structured Securities as collateral. However, we also issue Structured Securities backed by mortgage loans or non-Freddie Mac mortgage-related securities using collateral transferred to trusts that were specifically created for the purpose of issuing the securities. These trusts may issue various senior and subordinated interests. We purchase interests, including senior interests, of the trusts and issue and guarantee Structured Securities backed by these interests. We refer to these Structured Securities as Structured Transactions. Although Structured Transactions generally have underlying mortgage loans with higher risk characteristics, they may afford us credit protection from losses due to the underlying structure employed and additional credit enhancement features.

We also enter into long-term standby commitments for mortgage assets held by third parties that require us to purchase loans from lenders when the loans subject to these commitments meet certain delinquency criteria. In addition, we have entered into mortgage credit agreements under which we assume default risk for mortgage loans held by third parties for up to a 90-day period in exchange for a monthly fee.

We enter into guarantee contracts for the payment of principal and interest on tax-exempt and taxable multifamily housing revenue bonds that are collateralized by mortgage loans on low- and moderate-income multifamily housing projects. By engaging in these activities, we provide liquidity to this sector of the mortgage market.

### PC and Structured Securities Support Activities

We support the liquidity and depth of the market for PCs through a variety of activities, including educating dealers and investors about the merits of trading and investing in PCs, enhancing disclosure related to the collateral underlying our securities and introducing new mortgage-related securities products and initiatives. We support the price performance of our PCs through a variety of strategies, including the issuance of Structured Securities and the purchase and sale by our retained portfolio of PCs and other agency securities, including Fannie Mae securities. While some purchases of PCs may result in expected returns that are below our normal thresholds, this strategy is not expected to have a material effect on our long-term economic returns. Depending upon market conditions, including the relative prices, supply of and demand for PCs and comparable Fannie Mae securities, as well as other factors, such as the voluntary limit on the growth of our retained portfolio, there may be substantial variability in any period in the total amount of securities we purchase or sell for our retained portfolio in accordance with this strategy. We may increase, reduce or discontinue these or other related activities at any time, which could affect the liquidity and depth of the market for PCs.

### The To Be Announced Market

Because our PCs are homogeneous, issued in high volume and highly liquid, they trade on a "generic" basis, also referred to as trading in the To Be Announced, or TBA, market. A TBA trade in Freddie Mac securities represents a contract for the purchase or sale of PCs to be delivered at a future date; however, the specific PCs that will be delivered to fulfill the trade obligation, and thus the specific characteristics of the mortgages underlying those PCs, are not known (*i.e.*, "announced") at the time of the trade, but only shortly before the trade is settled. The use of the TBA market increases the liquidity of mortgage investments and improves the distribution of investment capital available for residential mortgage financing, thereby helping us to accomplish our statutory mission.

The Securities Industry and Financial Markets Association publishes guidelines pertaining to the types of mortgages that are eligible for TBA trades. On February 15, 2008, the Securities Industry and Financial Markets Association announced that the higher loan balances, which are now eligible for purchase by the Federal Housing Administration, or FHA, or GSEs under the temporary increase to conforming loan limits in the Economic Stimulus Act of 2008, described in "REGULATION AND SUPERVISION — Legislation — *Temporary Increase in Conforming Loan Limits*," will not be eligible for inclusion in TBA pools. By segregating these mortgages with higher loan balances from TBA eligible securities, we minimize any impact to the existing TBA market for our securities.

### Segments

We manage our business through three reportable segments:

* Investments;
* Single-family Guarantee; and
* Multifamily.

Certain activities that are not part of a segment are included in the All Other category. For a summary and description of our financial performance and financial condition on a consolidated as well as segment basis, see "MD&A" and "FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA" and the accompanying notes to our consolidated financial statements.

### Investments Segment

Through our Investments segment, we invest principally in mortgage-related securities and single-family mortgages through our mortgage-related investment portfolio. Our Investments segment activities may include the purchase of mortgages and mortgage-related securities with less attractive investment returns and with incremental risk in order to achieve our affordable housing goals and subgoals. We also maintain a cash and non-mortgage-related securities investment portfolio in this segment to help manage our liquidity needs.

We seek to generate attractive returns on our portfolio of mortgage-related investments while maintaining a disciplined approach to interest-rate risk and capital management. We seek to accomplish this objective through opportunistic purchases, sales and restructuring of mortgage assets or repurchase of liabilities. Although we are primarily a buy and hold investor in mortgage assets, we may sell assets to reduce risk, to respond to capital constraints, to provide liquidity or to structure certain transactions. We estimate our expected investment returns using an option-adjusted spread, or OAS, approach.

We fund our investment activities by issuing short-term and long-term debt. Competition for funding can vary with economic and financial market conditions and regulatory environments. See "MD&A — LIQUIDITY AND CAPITAL RESOURCES" for a description of our funding activities.

We use derivatives to: (a) regularly adjust or rebalance our funding mix in order to more closely match changes in the interest-rate characteristics of our mortgage-related assets; (b) economically hedge forecasted issuances of debt and synthetically create callable and non-callable funding; and (c) economically hedge foreign-currency exposure. For more information regarding our derivatives, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK" and "NOTE 11: DERIVATIVES" to our consolidated financial statements.

### Single-family Guarantee Segment

In our Single-family Guarantee segment, we guarantee the payment of principal and interest on single-family mortgage-related securities, including those held in our retained portfolio, in exchange for guarantee fees. Earnings for this segment consist of guarantee fee revenues less the related credit costs (i.e., provision for credit losses) and operating expenses. Also included is the interest earned on assets held in the Investments segment related to single-family guarantee activities, net of allocated funding costs and amounts related to net float benefits.

Through our Single-family Guarantee segment, we seek to issue guarantees with fee terms that we believe offer attractive long-term returns relative to anticipated credit costs. In addition, we seek to improve our share of the total residential mortgage securitization market by improving customer service, expanding our customer base, and expanding the types of mortgages we guarantee and the products we offer. We may make trade-offs in our pricing and our risk profile in order to maintain market share, support liquidity in various segments of the residential mortgage market, support the price performance of our PCs and acquire business in pursuit of our affordable housing goals and subgoals.

We provide guarantees to many of our larger customers through contracts that require them to sell or securitize a specified minimum share of their eligible loan originations to us, subject to certain conditions and exclusions. The purchase and securitization of mortgage loans from customers under these longer-term contracts have fixed pricing schedules for our guarantee fees that are negotiated at the outset of the contract. We call these transactions "flow" activity and they represent the majority of our purchase volumes. The remainder of our purchases and securitizations of mortgage loans occurs in "bulk" transactions for which purchase prices and guarantee fees are negotiated on an individual transaction basis. Mortgage purchase volumes from individual customers can fluctuate significantly.

### Multifamily Segment

Our Multifamily segment activities include purchases of multifamily mortgages for our retained portfolio and guarantees of payments of principal and interest on multifamily mortgage-related securities and mortgages underlying multifamily housing revenue bonds. The assets of the Multifamily segment include mortgages that finance low- and

moderate-income multifamily rental apartments. Our Multifamily segment also includes certain equity investments in various limited partnerships that sponsor low- and moderate-income multifamily rental apartments, which benefit from low-income housing tax credits, or LIHTC. These activities support our mission to supply financing for affordable rental housing. We guarantee the payment of principal and interest on multifamily mortgage loans and securities that are originated and held by state and municipal housing finance agencies to support tax-exempt and taxable multifamily housing revenue bonds. By engaging in these activities, we provide liquidity to this sector of the mortgage market.

We seek to generate attractive investment returns on our multifamily mortgage loans while fulfilling our mission to supply affordable rental housing. We also issue guarantees that we believe offer attractive long-term returns relative to anticipated credit costs.

**Employees**

At January 31, 2008, we had 5,281 full-time and 115 part-time employees. Our principal offices are located in McLean, Virginia.

**Available Information**

Our Information Statements, Supplements and other financial disclosure documents are available free of charge on our website at www.freddiemac.com. (We do not intend this internet address to be an active link and are not using references to this internet address here or elsewhere in this Information Statement to incorporate additional information into this Information Statement.) Our corporate governance guidelines, codes of conduct for employees and members of the board of directors (and any amendments or waivers that would be required to be disclosed) and the charters of the board's five standing committees (Audit; Finance and Capital Deployment; Mission, Sourcing and Technology; Governance, Nominating and Risk Oversight; and Compensation and Human Resources Committees) are also available on our website at www.freddiemac.com. Printed copies of these documents may be obtained upon request from our Investor Relations department.

## REGULATION AND SUPERVISION

In addition to the limitations on our business activities described above in "BUSINESS — Our Charter and Mission," we are subject to regulation and oversight by HUD and the Office of Federal Housing Enterprise Oversight, or OFHEO, under our charter and the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, or the GSE Act. We are also subject to certain regulation by other government agencies.

**Department of Housing and Urban Development**

HUD has general regulatory authority over Freddie Mac, including authority over new programs, affordable housing goals and fair lending. HUD periodically conducts reviews of our activities to ensure conformity with our charter and other regulatory obligations.

*Housing Goals and Home Purchase Subgoals*

HUD establishes annual affordable housing goals, which are set forth below in Table 2. The goals, which are set as a percentage of the total number of dwelling units underlying our total mortgage purchases, have risen steadily since they became permanent in 1995. The goals are intended to expand housing opportunities for low- and moderate-income families, low-income families living in low-income areas, very low-income families and families living in HUD-defined underserved areas. The goal relating to low-income families living in low-income areas and very low-income families is referred to as the "special affordable" housing goal. This special affordable housing goal also includes a multifamily subgoal that sets an annual minimum dollar volume of qualifying multifamily mortgage purchases. In addition, HUD has established three

subgoals that are expressed as percentages of the total number of mortgages we purchased that finance the purchase of single-family, owner-occupied properties located in metropolitan areas.

Table 2 — Housing Goals and Home Purchase Subgoals for 2007 and 2008[1]

| | Housing Goals | |
|---|---|---|
| | 2008 | 2007 |
| Low- and moderate-income goal | 56% | 55% |
| Underserved areas goal | 39 | 38 |
| Special affordable goal | 27 | 25 |
| Multifamily special affordable volume target (in billions) | $3.92 | $3.92 |

| | Home Purchase Subgoals | |
|---|---|---|
| | 2008 | 2007 |
| Low- and moderate-income subgoal | 47% | 47% |
| Underserved areas subgoal | 34 | 33 |
| Special affordable subgoal | 18 | 18 |

(1) An individual mortgage may qualify for more than one of the goals or subgoals. Each of the goal and subgoal percentages will be determined independently and cannot be aggregated to determine a percentage of total purchases that qualifies for these goals or subgoals.

Our performance with respect to the goals and subgoals is summarized in Table 3. HUD ultimately determined that we met the goals and subgoals for 2006. We expect to report our performance with respect to the 2007 goals and subgoals in March 2008. At this time, we believe that we did not achieve two home purchase subgoals (the low- and moderate-income subgoal and the special affordable subgoal) for 2007. We believe, however, that achievement of these two home purchase subgoals was infeasible in 2007 under the terms of the GSE Act of 1992. Accordingly, we have submitted an infeasibility analysis to HUD, which is in the process of reviewing our submission.

Table 3 — Housing Goals and Home Purchase Subgoals and Reported Results[1]

Housing Goals and Reported Results

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2006 | | 2005 | |
| | Goal | Result | Goal | Result |
| Low- and moderate-income goal | 53% | 55.9% | 52% | 54.0% |
| Underserved areas goal | 38 | 42.7 | 37 | 42.3 |
| Special affordable goal | 23 | 26.4 | 22 | 24.3 |
| Multifamily special affordable volume target (in billions) | $3.92 | $13.58 | $3.92 | $12.35 |

Home Purchase Subgoals and Reported Results

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2006 | | 2005 | |
| | Subgoal | Result | Subgoal | Result |
| Low- and moderate-income subgoal | 46% | 47.0% | 45% | 46.9% |
| Underserved areas subgoal | 33 | 33.6 | 32 | 35.5 |
| Special affordable subgoal | 17 | 17.0 | 17 | 17.7 |

(1) An individual mortgage may qualify for more than one of the goals or subgoals. Each of the goal and subgoal percentages and each of our percentage results is determined independently and cannot be aggregated to determine a percentage of total purchases that qualifies for these goals or subgoals.

From time to time, we make significant adjustments to our mortgage loan sourcing and purchase strategies in an effort to meet the increased housing goals and subgoals. These strategies include entering into some purchase and securitization transactions with lower expected economic returns than our typical transactions. At times, we also relax some of our underwriting criteria to obtain goals-qualifying mortgage loans and may make additional investments in higher-risk mortgage loan products that are more likely to serve the borrowers targeted by HUD's goals and subgoals. Efforts to meet the goals and subgoals could further increase our credit losses. We continue to evaluate the cost of these activities.

Declining market conditions and regulatory changes during 2007 made meeting our affordable housing goals and subgoals more challenging than in previous years. The increased difficulty we are experiencing has been driven by a combination of factors, including:

- the decreased affordability of single-family homes that began in 2005;
- deteriorating conditions in the mortgage credit markets, which have resulted in significant decreases in the number of originations of subprime mortgages; and
- increases in the levels of the goals and subgoals.

We anticipate that these market conditions will continue to affect our affordable housing activities in 2008. See also "RISK FACTORS — Legal and Regulatory Risks." However, we view the purchase of mortgage loans that are eligible to

count toward our affordable housing goals to be a principal part of our mission and business and we are committed to facilitating the financing of affordable housing for low- and moderate-income families.

If the Secretary of HUD finds that we failed to meet a housing goal established under section 1332, 1333, or 1334 of the GSE Act and that achievement of the housing goal was feasible, the GSE Act states that the Secretary shall require the submission of a housing plan with respect to the housing goal for approval by the Secretary. The housing plan must describe the actions we would take to achieve the unmet goal in the future. HUD has the authority to take enforcement actions against us, including issuing a cease and desist order or assessing civil money penalties, if we: (a) fail to submit a required housing plan or fail to make a good faith effort to comply with a plan approved by HUD; or (b) fail to submit certain data relating to our mortgage purchases, information or reports as required by law. See "RISK FACTORS — Legal and Regulatory Risks." While the GSE Act is silent on this issue, HUD has indicated that it has authority under the GSE Act to establish and enforce a separate specific subgoal within the special affordable housing goal.

### New Program Approval

We are required under our charter and the GSE Act to obtain the approval of the Secretary of HUD for any new program for purchasing, servicing, selling, lending on the security of, or otherwise dealing in, conventional mortgages that is significantly different from:

- programs that HUD has approved;
- programs that HUD had approved or we had engaged in before the date of enactment of the GSE Act; or
- programs that represent an expansion of programs above limits expressly contained in any prior approval regarding the dollar volume or number of mortgages or securities involved.

HUD must approve any such new program unless the Secretary determines that the new program is not authorized under our charter or that the program is not in the public interest.

### Fair Lending

Our mortgage purchase activities are subject to federal anti-discrimination laws. In addition, the GSE Act prohibits discriminatory practices in our mortgage purchase activities, requires us to submit data to HUD to assist in its fair lending investigations of primary market lenders and requires us to undertake remedial actions against lenders found to have engaged in discriminatory lending practices. In addition, HUD periodically reviews and comments on our underwriting and appraisal guidelines for consistency with the Fair Housing Act and the GSE Act.

### Anti-Predatory Lending

Predatory lending practices are in direct opposition to our mission, our goals and our practices. We have instituted anti-predatory lending policies intended to prevent the purchase or assignment of mortgage loans with unacceptable terms or conditions or resulting from unacceptable practices. In addition to the purchase policies we have instituted, we promote consumer education and financial literacy efforts to help borrowers avoid abusive lending practices and we provide competitive mortgage products to reputable mortgage originators so that borrowers have a greater choice of financing options.

### Office of Federal Housing Enterprise Oversight

OFHEO is the safety and soundness regulator for Freddie Mac and Fannie Mae. The GSE Act established OFHEO as a separate office within HUD, substantially independent of the HUD Secretary. The Director who heads OFHEO is appointed by the President and confirmed by the Senate. The OFHEO Director is responsible for ensuring that Freddie Mac and Fannie Mae are adequately capitalized and operating safely in accordance with the GSE Act. In this regard, OFHEO is authorized to:

- issue regulations to carry out its responsibilities;
- conduct examinations;
- require reports of financial condition and operation;
- develop and apply critical, minimum and risk-based capital standards, including classifying each enterprise's capital levels not less than quarterly;
- prohibit excessive executive compensation under prescribed standards; and
- impose temporary and final cease-and-desist orders and civil money penalties, provided certain conditions are met.

From time to time, OFHEO has adopted guidance on a number of different topics, including accounting practices, corporate governance and compensation practices.

OFHEO also has exclusive administrative enforcement authority that is similar to that of other federal financial institutions regulatory agencies. That authority can be exercised in the event we fail to meet regulatory capital requirements;

violate our charter, the GSE Act, OFHEO regulations, or a written agreement with or order issued by OFHEO; or engage in conduct that threatens to cause a significant depletion of our core capital. Core capital consists of the par value of outstanding common stock (common stock issued less common stock held in treasury), the par value of outstanding non-cumulative, perpetual preferred stock, additional paid-in capital and retained earnings, as determined in accordance with U.S. generally accepted accounting principles, or GAAP.

### Consent Order

On December 9, 2003, we entered into a consent order and settlement with OFHEO that concluded its special investigation of the company related to the restatement of our previously issued consolidated financial statements for the years ended December 31, 2000 and 2001 and the revision of fourth quarter and full-year consolidated financial statements for 2002. Under the terms of the consent order, we agreed to undertake certain remedial actions related to governance, corporate culture, internal controls, accounting practices, disclosure and oversight. We have taken actions to comply with the terms of the consent order and OFHEO continues to monitor our progress.

### Voluntary, Temporary Growth Limit

In response to a request by OFHEO on August 1, 2006, we announced that we would voluntarily and temporarily limit the growth of our retained portfolio to 2.0% annually. On September 19, 2007, OFHEO provided an interpretation regarding the methodology for calculating the voluntary, temporary growth limit. As of March 1, 2008, this voluntary temporary growth limit will no longer be in place.

### Capital Standards and Dividend Restrictions

The GSE Act established regulatory capital requirements for us that include ratio-based minimum and critical capital requirements and a risk-based capital requirement designed to ensure that we maintain sufficient capital to survive a sustained severe downturn in the economic environment. These standards determine the amounts of core capital and total capital that we must maintain to meet regulatory capital requirements. Total capital includes core capital and general reserves for mortgage and foreclosure losses and any other amounts available to absorb losses that OFHEO includes by regulation.

- *Minimum Capital.* The minimum capital standard requires us to hold an amount of core capital that is generally equal to the sum of 2.50% of aggregate on-balance sheet assets and approximately 0.45% of the sum of outstanding mortgage-related securities we guaranteed and other aggregate off-balance sheet obligations. As discussed below, in 2004 OFHEO implemented a framework for monitoring our capital adequacy, which includes a mandatory target capital surplus of 30% over the minimum capital requirement.

- *Critical Capital.* The critical capital standard requires us to hold an amount of core capital that is generally equal to the sum of 1.25% of aggregate on-balance sheet assets and approximately 0.25% of the sum of outstanding mortgage-related securities we guaranteed and other aggregate off-balance sheet obligations.

- *Risk-Based Capital.* The risk-based capital standard requires the application of a stress test to determine the amount of total capital that we must hold to absorb projected losses resulting from adverse interest-rate and credit-risk conditions specified by the GSE Act and adds 30% additional capital to provide for management and operations risk. The adverse interest-rate conditions prescribed by the GSE Act include one scenario in which 10-year Treasury yields rise by as much as 75% (up-rate scenario) and one in which they fall by as much as 50% (down-rate scenario). The credit risk component of the stress tests simulates the performance of our mortgage portfolio based on loss rates for a benchmark region. The criteria for the benchmark region are established by the GSE Act and are intended to capture the credit-loss experience of the region that experienced the highest historical rates of default and severity of mortgage losses for two consecutive origination years.

The GSE Act requires OFHEO to classify our capital adequacy at least quarterly. OFHEO has always classified us as "adequately capitalized," the highest possible classification.

To be classified as "adequately capitalized," we must meet both the risk-based and minimum capital standards. If we fail to meet the risk-based capital standard, we cannot be classified higher than "undercapitalized." If we fail to meet the minimum capital requirement but exceed the critical capital requirement, we cannot be classified higher than "significantly undercapitalized." If we fail to meet the critical capital standard, we must be classified as "critically undercapitalized." In addition, OFHEO has discretion to reduce our capital classification by one level if OFHEO determines that we are engaging in conduct OFHEO did not approve that could result in a rapid depletion of core capital or determines that the value of property subject to mortgage loans we hold or guarantee has decreased significantly. If a dividend payment on our common or preferred stock would cause us to fail to meet our minimum capital or risk-based capital requirements, we would not be able to make the payment without prior written approval from OFHEO.

When we are classified as adequately capitalized, we generally can pay a dividend on our common or preferred stock or make other capital distributions (which include common stock repurchases and preferred stock redemptions) without prior OFHEO approval so long as the payment would not decrease total capital to an amount less than our risk-based capital requirement and would not decrease our core capital to an amount less than our minimum capital requirement.

If we were classified as undercapitalized, we would be prohibited from making a capital distribution that would reduce our core capital to an amount less than our minimum capital requirement. We also would be required to submit a capital restoration plan for OFHEO approval, which could adversely affect our ability to make capital distributions.

If we were classified as significantly undercapitalized, we would be prohibited from making any capital distribution that would reduce our core capital to less than the critical capital level. We would otherwise be able to make a capital distribution only if OFHEO determined that the distribution will: (a) enhance our ability to meet the risk-based capital standard and the minimum capital standard promptly; (b) contribute to our long-term financial safety and soundness; or (c) otherwise be in the public interest. Also, under this classification, OFHEO could take action to limit our growth, require us to acquire new capital or restrict us from activities that create excessive risk. We also would be required to submit a capital restoration plan for OFHEO approval, which could adversely affect our ability to make capital distributions.

If we were classified as critically undercapitalized, OFHEO would be required to appoint a conservator for us, unless OFHEO made a written finding that it should not do so and the Secretary of the Treasury concurred in that determination. We would be able to make a capital distribution only if OFHEO determined that the distribution would: (a) enhance our ability to meet the risk-based capital standard and the minimum capital standard promptly; (b) contribute to our long-term financial safety and soundness; or (c) otherwise be in the public interest.

In a letter dated January 28, 2004, OFHEO created a framework for monitoring our capital. The letter directed that we:

- maintain a mandatory target capital surplus of 30% over our minimum capital requirement, subject to certain conditions and variations;
- submit weekly reports concerning our capital levels; and
- obtain OFHEO's prior approval of certain capital transactions, including common stock repurchases, redemption of any preferred stock and payment of dividends on preferred stock above stated contractual rates.

Our failure to manage to the mandatory target capital surplus would result in an OFHEO inquiry regarding the reason for such failure. If OFHEO were to determine that we had acted unreasonably regarding our compliance with the framework, as set forth in OFHEO's letter, OFHEO could seek to require us to submit a remedial plan or take other remedial steps. We reported to OFHEO that our estimated capital surplus at November 30, 2007 was below the 30% mandatory target capital surplus. In order to manage to the 30% mandatory target capital surplus and to improve business flexibility, we reduced our common stock dividend for the fourth quarter of 2007, issued $6.0 billion of non-cumulative, perpetual preferred stock and reduced the size of our retained and cash and investments portfolio. See "RISK FACTORS — Competitive and Market Risks — *Market uncertainty and volatility may adversely affect our business, profitability, results of operations and capital management.*" However, as of December 31, 2007, we reported to OFHEO that we exceeded each of our regulatory capital requirements in addition to the 30% mandatory target capital surplus.

OFHEO has announced that it will discuss with management a gradual decrease of the 30% mandatory target capital surplus as we complete the requirements of the consent order. The approach and timing of this decrease will also include consideration of our financial condition, our overall risk profile and current market conditions. It will also include consideration of the importance of remaining soundly capitalized to fulfill our public purpose and recent temporary expansion of our mission.

For additional information about the OFHEO mandatory target capital surplus framework, see "NOTE 9: REGULATORY CAPITAL" to our consolidated financial statements. Also, see "RISK FACTORS — Legal and Regulatory Risks — *Developments affecting our legislative and regulatory environment could materially harm our business prospects or competitive position*" for more information.

### *Guidance on Non-traditional Mortgage Product Risks and Subprime Lending*

In October 2006, five federal financial institution regulatory agencies jointly issued Interagency Guidance that clarified how financial institutions should offer non-traditional mortgage products in a safe and sound manner and in a way that clearly discloses the risks that borrowers may assume. In June 2007, the same financial institution regulatory agencies published the final interagency Subprime Statement, which addressed risks relating to subprime short-term hybrid ARMs. The Interagency Guidance and the Subprime Statement set forth principles that regulate financial institutions originating certain non-traditional mortgages (interest-only mortgages and option ARMs) and subprime short-term hybrid ARMs with respect to their underwriting practices. These principles included providing borrowers with clear and balanced

information about the relative benefits and risks of these products sufficiently early in the process to enable them to make informed decisions.

OFHEO has directed us to adopt practices consistent with the risk management, underwriting and consumer protection principles of the Interagency Guidance and the Subprime Statement. These principles apply to our purchases of non-traditional mortgages and subprime short-term hybrid ARMs and our related investment activities. In response, in July 2007, we informed our customers of new underwriting and disclosure requirements for non-traditional mortgages. In September 2007, we informed our customers and other counterparties of similar new requirements for subprime short-term hybrid ARMs. These new requirements are consistent with our announcement in February 2007 that we would implement stricter investment standards for certain subprime ARMs originated after September 1, 2007, and develop new mortgage products providing lenders with more choices to offer subprime borrowers. See "RISK FACTORS — Legal and Regulatory Risks."

### Department of the Treasury

Under our charter, the Secretary of the Treasury has approval authority over our issuances of notes, debentures and substantially identical types of unsecured debt obligations (including the interest rates and maturities of these securities), as well as new types of mortgage-related securities issued subsequent to the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989. The Secretary of the Treasury has performed this debt securities approval function by coordinating GSE debt offerings with Treasury funding activities. The Treasury Department has proposed certain changes to its process for approving our debt offerings. The impact of these changes, if adopted, on our debt issuance activities will depend on their ultimate content and the manner in which they are implemented.

### Securities and Exchange Commission

While we are exempt from Securities Act and Exchange Act registration and reporting requirements, we have committed to register our common stock under the Exchange Act. We plan to begin the process of registering our common stock with the SEC this year. Once this process is complete, we will be subject to the financial reporting requirements applicable to registrants under the Exchange Act, including the requirement to file with the SEC annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K. In addition, OFHEO issued a supplemental disclosure regulation under which we will submit proxy statements and insider transaction reports to the SEC in accordance with rules promulgated under the Exchange Act. After our common stock is registered under the Exchange Act, our securities will continue to be exempt from the securities offering registration requirements of the Securities Act and certain other provisions of the federal securities laws.

### Legislation

#### GSE Regulatory Oversight Legislation

We face a highly uncertain regulatory environment in light of GSE regulatory oversight legislation currently under consideration in Congress. The House of Representatives passed GSE regulatory oversight legislation on May 22, 2007. This legislation would establish a new regulator with substantial authority to assess our safety and soundness and to regulate our portfolio investments, including requiring reductions in those investments, consistent with our mission and safe and sound operation. This legislation includes provisions that would increase the regulator's authority to require us to maintain higher minimum and risk-based capital levels, and would require us to make an annual contribution from 2007 to 2011 to an affordable housing fund in an amount equal to 1.2 basis points of the average aggregate unpaid balance of our total mortgage portfolio. This legislation also includes provisions that would give our regulator enhanced authority to regulate our business activities, which could constrain our ability to respond quickly to a changing marketplace.

We believe the Senate is likely to consider legislation that poses similar issues, but may also include provisions that differ materially from any bill considered in the House. Provisions of the bill introduced in the House or any other bill considered by the House or Senate, individually and in certain combinations, could have a material adverse effect on our ability to fulfill our mission, future earnings, stock price and stockholder returns, the rate of growth of our business and our ability to recruit qualified officers and directors.

We believe appropriate GSE regulatory oversight legislation would strengthen market confidence and promote our mission. We cannot predict the prospects for the enactment, timing or content of any final legislation.

#### Temporary Increase in Conforming Loan Limits

On February 13, 2008, the President signed into law the Economic Stimulus Act of 2008 that includes a temporary increase in conventional conforming loan limits. The law raises the conforming loan limits for mortgages originated from July 1, 2007 through December 31, 2008 to the higher of the applicable 2008 conforming loan limits, set at $417,000 for a mortgage secured by a one-unit single-family residence, or 125% of the area median house price for a residence of applicable

size, not to exceed 175% of the applicable 2008 conforming loan limit, or $729,750 for a one-unit single-family residence. We are currently evaluating the impact this law may have on our business.

## RISK FACTORS

Before you invest in our securities, you should know that making such an investment involves risks, including the risks described below and in "BUSINESS," "FORWARD-LOOKING STATEMENTS," "MD&A" and elsewhere in this Information Statement. The risks that we have highlighted here are not the only ones that we face. These risks could lead to circumstances where our business, financial condition and/or results of operations could be adversely affected. In that case, the trading price of our securities could decline and you may lose all or part of your investment. Some of these risks are managed under our risk management framework, as described in "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK," "CREDIT RISKS" and "OPERATIONAL RISKS." We may also encounter risks of which we are currently not aware or that we currently deem immaterial. These risks also may impair our business operations, financial results or your investment in our securities.

### Competitive and Market Risks

*We are subject to mortgage credit risks and increased credit costs related to these risks could adversely affect our financial condition and/or results of operations.*

We are exposed to mortgage credit risk within our total mortgage portfolio, which consists of mortgage loans, PCs, Structured Securities and other mortgage guarantees we have issued in our guarantee business. Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage or an issuer will fail to make timely payments on a security we own or guarantee. Factors that affect the level of our mortgage credit risk include the credit profile of the borrower, the features of the mortgage loan, the type of property securing the mortgage and local and regional economic conditions, including regional unemployment rates and home price appreciation. Recent changes in mortgage pricing and uncertainty may limit borrowers' future ability to refinance in response to lower interest rates. Borrowers of the mortgage loans and securities held in our retained portfolio and underlying our guarantees may fail to make required payments of principal and interest on those loans, exposing us to the risk of credit losses.

The proportion of higher risk mortgage loans that were originated in the market during the last four years increased significantly. We have increased our securitization volume of non-traditional mortgage products, such as interest-only loans and loans originated with less documentation in the last two years in response to the prevalence of these products within the origination market. Total non-traditional mortgage products, including those designated as Alt-A and interest-only loans, made up approximately 30% and 24% of our single-family mortgage purchase volume in the years ended December 31, 2007 and 2006, respectively. Our increased purchases of these mortgages and issuances of guarantees of them expose us to greater credit risks. In addition, we have increased purchases of mortgages that were underwritten by our sellers/servicers using alternative automated underwriting systems or agreed-upon underwriting standards that differ from our system or guidelines. Those differences may increase our credit risk and may result in increases in credit losses. Furthermore, significant purchases pursuant to the temporary increase in conforming loan limits may also expose us to greater credit risks. In addition, if a recession occurs that negatively impacts national or regional economic conditions, we could experience significantly higher delinquencies and credit losses which will likely reduce our earnings or cause losses in future periods and will adversely affect our results of operations or financial condition.

*Market uncertainty and volatility may adversely affect our business, profitability, results of operations and capital management.*

The mortgage credit markets experienced difficult conditions and volatility during 2007. These deteriorating conditions in the mortgage market decreased the availability of corporate credit and liquidity within the mortgage industry in the second half of 2007 and disrupted the normal operations of major mortgage originators, including some of our largest customers. These conditions resulted in less liquidity, greater volatility, widening of credit spreads and a lack of price transparency. We operate in these markets and are subject to potential adverse effects on our results of operations and financial condition due to our activities involving securities, mortgages, mortgage commitments and other derivatives with our customers.

Mortgage market conditions and volatility have also adversely affected our capital levels, including our ability to manage to the 30% mandatory target capital surplus. Factors that could adversely affect the adequacy of our capital for future periods include GAAP net losses; continued declines in home prices; changes in our credit and interest-rate risk profiles; adverse changes in interest rates or implied volatility; adverse OAS changes; legislative or regulatory actions that increase capital requirements; or changes in accounting practices or standards.

As a result of the impact of GAAP net losses on our regulatory core capital, we reported to OFHEO that our capital surplus at November 30, 2007 was below the 30% mandatory target capital surplus. On November 27, 2007, we also

announced a 50% reduction in our common stock dividend for fourth quarter 2007. Also as part of these efforts and to improve business flexibility, we issued $6.0 billion of non-cumulative, perpetual preferred stock and reduced the size of our cash and investments portfolio. In the future, to help us manage to the mandatory target capital surplus, we may consider additional measures, such as limiting the growth or reducing the size of our retained portfolio, slowing issuances of our credit guarantees, issuing preferred or convertible preferred stock, issuing common stock or further reducing our common stock dividend.

Our ability to execute any of these actions or their effectiveness may be limited and we might not be able to manage to the mandatory target capital surplus. If we are not able to manage to the mandatory target capital surplus, OFHEO may, among other things, seek to require us to submit a plan for remediation or take other remedial steps. In addition, OFHEO has discretion to reduce our capital classification by one level if OFHEO determines that we are engaging in conduct OFHEO did not approve that could result in a rapid depletion of core capital or determines that the value of property subject to mortgage loans we hold or guarantee has decreased significantly. See "REGULATION AND SUPERVISION — Office of Federal Housing Enterprise Oversight — *Capital Standards and Dividend Restrictions*" and "NOTE 9: REGULATORY CAPITAL — Classification" to our consolidated financial statements for information regarding additional potential actions OFHEO may seek to take against us.

While it is difficult to predict how long these conditions will exist and how our markets or products will ultimately be affected, these factors could adversely impact our business, our results of operations, as well as our ability to provide liquidity to the mortgage markets.

*Higher credit losses and increased expected future credit costs could adversely affect our financial condition and/or results of operations.*

There can be no assurances that our risk management and loss mitigation strategies will effectively manage our credit risks or that our credit losses will not be higher than expected. Higher credit losses on our guarantees could require us to increase our allowances for credit losses through charges to earnings. Other credit exposures could also result in financial losses. Although we regularly review credit exposures to specific customers and counterparties, default risk may arise from events or circumstances that are difficult to detect or foresee. In addition, concerns about, or default by, one institution could lead to significant liquidity problems, losses or defaults by other institutions. This risk may also adversely affect financial intermediaries, such as clearing agencies, clearinghouses, banks, securities firms and exchanges with which we interact. These potential risks could ultimately cause liquidity problems or losses for us as well.

Changes in the mortgage credit environment also affect our credit guarantee activities through the valuation of our guarantee obligation. If expected future credit costs increase and we are not able to increase our guarantee fees due to competitive pressures or other factors, then the overall profitability of our new business would be lower and could result in losses on guarantees at their inception. Moreover, an increase in expected future credit costs increases the fair value of our existing guarantee obligation.

*We are exposed to increased credit risk related to subprime and Alt-A mortgage loans that back our non-agency mortgage-related securities investments.*

We invest in non-agency mortgage-related securities that are backed by Alt-A and subprime mortgage loans. Approximately $17.3 billion of non-agency mortgage-related securities in our retained portfolio backed by Alt-A and subprime mortgage loans were downgraded to ratings below AAA by at least one nationally recognized statistical rating organization between January 1, 2008 and February 25, 2008. In recent months, mortgage loan delinquencies and credit losses generally have increased, particularly in the subprime and Alt-A sectors. In addition, home prices in many areas have declined, after extended periods during which home prices appreciated. If delinquency and loss rates on subprime and Alt-A mortgages continue to increase, or there is a further decline in home prices, we could experience reduced yields or losses on our investments in non-agency mortgage-related securities backed by subprime or Alt-A loans. In addition, the fair value of these investments has declined and may be further adversely affected by additional ratings downgrades or market events. These factors could negatively affect our core capital and results of operations, if we were to conclude that other than temporary impairments occurred.

*We depend on our institutional counterparties to provide services that are critical to our business and our results of operations or financial condition may be adversely affected if one or more of our institutional counterparties is unable to meet their obligations to us.*

We face the risk that one or more of the institutional counterparties that has entered into a business contract or arrangement with us may fail to meet its obligations. Our primary exposures to institutional counterparty risk are with:

- mortgage insurers;
- mortgage sellers/servicers;

- issuers, guarantors or third party providers of credit enhancements (including bond insurers);
- mortgage investors;
- multifamily mortgage guarantors;
- issuers, guarantors and insurers of investments held in both our retained portfolio and our cash and investments portfolio; and
- derivatives counterparties.

In some cases, our business with institutional counterparties is concentrated. A significant failure by a major institutional counterparty could have a material adverse effect on our retained portfolio, cash and investments portfolio or credit guarantee activities. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" to our consolidated financial statements for additional information. As of December 31, 2007, our ten largest mortgage seller/servicers represented approximately 79% of our single-family mortgage purchase volume. We are exposed to the risk that we could lose purchase volume to the extent these arrangements are terminated or modified and not replaced from other lenders.

Some of our counterparties also may become subject to serious liquidity problems affecting, either temporarily or permanently, their businesses, which may adversely affect their ability to meet their obligations to us. Challenging market conditions have adversely affected and are expected to continue to adversely affect the liquidity and financial condition of a number of our counterparties, including some seller/servicers, mortgage insurers and bond insurers. Some of our largest seller/servicers have experienced ratings downgrades and liquidity constraints. A default by a counterparty with significant obligations to us could adversely affect our ability to conduct our operations efficiently and at cost-effective rates, which in turn could adversely affect our results of operations or our financial condition.

We are also exposed to risk relating to the potential insolvency or non-performance of mortgage insurers and bond insurers. At December 31, 2007, our top four mortgage insurers, each accounted for more than 10% of our overall mortgage insurance coverage, collectively represented approximately 75% of our overall mortgage insurance coverage. As of December 31, 2007, the top three of our bond insurers, each accounted for more than 20% of our overall bond insurance coverage (including secondary policies), collectively represented approximately 80% of our bond insurance coverage. See "CREDIT RISKS — Institutional Credit Risk" for additional information regarding our credit risks to our counterparties and how we manage them.

### A continued decline in U.S. housing prices or other changes in the U.S. housing market could negatively impact our business and earnings.

The national averages for new and existing home prices in the U.S. declined in 2007 for the first time in many years. This decline follows a decade of strong appreciation and dramatic price increases in the past few years. A continued declining trend in home price appreciation in any of the geographic markets we serve could result in a continued increase in delinquencies or defaults and a level of credit-related losses higher than our expectations when our guarantees were issued, which could significantly reduce our earnings. For more information, see "CREDIT RISKS."

If the conforming loan limits are decreased as a result of a decline in the index upon which such limits are based, we may face operational and legal challenges associated with changing our mortgage purchase commitments to conform with the lower limits and there could be fewer loans available for us to purchase. In October 2007, the Federal Housing Finance Board reported that the national average price of a one-family residence had declined slightly. OFHEO subsequently announced that the conforming loan limits would be maintained at the 2007 limits for 2008 and deferred any changes for one year. But, see "REGULATION AND SUPERVISION — Legislation — *Temporary Increase in Conforming Loan Limits*" regarding the temporary increase to the conforming loan limits in the Economic Stimulus Act of 2008 for additional information.

Our business volumes are closely tied to the rate of growth in total outstanding U.S. residential mortgage debt and the size of the U.S. residential mortgage market. The rate of growth in total residential mortgage debt declined to 7.1% in 2007 from 11.3% in 2006. If the rate of growth in total outstanding U.S. residential mortgage debt were to continue to decline, there could be fewer mortgage loans available for us to purchase, which could reduce our earnings and margins, as we could face more competition to purchase a smaller number of loans.

### Changes in general business and economic conditions may adversely affect our business and earnings.

Our business and earnings may continue to be adversely affected by changes in general business and economic conditions, including changes in the markets for our portfolio investments or our mortgage-related and debt securities. These conditions include employment rates, fluctuations in both debt and equity capital markets, the value of the U.S. dollar as compared to foreign currencies, and the strength of the U.S. economy and the local economies in which we conduct business. An economic downturn or increase in the unemployment rate could result in fewer mortgages for us to purchase, an

increase in mortgage delinquencies or defaults and a higher level of credit-related losses than we estimated, which could reduce our earnings or reduce the fair value of our net assets. Various factors could cause the economy to slow down or even decline, including higher energy costs, higher interest rates, pressure on housing prices, reduced consumer or corporate spending, natural disasters such as hurricanes, terrorist activities, military conflicts and the normal cyclical nature of the economy.

### Competition from banking and non-banking companies may harm our business.

We operate in a highly competitive environment and we expect competition to increase as financial services companies continue to consolidate to produce larger companies that are able to offer similar mortgage-related products at competitive prices. Increased competition in the secondary mortgage market and a decreased rate of growth in residential mortgage debt outstanding may make it more difficult for us to purchase mortgages to meet our mission objectives while providing favorable returns for our business. Furthermore, competitive pricing pressures may make our products less attractive in the market and negatively impact our profitability.

We also compete for low-cost debt funding with Fannie Mae, the Federal Home Loan Banks and other institutions that hold mortgage portfolios. Competition for debt funding from these entities can vary with changes in economic, financial market and regulatory environments. Increased competition for low-cost debt funding may result in a higher cost to finance our business, which could decrease our net income.

### We may face limited availability of financing, variation in our funding costs and uncertainty in our securitization financing.

The amount, type and cost of our funding, including financing from other financial institutions and the capital markets, directly impacts our interest expense and results of operations and can therefore affect our ability to grow our assets. A number of factors could make such financing more difficult to obtain, more expensive or unavailable on any terms, both domestically and internationally (where funding transactions may be on terms more or less favorable than in the U.S.).

Foreign investors, particularly in Asia, hold a significant portion of our debt securities and are an important source of funding for our business. Foreign investors' willingness to purchase and hold our debt securities can be influenced by many factors, including changes in the world economies, changes in foreign-currency exchange rates, regulatory and political factors, as well as the availability of and preferences for other investments. If foreign investors were to divest their holdings or reduce their purchases of our debt securities, our funding costs may increase. The willingness of foreign investors to purchase or hold our debt securities, and any changes to such willingness, may materially affect our liquidity, our business and results of operations. Foreign investors are also significant purchasers of mortgage-related securities and changes in the strength and stability of foreign demand for mortgage-related securities could affect the overall market for those securities and the returns available to us on our portfolio investments.

Other GSEs also issue significant amounts of agency debt, which may negatively impact the prices we are able to obtain for our debt securities. An inability to issue debt securities at attractive rates in amounts sufficient to fund our business activities and meet our obligations could have an adverse effect on our liquidity, financial condition and results of operations. See "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Debt Securities*" for a more detailed description of our debt issuance programs.

We maintain secured intraday lines of credit to provide additional intraday liquidity to fund our activities through the Fedwire system. These lines of credit may require us to post collateral to third parties. In certain limited circumstances, these secured counterparties may be able to repledge the collateral underlying our financing without our consent. In addition, because these secured intraday lines of credit are uncommitted, we may not be able to continue to draw on them if and when needed.

Our PCs and Structured Securities are also an integral part of our mortgage purchase program and any decline in the price performance of or demand for our PCs could have an adverse effect on the profitability of our securitization financing activities. There is a risk that our PC and Structured Securities support activities may not be sufficient to support the liquidity and depth of the market for PCs.

### A reduction in our credit ratings could adversely affect our liquidity.

Nationally recognized statistical rating organizations play an important role in determining, by means of the ratings they assign to issuers and their debt, the availability and cost of debt funding. We currently receive ratings from three nationally recognized statistical rating organizations for our unsecured borrowings. Our credit ratings are important to our liquidity. GAAP net losses and significant deterioration in our capital levels, as well as actions by governmental entities or others, sustained declines in our long-term profitability and other factors could adversely affect our credit ratings. A reduction in our credit ratings could adversely affect our liquidity, competitive position, or the supply or cost of equity capital or debt financing available to us. A significant increase in our borrowing costs could cause us to sustain losses or impair our liquidity by requiring us to find other sources of financing.

*Fluctuations in interest rates could negatively impact our reported net interest income, earnings and fair value of net assets.*

Our portfolio investment activities and credit guarantee activities expose us to interest-rate and other market risks and credit risks. Changes in interest rates — up or down — could adversely affect our net interest yield. Although the yield we earn on our assets and our funding costs tend to move in the same direction in response to changes in interest rates, either can rise or fall faster than the other, causing our net interest yield to expand or compress. For example, when interest rates rise, our funding costs may rise faster than the yield we earn on our assets, causing our net interest yield to compress until the effect of the increase is fully reflected in asset yields. Changes in the slope of the yield curve could also reduce our net interest yield.

Changes in interest rates could reduce our GAAP net income materially, especially if actual conditions vary considerably from our expectations. For example, if interest rates rise or fall faster than estimated or the slope of the yield curve varies other than as expected, we may incur significant losses. Changes in interest rates may also affect prepayment assumptions, thus potentially impacting the fair value of our assets, including investments in our retained portfolio, our derivative portfolio and our guarantee asset. When interest rates fall, borrowers are more likely to prepay their mortgage loans by refinancing them at a lower rate. An increased likelihood of prepayment on the mortgages underlying our mortgage-related securities may adversely impact the performance of these securities. An increased likelihood of prepayment on the mortgage loans we hold may also negatively impact the performance of our retained portfolio. Interest rates can fluctuate for a number of reasons, including changes in the fiscal and monetary policies of the federal government and its agencies, such as the Federal Reserve. Federal Reserve policies directly and indirectly influence the yield on our interest-earning assets and the cost of our interest-bearing liabilities. The availability of derivative financial instruments (such as options and interest-rate and foreign-currency swaps) from acceptable counterparties of the types and in the quantities needed could also affect our ability to effectively manage the risks related to our investment funding. Our strategies and efforts to manage our exposures to these risks may not be as effective as they have been in the past. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK" for a description of the types of market risks to which we are exposed and how we manage those risks.

*Changes in OAS could materially impact our fair value of net assets and affect future earnings.*

OAS is an estimate of the yield spread between a given security and an agency debt yield curve. The OAS between the mortgage and agency debt sectors can significantly affect the fair value of our net assets. The fair value impact of changes in OAS for a given period represents an estimate of the net unrealized increase or decrease in the fair value of net assets arising from net fluctuations in OAS during that period. We do not attempt to hedge or actively manage the impact of changes in mortgage-to-debt OAS. Changes in market conditions, including changes in interest rates, may cause fluctuations in the OAS. A widening of the OAS on a given asset typically causes a decline in the current fair value of that asset and may adversely affect current earnings or financial condition, but may increase the number of attractive opportunities to purchase new assets for our retained portfolio. Conversely, a narrowing or tightening of the OAS typically causes an increase in the current fair value of that asset, but may reduce the number of attractive opportunities to purchase new assets for our retained portfolio. Consequently, a tightening of the OAS may adversely affect future earnings or financial condition. See "MD&A — CONSOLIDATED FAIR VALUE BALANCE SHEETS ANALYSIS — Discussion of Fair Value Results" for a more detailed description of the impacts of changes in mortgage-to-debt OAS.

*The loss of business volume from key lenders could result in a decline in our market share and revenues.*

Our business depends on our ability to acquire a steady flow of mortgage loans. We purchase a significant percentage of our single-family mortgages from several large mortgage originators. During the years ended December 31, 2007 and 2006, approximately 79% and 76%, respectively, of our guaranteed mortgage securities issuances originated from purchase volume associated with our ten largest customers. Three of our customers each accounted for greater than 12% of our mortgage securitization volume for the year ended December 31, 2007. We enter into mortgage purchase volume commitments with many of our customers that are renewed annually and provide for a minimum level of mortgage volume that these customers will deliver to us. One of our customers, which accounted for more than 10% of our mortgage purchase volume for the year ended December 31, 2007, reduced its minimum mortgage volume commitments to us upon renewal of its contract at July 1, 2007. In addition, ABN Amro Mortgage Group, Inc., which accounted for more than 8% of our guaranteed securitization volume for the six months ended June 30, 2007, was acquired by a third party and, as a result, its contract was not renewed when it expired in July 2007. In January 2008, Bank of America Corporation announced it would acquire Countrywide Financial Corp. Together these companies accounted for approximately 28% and 16% of our securitization volume in 2007 and 2006, respectively. Because the transaction is still pending, it is uncertain how the transaction will affect the volume of our securitization business in the future. The mortgage industry has been consolidating and a decreasing number of large lenders originate most single-family mortgages. The loss of business from any one of our

major lenders could adversely affect our market share, our revenues and the performance of our guaranteed mortgage-related securities.

*Negative publicity causing damage to our reputation could adversely affect our business prospects, earnings or capital.*

Reputation risk, or the risk to our earnings and capital from negative public opinion, is inherent in our business. Negative public opinion could adversely affect our ability to keep and attract customers or otherwise impair our customer relationships, adversely affect our ability to obtain financing, impede our ability to hire and retain qualified personnel, hinder our business prospects or adversely impact the trading price of our securities. Perceptions regarding the practices of our competitors or our industry as a whole may also adversely impact our reputation. Adverse reputation impacts on third parties with whom we have important relationships may impair market confidence or investor confidence in our business operations as well. In addition, negative publicity could expose us to adverse legal and regulatory consequences, including greater regulatory scrutiny or adverse regulatory or legislative changes. These adverse consequences could result from our actual or alleged action or failure to act in any number of activities, including corporate governance, regulatory compliance, financial reporting and disclosure, purchases of products perceived to be predatory, safeguarding or using nonpublic personal information, or from actions taken by government regulators and community organizations in response to our actual or alleged conduct. Negative public opinion associated with our accounting restatement and material weaknesses in our internal control over financial reporting and related problems could continue to have adverse consequences.

### Business and Operational Risks

*Deficiencies in internal control over financial reporting and disclosure controls could result in errors, affect operating results and cause investors to lose confidence in our reported results.*

We face continuing challenges because of deficiencies in our accounting infrastructure and controls and the operational complexities of our business. There are a number of factors that may impede our efforts to establish and maintain effective internal control and a sound accounting infrastructure, including: the complexity our business activities and related GAAP requirements; uncertainty regarding the operating effectiveness and sustainability of newly established controls; and the uncertain impacts of recent housing and credit market volatility on the reliability of our models used to develop our accounting estimates. We cannot be certain that our efforts to improve our internal control over financial reporting will ultimately be successful.

Controls and procedures, no matter how well designed and operated, provide only reasonable assurance that material errors in our financial statements will be prevented or detected on a timely basis. A failure to establish and maintain effective internal control over financial reporting increases the risks of a material error in our reported financial results and delay in our financial reporting timeline. Depending on the nature of a failure and any required remediation, ineffective controls could have a material adverse effect on our business.

Delays in meeting our financial reporting obligations could affect our ability to maintain the listing of our securities on the New York Stock Exchange, or NYSE. Ineffective controls could also cause investors to lose confidence in our reported financial information, which may have an adverse effect on the trading price of our securities.

*We rely on internal models for financial accounting and reporting purposes, to make business decisions, and to manage risks, and our business could be adversely affected if those models fail to produce reliable results.*

We make significant use of business and financial models for financial accounting and reporting purposes and to manage risk. For example, we use models in determining the fair value of financial instruments for which independent price quotations are not available or reliable or in extrapolating third-party values to our portfolio. We also use models to measure and monitor our exposures to interest-rate and other market risks and credit risk. The information provided by these models is also used in making business decisions relating to strategies, initiatives, transactions and products.

Models are inherently imperfect predictors of actual results because they are based on assumptions and/or historical experience. Our models could produce unreliable results for a number of reasons, including incorrect coding of the models, invalid or incorrect assumptions underlying the models, the need for manual adjustments to respond to rapid changes in economic conditions, incorrect data being used by the models or actual results that do not conform to historical trends and experience. In addition, the complexity of the models and the impact of the recent turmoil in the housing and credit markets create additional risk regarding the reliability of our models. The valuations, risk metrics, amortization results and loan loss reserve estimations produced by our internal models may be different from actual results, which could adversely affect our business results, cash flows, fair value of net assets, business prospects and future earnings. Changes in any of our models or in any of the assumptions, judgments or estimates used in the models may cause the results generated by the model to be materially different. The different results could cause a revision of previously reported financial condition or results of operations, depending on when the change to the model, assumption, judgment or estimate is implemented. Any such changes may also cause difficulties in comparisons of the financial condition or results of operations of prior or future periods.

If our models are not reliable we could also make poor business decisions, impacting loan purchases, guarantee fee pricing, asset and liability management, or other decisions. Furthermore, any strategies we employ to attempt to manage the risks associated with our use of models may not be effective. See "MD&A — CRITICAL ACCOUNTING POLICIES AND ESTIMATES — Valuation of Financial Instruments" and "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" for more information on our use of models.

*Changes in our accounting policies, as well as estimates we make, could materially affect how we report our financial condition or results of operations.*

Our accounting policies are fundamental to understanding our financial condition and results of operations. We have identified certain accounting policies and estimates as being "critical" to the presentation of our financial condition and results of operations because they require management to make particularly subjective or complex judgments about matters that are inherently uncertain and for which materially different amounts could be recorded using different assumptions or estimates. For a description of our critical accounting policies, see "MD&A — CRITICAL ACCOUNTING POLICIES AND ESTIMATES." As new information becomes available and we update the assumptions underlying our estimates, we could be required to revise previously reported financial results.

From time to time, the Financial Accounting Standards Board, or FASB, and the SEC can change the financial accounting and reporting standards that govern the preparation of our financial statements. These changes are beyond our control, can be difficult to predict and could materially impact how we report our financial condition and results of operations. We could be required to apply a new or revised standard retrospectively, which may result in the revision of prior period financial statements by material amounts. In addition, as described in "MD&A" and "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES" to our consolidated financial statements, we have retrospectively applied certain changes in accounting principles that resulted in the revision of prior period financial statements by material amounts.

*We may be required to establish a valuation allowance against our deferred tax assets, which could materially affect our results of operations and capital position in the future.*

As of December 31, 2007, we had approximately $10.3 billion of net deferred tax assets as reported on our consolidated balance sheet. The realization of these deferred tax assets is dependent upon the generation of sufficient future taxable income. We currently believe that it is more likely than not that we will generate sufficient taxable income in the future to utilize these deferred tax assets. However, if future events differ from current forecasts, a valuation allowance may need to be established which could have a material adverse effect on our results of operations and capital position.

*A failure in our operational systems or infrastructure, or those of third parties, could impair our liquidity, disrupt our business, damage our reputation and cause losses.*

Shortcomings or failures in our internal processes, people or systems could lead to impairment of our liquidity, financial loss, disruption of our business, liability to customers, legislative or regulatory intervention or reputational damage. For example, our business is highly dependent on our ability to process a large number of transactions on a daily basis. The transactions we process have become increasingly complex and are subject to various legal and regulatory standards. Our financial, accounting, data processing or other operating systems and facilities may fail to operate properly or become disabled, adversely affecting our ability to process these transactions. The inability of our systems to accommodate an increasing volume of transactions or new types of transactions or products could constrain our ability to pursue new business initiatives.

We also face the risk of operational failure or termination of any of the clearing agents, exchanges, clearing houses or other financial intermediaries we use to facilitate our securities and derivatives transactions. Any such failure or termination could adversely affect our ability to effect transactions, service our customers and manage our exposure to risk.

Most of our key business activities are conducted in our principal offices located in McLean, Virginia. Despite the contingency plans and facilities we have in place, our ability to conduct business may be adversely impacted by a disruption in the infrastructure that supports our business and the communities in which we are located. Potential disruptions may include those involving electrical, communications, transportation or other services we use or that are provided to us. If a disruption occurs and our employees are unable to occupy our offices or communicate with or travel to other locations, our ability to service and interact with our customers or counterparties may suffer and we may not be able to successfully implement contingency plans that depend on communication or travel.

We are exposed to the risk that a catastrophic event, such as a terrorist event or natural disaster, could result in a significant business disruption and an inability to process transactions through normal business processes. To mitigate this risk, we maintain and test business continuity plans and have established backup facilities for critical business processes and systems away from, although in the same metropolitan area as, our main offices. However, we can make no assurances that these measures will be sufficient to respond to the full range of catastrophic events that may occur.

Our operations rely on the secure processing, storage and transmission of confidential and other information in our computer systems and networks. Although we take protective measures and endeavor to modify them as circumstances warrant, our computer systems, software and networks may be vulnerable to unauthorized access, computer viruses or other malicious code and other events that could have a security impact. If one or more of such events occur, this potentially could jeopardize confidential and other information, including nonpublic personal information and sensitive business data, processed and stored in, and transmitted through, our computer systems and networks, or otherwise cause interruptions or malfunctions in our operations or the operations of our customers or counterparties, which could result in significant losses or reputational damage. We may be required to expend significant additional resources to modify our protective measures or to investigate and remediate vulnerabilities or other exposures, and we may be subject to litigation and financial losses that are not fully insured. For a discussion of our material weaknesses related to our information technology and systems and our plans and efforts to remediate such weaknesses, see "CONTROLS AND PROCEDURES — Internal Control Over Financial Reporting."

*We rely on third parties for certain functions that are critical to financial reporting, our retained portfolio activity and mortgage loan underwriting. Any failures by those vendors could disrupt our business operations.*

We outsource certain key functions to external parties, including but not limited to (a) processing functions for trade capture, market risk management analytics, and asset valuation, (b) custody and recordkeeping for our investments portfolios, and (c) processing functions for mortgage loan underwriting. We may enter into other key outsourcing relationships in the future. If one or more of these key external parties were not able to perform their functions for a period of time, at an acceptable service level, or for increased volumes, our business operations could be constrained, disrupted or otherwise negatively impacted. Our use of vendors also exposes us to the risk of a loss of intellectual property or of confidential information or other harm. Financial or operational difficulties of an outside vendor could also hurt our operations if those difficulties interfere with the vendor's ability to provide services to us.

*Our risk management and loss mitigation efforts may not effectively mitigate the risks we seek to manage.*

We could incur substantial losses and our business operations could be disrupted if we are unable to effectively identify, manage, monitor and mitigate operational risks, interest-rate and other market risks and credit risks related to our business. Our risk management policies, procedures and techniques may not be sufficient to mitigate the risks we have identified or to appropriately identify additional risks to which we are subject. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK," "CREDIT RISKS" and "OPERATIONAL RISKS" for a discussion of our approach to managing the risks we face.

*Our ability to hire, train and retain qualified employees affects our business and operations.*

Our continued success depends, in large part, on our ability to hire and retain highly qualified people. Our business is complex and many of our positions require specific skills. Competition for highly qualified personnel is intense and there can be no assurances that we will retain our key personnel or that we will be successful in attracting, training or retaining other highly qualified personnel in the future. Furthermore, there is a risk that we may not have sufficient personnel or personnel with sufficient training in key roles.

### Legal and Regulatory Risks

*Developments affecting our legislative and regulatory environment could materially harm our business prospects or competitive position.*

Various developments or factors may adversely affect our legislative or regulatory environment, including:

* any changes affecting our charter, affordable housing goals or capital (including our ability to manage to the mandatory target capital surplus);
* the interpretation of these developments or factors by our regulators;
* the adequacy of internal systems, controls and processes related to these developments or factors;
* the exercise or assertion of regulatory or administrative authority beyond current practice;
* the imposition of additional remedial measures;
* voluntary agreements with our regulators; or
* the enactment of new legislation.

We are currently voluntarily limiting the growth of our retained portfolio, as described in "REGULATION AND SUPERVISION — Office of Federal Housing Enterprise Oversight — *Voluntary, Temporary Growth Limit.*" HUD may periodically review certain of our activities to ensure conformity with our mission and charter. In addition, the Treasury Department has proposed certain changes to its process for approving our debt offerings. We cannot predict the prospects for

the timing, content or impact of any changes or whether our business activities will be restricted as a result of any such changes.

We are also exposed to the risk that weaknesses in our internal systems, controls and processes could affect the accuracy or timing of the data we provide to HUD, OFHEO or the Treasury Department or our compliance with legal requirements, and could ultimately lead to regulatory actions (by HUD, OFHEO or both) or other adverse impacts on our business (including our ability or intent to retain investments). Any assertions of non-compliance with existing or new statutory or regulatory requirements could result in fines, penalties, litigation and damage to our reputation.

Furthermore, we could be required, or may find it advisable, to change the nature or extent of our business activities if our various exemptions and special attributes were modified or eliminated, new or additional fees or substantive regulation of our business activities were imposed, our relationship to the federal government were altered or eliminated, or our charter, the GSE Act, or other federal laws and regulations affecting us were significantly amended. Any of these changes could have a material effect on the scope of our activities, financial condition and results of operations. For example, such changes could (a) reduce the supply of mortgages available to us, (b) impose restrictions on the size of our retained portfolio, (c) make us less competitive by limiting our business activities or our ability to create new products, (d) increase our capital requirements, or (e) require us to make an annual contribution to an affordable housing fund. We cannot predict when or whether any potential legislation will be enacted or regulation will be promulgated. In addition, capital levels or other operational limitations may limit our ability to purchase a significant number of additional mortgages available to us as a result of the temporary increase in conforming loan limits. See "REGULATION AND SUPERVISION — Legislation — *Temporary Increase in Conforming Loan Limits.*"

Any of the developments or factors described above could materially adversely affect: our ability to fulfill our mission; our ability to meet our affordable housing goals; our ability or intent to retain investments; the size and growth of our mortgage portfolios; our future earnings, stock price and stockholder returns; the fair value of our assets; or our ability to recruit qualified officers and directors.

*We may make certain changes to our business in an attempt to meet HUD's housing goals and subgoals that may adversely affect our profitability.*

We may make adjustments to our mortgage sourcing and purchase strategies in an effort to meet our housing goals and subgoals, including changes to our underwriting guidelines and the expanded use of targeted initiatives to reach underserved populations. For example, we may purchase loans and mortgage-related securities that offer lower expected returns on our investment and increase our exposure to credit losses. In addition, in order to meet future housing goals and subgoals, our purchases of goal-eligible loans need to increase as a percentage of total new mortgage purchases. Doing so could cause us to forgo other purchase opportunities that we would expect to be more profitable. If our current efforts to meet the goals and subgoals prove to be insufficient, we may need to take additional steps that could further reduce our profitability. See "REGULATION AND SUPERVISION — Department of Housing and Urban Development" for additional information about HUD's regulation of our business.

*We are involved in legal proceedings that could result in the payment of substantial damages or otherwise harm our business.*

We are a party to various legal actions. In addition, certain of our directors, officers and employees are involved in legal proceedings for which they may be entitled to reimbursement by us for costs and expenses of the proceedings. The defense of these or any future claims or proceedings could divert management's attention and resources from the needs of the business. We may be required to establish reserves and to make substantial payments in the event of adverse judgments or settlements of any such claims, investigations or proceedings. Any legal proceeding, even if resolved in our favor, could result in negative publicity or cause us to incur significant legal and other expenses. Furthermore, developments in, outcomes of, impacts of, and costs, expenses, settlements and judgments related to these legal proceedings may differ from our expectations and exceed any amounts for which we have reserved or require adjustments to such reserves. See "LEGAL PROCEEDINGS" for information about our pending legal proceedings.

*Legislation or regulation affecting the financial services industry may adversely affect our business activities.*

Our business activities may be affected by a variety of legislative and regulatory actions related to the activities of banks, savings institutions, insurance companies, securities dealers and other regulated entities that constitute a significant part of our customer base. Legislative or regulatory provisions that create or remove incentives for these entities either to sell mortgage loans to us or to purchase our securities could have a material adverse effect on our business results. Among the legislative and regulatory provisions applicable to these entities are capital requirements for federally insured depository institutions and regulated bank holding companies.

For example, the Basel Committee on Banking Supervision, composed of representatives of certain central banks and bank supervisors, has developed a set of risk-based capital standards for banking organizations. The U.S. banking regulators

have adopted new capital standards for certain banking organizations that incorporate the Basel Committee's risk-based capital standards. Decisions by U.S. banking organizations about whether to hold or sell mortgage assets could be affected by the new standards. However, the manner in which U.S. banking organizations may respond to them remains uncertain.

The actions we are taking in connection with the Interagency Guidance and the Subprime Statement are described in "CREDIT RISKS — Mortgage Credit Risk — *Portfolio Diversification — Guidance on Non-traditional Mortgage Product Risks and Subprime Mortgage Lending*." These changes to our underwriting and borrower disclosure requirements and investment standards could reduce the number of these mortgage products available for us to purchase. These initiatives may also adversely affect our profitability or our ability to achieve our affordable housing goals and subgoals.

In addition, our business could also be adversely affected by any modification, reduction or repeal of the federal income tax deductibility of mortgage interest payments.

*We may be required to materially modify our disclosures or financial statements in connection with the process of registering our common stock with the SEC.*

We plan to register our common stock with the SEC during 2008. We expect that as part of the registration process, the SEC staff will comment on our disclosures and our financial statements as is customary during registration. The Company cannot predict the outcome of such review. However, given the complexity of our accounting, the fact that we previously have had accounting errors that resulted in the restatement of certain of our financial statements and have identified numerous material weaknesses and significant deficiencies in internal control over financial reporting and the nature of our business, the SEC may have significant comments and we may be required to modify our disclosures and financial statements in response to some of the SEC staff comments we receive and depending on the circumstances, such modifications could be material.

## PROPERTIES

We own a 75% interest in a limited partnership that owns our principal offices, consisting of four office buildings in McLean, Virginia, that comprise approximately 1.3 million square feet. We occupy this headquarters complex under a long-term lease from the partnership.

## LEGAL PROCEEDINGS

We are involved as a party to a variety of legal proceedings arising from time to time in the ordinary course of business including, among other things, contractual disputes, personal injury claims, employment-related litigation and other legal proceedings incidental to our business. We are frequently involved, directly or indirectly, in litigation involving mortgage foreclosures. From time to time, we are also involved in proceedings arising from our termination of a seller/servicer's eligibility to sell mortgages to, and service mortgages for, us. In these cases, the former seller/servicer sometimes seeks damages against us for wrongful termination under a variety of legal theories. In addition, we are sometimes sued in connection with the origination or servicing of mortgages. These suits typically involve claims alleging wrongful actions of seller/servicers. Our contracts with our seller/servicers generally provide for indemnification against liability arising from their wrongful actions. Litigation and claims resolution are subject to many uncertainties and are not susceptible to accurate prediction. Losses that might result from the adverse resolution of any of the remaining legal proceedings could be greater than reserves we may establish. See "NOTE 12: LEGAL CONTINGENCIES" to our consolidated financial statements for additional information regarding our legal proceedings.

**Recent Putative Securities Class Action Lawsuits.** *Reimer vs. Freddie Mac, Syron, Cook, Piszel and McQuade* and *Ohio Public Employees Retirement System vs. Freddie Mac, Syron, et al.* Two virtually identical putative securities class action lawsuits were filed against Freddie Mac and certain of our current and former officers alleging that the defendants violated federal securities laws by making "false and misleading statements concerning our business, risk management and the procedures we put into place to protect the company from problems in the mortgage industry." One suit was filed on November 21, 2007 in the U.S. District Court for the Southern District of New York and the other was filed on January 18, 2008 in the U.S. District Court for the Northern District of Ohio. The plaintiffs are seeking unspecified damages and interest; reasonable costs, including attorneys' fees and equitable and other injunctive relief. At present, it is not possible to predict the probable outcomes of these lawsuits or any potential impact on our business, financial condition, or results of operation.

**Recent Purported Shareholder Demand Letters.** In late 2007, the Board of Directors received two letters from purported shareholders of Freddie Mac alleging corporate mismanagement and breaches of fiduciary duty in connection with the company's risk management. One letter demands that the Board commence an independent investigation into the alleged conduct, institute legal proceedings to recover damages from the responsible individuals, and implement corporate governance initiatives to ensure that the alleged problems do not recur. The other letter demands that Freddie Mac commence legal proceedings to recover damages from responsible Board members, senior officers, Freddie Mac's outside

auditors, and other parties who allegedly aided or abetted the improper conduct. The Board of Directors formed a special committee to investigate the purported shareholders' allegations.

**Antitrust Lawsuits.** Consolidated lawsuits were filed against Fannie Mae and us in the U.S. District Court for the District of Columbia, originally on January 10, 2005, alleging that both companies conspired to establish and maintain artificially high guarantee fees. The complaint covers the period January 1, 2001 to the present and asserts a variety of claims under federal and state antitrust laws, as well as claims under consumer-protection and similar state laws. The plaintiffs seek injunctive relief, unspecified damages (including treble damages with respect to the antitrust claims and punitive damages with respect to some of the state claims) and other forms of relief. We filed a motion to dismiss the action and are awaiting a ruling from the court. At present, it is not possible for us to predict the probable outcome of the consolidated lawsuit or any potential impact on our business, financial condition or results of operations.

The New York Attorney General's Investigation.    In connection with the New York Attorney General's suit filed against eAppraiseIT and its parent corporation, First American, alleging appraisal fraud in connection with loans originated by Washington Mutual, in November 2007, the New York Attorney General demanded that we either retain an independent examiner to investigate our mortgage purchases from Washington Mutual supported by appraisals conducted by eAppraiseIT, or immediately cease and desist from purchasing or securitizing Washington Mutual loans and any loans supported by eAppraiseIT appraisals. We also received a subpoena from the New York Attorney General's office for information regarding appraisals and property valuations as they relate to our mortgage purchases and securitizations from January 1, 2004 to the present. Currently, we are discussing with the New York Attorney General and OFHEO resolution of the matter.

## MARKET FOR THE COMPANY'S
## COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND
## ISSUER PURCHASES OF EQUITY SECURITIES

### Market Information

Our common stock, par value $0.21 per share, is listed on the NYSE under the symbol "FRE." From time to time, our common stock may be admitted to unlisted trading status on other national securities exchanges. Put and call options on our common stock are traded on U.S. options exchanges. At January 31, 2008, there were 646,273,620 shares outstanding of our common stock.

Table 4 sets forth the high and low sale prices of our common stock for the periods indicated.

### Table 4 — Quarterly Common Stock Information

|  | Sale Prices[1] | |
| --- | --- | --- |
|  | High | Low |
| **2007 Quarter Ended** | | |
| December 31 | $65.88 | $22.90 |
| September 30 | 67.20 | 54.97 |
| June 30 | 68.12 | 58.62 |
| March 31 | 68.55 | 58.88 |
| **2006 Quarter Ended** | | |
| December 31 | $71.92 | $64.80 |
| September 30 | 66.47 | 55.64 |
| June 30 | 63.99 | 56.50 |
| March 31 | 68.75 | 60.64 |

(1)  The principal market is the NYSE and prices are based on the composite tape.

At February 15, 2008, the closing price for our common stock was $28.40 per share.

23

**Holders**

As of February 15, 2008, we had 2,081 common stockholders of record.

**Dividends**

Table 5 sets forth the cash dividend per common share that we have declared for the periods indicated.

**Table 5 — Dividends Per Common Share**

|  | Regular Cash Dividend Per Share |
| --- | --- |
| **2007 Quarter Ended** |  |
| December 31 | $0.25 |
| September 30 | 0.50 |
| June 30 | 0.50 |
| March 31 | 0.50 |
| **2006 Quarter Ended** |  |
| December 31 | $0.50 |
| September 30 | 0.47 |
| June 30 | 0.47 |
| March 31 | 0.47 |

We have historically paid dividends to our stockholders in each quarter. Our board of directors will determine the amount of dividends, if any, declared and paid in any quarter after considering our capital position and earnings and growth prospects, among other factors. See "NOTE 9: REGULATORY CAPITAL" to our consolidated financial statements for additional information regarding dividend payments and potential restrictions on such payments and "NOTE 8: STOCKHOLDERS' EQUITY" to our consolidated financial statements for additional information regarding our preferred stock dividend rates.

**Stock Performance Graph**

The following graph compares the five-year cumulative total stockholder return on our common stock with that of the Standard and Poor's, or S&P, 500 Financial Sector Index and the S&P 500 Index. The graph assumes $100 invested in each of our common stock, the S&P 500 Financial Sector Index and the S&P 500 Index on December 31, 2002. Total return calculations assume annual dividend reinvestment. The graph does not forecast performance of our common stock.



Comparative Cumulative Total Stockholder Return
(in dollars)

| | | | At December 31, | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| Freddie Mac | $100 | $101 | $130 | $118 | $126 | $ 65 |
| S&P 500 Financials | 100 | 131 | 145 | 155 | 185 | 150 |
| S&P 500 | 100 | 129 | 143 | 150 | 173 | 183 |

*Freddie Mac*

### Issuer Purchases of Equity Securities

On March 23, 2007, we announced that our board of directors had authorized us to repurchase up to $1 billion of outstanding shares of common stock. The repurchase program was completed in August 2007. We did not repurchase any of our common stock during the three months ended December 31, 2007 and we do not currently have any outstanding authorizations to repurchase common stock.

### Recent Sales of Unregistered Securities

The securities we issue are "exempted securities" under the Securities Act and the Exchange Act. As a result, we do not file registration statements with the SEC with respect to offerings of our securities.

During the three months ended December 31, 2007, we issued 240 million shares of fixed-to-floating rate non-cumulative, perpetual preferred stock in an offering underwritten by a syndicate of dealers represented by Lehman Brothers Inc. and Goldman, Sachs & Co. for aggregate offering proceeds of $6.0 billion and an aggregate underwriting discount of $90 million. See "NOTE 8: STOCKHOLDERS' EQUITY" to our consolidated financial statements for more information regarding our preferred stock offerings.

We regularly provide stock compensation to our employees and members of our board of directors. We have three stock-based compensation plans under which grants are currently made: (a) the Employee Stock Purchase Plan, or ESPP; (b) the 2004 Stock Compensation Plan, or 2004 Employee Plan; and (c) the 1995 Directors' Stock Compensation Plan, as amended and restated, or Directors' Plan. Prior to the stockholder approval of the 2004 Employee Plan, employee stock-based compensation was awarded in accordance with the terms of the 1995 Stock Compensation Plan, or 1995 Employee Plan. Although grants are no longer made under the 1995 Employee Plan, we currently have awards outstanding under this plan. We collectively refer to the 2004 Employee Plan and 1995 Employee Plan as the Employee Plans.

During the three months ended December 31, 2007, 13,655 stock options were exercised and no stock options were granted under our Employee Plans and Directors' Plan. Under our ESPP, 69,251 options to purchase stock were exercised and 82,566 options to purchase stock were granted. Further, during the three months ended December 31, 2007, under the Employee Plans and Directors' Plan, 89,147 restricted stock units were granted and restrictions lapsed on 178,758 restricted stock units. See "NOTE 10: STOCK-BASED COMPENSATION" to our consolidated financial statements for more information.

### Transfer Agent and Registrar

Computershare Trust Company, N.A.
P.O. Box 43078
Providence, RI 02940-3078
Telephone: 781-575-2879
http://www.computershare.com

### NYSE Corporate Governance Listing Standards

On July 9, 2007, our Chief Executive Officer submitted to the NYSE the certification required by Section 303A.12(a) of the NYSE Listed Company Manual regarding our compliance with the NYSE's corporate governance listing standards.

-

*Freddie Mac*

## FORWARD-LOOKING STATEMENTS

We regularly communicate information concerning our business activities to investors, securities analysts, the news media and others as part of our normal operations. Some of these communications, including the "BUSINESS" and "MD&A" sections of this Information Statement, contain "forward-looking statements" pertaining to our current expectations and objectives for financial reporting, remediation efforts, future business plans, results of operations, financial condition and market trends and developments. Forward-looking statements are often accompanied by, and identified with, terms such as "seek," "forecasts," "objective," "believe," "expect," "outlook," "plan," "uncertain," "future," "potential," "assumptions," "judgments," "estimates," "continue," "ability," "may," "anticipate," "indicator," "efforts," "long-term," "if," "likely," "might," "could," "would," and similar phrases. These statements are not historical facts, but rather represent our expectations based on current information, plans, estimates and projections. Forward-looking statements involve known and unknown risks, uncertainties and other factors, some of which are beyond our control. You should be careful about relying on any forward-looking statements and should also consider all risks, uncertainties and other factors described in this Information Statement in considering any forward-looking statements. Actual results may differ materially from those discussed as a result of various factors, including those factors described in the "RISK FACTORS" section of this Information Statement. Factors that could cause actual results to differ materially from the expectations expressed in these and other forward-looking statements by management include, among others:

- our ability to effectively implement our business strategies and manage the risks in our business, including our efforts to improve the supply and liquidity of, and demand for, our products;

- changes in our assumptions or estimates regarding rates of growth in our business, spreads we expect to earn, required capital levels, the timing and impact of capital transactions;

- changes in pricing or valuation methodologies, models, assumptions, estimates and/or other measurement techniques;

- volatility of reported results due to changes in fair value of certain instruments or assets;

- further adverse rating actions by credit rating agencies in respect of structured credit products, other credit-related exposures, or mortgage or bond insurers;

- changes in general economic conditions, including the risk of U.S. or global economic recession, regional employment rates, liquidity of the markets and availability of credit in the markets;

- our ability to manage and forecast our capital levels;

- our ability to effectively and timely implement the remediation plan undertaken as a result of the restatement of our consolidated financial statements and the consent order entered into with OFHEO, including particular initiatives relating to technical infrastructure and controls over financial reporting;

- changes in applicable legislative or regulatory requirements, including enactment of GSE oversight legislation, changes to our charter, affordable housing goals, regulatory capital requirements, the exercise or assertion of regulatory or administrative authority beyond historical practice, or regulation of the subprime market;

- our ability to effectively manage and implement changes, developments or impacts of accounting or tax standards and interpretations;

- changes in the loans available for us to purchase, such as increases or decreases in the conforming loan limits;

- the availability of debt financing and equity capital in sufficient quantity and at attractive rates to support growth in our Retained portfolio, to refinance maturing debt and to meet regulatory capital requirements;

- the rate of growth in total outstanding U.S. residential mortgage debt, the size of the U.S. residential mortgage market and , homeownership rates, supply and demand of available multifamily housing;

- direct and indirect impacts of continuing deterioration of subprime and other real estate markets;

- the levels and volatility of interest rates, mortgage-to-debt option adjusted spreads, and home prices;

- preferences of originators in selling into the secondary market and borrower preferences for fixed-rate mortgages or ARMs;

- Investor preferences for mortgage loans and mortgage-related and debt securities versus other investments;

26                                                                                                    *Freddie Mac*

- the occurrence of a major natural or other disaster in geographic areas that would adversely affect our Total mortgage portfolio holdings;

- other factors and assumptions described in this Information Statement, including in the sections titled "BUSINESS," "RISK FACTORS" and "MD&A;"

- our assumptions and estimates regarding the foregoing and our ability to anticipate the foregoing factors and their impacts; and

- market reactions to the foregoing.

We undertake no obligation to update forward-looking statements we make to reflect events or circumstances after the date of this Information Statement or to reflect the occurrence of unanticipated events.

## SELECTED FINANCIAL DATA AND OTHER OPERATING MEASURES[1]

| | | | At or for the Year Ended December 31, | | |
| | | Adjusted[1] | | | |
| | 2007 | 2006 | 2005 | 2004 | 2003 |
| | | (dollars in millions, except share-related amounts) | | | |
| **Income Statement Data** | | | | | |
| Net interest income | $ 3,099 | $ 3,412 | $ 4,627 | $ 8,313 | $ 8,598 |
| Non-interest income (loss) | 194 | 2,086 | 1,003 | (2,723) | 532 |
| Net income (loss) before cumulative effect of change in accounting principle | (3,094) | 2,327 | 2,172 | 2,603 | 4,809 |
| Cumulative effect of change in accounting principle, net of taxes | — | — | (59) | — | — |
| Net income (loss) | (3,094) | 2,327 | 2,113 | 2,603 | 4,809 |
| Net income (loss) available to common stockholders | $ (3,503) | $ 2,051 | $ 1,890 | $ 2,392 | $ 4,593 |
| Earnings (loss) per common share before cumulative effect of change in accounting principle: | | | | | |
| Basic | $ (5.37) | $ 3.01 | $ 2.82 | $ 3.47 | $ 6.68 |
| Diluted | (5.37) | 3.00 | 2.81 | 3.46 | 6.67 |
| Earnings (loss) per common share after cumulative effect of change in accounting principle: | | | | | |
| Basic | $ (5.37) | $ 3.01 | $ 2.73 | $ 3.47 | $ 6.68 |
| Diluted | (5.37) | 3.00 | 2.73 | 3.46 | 6.67 |
| Dividends per common share | $ 1.75 | $ 1.91 | $ 1.52 | $ 1.20 | $ 1.04 |
| Weighted average common shares outstanding (in thousands): | | | | | |
| Basic | 651,881 | 680,856 | 691,582 | 689,282 | 687,094 |
| Diluted | 651,881 | 682,664 | 693,511 | 691,521 | 688,675 |
| **Balance Sheet Data** | | | | | |
| Total assets | $ 794,368 | $ 804,910 | $ 798,609 | $ 779,572 | $ 787,962 |
| Senior debt, due within one year | 295,921 | 285,264 | 279,764 | 266,024 | 279,180 |
| Senior debt, due after one year | 438,147 | 452,677 | 454,627 | 443,772 | 438,738 |
| Subordinated debt, due after one year | 4,489 | 6,400 | 5,633 | 5,622 | 5,613 |
| All other liabilities | 28,911 | 33,139 | 31,945 | 32,720 | 32,094 |
| Minority interests in consolidated subsidiaries | 176 | 516 | 949 | 1,509 | 1,929 |
| Stockholders' equity | 26,724 | 26,914 | 25,691 | 29,925 | 30,408 |
| **Portfolio Balances**[1] | | | | | |
| Retained portfolio[1] | $ 720,813 | $ 703,959 | $ 710,346 | $ 653,261 | $ 645,767 |
| Total PCs and Structured Securities issued[4] | 1,738,833 | 1,477,023 | 1,335,524 | 1,208,968 | 1,162,068 |
| Total mortgage portfolio | 2,102,676 | 1,826,720 | 1,684,546 | 1,505,531 | 1,414,700 |
| **Non-performing Assets**[5] | | | | | |
| Troubled debt restructurings | $ 3,621 | $ 3,103 | $ 2,605 | $ 2,297 | $ 2,370 |
| Real estate owned, net | 1,736 | 743 | 629 | 741 | 795 |
| Other delinquent loans | 13,089 | 5,700 | 6,439 | 6,345 | 7,491 |
| Total non-performing assets | 18,446 | 9,546 | 9,673 | 9,383 | 10,656 |
| **Ratios** | | | | | |
| Return on average assets[6] | (0.4)% | 0.3% | 0.3% | 0.3% | 0.6% |
| Return on common equity[7] | (21.0) | 9.8 | 8.1 | 9.4 | 17.7 |
| Return on total equity[8] | (11.5) | 8.8 | 7.6 | 8.6 | 15.8 |
| Dividend payout ratio on common stock[9] | N/A | 63.9 | 56.9 | 34.9 | 15.6 |
| Equity to assets ratio[10] | 3.4 | 3.3 | 3.5 | 3.8 | 4.0 |
| Preferred stock to core capital ratio[11] | 37.3 | 17.3 | 13.2 | 13.5 | 14.2 |

(1) See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES" to our consolidated financial statements for more information regarding our accounting policies and adjustments made to previously reported results due to changes in accounting principles. Effective January 1, 2006, we adopted the provisions of Statement of Financial Accounting Standards, or SFAS, No. 123(R), "Share-based Payment" and also changed our method of estimating prepayments for the purpose of amortizing premiums, discounts and deferred fees related to certain mortgage-backed securities. Effective January 1, 2005, we changed to the effective interest method of accounting for interest expense related to callable debt.

(2) Represent the unpaid principal balance and exclude mortgage loans and mortgage-related securities traded, but not yet settled. Effective December 2007, we established a trust for the administration of cash remittances received related to the underlying assets of our PCs and Structured Securities issued. As a result, we adjusted the reported balance of our mortgage portfolios to reflect the publicly-available security balances of our PCs and Structured Securities. Previously, we reported these balances based on the unpaid principal balance of the underlying mortgage loans.

(3) The retained portfolio presented on our consolidated balance sheets differs from the retained portfolio in this table because the consolidated balance sheet caption includes valuation adjustments and deferred balances. See "MD&A — CONSOLIDATED BALANCE SHEETS ANALYSIS — Table 22 — Characteristics of Mortgage Loans and Mortgage-Related Securities in our Retained Portfolio" for more information.

(4) Excludes Structured Securities for which we have resecuritized our PCs and Structured Securities. These resecuritized securities do not increase our credit-related exposure and consist of single-class Structured Securities backed by PCs, REMICs and principal-only strips. The notional balances of interest-only strips are excluded because this line item is based on unpaid principal balance. Includes other guarantees issued that are not in the form of a PC, such as long-term stand-by commitments and credit enhancements for multifamily housing revenue bonds.

(5) Represents mortgage loans held in our retained portfolio, as well as mortgage loans backing our guaranteed PCs and Structured Securities, including those held by third parties.

(6) Ratio computed as net income (loss) divided by the simple average of the beginning and ending balances of total assets.

(7) Ratio computed as net income (loss) available to common stockholders divided by the simple average of the beginning and ending balances of stockholders' equity, net of preferred stock (at redemption value).

(8) Ratio computed as net income (loss) divided by the simple average of the beginning and ending balances of stockholders' equity.

(9) Ratio computed as common stock dividends declared divided by net income available to common stockholders. For the year ended December 31, 2007, net income (loss) available to common stockholders was a loss, and this calculation is not applicable.

(10) Ratio computed as the simple average of the beginning and ending balances of stockholders' equity divided by the simple average of the beginning and ending balances of total assets.

(11) Ratio computed as preferred stock, at redemption value divided by core capital. See "NOTE 9: REGULATORY CAPITAL" to our consolidated financial statements for more information regarding core capital.

MANAGEMENT'S DISCUSSION AND ANALYSIS
OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
EXECUTIVE SUMMARY

**Our Business**

We generate income through our portfolio investment activities and credit guarantee activities, operating as three reportable segments: Investments, Single-family Guarantee and Multifamily. To achieve our objectives for long-term growth, we focus on three long-term business drivers — the profitability of new business, growth and market share. Competition, other market factors, our housing mission under our charter and the HUD affordable housing goals and subgoals require that we make trade-offs in our business that affect each of these drivers.

**Market Overview**

The U.S. residential mortgage market weakened considerably during 2007, adversely affecting our financial condition and results of operations. We expect that weakened conditions in the residential mortgage market will continue in 2008.

Home prices declined in 2007. The volume of new and existing home sales continued to decline and increased inventories of unsold homes have undermined property values. Forecasts of nationwide home prices indicate a continued overall decline through 2008. Changes in home prices are an important market indicator for us. When home prices decline, the risk of borrower defaults and the severity of credit losses generally increase.

Credit concerns and resulting liquidity issues affected the financial markets. Recently, the market for mortgage-related securities has been characterized by high levels of volatility and uncertainty, reduced demand and liquidity, significantly wider credit spreads and a lack of price transparency. Mortgage-related securities, particularly those backed by non-traditional mortgage products, have been subject to various rating agency downgrades and price declines. Many lenders tightened credit standards in the second half of 2007 or stopped originating certain types of mortgages for riskier products in the market, such as some types of ARMs, resulting in higher mortgage rates. This response has adversely affected many borrowers seeking to refinance out of ARMs scheduled to reset to higher rates, contributing to higher observed delinquencies.

The credit performance of all mortgage products deteriorated during 2007; however, the performance of subprime, Alt-A loans and other non-traditional mortgage products deteriorated more severely. See "CREDIT RISKS — Mortgage Credit Risk" for additional information regarding mortgage-related securities backed by subprime and Alt-A loans.

**Consolidated Results — GAAP**

Effective December 31, 2007, we retrospectively changed our method of accounting for our guarantee obligation: a) to a policy of no longer extinguishing our guarantee obligation when we purchase all or a portion of a Freddie Mac-guaranteed security from a policy of effective extinguishment through the recognition of a Participation Certificate residual and b) to a policy that amortizes our guarantee obligation into earnings in a manner that corresponds more closely to our economic release from risk under our guarantee than our former policy, which amortized our guarantee obligation according to the contractual expiration of our guarantee as observed by the decline in the unpaid principal balance of securitized mortgage loans. While our previous accounting is acceptable, we believe the newly adopted method of accounting for our guarantee obligation is preferable because it:

- significantly enhances the transparency and understanding of our financial results;
- promotes uniformity in the accounting model for the credit risk retained in our primary credit guarantee business;
- better aligns revenue recognition to the release from economic risk of loss under our guarantee; and
- increases comparability with other similar financial institutions.

The results of operations for all periods presented in this discussion reflect the retrospective application of our new method of accounting for our guarantee obligation. The net cumulative effect of these changes in accounting principles through December 31, 2007 was an increase to our retained earnings of $1.3 billion. See "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES" to our consolidated financial statements for additional information.

In 2007, we reported net losses of $(3.1) billion, or $(5.37) per diluted share, compared to net income of $2.3 billion, or $3.00 per diluted share, in 2006. Net losses in 2007 were primarily due to higher credit-related expenses and mark-to-market losses on our portfolio of derivatives and guarantee assets. Without giving effect to the changes in accounting method, net losses would have been $(3.7) billion for the fourth quarter of 2007 and $(5.2) billion for the year ended December 31, 2007.

Net interest income decreased to $3.1 billion in 2007 from $3.4 billion in 2006. The decline in net interest income reflected higher replacement costs associated with the funding of our retained portfolio. Our long-term debt interest costs increased because our lower-rate debt matured and was replaced with higher-rate debt.

In 2007, management and guarantee income increased to $2.6 billion from $2.4 billion in 2006, resulting from a 13% increase in the average balance of our PCs and Structured Securities issued. Despite increases in contractual guarantee fees, our total management and guarantee fee rate decreased to 16.6 basis points in 2007 from 17.1 basis points in 2006, primarily attributable to declines in amortization income resulting from slower prepayment projections in 2007.

Other components of non-interest income (loss) totaled $(2.4) billion in 2007, compared to $(0.3) billion in 2006. These amounts include $(4.3) billion of valuation losses in 2007 compared to $(1.3) billion in 2006. The change in valuation losses was primarily attributable to the impact of decreasing long-term interest rates on our derivatives portfolio. Our valuation losses in 2007 were partially offset by $0.5 billion of recoveries on loans impaired upon purchase.

Credit-related expenses, which consist of the total of provision for credit losses and real estate owned, or REO, operations expense, were $3.1 billion and $0.4 billion in 2007 and 2006, respectively. In 2007, our provision for credit losses increased due to significant credit deterioration in our single-family credit guarantee portfolio.

Other non-interest expense included losses on certain credit guarantees and losses on loans purchased, which totaled $3.9 billion in 2007, compared to $0.6 billion in 2006. Increases in losses on certain credit guarantees reflect expectations of higher defaults and severity in the credit market in 2007 which were not fully offset by increases in guarantee and delivery fees due to competitive pressures and contractual fee arrangements. Increases in losses on loans purchased reflect reduced fair values and higher volume of delinquent loans purchased under our guarantees. See 'CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Expenses — Losses on Certain Credit Guarantees" for additional information.

We reported income tax expense (benefit) of $(2.9) billion and $(45) million in 2007 and 2006 resulting in effective tax rates of 48% and (2)%, respectively. See "NOTE 13: INCOME TAXES" to our consolidated financial statements for additional information.

### Segment Results-Adjusted Operating Income

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee and Multifamily. The activities of our business segments are described in "BUSINESS — Business Activities." Certain activities that are not part of a segment are included in the "All Other" category; this category consists of certain unallocated corporate items, such as remediation and restructuring costs, costs related to the resolution of certain legal matters and certain income tax items. We manage and evaluate performance of the segments and All Other using an Adjusted operating income approach. Adjusted operating income differs significantly from, and should not be used as a substitute for net income (loss) before cumulative effect of change in accounting principle or net income (loss) as determined in accordance with GAAP. There are important limitations to using Adjusted operating income as a measure of our financial performance. Among other things, our regulatory capital requirements are based on our GAAP results. Adjusted operating income adjusts for the effects of certain gains and losses and mark-to-market items which, depending on market circumstances, can significantly affect, positively or negatively, our GAAP results and which, in recent periods, have caused us to record GAAP net losses. GAAP net losses will adversely impact our regulatory capital, regardless of results reflected in Adjusted operating income. See "CONSOLIDATED RESULTS OF OPERATIONS — Segment Measures — Adjusted Operating Income" for a description of "Adjusted operating income" and a discussion of its use as a measure of segment operating performance.

The objective of Adjusted operating income is to present our results on an accrual basis as the cash flows from our segments are earned over time. We are primarily a buy and hold investor in mortgage assets, and given our business objectives, we believe it is meaningful to measure performance of our investment business using long-term returns, not on a short-term fair value basis. The business model for our investment activity is one where we generally hold our investments for the long term, fund the investments with debt and derivatives to minimize interest rate risk, and generate net interest income in line with our return on equity objectives. The business model for our credit guarantee activity is one where we are a long-term guarantor of the conforming mortgage markets, manage credit risk, and generate guarantee and credit fees, net of incurred credit losses. As a result of these business models, we believe that an accrual-based metric is a meaningful way to present the emergence of our results as actual cash flows are realized, net of credit losses and impairments. In summary, Adjusted operating income provides us with a view of our financial results that is more consistent with our business objectives, which helps us better evaluate the performance of our business, both from period to period and over the longer term.

Table 6 presents Adjusted operating income by segment and the All Other category and includes a reconciliation of Adjusted operating income to net income (loss) prepared in accordance with GAAP.

**Table 6 — Reconciliation of Adjusted Operating Income to GAAP Net Income (Loss)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| | | (in millions) | |
| Adjusted operating income (loss) after taxes: | | | |
| Investments............................................................ | $ 2,028 | $ 2,111 | $ 2,284 |
| Single-family Guarantee .............................................. | (256) | 1,289 | 965 |
| Multifamily .......................................................... | 398 | 434 | 363 |
| All Other ............................................................ | (103) | 19 | (437) |
| Total Adjusted operating income, net of taxes ...................... | 2,067 | 3,853 | 3,175 |
| Reconciliation to GAAP net income (loss): | | | |
| Derivative- and foreign currency translation-related adjustments ......... | (5,667) | (2,371) | (1,664) |
| Credit guarantee-related adjustments.................................. | (3,268) | (201) | (458) |
| Investment sales, debt retirements and fair value-related adjustments....... | 987 | 231 | 570 |
| Fully taxable-equivalent adjustments.................................. | (388) | (388) | (336) |
| Total pre-tax adjustments ........................................ | (8,336) | (2,729) | (1,868) |
| Tax-related adjustments............................................. | 3,175 | 1,203 | 865 |
| Total reconciling items, net of taxes................................ | (5,161) | (1,526) | (1,003) |
| Net income (loss)[(1)] ................................................ | $(3,094) | $ 2,327 | $ 2,172 |

(1) Total per consolidated statement of income reflects the impact of the adjustments described in "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES" to our consolidated financial statements. Additionally, Net income (loss) is presented before the cumulative effect of a change in accounting principle related to 2005.

*Investments*

Through our Investments segment, we seek to generate attractive returns on our mortgage-related investment portfolio while maintaining a disciplined approach to interest-rate risk and capital management. We seek to accomplish this objective through opportunistic purchases, sales and restructuring of mortgage assets. Although we are primarily a buy and hold investor in mortgage assets, we may sell assets to reduce risk, respond to capital constraints, provide liquidity or structure certain transactions that improve our returns. We estimate our expected investment returns using an OAS approach.

Adjusted operating income for our Investments segment declined in 2007 compared to 2006. We experienced higher funding costs in 2007 for our mortgage-related investment portfolio as our long-term debt interest expense increased, reflecting the replacement of maturing debt.

*Performance Highlights of 2007 versus 2006:*

- Unpaid principal balance of our mortgage-related investment portfolio increased 1% to $663 billion at December 31, 2007.

- Adjusted operating net interest yield was flat in 2007, as compared to 2006, due to increased funding costs offset by a decline in amortization expense of our mortgage-related portfolio.

- Capital constraints limited our ability to significantly increase our mortgage-related investment portfolio in order to take advantage of wider mortgage-to-debt OAS.

*Single-family Guarantee*

Through our Single-family Guarantee segment, we seek to issue guarantees that we believe offer attractive long-term returns relative to anticipated credit costs while fulfilling our mission to provide liquidity, stability and affordability in the residential mortgage market. In addition, we seek to improve our share of the total residential mortgage securitization market by enhancing customer service and expanding our customer base, the types of mortgages we guarantee and the products we offer.

Adjusted operating income for our Single-family Guarantee segment declined in 2007 compared to 2006. In 2007, we experienced an increase in credit costs largely driven by higher volumes of both non-performing loans and foreclosures, higher severity of losses on a per-property basis, a national decline in home prices and declines in regional economic conditions.

*Performance Highlights of 2007 versus 2006:*

- Credit guarantee portfolio increased by 17.7% for the year ended December 31, 2007, compared to 11.1% for the year ended December 31, 2006.

- Average rates of Adjusted operating management and guarantee fee income for the Single-family Guarantee segment remained unchanged at 18.0 basis points.

- Adjusted operating provision for credit losses for the Single-family Guarantee segment increased to $3.0 billion for the year ended December 31, 2007 from $0.3 billion for the year ended December 31, 2006.

- Realized single-family credit losses in 2007 were 3.0 basis points of the average total mortgage portfolio, excluding non-Freddie Mac securities, compared to 1.4 basis points in 2006.
- Announced significant delivery fee increases effective March 2008. Also, in February 2008, we announced an additional increase in delivery fees, effective June 2008, for certain flow transactions.

### *Multifamily*

Through our Multifamily segment, we seek to generate attractive returns on our investments in multifamily mortgage loans while fulfilling our mission to supply affordable rental housing. We also seek to issue guarantees that we believe offer attractive long-term returns relative to anticipated credit costs.

Adjusted operating income for our Multifamily segment decreased in 2007 compared to 2006 as a result of a decrease in net interest income. The decrease in net interest income is primarily attributable to increased debt expense related to higher debt funding costs as well as lower interest yields on the portfolio. Despite market volatility and credit concerns in the single-family market, the multifamily market fundamentals generally continued to display positive trends. Tightened credit standards and reduced liquidity caused many market participants to limit purchases of multifamily mortgages during the second half of 2007, creating investment opportunities for us with higher long-term expected returns and enhancing our ability to meet our affordable housing goals. Despite the investment limitations created by our current capital position, our purchases of multifamily retained mortgages were at record levels in 2007.

### *Performance Highlights of 2007 versus 2006:*

- Mortgage purchases into our multifamily loan portfolio increased approximately 50% in 2007, to $18.2 billion from $12.1 billion in 2006.
- Unpaid principal balance of our mortgage loan portfolio increased to $57.6 billion at December 31, 2007 from $45.2 billion at December 31, 2006.
- Our provision for credit losses for the Multifamily segment remained low at $38 million for the year ended December 31, 2007.

### Capital Management

Our primary objective in managing capital is preserving our safety and soundness. We also seek to have sufficient capital to support our business and mission. We make investment decisions based on our capital levels. OFHEO monitors our capital adequacy using several capital standards and since 2004 has directed a 30% mandatory target capital surplus above our regulatory minimum capital requirement.

Weakness in the housing market and volatility in the financial markets continue to adversely affect our capital, including our ability to manage to the 30% mandatory target capital surplus. As a result of the impact of GAAP net losses on our regulatory core capital, our estimated capital surplus was below the 30% mandatory target capital surplus at the end of November 2007. In order to manage to the 30% mandatory target capital surplus and improve business flexibility, on December 4, 2007, we issued $6 billion of non-cumulative, perpetual preferred stock. In addition, during the fourth quarter of 2007, we reduced our common stock dividend by 50% and reduced the size of our cash and investments portfolio. In the future, to help us manage to the 30% mandatory target capital surplus, we may consider additional measures, such as limiting the growth or reducing the size of our retained portfolio, slowing issuances of our credit guarantees, issuing preferred or convertible preferred stock, issuing common stock or further reducing our common stock dividend.

Factors that could adversely affect the adequacy of our capital in future periods include GAAP net losses; continued declines in home prices; changes in our credit and interest-rate risk profiles; adverse changes in interest rates or implied volatility; adverse OAS changes; legislative or regulatory actions that increase capital requirements; or changes in accounting practices or standards.

Other items positively affecting our capital position include: (a) certain operational changes in December 2007 for purchasing delinquent loans from PCs, (b) changes in accounting principles we adopted, which increased core capital by $1.3 billion at December 31, 2007 and (c) our adoption of SFAS No. 159, "*The Fair Value Option of Financial Assets and Financial Liabilities, including an amendment of FASB Statement No. 115,*" or SFAS 159, on January 1, 2008, which increased core capital by an estimated $1.0 billion.

We will submit amended quarterly minimum and critical capital reports to OFHEO that are adjusted to reflect the impacts of the retrospective application of our changes in method of accounting for our guarantee obligation. OFHEO is the authoritative source for our regulatory capital calculations. However, we believe that we remain adequately capitalized for all historical quarters, on an adjusted basis. At December 31, 2007 our estimated regulatory core capital was $37.9 billion after the effects of the adjustments, which was an estimated $11.4 billion in excess of our minimum capital requirement and

$3.5 billion in excess of the 30% mandatory target capital surplus. See "NOTE 9: REGULATORY CAPITAL" to our consolidated financial statements for additional information about our regulatory capital.

### Fair Value Results

We use estimates of fair value on a routine basis to make decisions about our business activities. Our attribution of the changes in fair value relies on models, assumptions and other measurement techniques that will evolve over time. Our consolidated fair value measurements are a component of our risk management processes. For information about how we estimate the fair value of financial instruments, see "NOTE 16: FAIR VALUE DISCLOSURES" to our consolidated financial statements.

In 2007, the fair value of net assets attributable to common stockholders, before capital transactions, decreased by $23.6 billion, compared to a $2.5 billion increase in 2006. The payment of common dividends and the repurchase of common shares, net of reissuance of treasury stock, reduced total fair value by an additional $2.1 billion. The fair value of net assets attributable to common stockholders as of December 31, 2007 was $0.3 billion, compared to $26.0 billion as of December 31, 2006.

The following attribution of changes in fair value reflects our current estimate of the items presented (on a pre-tax basis) and excludes the effect of returns on capital and administrative expenses.

Our investment activities decreased fair value by approximately $18.1 billion in 2007. This estimate includes declines in fair value of approximately $23.8 billion attributable to net mortgage-to-debt OAS widening. Of this amount, approximately $13.4 billion was related to the impact of the net mortgage-to-debt OAS widening on our portfolio of non-agency mortgage-related securities.

Our investment activities increased fair value by an estimated $1.3 billion in 2006. This increase in fair value was primarily attributable to the core spread earned on our retained portfolio.

The impact of mortgage-to-debt OAS widening during 2007 increases the likelihood that, in future periods, we will be able to recognize core spread income from our investment activities at a higher spread level. We estimate that we recognized core spread income at a net mortgage-to-debt OAS level of approximately 100 to 105 basis points at December 31, 2007, as compared to approximately 25 to 30 basis points estimated at December 31, 2006. See "CONSOLIDATED FAIR VALUE BALANCE SHEETS ANALYSIS — Discussion of Fair Value Results — *Estimated Impact of Changes in Mortgage-To-Debt OAS on Fair Value Results*" for additional information.

Our credit guarantee activities, including multifamily and single-family whole loan credit exposure, decreased fair value by an estimated $18.5 billion in 2007. This estimate includes an increase in the single-family guarantee obligation of approximately $22.2 billion, primarily attributable to higher expected future credit costs and increased uncertainty in the market. This increase in the single-family guarantee obligation was partially offset by a fair value increase in the single-family guarantee asset of approximately $2.1 billion and cash receipts related to management and guarantee fees and other up-front fees.

During 2006, our credit guarantee activities increased fair value by an estimated $1.9 billion. This estimate includes a fair value increase related to the single-family guarantee asset of approximately $0.9 billion and cash receipts related to management and guarantee fees and other up-front fees. These increases were partially offset by an increase in the single-family guarantee obligation of approximately $1.3 billion.

### Business Outlook

We expect that our realized credit losses will continue to increase, which will adversely affect the profitability of our Single-family Guarantee segment. We expect the increase will be largely driven by the credit characteristics of loans originated in 2006 and 2007, which are generally of lower credit quality than loans underlying our issuances in prior years. In addition, the average management and guarantee fees on our 2007 issuances did not keep pace with the increase in expected default costs on the underlying loans. We expect to continue to pursue increases to our guarantee fees and delivery fees on bulk and flow transactions to better reflect our expectations of future default costs.

We expect to continue to experience attractive purchase opportunities for our retained portfolio, due to wider mortgage spreads and continued attractive debt funding levels. As a result of the temporary increase in the conventional conforming loan limits, we expect to purchase mortgages with significantly higher unpaid principal balances. Our ability to purchase these mortgages is subject to certain operational constraints and any conditions that may be imposed by our regulators as well as our ability to manage the additional credit risks associated with such mortgages. In addition, our ability to take full advantage of these and other market opportunities may also be limited by our ability to manage to the 30% mandatory target capital surplus and our voluntary, temporary growth limit.

The turmoil in the credit and mortgage markets is also presenting opportunities to profitably grow our single-family and multifamily portfolios. We expect our share of the mortgage securitization market to grow as mortgage originators have

generally tightened their credit standards during 2007, causing conforming mortgages to be the predominant product in the market.

We expect to begin the process of registering our common stock with the SEC in 2008. As a part of this initiative, we expect to complete the remediation of the material weaknesses in our financial reporting processes. Although we have made substantial progress in the remediation of our control deficiencies, the process of registering with the SEC and meeting our ongoing reporting obligations once our common stock is registered poses significant operational challenges for us.

Over the next two years, we believe we should be able to reduce administrative expenses. We expect to begin this process in 2008, as we complete our financial remediation efforts and benefit from our investments in new technology.

We expect that it will be challenging for us to achieve HUD's affordable housing goals and subgoals for 2008, due to the significant changes in the residential mortgage market that occurred in 2007 and that are likely to continue well into 2008. These changes include a decrease in single-family home sales that began in 2005 and deteriorating conditions in the mortgage credit markets, which have resulted in more rigorous underwriting standards, and greatly reduced originations of subprime and Alt-A mortgages.

## CONSOLIDATED RESULTS OF OPERATIONS

The following discussion of our consolidated results of operations should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for more information concerning the most significant accounting policies and estimates applied in determining our reported financial position and results of operations.

Effective December 31, 2007, we retrospectively changed our method of accounting for our guarantee obligation: a) to a policy of no longer extinguishing our guarantee obligation when we purchase all or a portion of a Freddie Mac-guaranteed security from a policy of effective extinguishment through the recognition of a Participation Certificate residual and b) to a policy that amortizes our guarantee obligation into earnings in a manner that corresponds more closely to our economic release from risk under our guarantee than our former policy, which amortized our guarantee obligation according to the contractual expiration of our guarantee as observed by the decline in the unpaid principal balance of securitized mortgage loans. While our previous accounting is acceptable, we believe the newly adopted method of accounting for our guarantee obligation is preferable because it:

- significantly enhances the transparency and understandability of our financial results;
- promotes uniformity in the accounting model for the credit risk retained in our primary credit guarantee business;
- better aligns revenue recognition to the release from economic risk of loss under our guarantee; and
- increases comparability with other similar financial institutions.

All of the results of operations discussed below for years ended December 31, 2006 and 2005 are shown as "Adjusted" in the tables to reflect the retrospective application of our new method of accounting for our guarantee obligation. Results for the quarters of 2007 and the twelve months ended 2007 reflect these changes for the full periods presented.

On October 1, 2007, we adopted FASB Interpretation No. 39-1, "*Amendment to FASB Interpretation No. 39*," or FSP FIN 39-1. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Adopted Accounting Standards — *Offsetting of Amounts Related to Certain Contracts*" to our consolidated financial statements for additional information about our adoption of FSP FIN 39-1. The adoption of FSP FIN 39-1 had no effect on our consolidated statements of income.

The net cumulative effect of these changes in accounting principles through December 31, 2007 was an increase to our net income of $1.3 billion, which includes a net cumulative increase of $2.2 billion for 2005, 2006 and 2007 and a net cumulative decrease of $0.9 billion related to periods prior to 2005. See "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES" to our consolidated financial statements for additional information.

### Table 7 — Summary Consolidated Statements of Income — GAAP Results

| | Year Ended December 31, | | |
|---|---|---|---|
| | | Adjusted | |
| | 2007 | 2006 | 2005 |
| | (In millions) | | |
| Net interest income | $ 3,099 | $ 3,412 | $ 4,627 |
| Non-interest income: | | | |
| Management and guarantee income | 2,635 | 2,393 | 2,076 |
| Gains (losses) on guarantee asset | (1,484) | (978) | (1,409) |
| Income on guarantee obligation | 1,905 | 1,519 | 1,428 |
| Derivative gains (losses) | (1,904) | (1,173) | (1,321) |
| Gains (losses) on investment activity | 294 | (473) | (97) |
| Gains on debt retirement | 345 | 466 | 206 |
| Recoveries on loans impaired upon purchase | 505 | — | — |
| Foreign-currency gains (losses), net | (2,348) | 96 | (6) |
| Other income | 246 | 236 | 126 |
| Non-interest income | 194 | 2,086 | 1,003 |
| Non-interest expense: | | | |
| Administrative expenses | (1,674) | (1,641) | (1,535) |
| Other expenses | (7,596) | (1,575) | (1,565) |
| Non-interest expense | (9,270) | (3,216) | (3,100) |
| Income (loss) before income tax (expense) benefit and cumulative effect of change in accounting principle | (5,977) | 2,282 | 2,530 |
| Income tax (expense) benefit | 2,883 | 45 | (358) |
| Net income (loss) before cumulative effect of change in accounting principle | (3,094) | 2,327 | 2,172 |
| Cumulative effect of change in accounting principle, net of tax | — | — | (59) |
| Net income (loss) | $(3,094) | $ 2,327 | $ 2,113 |

*Freddie Mac*

## Net Interest Income

Table 8 summarizes our net interest income and net interest yield and provides an attribution of changes in annual results to changes in interest rates or changes in volumes of our interest-earning assets and interest-bearing liabilities. Average balance sheet information is presented because we believe end-of-period balances are not representative of activity throughout the periods presented. For most components of the average balances, a daily weighted average balance was calculated for the period. When daily weighted average balance information was not available, a simple monthly average balance was calculated.

### Table 8 — Average Balance, Net Interest Income and Rate/Volume Analysis

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Adjusted | | | | | |
| | 2007 | | | 2006 | | | 2005 | | |
| | Average Balance[1][2] | Interest Income (Expense)[1] | Average Rate | Average Balance[1][2] | Interest Income (Expense)[1] | Average Rate | Average Balance[1][2] | Interest Income (Expense)[1] | Average Rate |
| | (dollars in millions) | | | | | | | | |
| **Interest-earning assets:** | | | | | | | | | |
| Mortgage loans[3][4] | $ 70,890 | $ 4,449 | 6.28% | $ 63,870 | $ 4,152 | 6.50% | $ 61,256 | $ 4,010 | 6.55% |
| Mortgage-related securities | 645,344 | 34,893 | 5.40 | 650,992 | 33,850 | 5.20 | 611,761 | 28,968 | 4.74 |
| Total retained portfolio | 716,234 | 39,342 | 5.49 | 714,862 | 38,002 | 5.32 | 673,017 | 32,978 | 4.90 |
| Investments[5] | 43,910 | 2,285 | 5.20 | 57,705 | 2,789 | 4.83 | 53,252 | 1,773 | 3.33 |
| Securities purchased under agreements to resell and federal funds sold | 24,469 | 1,283 | 5.25 | 28,577 | 1,473 | 5.15 | 25,344 | 833 | 3.28 |
| Total interest-earning assets | $785,113 | $ 42,910 | 5.46 | $801,144 | $ 42,264 | 5.28 | $751,613 | $ 35,584 | 4.73 |
| **Interest-bearing liabilities:** | | | | | | | | | |
| Short-term debt | $174,418 | $ (8,916) | (5.11) | $179,882 | $ (8,665) | (4.82) | $192,497 | $ (6,102) | (3.17) |
| Long-term debt[6] | 576,973 | (29,148) | (5.05) | 587,978 | (28,218) | (4.80) | 524,270 | (23,246) | (4.43) |
| Total debt securities | 751,391 | (38,064) | (5.07) | 767,860 | (36,883) | (4.80) | 716,767 | (29,348) | (4.09) |
| Due to PC investors | 7,820 | (418) | (5.35) | 7,475 | (387) | (5.18) | 10,399 | (551) | (5.30) |
| Total interest-bearing liabilities | 759,211 | (38,482) | (5.07) | 775,335 | (37,270) | (4.81) | 727,166 | (29,899) | (4.11) |
| Expense related to derivatives | | (1,329) | (0.17) | | (1,582) | (0.20) | | (1,058) | (0.15) |
| Impact of net non-interest-bearing funding | 25,902 | — | 0.17 | 25,809 | — | 0.16 | 24,447 | — | 0.14 |
| Total funding of interest-earning assets | $785,113 | $(39,811) | (5.07) | $801,144 | $(38,852) | (4.85) | $751,613 | $(30,957) | (4.12) |
| Net interest income/yield | | $ 3,099 | 0.39 | | $ 3,412 | 0.43 | | $ 4,627 | 0.61 |
| Fully taxable-equivalent adjustments[7] | | 392 | 0.05 | | 392 | 0.04 | | 339 | 0.05 |
| Net interest income/yield (fully taxable-equivalent basis) | | $ 3,491 | 0.44% | | $ 3,804 | 0.47% | | $ 4,966 | 0.66% |

| | 2007 vs. 2006 Variance Due to | | | 2006 vs. 2005 Variance Due to | | |
|---|---|---|---|---|---|---|
| | Rate[8] | Volume[8] | Total Change | Rate[8] | Volume[8] | Total Change |
| | (in millions) | | | | | |
| **Interest-earning assets:** | | | | | | |
| Mortgage loans | $ (147) | $ 444 | $ 297 | $ (28) | $ 170 | $ 142 |
| Mortgage-related securities | 1,312 | (269) | 1,043 | 2,952 | 1,930 | 4,882 |
| Total retained portfolio | 1,165 | 175 | 1,340 | 2,924 | 2,100 | 5,024 |
| Investments | 201 | (705) | (504) | 857 | 159 | 1,016 |
| Securities purchased under agreements to resell and federal funds sold | 25 | (215) | (190) | 523 | 117 | 640 |
| Total interest-earning assets | $ 1,391 | $(745) | $ 646 | $ 4,304 | $ 2,376 | $ 6,680 |
| **Interest-bearing liabilities:** | | | | | | |
| Short-term debt | $ (520) | $ 269 | $ (251) | $(2,986) | $ 423 | $(2,563) |
| Long-term debt | (1,465) | 535 | (930) | (2,008) | (2,964) | (4,972) |
| Total debt securities | (1,985) | 804 | (1,181) | (4,994) | (2,541) | (7,535) |
| Due to PC investors | (13) | (18) | (31) | 12 | 152 | 164 |
| Total interest-bearing liabilities | (1,998) | 786 | (1,212) | (4,982) | (2,389) | (7,371) |
| Expense related to derivatives | 253 | — | 253 | (524) | — | (524) |
| Total funding of interest-earning assets | $(1,745) | $ 786 | $ (959) | $(5,506) | $(2,389) | $(7,895) |
| Net interest income | $ (354) | $ 41 | $ (313) | $(1,202) | $ (13) | $(1,215) |
| Fully taxable-equivalent adjustments | 9 | (9) | — | 29 | 24 | 53 |
| Net interest income (fully taxable-equivalent basis) | $ (345) | $ 32 | $ (313) | $(1,173) | $ 11 | $(1,162) |

(1) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) For securities in our retained and investment portfolios, we calculated average balances based on their unpaid principal balance plus their associated deferred fees and costs (e.g., premiums and discounts), but excluded the effects of mark-to-fair-value changes.
(3) Non-performing loans, where interest income is recognized when collected, are included in average balance.
(4) Loan fees included in our mortgage loan interest income were $290 million, $280 million and $371 million for the years ended December 31, 2007, 2006 and 2005, respectively.
(5) Consist of cash and cash equivalents and non-mortgage-related securities.
(6) Includes current portion of long-term debt. See "NOTE 7: DEBT SECURITIES AND SUBORDINATED BORROWINGS" to our consolidated financial statements for a reconciliation of senior debt, due within one year on our consolidated balance sheets.
(7) The determination of net interest income/yield (fully taxable-equivalent basis), which reflects fully taxable-equivalent adjustments to interest income, involves the conversion of tax-exempt sources of interest income to the equivalent amounts of interest income that would be necessary to derive the same net return if the investments had been subject to income taxes using our federal statutory tax rate of 35%.
(8) Rate and volume changes are calculated on the individual financial statement line item level. Combined rate/volume changes were allocated to the individual rate and volume change based on their relative size.

*Freddie Mac*

Table 9 summarizes components of our net interest income.

**Table 9 — Net Interest Income**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2007 | Adjusted 2006 | 2005 |
| | | (In millions) | |
| Contractual amounts of net interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 6,038 | $ 7,472 | $ 8,289 |
| Amortization expense, net:[1] | | | |
| Asset-related amortization expense, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (268) | (875) | (1,158) |
| Long-term debt-related amortization expense, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,342) | (1,603) | (1,446) |
| Total amortization expense, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,610) | (2,478) | (2,604) |
| Expense related to derivatives: | | | |
| Amortization of deferred balances in AOCI[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,329) | (1,620) | (1,966) |
| Accrual of periodic settlements of derivatives:[3] | | | |
| Receive-fixed swaps[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 502 | 1,185 |
| Foreign-currency swaps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (464) | (277) |
| Total accrual of periodic settlements of derivatives . . . . . . . . . . . . . . . . . . . . . . . | — | 38 | 908 |
| Total expense related to derivatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,329) | (1,582) | (1,058) |
| Net interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,099 | 3,412 | 4,627 |
| Fully taxable-equivalent adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 392 | 392 | 339 |
| Net interest income (fully taxable-equivalent basis) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 3,491 | $ 3,804 | $ 4,966 |

(1) Represents amortization related to premiums, discounts, deferred fees and other adjustments to the carrying value of our financial instruments and the reclassification of previously deferred balances from accumulated other comprehensive income, or AOCI, for certain derivatives in cash flow hedge relationships related to individual debt issuances and mortgage purchase transactions.
(2) Represents changes in fair value of derivatives in cash flow hedge relationships that were previously deferred in AOCI and have been reclassified to earnings as the associated hedged forecasted issuance of debt and mortgage purchase transactions affect earnings.
(3) Reflects the accrual of periodic cash settlements of all derivatives in qualifying hedge accounting relationships.
(4) Include imputed interest on zero-coupon swaps.

Net interest income and net interest yield on a fully taxable-equivalent basis decreased for the year ended December 31, 2007 compared to the year ended December 31, 2006. During 2007, we experienced higher funding costs for our retained portfolio as our long-term debt interest expense increased, reflecting the replacement of maturing debt that had been issued at lower interest rates to fund our investments in fixed-rate mortgage-related investments. The decrease in net interest income and net interest yield on a fully taxable-equivalent basis was partially offset by a decrease in our mortgage-related securities premium amortization expense as purchases into our retained portfolio in 2007 largely consisted of securities purchased at a discount. In addition, wider mortgage-to-debt OAS due to continued lower demand for mortgage-related securities from depository institutions and foreign investors, along with heightened market uncertainty regarding mortgage-related securities, resulted in favorable investment opportunities. However, to manage to our 30% mandatory target capital surplus, we reduced our average balance of interest earning assets and as a result, we were not able to take full advantage of these opportunities.

Net interest income and net interest yield on a fully taxable-equivalent basis decreased in 2006 as compared to 2005 as spreads on fixed-rate investments continued to narrow, driven by increases in long- and medium-term interest rates. The increase in our long-term debt interest costs reflects the turnover of medium-term debt that we issued in previous years to fund our investments in fixed-rate mortgage-related investments when the yield curve was steep (*i.e.*, short- and medium-term interest rates were low as compared to long-term interest rates). As the yield curve flattened during 2005 and 2006, we experienced increased funding costs associated with replacing maturing lower-cost debt. During 2006, net interest margins declined as a result of changes in interest rates on variable-rate assets acquired in 2004 and 2005. Also, we adjusted our funding mix in 2006 by increasing the proportion of callable debt outstanding, which we use to manage prepayment risk associated with our mortgage-related investments and which generally has a higher interest cost than non-callable debt. In 2006, we considered the issuance of callable debt to be more cost effective than alternative interest-rate risk management strategies, primarily the issuance of non-callable bullet debt combined with the use of derivatives. In addition, the impact of rising short-term interest rates on our funding costs was largely offset by the impact of rising rates on our variable-rate assets in our retained portfolio and cash and investments portfolio.

Net interest income for 2006 also reflected lower net interest income on derivatives in qualifying hedge accounting relationships. Net interest income associated with the accrual of periodic settlements declined as the benchmark London Interbank Offer Rate, or LIBOR, and the Euro Interbank Offered Rate, or Euribor, interest rates increased during the year, adversely affecting net settlements on our receive-fixed and foreign-currency swaps (Euro-denominated). Net interest income was also affected by our decisions in March and December 2006 to discontinue hedge accounting treatment for a significant amount of our receive-fixed and foreign-currency swaps, as discussed in "NOTE 11: DERIVATIVES" to our consolidated financial statements. The net interest expense related to these swaps is no longer a component of net interest

income, after hedge accounting was discontinued, but instead is recognized as a component of derivative gains (losses). By the end of 2006, nearly all of our derivatives were not in hedge accounting relationships.

Enhancements to certain models used to estimate prepayment speeds on mortgage-related securities and our approach for estimating uncollectible interest on single-family mortgages greater than 90 days delinquent resulted in a net decrease in retained portfolio interest income of $166 million (pre-tax) during the first quarter of 2005.

## Non-Interest Income (Loss)

### Management and Guarantee Income

The primary drivers affecting management and guarantee income are changes in the average balance of our PCs and Structured Securities issued and changes in guarantee fee rates. Contractual management and guarantee fees include adjustments for buy-ups and buy-downs, whereby the guarantee fee is adjusted for up-front cash payments we make (buy-up) or receive (buy-down) upon issuance of our guarantee. Our average rates of management and guarantee income are affected by the mix of products we issue, competition in the market and customer preference for buy-up and buy-down fees. The majority of our guarantees are issued under customer flow channel contracts. The remainder of our purchase and guarantee securitization of mortgage loans occurs through bulk purchases.

Table 10 provides summary information about management and guarantee income. Management and guarantee income consists of contractual amounts due to us (reflecting buy-ups and buy-downs to base guarantee fees) as well as amortization of certain pre-2003 deferred credit and buy-down fees received by us which are recorded as deferred income as a component of other liabilities. Post-2002 credit fees and buy-down fees are reflected as either increased income on guarantee obligation as the guarantee obligation is amortized or a reduction in losses on certain credit guarantees recorded at the initiation of a guarantee.

### Table 10 — Management and Guarantee Income

| | Year Ended December 31, | | | | | |
| | 2007 | | Adjusted 2006 | | 2005 | |
| | Amount | Rate | Amount | Rate | Amount | Rate |
| | (dollars in millions, rates in basis points) | | | | | |
| Contractual management and guarantee fees........................................... | $2,591 | 16.3 | $2,201 | 15.7 | $1,982 | 15.8 |
| Amortization of credit and buy-down fees included in other liabilities................ | 44 | 0.3 | 192 | 1.4 | 94 | 0.8 |
| Total management and guarantee income ............................................ | $2,635 | 16.6 | $2,393 | 17.1 | $2,076 | 16.6 |
| Unamortized balance of credit and buy-down fees included in other liabilities, at period end .............................................................................. | $ 410 | | $ 440 | | $ 619 | |

Management and guarantee income increased in 2007 compared to 2006 resulting from a 13% increase in the average balance of our PCs and Structured Securities. The total management and guarantee fee rate decreased in 2007 compared to 2006 due to declines in amortization income resulting from slowing prepayments attributable to increasing interest rate projections. The decline was partially offset by an increase in contractual management and guarantee fee rates as a result of an increase in buy-up activity in 2007.

Management and guarantee income increased in 2006 compared to 2005 reflecting a 12% increase in the average balance of our PCs and Structured Securities. The total management and guarantee fee rate increased in 2006 compared to 2005, which reflects higher amortization income due to a decrease in interest rates. The contractual management and guarantee fee rate increase was offset by an increase in buy-down activity in 2006.

### Gains (Losses) on Guarantee Asset

Upon issuance of a guarantee of securitized assets, we record a guarantee asset on our consolidated balance sheets representing the fair value of the guarantee fees we expect to receive over the life of our PCs or Structured Securities. Subsequent changes in the fair value of the guarantee asset are reported in current period income as gains (losses) on guarantee asset.

The change in fair value of the guarantee asset reflects:

- reductions related to the management and guarantee fees received that are considered a return of our recorded investment in the guarantee asset;

- changes in future management and guarantee fees we expect to receive over the life of the related PCs or Structured Securities, and

- The fair value of future management and guarantee fees is driven by expected changes in interest rates that affect the estimated life of the mortgages underlying our PCs and Structured Securities issued and the related discount rates used to determine the net present value of the cash flows. For example, an increase in interest rates extends the life of the guarantee asset and increases the fair value of future management and guarantee fees. Our valuation

methodology for the guarantee asset uses market-based information, including market values of excess servicing, interest-only securities, to determine the fair value of future cash flows associated with the guarantee asset.

### Table 11 — Attribution of Change — Gains (Losses) on Guarantee Asset

| | Year Ended December 31, | | |
| | Adjusted | | |
| | 2007 | 2006 | 2005 |
| | (in millions) | | |
|---|---|---|---|
| Management and guarantee fees due | $(2,288) | $(1,873) | $(1,565) |
| Portion of contractual guarantee fees due related to imputed interest income | 549 | 580 | 450 |
| Return of investment on guarantee asset | (1,739) | (1,293) | (1,115) |
| Change in fair value of management and guarantee fees | 309 | 261 | (267) |
| Change in estimate[1] | (54) | 54 | (27) |
| Gains (losses) on guarantee asset | $(1,484) | $ (978) | $(1,409) |

(1) Represents a change in estimate related to gains (losses) on guarantee asset resulting from enhancing our approach for determining the fair value of the guarantee asset.

Management and guarantee fees due represents cash received in the current period related to our PCs and Structured Securities with an established guarantee asset. A portion of management and guarantee fees due is attributed to imputed interest income on the guarantee asset. Management and guarantee fees due increased in both 2007 and 2006, primarily due to increases in the average balance of our PCs and Structured Securities issued.

Gains on fair value of management and guarantee fees in 2007 primarily resulted from an increase in interest rates during the second quarter. The increase in gains on fair value of management and guarantee fees in 2006 was due to an increase in interest rates throughout the year.

### Income on Guarantee Obligation

Upon issuance of a guarantee of securitized assets, we record a guarantee obligation on our consolidated balance sheets representing the fair value of our obligation to perform under the terms of the guarantee. Our guarantee obligation is amortized into income using a static effective yield calculated and fixed at inception of the guarantee based on forecasted unpaid principal balances. The static effective yield will be evaluated and adjusted when significant changes in economic events cause a shift in the pattern of our economic release from risk. For example, certain market environments may lead to sharp and sustained changes in home prices or prepayments of mortgages, leading to the need for an adjustment in the static effective yield for specific mortgage pools underlying the guarantee. When a change is required, a cumulative catch-up adjustment, which could be significant in a given period, will be recognized and a new static effective yield will be used to determine our guarantee obligation amortization. Our guarantee obligation consists of:

- performance and other related costs, which consist of: estimated credit costs, including unrecoverable principal and interest over the expected life of the underlying mortgages; estimated foreclosure-related costs; and administrative and other costs related to our guarantee; and
- deferred guarantee income on newly-issued guarantor swap transactions, which represents the excess of compensation, if any, received on issued guarantees and the fair value of our related guarantee asset, compared to the fair value of our corresponding guarantee obligation. Compensation received includes credit and buy-down fees received at the time of securitization. Credit fees vary with the credit quality of the underlying mortgages and buy-down fees vary based on customer compensation payment preferences. Compensation also includes various types of seller-provided credit enhancements related to the underlying mortgage loans.

See "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES" to our consolidated financial statements for further information regarding our guarantee obligation.

### Table 12 — Income on Guarantee Obligation

| | Year Ended December 31, | | |
| | Adjusted | | |
| | 2007 | 2006 | 2005 |
| | (in millions) | | |
|---|---|---|---|
| Amortization income related to: | | | |
| Performance and other related costs | $ 1,146 | $ 804 | $ 747 |
| Deferred guarantee income | 759 | 715 | 681 |
| Total income on guarantee obligation | $ 1,905 | $1,519 | $1,428 |
| Components of the guarantee obligation, at period end: | | | |
| Unamortized balance of performance and other related costs | $ 9,930 | $5,841 | $4,556 |
| Unamortized balance of deferred guarantee income | 3,782 | 3,641 | 3,351 |
| Total guarantee obligation | $13,712 | $9,482 | $7,907 |

Amortization income increased in 2007 and 2006. These increases reflect the growth of the guarantee obligation associated with newly-issued guarantees, which have higher associated performance costs due to higher expected credit costs than issuances in previous years, as well as higher average balances of our PCs and Structured Securities.

Our amortization method is intended to correlate to our economic release from risk under our guarantee, under changing economic scenarios. In the event of significant and sustained economic changes, we would revise our static effective yield amortization, by recognizing a cumulative, catch-up adjustment. We expect that the decline in national home prices in 2008 will require catch-up adjustments to our static effective yield method. This will result in higher amortization in the first quarter of 2008 than would be recognized under the static effective yield method absent these economic changes.

### Derivative Overview

Table 13 presents the effect of derivatives on our consolidated financial statements, including notional or contractual amounts of our derivatives and our hedge accounting classifications.

**Table 13 — Summary of the Effect of Derivatives on Selected Consolidated Financial Statement Captions**

| | Consolidated Balance Sheets | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2007 | | | Adjusted December 31, 2006 | | |
| Description | Notional or Contractual Amount[1] | Fair Value (Pre-Tax)[2] | AOCI (Net of Taxes)[3] | Notional or Contractual Amount[1] | Fair Value (Pre-Tax)[2] | AOCI (Net of Taxes)[3] |
| | (in millions) | | | | | |
| Cash flow hedges-open | $    — | $    — | $    — | $    70 | $    — | $    — |
| No hedge designation | 1,322,881 | 4,790 | — | 758,039 | 7,720 | — |
| Subtotal | 1,322,881 | 4,790 | — | 758,109 | 7,720 | — |
| Balance related to closed cash flow hedges | — | — | (4,059) | — | — | (5,032) |
| Total | $1,322,881 | $4,790 | $(4,059) | $758,109 | $7,720 | $(5,032) |

| | Consolidated Statements of Income | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | | Adjusted | |
| | 2007 | 2006 | 2005 |
| Description | Derivative Gains (Losses) | Derivative Gains (Losses) | Derivative Gains (Losses) |
| | (in millions) | | |
| Cash flow hedges-open | $    — | $    — | $    (25) |
| No hedge designation | (1,904) | (1,173) | (1,296) |
| Total | $(1,904) | $(1,173) | $(1,321) |

(1) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged. Notional or contractual amounts are not recorded as assets or liabilities.

(2) The value of derivatives on our consolidated balance sheets is reported as derivative asset, net and derivative liability, net, and includes net derivative interest receivable or payable and cash collateral held or posted. Fair value excludes net derivative interest receivable of $1.7 billion and net derivative collateral held of $6.2 billion at December 31, 2007. Fair value excludes net derivative interest receivable of $2.3 billion and net derivative collateral held of $9.5 billion at December 31, 2006.

(3) Derivatives that meet specific criteria may be accounted for as cash flow hedges. Changes in the fair value of the effective portion of open cash flow hedges are recorded in AOCI, net of taxes. Net deferred gains and losses on closed cash flow hedges (i.e., where the derivative is either terminated or redesignated) are also included in AOCI, net of taxes, until the related forecasted transaction affects earnings or is determined to be probable of not occurring.

Prior to 2007, we discontinued nearly all of our cash flow hedge and fair value hedge accounting relationships. At December 31, 2007, we did not have any derivatives in hedge accounting relationships. From time to time, we designate as cash flow hedges certain commitments to forward sell mortgage-related securities. See "NOTE 11: DERIVATIVES" to our consolidated financial statements for additional information on our discontinuation of hedge accounting treatment. Derivatives that are not in qualifying hedge accounting relationships generally increase the volatility of reported non-interest income because the fair value gains and losses on the derivatives are recognized in earnings without the offsetting recognition in earnings of the change in value of the economically hedged exposures.

For derivatives designated in cash flow hedge accounting relationships, the effective portion of the change in fair value of the derivative asset or derivative liability is presented in the stockholders' equity section of our consolidated balance sheets in AOCI, net of taxes. At December 31, 2007 and 2006, the net cumulative change in the fair value of all derivatives designated in cash flow hedge relationships for which the forecasted transactions had not yet affected earnings (net of amounts previously reclassified to earnings through each year-end) was an after-tax loss of approximately $4.1 billion and $5.0 billion, respectively. These amounts relate to net deferred losses on closed cash flow hedges. The majority of the closed cash flow hedges relate to hedging the variability of cash flows from forecasted issuances of debt. Fluctuations in prevailing market interest rates have no impact on the deferred portion of AOCI, net of taxes, relating to closed cash flow hedges. The

deferred amounts related to closed cash flow hedges will be recognized into earnings as the hedged forecasted transactions affect earnings, unless it becomes probable that the forecasted transactions will not occur. If it is probable that the forecasted transactions will not occur, then the deferred amount associated with the forecasted transactions will be recognized immediately in earnings.

At December 31, 2007, over 70% and 90% of the $4.1 billion net deferred losses in AOCI, net of taxes, relating to cash flow hedges were linked to forecasted transactions occurring in the next 5 and 10 years, respectively. Over the next 10 years, the forecasted debt issuance needs associated with these hedges range from approximately $18.6 billion to $104.7 billion in any one quarter, with an average of $58.3 billion per quarter.

Table 14 presents the scheduled amortization of the net deferred losses in AOCI at December 31, 2007 related to closed cash flow hedges. The scheduled amortization is based on a number of assumptions. Actual amortization will differ from the scheduled amortization, perhaps materially, as we make decisions on debt funding levels or as changes in market conditions occur that differ from these assumptions. For example, for the scheduled amortization for cash flow hedges related to future debt issuances, we assume that we will not repurchase the related debt and that no other factors affecting debt issuance probabilities will change.

**Table 14 — Scheduled Amortization into Income of Net Deferred Losses in AOCI Related to Closed Cash Flow Hedge Relationships**

| Period of Scheduled Amortization into Income | December 31, 2007 | |
|---|---|---|
| | Amount (Pre-tax) | Amount (After-tax) |
| | (in millions) | |
| 2008 | $(1,331) | $ (865) |
| 2009 | (1,105) | (718) |
| 2010 | (910) | (592) |
| 2011 | (720) | (468) |
| 2012 | (563) | (366) |
| 2013 to 2017 | (1,107) | (719) |
| Thereafter | (509) | (331) |
| Total net deferred losses in AOCI related to closed cash flow hedge relationships | $(6,245) | $(4,059) |

*Freddie Mac*

### Derivative Gains (Losses)

Table 15 provides a summary of the period-end notional amounts and the gains and losses recognized during the year related to derivatives not accounted for in hedge accounting relationships.

**Table 15 — Derivatives Not in Hedge Accounting Relationships**

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | | | Adjusted | | |
| | **2007** | | **2006** | | **2005** | |
| | Notional or Contractual Amount | Derivative Gains (Losses) | Notional or Contractual Amount | Derivative Gains (Losses) | Notional or Contractual Amount | Derivative Gains (Losses) |
| | | | (In millions) | | | |
| Call swaptions | | | | | | |
| Purchased | $ 259,272 | $ 2,472 | $194,200 | $(1,128) | $146,615 | $ (402) |
| Written | 1,900 | (121) | — | — | — | — |
| Put swaptions | | | | | | |
| Purchased | 18,725 | (4) | 29,725 | (100) | 34,675 | 202 |
| Written | 2,650 | (72) | — | — | — | — |
| Receive-fixed swaps | 301,649 | 3,905 | 222,631 | (290) | 81,185 | (1,535) |
| Pay-fixed swaps | 409,682 | (11,362) | 217,565 | 649 | 181,562 | 612 |
| Futures | 196,270 | 142 | 22,400 | (248) | 86,252 | 63 |
| Foreign-currency swaps | 20,118 | 2,341 | 29,234 | (92) | 197 | (9) |
| Forward purchase and sale commitments | 72,662 | 445 | 9,942 | (95) | 21,827 | 110 |
| Other[1] | 39,953 | 18 | 32,342 | 39 | 15,643 | (25) |
| Subtotal | 1,322,881 | (2,236) | 758,039 | (1,265) | 567,956 | (984) |
| Accrual of periodic settlements: | | | | | | |
| Receive-fixed swaps[1] | | (327) | | (418) | | 426 |
| Pay-fixed swaps | | 703 | | 541 | | (763) |
| Foreign-currency swaps | | (48) | | (34) | | — |
| Other[2] | | 4 | | 3 | | — |
| Total accrual of periodic settlements | | 332 | | 92 | | (337) |
| Total | $1,322,881 | $ (1,904) | $758,039 | $(1,173) | $567,956 | $(1,321) |

(1) Consists of basis swaps, certain option-based contracts (including written options), interest-rate caps, credit derivatives and swap guarantee derivatives not accounted for in hedge accounting relationships. 2005 also included a prepayment management agreement which was terminated effective December 31, 2005.
(2) Includes imputed interest on zero-coupon swaps.

Derivative gains (losses) reflect the change in the fair value of and the accrual of periodic settlements of all derivatives not in hedge accounting relationships. From 2005 through 2007, we experienced significant periodic income volatility due to changes in the fair values of our derivatives and changes in the composition of our portfolio of derivatives not in hedge accounting relationships.

We use receive- and pay-fixed swaps to adjust the interest rate characteristics of our debt funding in order to more closely match changes in the interest-rate characteristics of our mortgage assets. A receive-fixed swap results in our receipt of a fixed interest-rate payment from our counterparty in exchange for a variable-rate payment to our counterparty. Conversely, a pay-fixed swap requires us to make a fixed interest-rate payment to our counterparty in exchange for a variable-rate payment from our counterparty. Receive-fixed swaps increase in value and pay-fixed swaps decrease in value when interest rates decrease (with the opposite being true when interest rates increase).

We use swaptions and other option-based derivatives to adjust the characteristics of our debt in response to changes in the expected lives of mortgage-related assets in our retained portfolio. Purchased call and put swaptions, where we make premium payments, are options for us to enter into receive- and pay-fixed swaps, respectively. Conversely, written call and put swaptions, where we receive premium payments, are options for our counterparty to enter into receive- and pay-fixed swaps, respectively. The fair values of both purchased and written call and put swaptions are sensitive to changes in interest rates and are also driven by the market's expectation of potential changes in future interest rates (referred to as "implied volatility"). Purchased swaptions generally become more valuable as implied volatility increases and less valuable as implied volatility decreases. Recognized losses on purchased options in any given period are limited to the premium paid to purchase the option plus any unrealized gains previously recorded. Potential losses on written options are unlimited.

In 2007, overall decreases in interest rates across the swap yield curve resulted in fair value losses on our interest-rate swap derivative portfolio that were partially offset by fair value gains on our option-based derivative portfolio. Gains on our option-based derivative portfolio resulted from an overall increase in implied volatility and decreasing interest rates. The overall decline in interest rates resulted in a loss of $11.4 billion on our pay-fixed swaps that was only partially offset by a $3.9 billion gain on our receive-fixed swap position. Gains on option-based derivatives, particularly purchased call swaptions, increased in 2007 to $2.3 billion. We recognized a gain of $2.3 billion on our foreign-currency swaps as the Euro

*Freddie Mac*

continued to strengthen against the dollar. The gains on foreign-currency swaps offset a $2.3 billion loss on the translation of our foreign-currency denominated debt, which is recorded in foreign-currency gains (losses), net.

The accrual of periodic settlements for derivatives not in qualifying hedge accounting relationships increased in 2007 compared to 2006 due to the increase in our net pay-fixed swap position as we responded to the changing interest rate environment.

During 2006, fair value losses on our swaptions increased as implied volatility declined and both long-term and short-term swap interest rates increased. During 2006 and 2005, fair value changes of our pay-fixed and receive-fixed swaps were driven by increases in long-term swap interest rates. Our discontinuation of hedge accounting treatment resulted in an increase in the notional balance of our receive-fixed swaps not in qualifying hedge accounting relationships, which, combined with fluctuations in swap interest rates throughout the year, reduced fair value losses recognized on our receive-fixed swaps during 2006. See "NOTE 11: DERIVATIVES" to our consolidated financial statements for additional information on our discontinuation of hedge accounting treatment.

The accrual of periodic settlements for derivatives not in qualifying hedge accounting relationships increased during 2006 compared to 2005 as short-term interest rates increased resulting in an increase in income on our pay-fixed swaps.

### Gains (Losses) on Investment Activity

Table 16 summarizes the components of gains (losses) on investment activity.

### Table 16 — Gains (Losses) on Investment Activity

|  | Year Ended December 31, | | |
|  | | Adjusted | |
|  | 2007 | 2006 | 2005 |
|  | | (in millions) | |
| Gains (losses) on trading securities | $ 540 | $  1 | $(289) |
| Gains (losses) on sale of mortgage loans[1] | 14 | 90 | 124 |
| Gains (losses) on sale of available-for-sale securities | 232 | (140) | 370 |
| Security impairments: | | | |
| Interest-only security impairments | (36) | (147) | (71) |
| Other security impairments | (363) | (257) | (221) |
| Total security impairments | (399) | (404) | (292) |
| Lower-of-cost-or-market valuation adjustments | (93) | (20) | (10) |
| Total gains (losses) on investment activity | $ 294 | $(473) | $ (97) |

(1) Represent mortgage loans sold in connection with securitization transactions.

### Gains (Losses) on Trading Securities

In 2007, the overall decrease in long-term interest rates resulted in gains related to our REMIC securities classified as trading.

In 2006, the increase in long-term interest rates resulted in gains related to our interest-only mortgage related securities classified as trading. These gains were offset by losses on other mortgage-related securities classified as trading as a result of the rise in interest rates. In 2005, increases in long-term interest rates resulted in losses on mortgage-related securities classified as trading.

### Gains (Losses) on Sale of Available-For-Sale Securities

We realized net gains on the sale of available-for-sale securities of $232 million for the year ended December 31, 2007, compared to net losses of $140 million for the year ended December 31, 2006. During the fourth quarter of 2007, we sold approximately $27.2 billion of PCs and Structured Securities, classified as available-for-sale, for capital management purposes. These sales generated net gains of approximately $186 million included in gains (losses) on sale of available-for-sale securities. These gains were partially offset by losses generated by the sale of securities during the second quarter of 2007.

In 2006, losses on sales of available-for-sale securities were primarily driven by resecuritization activity, partially offset by net gains of $188 million related to the sale of certain commercial mortgage-backed securities, or CMBS, as discussed in "Security Impairments."

### Security Impairments

Security impairments on mortgage-related securities remained flat for the year ended December 31, 2007, compared to the year ended December 31, 2006. Security impairments in 2007 were primarily related to impairments recognized during the second quarter of 2007 on agency securities that we sold in the third quarter of 2007 and thus did not have the intent to hold until the loss would be recovered. In addition, we recognized $36 million of impairments on our mortgage-related interest-only securities due to the decline in interest rates during the second half of 2007.

For the year ended December 31, 2006 and 2005 security impairments included $147 million and $71 million, respectively, related to mortgage-related interest-only securities, primarily due to periodic declines in mortgage interest rates experienced during those years. During the years ended December 31, 2006 and 2005, security impairments also included $196 million and $36 million, respectively, of interest-rate related impairments related to mortgage-related securities where we did not have the intent to hold the security until the loss would be recovered. Security impairments during the years ended December 31, 2006 and 2005 also included $61 million and $185 million, respectively, related to certain CMBSs backed by cash flows from mixed pools of multifamily and non-residential commercial mortgages. In December 2005, HUD determined that these mixed-pool investments were not authorized under our charter and OFHEO subsequently directed us to divest these investments, which we did in 2006.

### Recoveries on Loans Impaired upon Purchase

Recoveries on loans impaired upon purchase represent the recapture into income of previously recognized losses on loans purchased and provision for credit losses associated with purchases of delinquent loans from our PCs and Structured Securities in conjunction with our guarantee activities. Recoveries occur when a non-performing loan is repaid in full or when at the time of foreclosure the estimated fair value of the acquired property, less costs to sell, exceeds the carrying value of the loan. During 2007, we recognized recoveries on loans impaired upon purchase of $505 million. During 2006, we recaptured $58 million on impaired loans, which reduced losses on loans purchased. For impaired loans where the borrower has made required payments that return to current status, the basis adjustments are accreted into interest income over time, as periodic payments are received.

### Foreign-Currency Gains (Losses), Net

We actively manage the foreign-currency exposure associated with our foreign-currency denominated debt through the use of derivatives. For the year ended December 31, 2007, we recognized net foreign-currency translation losses of $2.3 billion primarily due to the weakening of the U.S. dollar relative to the Euro. These losses offset an increase in fair value of $2.3 billion related to foreign-currency-related derivatives during the period, which is recorded in derivative gains (losses).

For the year ended December 31, 2006, we recognized net foreign-currency translation gains related to our foreign-currency denominated debt of $96 million. These gains offset a decrease in fair value of $92 million related to foreign-currency-related derivatives during the period, which is recorded in derivative gains (losses).

In December 2006, we voluntarily discontinued hedge accounting for our foreign-currency swaps. See *"Derivative Gains (Losses)"* and "NOTE 11: DERIVATIVES" to our consolidated financial statements for additional information about our derivatives.

### Other Income

Other income increased in 2007 compared to 2006 due to $18 million of trust management income that was related to the establishment of securitization trusts in December 2007 for the underlying assets of our PCs and Structured Securities. Trust management income represents the fees we earn as master servicer, issuer and trustee. These fees are derived from interest earned on principal and interest cash flows between the time they are remitted to the trust by servicers and the date of distribution to our PC and Structured Securities holders.

Other income increased in 2006 compared to 2005, primarily due to $80 million of expense recorded in 2005 that was related to certain errors not material to our consolidated financial statements with respect to income in previously reported periods.

*Freddie Mac*

### Non-Interest Expense

Table 17 summarizes the components of non-interest expense.

#### Table 17 — Non-Interest Expense

| | Year Ended December 31, | | |
| | | Adjusted | |
| | 2007 | 2006 | 2005 |
| --- | --- | --- | --- |
| | | (in millions) | |
| **Administrative Expenses:** | | | |
| Salaries and employee benefits | $ 896 | $ 830 | $ 805 |
| Professional services | 443 | 460 | 386 |
| Occupancy expense | 64 | 61 | 58 |
| Other administrative expenses | 271 | 290 | 286 |
| Total administrative expenses | 1,674 | 1,641 | 1,535 |
| Provision for credit losses | 2,854 | 296 | 307 |
| REO operations expense | 206 | 60 | 40 |
| Losses on certain credit guarantees | 1,988 | 406 | 272 |
| Losses on loans purchased | 1,865 | 148 | — |
| LIHTC partnerships | 469 | 407 | 320 |
| Minority interests in earnings of consolidated subsidiaries | (8) | 58 | 96 |
| Other expenses | 222 | 200 | 530 |
| Total non-interest expense | $9,270 | $3,216 | $3,100 |

#### *Administrative Expenses*

Salaries and employee benefits increased during the past three years as we hired additional employees to support our financial reporting and infrastructure activities. Certain long-term employee incentive compensation costs also increased as we worked to attract and retain key talent to reduce reliance on external resources.

Professional services decreased in 2007 compared to 2006 as we modestly decreased our reliance on consultants and relied more heavily on our employee base to complete certain financial initiatives and our control remediation activities. Professional services increased in 2006 compared to 2005 as we increased the number of consultants utilized to assist in our initiatives to build new financial accounting systems and improve our financial controls.

Despite continued increases in administrative expenses, administrative expenses as a percentage of our average total mortgage portfolio declined to 8.6 basis points for the year ended December 31, 2007 from 9.3 basis points and 9.7 basis points for the years ended 2006 and 2005, respectively.

#### *Provision for Credit Losses*

Our credit loss reserves reflect our best estimates of incurred losses. Our reserve estimate includes projections related to strategic loss mitigation initiatives, including a higher rate of loan modifications for troubled borrowers, and projections of recoveries through repurchases by seller/servicers of defaulted loans due to failure to follow contractual underwriting requirements at the time of the loan origination.

Our reserve estimate also reflects our best projection of defaults. However, the unprecedented deterioration in the national housing market and the uncertainty in other macro economic factors makes forecasting of default rates increasingly imprecise.

The inability to realize the benefits of our loss mitigation plans, a lower realized rate of seller/servicer repurchases or default rates that exceed our current projections will cause our losses to be significantly higher than those currently estimated.

The provision for credit losses increased significantly in 2007 compared to 2006, as continued weakening in the housing market affected our single-family portfolio. In 2007, and to a lesser extent in 2006, we recorded additional reserves for credit losses on our single-family portfolio as a result of:

- increased estimates of incurred losses on mortgage loans that are expected to experience higher default rates, particularly for mortgage loans originated during 2006 and 2007, which do not have the benefit of significant home price appreciation;

- an observed increase in delinquency rates and the rates at which loans transition through delinquency to foreclosure; and

- increases in the severity of losses on a per-property basis, driven in part by the declines in home sales and home prices, particularly in the North Central, East and West regions of the U.S.

We expect our loan loss reserves to increase in future periods commensurate with our outlook for future charge-offs. The rate of change will depend on a number of factors including property values, geographic distribution, loan balances and third-party insurance coverage. In 2005, we recorded an additional loss provision of $128 million for our estimate of

incurred losses for loans affected by Hurricane Katrina. During 2006, we reversed $82 million of the provision for credit losses recorded in 2005 associated with Hurricane Katrina because the related payment and delinquency experience on affected properties was more favorable than expected. Absent the adjustments related to Hurricane Katrina, the provision for credit losses would have been $378 million and $179 million in 2006 and 2005, respectively.

### REO Operations Expense

The increase in REO operations expense in 2007, as compared to 2006, was due to a 64% increase in our REO property inventory in 2007 and declining REO property values. The decline in home prices during 2007, combined with our higher REO inventory balance, resulted in an increase in the market-based writedowns of REO, which totaled $129 million and $5 million in 2007 and 2006, respectively. The increase in REO expense in 2006, as compared to 2005, was due to higher real estate taxes, maintenance and net losses on sales experienced in 2006.

### Losses on Certain Credit Guarantees

We recognize losses on certain credit guarantees when, upon the issuance of PCs in guarantor swap transactions, we determine that the fair value of our guarantee obligation net of other initial compensation exceeds the fair value of our guarantee asset plus buy-up fees and credit enhancement-related assets. Our recognition of losses on guarantee contracts can occur due to any one or a combination of several factors, including long-term contract pricing for our flow business, the difference in overall transaction pricing versus pool-level accounting measurements and, to a lesser extent, efforts to support our affordable housing mission.

We negotiate contracts with our customers based on the volume and types of mortgage loans to be delivered to us, and our estimates of the net present value of related future guarantee fees, credit costs and other associated cash flows. However, the accounting for our guarantee assets and guarantee obligations is not determined at the level at which we negotiate contracts; rather, it is determined separately for each PC-related pool of loans. We determine the initial fair value of the pool-level guarantee assets and guarantee obligations using methodologies that employ direct market-based information. These methodologies differ from the methodologies we use to determine pricing on new contracts.

For each loan pool created, we compare the initial fair value of the related guarantee obligation to the initial fair value of the related guarantee asset and credit enhancement-related assets. If the guarantee obligation is greater than the guarantee asset, we immediately recognize a loss equal to the difference with respect to that pool. If the guarantee obligation is less than the guarantee asset, no initial gain is recorded; rather, guarantee income equal to the difference is deferred as an addition to the guarantee obligation and is recognized as that liability is amortized. Accordingly, a guarantor swap transaction may result in some loan pools for which a loss is recognized immediately in earnings and other loan pools where guarantee income is deferred. We record these losses as losses on certain credit guarantees.

In 2007, 2006 and 2005 we recognized losses of $2.0 billion, $0.4 billion and $0.3 billion, respectively, on certain guarantor swap transactions entered into during those periods. We also deferred income related to newly-issued guarantees of $0.9 billion, $1.0 billion and $1.2 billion in 2007, 2006 and 2005, respectively. Increases in losses on certain credit guarantees reflect expectations of higher defaults and severity in the credit market in 2007 which were not fully offset by increases in guarantee and delivery fees due to competitive pressures and contractual fee arrangements. Increases in losses on loans purchased reflect reduced fair values and higher volume of delinquent loans purchased under our guarantees. Losses on certain credit guarantees are expected to continue to increase until the fair values of our newly-issued obligations return to historical levels or our price increases are sufficient to mitigate the rise in higher expected default costs.

Our guarantee fees with customers are negotiated periodically and remain in effect for an initial contract period of up to one year. We expect most of our guarantor swap transactions under these contracts to generate positive economic returns over the lives of the related PCs. During periods in which conditions in the mortgage credit market deteriorate, such as experienced in 2007, we may incur losses on certain transactions until such time as contract terms are changed or business conditions improve. While we continue to believe the fair value of the guarantee obligation recorded exceeds the losses that we ultimately expect to incur, our expectation of losses on new guarantees have increased significantly.

During the fourth quarter of 2007, we announced increases in delivery fees which are paid at the time of securitization. These increases represent additional fees assessed on all loans issued through flow activity channels, including extra fees for non-traditional and higher risk mortgage loans, that are effective in March 2008. Also, in February 2008, we announced an additional increase in delivery fees, effective in June 2008, for certain flow transactions. We expect that price increases, including the delivery fee increase effective in March and June 2008, will mitigate a portion of the losses on certain credit guarantees.

### Losses on Loans Purchased

Losses on non-performing loans purchased from the mortgage pools underlying our PCs and Structured Securities occur when the acquisition basis of the purchased loan exceeds the estimated fair value of the loan on the date of purchase.

In 2007, the market-based valuation of non-performing loans was adversely affected by the market's expectation of higher default costs. The decrease in fair values of these loans, combined with an increase in the volume of purchases of non-performing loans and an increase in the average unpaid principal balance of those loans, resulted in losses of $1.9 billion and $0.1 billion for 2007 and 2006, respectively. We expect to recover a portion of the losses on loans purchased over time as these market-based valuations imply future credit losses that are significantly higher than we expect to ultimately incur. See "Non-Interest Income (Loss) — *Recoveries on Loans Impaired upon Purchase*" for discussion related to recoveries on those previously purchased loans. See "CREDIT RISKS — Table 52 — Changes in Loans Purchased Under Financial Guarantees" for additional information about our purchases of non-performing loans.

Effective December 2007 we made certain operational changes for purchasing delinquent loans from PC pools, which reduced the amount of our losses on loans purchased during the fourth quarter of 2007. We believe that our historical practice of purchasing loans from PC pools once they become 120 days delinquent does not reflect our historical cure rate for most of these delinquent loans. Allowing the loans to remain in PC pools until they become modified, foreclosure occurs or they reach 24 months past due unless we determine it is economically beneficial to purchase the loans sooner, better reflects our expectations for credit losses, because a significant number of these loans reperform. Taking this action is expected to reduce our losses on loans purchased, and result in higher provision for credit losses associated with our PCs and Structured Securities. However, due to the increases in delinquency rates of loans underlying our PCs and Structured Securities in 2007, we expect that the number of loan modifications will increase significantly in 2008, contributing to losses on loans purchased.

### Other Expenses

Other expenses increased slightly from 2007 to 2006 and decreased from 2006 to 2005 due to $339 million of expenses we recorded in 2005 to increase our reserves for legal settlements, net of expected insurance proceeds. See "NOTE 12: LEGAL CONTINGENCIES" to our consolidated financial statements for more information.

### Income Tax Expense (Benefit)

For 2007, 2006 and 2005, we reported income tax expense (benefit) of $(2.9) billion, $(45) million, and $358 million, respectively, resulting in effective tax rates of 48%, (2)% and 14%, respectively. The volatility in our effective tax rate over the past three years is primarily the result of fluctuations in pre-tax income. Our effective tax rate continues to be favorably impacted by our investments in LIHTC partnerships and interest earned on tax-exempt housing related securities. Our 2006 effective tax rate also benefited from releases of tax reserves of $174 million.

For the year ended December 31, 2007, our pre-tax loss exceeded our pre-tax income for years 2005 and 2006. We have not recorded a valuation allowance against our deferred tax assets as we believe that realization is more likely than not. See "NOTE 13: INCOME TAXES" to our consolidated financial statements for additional information.

### Segment Measures — Adjusted Operating Income

#### Adjusted Operating Income

In managing our business, we measure the operating performance of our segments using Adjusted operating income. Adjusted operating income differs significantly from, and should not be used as a substitute for net income (loss) before cumulative effect of change in accounting principle or net income (loss) as determined in accordance with GAAP. There are important limitations to using Adjusted operating income as a measure of our financial performance. Among other things, our regulatory capital requirements are based on our GAAP results. Adjusted operating income adjusts for the effects of certain gains and losses and mark-to-market items which, depending on market circumstances, can significantly affect, positively or negatively, our GAAP results and which, in recent periods, have contributed to GAAP net losses. GAAP net losses will adversely impact our regulatory capital, regardless of results reflected in Adjusted operating income. Also, our definition of Adjusted operating income may differ from similar measures used by other companies. However, we believe that the presentation of Adjusted operating income highlights the results from ongoing operations and the underlying results of the segments in a manner that is useful to the way we manage and evaluate the performance of our business. See "NOTE 15: SEGMENT REPORTING" to our consolidated financial statements for more information regarding segments and Adjusted operating income.

As described below, Adjusted operating income is calculated for the segments by adjusting net income (loss) before cumulative effect of change in accounting principle for certain investment-related activities and credit guarantee-related activities. Adjusted operating income includes certain reclassifications among income and expense categories that have no impact on net income (loss) but provide us with a meaningful metric to assess the performance of each segment and the company as a whole.

*Investment Activity-Related Adjustments*

We are primarily a buy and hold investor in mortgage assets, although we may sell assets to reduce risk, respond to capital constraints, provide liquidity, or structure transactions that improve our returns. Our measure of Adjusted operating income for our investment-related activities is useful to us because it reflects the way we manage and evaluate the performance of our business.

The most significant inherent risk in our investing activities is interest-rate risk, including duration, convexity and volatility. We actively manage these risks through asset selection and structuring, financing asset purchases with a broad range of both callable and non-callable debt and the use of interest-rate derivatives designed to economically hedge a significant portion of our interest-rate exposure. Our interest rate derivatives include interest-rate swaps, exchange-traded futures, and both purchased and written options (including swaptions). GAAP-basis earnings related to investment activities of our Investments segment, and to a lesser extent, our Multifamily segment, are subject to significant period-to-period variability, which we believe is not necessarily indicative of the risk management techniques that we employ and the performance of these segments.

Our derivative instruments are adjusted to fair value under GAAP with resulting gains or losses recorded in GAAP-basis income. Certain other assets are also adjusted to fair value under GAAP with resulting gains or losses recorded in GAAP-basis income. These assets consist primarily of mortgage-related securities classified as trading and mortgage-related securities classified as available-for-sale when a decline in the fair value of available-for-sale securities is deemed to be other than temporary.

To help us assess the performance of our investment-related activities, we make the following adjustments to earnings as determined under GAAP. We believe this measure of performance, which we call Adjusted operating income, enhances the understanding of operating performance for specific periods, as well as trends in results over multiple periods, as this measure is consistent with assessing our performance against our investment objectives and the related risk-management activities.

- Derivative- and foreign currency translation-related adjustments:

  - Fair value adjustments on derivative positions, recorded pursuant to GAAP, are not recognized in Adjusted operating income as these positions economically hedge our investment activities.

  - Payments or receipts to terminate derivative positions are amortized prospectively into Adjusted operating income on a straight-line basis over the associated term of the derivative instrument.

  - Payments of up-front premiums (*e.g.*, payments made to third parties related to purchased swaptions) are amortized prospectively on a straight-line basis into Adjusted operating income over the contractual life of the instrument. The up-front payments, primarily for option premiums, are amortized to reflect the periodic cost associated with the protection provided by the option contract.

  - Foreign-currency translation gains and losses associated with foreign-currency denominated debt along with the foreign currency derivatives gains and losses are excluded from Adjusted operating income because the fair value adjustments on the foreign-currency swaps that we use to manage foreign-currency exposure are also excluded through the fair value adjustment on derivative positions as described above as the foreign currency exposure is economically hedged.

- Investment sales, debt retirements and fair value-related adjustments:

  - Gains and losses on investment sales and debt retirements that are recognized at the time of the transaction pursuant to GAAP are not immediately recognized in Adjusted operating income. Gains and losses on securities sold out of the retained portfolio and cash and investments portfolio are amortized prospectively into Adjusted operating income on a straight-line basis over five years and three years, respectively. Gains and losses on debt retirements are amortized prospectively into Adjusted operating income on a straight-line basis over the original terms of the repurchased debt.

  - Trading losses or impairments that reflect expected or realized credit losses are realized immediately pursuant to GAAP and in Adjusted operating income since they are not economically hedged. Fair value adjustments to trading securities related to investments that are economically hedged are not included in Adjusted operating income. Similarly, non-credit related impairment losses on securities are not included in Adjusted operating income. These amounts are deferred and amortized prospectively into Adjusted operating income on a straight-line basis over five years for securities in the retained portfolio and over three years for securities in the cash and investments portfolio. GAAP-basis accretion income that may result from impairment adjustments is also not included in Adjusted operating income.

- Fully taxable-equivalent adjustment:
  - Interest income on tax-exempt investments is adjusted to reflect its equivalent yield on a fully taxable basis.

We fund our investment assets with debt and derivatives to minimize interest-rate risk as evidenced by our PMVS and duration gap metrics. As a result, in situations where we record gains and losses on derivatives, securities or debt buybacks, these gains and losses are offset by economic hedges that we do not mark-to-market for GAAP purposes. For example, when we realize a gain on the sale of a security, the debt which is funding the security has an embedded loss that is not recognized under GAAP, but instead over time as we realize the interest expense on the debt. As a result, in Adjusted operating income, we defer and amortize the security gain to interest income to match the interest expense on the debt that funded the asset. Because of our risk management strategies, we believe that amortizing gains or losses on economically hedged positions in the same periods as the offsetting gains or losses is a meaningful way to assess performance of our investment activities.

We believe it is useful to measure our performance using long-term returns, not on a short-term fair value basis. Fair value fluctuations in the short-term are not an accurate indication of long-term returns. In calculating Adjusted operating income, we make adjustments to our GAAP-basis results that are designed to provide a more consistent view of our financial results, which helps us better assess the performance of our business segments, both from period to period and over the longer term. The adjustments we make to present our Adjusted operating income results are consistent with the financial objectives of our investment activities and related hedging transactions and provide us with a view of expected investment returns and effectiveness of our risk management strategies that we believe is useful in managing and evaluating our investment-related activities. Although we seek to mitigate the interest-rate risk inherent in our investment-related activities, our hedging and portfolio management activities do not eliminate risk. We believe that a relevant measure of performance should closely reflect the economic impact of our risk management activities. Thus, we amortize the impact of terminated derivatives as well as gains and losses on asset sales and debt retirements into Adjusted operating income. Although our interest-rate risk and asset/liability management processes ordinarily involve active management of derivatives as well as asset sales and debt retirements, we believe that Adjusted operating income, although it differs significantly from, and should not be used as a substitute for GAAP-basis results, is indicative of the longer-term time horizon inherent in our investment-related activities.

*Credit Guarantee Activity-Related Adjustments*

The credit guarantee activities of our Single-family Guarantee and Multifamily segments consist largely of our guarantee of the payment of principal and interest on mortgages and mortgage-related securities in exchange for guarantee and other fees. Over the longer-term, earnings consist almost entirely of the guarantee fee revenues we receive less related credit costs (*i.e.*, provision for credit losses) and operating expenses. Our measure of Adjusted operating income for these activities consists primarily of these elements of revenue and expense. We believe this measure is a relevant indicator of operating performance for specific periods, as well as trends in results over multiple periods, because it more closely aligns with how we manage and evaluate the performance of the credit guarantee business.

We purchase mortgages from sellers/servicers in order to securitize and issue PCs and Structured Securities. In addition to the components of earnings noted above, GAAP-basis earnings for these activities include gains or losses realized upon the execution of such transactions, subsequent fair value adjustments to the guarantee asset and amortization of the guarantee obligation.

Our credit-guarantee activities also include the purchase of significantly past due mortgage loans from loan pools that underlie our guarantees. Pursuant to GAAP, at the time of our purchase, the loans are recorded at fair value. To the extent the adjustment of a purchased loan to market value exceeds our own estimate of the losses we will ultimately realize on the loan, as reflected in our loan loss reserve, an additional loss is recorded in our GAAP-basis results.

When we determine Adjusted operating income for our credit guarantee-related activities, the adjustments we apply to earnings computed on a GAAP-basis include the following:

- Amortization and valuation adjustments pertaining to the guarantee asset and guarantee obligation are excluded from Adjusted operating income. Cash compensation exchanged at the time of securitization, excluding buy-up and buy-down fees, is amortized into earnings.
- The initial recognition of gains and losses in connection with the execution of either securitization transactions that qualify as sales or guarantor swap transactions, such as losses on certain credit guarantees, is excluded from Adjusted operating income.
- Fair value adjustments recorded upon the purchase of delinquent loans from pools that underlie our guarantees are excluded from Adjusted operating income. However, for Adjusted operating income reporting, our GAAP-basis loan loss provision is adjusted to reflect our own estimate of the losses we will ultimately realize on such items.

*Freddie Mac*

---

mortgage-related securities. In November 2007, additional widening in OAS levels negatively impacted our GAAP results and lowered our overall capital position. Capital constraints forced us to reduce our balance of interest earning assets, issue $6 billion of non-cumulative, perpetual preferred stock and reduce our common stock dividend by 50% in the fourth quarter of 2007. As a result, the unpaid principal balance of our mortgage-related investment portfolio increased only slightly from $658.8 billion at December 31, 2006 to $663.2 billion at December 31, 2007.

The unpaid principal balance of our mortgage-related investment portfolio declined to $658.8 billion at December 31, 2006 from $669.3 billion at December 31, 2005, as relatively tight mortgage-to-debt OASs limited attractive investment opportunities. In addition, we began managing our mortgage-related investment portfolio under a voluntary, temporary growth limit during the second half of 2006.

Our net interest yield remained unchanged for the year ended December 31, 2007 compared to the year ended December 31, 2006; however, our Adjusted operating net interest income declined. This decline is due, in part, to a decrease in the average balance of our mortgage-related investment portfolio. We also experienced higher funding costs as our long-term debt interest expense increased, reflecting the replacement of maturing debt that we issued at lower interest rates during the past few years. Increases in our funding costs were offset by a decline in our mortgage-related securities amortization expense as purchases in 2007 largely consisted of securities purchased at a discount.

During the year ended December 31, 2007, demand for our debt securities remained strong, allowing us to issue our debt securities at rates below those of comparable maturities on the LIBOR yield curve.

*Single-Family Guarantee*

In this segment, we guarantee the payment of principal and interest on single-family mortgage-related securities, including those held in our retained portfolio, in exchange for guarantee fees received over time and other up-front compensation. Earnings for this segment consist of guarantee fee revenues less the related credit costs (*i.e.*, provision for credit losses) and operating expenses. Also included is the interest earned on assets held in the Investments segment related to single-family guarantee activities, net of allocated funding costs and amounts related to net float benefits. Float arises from timing differences between when the borrower makes principal payments on the loan and the reduction of the PC balance.

Table 19 presents the Adjusted operating income results of our Single-family Guarantee segment.

**Table 19 — Adjusted Operating Income Segment Results — Single-Family Guarantee**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | | (in millions) | |
| Adjusted operating income results: | | | |
| Net interest income | $    703 | $    556 | $    349 |
| Non-interest income: | | | |
| Management and guarantee income | 2,889 | 2,541 | 2,341 |
| Other non-interest income | 117 | 159 | 78 |
| Total non-interest income | 3,006 | 2,700 | 2,419 |
| Non-interest expense: | | | |
| Administrative expenses | (806) | (815) | (767) |
| Provision for credit losses | (3,014) | (313) | (447) |
| REO operations expense | (205) | (61) | (40) |
| Other non-interest expense | (78) | (84) | (30) |
| Total non-interest expense | (4,103) | (1,273) | (1,284) |
| Adjusted operating income (loss) before income tax expense | (394) | 1,983 | 1,484 |
| Income tax (expense) benefit | 138 | (694) | (519) |
| Adjusted operating income (loss), net of taxes | (256) | 1,289 | 965 |
| Reconciliation to GAAP net income (loss): | | | |
| Credit guarantee-related adjustments | (3,270) | (205) | (462) |
| Tax-related adjustments | 1,144 | 72 | 161 |
| Total reconciling items, net of taxes | (2,126) | (133) | (301) |
| Net income (loss) | $(2,382) | $ 1,156 | $    664 |

Adjusted operating income for our Single-family Guarantee segment declined in 2007 compared to 2006. This decline reflects an increase in credit costs largely driven by a decline in home prices and other declines in regional economic conditions, partially offset by an increase in management and guarantee income. The increases in management and guarantee income in 2006 and 2007 are primarily due to higher average balances of the single-family credit guarantee portfolio.

Table 20 below provides summary Adjusted operating income information about management and guarantee income for the Single-family Guarantee segment. Management and guarantee income consists of contractual amounts due to us related to our management and guarantee fees as well as amortization of credit fees.

**Table 20 — Adjusted Operating Management and Guarantee Income — Single-Family Guarantee**

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2007 | | 2006 | | 2005 | |
| | Amount | Rate | Amount | Rate | Amount | Rate |
| | (dollars in millions, rates in basis points) | | | | | |
| Contractual management and guarantee fees........................ | $2,514 | 15.7 | $2,186 | 15.5 | $1,934 | 15.4 |
| Amortization of credit fees included in other liabilities ............... | 375 | 2.3 | 355 | 2.5 | 407 | 3.2 |
| Total Adjusted operating management and guarantee income................. | 2,889 | 18.0 | 2,541 | 18.0 | 2,341 | 18.6 |
| Adjustments to reconcile to consolidated GAAP: | | | | | | |
| Reclassification between net interest income and guarantee fee[(1)(2)] ........... | 29 | | (37) | | (9) | |
| Credit guarantee-related activity adjustments[(3)] ...................... | (342) | | (172) | | (315) | |
| Multifamily management and guarantee income[(4)] ...................... | 59 | | 61 | | 59 | |
| Management and guarantee income, GAAP ........................... | $2,635 | | $2,393 | | $2,076 | |

(1) Guarantee fees earned on mortgage loans held in our retained portfolio are reclassified from net interest income within the Investments segment to management and guarantee fee within the Single-family Guarantee segment.
(2) Buy-up and buy-down fees are transferred from the Single-family Guarantee segment to the Investments segment.
(3) Primarily represents credit fee amortization adjustments.
(4) Represents management and guarantee income recognized related to our Multifamily segment that is not included in our Single-family Guarantee segment.

In 2007 and 2006, the growth rates of our credit guarantee portfolio were 17.7% and 11.1%, respectively. We estimate the annual growth in total U.S. residential mortgage debt outstanding to be approximately 7.1% in 2007 compared to 11.3% in 2006. Our single-family mortgage purchase and guarantee volumes are impacted by several factors, including origination volumes, mortgage product and underwriting trends, competition, customer-specific behavior and contract terms. Mortgage purchase volumes from individual customers can fluctuate significantly. In 2007, flow and bulk transactions represented approximately 78% and 22%, respectively, of our single-family mortgage purchase and securitization volumes.

The credit markets have been increasingly volatile and the securitization market was extremely competitive. Competitive pressure on flow business guarantee contracts in early 2007 during the renewal periods of some of our longer-term contracts limited our ability to increase flow-business guarantee fees in 2007. As a result, some of our guarantee business in 2007 was acquired below our normal expected return thresholds. At the same time, the expected future credit costs associated with our new credit guarantee business increased.

We negotiated increases in our contractual fee rates for securitization issuances through bulk activity channels throughout 2007 in response to increases in market pricing of mortgage credit risk. We continue to pursue guarantee fee price increases in our flow-business as contracts are renewed. During the fourth quarter of 2007, we announced increases in delivery fees, which are paid at the time of securitization. These increases, which will be effective in March 2008, represent an additional 25 basis points of fees assessed on all loans issued through flow-business channels, as well as extra fees for non-traditional and higher risk mortgage loans. Also, in February 2008, we announced an additional increase in delivery fees for certain flow-business transactions that will be effective in June 2008.

Net interest income increased due to interest earned on cash and investment balances held in the Investments segment related to single-family guarantee activities, net of allocated funding costs. We expect net interest income from cash and investments to decline in 2008, as we begin to recognize trust management income in other non-interest income. The trust management income will be offset by interest expense we incur when a borrower prepays.

Our Adjusted operating provision for credit losses for the Single-family Guarantee segment increased to $3.0 billion in 2007, compared to $0.3 billion in 2006, due to continued credit deterioration in our single-family credit guarantee portfolio, primarily related to 2006 and 2007 loan originations. Mortgages in our portfolio originated in 2006 and 2007 have higher transition rates from delinquency to foreclosure, higher delinquency rates as well as higher loss severities on a per-property basis. Our provision is based on our estimate of incurred credit losses inherent in both our retained mortgage loan and our credit guarantee portfolio using recent historical performance, such as the trends in delinquency rates, recent charge-off experience, recoveries from credit enhancements and other loss mitigation activities.

The proportion of higher risk mortgage loans that were originated in the market during the last several years increased significantly. We have increased our securitization volume of non-traditional mortgage products, such as interest-only loans and loans originated with less documentation in the last two years in response to the prevalence of these products within the origination market. Total non-traditional mortgage products, including those designated as Alt-A and interest-only loans, made up approximately 30% and 24% of our single-family mortgage purchase volume in the years ended December 31 2007 and 2006, respectively. Our increased purchases of these mortgages and issuances of guarantees of them expose us to greater

credit risks. In addition, we have increased purchases of mortgages that were underwritten by our seller/servicers using alternative automated underwriting systems or agreed-upon underwriting standards that differ from our system or guidelines.

The delinquency rate on our single-family credit guarantee portfolio, representing those loans which are 90 days or more past due and excluding loans underlying Structured Transactions, increased to 65 basis points as of December 31, 2007 from 42 basis points as of December 31, 2006. Increases in delinquency rates occurred in all product types in 2007, but were most significant for interest-only and option ARM mortgages. Although we believe that our delinquency rates remain low relative to conforming loan delinquency rates of other industry participants, we expect our delinquency rates will rise in 2008. See "CREDIT RISKS — Table 51 — Single-Family — Delinquency Rates — By Product" for further discussion.

Single-family charge-offs, gross, increased 71% in 2007 compared to 2006, primarily due to a considerable increase in the volume of REO properties acquired at foreclosure. In addition, there has been a substantial increase in the average size of the associated unpaid principal balances in 2007, especially for those loans in major metropolitan areas. Higher volumes of foreclosures and higher average loan balances resulted in higher charge-offs, on a per property basis, during 2007.

We experienced increases in delinquency rates and REO activity in the Northeast, North Central, Southeast and West regions during 2007 compared to 2006. The increases in delinquencies and foreclosures have been most evident in the North Central region, where unemployment rates continue to be high. During 2007, we experienced increases in the rate at which loans in our single-family credit guarantee portfolio transitioned from delinquency to foreclosure. The increase in the delinquency transition rates which is the percentage of delinquent loans that proceed to foreclosure or are modified as troubled debt restructurings, compared to our historical experience, has been progressively worse for mortgage loans originated in 2006 and 2007. We believe this trend is, in part, due to the increase of non-traditional mortgage loans, such as interest-only mortgages, as well as an increase in total loan-to-value ratios for mortgage loans originated during these years. In addition, the average size of the unpaid principal balance related to REO properties in our portfolio rose significantly in 2007, especially those REO properties in the Northeast, Southeast and West regions.

Declines in home prices have contributed to the increase in the weighted average estimated current loan-to-value, or LTV, ratio for loans underlying our single-family credit guarantee portfolio to 63% at December 31, 2007 from 57% at December 31, 2006. Approximately 10% of loans in our single-family mortgage portfolio had estimated current LTV ratios above 90% at December 31, 2007, compared to 2% at December 31, 2006. However, as home prices increased during 2006 and prior years, many borrowers used second liens at the time of purchase to potentially reduce the LTV ratio to below 80%, thus avoiding requirements to have private mortgage insurance. Including this secondary financing that our borrowers secured with other financial institutions, we estimate that the percentage of loans underlying our single-family portfolio with total LTV ratios above 90% has risen to approximately 14% at December 31, 2007. In general, higher total LTV ratios indicate that the borrower has less equity in the home and would thus be more susceptible to foreclosure in the event of a financial downturn.

### Multifamily

In this segment, we purchase multifamily mortgages for our retained portfolio and guarantee the payment of principal and interest on multifamily mortgage-related securities and mortgages underlying multifamily housing revenue bonds. These activities support our mission to supply financing for affordable rental housing. This segment also includes certain equity investments in various limited partnerships that sponsor low- and moderate-income multifamily rental apartments, which benefit from low-income housing tax credits. Also included is the interest earned on assets held in the Investments segment related to multifamily guarantee activities, net of allocated funding costs.

Table 21 presents the Adjusted operating income results of our Multifamily segment.

**Table 21 — Adjusted Operating Income Segment Results — Multifamily**

|  | Year Ended December 31, | | |
|  | 2007 | 2006 | 2005 |
|  | | (in millions) | |
| Adjusted operating income results: | | | |
| Net interest income. | $ 426 | $ 479 | $ 417 |
| Non-interest income: | | | |
| Management and guarantee income | 59 | 61 | 59 |
| Other non-interest income | 24 | 28 | 19 |
| Total non-interest income | 83 | 89 | 78 |
| Non-interest expense: | | | |
| Administrative expenses | (189) | (182) | (151) |
| Provision for credit losses | (38) | (4) | (7) |
| REO operations expense | (1) | 1 | — |
| LIHTC partnerships | (469) | (407) | (320) |
| Other non-interest expense | (21) | (17) | (20) |
| Total non-interest expense | (718) | (609) | (498) |
| Adjusted operating (loss) before income tax benefit | (209) | (41) | (3) |
| LIHTC partnerships tax benefit | 534 | 461 | 365 |
| Income tax benefit | 73 | 14 | 1 |
| Adjusted operating income, net of taxes | 398 | 434 | 363 |
| Reconciliation to GAAP net income: | | | |
| Derivative and foreign currency translation-related adjustments | (9) | 3 | 8 |
| Credit guarantee-related adjustments | — | 3 | 4 |
| Tax-related adjustments | 2 | (1) | (4) |
| Total reconciling items, net of taxes | (7) | 5 | 8 |
| Net income | $ 391 | $ 439 | $ 371 |

Adjusted operating income for our Multifamily segment decreased $36 million, or 8%, in 2007 compared to 2006 primarily due to lower net interest income, higher provision for credit losses and higher LIHTC losses.

Net interest income includes interest earned on cash and interest balances held in the Investments segment related to multifamily guarantee activities, net of allocated funding costs. The net interest income of this segment declined slightly in 2007, compared to 2006, as higher funding costs more than offset the increase in our loan portfolio balances. We experienced higher funding costs in 2007 versus 2006, reflecting the replacement of maturing long-term debt that was issued at lower rates in prior years.

Despite market volatility and credit concerns in the single-family market, the multifamily market fundamentals generally continued to display positive trends throughout 2007. Tightened credit standards and reduced liquidity caused many market participants to limit purchases of multifamily mortgages during the second half of 2007, creating investment opportunities for us with higher long-term expected returns and enhancing our ability to meet our affordable housing goals.

Mortgage purchases into our multifamily loan portfolio increased approximately 50% in 2007, to $18.2 billion from $12.1 billion in 2006. The balance of our multifamily loan portfolio increased to $57.6 billion at December 31, 2007 from $45.2 billion at December 31, 2006. The credit quality of the Multifamily segment remains strong, reflecting a geographically diversified portfolio. While current market developments indicate higher credit losses for most multifamily mortgage investors, we expect a modest impact to our results, as we continued our conservative approach to underwriting multifamily assets throughout the past two years while credit standards for many lenders deteriorated sharply. Our relatively low provision for credit losses and other non-interest expenses in 2007 and 2006 for this segment reflects our disciplined approach.

We increased our LIHTC investment in 2007 compared to 2006. These investments generated losses and tax credits during development and construction phases and income when the properties were placed into service. At December 31, 2007, the unconsolidated LIHTC equity investment portfolio consisted of 268 funds invested in 5,064 properties and had a net investment balance of $4.6 billion. Our continued investment in LIHTC partnership funds resulted in tax benefits of $534 million and $461 million for the years ended December 31, 2007 and 2006, respectively.

## CONSOLIDATED BALANCE SHEETS ANALYSIS

The following discussion of our consolidated balance sheets should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for more information concerning our significant accounting policies.

On October 1, 2007, we adopted FSP FIN 39-1. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Adopted Accounting Standards — *Offsetting of Amounts Related to Certain Contracts*" to our

consolidated financial statements for additional information about adoption of FSP FIN 39-1. The adoption of FSP FIN 39-1 reduced derivative assets, net, derivative liabilities, net and senior debt, due within one year on our consolidated balance sheets.

Effective December 31, 2007, we retrospectively applied changes in our method of accounting for our guarantee obligation. See "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES" to our consolidated financial statements for additional information regarding these changes and the effect on our consolidated balance sheets. Previously reported consolidated balance sheet amounts as of December 31, 2006 discussed below have been adjusted to reflect the retrospective application of these changes in method.

### Retained Portfolio

We refer to our investments in mortgage loans and mortgage-related securities recorded on our consolidated balance sheets as our retained portfolio. See "PORTFOLIO BALANCES AND ACTIVITIES" for further information on the composition of our mortgage portfolios. In response to a request by OFHEO, on August 1, 2006, we voluntarily and temporarily limited the growth of our retained portfolio. For a further discussion of our retained portfolio growth limitation see "REGULATION AND SUPERVISION — Office of Federal Housing Enterprise Oversight — *Voluntary, Temporary Growth Limit.*" The average unpaid principal balance of our retained portfolio for the six months ended December 31, 2007, calculated using cumulative average month-end portfolio balances, was $26.9 billion below our voluntary growth limit of $742.4 billion.

*Freddie Mac*

Table 22 provides detail regarding the mortgage loans and mortgage-related securities in our retained portfolio.

**Table 22 — Characteristics of Mortgage Loans and Mortgage-Related Securities in our Retained Portfolio**

| | December 31, | | | | | |
| | 2007 | | | 2006 (Adjusted) | | |
| | Fixed Rate | Variable Rate | Total | Fixed Rate | Variable Rate | Total |
|---|---|---|---|---|---|---|
| | (in millions) | | | | | |
| **Mortgage loans:** | | | | | | |
| Single-family[1] | $ 21,889 | $ 2,700 | $ 24,589 | $ 19,407 | $ 1,233 | $ 20,640 |
| Multifamily[2] | 53,114 | 4,455 | 57,569 | 41,866 | 3,341 | 45,207 |
| Total mortgage loans | 75,003 | 7,155 | 82,158 | 61,273 | 4,574 | 65,847 |
| **PCs and Structured Securities:[1][3]** | | | | | | |
| Single-family | 269,896 | 84,415 | 354,311 | 282,052 | 71,828 | 353,880 |
| Multifamily | 2,522 | 137 | 2,659 | 241 | 141 | 382 |
| Total PCs and Structured Securities | 272,418 | 84,552 | 356,970 | 282,293 | 71,969 | 354,262 |
| **Non-Freddie Mac mortgage-related securities:[1]** | | | | | | |
| Agency mortgage-related securities:[4] | | | | | | |
| Fannie Mae: | | | | | | |
| Single-family | 23,140 | 23,043 | 46,183 | 25,779 | 17,441 | 43,220 |
| Multifamily | 759 | 163 | 922 | 1,013 | 201 | 1,214 |
| Government National Mortgage Association, or Ginnie Mae: | | | | | | |
| Single-family | 537 | 181 | 718 | 707 | 231 | 938 |
| Multifamily | 13 | — | 13 | 13 | — | 13 |
| Total agency mortgage-related securities | 24,449 | 23,387 | 47,836 | 27,512 | 17,873 | 45,385 |
| **Non-agency mortgage-related securities:** | | | | | | |
| Single-family: | | | | | | |
| Subprime[5] | 498 | 100,827 | 101,325 | 408 | 121,691 | 122,099 |
| Alt-A and other[6] | 3,762 | 47,551 | 51,313 | 3,683 | 52,579 | 56,262 |
| CMBS | 25,709 | 39,095 | 64,804 | 23,517 | 21,243 | 44,760 |
| Mortgage revenue bonds[7] | 14,870 | 65 | 14,935 | 13,775 | 59 | 13,834 |
| Manufactured housing[8] | 1,250 | 222 | 1,472 | 1,381 | 129 | 1,510 |
| Total non-agency mortgage-related securities[9] | 46,089 | 187,760 | 233,849 | 42,764 | 195,701 | 238,465 |
| Total unpaid principal balance of retained portfolio | $417,959 | $302,854 | 720,813 | $413,842 | $290,117 | 703,959 |
| Premiums, discounts, deferred fees, impairments of unpaid principal balances and other basis adjustments | | | (655) | | | 993 |
| Net unrealized gains (losses) on mortgage-related securities, pre-tax | | | (10,116) | | | (4,950) |
| Allowance for loan losses on mortgage loans held-for-investment | | | (256) | | | (69) |
| Total retained portfolio per consolidated balance sheets | | | $709,786 | | | $699,933 |

(1) Variable-rate single-family mortgage loans and mortgage-related securities include those with a contractual coupon rate that, prior to contractual maturity, is either scheduled to change or is subject to change based on changes in the composition of the underlying collateral. Single-family mortgage loans also include mortgages with balloon/reset provisions.
(2) Variable-rate multifamily mortgage loans include only those loans that, as of the reporting date, have a contractual coupon rate that is subject to change.
(3) For our PCs and Structured Securities, we are subject to the credit risk associated with the underlying mortgage loan collateral.
(4) Agency mortgage-related securities are generally not separately rated by nationally recognized statistical rating organizations, but are viewed as having a level of credit quality at least equivalent to non-agency mortgage-related securities AAA-rated or equivalent.
(5) Single-family non-agency mortgage-related securities backed by subprime residential loans include significant credit-enhancements, particularly through subordination, and approximately 81% of these securities held at December 31, 2007 were AAA-rated at February 25, 2008.
(6) Single-family non-agency mortgage-related securities backed by Alt-A and other mortgage loans include significant credit enhancements, particularly through subordination, and approximately 98% of these securities held at December 31, 2007 were AAA-rated at February 25, 2008.
(7) Consist of obligations of states and political subdivisions. Approximately 67% and 66% of these securities were AAA-rated at December 31, 2007 and 2006, respectively.
(8) At December 31, 2007 and 2006, 34% and 30%, respectively, of mortgage-related securities backed by manufactured housing were rated BBB- or above. For the same dates, 97% of these securities were supported by third-party credit enhancements (e.g., bond insurance) and other credit enhancements (e.g., deal structure through subordination). Approximately 28% and 23% of these securities were AAA-rated at December 31, 2007 and 2006, respectively.
(9) Credit ratings for most non-agency mortgage-related securities are designated by no fewer than two nationally recognized statistical rating organizations. At both December 31, 2007 and 2006, approximately 96% of total non-agency mortgage-related securities were AAA-rated.

We invest in agency-issued mortgage-related securities, principally our own, when market conditions offer positive risk-adjusted returns relative to other permitted investments. We have also purchased non-agency mortgage-related securities in support of our affordable housing mission.

Our purchases of non-agency single-family mortgage-related securities, which principally consist of securities backed by subprime and Alt-A mortgage products, have been in highly-rated, senior tranches of securitized mortgage pools. Due to credit concerns in the second half of 2007, new issuances of these securities in the market have declined dramatically. Consequently, our holdings of non-agency single-family mortgage-related securities have decreased in 2007, compared to

2006. We have replaced these investments with purchases of non-agency CMBS securities that meet our investment criteria.

Table 23 provides additional detail regarding the fair value of mortgage-related securities in our retained portfolio.

**Table 23 — Fair Value of Available-For-Sale and Trading Mortgage-Related Securities in our Retained Portfolio**

| | December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | | (in millions) | |
| **Available-for-sale securities:** | | | |
| Mortgage-related securities issued by: | | | |
| Freddie Mac | $346,967 | $344,088 | $351,447 |
| Fannie Mae | 45,857 | 43,886 | 43,306 |
| Ginnie Mae | 562 | 733 | 1,115 |
| Other | 207,701 | 224,099 | 231,356 |
| Obligations of states and political subdivisions | 14,578 | 13,925 | 11,241 |
| Total available-for-sale mortgage-related securities | 615,665 | 626,731 | 638,465 |
| **Trading securities:** | | | |
| Mortgage-related securities issued by: | | | |
| Freddie Mac | 12,216 | 6,573 | 8,156 |
| Fannie Mae | 1,697 | 802 | 534 |
| Ginnie Mae | 175 | 222 | 204 |
| Other | 1 | — | — |
| Total trading mortgage-related securities | 14,089 | 7,597 | 8,894 |
| Total fair value of available-for-sale and trading mortgage-related securities | $629,754 | $634,328 | $647,359 |

Upon the adoption of SFAS 159 we increased the number of securities categorized as trading in our retained portfolio on January 1, 2008. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Issued Accounting Standards, Not Yet Adopted — *The Fair Value Option for Financial Assets and Financial Liabilities*" to our consolidated financial statements for more information.

**Issuers Greater than 10% of Stockholders' Equity**

We held Fannie Mae securities in our retained portfolio with a fair value of $47.6 billion, which represented 178% of total stockholders' equity of $26.7 billion at December 31, 2007. In addition, we held securities issued by Citi Mortgage Loan Trust 2007-1 in our retained portfolio with a fair value of $4.0 billion, which represented 15% of total stockholders' equity at December 31, 2007. No other individual issuer at the individual trust level exceeded 10% of total stockholders' equity at December 31, 2007.

**Cash and Investments**

Table 24 provides additional detail regarding the non-mortgage-related securities in our cash and investments portfolio.

**Table 24 — Cash and Investments**

| | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2007 | | 2006 | | 2005 | |
| | Fair Value | Average Maturity (Months) | Fair Value | Average Maturity (Months) | Fair Value | Average Maturity (Months) |
| | | | (dollars in millions) | | | |
| Cash and cash equivalents | $ 8,574 | <3 | $11,359 | <3 | $10,468 | <3 |
| Investments: | | | | | | |
| Available-for-sale securities: | | | | | | |
| Non-mortgage-related securities: | | | | | | |
| Commercial paper | 18,513 | <3 | 11,191 | <3 | 5,764 | <3 |
| Asset-backed securities[1] | 16,588 | N/A | 32,122 | N/A | 30,578 | N/A |
| Obligations of states and political subdivisions[1] | — | N/A | 2,273 | 363 | 5,823 | 282 |
| Total available-for-sale non-mortgage-related securities[2] | 35,101 | | 45,586 | | 42,165 | |
| Securities purchased under agreements to resell | 6,400 | <3 | 3,250 | <3 | 5,250 | <3 |
| Federal funds sold and Eurodollars | 162 | <3 | 19,778 | <3 | 9,909 | <3 |
| Subtotal | 6,562 | | 23,028 | | 15,159 | |
| Total investments | 41,663 | | 68,614 | | 57,324 | |
| Total cash and investments per consolidated balance sheets | $50,237 | | $79,973 | | $67,792 | |

(1) Consist primarily of securities that can be prepaid prior to their contractual maturity without penalty.
(2) Credit ratings for most securities are designated by no fewer than two nationally recognized statistical rating organizations. At December 31, 2007, 2006 and 2005, all of our available-for-sale non-mortgage-related securities were rated A or better.

During 2007, we reduced the balance of our cash and investments portfolio in order to take advantage of investment opportunities in mortgage-related securities as OAS widened. In addition, effective in December 2007 we established

securitization trusts for the underlying assets of our PCs and Structured Securities. Consequently, we hold remittances in a segregated account and do not commingle those funds with our general operating funds. The cash owned by the trusts is not reflected in our cash and investment balances on our consolidated balance sheets.

During 2006, we made a decision to maintain higher levels of liquid investments to ensure that we could appropriately service our outstanding debt and PCs and Structured Securities while operating under the Federal Reserve Board's intraday overdraft policy, which was revised effective July 2006. The revised policy restricts the GSEs, among others, from maintaining intraday overdraft positions at the Federal Reserve.

**Derivative Assets and Liabilities, Net**

See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for a description of gains (losses) on our derivative positions. Table 25 summarizes the notional or contractual amounts and related fair value of our total derivative portfolio by product type.

**Table 25 — Total Derivative Portfolio**

| | December 31, | | | |
|---|---|---|---|---|
| | 2007 | | Adjusted 2006 | |
| | Notional or Contractual Amount[1] | Fair Value[2] | Notional or Contractual Amount[1] | Fair Value[2] |
| | | (In millions) | | |
| Interest-rate swaps: | | | | |
| Receive-fixed | $ 301,649 | $ 3,648 | $222,631 | $ (334) |
| Pay-fixed | 409,682 | (11,492) | 217,565 | (1,352) |
| Basis (floating to floating) | 498 | — | 683 | — |
| Total interest-rate swaps | 711,829 | (7,844) | 440,879 | (1,686) |
| Option-based: | | | | |
| Call swaptions | | | | |
| Purchased | 259,272 | 7,134 | 194,200 | 4,034 |
| Written | 1,900 | (27) | — | — |
| Put swaptions | | | | |
| Purchased | 18,725 | 631 | 29,725 | 958 |
| Written | 2,650 | (74) | — | — |
| Other option-based derivatives[3] | 30,486 | (23) | 28,097 | (15) |
| Total option-based | 313,033 | 7,641 | 252,022 | 4,977 |
| Futures | 196,270 | 92 | 22,400 | 28 |
| Foreign-currency swaps | 20,118 | 4,568 | 29,234 | 4,399 |
| Subtotal | 1,241,250 | 4,457 | 744,535 | 7,718 |
| Forward purchase and sale commitments | 72,662 | 327 | 10,012 | 6 |
| Credit derivatives | 7,667 | 10 | 2,605 | (1) |
| Swap guarantee derivatives | 1,302 | (4) | 957 | (3) |
| Total derivative portfolio | $1,322,881 | $ 4,790 | $758,109 | $ 7,720 |

(1) Notional or contractual amounts are used to calculate the periodic amounts to be received and paid and generally do not represent actual amounts to be exchanged or directly reflect our exposure to institutional credit risk. Notional or contractual amounts are not recorded as assets or liabilities on our consolidated balance sheets.

(2) The value of derivatives on our consolidated balance sheets is reported as derivative asset, net and derivative liability, net, and includes net derivative interest receivable or payable and cash collateral held or posted. Fair value excludes net derivative interest receivable of $1.7 billion and net derivative collateral held of $6.2 billion at December 31, 2007. Fair value excludes net derivative interest receivable of $2.3 billion, and net derivative collateral held of $9.5 billion at December 31, 2006. The fair values for futures are directly derived from quoted market prices. Fair values of other derivatives are derived primarily from valuation models using market data inputs.

(3) Primarily represents written options, including guarantees of stated final maturity of issued Structured Securities and written call options on PCs we issued.

On October 1, 2007, we adopted FSP FIN 39-1. The position amends FASB Interpretation No. 39, "*Offsetting of Amounts Related to Certain Contracts, an interpretation of APB Opinion No. 10 and FASB Statement No. 105,*" and permits a reporting entity to offset fair value amounts recognized for the right to reclaim cash collateral or the obligation to return cash collateral against fair value amounts recognized for derivative instruments executed with the same counterparty under a master netting agreement. Our adoption resulted in a decrease to total assets and total liabilities of $8.7 billion. We elected to reclassify net derivative interest receivable or payable and cash collateral held or posted on our consolidated balance sheets to derivative asset, net and derivative liability, net. Prior to adoption, these amounts were recorded in accounts and other receivables, net, accrued interest payable, other assets and senior debt; due within one year, as applicable. FSP FIN 39-1 requires retrospective application and certain amounts in prior periods' consolidated balance sheets have been reclassified to conform to the current presentation. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Derivatives" to our consolidated financial statements for additional information about our derivatives.

The composition of our derivative portfolio will change from period to period as a result of derivative purchases, terminations or assignments prior to contractual maturity and expiration of the derivatives at their contractual maturity. We record changes in fair values of our derivatives in current income or, to the extent our accounting hedge relationships are effective, we defer those changes in AOCI or offset them with basis adjustments to the related hedged item.

As interest rates fluctuate, we use derivatives to adjust the contractual funding of our debt in response to changes in the expected lives of mortgage-related assets in our retained portfolio. Notional or contractual amount increased year-over-year as we responded to the changing interest rate environment. It is often operationally more efficient to enter new derivative positions even though the same economic result can be achieved by terminating existing positions.

The fair value of the total derivative portfolio decreased in 2007 due to net interest rate decreases across the yield curve that negatively impacted the fair value of our interest-rate swap portfolio. These fair values losses were partially offset by fair value increases on our purchased call swaption derivative portfolio that resulted from a net increase in implied volatility and net interest rate decreases.

As interest rates decreased, the fair value of our pay-fixed swap portfolio decreased by $10.1 billion in 2007. This was partially offset by increases in the fair value of our receive-fixed swap portfolio of approximately $4.0 billion and our purchased call swaption portfolio of $3.1 billion. In 2007, we added to our portfolio of purchased call swaptions to manage convexity risk associated with the prepayment option in a decreasing interest rate environment. The notional amount of our pay-fixed swap portfolio increased because we enter into forward-starting pay-fixed swaps to mitigate the duration risk created when we enter into purchased call swaptions and to manage steepening yield curve effects on mortgage duration.

Table 26 summarizes the changes in derivative fair values.

### Table 26 — Changes in Derivative Fair Values

| | 2007[1] | Adjusted 2006[1] |
|---|---|---|
| | (in millions) | |
| Beginning balance, at January 1 — Net asset (liability) | $ 7,720 | $ 6,517 |
| Net change in: | | |
| Forward purchase and sale commitments | 321 | 40 |
| Credit derivatives | 11 | — |
| Swap guarantee derivatives | (1) | (1) |
| Other derivatives:[2] | | |
| Changes in fair value | (2,688) | 2,008 |
| Fair value of new contracts entered into during the period[3] | 1,146 | 2,577 |
| Contracts realized or otherwise settled during the period | (1,719) | (3,421) |
| Ending balance, at December 31 — Net asset (liability) | $ 4,790 | $ 7,720 |

(1) The value of derivatives on our consolidated balance sheets is reported as derivative asset, net and derivative liability, net, and includes net derivative interest receivable or payable and cash collateral held or posted. Fair value excludes net derivative interest receivable of $1.7 billion and net derivative collateral held of $6.2 billion at December 31, 2007. Fair value excludes net derivative interest receivable of $2.3 billion and net derivative collateral held of $9.5 billion at December 31, 2006. Fair value excludes net derivative interest receivable of $1.8 billion and net derivative collateral held of $8.5 billion at January 1, 2006.
(2) Includes fair value changes for interest-rate swaps, option-based derivatives, futures, foreign-currency swaps and interest-rate caps.
(3) Consists primarily of cash premiums paid or received on options.

Table 27 provides information on our outstanding written and purchased swaption and option premiums at December 31, 2007 and 2006, based on the original premium receipts or payments. We use written options primarily to mitigate convexity risk and reduce our overall hedging costs. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks — Sources of Interest-Rate Risk and Other Market Risks — Duration Risk and Convexity Risk" for further discussion related to convexity risk.

### Table 27 — Outstanding Written and Purchased Swaption and Option Premiums

| | Original Premium Amount (Paid) Received | Original Weighted Average Life to Expiration | Remaining Weighted Average Life |
|---|---|---|---|
| | (dollars in millions) | | |
| Purchased:[1] | | | |
| At December 31, 2007 | $(5,478) | 7.8 years | 6.0 years |
| At December 31, 2006 | $(5,316) | 7.5 years | 6.1 years |
| Written:[1] | | | |
| At December 31, 2007 | $   87 | 3.0 years | 2.6 years |
| At December 31, 2006 | $   21 | 0.2 years | 0.1 years |

(1) Purchased options exclude callable swaps.
(2) Excludes written options on guarantees of stated final maturity of Structured Securities.

Table 28 shows the fair value for each derivative type and the maturity profile of our derivative positions. A positive fair value in Table 28 for each derivative type is the estimated amount, prior to netting by counterparty, that we would be

entitled to receive if we terminated the derivatives of that type. A negative fair value for a derivative type is the estimated amount, prior to netting by counterparty, that we would owe if we terminated the derivatives of that type. See "Table 44 — Derivative Counterparty Credit Exposure" under "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" for additional information regarding derivative counterparty credit exposure. Table 28 also provides the weighted average fixed rate of our pay-fixed and receive-fixed swaps.

Table 28 — Derivative Fair Values and Maturities

| | | | December 31, 2007 | | | |
|---|---|---|---|---|---|---|
| | | | | Fair Value[1] | | |
| | Notional or Contractual Amount | Total Fair Value[2] | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 282,504 | $ 3,266 | $ 27 | $ 1,557 | $ 785 | $ 897 |
| Weighted-average fixed rate[3] | | | 4.61% | 4.46% | 4.54% | 5.47% |
| Forward-starting swaps[4] | 19,145 | 382 | — | 5 | 19 | 358 |
| Weighted-average fixed rate[5] | | | — | 4.78% | 5.02% | 5.34% |
| Total receive-fixed | 301,649 | 3,648 | 27 | 1,562 | 804 | 1,255 |
| Basis (floating to floating) | 498 | — | — | — | — | — |
| Pay-fixed: | | | | | | |
| Swaps | 322,316 | (8,517) | (92) | (2,216) | (1,849) | (4,360) |
| Weighted-average fixed rate[3] | | | 5.10% | 4.77% | 4.92% | 5.15% |
| Forward-starting swaps[4] | 87,366 | (2,975) | — | — | (4) | (2,971) |
| Weighted-average fixed rate[5] | | | — | — | 5.25% | 5.66% |
| Total pay-fixed | 409,682 | (11,492) | (92) | (2,216) | (1,853) | (7,331) |
| Total interest-rate swaps | 711,829 | (7,844) | (65) | (654) | (1,049) | (6,076) |
| Option-based: | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 259,272 | 7,134 | 406 | 1,533 | 1,940 | 3,255 |
| Written | 1,900 | (27) | — | — | (27) | — |
| Put swaptions | | | | | | |
| Purchased | 18,725 | 631 | 31 | 68 | 61 | 471 |
| Written | 2,650 | (74) | (4) | (49) | (21) | — |
| Other option-based derivatives[5] | 30,486 | (23) | — | — | (1) | (22) |
| Total option-based | 313,033 | 7,641 | 433 | 1,552 | 1,952 | 3,704 |
| Futures | 196,270 | 92 | 93 | (1) | — | — |
| Foreign-currency swaps | 20,118 | 4,568 | 1,173 | 2,047 | 544 | 804 |
| Forward purchase and sale commitments | 72,662 | 327 | 327 | — | — | — |
| Swap guarantee derivatives | 1,302 | (4) | — | — | — | (4) |
| Subtotal | 1,315,214 | 4,780 | $1,961 | $ 2,944 | $ 1,447 | $(1,572) |
| Credit derivatives | 7,667 | 10 | | | | |
| Total | $1,322,881 | $ 4,790 | | | | |

(1) Fair value is categorized based on the period from December 31, 2007 until the contractual maturity of the derivative.
(2) The value of derivatives on our consolidated balance sheets is reported as derivative asset, net and derivative liability, net, and includes net derivative interest receivable or payable and cash collateral held or posted. Fair value excludes net derivative interest receivable of $1.7 billion and net derivative collateral held of $6.2 billion at December 31, 2007.
(3) Represents the notional weighted average rate for the fixed leg of the swaps.
(4) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to ten years.
(5) Primarily represents written options, including guarantees of stated final maturity of issued Structured Securities and written call options on PCs we issued.

**Guarantee Asset**

Table 29 summarizes changes in the guarantee asset balance.

**Table 29 — Changes in Guarantee Asset**

| | December 31, | |
| | 2007 | Adjusted 2006 |
| | (In millions) | |
|---|---|---|
| Beginning balance | $ 7,389 | $ 6,264 |
| Additions, net | 3,686 | 2,103 |
| Return of investment on guarantee asset | (1,739) | (1,293) |
| Change in fair value of future management and guarantee fees | 309 | 261 |
| Change in estimate | (54) | 54 |
| Gains (losses) on guarantee asset | (1,484) | (978) |
| Ending balance | $ 9,591 | $ 7,389 |

The increase in additions, net, in 2007, as compared to 2006, is due to an increase in our guarantee fee rates for both adjustable rate and fixed rate products, and to a lesser extent, the increase in our issuance volume in 2007.

The losses on guarantee assets in 2007 increased as compared to 2006. This increase is due to the return of investment associated with a higher guarantee asset balance. Gains on fair value of management and guarantee fees in 2007 resulted from an increase in interest rates during the second quarter. The increase in gains on fair value of management and guarantee fees in 2006 was due to an increase in interest rates throughout the year. See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — *Gains (Losses) on Guarantee Asset*" for further discussion of gains (losses) on our guarantee asset.

**Total Debt Securities, Net**

Table 30 reconciles the par value of our debt securities to the amounts shown on our consolidated balance sheets. See "LIQUIDITY AND CAPITAL RESOURCES" for further discussion of our debt management activities.

**Table 30 — Reconciliation of the Par Value of Total Debt Securities to Our Consolidated Balance Sheets**

| | December 31, | |
| | 2007 | 2006 |
| | (In millions) | |
|---|---|---|
| Total debt securities: | | |
| Par value[1] | $775,847 | $778,418 |
| Unamortized balance of discounts and premiums[2] | (43,540) | (41,814) |
| Foreign-currency-related and hedging-related basis adjustments[3] | 6,250 | 7,737 |
| Total debt securities, net | $738,557 | $744,341 |

(1) Includes securities sold under agreements to repurchase and federal funds purchased.
(2) Primarily represents unamortized discounts on zero-coupon debt securities.
(3) Primarily represent deferrals related to the translation gain (loss) on foreign-currency denominated debt that was in hedge accounting relationships.

Table 31 summarizes our senior debt, due within one year.

**Table 31 — Senior Debt, Due Within One Year**

| | 2007 | | | | |
|---|---|---|---|---|---|
| | December 31, | | Average Outstanding During the Year | | Maximum Balance, Net Outstanding at Any Month End |
| | Balance, Net[1] | Weighted Average Effective Rate[2] | Balance, Net[3] | Weighted Average Effective Rate[4] | |
| | | | (dollars in millions) | | |
| Reference Bills® securities and discount notes | $196,426 | 4.52% | $158,467 | 5.02% | $196,426 |
| Medium-term notes | 1,175 | 4.36 | 4,496 | 5.27 | 8,907 |
| Securities sold under agreements to repurchase and federal funds purchased | — | — | 112 | 5.42 | 804 |
| Short-term debt securities | 197,601 | 4.52 | | | |
| Current portion of long-term debt | 98,320 | 4.44 | | | |
| Senior debt, due within one year | $295,921 | 4.49 | | | |

| | 2006 | | | | |
|---|---|---|---|---|---|
| | December 31, | | Average Outstanding During the Year | | Maximum Balance, Net Outstanding at Any Month End |
| | Balance, Net[1] | Weighted Average Effective Rate[2] | Balance, Net[3] | Weighted Average Effective Rate[4] | |
| | | | (dollars in millions) | | |
| Reference Bills® securities and discount notes | $157,553 | 5.14% | $165,270 | 4.76% | $182,946 |
| Medium-term notes | 9,832 | 5.16 | 4,850 | 4.82 | 9,832 |
| Securities sold under agreements to repurchase and federal funds purchased | — | — | 81 | 5.48 | 2,200 |
| Short-term debt securities | 167,385 | 5.14 | | | |
| Current portion of long-term debt | 117,879 | 4.10 | | | |
| Senior debt, due within one year | $285,264 | 4.71 | | | |

| | 2005 | | | | |
|---|---|---|---|---|---|
| | December 31, | | Average Outstanding During the Year | | Maximum Balance, Net Outstanding at Any Month End |
| | Balance, Net[1] | Weighted Average Effective Rate[2] | Balance, Net[3] | Weighted Average Effective Rate[4] | |
| | | | (dollars in millions) | | |
| Reference Bills® securities and discount notes | $181,468 | 4.00% | $181,878 | 3.11% | $194,578 |
| Medium-term notes | 2,032 | 4.17 | 850 | 3.35 | 2,032 |
| Securities sold under agreements to repurchase and federal funds purchased | 450 | 4.25 | 267 | 3.08 | 1,000 |
| Hedging-related basis adjustments | (5) | N/A | | | |
| Short-term debt securities | 183,945 | 4.00 | | | |
| Current portion of long-term debt | 95,819 | 3.42 | | | |
| Senior debt, due within one year | $279,764 | 3.80 | | | |

(1) Represents par value, net of associated discounts, premiums and foreign-currency-related basis adjustments.
(2) Represents the approximate weighted average effective rate for each instrument outstanding at the end of the period, which includes the amortization of discounts or premiums and issuance costs, but excludes the amortization of hedging-related basis adjustments.
(3) Represents par value, net of associated discounts, premiums and issuance costs. Issuance costs are reported in the other assets caption on our consolidated balance sheets.
(4) Represents the approximate weighted average effective rate during the period, which includes the amortization of discounts or premiums and issuance costs, but excludes the amortization of foreign-currency-related basis adjustments.

**Guarantee Obligation**

Our guarantee obligation is comprised of the unamortized balance of our contractual obligation on the performance of our PCs and Structured Securities and the unamortized balance of deferred guarantee income. Table 32 summarizes the

*Freddie Mac*

changes in our guarantee obligation balances for 2007 and 2006, as well as the balances of the components of our guarantee obligation at December 31, 2007 and 2006.

**Table 32 — Changes in Guarantee Obligation**

| | December 31, | |
|---|---|---|
| | **2007** | **Adjusted 2006** |
| | (In millions) | |
| Beginning balance | $ 9,482 | $ 7,907 |
| Transfer-out to the loan loss reserve[1] | (7) | (7) |
| Additions, net: | | |
| Fair value of performance and other related costs of newly-issued guarantees | 5,241 | 2,097 |
| Deferred guarantee income of newly-issued guarantees | 901 | 1,004 |
| Amortization income: | | |
| Performance and other related costs | (1,146) | (804) |
| Deferred guarantee income | (759) | (715) |
| Income on guarantee obligation | (1,905) | (1,519) |
| Ending balance | $13,712 | $ 9,482 |
| Components of the guarantee obligation, at period end: | | |
| Unamortized balance of performance and other related costs | $ 9,930 | $ 5,841 |
| Unamortized balance of deferred guarantee income | 3,782 | 3,641 |
| Ending balance | $13,712 | $ 9,482 |

(1) Represents portions of the guarantee obligation that correspond to incurred credit losses reclassified to reserve for guarantee losses on PCs.

The primary drivers affecting our guarantee obligation balances are our credit guarantee business volumes, fair values of performance obligations on new guarantees and expected profitability of new guarantee business at origination. Additions related to the performance obligations of our newly-issued PCs and Structured Securities increased in 2007, as compared to 2006, due to widening credit spreads of both fixed-rate and adjustable-rate products and higher volume of credit guarantee business. We issued $471 billion and $360 billion of our PCs and Structured Securities in 2007 and 2006, respectively. Deferred guarantee income related to newly-issued guarantees declined in 2007, as compared to 2006, due to a decrease in profitability expected on guarantees issued in 2007.

The increase in amortization income attributable to the performance and other related costs is primarily due to an increase in the guarantee obligation caused by higher expected default costs on newly-issued guarantees as well as a higher volume of credit guarantee business. See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — Income on Guarantee Obligation" for additional discussion related to our guarantee obligation.

**Total Stockholders' Equity**

Total stockholders' equity decreased $0.2 billion during 2007. This decrease was primarily a result of a net loss of $3.1 billion, a $2.7 billion net increase in the AOCI loss, the repurchase of $1.0 billion of common stock and $1.6 billion of common and preferred stock dividends declared. These reductions were partially offset by a net increase of $8.0 billion in non-cumulative, perpetual preferred stock. We issued $8.6 billion of non-cumulative, perpetual preferred stock, consisting of $1.5 billion in connection with the planned replacement of common stock with an equal amount of preferred stock and $600 million to replace higher-cost preferred stock that we redeemed and additional issuances of $6.5 billion in the aggregate to bolster our capital base and for general corporate purposes. See "LIQUIDITY AND CAPITAL RESOURCES — Capital Resources — *Core Capital*" for additional information.

The balance of AOCI at December 31, 2007 was a net loss of approximately $11.1 billion, net of taxes, compared to a net loss of $8.5 billion, net of taxes, at December 31, 2006. The increase in the net loss in AOCI was primarily attributable to unrealized losses on our single-family non-agency mortgage-related securities backed by subprime loans and Alt-A loans with net unrealized losses, net of taxes, recorded in AOCI of $5.6 billion and $1.7 billion, respectively, at December 31, 2007. The increase in the net loss in AOCI was partially offset by an increase in the value of available-for-sale securities as medium- and long-term rates declined since December 31, 2006 and the reclassification to earnings of deferred losses related to closed cash flow hedge relationships. See "CREDIT RISKS — Mortgage Credit Risk" for more information regarding mortgage-related securities backed by subprime loans and Alt-A loans.

## CONSOLIDATED FAIR VALUE BALANCE SHEETS ANALYSIS

Our consolidated fair value balance sheets include the estimated fair values of financial instruments recorded on our consolidated balance sheets prepared in accordance with GAAP, as well as off-balance sheet financial instruments that represent our assets or liabilities that are not recorded on our GAAP consolidated balance sheets. These off-balance sheet items predominantly consist of: (a) the unrecognized guarantee asset and guarantee obligation associated with our PCs

issued through our Guarantor Swap program prior to the implementation of FIN 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, an interpretation of FASB Statements No. 5, 57 and 107 and rescission of FASB Interpretation No. 34," (b) certain commitments to purchase mortgage loans and (c) certain credit enhancements on manufactured housing asset-backed securities. The fair value balance sheets also include certain assets and liabilities that are not financial instruments (such as property and equipment and real estate owned, which are included in other assets) at their carrying value in accordance with GAAP. During 2007 and 2006, our fair value results were impacted by several improvements in our approach for estimating the fair value of certain financial instruments. See "OFF-BALANCE SHEET ARRANGEMENTS" and "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" as well as "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 16: FAIR VALUE DISCLOSURES" to our consolidated financial statements for more information on fair values.

In conjunction with the preparation of our consolidated fair value balance sheets, we use a number of financial models. See "OPERATIONAL RISKS" and "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" for information concerning the risks associated with these models.

### Key Components of Changes in Fair Value of Net Assets

Our attribution of changes in the fair value of net assets relies on models, assumptions, and other measurement techniques that will evolve over time. Changes in the fair value of net assets from period to period result from returns (measured on a fair value basis) and capital transactions and are primarily attributable to changes in a number of key components:

#### Core Spread Income

Core spread income on our retained portfolio is a fair value estimate of the net current period accrual of income from the spread between mortgage-related investments and debt, calculated on an option-adjusted basis. OAS is an estimate of the yield spread between a given financial instrument and a benchmark (LIBOR, agency or Treasury) yield curve, after consideration of potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as prepayment options.

#### Changes in Mortgage-To-Debt OAS

The fair value of our net assets can be significantly affected from period to period by changes in the net OAS between the mortgage and agency debt sectors. The fair value impact of changes in OAS for a given period represents an estimate of the net unrealized increase or decrease in fair value of net assets arising from net fluctuations in OAS during that period. We do not attempt to hedge or actively manage the basis risk represented by the impact of changes in mortgage-to-debt OAS because we generally hold a substantial portion of our mortgage assets for the long term and we do not believe that periodic increases or decreases in the fair value of net assets arising from fluctuations in OAS will significantly affect the long-term value of our retained portfolio. Our estimate of the effect of changes in OAS excludes the impact of other market risk factors we actively manage, or economically hedge, to keep interest-rate risk exposure within prescribed limits.

#### Asset-Liability Management Return

Asset-liability management return represents the estimated net increase or decrease in the fair value of net assets resulting from net exposures related to the market risks we actively manage. We do not hedge all of the interest-rate risk that exists at the time a mortgage is purchased or that arises over its life. The market risks to which we are exposed as a result of our retained portfolio activities that we actively manage include duration and convexity risks, yield curve risk and volatility risk. We seek to manage these risk exposures within prescribed limits as part of our overall portfolio management strategy. Taking these risk positions and managing them within prudent limits is an integral part of our strategy to optimize the risk/return profile of our investment activity and generate fair value growth. We expect that the net exposures related to market risks we actively manage will generate fair value returns that contribute to meeting our long-term growth objectives, although those positions may result in a net increase or decrease in fair value for a given period. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" for more information.

#### Core Guarantee Fees, Net

Core guarantee fees, net represents a fair value estimate of the annual income of the credit guarantee portfolio, based on current portfolio characteristics and market conditions. This estimate considers both contractual guarantee fees collected over the life of the credit guarantee portfolio and credit-related delivery fees collected up-front when pools are formed, and associated costs and obligations, which include default costs.

*Change in the Fair Value of the Credit Guarantee Portfolio*

Change in the fair value of the credit guarantee portfolio represents the estimated impact on the fair value of the credit guarantee business resulting from additions to the portfolio (net difference between the fair values of the guarantee asset and guarantee obligation recorded when pools are formed) plus the effect of changes in interest rates, projections of the future credit outlook and other market factors (*e.g.*, impact of the passage of time on cash flow discounting).

We generally do not hedge changes in the fair value of our existing credit guarantee portfolio, with two exceptions discussed below. While periodic changes in the fair value of the credit guarantee portfolio may have a significant impact on the fair value of net assets, we believe that changes in the fair value of our existing credit guarantee portfolio are not the best indication of long-term fair value expectations because such changes do not reflect our expectation that, over time, replacement business will largely replenish guarantee fee income lost because of prepayments. However, to the extent that projections of the future credit outlook are realized our fair value results may be affected.

We hedge interest-rate exposure related to net buy-ups (up-front payments we made that increase the guarantee fee that we will receive over the life of the pool) and float (expected gains or losses resulting from our mortgage security program remittance cycles). These value changes are excluded from our estimate of the changes in fair value of the credit guarantee portfolio, so that it reflects only the impact of changes in interest rates and other market factors on the unhedged portion of the projected cash flows from the credit guarantee business. The fair value changes associated with net buy-ups and float are considered in asset-liability management return (described above) because they relate to hedged positions.

*Fee Income*

Fee income includes miscellaneous fees, such as resecuritization fees, fees generated by our automated underwriting service and delivery fees on some mortgage purchases.

### Discussion of Fair Value Results

In 2007, the fair value of net assets attributable to common stockholders, before capital transactions, decreased by $23.6 billion compared to a $2.5 billion increase in 2006. The payment of common dividends and the repurchase of common shares, net of reissuance of treasury stock, reduced total fair value by $2.1 billion in 2007. The fair value of net assets attributable to common stockholders as of December 31, 2007 was $0.3 billion, compared to $26.0 billion as of December 31, 2006.

Table 33 summarizes the change in the fair value of net assets attributable to common stockholders for 2007 and 2006.

**Table 33 — Summary of Change in the Fair Value of Net Assets Attributable to Common Stockholders**

|  | 2007 | 2006 |
|---|---|---|
|  | (In billions) | |
| Beginning balance | $ 26.0 | $26.8 |
| Changes in fair value of net assets attributable to common stockholders, before capital transactions | (23.6) | 2.5 |
| Capital transactions: | | |
| Common dividends, common share repurchases and issuances, net | (2.1) | (3.3) |
| Ending balance | $ 0.3 | $26.0 |

### Estimated Impact of Changes in Mortgage-To-Debt OAS on Fair Value Results

For the years ended December 31, 2007 and 2006, we estimate that on a pre-tax basis the changes in the fair value of net assets attributable to common stockholders, before capital transactions, included decreases of approximately $23.8 billion and $0.9 billion, respectively, due to a net widening of mortgage-to-debt OAS.

We believe disclosing the estimated impact of changes in mortgage-to-debt OAS on the fair value of net assets is helpful to understanding our current period fair value results in the context of our long-term fair value return objective. Due to the significant challenges that exist in the current market, we will not, in the near-term, achieve our objective of long-term returns, before capital transactions, on the average fair value of net assets attributable to common stockholders in the low-to mid-teens. Given the current level of uncertainty in the residential mortgage credit market, volatility in interest rates and our current capital constraints, we will not achieve our long-term objective until market conditions improve.

### How We Estimate the Impact of Changes in Mortgage-To-Debt OAS on Fair Value Results

The impact of changes in OAS on fair value should be understood as an estimate rather than a precise measurement. To estimate the impact of OAS changes, we use models that involve the forecast of interest rates and prepayment behavior and other inputs. We also make assumptions about a variety of factors, including macroeconomic and security-specific data, interest-rate paths, cash flows and prepayment rates. We use these models and assumptions in running our business, and we rely on many of the models in producing our financial statements and measuring, managing and reporting interest-rate and other market risks. The use of different estimation methods or the application of different assumptions could result in a materially different estimate of OAS impact.

65

*Freddie Mac*

An integral part of this framework includes the attribution of fair value changes to assess the performance of our investment activities. On a daily basis, all interest rate sensitive assets, liabilities and derivatives are modeled using our proprietary prepayment and interest rate models. Management uses interest-rate risk statistics generated from this process, along with daily market movements, coupon accruals and price changes, to estimate and attribute returns into various risk factors commonly used in the fixed income industry to quantify and understand sources of fair value return. One important risk factor is the change in fair value due to changes in mortgage-to-debt OAS.

### Understanding Our Estimate of the Impact of Changes in Mortgage-To-Debt OAS on Fair Value Results

A number of important qualifications apply to our disclosed estimates. The estimated impact of the change in option-adjusted spreads on the fair value of our net assets in any given period does not depend on other components of the change in fair value. Although the fair values of our financial instruments will generally move toward their par values as the instruments approach maturity, investors should not expect that the effect of past changes in OAS will necessarily reverse through future changes in OAS. To the extent that actual prepayment or interest rate distributions differ from the forecasts contemplated in our models, changes in values reflected in mortgage-to-debt OAS may not be recovered in fair value returns at a later date.

When the OAS on a given asset widens, the fair value of that asset will typically decline, all other things being equal. However, we believe such OAS widening has the effect of increasing the likelihood that, in future periods, we will recognize income at a higher spread on this existing asset. The reverse is true when the OAS on a given asset tightens — current period fair values for that asset typically increase due to the tightening in OAS, while future income recognized on the asset is more likely to be earned at a reduced spread. Although a widening of OAS is generally accompanied by lower current period fair values, it can also provide us with greater opportunity to purchase new assets for our retained portfolio at the wider mortgage-to-debt OAS.

For these reasons, our estimate of the impact of the change in OAS provides information regarding one component of the change in fair value for the particular period being evaluated. However, results for a single period should not be used to extrapolate long-term fair value returns. We believe the potential fair value return of our business over the long term depends primarily on our ability to add new assets at attractive mortgage-to-debt OAS and to effectively manage over time the risks associated with these assets, as well as the risks of our existing portfolio. In other words, to capture the fair value returns we expect, we have to apply accurate estimates of future prepayment rates and other performance characteristics at the time we purchase assets, and then manage successfully the range of market risks associated with a debt-funded mortgage portfolio over the life of these assets.

### Estimated Impact of Credit Guarantee on Fair Value Results

Our credit guarantee activities, including multifamily and single-family whole loan credit exposure, decreased pre-tax fair value by an estimated $18.5 billion in 2007. This estimate includes an increase in the single-family guarantee obligation of approximately $22.2 billion, primarily attributable to the market's pricing of mortgage credit. Wider credit spreads on CMBS and whole loans also negatively impacted our multifamily guarantee obligation. These increases were partially offset by a fair value increase in the single-family guarantee asset of approximately $2.1 billion and cash receipts related to management and guarantee fees and other up-front fees.

### LIQUIDITY AND CAPITAL RESOURCES

#### Liquidity

Our business activities require that we maintain adequate liquidity to make payments upon the maturity, redemption or repurchase of our debt securities; purchase mortgage loans, mortgage-related securities and other investments; make payments of principal and interest on our debt securities and on our PCs and Structured Securities; make net payments on derivative instruments; fund our general operations; and pay dividends on and repurchase our preferred and common stock.

We fund our cash requirements primarily by issuing short-term and long-term debt. Other sources of cash include:

- receipts of principal and interest payments on securities or mortgage loans we hold;
- sales of securities we hold;
- borrowings against mortgage-related securities and other investment securities we hold;
- other cash flows from operating activities, including guarantee activities; and
- issuances of common and preferred stock.

We measure our cash position on a daily basis, netting uses of cash with sources of cash. We manage the net cash position over a rolling forecasted 120-day period, with the goal of providing the amount of debt funding needed to cover expected net cash outflows without adversely affecting our overall funding levels. We maintain alternative sources of liquidity

to allow normal operations for 120 days without relying upon the issuance of unsecured debt consistent with industry practices of sound liquidity management. Our daily liquidity management activities are consistent with the liquidity component of our commitment with OFHEO to maintain alternative sources of liquidity to allow normal operations for 90 days without relying upon issuance of unsecured debt. See "RISK MANAGEMENT AND DISCLOSURE COMMITMENTS" for further information.

Effective December 2007, we established securitization trusts for the underlying assets of our PCs and Structured Securities. Consequently, we hold remittances in a segregated account and do not commingle those funds with our general operating funds. We now receive trust management income, which represents the fees we earn as master servicer, issuer and trustee for our PCs and Structured Securities. These fees are derived from interest earned on principal and interest cash flows between the time remitted to the trust by servicers and the date of distribution to our PC and Structured Securities holders.

Effective in July 2006, the Federal Reserve Board revised its payments system risk policy to restrict or eliminate daylight overdrafts by GSEs in connection with their use of the Fedwire system. The revised policy also includes a requirement that the GSEs fully fund their accounts in the system to the extent necessary to cover payments on their debt and mortgage-related securities each day, before the Federal Reserve Bank of New York, acting as fiscal agent for the GSEs, will initiate such payments. We have taken actions to fully fund our account as necessary, such as opening lines of credit with third parties. Certain of these lines of credit require that we post collateral that, in certain limited circumstances, the secured party has the right to repledge to other third parties, including the Federal Reserve Bank. As of December 31, 2007, we pledged approximately $16.8 billion of securities to these secured parties. These lines of credit, which provide additional intraday liquidity to fund our activities through the Fedwire system, are uncommitted intraday loan facilities. As a result, while we expect to continue to use these facilities, we may not be able to draw on them if and when needed. See "NOTE 4: RETAINED PORTFOLIO AND CASH AND INVESTMENTS PORTFOLIO" to our consolidated financial statements for further information.

To fund our business activities, we depend on the continuing willingness of investors to purchase our debt securities. Any change in applicable legislative or regulatory exemptions, including those described in "REGULATION AND SUPERVISION," could adversely affect our access to some debt investors, thereby potentially increasing our debt funding costs. However, because of our financial performance and our regular and significant participation as an issuer in the capital markets, our sources of liquidity have remained adequate to meet our needs and we anticipate that they will continue to be so.

Under our charter, the Secretary of the Treasury has discretionary authority to purchase our obligations up to a maximum of $2.25 billion principal balance outstanding at any one time. However, we do not rely on this authority as a source of liquidity to meet our obligations.

Depending on market conditions and the mix of derivatives we employ in connection with our ongoing risk management activities, our derivative portfolio can be either a net source or a net use of cash. For example, depending on the prevailing interest-rate environment, interest-rate swap agreements could cause us either to make interest payments to counterparties or to receive interest payments from counterparties. Purchased options require us to pay a premium while written options allow us to receive a premium.

We are required to pledge collateral to third parties in connection with secured financing and daily trade activities. In accordance with contracts with certain derivative counterparties, we post collateral to those counterparties for derivatives in a net loss position, after netting by counterparty, above agreed-upon posting thresholds. See "NOTE 4: RETAINED PORTFOLIO AND CASH AND INVESTMENTS PORTFOLIO" to our consolidated financial statements for information about assets we pledge as collateral.

We are involved in various legal proceedings, including those discussed in "LEGAL PROCEEDINGS," which may result in a use of cash.

### Debt Securities

Because of our GSE status and the special attributes granted to us under our charter, our debt securities and those of other GSE issuers trade in the so-called "agency sector" of the debt markets. This highly liquid market segment exhibits its own yield curve reflecting our ability to borrow at lower rates than many other corporate debt issuers. As a result, we mainly compete for funds in the debt issuance markets with Fannie Mae and the Federal Home Loan Banks, which issue debt securities of comparable quality and ratings. However, we also compete for funding with other debt issuers. The demand for, and liquidity of, our debt securities benefit from their status as permitted investments for banks, investment companies and other financial institutions under their statutory and regulatory framework. Competition for funding can vary with economic, financial market and regulatory environments.

We fund our business activities primarily through the issuance of short- and long-term debt. Table 34 summarizes the par value of the debt securities we issued, based on settlement dates, during 2007 and 2006. We seek to maintain a variety of consistent, active funding programs that promote high-quality coverage by market makers and reach a broad group of institutional and retail investors. By diversifying our investor base and the types of debt securities we offer, we believe we enhance our ability to maintain continuous access to the debt markets under a variety of market conditions.

## Table 34 — Debt Security Issuances by Product, at Par Value[1]

| | Year Ended December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | (in millions) | |
| **Short-term debt:** | | |
| Reference Bills® securities and discount notes | $597,587 | $593,444 |
| Medium-term notes — callable | 4,100 | 8,532 |
| Medium-term notes — non-callable | 202 | 1,550 |
| Total short-term debt | 601,889 | 603,526 |
| **Long-term debt:** | | |
| Medium-term notes — callable[3] | 112,452 | 106,777 |
| Medium-term notes — non-callable[3] | 25,096 | 17,721 |
| U.S. dollar Reference Notes® securities — non-callable | 51,000 | 55,000 |
| Freddie SUBS® securities[4] | — | 3,299 |
| Total long-term debt | 188,548 | 182,797 |
| Total debt securities issued | $790,437 | $786,323 |

(1) Exclude securities sold under agreements to repurchase and federal funds purchased, lines of credit and securities sold but not yet purchased.
(2) Include $145 million and $100 million of medium-term notes — callable issued for the years ended December 31, 2007 and 2006, respectively, which were accounted for as debt exchanges.
(3) Include $— and $1.0 billion of medium-term notes — non-callable issued for the years ended December 31, 2007 and 2006, respectively, which were accounted for as debt exchanges.
(4) Include $— and $1.5 billion of Freddie SUBS® securities issued for the years ended December 31, 2007 and 2006, respectively, which were accounted for as debt exchanges.

### Short-Term Debt

We fund our operating cash needs, in part, by issuing Reference Bills® securities and other discount notes, which are short-term instruments with maturities of one year or less that are sold on a discounted basis, paying only principal at maturity. Our Reference Bills® securities program consists of large issues of short-term debt that we auction to dealers on a regular schedule. We issue discount notes with maturities ranging from one day to one year in response to investor demand and our cash needs. Short-term debt also includes certain medium-term notes that have original maturities of one year or less.

### Long-Term Debt

We issue debt with maturities greater than one year primarily through our medium-term notes program and our Reference Notes® securities program.

### Medium-term Notes

We issue a variety of fixed- and variable-rate medium-term notes, including callable and non-callable fixed-rate securities, zero-coupon securities and variable-rate securities, with various maturities ranging up to 30 years. Medium-term notes with original maturities of one year or less are classified as short-term debt. Medium-term notes typically contain call provisions, effective as early as three months or as distant as ten years after the securities are issued.

### Reference Notes® Securities

Through our Reference Notes® securities program, we sell large issues of long-term debt that provide investors worldwide with a high-quality, liquid investment vehicle. Reference Notes® securities are regularly issued, U.S. dollar denominated, non-callable fixed-rate securities, which we currently issue with original maturities ranging from two through ten years. We have also issued €Reference Notes® securities denominated in Euros, but did not issue any such securities in 2007 or 2006. We hedge our exposure to changes in foreign-currency exchange rates by entering into swap transactions that convert foreign-currency denominated obligations to U.S. dollar-denominated obligations. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks — *Sources of Interest-Rate Risk and Other Market Risks*" for more information.

The investor base for our debt is predominantly institutional. However, we also conduct weekly offerings of FreddieNotes® securities, a medium-term notes program designed to meet the investment needs of retail investors.

*Subordinated Debt*

During the year ended December 31, 2007, we called $1.9 billion of higher-cost Freddie SUBS® securities, while not issuing any new securities. During the year ended December 31, 2006, we issued approximately $3.3 billion of Freddie SUBS® securities. In addition, we called approximately $1.0 billion of previously issued Freddie SUBS® securities in August 2006. At December 31, 2007 and 2006, the balance of our subordinated debt outstanding was $4.5 billion and $6.4 billion, respectively. Our subordinated debt in the form of Freddie SUBS® securities is a component of our risk management and disclosure commitments with OFHEO (described in "RISK MANAGEMENT AND DISCLOSURE COMMITMENTS").

*Debt Retirement Activities*

We repurchase or call our outstanding debt securities from time to time to help support the liquidity and predictability of the market for our debt securities and to manage interest-rate risk associated with our assets and liabilities. When our debt securities become seasoned or one-time call options on our debt securities expire, they may become less liquid, which could cause their price to decline. By repurchasing debt securities, we help preserve the liquidity of our debt securities and improve their price performance, which helps to reduce our funding costs over the long-term. Our repurchase activities also help us manage the funding mismatch, or duration gap, created by changes in interest rates. For example, when interest rates decline, the expected lives of the mortgage-related securities held in our retained portfolio decrease, reducing the need for long-term debt. We use a number of different means to shorten the effective weighted average lives of our outstanding debt securities and thereby manage the duration gap, including retiring long-term debt through repurchases or calls; changing our debt funding mix between short- and long-term debt; or using derivative instruments, such as entering into receive-fixed swaps or terminating or assigning pay-fixed swaps. From time to time, we may also enter into transactions in which we exchange newly issued debt securities for similar outstanding debt securities held by investors. These transactions are accounted for as debt exchanges.

Table 35 provides the par value, based on settlement dates, of debt securities we repurchased, called and exchanged during 2007 and 2006.

**Table 35 — Debt Security Repurchases, Calls and Exchanges**

| | Year Ended December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | (in millions) | |
| Repurchases of outstanding €Reference Notes® securities | $ 3,965 | $ 5,210 |
| Repurchases of outstanding medium-term notes | 10,986 | 28,560 |
| Calls of callable medium-term notes | 95,317 | 26,559 |
| Calls of callable Freddie SUBS® securities | 1,930 | 1,000 |
| Exchanges of medium-term notes | 145 | 1,074 |
| Exchanges of Freddie SUBS® securities | — | 1,480 |

*Credit Ratings*

Our ability to access the capital markets and other sources of funding, as well as our cost of funds, are highly dependent upon our credit ratings. Table 36 indicates our credit ratings at February 1, 2008.

**Table 36 — Freddie Mac Credit Ratings**

| | Nationally Recognized Statistical Rating Organization | | |
|---|---|---|---|
| | S&P | Moody's | Fitch |
| Senior long-term debt[1] | AAA | Aaa | AAA |
| Short-term debt[2] | A-1+ | P-1 | F-1+ |
| Subordinated debt[3] | AA−/Negative | Aa2 | AA− |
| Preferred stock | AA−/Negative | Aa3 | A+ |

(1) Includes medium-term notes, U.S. dollar Reference Notes® securities and €Reference Notes® securities.
(2) Includes Reference Bills® securities and discount notes.
(3) Includes Freddie SUBS® securities only.

In addition to the ratings described in Table 36, S&P provides a "Risk-To-The-Government" rating that measures our ability to meet our debt obligations and the value of our franchise in the absence of any implied government support. Our "Risk-To-The-Government" rating was AA− with a negative outlook at February 1, 2008. See "RISK MANAGEMENT AND DISCLOSURE COMMITMENTS." A S&P rating outlook assesses the potential direction of a long-term credit rating over the intermediate term (typically six months to two years). A modifier of "negative" means that a rating may be lowered.

Moody's also provides a "Bank Financial Strength" rating that represents Moody's opinion of our intrinsic safety and soundness and, as such, excludes certain external credit risks and credit support elements. Ratings under this measure range

from A, the highest, to E, the lowest rating. On January 9, 2008, Moody's placed our "Bank Financial Strength" rating on review for possible downgrade. Our "Bank Financial Strength" rating remained at A— as of February 1, 2008.

### *Equity Securities*

See "Capital Resources — *Core Capital*" and "MARKET FOR THE COMPANY'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES" for information about issuances and repurchases of our equity securities.

### *Cash and Investments Portfolio*

We maintain a cash and investments portfolio that is important to our financial management and our ability to provide liquidity and stability to the mortgage market. At December 31, 2007, this portfolio consisted primarily of cash equivalents and non-mortgage-related securities, such as commercial paper and asset-backed securities, that we could sell or finance to provide us with an additional source of liquidity to fund our business operations. We also use the portfolio to help manage recurring cash flows and meet our other cash management needs. In addition, we use the portfolio to hold capital on a temporary basis until we can deploy it into retained portfolio investments or credit guarantee opportunities. We may also sell or finance the securities in this portfolio to maintain capital reserves to meet mortgage funding needs, provide diverse sources of liquidity or help manage the interest-rate risk inherent in mortgage-related assets.

For additional information on our cash and investments portfolio, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Cash and Investments." The non-mortgage-related investments in this portfolio may expose us to institutional credit risk and the risk that the investments could decline in value due to market-driven events such as credit downgrades or changes in interest rates and other market conditions. See "CREDIT RISKS — Institutional Credit Risk" for more information.

### Cash Flows

Our cash and cash equivalents decreased $2.8 billion to $8.6 billion for the year ended December 31, 2007. Cash flows used for operating activities in 2007 were $7.4 billion, which reflected a reduction in cash due to a net loss of $3.1 billion and a decrease in liabilities to PC investors as a result of a change in our PC issuance process. See "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES" to our consolidated financial statements for additional information. Net cash used was primarily provided by net interest income, management and guarantee fees and changes in other operating assets and liabilities. Cash flows provided by investing activities in 2007 were $9.6 billion, primarily due to a net increase in cash flows as we reduced our balance of federal funds sold and eurodollars. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Cash and Investments" for additional information. This was partially offset by an increase in cash used to purchase mortgage loans under financial guarantees as a result of increasing delinquencies. See "CREDIT RISKS — Mortgage Credit Risk — *Performing and Non-Performing Assets*" and "— *Delinquencies*" for additional information. Cash flows used for financing activities in 2007 were $5.0 billion and resulted from a decrease in debt securities, net, preferred and common stock repurchases and dividends paid. Cash used was partially offset by proceeds from the issuance of preferred stock. See "NOTE 8: STOCKHOLDERS' EQUITY" to our consolidated financial statements for more information.

Our cash and cash equivalents increased $0.9 billion to $11.4 billion for the year ended December 31, 2006. Cash flows provided by operating activities in 2006 were $8.7 billion, which primarily reflected cash flows provided by net interest income, management and guarantee fees and changes in other operating assets and liabilities, partially offset by non-interest expenses. Cash flows used for investing activities in 2006 were $4.9 billion, primarily resulting from purchases of held-for-investment mortgages and available-for-sale securities, as well as a net decrease in cash flows from securities purchased under agreements to resell and federal funds sold, partially offset by proceeds from sales and maturities of available-for-sale securities and repayments of held-for-investment mortgages. Cash flows used for financing activities in 2006 were $2.9 billion and were primarily due to repayments of debt securities, repurchases of common stock, payment of cash dividends on preferred stock and common stock, and payments of housing tax credit partnerships notes payable, partially offset by proceeds from issuance of debt securities.

Our cash and cash equivalents decreased $24.8 billion to $10.5 billion for the year ended December 31, 2005. Cash flows provided by operating activities in 2005 were approximately $6.2 billion, which primarily reflected cash flows provided by net interest income, management and guarantee fees and changes to other operating assets and liabilities, partially offset by non-interest expenses as well as net cash flows used in purchases of held-for-sale mortgages. Cash flows used for investing activities were $58.4 billion, primarily resulting from purchases of held-for-investment mortgages and available-for-sale securities as we increased our retained portfolio in 2005 and the repayment of swap collateral obligations. These outflows were partially offset by proceeds from sales and maturities of available-for-sale securities and repayments of held-for-investment mortgages, as well as cash flows from securities purchased under agreements to resell and federal funds sold.

Cash flows provided by financing activities in 2005 were $27.4 billion and were primarily due to proceeds from issuance of debt securities, partially offset by net cash flows used in repayments of debt securities, payment of cash dividends on preferred stock and common stock, and payments of housing tax credit partnerships notes payable.

## Capital Resources

### Capital Management

Our primary objective in managing capital is preserving our safety and soundness. We also seek to have sufficient capital to support our business and mission at attractive long-term returns. See "NOTE 9: REGULATORY CAPITAL" to our consolidated financial statements for more information regarding our regulatory capital requirements and OFHEO's capital monitoring framework. When appropriate, we will consider opportunities to return excess capital to shareholders (through dividends and share repurchases) and optimize our capital structure to lower our cost of capital.

We assess and project our capital adequacy relative to our regulatory requirements as well as our economic risks. This includes targeting a level of additional capital above each of our capital requirements, as well as the 30% mandatory target capital surplus to help support ongoing compliance and to accommodate future uncertainties. We evaluate the adequacy of our targeted additional capital in light of changes in our business, risk and economic environment.

We develop an annual capital plan that is approved by our board of directors and updated periodically. This plan provides projections of capital adequacy, taking into consideration our business plans, forecasted earnings, economic risks and regulatory requirements.

### Capital Adequacy

We estimate at December 31, 2007 that we exceeded each of our regulatory capital requirements, in addition to the 30% mandatory target capital surplus. However, weakness in the housing market and volatility in the financial markets continue to adversely affect our capital, including our ability to manage to the 30% mandatory target capital surplus. Factors that could adversely affect the adequacy of our capital in future periods include GAAP net losses; continued declines in home prices; changes in our credit and interest-rate risk profiles; adverse changes in interest-rate or implied volatility; adverse OAS changes; legislative or regulatory actions that increase capital requirements; or changes in accounting practices or standards.

As a result of the impact of GAAP net losses on our core capital, we did not meet the 30% mandatory target capital surplus at the end of November 2007. In order to manage to the 30% mandatory target capital surplus and improve business flexibility, on December 4, 2007, we issued $6 billion of non-cumulative, perpetual preferred stock. In addition, during the fourth quarter of 2007, we reduced our common stock dividend by 50% and reduced the size of our cash and investments portfolio. If these measures are not sufficient to help us manage to the 30% mandatory target capital surplus, then we will consider additional measures in the future, such as limiting growth or reducing the size of our retained portfolio, slowing issuances of our credit guarantees, issuing preferred or convertible preferred stock, issuing common stock or further reducing our common stock dividend.

Other items positively affecting our capital position include: (a) certain operational changes in December 2007 for purchasing delinquent loans from our PCs, (b) changes in accounting principles we adopted, which increased core capital by $1.3 billion at December 31, 2007 and (c) our adoption of SFAS 159 on January 1, 2008, which increased core capital by an estimated $1.0 billion.

Our ability to execute additional actions or their effectiveness may be limited and we might not be able to manage to the 30% mandatory target capital surplus. If we are not able to manage to the 30% mandatory target capital surplus, OFHEO may, among other things, seek to require us to (a) submit a plan for remediation or (b) take other remedial steps. In addition, OFHEO has discretion to reduce our capital classification by one level if OFHEO determines that we are engaging in conduct OFHEO did not approve that could result in a rapid depletion of core capital or determines that the value of property subject to mortgage loans we hold or guarantee has decreased significantly. See "REGULATION AND SUPERVISION — Office of Federal Housing Enterprise Oversight — *Capital Standards and Dividend Restrictions*" and "NOTE 9: REGULATORY CAPITAL — Classification" to our consolidated financial statements for information regarding additional potential actions OFHEO may seek to take against us.

### Core Capital

During 2007 and 2006, our core capital increased approximately $2.5 billion and $0.3 billion, respectively. The increase in 2007 was primarily due to a net increase in the balance of our non-cumulative, perpetual preferred stock of $8.0 billion and the cumulative effect of a change-in accounting principle of $181 million, partially offset by a net loss of $3.1 billion, common stock repurchases of $1.0 billion, and common and preferred stock dividends declared of $1.6 billion. The increase in our core capital in 2006 was primarily from net income of $2.3 billion and a net increase in the balance of our non-cumulative, perpetual preferred stock of $1.5 billion, partially offset by common stock repurchases of $2.0 billion and the

payment of common stock and preferred stock dividends totaling $1.6 billion. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Adopted Accounting Standards — *Accounting for Uncertainty in Income Taxes*" to our consolidated financial statements for further information regarding the cumulative effect of a change in accounting principle.

We completed five non-cumulative, perpetual preferred stock offerings during 2007. In these offerings, we issued an aggregate of $8.6 billion of non-cumulative, perpetual preferred stock, consisting of $1.5 billion in connection with the planned replacement of common stock with an equal amount of preferred stock and $600 million to replace higher-cost preferred stock that we redeemed and additional issuances of $6.5 billion in the aggregate to bolster our capital base and for general corporate purposes. We purchased a total of approximately 16.1 million shares of our outstanding common stock under the stock repurchase plan authorized in March 2007 at an average cost of $62.04 per share.

Our board of directors approved a dividend per common share of $0.25 for the fourth quarter of 2007, a decrease from the $0.50 per share common dividend that was paid for each of the first three quarters of 2007 and the fourth quarter of 2006. Our common dividend per share was $0.47 for each of the first three quarters of 2006 and the fourth quarter of 2005. Our board of directors will determine the amount of future dividends, if any, after considering factors such as our capital position and our earnings and growth prospects. Our board of directors also approved an increase in the number of authorized shares of common stock from 726 million to 806 million in November 2007.

For the fourth quarter of 2005 through the fourth quarter of 2007, our board of directors also approved quarterly preferred stock dividends that were consistent with the contractual rates and terms of the preferred stock. See "NOTE 8: STOCKHOLDERS' EQUITY" to our consolidated financial statements for information regarding our outstanding issuances of preferred stock.

## PORTFOLIO BALANCES AND ACTIVITIES

**Total Mortgage Portfolio**

Our total mortgage portfolio includes mortgage loans and mortgage-related securities held in our retained portfolio as well as the balances of PCs and Structured Securities held by third parties. Guaranteed PCs and Structured Securities held by third parties are not included on our consolidated balance sheets.

Table 37 provides information about our total mortgage portfolio at December 31, 2007, 2006 and 2005.

**Table 37 — Total Mortgage Portfolio and Segment Portfolio Composition**[1][2]

| | December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | | (in millions) | |
| **Total mortgage portfolio:** | | | |
| *Retained portfolio:* | | | |
| Single-family mortgage loans | $ 24,589 | $ 20,640 | $ 20,396 |
| Multifamily mortgage loans | 57,569 | 45,207 | 41,085 |
| Total mortgage loans | 82,158 | 65,847 | 61,481 |
| Guaranteed PCs and Structured Securities in the retained portfolio | 356,970 | 354,262 | 361,324 |
| Non-Freddie Mac mortgage-related securities, agency | 47,836 | 45,385 | 44,626 |
| Non-Freddie Mac mortgage-related securities, non-agency | 233,849 | 238,465 | 242,915 |
| Total non-Freddie Mac mortgage-related securities | 281,685 | 283,850 | 287,541 |
| *Total retained portfolio*[3] | 720,813 | 703,959 | 710,346 |
| *Guaranteed PCs and Structured Securities held by third parties:* | | | |
| Single-family Structured Transactions | 9,351 | 8,424 | 10,489 |
| Multifamily Structured Transactions | 900 | 867 | — |
| Single-family PCs and other Structured Securities | 1,363,613 | 1,105,437 | 949,599 |
| Multifamily PCs and other Structured Securities | 7,999 | 8,033 | 14,112 |
| *Total guaranteed PCs and Structured Securities held by third parties* | 1,381,863 | 1,122,761 | 974,200 |
| Total mortgage portfolio | $2,102,676 | $1,826,720 | $1,684,546 |

| | December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | | (in millions) | |
| **Segment portfolios:** | | | |
| *Investments — Mortgage-related investment portfolio:* | | | |
| Single-family mortgage loans | $ 24,589 | $ 20,640 | $ 20,396 |
| Guaranteed PCs and Structured Securities in the retained portfolio | 356,970 | 354,262 | 361,324 |
| Non-Freddie Mac mortgage-related securities in the retained portfolio | 281,685 | 283,850 | 287,541 |
| *Total Investments — Mortgage-related investment portfolio*[4] | $ 663,244 | $ 658,752 | $ 669,261 |
| *Single-family Guarantee — Credit guarantee portfolio:* | | | |
| Guaranteed PCs and Structured Securities in the retained portfolio | $ 343,071 | $ 336,869 | $ 344,922 |
| Guaranteed PCs and Structured Securities held by third parties | 1,363,613 | 1,105,437 | 949,599 |
| Single-family Structured Transactions in the retained portfolio | 11,240 | 17,011 | 16,011 |
| Single-family Structured Transactions held by third parties | 9,351 | 8,424 | 10,489 |
| *Total Single-family Guarantee — Credit guarantee portfolio* | $1,727,275 | $1,467,741 | $1,321,021 |
| *Multifamily — Guarantee and loan portfolios:* | | | |
| Multifamily loan portfolio | $ 57,569 | $ 45,207 | $ 41,085 |
| Multifamily Structured Transactions | 900 | 867 | — |
| Multifamily PCs and other Structured Securities[5] | 10,658 | 8,415 | 14,503 |
| Total multifamily guarantee portfolio | 11,558 | 9,282 | 14,503 |
| *Total Multifamily — Guarantee and loan portfolios* | $ 69,127 | $ 54,489 | $ 55,588 |
| Less: Guaranteed PCs and Structured Securities in the retained portfolio[6] | (356,970) | (354,262) | (361,324) |
| Total mortgage portfolio | $2,102,676 | $1,826,720 | $1,684,546 |

(1) Based on unpaid principal balance and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Effective December 2007, we established securitization trusts for the underlying assets of our PCs and Structured Securities issued. As a result, we adjusted the reported balance of our mortgage portfolios to reflect the publicly-available security balances of our PCs and Structured Securities. Previously these balances were based on the unpaid principal balance of the underlying mortgage loans.
(3) See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Table 22 — Characteristics of Mortgage Loans and Mortgage-Related Securities in our Retained Portfolio" for a reconciliation of the retained portfolio amounts shown in this table to the amounts shown under such caption in conformity with GAAP on our consolidated balance sheets.
(4) Includes certain assets related to Single-family Guarantee activities and Multifamily activities.
(5) Includes multifamily PCs and other Structured Securities both in the retained portfolio and held by third parties.
(6) The amount of our PCs and Structured Securities in the retained portfolio is included in both our segments' mortgage-related and guarantee portfolios and thus deducted in order to reconcile to our total mortgage portfolio. These securities are managed by the Investments segment, which receives related interest income; however, the Single-family and Multifamily segments manage and receive associated guarantee fees.

In 2007 and 2006, our total mortgage portfolio grew at a rate of 15% and 8%, respectively. Our new business purchases consist of mortgage loans and non-Freddie Mac mortgage-related securities that are purchased for our retained portfolio or serve as collateral for our issued PCs and Structured Securities. We generate a significant portion of our mortgage purchase volume through several key mortgage lenders. See "BUSINESS — Our Charter and Mission — *Types of Mortgages We Purchase*" for information about these relationships and consequent risks. Table 38 summarizes purchases into our total mortgage portfolio.

*Freddie Mac*

## Table 38 — Total Mortgage Portfolio Activity Detail[1]

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2007 | | 2006 | | 2005 | |
| | Amount | % of Purchase Amounts | Amount | % of Purchase Amounts | Amount | % of Purchase Amounts |
| | (dollars in millions) | | | | | |
| **New business purchases:** | | | | | | |
| *Single-family mortgage purchases:* | | | | | | |
| Conventional: | | | | | | |
| 30-year amortizing fixed-rate[2] | $326,455 | 66% | $251,143 | 67% | $272,702 | 67% |
| 15-year amortizing fixed-rate | 28,910 | 6 | 21,556 | 6 | 40,963 | 10 |
| ARMs/adjustable-rate[3] | 12,465 | 3 | 18,834 | 5 | 35,617 | 9 |
| Interest-only[4] | 97,778 | 20 | 58,176 | 16 | 26,516 | 7 |
| Option ARMs[5] | — | — | — | — | 3,918 | 1 |
| Balloon/resets[3] | 135 | — | 419 | — | 1,720 | — |
| FHA/VA[6] | 157 | — | 946 | — | — | — |
| Rural Housing Service and other federally guaranteed loans | 176 | — | 176 | — | 177 | — |
| *Total single-family* | 466,066 | 95 | 351,270 | 94 | 381,673 | 94 |
| Multifamily: | | | | | | |
| Conventional and other | 21,645 | 4 | 13,031 | 4 | 11,172 | 3 |
| *Total multifamily* | 21,645 | 4 | 13,031 | 4 | 11,172 | 3 |
| *Total mortgage purchases* | 487,711 | 99 | 364,301 | 98 | 392,845 | 97 |
| **Non-Freddie Mac mortgage-related securities purchased for Structured Securities:** | | | | | | |
| Ginnie Mae Certificates | 48 | — | 48 | — | 37 | — |
| Structured Transactions[7] | 3,431 | 1 | 8,592 | 2 | 14,331 | 3 |
| *Total Non-Freddie Mac mortgage-related securities purchased for Structured Securities* | 3,479 | 1 | 8,640 | 2 | 14,368 | 3 |
| Total single-family and multifamily mortgage purchases and total non-Freddie Mac mortgage-related securities purchased for Structured Securities | $491,190 | 100% | $372,941 | 100% | $407,213 | 100% |
| **Non-Freddie Mac mortgage-related securities purchased into the retained portfolio:** | | | | | | |
| *Agency securities:* | | | | | | |
| Fannie Mae: | | | | | | |
| Single-family: | | | | | | |
| Fixed-rate | $ 2,170 | | $ 4,259 | | $ 2,854 | |
| Variable-rate | 9,863 | | 8,014 | | 3,368 | |
| *Total Fannie Mae* | 12,033 | | 12,273 | | 6,222 | |
| Ginnie Mae: | | | | | | |
| Single-family: | | | | | | |
| Fixed-rate | — | | — | | 64 | |
| *Total Ginnie Mae* | — | | — | | 64 | |
| *Total agency mortgage-related securities* | 12,033 | | 12,273 | | 6,286 | |
| *Non-agency securities:* | | | | | | |
| Single-family: | | | | | | |
| Single-family: | | | | | | |
| Fixed-rate | 881 | | 718 | | 2,154 | |
| Variable-rate | 49,563 | | 96,906 | | 148,600 | |
| *Total single-family* | 50,444 | | 97,624 | | 150,754 | |
| Commercial mortgage-backed securities: | | | | | | |
| Fixed-rate | 3,558 | | 2,534 | | 10,343 | |
| Variable-rate | 18,526 | | 13,432 | | 4,497 | |
| *Total commercial mortgage-backed securities* | 22,084 | | 15,966 | | 14,840 | |
| Mortgage revenue bonds: | | | | | | |
| Single-family: | | | | | | |
| Fixed-rate | 1,813 | | 3,062 | | 2,374 | |
| Variable-rate | — | | — | | 27 | |
| Multifamily: | | | | | | |
| Fixed-rate | — | | 116 | | 434 | |
| Variable-rate | — | | — | | 5 | |
| *Total mortgage revenue bonds* | 1,813 | | 3,178 | | 2,840 | |
| Manufactured Housing: | | | | | | |
| Single-family: | | | | | | |
| Variable-rate | 127 | | — | | — | |
| *Total Manufactured Housing* | 127 | | — | | — | |
| *Total non-agency mortgage-related securities* | 74,468 | | 116,768 | | 168,434 | |
| *Total non-Freddie Mac mortgage-related securities purchased into the retained portfolio* | 86,501 | | 129,041 | | 174,720 | |
| **Total new business purchases** | $577,691 | | $501,982 | | $581,933 | |
| Mortgage purchases with credit enhancements | | 21% | | 17% | | 17% |
| Mortgage liquidations[8] | $298,089 | | $339,814 | | $334,674 | |
| Mortgage liquidations rate[8] | | 16% | | 20% | | 26% |
| **Freddie Mac securities repurchased into the retained portfolio:** | | | | | | |
| Single-family: | | | | | | |
| Fixed-rate | $111,976 | | $ 76,378 | | $106,682 | |
| Variable-rate | 26,800 | | 27,146 | | 29,805 | |
| Multifamily: | | | | | | |
| Fixed-rate | 2,283 | | — | | — | |
| *Total Freddie Mac securities repurchased into the retained portfolio* | $141,059 | | $103,524 | | $136,487 | |

(1) Based on unpaid principal balances. Excludes mortgage loans and mortgage-related securities traded but not yet settled. Also excludes net additions to the retained portfolio for delinquent mortgage loans and balloon reset mortgages purchased out of PC pools.
(2) Includes 40-year and 30-year fixed-rate mortgages.
(3) Includes ARMs with 1-, 3-, 5-, 7- and 10-year initial fixed-rate periods.
(4) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments.
(5) Represents mortgages whose terms require lump sum principal payments on contractually determined future dates unless the borrower qualifies for and elects an extension of the maturity date at an adjusted interest-rate.
(6) Excludes FHA/Department of Veterans Affairs, or VA, loans that back Structured Transactions.
(7) Includes $312 million, $8,905 million and $14,331 million of Option ARM loans purchased for Structured Transactions in 2007, 2006 and 2005, respectively.
(8) Based on total mortgage portfolio.

**Guaranteed PCs and Structured Securities**

Guaranteed PCs and Structured Securities represent the unpaid principal balances of the mortgage-related securities we issue or otherwise guarantee. Table 39 presents the distribution of underlying mortgage assets for our PCs and Structured Securities.

**Table 39 — Guaranteed PCs and Structured Securities[1] [2]**

| | December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | | (In millions) | |
| Single-family: | | | |
| Conventional: | | | |
| 30-year fixed rate[3] | $1,091,212 | $ 882,398 | $ 741,913 |
| 20-year fixed-rate | 72,225 | 66,777 | 67,937 |
| 15-year fixed rate | 272,490 | 290,314 | 321,176 |
| ARMs/adjustable-rate | 91,219 | 100,808 | 106,644 |
| Option ARMs | 1,853 | 2,808 | 3,830 |
| Interest-only[4] | 159,028 | 76,114 | 25,697 |
| Balloon/resets | 17,242 | 21,551 | 26,321 |
| FHA/VA | 1,283 | 1,398 | 849 |
| Rural Housing Service and other federally guaranteed loans | 132 | 138 | 154 |
| Total single-family | 1,706,684 | 1,442,306 | 1,294,521 |
| Multifamily: | | | |
| Conventional and other | 10,658 | 8,415 | 14,503 |
| Total multifamily | 10,658 | 8,415 | 14,503 |
| Structured Securities backed by non-Freddie Mac mortgage-related securities: | | | |
| Ginnie Mae Certificates[5] | 1,268 | 1,510 | 2,021 |
| Structured Transactions[6] | 20,223 | 24,792 | 24,479 |
| Total Structured Securities backed by non-Freddie Mac mortgage-related securities | 21,491 | 26,302 | 26,500 |
| Total guaranteed PCs and Structured Securities | $1,738,833 | $1,477,023 | $1,335,524 |

(1) Based on unpaid principal balances and excludes mortgage-related securities traded, but not yet settled.
(2) Effective December 2007, we established securitization trusts for the underlying assets of our PCs and Structured Securities. As a result, we adjusted the reported balance of our mortgage portfolios to reflect the publicly-available security balances of our PCs and Structured Securities. Previously we reported these balances based on the unpaid principal balance of the underlying mortgage loans.
(3) Portfolio balances include $1,762 million, $42 million and $— of 40-year fixed-rate mortgages at December 31, 2007, 2006 and 2005, respectively.
(4) Includes both fixed and variable-rate interest only loans.
(5) Ginnie Mac Certificates that underlie the Structured Securities are backed by FHA/VA loans.
(6) Represents Structured Securities backed by non-agency securities that include prime, FHA/VA and subprime mortgage loan issuances.

Our guarantees of non-traditional mortgage products, including lower documentation loans, have increased in the last two years in response to newer products in the mortgage origination market. Interest-only loans represented approximately 20% and 16% of our securitization volume in 2007 and 2006, respectively. Other non-traditional mortgage products, including those designated as Alt-A loans, made up approximately 10% and 8% of our mortgage purchase volume in 2007 and 2006, respectively. We impose risk management thresholds on purchases of certain new products for which we have limited historical experience. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK" and "CREDIT RISKS" for additional information regarding our non-traditional mortgage loans, including delinquency rate information.

Table 40 provides additional detail regarding our PCs and Structured Securities.

**Table 40 — Single-Class and Multi-Class PCs and Structured Securities[1]**

| December 31, 2007 | Retained Portfolio | Held by Third Parties | Total Guaranteed PCs and Structured Securities[6] |
|---|---|---|---|
| | | *(in millions)* | |
| **PCs and Structured Securities:** | | | |
| Single-class[2] | $219,702 | $ 817,353 | $1,037,055 |
| Multi-class[3][4] | 137,268 | 526,604 | 663,872 |
| Other[5] | — | 37,906 | 37,906 |
| Total PCs and Structured Securities[7] | $356,970 | $1,381,863 | $1,738,833 |
| **December 31, 2006** | | | |
| **PCs and Structured Securities:** | | | |
| Single-class[2] | $194,057 | $ 624,383 | $ 818,440 |
| Multi-class[3][4] | 160,205 | 491,696 | 651,901 |
| Other[5] | — | 6,682 | 6,682 |
| Total PCs and Structured Securities | $354,262 | $1,122,761 | $1,477,023 |

(1) Based on unpaid principal balances, and excludes Freddie Mac mortgage-related securities traded, but not yet settled.
(2) Includes single-class Structured Securities backed by PCs and Ginnie Mae Certificates.
(3) Includes multi-class Structured Securities that are backed by PCs, Ginnie Mae Certificates and non-agency mortgage-related securities.
(4) Principal-only strips backed by our PCs and held in the retained portfolio are classified as multi-class for the purpose of this table.
(5) See "NOTE 2: FINANCIAL GUARANTEES AND TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS" to our consolidated financial statements for a discussion of our other mortgage guarantees.
(6) Total PCs and Structured Securities exclude $1,519 billion and $1,240 billion at December 31, 2007 and 2006, respectively, of Structured Securities backed by resecuritized PCs and other previously issued Structured Securities. These excluded Structured Securities which do not increase our credit related exposure, consist of single-class Structured Securities backed by PCs, REMICs, and principal-only strips. The notional balances of interest-only strips are excluded because this table is based on unpaid principal balances. Also excluded are modifiable and combinable REMIC tranches and interest and principal classes, where the holder has the option to exchange the security tranches for other pre-defined security tranches.
(7) Effective December 2007, we established securitization trusts for the underlying assets of our PCs and Structured Securities issued. As a result, we adjusted the reported balance of our mortgage portfolios to reflect the publicly-available security balances of our PCs and Structured Securities. Previously, we reported these balances based on the unpaid principal balance of the underlying mortgage loans.

## OFF-BALANCE SHEET ARRANGEMENTS

We enter into certain business arrangements that are not recorded on our consolidated balance sheets or may be recorded in amounts that differ from the full contract or notional amount of the transaction. Most of these arrangements relate to our financial guarantee and securitization activity for which we record guarantee assets and obligations, but the related securitized assets are owned by third parties. These off-balance sheet arrangements may expose us to potential losses in excess of the amounts recorded on our consolidated balance sheets.

### Guarantee of PCs and Structured Securities

As discussed in "BUSINESS — Types of Mortgages We Purchase," we guarantee the payment of principal and interest on PCs and Structured Securities we issue. Mortgage-related assets that back PCs and Structured Securities held by third parties are not reflected as assets on our consolidated balance sheets.

We manage the risks of our credit guarantee activity carefully, sharing the risk in some cases with third parties through the use of primary mortgage insurance, pool insurance and other credit enhancements. "NOTE 2: FINANCIAL GUARANTEES AND TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS" to our consolidated financial statements provides information about our guarantees, including details related to credit protections and maximum coverages that we obtain through credit enhancements. Also, see "CREDIT RISKS" for more information.

Our credit guarantee activities principally occur through our guarantor swap program in the form of mortgage swap transactions. In a mortgage swap transaction, a mortgage lender delivers mortgages to us in exchange for our PCs that represent undivided interests in those same mortgages. We receive various forms of consideration in exchange for providing our guarantee on issued PCs, including (a) the contractual right to receive a management and guarantee fee, (b) delivery or credit fees for higher-risk mortgages and (c) other forms of credit enhancements received from counterparties or mortgage loan insurers.

Credit guarantee activity also occurs through our cash window and our multilender swap program. Single-family mortgage loans we purchase for cash through the cash window are typically either retained by us in our retained portfolio or pooled together with other single-family mortgage loans we purchase in connection with PC swap-based transactions in our multilender program executed with various lenders. We may issue such PCs to these lenders in exchange for the mortgage loans we purchase from them or, to the extent these loans are pooled with loans purchased for cash, we may sell them to third parties for cash consideration through an auction.

We also sell PCs from our retained portfolio in resecuritized form. We issue single- and multi-class Structured Securities that are backed by securities held in our retained portfolio and subsequently transfer such Structured Securities to third parties in exchange for cash, PCs or other mortgage-related securities. We earn resecuritization fees in connection with the creation of certain Structured Securities. We resecuritized a total of $456.9 billion and $388.9 billion of single and multiclass Structured Securities during the year ended December 31, 2007 and 2006, respectively. The increase of our principal credit risk exposure on Structured Securities relates only to that portion of resecuritized assets that consists of non-Freddie Mac mortgage-related securities. For information about our purchase and securitization activities, see "PORTFOLIO BALANCES AND ACTIVITIES."

In addition, we also enter into long-term standby commitments for mortgage assets held by third parties that require that we purchase loans from lenders when the loans subject to these commitments meet certain delinquency criteria. We have included these transactions in the reported activity and balances of our PCs and Structured Securities. Long-term standby commitments represented approximately 2% and less than 1% of the balance of our PCs and Structured Securities as of December 31, 2007 and 2006, respectively.

Our maximum potential off-balance sheet exposure to credit losses relating to our PCs and Structured Securities is primarily represented by the unpaid principal balance of those securities held by third parties, which was $1,382 billion and $1,123 billion at December 31, 2007 and 2006, respectively. Based on our historical credit losses, which in 2007 averaged approximately 3.0 basis points of the aggregate unpaid principal balance of our PCs and Structured Securities, we do not believe that the maximum exposure is representative of our actual exposure on these guarantees. The maximum exposure does not take into consideration the recovery we would receive through exercising our rights to the collateral backing the underlying loans nor the available credit enhancements, which include recourse and primary insurance with third parties.

The accounting policies and fair value estimation methodologies we apply to our credit guarantee activities significantly affect the volatility of our reported earnings. See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss)" for an analysis of the effects on our consolidated statements of income related to our credit guarantee activities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS" for a description of our guarantee asset and guarantee obligation. The accounting for our securitization transactions and the significant assumptions used to determine the gains or losses from such transfers that are accounted for as sales are discussed in "NOTE 2: FINANCIAL GUARANTEES AND TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS" to our consolidated financial statements.

### Other

We extend other guarantees and provide indemnification to counterparties for breaches of standard representations and warranties in contracts entered into in the normal course of business based on an assessment that the risk of loss would be remote. See "NOTE 2: FINANCIAL GUARANTEES AND TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS" to our consolidated financial statements for additional information.

We are a party to numerous entities that are considered to be variable interest entities, or VIEs, in accordance with FASB Interpretation No. 46 (Revised December 2003), "*Consolidation of Variable Interest Entities (revised December 2003), an interpretation of APB No. 51*," or FIN 46(R). These variable interest entities include low-income multifamily housing tax credit partnerships, certain Structured Transactions and certain asset-backed investment trusts. See "NOTE 3: VARIABLE INTEREST ENTITIES" to our consolidated financial statements for additional information related to our significant variable interests in these VIEs.

As part of our credit guarantee business, we routinely enter into forward purchase and sale commitments for mortgage loans and mortgage-related securities. Some of these commitments are accounted for as derivatives. Their fair values are reported as either Derivative assets, net at fair value or Derivative liabilities, net at fair value on our consolidated balance sheets. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" for further information. Our non-derivative commitments are primarily related to commitments arising from mortgage swap transactions and, to a lesser extent, commitments to purchase certain multifamily mortgage loans that will be classified as held-for-investment. These non-derivative commitments totaled $173.4 billion and $264.4 billion at December 31, 2007 and 2006, respectively. Such commitments are not accounted for as derivatives and are not recorded on our consolidated balance sheets.

Effective December 2007 we established securitization trusts for the administration of cash remittances received on the underlying assets of our PCs and Structured Securities. We receive trust management income, which represents the fees we earn as master servicer, issuer, trustee and administrator for our PCs and Structured Securities. These fees, which are included in our non-interest income, are derived from interest earned on principal and interest cash flows between the time funds are remitted to the trust by servicers and the date of distribution to our PC and Structured Securities holders. The trust management income will be offset by interest expense we incur when a borrower prepays.

## CONTRACTUAL OBLIGATIONS

Table 41 provides aggregated information about the listed categories of our contractual obligations as of December 31, 2007. These contractual obligations affect our short- and long-term liquidity and capital resource needs. The table includes information about undiscounted future cash payments due under these contractual obligations, aggregated by type of contractual obligation, including the contractual maturity profile of our debt securities and other liabilities reported on our consolidated balance sheet and our operating leases at December 31, 2007. The timing of actual future payments may differ from those presented due to a number of factors, including discretionary debt repurchases. Our contractual obligations include other purchase obligations that are enforceable and legally binding. For purposes of this table, purchase obligations are included through the termination date specified in the respective agreements, even if the contract is renewable. Many of our purchase agreements for goods or services include clauses that would allow us to cancel the agreement prior to the expiration of the contract within a specified notice period; however, this table includes such obligations without regard to such termination clauses (unless we have provided the counterparty with actual notice of our intention to terminate the agreement).

In Table 41, the amounts of future interest payments on debt securities outstanding at December 31, 2007 are based on the contractual terms of our debt securities at that date. These amounts were determined using the key assumptions that (a) variable-rate debt continues to accrue interest at the contractual rates in effect at December 31, 2007 until maturity and (b) callable debt continues to accrue interest until its contractual maturity. The amounts of future interest payments on debt securities presented do not reflect certain factors that will change the amounts of interest payments on our debt securities after December 31, 2007, such as (a) changes in interest rates, (b) the call or retirement of any debt securities and (c) the issuance of new debt securities. Accordingly, the amounts presented in the table do not represent a forecast of our future cash interest payments or interest expense.

Table 41 excludes the following items:

- future payments related to our guarantee obligation, because the amount and timing of such payments are generally contingent upon the occurrence of future events and are therefore uncertain;

- future contributions to our Pension Plan, as we have not yet determined whether a contribution is required for 2008. See "NOTE 14: EMPLOYEE BENEFITS" to our consolidated financial statements for additional information about contributions to our Pension Plan;

- future cash settlements on derivative agreements not yet accrued, because the amount and timing of such payments are dependent upon changes in the underlying financial instruments and are therefore uncertain; and

- future dividends on the preferred stock we issued, because dividends on these securities are non-cumulative. In addition, the classes of preferred stock issued by our two consolidated real estate investment trust, or REIT, subsidiaries pay dividends that are cumulative. However, dividends on the REIT preferred stock are excluded because the timing of these payments is dependent upon declaration by the boards of directors of the REITs.

Table 41 — Contractual Obligations by Year at December 31, 2007

| | Total | 2008 | 2009 | 2010 | 2011 | 2012 | Thereafter |
|---|---|---|---|---|---|---|---|
| | | | | (In millions) | | | |
| Long-term debt securities[1] | $576,349 | $ 97,262 | $ 79,316 | $63,911 | $45,966 | $52,317 | $237,577 |
| Short-term debt securities[1] | 199,498 | 199,498 | — | — | — | — | — |
| Interest payable[2] | 144,405 | 25,181 | 20,806 | 17,606 | 14,279 | 12,073 | 54,460 |
| Other liabilities reflected on our consolidated balance sheet: | | | | | | | |
| Other contractual liabilities[3][4][5] | 2,912 | 2,293 | 300 | 104 | 66 | 12 | 137 |
| Purchase obligations: | | | | | | | |
| Purchase commitments[6] | 38,013 | 38,013 | — | — | — | — | — |
| Other purchase obligations | 401 | 262 | 54 | 27 | 21 | 18 | 19 |
| Operating lease obligations | 107 | 19 | 19 | 14 | 8 | 7 | 40 |
| Capital lease obligations | 1 | 1 | — | — | — | — | — |
| Total specified contractual obligations | $961,686 | $362,529 | $100,495 | $81,662 | $60,340 | $64,427 | $292,233 |

(1) Represent par value. Callable debt is included in this table at its contractual maturity. For additional information about our debt securities, see "NOTE 7: DEBT SECURITIES AND SUBORDINATED BORROWINGS" to our consolidated financial statements.
(2) Includes estimated future interest payments on our short-term and long-term debt securities. Also includes accrued interest payable recorded on our consolidated balance sheet, which consists primarily of the accrual of interest on short-term and long-term debt as well as the accrual of periodic cash settlements of derivatives, netted by counterparty.
(3) Other contractual liabilities primarily represent future cash payments due under our contractual obligations to make delayed equity contributions to LIHTC partnerships and payables to the trust established for the administration of cash remittances received related to the underlying assets of our PCs and Structured Securities issued.
(4) Accrued obligations related to our defined benefit plans, defined contribution plans and executive deferred compensation plan are included in the Total and 2008 columns. However, the timing of payments due under these obligations is uncertain. See "NOTE 14: EMPLOYEE BENEFITS" to our consolidated financial statements for additional information.
(5) As of December 31, 2007, we have recorded tax liabilities for unrecognized tax benefits totaling $563 million and allocated interest of $137 million. These amounts have been excluded from this table because we cannot estimate the years in which these liabilities may be settled. See "NOTE 13: INCOME TAXES" to our consolidated financial statements for additional information.
(6) Purchase commitments represent our obligations to purchase mortgage loans and mortgage-related securities from third parties. The majority of purchase commitments included in this caption are accounted for as derivatives in accordance with SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," or SFAS 133.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in accordance with GAAP requires us to make a number of judgments, estimates and assumptions that affect the reported amounts of our assets, liabilities, income, and expenses. Certain of our accounting policies, as well as estimates we make, are critical to the presentation of our financial condition and results of operations. They often require management to make difficult, complex or subjective judgments and estimates, at times, regarding matters that are inherently uncertain. The accounting policies discussed in this section are particularly critical to understanding our consolidated financial statements. Actual results could differ from our estimates and different judgments and assumptions related to these policies and estimates could have a material impact on our consolidated financial statements.

Our critical accounting policies and estimates relate to: (a) valuation of financial instruments; (b) derivative instruments and hedging activities; (c) allowances for loan losses and reserve for guarantee losses; (d) application of the static effective yield method guarantee obligation; (e) application of the effective interest method; and (f) impairment recognition on investments in securities. For additional information about these and other significant accounting policies, including recently issued accounting pronouncements, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" to our consolidated financial statements.

### Valuation of Financial Instruments

A significant portion of our assets and liabilities consists of financial instruments that are measured at fair value on our consolidated financial statements. For instruments that are complex in nature, the measurement of fair value requires significant management judgments and assumptions. These judgments and assumptions, as well as changes in market conditions, may have a material effect on our GAAP consolidated balance sheets and statements of income as well as our consolidated fair value balance sheets.

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in a transaction between market participants at the measurement date. The selection of a technique to measure fair value for each type of financial instrument depends on both the reliability and the availability of relevant market data. The amount of judgment involved in measuring the fair value of a financial instrument is affected by a number of factors, such as the type of

instrument, the liquidity of the markets for the instrument and the contractual characteristics of the instrument. We measure fair value according to the following fair value hierarchy of inputs to valuation techniques:

- quoted market prices for identical and similar instruments;
- industry standard models that consider market inputs such as yield curves, duration, volatility factors and prepayment speeds; and
- internally developed models that consider inputs based on management's judgment of market-based assumptions.

Financial instruments with active markets and readily available market prices are valued based on independent price quotations obtained from third party sources, such as pricing services, dealer quotes or direct market observations. During the second half of 2007, the market for non-agency securities has become significantly less liquid, which has resulted in lower transaction volumes, wider credit spreads and less transparency with pricing for these assets. In addition, we have observed more variability in the quotations received from dealers and third-party pricing services. However we believe that these quotations provide reasonable estimates of fair value. Independent price quotations obtained from pricing services are valuations estimated by a service provider using available market information. Dealer quotes are prices obtained from dealers that generally make markets in the relevant products and are an indication of the price at which the dealer would consider transacting in normal market conditions. Market observable prices are prices that are retrieved from sources in which market trades are executed, such as electronic trading platforms. When quoted prices are not readily available, we utilize models, including industry standard models and internally-developed models. These models use observable market inputs such as interest rate curves, market volatilities and pricing spreads. We maximize the use of observable inputs to the extent available. Certain complex financial instruments have significant data inputs that cannot be validated by reference to the market. These instruments are typically illiquid or unique in nature and require the use of management's judgment of market-based assumptions. The use of different pricing models or assumptions could produce materially different measurements of fair value.

Fair value affects our statement of income in the following ways:

- For certain financial instruments that are recorded in the GAAP consolidated balance sheets at fair value, changes in fair value are recognized in current period earnings. These include:
  - securities classified as trading, which are recorded in gains (losses) on investment activity;
  - derivatives with no hedge designation, which are recorded in derivative gains (losses); and
  - the guarantee asset, which is recorded in gains (losses) on guarantee asset.
- For other financial instruments that are recorded in the GAAP consolidated balance sheets at fair value, changes in fair value are deferred, net of tax, in AOCI. These include:
  - securities classified as available-for-sale, which are initially measured at fair value with deferred gains and losses recognized in AOCI. These deferred gains and losses affect earnings over time through amortization, sale or impairment recognition; and
  - changes in derivatives that are designated in cash flow hedge accounting relationships.
- Our guarantee obligation is initially measured at fair value, but is not remeasured at fair value on a periodic basis. This initial estimate results in losses on certain guarantees when the fair value of the guarantee obligation exceeds the fair value of the related guarantee asset and credit enhancement-related assets at issuance. This obligation also affects earnings over time through amortization to income on guarantee obligation.
- Mortgage loans purchased under our financial guarantees result in recognition of losses on loans purchased when fair values are less than our acquisition basis at the date of purchase.
- Mortgage loans that are held-for-sale are recorded at the lower-of-cost-or-market with changes in fair value recorded through earnings in gains (losses) on investment activity.

We periodically evaluate our valuation techniques and may change them to improve our fair value estimates, to accommodate market developments or to compensate for changes in data availability and reliability or other operational constraints.

At December 31, 2007 and 2006, the fair values for approximately 99% of our mortgage-related securities were based on prices obtained from third parties or were determined using models with significant observable inputs. The fair values for the remainder of our mortgage-related securities were obtained from internal models with few or no observable inputs. All of the fair values for our non-mortgage-related securities at December 31, 2007, and the majority of them at December 31, 2006, were based on prices obtained from third parties. The majority of our derivative positions were valued using internally developed models that used market inputs because few of the derivative contracts we used were listed on exchanges. At December 31, 2007 and 2006, approximately 71% and 65%, respectively, of the gross fair value of our derivative portfolio

related to interest-rate and foreign-currency swaps that did not have embedded options. These derivatives were valued using a discounted cash flow model that projects future cash flows and discounts them at the spot rate related to each cash flow. The remaining 29% and 35%, respectively, of our derivatives portfolio was valued based on prices obtained from third parties or using models with significant observable inputs.

See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" for discussion of market risks and our interest-rate sensitivity measures, Portfolio Market Value Sensitivity or PMVS, and duration gap.

### Derivative Instruments and Hedging Activities

We discontinued substantially all of our hedge accounting relationships by December 31, 2006. During 2006 and 2005, our hedge accounting relationships primarily consisted of hedging benchmark interest-rate risk related to the forecasted issuances of debt that were designated as cash flow hedges, and fair value hedges of benchmark interest-rate risk and/or foreign currency risk on existing fixed-rate debt.

The changes in fair value of the derivatives in these cash flow hedge relationships were recorded as a separate component of AOCI to the extent the hedge relationships were effective, and amounts are reclassified to earnings when the forecasted transaction affects earnings.

When a cash flow hedge is discontinued, the net derivative gain or loss remains in AOCI unless it is probable that the hedged transaction will not occur. This requires estimates based on our expectation of future funding needs and the composition of future debt issuances. Our expectations about future funding needs are based upon projected growth and historical activity.

We believe that the forecasted issuances of debt previously hedged in cash flow hedging relationships have not become probable of not occurring; therefore, we may continue to include previously deferred amounts in AOCI. In the event that these forecasted issuances of debt do not occur or become probable of not occurring, potentially material amounts that are currently deferred and reported in AOCI would then be immediately recognized in our consolidated statements of income under derivative gains (losses).

The change in fair value of the derivatives in fair value hedge relationships were recorded in earnings along with the change in fair value of the hedged debt. Any difference was reflected as hedge ineffectiveness in other income.

For additional discussion of our use of derivatives and summaries of derivative positions, see "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — *Derivative Overview*" and "NOTE 11: DERIVATIVES" to our consolidated financial statements.

### Allowance for Loan Losses and Reserve for Guarantee Losses

We maintain an allowance for loan losses on mortgage loans held-for-investment and a reserve for guarantee losses on PCs, collectively referred to as our loan loss reserves, to provide for credit losses when it is probable that a loss has been incurred. We use the same methodology to determine our allowance for loan losses and reserve for guarantee losses, as the relevant factors affecting credit risk are the same.

To calculate the loan loss reserves for the single-family loan portfolio, we aggregate homogenous loans into pools based on common underlying characteristics, using statistically based models to evaluate relevant factors affecting loan collectibility, and determine the best estimate of loss. To calculate loan loss reserves for the multifamily loan portfolio, we also use models, evaluate certain larger loans for impairment, and review repayment prospects and collateral values underlying individual loans.

We regularly evaluate the underlying estimates and models we use when determining the loan loss reserves and update our assumptions to reflect our historical experience and current view of economic factors.

Determining the adequacy of the loan loss reserves is a complex process that is subject to numerous estimates and assumptions requiring significant judgment. Key estimates and assumptions that impact our loan loss reserves include:

* loss severity trends;
* default experience;
* expected proceeds from credit enhancements;
* collateral valuation; and
* identification and impact assessment of macroeconomic factors.

No single statistic or measurement determines the adequacy of the loan loss reserves. Changes in one or more of the estimates or assumptions used to calculate the loan loss reserves could have a material impact on the loan loss reserves and provisions for credit losses.

We believe the level of our loan loss reserves is reasonable based on internal reviews of the factors and methodologies used. A management committee reviews the overall level of loan loss reserves, as well as the factors and methodologies that give rise to the estimate, and submits the best point estimate for review by senior management.

### Application of the Static Effective Yield Method

We amortize our guarantee obligation under the static effective yield method. The static effective yield will be calculated and fixed at inception of the guarantee based on forecasted unpaid principal balances. The static effective yield will be evaluated and adjusted when significant changes in economic events cause a shift in the pattern of our economic release from risk. For example, certain market environments may lead to sharp and sustained changes in home prices or prepayments of mortgages, leading to the need for an adjustment in the static effective yield for specific mortgage pools underlying the guarantee. When a change is required, a cumulative catch-up adjustment, which could be significant in a given period, will be recognized and a new static effective yield will be used to determine our guarantee obligation amortization. See "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES" to our consolidated financial statements for further information.

### Application of the Effective Interest Method

As described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" to our consolidated financial statements, we use the effective interest method to: (a) recognize interest income on our investments in debt securities; and (b) amortize related deferred items into interest income. The application of the effective interest method requires us to estimate the effective yield at each period end using our current estimate of future prepayments. Determination of these estimates requires significant judgment, as expected prepayment behavior is inherently uncertain. Estimates of future prepayments are derived from market sources and our internal prepayment models. Judgment is involved in making initial determinations about prepayment expectations and in updating those expectations over time in response to changes in market conditions, such as interest rates and other macroeconomic factors. See the discussion of market risks and our interest-rate sensitivity measures under "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks." We believe that our current estimates of future prepayments are reasonable and comparable to those used by other market participants.

### Impairment Recognition on Investments in Securities

We recognize impairment losses on available-for-sale securities through the income statement when we have concluded that a decrease in the fair value of a security is not temporary. For securities accounted for under Emerging Issues Task Force 99-20, *"Recognition of Interest Income and Impairment on Purchased Beneficial Interests and Beneficial Interests That Continue to Be Held by a Transferor in Securitized Financial Assets,"* or EITF 99-20, an impairment loss is recognized when there is both a decline in fair value below the carrying amount and an adverse change in expected cash flows. Determination of whether an adverse change has occurred involves judgment about expected prepayments and credit events. We review securities not accounted for under EITF 99-20 for potential impairment whenever the security's fair value is less than its amortized cost to determine whether we have the intent and ability to hold the investments until a forecasted recovery. This review considers a number of factors, including the severity of the decline in fair value, credit ratings, the length of time the investment has been in an unrealized loss position, and the likelihood of sale in the near term. While market prices and rating agency actions are factors that are considered in the impairment analysis, cash flow analysis based on default and prepayment assumptions serves as an important factor in determining if an other than temporary impairment has occurred. We recognize impairment losses when quantitative and qualitative factors indicate that it is probable that the security will suffer a contractual principal loss or interest shortfall. We apply significant judgment in determining whether impairment loss recognition is appropriate. We believe our judgments are reasonable. However, different judgments could have resulted in materially different impairment loss recognition. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" to our consolidated financial statements for more information on impairment recognition on securities.

### Accounting Changes and Recently Issued Accounting Pronouncements

See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" to our consolidated financial statements for more information concerning our accounting policies and recently issued accounting pronouncements, including those that we have not yet adopted and that will likely affect our consolidated financial statements.

## QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are exposed to risks that include interest-rate and other market risks, including those described in "RISK FACTORS." While we consider both our day-to-day and long-term management of interest-rate and other market risks to be satisfactory, we identified weaknesses in prior years in our overall risk governance framework. We created an executive

management enterprise risk committee to provide a company-wide view of risk and have formed five subcommittees to focus on credit, market, models, operational and regulatory risks. Our board of directors has also assigned primary responsibility for oversight of enterprise risk management to the Governance, Nominating and Risk Oversight Committee of the board of directors.

### Interest-Rate Risk and Other Market Risks

Our interest-rate risk management objective is to serve our mission by protecting shareholder value in all interest-rate environments. Our disciplined approach to interest-rate risk management is essential to maintaining a strong and durable capital base and uninterrupted access to debt and equity capital markets.

#### Sources of Interest-Rate Risk and Other Market Risks

Our retained portfolio activities expose us to interest-rate risk and other market risks arising primarily from the uncertainty as to when borrowers will pay the outstanding principal balance of mortgage loans and mortgage-related securities held in our retained portfolio, known as prepayment risk, and the resulting potential mismatch in the timing of our receipt of cash flows related to our assets versus the timing of payment of cash flows related to our liabilities. For the vast majority of our mortgage-related investments, the mortgage borrower has the option to make unscheduled payments of additional principal or to completely pay off a mortgage loan at any time before its scheduled maturity date (without having to pay a prepayment penalty) or make principal payments in accordance with their contractual obligation.

Our credit guarantee activities also expose us to interest-rate risk because changes in interest rates can cause fluctuations in the fair value of our existing credit guarantee portfolio. We generally do not hedge these changes in fair value except for interest-rate exposure related to net buy-ups and float. Float, which arises from timing differences between when the borrower makes principal payments on the loan and the reduction of the PC balance, can lead to significant interest expense if the interest rate paid to a PC investor is higher than the reinvestment rate earned by the securitization trusts on payments received from mortgage borrowers and paid to us as trust management income.

The types of interest-rate risk and other market risks to which we are exposed are described below.

#### Duration Risk and Convexity Risk

Duration is a measure of a financial instrument's price sensitivity to changes in interest rates. Convexity is a measure of how much a financial instrument's duration changes as interest rates change. Our convexity risk primarily results from prepayment risk. We actively manage duration risk and convexity risk through asset selection and structuring (that is, by identifying or structuring mortgage-related securities with attractive prepayment and other characteristics), by issuing a broad range of both callable and non-callable debt instruments and by using interest-rate derivatives and written options. Managing the impact of duration risk and convexity risk is the principal focus of our daily market risk management activities. These risks are encompassed in our PMVS and duration gap risk measures, discussed in greater detail below. We use prepayment models to determine the estimated duration and convexity of mortgage assets for our PMVS and duration gap measures. Expected results can be affected by differences between prepayments forecasted by the models and actual prepayments.

#### Yield Curve Risk

Yield curve risk is the risk that non-parallel shifts in the yield curve (such as a flattening or steepening) will adversely affect shareholder value. Because changes in the shape, or slope, of the yield curve often arise due to changes in the market's expectation of future interest rates at different points along the yield curve, we evaluate our exposure to yield curve risk by examining potential reshaping scenarios at various points along the yield curve. Our yield curve risk under a specified yield curve scenario is reflected in our PMVS-Yield Curve, or PMVS-YC, disclosure.

#### Volatility Risk

Volatility risk is the risk that changes in the market's expectation of the magnitude of future variations in interest rates will adversely affect shareholder value. Implied volatility is a key determinant of the value of an interest-rate option. Since prepayment risk is generally inherent in mortgage assets, changes in implied volatility affect the value of mortgage assets. We manage volatility risk through asset selection and by maintaining a consistently high percentage of option-embedded liabilities relative to our mortgage assets. We monitor volatility risk by measuring exposure levels on a daily basis and we maintain internal limits on the amount of volatility risk exposure that is acceptable to us.

#### Basis Risk

Basis risk is the risk that interest rates in different market sectors will not move in tandem and will adversely affect shareholder value. This risk arises principally because we generally hedge mortgage-related investments with debt securities. We do not actively manage the basis risk arising from funding retained portfolio investments with our debt securities, also referred to as mortgage-to-debt OAS risk. See "MD&A — CONSOLIDATED FAIR VALUE BALANCE SHEETS

ANALYSIS — Key Components of Changes in Fair Value of Net Assets — *Changes in Mortgage-To-Debt OAS*" for additional information. We also incur basis risk when we use LIBOR- or Treasury-based instruments in our risk management activities.

### Foreign-Currency Risk

Foreign-currency risk is the risk that fluctuations in currency exchange rates (*e.g.*, foreign currencies to the U.S. dollar) will adversely affect shareholder value. We are exposed to foreign-currency risk because we have debt denominated in currencies other than the U.S. dollar, our functional currency. We eliminate virtually all of our foreign-currency risk by entering into swap transactions that effectively convert foreign-currency denominated obligations into U.S. dollar-denominated obligations.

### Portfolio Market Value Sensitivity and Measurement of Interest-Rate Risk

We employ a risk management strategy that seeks to substantially match the duration characteristics of our assets and liabilities. To accomplish this, we employ an integrated strategy encompassing asset selection and structuring and asset and liability management.

Through our asset selection process, we seek to purchase mortgage assets with desirable prepayment expectations based on our evaluation of their yield-to-maturity, option-adjusted spreads and credit characteristics. Through this selection process and the restructuring of mortgage assets, we seek to retain cash flows with more stable risk and investment return characteristics while selling off the cash flows that do not meet our investment profile.

Through our asset and liability management process, we mitigate interest-rate risk by issuing a wide variety of debt products. The prepayment option held by mortgage borrowers drives the fair value of our mortgage assets such that the combined fair value of our mortgage assets and non-callable debt will decline if interest rates move significantly in either direction. We mitigate much of our exposure to changes in interest rates by funding a significant portion of our mortgage portfolio with callable debt. When interest rates change, our option to redeem this debt offsets a large portion of the fair value change driven by the mortgage prepayment option. At December 31, 2007, approximately 44% of our fixed-rate mortgage assets were funded and economically hedged with callable debt. However, because the mortgage prepayment option is not fully hedged by callable debt, the combined fair value of our mortgage assets and debt will be affected by changes in interest rates.

To further reduce our exposure to changes in interest rates, we hedge a significant portion of the remaining prepayment risk with option-based derivatives. These derivatives primarily consist of call swaptions, which tend to increase in value as interest rates decline, and put swaptions, which tend to increase in value as interest rates increase. With the addition of these option-based derivatives, a greater portion of our prepayment risk has been hedged. We also manage interest-rate risk by rebalancing the portfolio, primarily using interest-rate swaps. Although we do not hedge all of our exposure to changes in interest rates, these exposures are generally well understood, are subject to established limits, and are monitored and controlled through our disciplined risk management process. These limits are refined and updated from time to time. See "MD&A — CONSOLIDATED FAIR VALUE BALANCE SHEETS ANALYSIS — Key Components of Changes in Fair Value of Net Assets — *Changes in Mortgage-To-Debt OAS*" for further information.

### PMVS and Duration Gap

Our primary interest-rate risk measures are PMVS and duration gap. PMVS is measured in two ways, one measuring the estimated sensitivity of our portfolio market value (as defined below) to parallel moves in interest rates (Portfolio Market Value Sensitivity-Level or (PMVS-L)) and the other to nonparallel movements (PMVS-YC). In December 2007, we changed our PMVS reporting to represent estimated dollars-at-risk, rather than expressed as a percentage of fair value to common equity. We believe this change provides more relevant information and better represents our overall level and low exposure to adverse interest-rate movements given the substantial reduction in the fair value of common equity that occurred during 2007.

Our PMVS and duration gap estimates are determined using models that involve our best judgment of interest-rate and prepayment assumptions. Accordingly, while we believe that PMVS and duration gap are useful risk management tools, they should be understood as estimates rather than as precise measurements.

While PMVS and duration gap estimate the exposure to changes in interest rates, they do not capture the potential impact of certain other market risks, such as changes in volatility, basis, prepayment model, mortgage-to-debt option-adjusted spreads and foreign-currency risk. The impact of these other market risks can be significant. See "*Sources of*

*Interest-Rate Risk and Other Market Risks*" discussed above for further information. Definitions of our primary interest rate risk measures follow:

- PMVS-L shows the estimated loss in pre-tax portfolio market value from an immediate adverse 50 basis point parallel shift in the level of LIBOR rates (*i.e.*, when the yield at each point on the LIBOR yield curve increases or decreases by 50 basis points).

- PMVS-YC shows the estimated loss in pre-tax portfolio market value from an immediate adverse 25 basis point change in the slope (up and down) of the LIBOR yield curve. The 25 basis point change in slope for the PMVS-YC measure is obtained by shifting the two-year and ten-year LIBOR rates by an equal amount (12.5 basis points), but in opposite directions. LIBOR rate shifts between the two-year and ten-year points are interpolated.

- Duration gap estimates the net sensitivity of the fair value of our financial instruments to movements in interest rates. Duration gap is presented in units expressed as months. A duration gap of zero implies that the change in value of assets from an instantaneous rate move will be accompanied by an equal and offsetting move in the value of debt and derivatives thus leaving the net fair value of equity unchanged. However, because duration does not capture convexity exposure (the amount by which duration itself changes as rates move), actual changes in fair value from interest-rate changes may differ from those implied by duration gap alone. For that reason, we believe duration gap is most useful when used in conjunction with PMVS.

The 50 basis point shift and 25 basis point change in slope of the LIBOR yield curve used for our PMVS measures represent events that are expected to have an approximately 5% probability of occurring over a one-month time horizon. We believe that our PMVS measures represent conservative measures of interest-rate risk because these assumed scenarios are unlikely and because the scenarios assume instantaneous shocks. Therefore, these PMVS measures do not consider the effects on fair value of any rebalancing actions that we would typically take to reduce our risk exposure.

The expected loss in portfolio market value is an estimate of the sensitivity to changes in interest rates of the fair value of all interest-earning assets, interest-bearing liabilities and derivatives on a pre-tax basis. When we calculate the expected loss in portfolio market value and duration gap, we also take into account the cash flows related to certain credit guarantee-related items, including net buy-ups and expected gains or losses due to net interest from float. In making these calculations, we do not consider the sensitivity to interest-rate changes of the following assets and liabilities:

- *Credit guarantee portfolio.* We do not consider the sensitivity of the fair value of the credit guarantee portfolio to changes in interest rates except for the guarantee-related items mentioned above (*i.e.*, net buy-ups and float), because we believe the expected benefits from replacement business provide an adequate hedge against interest-rate changes over time.

- *Other assets with minimal interest-rate sensitivity.* We do not include other assets, primarily non-financial instruments such as fixed assets and REO, because we estimate their impact on PMVS and duration gap to be minimal.

## PMVS Results

Table 42 provides estimated point-in-time PMVS-L and PMVS-YC results at December 31, 2007 and 2006. Table 42 also provides PMVS-L estimates assuming an immediate 100 basis point shift in the LIBOR yield curve. Because we do not hedge all prepayment option risk, the duration of our mortgage assets changes more rapidly as changes in interest rates increase. Accordingly, as shown in Table 42, the PMVS-L results based on a 100 basis point shift in the LIBOR curve are disproportionately higher than the PMVS-L results based on a 50 basis point shift in the LIBOR curve.

### Table 42 — PMVS Assuming Shifts of the LIBOR Yield Curve

| | Potential Pre-Tax Loss in Portfolio Market Value | | |
| | PMVS-YC | PMVS-L | |
| | 25 bps | 50 bps | 100 bps |
| | | (In millions) | |
| At: | | | |
| December 31, 2007 | $42 | $533 | $1,681 |
| December 31, 2006 | $27 | $146 | $ 560 |

Derivatives have enabled us to keep our interest-rate risk exposure at consistently low levels in a wide range of interest-rate environments. Table 43 shows that the low PMVS-L risk levels for the periods presented would generally have been higher if we had not used derivatives to manage our interest-rate risk exposure.

*Freddie Mac*

Table 43 — Derivative Impact on PMVS-L (50 bps)

|  | Before Derivatives | After Derivatives | Effect of Derivatives |
|---|---|---|---|
|  |  | (in millions) |  |
| At: |  |  |  |
| December 31, 2007 | $1,371 | $533 | $(838) |
| December 31, 2006 | $ 541 | $146 | $(395) |

## Duration Gap Results

Our estimated average duration gap for the months of December 2007 and 2006 was zero months.

The disclosure in our Monthly Volume Summary reports, which are available on our website at www.freddiemac.com, reflects the average of the daily PMVS-L, PMVS-YC and duration gap estimates for a given reporting period (a month, quarter or year).

### Use of Derivatives and Interest-Rate Risk Management
### Use of Derivatives

We use derivatives primarily to:

* hedge forecasted issuances of debt and synthetically create callable and non-callable funding;
* regularly adjust or rebalance our funding mix in order to more closely match changes in the interest-rate characteristics of our mortgage assets; and
* hedge foreign-currency exposure (see "Sources of Interest-Rate Risk and Other Market Risks — Foreign-Currency Risk.")

### Hedge Forecasted Debt Issuances and Create Synthetic Funding

We typically commit to purchase mortgage investments on an opportunistic basis for a future settlement, typically ranging from two weeks to three months after the date of the commitment. To facilitate larger and more predictable debt issuances that contribute to lower funding costs, we use interest-rate derivatives to economically hedge the interest-rate risk exposure from the time we commit to purchase a mortgage to the time the related debt is issued. We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures. For example, the combination of a series of short-term debt issuances over a defined period and a pay-fixed swap with the same maturity as the last debt issuance is the substantive economic equivalent of a long-term fixed-rate debt instrument of comparable maturity. Similarly, the combination of non-callable debt and a call swaption, or option to enter into a receive-fixed swap, with the same maturity as the non-callable debt, is the substantive economic equivalent of callable debt. These derivatives strategies increase our funding flexibility and allow us to better match asset and liability cash flows, often reducing overall funding costs.

### Adjust Funding Mix

We generally use interest-rate swaps to mitigate contractual funding mismatches between our assets and liabilities. We also use swaptions and other option-based derivatives to adjust the contractual funding of our debt in response to changes in the expected lives of mortgage-related assets in our retained portfolio. As market conditions dictate, we take rebalancing actions to keep our interest-rate risk exposure within management-set limits. In a declining interest-rate environment, we typically enter into receive-fixed swaps or purchase Treasury-based derivatives to shorten the duration of our funding to offset the declining duration of our mortgage assets. In a rising interest-rate environment, we typically enter into pay-fixed swaps or sell Treasury-based derivatives in order to lengthen the duration of our funding to offset the increasing duration of our mortgage assets.

### Types of Derivatives

The derivatives we use to hedge interest-rate and foreign-currency risk are common in the financial markets. We principally use the following types of derivatives:

* LIBOR- and the Euro Interbank Offered Rate, or Euribor-, based interest-rate swaps;
* LIBOR- and Treasury-based options (including swaptions);
* LIBOR- and Treasury-based exchange-traded futures; and
* Foreign-currency swaps.

In addition to swaps, futures and purchased options, our derivative positions include the following:

### Written Options and Swaptions

Written call and put swaptions are sold to counterparties allowing them the option to enter into receive- and pay-fixed swaps, respectively. Written call and put options on mortgage-related securities give the counterparty the right to execute a

*Freddie Mac*

contract under specified terms, which generally occurs when we are in a liability position. We use these written options and swaptions to manage convexity risk over a wide range of interest rates. Written options lower our overall hedging costs, allow us to hedge the same economic risk we assume when selling guaranteed final maturity REMICs with a more liquid instrument and allow us to rebalance the options in our callable debt and REMIC portfolios. We may, from time to time, write other derivative contracts such as caps, floors, interest-rate futures and options on buy-up and buy-down commitments.

### Forward Purchase and Sale Commitments

We routinely enter into forward purchase and sale commitments for mortgage loans and mortgage-related securities. Most of these commitments are derivatives subject to the requirements of SFAS 133.

### Swap Guarantee Derivatives

We issue swap guarantee derivatives that guarantee the payments on (a) multifamily mortgage loans that are originated and held by state and municipal housing finance agencies to support tax-exempt multifamily housing revenue bonds and (b) Freddie Mac pass-through certificates which are backed by tax-exempt multifamily housing revenue bonds and related taxable bonds and/or loans. In connection with some of these guarantees, we may also guarantee the sponsor's or the borrower's performance as a counterparty on any related interest-rate swaps used to mitigate interest-rate risk.

### Credit Derivatives

We entered into credit derivatives during 2007, including risk-sharing agreements. Under these risk-sharing agreements, default losses on specific mortgage loans delivered by sellers are compared to default losses on reference pools of mortgage loans with similar characteristics. Based upon the results of that comparison, we remit or receive payments based upon the default performance of the referenced pools of mortgage loans. In addition, we entered into an agreement whereby we assume credit risk for mortgage loans held by third parties for up to a 90-day period in exchange for a monthly fee. Should the mortgage loans become delinquent we are obligated to purchase the loans.

In addition, we have also purchased mortgage loans containing debt cancellation contracts, which provide mortgage debt or payment cancellation for borrowers who experience unanticipated losses of income dependent on a covered event. The rights and obligations under these agreements have been assigned to the servicers. However, in the event the servicer does not perform as required by contract, under our guarantee, we would be obligated to make the required contractual payments.

### Derivative-Related Risks

Our use of derivatives exposes us to derivative market liquidity risk and counterparty credit risk.

### Derivative Market Liquidity Risk

Derivative market liquidity risk is the risk that we may not be able to enter into or exit out of derivative transactions at a reasonable cost. A lack of sufficient capacity or liquidity in the derivatives market could limit our risk management activities, increasing our exposure to interest-rate risk. To help maintain continuous access to derivative markets, we use a variety of products and transact with many different derivative counterparties. In addition to over-the-counter, or OTC, derivatives, we also use exchange-traded derivatives, asset securitization activities, callable debt and short-term debt to rebalance our portfolio.

We limit our duration and convexity exposure to each counterparty. At December 31, 2007, the largest single uncollateralized exposure of our 27 approved OTC counterparties listed in "Table 44 — Derivative Counterparty Credit Exposure" was related to a AAA-rated counterparty, constituting $174 million, or 51%, of the total uncollateralized exposure of our OTC interest-rate swaps, option-based derivatives and foreign-currency swaps.

### Derivative Counterparty Credit Risk

Counterparty credit risk arises from the possibility that the derivative counterparty will not be able to meet its contractual obligations. Exchange-traded derivatives, such as futures contracts, do not measurably increase our counterparty credit risk because changes in the value of open exchange-traded contracts are settled daily through a financial clearinghouse established by each exchange. OTC derivatives, however, expose us to counterparty credit risk because transactions are executed and settled between us and the counterparty. When our net position with an OTC counterparty subject to a master netting agreement has a market value above zero at a given date (i.e., it is an asset reported as derivative assets, net on our consolidated balance sheets), then the counterparty could potentially be obligated to deliver cash, securities or a combination of both having that market value to satisfy its obligation to us under the derivative.

We actively manage our exposure to counterparty credit risk using several tools, including:

- review of external rating analyses;
- strict standards for approving new derivative counterparties;

- ongoing monitoring of our positions with each counterparty;
- managing diversification mix among counterparties;
- master netting agreements and collateral agreements; and
- stress-testing to evaluate potential exposure under possible adverse market scenarios.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or events affecting an individual counterparty occur.

### Derivative Counterparties

Our use of OTC interest-rate swaps, option-based derivatives and foreign-currency swaps is subject to rigorous internal credit and legal reviews. Our derivative counterparties carry external credit ratings among the highest available from major rating agencies. All of these counterparties are major financial institutions and are experienced participants in the OTC derivatives market.

### Master Netting and Collateral Agreements

We use master netting and collateral agreements to reduce our credit risk exposure to our active OTC derivative counterparties for interest-rate swaps, option-based derivatives and foreign-currency swaps. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" to our consolidated financial statements for additional information.

Table 44 summarizes our exposure to counterparty credit risk in our derivatives, which represents the net positive fair value of derivative contracts, related accrued interest and collateral held by us from our counterparties, after netting by counterparty as applicable (i.e., net amounts due to us under derivative contracts). This table is useful in understanding the counterparty credit risk related to our derivative portfolio.

**Table 44 — Derivative Counterparty Credit Exposure**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | **December 31, 2007** | | | | |
| Rating[1] | Number of Counterparties[2] | Notional Amount | Total Exposure at Fair Value[3] | Exposure, Net of Collateral[4] | Weighted Average Contractual Maturity (in years) | | Collateral Posting Threshold |
| | | | | (dollars in millions) | | | |
| AAA | 2 | $ 1,173 | $ 174 | $174 | 3.4 | | Mutually agreed upon |
| AA+ | 3 | 180,939 | 945 | — | 4.4 | | $10 million or less |
| AA | 9 | 463,163 | 1,347 | 62 | 5.3 | | $10 million or less |
| AA− | 6 | 160,678 | 2,230 | 30 | 5.8 | | $10 million or less |
| A+ | 5 | 168,680 | 1,770 | 54 | 6.1 | | $1 million or less |
| A | 2 | 35,391 | 239 | 19 | 5.7 | | $1 million or less |
| Subtotal[5] | 27 | 1,010,024 | 6,705 | 339 | 5.4 | | |
| Other derivatives[6] | | 238,893 | — | — | | | |
| Forward purchase and sale commitments | | 72,662 | 465 | 465 | | | |
| Swap guarantee derivatives | | 1,302 | — | — | | | |
| Total derivatives | | $1,322,881 | $7,170 | $804 | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | **December 31, 2006** | | | | |
| | | | **Adjusted** | | | | |
| Rating[1] | Number of Counterparties[2] | Notional Amount | Total Exposure at Fair Value[3] | Exposure, Net of Collateral[4] | Weighted Average Contractual Maturity (in years) | | Collateral Posting Threshold |
| | | | | (dollars in millions) | | | |
| AAA | 2 | $ 3,408 | $ 411 | $411 | 1.6 | | Mutually agreed upon |
| AA | 8 | 269,126 | 2,134 | 92 | 4.7 | | $10 million or less |
| AA− | 12 | 278,993 | 6,264 | 161 | 5.2 | | $10 million or less |
| A+ | 4 | 142,332 | 1,393 | 7 | 6.1 | | $1 million or less |
| A− | 1 | 210 | 1 | 1 | 5.0 | | $1 million or less |
| Subtotal[5] | 27 | 694,069 | 10,203 | 672 | 5.2 | | |
| Other derivatives[6] | | 53,071 | — | — | | | |
| Forward purchase and sale commitments | | 10,012 | 18 | 18 | | | |
| Swap guarantee derivatives | | 957 | — | — | | | |
| Total derivatives | | $758,109 | $10,221 | $690 | | | |

(1) We use the lower of S&P and Moody's ratings to manage collateral requirements. In this table, the rating of the legal entity is stated in terms of the S&P equivalent.
(2) Based on legal entities. Affiliated legal entities are reported separately.
(3) For each counterparty, this amount includes derivatives with a net positive fair value (recorded as derivative assets, net), including the related accrued interest receivable/payable (net).
(4) Total Exposure at Fair Value less collateral held as determined at the counterparty level.
(5) Consists of OTC derivative agreements for interest-rate swaps, option-based derivatives (excluding written options), foreign-currency swaps and purchased interest-rate caps. Written options do not present counterparty credit exposure, because we receive a one-time up-front premium in exchange for giving the holder the right to execute a contract under specified terms, which generally puts us in a liability position.
(6) Consists primarily of exchange-traded contracts, certain written options and certain credit derivatives.

Over time, our exposure to individual counterparties for OTC interest-rate swaps, option-based derivatives and foreign-currency swaps varies depending on changes in fair values, which are affected by changes in period-end interest rates, the implied volatility of interest rates, foreign-currency exchange rates and the amount of derivatives held. Our uncollateralized exposure to counterparties for these derivatives, after applying netting agreements and collateral, decreased to $339 million at December 31, 2007 from $672 million at December 31, 2006. This decrease was primarily due to a significant decrease in uncollateralized exposure to AAA-rated counterparties, which typically are not required to post collateral given their low risk profile.

At December 31, 2007, the uncollateralized exposure to non-AAA-rated counterparties was primarily due to exposure amounts below the applicable counterparty collateral posting threshold as well as market movements during the time period between when a derivative was marked to fair value and the date we received the related collateral. Collateral is typically transferred within one business day based on the values of the related derivatives.

As indicated in Table 44, approximately 95% of our counterparty credit exposure for OTC interest-rate swaps, option-based derivatives and foreign-currency swaps was collateralized at December 31, 2007. If all of our counterparties for these derivatives had defaulted simultaneously on December 31, 2007, our maximum loss for accounting purposes would have been approximately $339 million.

In the event of counterparty default our economic loss may be higher than the uncollateralized exposure of our derivatives if we were not able to replace the defaulted derivatives in a timely fashion. We monitor the risk that our uncollateralized exposure to each of our OTC counterparties for interest-rate swaps, option-based derivatives and foreign-currency swaps will increase under certain adverse market conditions by performing daily market stress tests. These tests

89

evaluate the potential additional uncollateralized exposure we would have to each of these derivative counterparties assuming changes in the level and implied volatility of interest rates and changes in foreign-currency exchange rates over a brief time period.

To date, we have not incurred any credit losses on OTC derivative counterparties or set aside specific reserves for institutional credit risk exposure. We do not believe such reserves are necessary, given our counterparty credit risk management policies and collateral requirements.

As indicated in Table 44, the total exposure to our forward purchase and sale commitments of $465 million and $18 million at December 31, 2007 and 2006, respectively, was uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than one year, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis to ensure that they continue to meet our internal risk-management standards. At December 31, 2007, we had a large volume of purchase and sale commitments related to our retained portfolio that increased our exposure to the counterparties to our forward purchase and sale commitment. These commitments settled in January 2008.

## CREDIT RISKS

Our credit guarantee portfolio is subject primarily to two types of credit risk: mortgage credit risk and institutional credit risk. Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage or security we own or guarantee. We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a PC, Structured Security or other borrower performance commitment. Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will fail to meet its obligations.

Mortgage and credit market conditions deteriorated rapidly in the second half of 2007 and have continued in 2008. These conditions were brought about by several factors, which increased our exposure to both mortgage credit and institutional credit risks. Factors negatively affecting the mortgage and credit markets in recent months include:

- significant volatility;
- lower levels of liquidity;
- wider credit spreads;
- rating agency downgrades of mortgage-related securities or counterparties;
- declines in home prices nationally;
- higher incidence of institutional insolvencies; and
- higher levels of foreclosures and delinquencies, particularly with respect to non-traditional and subprime mortgage loans.

### Mortgage Credit Risk

#### *Mortgage Credit Risk Management Strategies*

Mortgage credit risk is primarily influenced by the credit profile of the borrower on the mortgage, the features of the mortgage itself, the type of property securing the mortgage, home price trends, apartment demand in the area, the number of competing properties in the area (including properties under construction) and the general economy. To manage our mortgage credit risk, we focus on three key areas: underwriting requirements and quality control standards; portfolio diversification; and portfolio management activities, including loss mitigation and the use of credit enhancements.

#### *Underwriting Requirements and Quality Control Standards*

All mortgages that we purchase for our retained portfolio or our credit guarantee portfolio have an inherent risk of default. We seek to manage the underlying risk by using our underwriting and quality control processes and adequately pricing for the risk.

We use a process of delegated underwriting for the single-family mortgages we purchase or securitize. In this process, we provide originators with a series of mortgage underwriting standards and the originators represent and warrant to us that the mortgages sold to us meet these requirements. We subsequently review a sample of these loans and, if we determine that any loan is not in compliance with our contractual standards, we may require the seller/servicer to repurchase that mortgage or make us whole in the event of a default. We provide originators with written standards and/or automated underwriting software tools, such as Loan Prospector.® We use other quantitative credit risk management tools that are designed to evaluate single-family mortgages and monitor the related mortgage credit risk for loans we may purchase. Loan Prospector® generates a credit risk classification by evaluating information on significant indicators of mortgage default risk,

such as LTV ratios, credit scores and other mortgage and borrower characteristics. These statistically-based risk assessment tools increase our ability to distinguish among single-family loans based on their expected risk, return and importance to our mission. In many cases, underwriting standards are tailored under contracts with individual customers. We have been expanding the share of mortgages we purchase that were underwritten by our seller/servicers using alternative automated underwriting systems or agreed-upon underwriting standards that differ from our system or guidelines, which may increase our credit risk and may result in increased losses. We regularly monitor the performance of mortgages purchased using these systems and standards, and if they underperform mortgages originated using Loan Prospector®, we may seek additional guarantee fee compensation for future purchases of similar mortgages.

The percentage of our single-family mortgage purchase volume evaluated using Loan Prospector® prior to purchase has declined over the last three years. As part of our post-purchase quality control review process, we use Loan Prospector® to evaluate the credit quality of virtually all single-family mortgages that were not evaluated by Loan Prospector® prior to purchase. Loan Prospector® risk classifications influence both the price we charge to guarantee loans and the loans we review in quality control.

For multifamily mortgage loans, we use an intensive pre-purchase underwriting process for the mortgages we purchase, unless the mortgage loans have significant credit enhancements. Our underwriting process includes assessments of the local market, the borrower, the property manager, the property's historical and projected financial performance and the property's physical condition, which may include a physical inspection of the property. In addition to our own inspections, we rely on third-party appraisals and environmental and engineering reports. We have also engaged third-party underwriters to underwrite mortgages on our behalf. During 2007, we also began a program of delegated underwriting for certain multifamily mortgages we purchase or securitize.

### Credit Enhancements

Our charter requires that single-family mortgages with LTV ratios above 80% at the time of purchase must be covered by one or more of the following: (a) primary mortgage insurance on the portion above 80% guaranteed or insured by a qualified insurer as we determined; (b) a seller's agreement to repurchase or replace any mortgage in default (for such period and under such circumstances as we may require); or (c) retention by the seller of at least a 10% participation interest in the mortgages. In addition, for some mortgage loans, we elect to share the default risk by transferring a portion of that risk to various third parties through a variety of other credit enhancements. In many cases, the lender's or third party's risk is limited to a specific level of losses at the time the credit enhancement becomes effective.

At December 31, 2007 and 2006, credit-enhanced single-family mortgages and mortgage-related securities represented approximately 17% and 16% of the $1,819 billion and $1,541 billion, respectively, unpaid principal balance of the total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of issued Structured Securities that is backed by Ginnie Mae Certificates. We exclude non-Freddie Mac mortgage-related securities because they expose us primarily to institutional credit risk. We exclude that portion of Structured Securities backed by Ginnie Mae Certificates because the incremental credit risk to which we are exposed is considered insignificant. See "MD&A — CONSOLIDATED BALANCE SHEETS ANALYSIS — Table 22 — Characteristics of Mortgage Loans and Mortgage-Related Securities in our Retained Portfolio" for additional information about our non-Freddie Mac mortgage-related securities. Our ability and desire to expand or reduce the portion of our total mortgage portfolio with credit enhancements will depend on our evaluation of the credit quality of new business purchase opportunities, the risk profile of our portfolio and the future availability of effective credit enhancements at prices that permit an attractive return. While the use of credit enhancements reduces our exposure to mortgage credit risk, it increases our exposure to institutional credit risk.

Primary mortgage insurance is the most prevalent type of credit enhancement protecting our total mortgage portfolio and is typically provided on a loan-level basis for certain single-family mortgages. Primary mortgage insurance transfers varying portions of the credit risk associated with a mortgage to a third-party insurer. The amount of insurance we obtain on any mortgage depends on our requirements and our assessment of risk. We may, from time to time, agree with the insurer to reduce the amount of coverage that is in excess of our charter's minimum requirement and may also furnish certain services to the insurer in exchange for fees paid by the insurer. As is the case with credit enhancement agreements generally, these agreements often improve the overall value of purchased mortgages and thus may allow us to offer lower guarantee fees to sellers. As of December 31, 2007 and 2006, in connection with PCs and Structured Securities backed by single-family mortgage loans, excluding the loans that are underlying Structured Transactions, we had maximum coverage totaling $51.9 billion and $40.2 billion, respectively, in primary mortgage insurance.

Other prevalent types of credit enhancement that we use are lender recourse and indemnification agreements (under which we may require a lender to reimburse us for credit losses realized on mortgages), as well as pool insurance. Pool insurance provides insurance on a pool of loans up to a stated aggregate loss limit. In addition to a pool-level loss coverage limit, some pool insurance contracts may have limits on coverage at the loan level. For pool insurance contracts that expire

before the completion of the contractual term of the mortgage loan, we seek to ensure that the contracts cover the period of time during which we believe the mortgage loans are most likely to default. At December 31, 2007 and 2006, in connection with PCs and Structured Securities backed by single-family mortgage loans, excluding the loans that are underlying Structured Transactions, we had maximum coverage totaling $12.1 billion, and $10.5 billion, respectively, in lender recourse and indemnification agreements; and $3.8 billion and $3.7 billion, respectively, in pool insurance. See "Institutional Credit Risk — *Mortgage Insurers*" for further discussion about our mortgage loan insurers.

Other forms of credit enhancements on single-family mortgage loans include government guarantees, collateral (including cash or high-quality marketable securities) pledged by a lender, excess interest and subordinated security structures. As of December 31, 2007 and 2006, in connection with PCs and Structured Securities backed by single-family mortgage loans, excluding the loans that are underlying Structured Transactions, we had maximum coverage totaling $0.5 billion and $0.8 billion, respectively, in other credit enhancements.

We occasionally use credit enhancements to mitigate risk on multifamily mortgages. These mortgages are in almost all cases without recourse to the borrower, absent borrower misconduct. The types of credit enhancements used for multifamily mortgage loans include recourse to the mortgage seller, third-party guarantees or letters of credit, cash escrows, subordinated participations in mortgage loans or structured pools, sharing of losses with sellers, and cross-default and cross-collateralization provisions. Cross-default and cross-collateralization provisions typically work in tandem. With a cross-default provision, if the loan on a property goes into default, we have the right to declare specified other mortgage loans of the same borrower or certain of its affiliates to be in default and to foreclose those other mortgages. In cases where the borrower agrees to cross-collateralization, we have the additional right to apply excess proceeds from the foreclosure of one mortgage to amounts owed to us by the same borrower or its specified affiliates relating to other multifamily mortgage loans we own. We also receive similar credit enhancements for multifamily PC Guarantor Swaps; for tax-exempt multifamily housing revenue bonds that support pass-through certificates issued by third parties for which we provide our guarantee of the payment of principal and interest; for Freddie Mac pass-through certificates that are backed by tax-exempt multifamily housing revenue bonds and related taxable bonds and/or loans; and for multifamily mortgage loans that are originated and held by state and municipal agencies to support tax-exempt multifamily housing revenue bonds for which we provide our guarantee of the payment of principal and interest. As of December 31, 2007 and 2006, in connection with PCs and Structured Securities backed by multifamily mortgage loans, excluding the loans that are underlying Structured Transactions, we had maximum coverage totaling $1.2 billion and $1.1 billion, respectively.

### Other Credit Risk Management Activities

To compensate us for unusual levels of risk in some mortgage products, we may charge incremental fees above a base guarantee fee calculated based on credit risk factors such as the mortgage product type, loan purpose, LTV ratio, and other loan or borrower attributes. In addition, we occasionally use financial incentives and credit derivatives, as described below, in situations where we believe they will benefit our credit risk management strategy. These arrangements are intended to reduce our credit-related expenses, thereby improving our overall returns.

In some cases, we provide financial incentives in the form of lump sum payments to selected seller/servicers if they deliver a specified volume or percentage of mortgage loans meeting specified credit risk standards over a defined period of time. These financial incentives may also take the form of a fee payable to us by the seller if the mortgages delivered to us do not meet certain credit standards.

We have also entered into credit derivatives. All credit derivatives were classified as no hedge designation. The fair value of these credit derivatives was not material at either December 31, 2007 or 2006. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — *Use of Derivatives and Interest-Rate Risk Management — Credit Derivatives*" for further discussion.

Although these arrangements are part of our overall credit risk management strategy, we have not treated them as credit enhancements for purposes of describing our total mortgage portfolio characteristics because the risk-sharing and credit derivative agreements may require us to make payments to the seller/servicer.

### Portfolio Diversification

A key characteristic of our credit risk portfolio is diversification along a number of critical risk dimensions. We continually monitor a variety of mortgage loan characteristics such as product mix, LTV ratios and geographic concentrations, which may affect the default experience on our overall mortgage portfolio. As part of our risk management practices, we have adopted a set of limits on our purchases and holdings of certain types of non-traditional mortgage products that are deemed to have higher risks or lack sufficient historical experience to confidently forecast performance expectations over a full housing cycle. These loan products include option ARMs and loans with high LTV ratios, and mortgages originated with limited or no underwriting documentation.

*Freddie Mac*

Product mix affects the credit risk profile of our total mortgage portfolio. In general, 15-year amortizing fixed-rate mortgages exhibit the lowest default rate among the types of mortgage loans we securitize and purchase, due to the accelerated rate of principal amortization on these mortgages and the credit profiles of borrowers who seek and qualify for them. In a rising interest rate environment, balloon/reset mortgages and ARMs typically default at a higher rate than fixed-rate mortgages, although default rates for different types of ARMs may vary.

The primary mortgage products within our mortgage loan and guaranteed PC and Structured Securities portfolios are conventional fixed-rate loans. However, during the past several years, there was a rapid proliferation of non-traditional mortgage product types designed to address a variety of borrower and lender needs, including issues of affordability and reduced income documentation requirements. While features of these products have been on the market for some time, their prevalence in the market and our total mortgage portfolio increased in 2007 and 2006. See "REGULATION AND SUPERVISION — Office of Federal Housing Enterprise Oversight — *Guidance on Non-traditional Mortgage Product Risks and Subprime Lending*" and "RISK FACTORS — Legal and Regulatory Risks" for more information on these products. Despite an increase in the purchase of adjustable-rate mortgages in the last few years, single-family traditional long-term fixed-rate mortgages comprised approximately 80% and 82% of our mortgage loans and loans underlying our PCs and Structured Securities at December 31, 2007 and 2006, respectively.

*Adjustable-Rate, Interest-Only and Option ARM Loans*

These mortgages are designed to offer borrowers greater choices in their payment terms. Interest-only mortgages allow the borrower to pay only interest for a fixed period of time before the loan begins to amortize. Option ARM loans permit a variety of repayment options, which include minimum, interest only, fully amortizing 30-year and fully amortizing 15-year payments. Minimum payment option loans allow the borrower to make monthly payments that are less than the interest accrued for the period. The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance. Our purchases of interest-only mortgage products increased in 2007, representing approximately 20% of our total mortgage portfolio purchases as compared to approximately 16% in 2006. Our purchase of option ARM mortgage products decreased in 2007, representing less than 1% and approximately 2% of our total mortgage portfolio purchases in 2007 and 2006, respectively. Interest-only and option ARM loans are considered non-traditional mortgage products as defined by the October 2006 Guidance on Non-traditional Mortgage Product Risks. At December 31, 2007 and 2006, interest-only and option ARM loans collectively represented approximately 10% and 6%, respectively, of the unpaid principal balance of the total mortgage portfolio. We will continue to monitor the growth of these products in our portfolio and, if appropriate, may seek credit enhancements to further manage the incremental risk.

Table 45 presents scheduled reset information for single-family mortgage loans underlying our PCs and Structured Securities, excluding Structured Transactions, at December 31, 2007 that contain adjustable payment terms. The reported balances in the table are based on the unpaid principal balances of these loans, aggregated by adjustable-rate loan product type and categorized by year of the next scheduled contractual reset date. The timing of the actual reset dates may differ from those presented due to a number of factors, including refinancing or exercising of other provisions within the terms of the mortgage.

Table 45 — Single-Family Scheduled Adjustable-Rate Resets by Year at December 31, 2007[1]

| | 2008 | 2009 | 2010 | 2011 | 2012 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | |
| ARMs/amortizing | $20,258 | $17,945 | $16,751 | $12,420 | $ 8,516 | $14,437 | $ 90,327 |
| ARMs/interest-only | 2,382 | 3,529 | 18,822 | 30,105 | 32,909 | 33,857 | 121,604 |
| Balloon/resets | 3,236 | 3,004 | 6,863 | 2,821 | 880 | 318 | 17,122 |
| Adjustable-rate loans[2] | $25,876 | $24,478 | $42,436 | $45,346 | $42,305 | $48,612 | $229,053 |

(1) Based on the unpaid principal balances of mortgage products that contain adjustable-rate interest provisions, excluding $1.9 billion of option ARM loans, as of December 31, 2007. These reported balances are based on the unpaid principal balance of the underlying mortgage loans and do not reflect the publicly-available security balances we use to report the composition of our PCs and Structured Securities.
(2) Represents the portion of the unpaid principal balances that are scheduled to reset during the period specified above.

Adjustable-rate mortgages typically have initial periods during which the interest rate is fixed. After this initial period, which can typically range from two to ten years, the interest rate on the loan will then periodically reset based on a current market rate. As of December 31, 2007, approximately 22% of the adjustable-rate single-family mortgage loans within our PCs and Structured Securities are scheduled to have interest rates that reset in 2008 or 2009.

*Subprime Loans*

Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories

and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high LTV ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. The subprime market helps certain borrowers by broadening the availability of mortgage credit.

While we have not historically characterized the single-family loans underlying our PCs and Structured Securities as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk. See "*Mortgage Portfolio Characteristics — Higher Risk Combinations*" for further information. We estimate that approximately $6 billion and $3 billion of loans underlying our Structured Transactions at December 31, 2007 and 2006, respectively, were classified as subprime mortgage loans. To support our mission, we announced in April 2007 that we will purchase up to $20 billion in fixed-rate and hybrid ARM products that will provide lenders with more choices to offer subprime borrowers. The products are intended to be consumer-friendly mortgages for borrowers that will limit payment shock by offering reduced adjustable-rate margins, longer fixed-rate terms and longer reset periods than existing similar products. Subsequent to our announcement, we have entered into purchase commitments of $207 million of mortgages on primary residence, single-family properties specifically pursuant to this commitment. We also fulfill this commitment through purchases of refinance mortgages made to credit challenged borrowers, who may have previously been served by the subprime mortgage market. As of December 31, 2007, we have purchased approximately $43 billion of conventional mortgages made to borrowers who otherwise might have been limited to subprime products, including approximately $23 billion of refinance mortgages meeting our criteria.

With respect to our retained portfolio, at December 31, 2007 and 2006, we held investments of approximately $101 billion and $122 billion, respectively, of non-agency mortgage-related securities backed by subprime loans. These securities include significant credit enhancement, particularly through subordination, and 81% of these securities were AAA-rated at February 25, 2008. During 2007, we recognized $10 million of credit losses as impairment expense on these securities related to four positions that were below AAA-rated at acquisition. The net unrealized losses, net of tax, on the remaining securities that are below AAA-rated are included in AOCI and totaled $504 million as of December 31, 2007. Between December 31, 2007 and February 25, 2008, credit ratings for mortgage-related securities backed by subprime loans with an aggregate unpaid principal balance of $16 billion were downgraded by at least one nationally recognized statistical rating organization. In addition, there were $5 billion of unrealized losses, net of tax, associated with AAA-rated, non-agency mortgage-related securities backed by subprime collateral that are principally a result of decreased liquidity in the subprime market. The extent and duration of the decline in fair value of these securities relative to our cost have met our criteria that indicate the impairment of these securities is temporary. However, if market conditions continue to deteriorate, further credit downgrades to our non-agency mortgage-related securities backed by subprime loans could occur and may result in additional declines in their fair value.

*Alt-A Loans*

Many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category or may be underwritten with lower or alternative documentation than a full documentation mortgage loan. Although there is no universally accepted definition of Alt-A, industry participants have used this classification principally to describe loans for which the underwriting process has been streamlined in order to reduce the documentation requirements of the borrower or allow alternative documentation.

We principally acquire Alt-A mortgage loans from our traditional lenders that largely specialize in originating prime mortgage loans. These lenders typically originate Alt-A loans as a complementary product offering and generally follow an origination path similar to that used for their prime origination process. In determining our exposure to Alt-A loans in our PC and Structured Securities portfolio, we have classified mortgage loans as Alt-A if the lender that delivers them to us has classified the loans as Alt-A, or if the loans had reduced documentation requirements which indicate that the loans should be classified as Alt-A. We estimate that approximately $154 billion, or 9%, of our single-family PCs and Structured Securities at December 31, 2007 were backed by Alt-A mortgage loans. For these loans, our average credit score was 719, our estimated current average LTV ratio was 72% and our delinquency rate, excluding certain Structured Transactions, was 1.86% at December 31, 2007.

We also invest in non-agency mortgage-related securities backed by Alt-A loans in our retained portfolio. We have classified these securities as Alt-A if the securities were labeled as Alt-A when sold to us or we believe the underlying collateral includes a significant amount of Alt-A loans. We believe that $51 billion and $56 billion of our single-family non-agency mortgage-related securities that are not backed by subprime loans are generally backed by Alt-A mortgage loans at December 31, 2007 and 2006, respectively. We have focused our purchases on credit-enhanced, senior tranches of these securities and more than 99% of these securities were AAA-rated as of December 31, 2007. Between December 31, 2007

and February 25, 2008, credit ratings for mortgage-related securities backed by Alt-A loans with an aggregate unpaid principal balance of $1.1 billion were downgraded from AAA by at least one nationally recognized statistical rating organization.

*Guidance on Non-traditional Mortgage Product Risks and Subprime Mortgage Lending*

In October 2006, five federal financial institution regulatory agencies jointly issued Interagency Guidance that clarified how financial institutions should offer non-traditional mortgage products in a safe and sound manner and in a way that clearly discloses the risks that borrowers may assume. In June 2007, the same financial institution regulatory agencies published the final interagency Subprime Statement, which addressed risks relating to subprime short-term hybrid ARMs. The Interagency Guidance and the Subprime Statement set forth principles that regulate financial institutions originating certain non-traditional mortgages and subprime short-term hybrid ARMs with respect to their underwriting practices. These principles included providing borrowers with clear and balanced information about the relative benefits and risks of these products sufficiently early in the process to enable them to make informed decisions.

OFHEO has directed us to adopt practices consistent with the risk management, underwriting and consumer protection guidelines of the Interagency Guidance and the Subprime Statement. These principles apply to our purchase of non-traditional mortgages and subprime short-term hybrid ARMs and our related investment activities. In response, in July 2007, we informed our customers of new underwriting and disclosure requirements for non-traditional mortgages. In September 2007, we informed our customers and other counterparties of similar new requirements for subprime short-term hybrid ARMs. These new requirements are consistent with our announcement in February 2007 that we would implement stricter investment standards for certain subprime ARMs originated after September 1, 2007, and develop new mortgage products providing lenders with more choices to offer subprime borrowers. See "RISK FACTORS — Legal and Regulatory Risks" for further discussion

*Mortgage Portfolio Characteristics*

As previously noted, all mortgages that we purchase for our retained portfolio or that we guarantee have an inherent risk of default. We seek to manage the underlying risk by adequately pricing for the risk we assume using our underwriting and quality control processes. Our underwriting process evaluates mortgage loans using several critical risk characteristics, such as credit score, LTV ratio and occupancy type. Table 46 provides characteristics of our single-family new business purchases in 2007 and 2006, and of our single-family mortgage portfolio at December 31, 2007 and 2006.

**Table 46 — Characteristics of Single-Family Mortgage Portfolio[1]**

| | Purchases During the Year Ended December 31, | | | Portfolio at December 31, | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
| **Original LTV Ratio Range[2]** | | | | | | |
| Less than 60% | 18% | 19% | 21% | 22% | 24% | 25% |
| Above 60% to 70% | 14 | 14 | 16 | 16 | 16 | 17 |
| Above 70% to 80% | 49 | 54 | 50 | 47 | 46 | 44 |
| Above 80% to 90% | 8 | 7 | 7 | 8 | 7 | 8 |
| Above 90% to 100% | 11 | 6 | 6 | 7 | 7 | 6 |
| Above 100% | — | — | — | — | — | — |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average original ratio | 74% | 73% | 71% | 71% | 70% | 70% |
| **Estimated Current LTV Ratio Range[3]** | | | | | | |
| Less than 60% | | | | 41% | 52% | 56% |
| Above 60% to 70% | | | | 15 | 18 | 18 |
| Above 70% to 80% | | | | 19 | 20 | 18 |
| Above 80% to 90% | | | | 15 | 8 | 6 |
| Above 90% to 100% | | | | 7 | 2 | 2 |
| Above 100% | | | | 3 | — | — |
| Total | | | | 100% | 100% | 100% |
| Weighted average estimated current LTV ratio | | | | 63% | 57% | 56% |
| **Credit Score[4]** | | | | | | |
| 740 and above | 42% | 42% | 44% | 45% | 45% | 45% |
| 700 to 739 | 22 | 24 | 23 | 23 | 23 | 23 |
| 660 to 699 | 19 | 19 | 19 | 18 | 18 | 18 |
| 620 to 659 | 11 | 10 | 10 | 9 | 9 | 9 |
| Less than 620 | 6 | 5 | 4 | 4 | 4 | 4 |
| Not available | — | — | — | 1 | 1 | 1 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average credit score | 718 | 720 | 722 | 723 | 725 | 725 |
| **Loan Purpose** | | | | | | |
| Purchase | 47% | 53% | 44% | 40% | 37% | 32% |
| Cash-out refinance | 32 | 32 | 35 | 30 | 29 | 29 |
| Other refinance | 21 | 15 | 21 | 30 | 34 | 39 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Property Type** | | | | | | |
| 1 unit | 97% | 97% | 97% | 97% | 97% | 97% |
| 2-4 units | 3 | 3 | 3 | 3 | 3 | 3 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Occupancy Type** | | | | | | |
| Primary residence | 89% | 89% | 91% | 91% | 92% | 93% |
| Second/vacation home | 5 | 6 | 5 | 5 | 5 | 4 |
| Investment | 6 | 5 | 4 | 4 | 3 | 3 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

(1) Purchases and ending balances are based on the unpaid principal balance of the single-family mortgage portfolio (excluding certain Structured Transactions). Purchases included in the data totaled $467 billion, $358 billion and $396 billion in 2007, 2006 and 2005, respectively. Ending balances included in the data totaled $1,718 billion, $1,482 billion and $1,333 billion at December 31, 2007, 2006 and 2005, respectively.

(2) Original LTV ratios are calculated as the amount of the mortgage we guarantee divided by the lesser of the appraised value of the property at time of mortgage origination or the mortgage borrower's purchase price.

(3) Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes since origination. Estimated current LTV excludes Structured Transactions and option ARMs. Estimated current LTV ratio range is not applicable to purchases made during the year and excludes any secondary financing.

(4) Credit score data is as of mortgage loan origination for all loans within mortgage pools underlying our issued PCs and Structured Securities, as well as mortgage loans held in our retained portfolio, and is based on the rating system scale developed by Fair, Isaac and Co., Inc., or FICO®, scores.

*Loan-to-Value Ratios.* An important safeguard against credit losses for mortgage loans in our single-family non-credit-enhanced portfolio is provided by the borrowers' equity in the underlying properties. Our charter requires that single-family mortgages with LTV ratios above 80% at the time of purchase be covered by one or more of the following: (a) mortgage insurance for mortgage amounts above the 80% threshold; (b) a seller's agreement to repurchase or replace any mortgage upon default; or (c) retention by the seller of at least a 10% participation interest in the mortgages. In addition, we employ other types of credit enhancements, including pool insurance, indemnification agreements, collateral pledged by lenders and subordinated security structures.

The likelihood of single-family mortgage default depends not only on the initial credit quality of the loan, but also on events that occur after origination. Accordingly, we monitor changes in home prices across the country and the impact of these home price changes on the underlying LTV ratio of mortgages in our portfolio. While home prices rose significantly during the years prior to 2006, growth slowed significantly during 2006 and home prices generally declined in 2007 across the United States. We monitor regional geographic markets for changes in these trends, particularly with respect to new loans originated in regional markets that have had significant home price appreciation, and we may seek to reinsure a portion of our risk. Historical experience has shown that defaults are less likely to occur on mortgages with lower estimated current LTV ratios. At December 31, 2007, 2006 and 2005, single-family mortgage portfolio loans with 80% or less in estimated current LTV ratio, totaled 75%, 90% and 92%, respectively, which indicates an increase in our exposure to losses in the event of default.

*Credit Score.*   Credit scores are a useful measure for assessing the credit quality of a borrower. Credit scores are numbers reported by credit repositories, based on statistical models, that summarize an individual's credit record and predict the likelihood that a borrower will repay future obligations as expected. FICO scores are the most commonly used credit scores today. FICO scores are ranked on a scale of approximately 300 to 850 points. Statistically, consumers with higher credit scores are more likely to repay their debts as expected than those with lower scores. At December 31, 2007, 2006 and 2005, the weighted average credit score for single-family mortgage portfolio (based on the credit score at origination) remained high at 723, 725 and 725, respectively, indicating borrowers with strong credit quality.

*Loan Purpose.*   Mortgage loan purpose indicates how the borrower intends to use the funds from a mortgage loan. The three general categories are purchase, cash-out refinance and other refinance. In a purchase transaction, funds are used to acquire a property. In a cash-out refinance transaction, in addition to paying off an existing first mortgage lien, the borrower obtains additional funds that may be used for other purposes, including paying off subordinate mortgage liens and providing unrestricted cash proceeds to the borrower. In other refinance transactions, the funds are used to pay off an existing first mortgage lien and may be used in limited amounts for certain specified purposes; such refinances are generally referred to as "no cash-out" or "rate and term" refinances. Other refinance transactions also include refinance mortgages for which the delivery data provided was not sufficient for us to determine whether the mortgage was a cash-out or a no cash-out refinance transaction. Given similar loan characteristics (*e.g.*, LTV ratios), purchase transactions have the lowest likelihood of default followed by no cash-out refinances and then cash-out refinances. The amount of purchase mortgages in our single-family mortgage portfolio has been increasing in each of the last three years as homeownership rates in the U.S. have also increased.

*Property Type.*   Single-family mortgage loans are defined as mortgages secured by housing with up to four living units. Mortgages on one-unit properties tend to have lower credit risk than mortgages on multiple-unit properties.

*Occupancy Type.*   Borrowers may purchase a home as a primary residence, second/vacation home or investment property that is typically a rental property. Mortgage loans on properties occupied by the borrower as a primary or secondary residence tend to have a lower credit risk than mortgages on investment properties.

*Geographic Concentration.*   Because our business involves purchasing mortgages from every geographic region in the U.S., we maintain a geographically diverse single-family mortgage portfolio. This diversification generally mitigates credit risks arising from changing local economic conditions. Our single-family mortgage portfolio's geographic distribution was relatively stable from 2005 to 2007, and remains broadly diversified across these regions. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" to our consolidated financial statements for more information concerning the distribution of our single-family mortgage portfolio by geographic region.

*Higher Risk Combinations.*   Combining certain loan characteristics often can indicate a higher degree of credit risk. For example, mortgages with both high LTV ratios and borrowers who have lower credit scores typically experience higher rates of delinquency, default and credit losses. As of December 31, 2007, approximately 1% of single-family mortgage loans we have guaranteed were made to borrowers with credit scores below 620 and had original LTV ratios above 90% at the time of mortgage origination. In addition, as of December 31, 2007, 4% of Alt-A and interest-only single-family loans we have guaranteed have been made to borrowers with credit scores below 620 at mortgage origination. These combinations of loans represent categories that have inherently greater credit risk, but reflect our efforts to meet increasingly demanding affordable housing goals. For the 25% of single-family mortgage loans with greater than 80% estimated current LTV ratios, the borrowers had a weighted average credit score at origination of 708 and 705 at December 31, 2007 and 2006, respectively. Similarly, for the 14% of single-family mortgage loans where the average credit score at origination was less than 660, the average estimated current LTV ratios were 71% and 63% at December 31, 2007 and 2006, respectively. As home prices increased during 2006 and prior years, many borrowers used second liens at the time of purchase to potentially reduce their LTV ratio to below 80%. Including this secondary financing, we estimate that the percentage of loans we have guaranteed with total LTV ratios above 90% has risen to 14% as of December 31, 2007.

*Freddie Mac*

*Loss Mitigation Activities*

Loss mitigation activities are a key component of our strategy for managing and resolving troubled assets and lowering credit losses. Our single-family loss mitigation strategy emphasizes early intervention in delinquent mortgages and providing alternatives to foreclosure. Other single-family loss mitigation activities include providing our single-family servicers with default management tools designed to help them manage non-performing loans more effectively and support fulfillment of our mission by assisting borrowers in retaining homeownership. Foreclosure alternatives are intended to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by reducing or eliminating a portion of the costs related to foreclosed properties and avoiding the credit loss in REO.

Our foreclosure alternatives include:

- Repayment plans are contractual plans to make up past due amounts. They mitigate our credit losses because they assist borrowers in returning to compliance with the original terms of their mortgages.

- Loan modifications, which involve adding delinquent interest to the original unpaid principal balance of the loan or changing other terms of a mortgage as an alternative to foreclosure. We examine the borrower's capacity to make payments under the new terms by reviewing the borrower's qualifications, including income and other indebtedness.

- Forbearance agreements, under which reduced payments or no payments are required during a defined period. They provide a temporary suspension of the foreclosure process to allow additional time for the borrower to return to compliance with the original terms of the borrower's mortgage or to implement another foreclosure alternative.

- Pre-foreclosure sales, in which the borrower, working with the servicer, sells the home and pays off all or part of the outstanding loan, accrued interest and other expenses from the sale proceeds.

The table below presents the number of loans with foreclosure alternatives for the years ended December 31, 2007, 2006 and 2005.

**Table 47 — Single-Family Foreclosure Alternatives[1]**

|  | December 31, | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
|  | (number of loans) | | |
| Repayment plans | 38,809 | 36,996 | 38,740 |
| Loan modifications | 8,105 | 9,348 | 6,232 |
| Forbearance agreements | 3,108 | 11,152 | 13,403 |
| Pre-foreclosure sales | 2,009 | 1,575 | 1,672 |
| Foreclosure alternatives | 52,031 | 59,071 | 60,047 |

(1) Based on the single-family mortgage portfolio, excluding non-Freddie Mac mortgage-related securities, Structured Transactions, and that portion of Structured Securities that is backed by Ginnie Mae Certificates.

The total number of loans with foreclosure alternatives decreased in 2007, as compared to 2006 and 2005, due to a significant reduction in the number of forbearance agreements that were extended to single-family borrowers affected by Hurricane Katrina in 2005 and 2006. Absent the impact of Hurricane Katrina, the number of foreclosure alternatives increased slightly due to the deterioration of the residential mortgage market during 2007.

We require multifamily seller/servicers to closely manage mortgage loans they have sold us in order to mitigate potential losses. For loans over $1 million, servicers must generally submit an annual assessment of the mortgaged property to us based on the servicer's analysis of financial and other information about the property and, except for certain higher performing loans, an inspection of the property. We evaluate these assessments internally and may direct the servicer to take specific actions to reduce the likelihood of delinquency or default. If a loan defaults despite these actions, we may offer a foreclosure alternative to the borrower. For example, we may modify the terms of a multifamily mortgage loan, which gives the borrower an opportunity to bring the loan current and retain ownership of the property. Because the activities of multifamily seller/servicers are an important part of our loss mitigation process, we rate their performance regularly and conduct on-site reviews of their servicing operations to confirm compliance with our standards.

*Performing and Non-Performing Assets*

We have classified loans in our single-family mortgage portfolio that are past due for 90 days or more (seriously delinquent) or whose contractual terms have been modified due to the financial difficulties of the borrower as non-performing assets. Similarly, multifamily loans are classified as non-performing assets if they are 60 days or more past due (seriously delinquent), if collectibility of principal and interest is not reasonably assured based on an individual loan level assessment, or if their contractual terms have been modified due to financial difficulties of the borrower. Table 48 provides detail on performing and non-performing assets in our total mortgage portfolio.

Table 48 — Performing and Non-Performing Assets[1]

| | December 31, 2007 | | | |
| | | Non-Performing Assets | | |
| | Performing Assets[1] | Less Than 90 Days Past Due[2] | Seriously Delinquent[4] | Total |
| | | (In millions) | | |
|---|---|---|---|---|
| *Mortgage loans in retained portfolio* | | | | |
| Multifamily | $ 57,295 | $ — | $ 3 | $ 57,298 |
| Multifamily troubled debt restructurings | — | 264 | 7 | 271 |
| Subtotal, mortgage loans in retained portfolio, multifamily | 57,295 | 264 | 10 | 57,569 |
| Single-family | 13,591 | — | 698 | 14,289 |
| Single-family loans purchased under financial guarantees[5] | 2,399 | — | 4,602 | 7,001 |
| Single-family troubled debt restructurings | — | 2,690 | 609 | 3,299 |
| Subtotal, mortgage loans in retained portfolio, single-family | 15,990 | 2,690 | 5,909 | 24,589 |
| Subtotal, mortgage loans in retained portfolio | 73,285 | 2,954 | 5,919 | 82,158 |
| *Guaranteed PCs and Structured Securities* | | | | |
| Multifamily | 10,607 | — | — | 10,607 |
| Multifamily troubled debt restructurings | — | 51 | — | 51 |
| Single-family[6] | 1,700,543 | — | 6,141 | 1,706,684 |
| Structured Securities backed by non-Freddie Mac mortgage-related securities[7] | 19,846 | — | 1,645 | 21,491 |
| Subtotal, guaranteed PCs and Structured Securities | 1,730,996 | 51 | 7,786 | 1,738,833 |
| REO, Net | — | — | 1,736 | 1,736 |
| Totals | $1,804,281 | $3,005 | $15,441 | $1,822,727 |

| | December 31, 2006 (Adjusted) | | | |
| | | Non-Performing Assets | | |
| | Performing Assets[1] | Less Than 90 Days Past Due[2] | Seriously Delinquent[4] | Total |
| | | (In millions) | | |
|---|---|---|---|---|
| *Mortgage loans in retained portfolio* | | | | |
| Multifamily | $ 44,845 | $ — | $ — | $ 44,845 |
| Multifamily troubled debt restructurings | — | 362 | — | 362 |
| Subtotal, mortgage loans in retained portfolio, multifamily | 44,845 | 362 | — | 45,207 |
| Single-family | 13,843 | — | 1,125 | 14,968 |
| Single-family loans purchased under financial guarantees[5] | 1,156 | — | 1,827 | 2,983 |
| Single-family troubled debt restructurings | — | 2,219 | 470 | 2,689 |
| Subtotal, mortgage loans in retained portfolio, single-family | 14,999 | 2,219 | 3,422 | 20,640 |
| Subtotal, mortgage loans in retained portfolio | 59,844 | 2,581 | 3,422 | 65,847 |
| *Guaranteed PCs and Structured Securities* | | | | |
| Multifamily | 8,333 | — | 30 | 8,363 |
| Multifamily troubled debt restructurings | — | 52 | — | 52 |
| Single-family[6] | 1,440,585 | — | 1,721 | 1,442,306 |
| Structured Securities backed by non-Freddie Mac mortgage-related securities[7] | 25,305 | — | 997 | 26,302 |
| Subtotal, guaranteed PCs and Structured Securities | 1,474,223 | 52 | 2,748 | 1,477,023 |
| REO, Net | — | — | 743 | 743 |
| Totals | $1,534,067 | $2,633 | $ 6,913 | $1,543,613 |

(1) Based on unpaid principal balance. Effective December 2007, we established securitization trusts for the underlying assets of our PCs and Structured Securities issued. As a result, we adjusted the reported balance of our mortgage portfolios to reflect the publicly-held security balances of our PCs and Structured Securities. Previously we reported these balances based on the unpaid principal balance of the underlying mortgage loans.
(2) Consists of single-family loans that are less than 90 days past due and multifamily loans less than 60 days past due under the original terms of the mortgage as of period end and have not had loan terms modified.
(3) Includes single-family loans that were previously reported as seriously delinquent and for which the original loan terms have been modified.
(4) Consists of single-family loans 90 days or more delinquent or in foreclosure and multifamily loans 60 days or more delinquent at period end. Delinquency status does not apply to REO; however, REO is included in non-performing assets.
(5) Represents those loans purchased from the mortgage pools underlying our PCs, Structured Securities or long-term standby agreements due to the borrower's delinquency. Once we purchase a loan under our financial guarantee it is placed on non-accrual status as long as it remains greater than 90 days past due. Through November 2007, our general practice was to purchase the mortgage loans out of PCs after the loans became 120 days delinquent. Effective December 2007, our practice changed to purchase these impaired loans out of our PC pools when the loans have been modified, foreclosure sales occur, or when the loans have been delinquent for 24 months, unless we determine it is economically beneficial to do so sooner.
(6) Excludes our Structured Securities that we classify separately as Structured Transactions.
(7) Consists of our Structured Transactions and that portion of Structured Securities that are backed by Ginnie Mae Certificates.

The amount of non-performing assets increased 93% at December 31, 2007, to approximately $18.4 billion, from $9.5 billion at December 31, 2006, due to the continued deterioration in single-family housing market fundamentals which has resulted in higher delinquency transition rates in 2007. This rate increased in 2007, compared to 2006. The changes in

these delinquency transition rates, as compared to our historical experience, have been progressively worse for loans originated in 2006 and 2007. We believe this trend is, in part, due to greater origination volume of non-traditional loans, such as interest-only mortgages, as well as an increase in total LTV ratios for mortgage loans originated in those years. In addition, the average size of the unpaid principal balance related to non-performing assets in our portfolio rose in 2007. As a result, the balance of our REO, net, increased 134% in 2007. Until nationwide home prices return to historical appreciation rates or selected regional economies improve, we expect to continue to experience higher delinquency transition rates than those experienced in 2006 and an increase in non-performing assets.

*Delinquencies*

We report single-family delinquency information based on the number of loans that are 90 days or more past due or in foreclosure. For multifamily loans, we report the delinquency when payment is 60 days or more past due. We include all the single-family loans that we own and those that are collateral for our PCs and Structured Securities, including those with significant credit enhancement, in the calculation of delinquency information; however, we exclude that portion of our Structured Securities that is backed by Ginnie Mae Certificates and our Structured Transactions. Structured Transactions represented 1%, 2% and 2% of our total mortgage portfolio at December 31, 2007, 2006 and 2005, respectively. Multifamily delinquencies may include mortgage loans where the borrowers are not paying as agreed, but principal and interest are being paid to us under the terms of a credit enhancement agreement. Table 49 presents delinquency information for the single-family loans underlying our total mortgage portfolio.

Table 49 — Single-Family — Delinquency Rates, Excluding Structured Transactions — by Region

| | December 31, 2007 | | December 31, 2006 | | December 31, 2005 | |
|---|---|---|---|---|---|---|
| | Percent of Unpaid Principal Balance[1] | Delinquency Rate[1] | Percent of Unpaid Principal Balance[1] | Delinquency Rate[1] | Percent of Unpaid Principal Balance[1] | Delinquency Rate[1] |
| Northeast[1] | 24% | 0.39% | 24% | 0.24% | 24% | 0.22% |
| Southeast[1] | 18 | 0.59 | 18 | 0.30 | 18 | 0.38 |
| North Central[1] | 20 | 0.48 | 21 | 0.32 | 22 | 0.30 |
| Southwest[1] | 13 | 0.32 | 13 | 0.26 | 13 | 0.64 |
| West[1] | 25 | 0.42 | 24 | 0.12 | 23 | 0.11 |
| | 100% | | 100% | | 100% | |
| Total non-credit-enhanced — all regions | | 0.45 | | 0.25 | | 0.30 |
| Total credit-enhanced — all regions | | 1.62 | | 1.30 | | 1.61 |
| Total single-family portfolio | | 0.65 | | 0.42 | | 0.53 |

(1) Presentation of non-credit-enhanced delinquency rates with the following regional designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); and Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).
(2) Percentages are based on mortgage loans in the retained portfolio and total PCs and Structured Securities issued, excluding that portion of our Structured Securities that is backed by Ginnie Mae Certificates.
(3) Percentages are based on number of loans and excluding Structured Transactions.

During 2007 and continuing into 2008, home prices have continued to decline. In some geographical areas, particularly in the North Central region, this decline has been combined with increased rates of unemployment and weakness in home sales, which has resulted in increases in delinquency rates throughout 2007. We have also experienced increases in delinquency rates in the Northeast, Southeast and West regions in 2007.

Although Structured Transactions generally have underlying mortgage loans with a variety of risk characteristics, many of them may afford us credit protection from losses due to the underlying structure employed and additional credit enhancement features. Delinquency rates on Structured Transactions were 9.86%, 8.36% and 12.34% at December 31, 2007, 2006 and 2005, respectively. The delinquency rate of the total single-family portfolio, including Structured Transactions, was 0.76%, 0.54% and 0.71% at December 31, 2007, 2006 and 2005, respectively.

Table 50 — Single-Family Mortgages by Year of Origination — Percentage of Mortgage Portfolio and Non-Credit-Enhanced Delinquency Rates[1]

| | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2007 | | 2006 | | 2005 | |
| Year of Origination | Percent of Single-Family Unpaid Principal Balance | Non-Credit-Enhanced Delinquency Rate | Percent of Single-Family Unpaid Principal Balance | Non-Credit-Enhanced Delinquency Rate | Percent of Single-Family Unpaid Principal Balance | Non-Credit-Enhanced Delinquency Rate |
| Pre-2000 | 3% | 0.64% | 4% | 0.58% | 6% | 0.73% |
| 2000 | <1 | 1.63 | <1 | 1.83 | <1 | 2.09 |
| 2001 | 2 | 0.60 | 3 | 0.60 | 4 | 0.75 |
| 2002 | 6 | 0.37 | 9 | 0.32 | 11 | 0.38 |
| 2003 | 20 | 0.20 | 26 | 0.15 | 34 | 0.17 |
| 2004 | 13 | 0.35 | 16 | 0.22 | 21 | 0.21 |
| 2005 | 18 | 0.51 | 23 | 0.19 | 24 | 0.08 |
| 2006 | 18 | 0.89 | 19 | 0.09 | — | — |
| 2007 | 20 | 0.35 | — | — | — | — |
| Total | 100% | 0.45 | 100% | 0.25 | 100% | 0.30 |

[1] Excludes Structured Transactions.

Our single-family mortgage portfolio was affected by heavy refinance volumes, which have contributed to higher liquidation rates during the last five years. At December 31, 2007, approximately 56% of our single-family mortgage portfolio consisted of mortgage loans originated in 2007, 2006 or 2005. The single-family loans in our retained portfolio and underlying our PCs and Structured Securities that were originated in 2007, 2006 and 2005 have experienced higher rates of delinquency in the earlier years of their terms as compared to our historical experience for newer originations. We attribute this increase to a number of factors, including the expansion of credit terms under which loans are underwritten and an increase in our purchases of adjustable-rate and non-traditional mortgage products that have higher inherent credit risk than traditional fixed-rate mortgage products. Table 51 presents the delinquency rates of our single-family retained mortgages and those that underlie our PCs and Structured Securities categorized by product type.

**Table 51 — Single-Family — Delinquency Rates — By Product**

| | Non-Credit-Enhanced, December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2007** | | **2006** | | **2005** | |
| | Percent of Number of Single-Family Loans | Delinquency Rate | Percent of Number of Single-Family Loans | Delinquency Rate | Percent of Number of Single-Family Loans | Delinquency Rate |
| Conventional: | | | | | | |
| 30-year amortizing fixed-rate[1] | 60% | 0.46% | 55% | 0.31% | 52% | 0.40% |
| 15-year amortizing fixed-rate | 29 | 0.18 | 34 | 0.14 | 38 | 0.19 |
| ARMs/adjustable-rate | 4 | 0.36 | 6 | 0.26 | 6 | 0.22 |
| Interest-only | 5 | 1.85 | 3 | 0.30 | 1 | 0.04 |
| Balloon/resets | 1 | 0.33 | 1 | 0.19 | 2 | 0.19 |
| Total mortgage loans, PCs and Structured Securities | 99 | 0.45 | 99 | 0.25 | 99 | 0.30 |
| Structured Transactions[2] | 1 | 1.88 | 1 | 0.22 | 1 | 0.10 |
| Total mortgage portfolio | 100% | 0.45 | 100% | 0.25 | 100% | 0.30 |
| Number of single-family loans (in millions) | 10.10 | | 9.23 | | 8.67 | |

| | Credit-Enhanced[4], December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2007** | | **2006** | | **2005** | |
| | Percent of Number of Single-Family Loans | Delinquency Rate | Percent of Number of Single-Family Loans | Delinquency Rate | Percent of Number of Single-Family Loans | Delinquency Rate |
| Conventional: | | | | | | |
| 30-year amortizing fixed-rate[1] | 80% | 1.60% | 75% | 1.32% | 72% | 1.74% |
| 15-year amortizing fixed-rate | 5 | 0.63 | 7 | 0.64 | 9 | 0.81 |
| ARMs/adjustable-rate | 4 | 1.14 | 6 | 1.21 | 8 | 1.05 |
| Interest-only | 4 | 3.11 | 3 | 1.05 | 2 | 0.23 |
| Balloon/resets | < 1 | 1.55 | 1 | 0.98 | 1 | 0.91 |
| FHA/VA | 2 | 2.96 | 2 | 2.99 | 2 | 4.03 |
| Rural Housing Service and other federally guaranteed loans | 1 | 2.85 | 1 | 2.65 | 1 | 3.34 |
| Total mortgage loans, PCs and Structured Securities | 96 | 1.62 | 95 | 1.30 | 95 | 1.61 |
| Structured Transactions[2] | 4 | 13.79 | 5 | 14.43 | 5 | 19.65 |
| Total mortgage portfolio | 100% | 2.14 | 100% | 1.93 | 100% | 2.54 |
| Number of single-family loans (in millions) | 2.23 | | 1.95 | | 1.92 | |

| | Total, December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2007** | | **2006** | | **2005** | |
| | Percent of Number of Single-Family Loans | Delinquency Rate | Percent of Number of Single-Family Loans | Delinquency Rate | Percent of Number of Single-Family Loans | Delinquency Rate |
| Conventional: | | | | | | |
| 30-year amortizing fixed-rate[1] | 64% | 0.72% | 60% | 0.54% | 56% | 0.72% |
| 15-year amortizing fixed-rate | 25 | 0.20 | 29 | 0.16 | 33 | 0.22 |
| ARMs/adjustable-rate | 4 | 0.50 | 6 | 0.44 | 7 | 0.39 |
| Interest-only | 5 | 2.03 | 3 | 0.44 | 1 | 0.10 |
| Balloon/resets | 1 | 0.41 | 1 | 0.25 | 2 | 0.25 |
| FHA/VA | < 1 | 2.96 | < 1 | 2.99 | < 1 | 4.03 |
| Rural Housing Service and other federally guaranteed loans | < 1 | 2.85 | < 1 | 2.65 | < 1 | 3.34 |
| Total mortgage loans, PCs and Structured Securities | 99 | 0.65 | 99 | 0.42 | 99 | 0.53 |
| Structured Transactions[2][3] | 1 | 9.86 | 1 | 8.36 | 1 | 12.34 |
| Total mortgage portfolio | 100% | 0.76 | 100% | 0.54 | 100% | 0.71 |
| Number of single-family loans (in millions) | 12.33 | | 11.18 | | 10.59 | |
| Net charge-offs (dollars in millions) | | | | | | |
| Mortgage loans, PCs and Structured Securities | $289 | | $141 | | $101 | |
| Structured Transactions[2][3][5] | 1 | | 1 | | — | |
| Total mortgage portfolio | $290 | | $142 | | $101 | |

(1) Includes 40-year and 20-year fixed-rate mortgages.
(2) Structured Transactions generally have underlying mortgage loans with a variety of risk characteristics but many provide inherent credit protection from losses due to the structure employed, including subordination, excess interest, overcollateralization and other features.
(3) Includes $13 billion, $19 billion and $18 billion of option ARM loans that are underlying our Structured Transactions as of December 31, 2007, 2006 and 2005, respectively.
(4) Credit-enhanced loans are primarily those mortgage loans for which a third party has primary default risk. The total credit-enhanced unpaid principal balance as of December 31, 2007, 2006 and 2005 was $326 billion, $266 billion and $253 billion, respectively, for which the maximum coverage of third party primary liability was $55 billion, $58 billion and $53 billion, respectively.
(5) Does not include credit losses related to Structured Transactions that were held in our retained portfolio.

Increases in delinquency rates occurred in all product types in 2007, but were most significant for interest-only and option ARM mortgages. Delinquency rates for interest-only and option ARM products, increased to 203 and 224 basis points, respectively, compared to 44 and 31 basis points at December 31, 2006, respectively. The delinquency rate on our total single-family portfolio, excluding that portion of Structured Securities that is backed by Ginnie Mae Certificates and Structured Transactions, was 65 basis points at December 31, 2007, as compared to 42 basis points at December 31, 2006. Although we believe our delinquency rates have remained low relative to conforming loan delinquency rates of other industry participants, we expect our delinquency rates to continue to rise in 2008. Our multifamily delinquency rate remained very low at 0.02%, 0.06% and —% at the end of 2007, 2006 and 2005, respectively.

Table 52 presents activities related to loans acquired under financial guarantees in 2007.

## Table 52 — Changes in Loans Purchased Under Financial Guarantees[1]

| | 2007 | | | |
| | Unpaid Principal Balance | Purchase Discount | Loan Loss Reserves | Net Investment |
| --- | --- | --- | --- | --- |
| | (In millions) | | | |
| Beginning balance | $ 2,983 | $ (220) | $ — | $ 2,763 |
| Purchases of loans | 8,833 | (2,364) | — | 6,469 |
| Provision for credit losses | — | — | (12) | (12) |
| Principal repayments | (1,486) | 197 | 4 | (1,285) |
| Troubled debt restructurings[2] | (694) | 129 | — | (565) |
| Foreclosures, transferred to REO | (2,635) | 491 | 6 | (2,138) |
| Ending balance[3] | $ 7,001 | $(1,767) | $ (2) | $ 5,232 |

(1) Consists of seriously delinquent loans purchased in performance of our financial guarantees since January 1, 2006.
(2) Consist of loans that have transitioned into troubled debt restructurings during the stated period.
(3) Includes loans that have subsequently returned to current status under the original loan terms at December 31, 2007.

We have the right to purchase mortgages that back our PCs and Structured Securities from the underlying loan pools when they are significantly past due. This right to repurchase collateral is known as our repurchase option. Through November 2007, our general practice was to purchase the mortgage loans out of PCs after the loans became 120 days delinquent. Effective December 2007, our practice changed to purchase these loans out of our PCs when the loans have been modified, foreclosure sales occur, or when the loans have been delinquent for 24 months, unless we determine it is economically beneficial to do so sooner. Consequently, we purchased relatively few impaired loans under our repurchase option in December 2007. We record at fair value loans that we purchase out of our guaranteed PCs and Structured Securities in connection with our repurchase option. We record losses on loans purchased on our consolidated statements of income in order to reduce our net investment in acquired loans to their fair value.

The unpaid principal balance of non-performing loans that have been purchased under our financial guarantees and that have not been modified under troubled debt restructurings increased approximately 135% in 2007. This increase is attributable to an increase in the volume of delinquent loans in 2007 as well as an increase in the average size of the unpaid principal balance of those loans. We purchased approximately $8.8 billion in unpaid principal balances of these loans with a fair value at acquisition of $6.5 billion.

Loans acquired in 2007 added approximately $2.4 billion of purchase discount, which is comprised of $0.5 billion that was previously recorded on our consolidated balance sheets as loan loss reserve and $1.9 billion of losses on loans purchased as shown on our consolidated statements of income during 2007. We expect that we will continue to incur losses on the purchase of non-performing loans in 2008. However, the volume and severity of these losses is dependent on many factors, including the effects of our change in practice for repurchases and regional changes in home prices.

Recoveries on loans impaired upon purchase represent the recapture into income of previously recognized losses on loans purchased and provision for credit losses associated with purchases of delinquent loans from our PCs and Structured Securities in conjunction with our guarantee activities. Recoveries occur when a non-performing loan is repaid in full or when at the time of foreclosure the estimated fair value of the acquired property, less costs to sell, exceeds the carrying value of the loan. During 2007, we recognized recoveries on loans impaired upon purchase of $505 million. For impaired loans where the borrower has made required payments that return to current status, the basis adjustments are accreted into interest income over time as periodic payments are received. We classify loans repaid in full and those returning to current status, including those with modified terms, as cured loans and the cumulative percentage of impaired loans that have cured since our purchase out of our PCs as a cure rate. As of December 31, 2007, the cure rate for non-performing loans purchased out of PCs during 2007 and 2006 was approximately 34% and 56%, respectively. We believe, based on the cure rate experienced on these loans, as well as our access to credit enhancement remedies that we will continue to recognize recoveries on loans impaired upon purchase in 2008.

*Freddie Mac*

*Credit Loss Performance*

Table 53 provides detail on our credit loss performance associated with mortgage loans in our retained portfolio, including those purchased out of PCs and Structured Securities.

**Table 53 — Credit Loss Performance**

| | December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | (dollars in millions) | | |
| **REO** | | | |
| REO balances: | | | |
| Single-family | $ 1,736 | $ 734 | $ 611 |
| Multifamily | — | 9 | 18 |
| Total | $ 1,736 | $ 743 | $ 629 |
| REO activity (number of properties):[1] | | | |
| Beginning property inventory | 8,785 | 8,070 | 9,604 |
| Properties acquired | 22,840 | 16,387 | 15,861 |
| Properties disposed | (17,231) | (15,672) | (17,395) |
| Ending property inventory | 14,394 | 8,785 | 8,070 |
| Average holding period (in days)[2] | 167 | 175 | 186 |
| REO operations income (expense): | | | |
| Single-family | $ (205) | $ (61) | $ (40) |
| Multifamily | (1) | 1 | — |
| Total | $ (206) | $ (60) | $ (40) |
| **CHARGE-OFFS** | | | |
| Single-family: | | | |
| Foreclosure alternatives, gross | $ (57) | $ (50) | $ (44) |
| Recoveries[3] | 19 | 11 | 23 |
| Foreclosure alternatives, net | (38) | (39) | (21) |
| REO acquisitions, gross | (471) | (258) | (242) |
| Recoveries[3] | 219 | 155 | 162 |
| REO acquisitions, net | (252) | (103) | (80) |
| Single-family totals: | | | |
| Charge-offs, gross[4] (including $372 million, $308 million and $286 million relating to loan loss reserves, respectively) | (528) | (308) | (286) |
| Recoveries[3] | 238 | 166 | 185 |
| Single-family charge-offs, net | (290) | (142) | (101) |
| Multifamily: | | | |
| Charge-offs, gross[4] (including $4 million, $5 million and $8 million relating to loan loss reserves, respectively) | (4) | (5) | (8) |
| Recoveries[3] | 1 | — | — |
| Multifamily charge-offs, net | (3) | (5) | (8) |
| Total Charge-offs: | | | |
| Charge-offs, gross[4] (including $376 million, $313 million and $294 million relating to loan loss reserves, respectively) | (532) | (313) | (294) |
| Recoveries: | | | |
| Related to primary mortgage insurance | 156 | 112 | 119 |
| Related to other credit enhancements | 83 | 54 | 66 |
| Total recoveries[3] | 239 | 166 | 185 |
| Charge-offs, net | $ (293) | $ (147) | $ (109) |
| **CREDIT LOSSES[5]** | | | |
| Single-family | $ (495) | $ (203) | $ (141) |
| Multifamily | (4) | (4) | (8) |
| Total | $ (499) | $ (207) | $ (149) |
| In basis points[6] | | | |
| Single-family | (3.0) | (1.4) | (1.1) |
| Multifamily | — | — | — |
| Total | (3.0) | (1.4) | (1.1) |

(1) Includes single-family and multifamily REO properties.
(2) Represents weighted average holding period for single-family and multifamily properties based on number of REO properties.
(3) Includes recoveries of charge-offs primarily resulting from foreclosure alternatives and REO acquisitions on loans where a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements.
(4) Charge-offs represent the amount of the unpaid principal balance of a loan that has been discharged in order to remove the loan from our retained portfolio at the time of resolution, regardless of when the impact of the credit loss was recorded on our consolidated statements of income through the provision for credit losses or losses on loans purchased. The amount of charge-offs for credit loss performance is generally derived as the contractual balance of a loan at the date it is discharged less the estimated value in final disposition.
(5) Equal to REO operations income (expense) plus charge-offs, net.
(6) Calculated as credit losses divided by the average total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of Structured Securities that is backed by Ginnie Mae Certificates.

Our credit loss performance is a historic metric that measures losses at the conclusion of the loan resolution process. Our credit loss performance does not include our provision for credit losses and losses on loans purchased. We expect our credit losses to continue to increase in 2008, especially if market conditions, such as home prices and the rate of home sales, continue to deteriorate.

Table 54 and Table 55 provide detail by region for two credit performance statistics, REO activity and charge-offs. Regional REO acquisition and charge-off trends generally follow a pattern that is similar to, but lags, that of regional delinquency trends.

**Table 54 — REO Activity by Region[1]**

| | December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | (number of properties) | | |
| **REO Inventory** | | | |
| Beginning property inventory | 8,785 | 8,070 | 9,604 |
| Properties acquired by region: | | | |
| Northeast | 2,336 | 1,253 | 1,306 |
| Southeast | 4,942 | 3,970 | 4,504 |
| North Central | 9,175 | 7,236 | 5,790 |
| Southwest | 3,977 | 3,498 | 3,412 |
| West | 2,410 | 430 | 849 |
| Total properties acquired | 22,840 | 16,387 | 15,861 |
| Properties disposed by region: | | | |
| Northeast | (1,484) | (1,260) | (1,384) |
| Southeast | (4,009) | (4,132) | (5,221) |
| North Central | (7,520) | (6,294) | (5,715) |
| Southwest | (3,488) | (3,441) | (3,820) |
| West | (730) | (545) | (1,255) |
| Total properties disposed | (17,231) | (15,672) | (17,395) |
| Ending property inventory | 14,394 | 8,785 | 8,070 |

(1) See "Table 49 — Single-Family — Delinquency Rates, Excluding Structured Transactions — By Region" for a description of these regions.

Our REO property inventories increased 64% in 2007 reflecting the impact of the weakening housing market and tightening credit standards. In addition, the impact of a national decline in home prices and a decrease in the volume of home sales activity during 2007 lessens the alternatives to foreclosure for homeowners exposed to temporary deterioration in their financial condition. Increases in our REO inventories have been most severe in areas of the country where unemployment rates continue to be high, such as the North Central region. The East and West coastal areas of the country also experienced significant increases in REO in 2007.

**Table 55 — Single-Family Charge-offs and Recoveries by Region[1][2]**

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2007 | | | 2006 | | | 2005 | | |
| | Charge-offs, gross | Recoveries | Charge-offs, net | Charge-offs, gross | Recoveries | Charge-offs, net | Charge-offs, gross | Recoveries | Charge-offs, net |
| | | | | (in millions) | | | | | |
| Northeast | $ 50 | $ (21) | $ 29 | $ 22 | $ (9) | $ 13 | $ 21 | $ (10) | $ 11 |
| Southeast | 112 | (60) | 52 | 72 | (42) | 30 | 76 | (54) | 22 |
| North Central | 219 | (92) | 127 | 133 | (66) | 67 | 102 | (66) | 36 |
| Southwest | 90 | (45) | 45 | 73 | (44) | 29 | 68 | (44) | 24 |
| West | 57 | (20) | 37 | 8 | (5) | 3 | 19 | (11) | 8 |
| Total | $528 | $(238) | $290 | $308 | $(166) | $142 | $286 | $(185) | $101 |

(1) See "Table 49 — Single-Family — Delinquency Rates, Excluding Structured Transactions — By Region" for a description of these regions.
(2) Includes recoveries of charge-offs primarily resulting from foreclosure alternatives and REO acquisitions on loans where a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements. Recoveries of charge-offs through credit enhancements are limited in some instances to amounts less than the full amount of the loss.

Single-family charge-offs, gross, increased 71% in 2007 compared to 2006, primarily due to a considerable increase in the volume of REO properties acquired at foreclosure. We expect that the volume of our REO properties will continue to increase if the economic condition of the residential mortgage market does not improve. Higher volumes of foreclosures and higher average loan balances resulted in higher charge-offs, on a per property basis, during 2007.

We maintain two loan loss reserves — reserve for losses on mortgage loans held-for-investment and reserve for guarantee losses on Participation Certificates — at levels we deem adequate to absorb probable incurred losses on mortgage loans held-for-investment in the retained portfolio and mortgages underlying our PCs and Structured Securities. See "MD&A — CRITICAL ACCOUNTING POLICIES AND ESTIMATES — Allowance for Loan Losses and Reserve for Guarantee Losses," "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 5:

MORTGAGE LOANS AND LOAN LOSS RESERVES" to our consolidated financial statements for further information. Table 56 summarizes our loan loss reserves activity for both reserves in total.

**Table 56 — Loan Loss Reserves Activity**

| | Year Ended December 31, | | | | |
| | | | Adjusted | | |
| | 2007 | 2006 | 2005 | 2004 | 2003 |
| | | | (in millions) | | |
|---|---|---|---|---|---|
| **Total loan loss reserves:**[1] | | | | | |
| Beginning balance ........................................ | $ 619 | $ 548 | $ 355 | $ 356 | $ 439 |
| Provision (benefit) for credit losses ..................... | 2,854 | 296 | 307 | 164 | (35) |
| Charge-offs, gross[2] ..................................... | (376) | (313) | (294) | (300) | (224) |
| Recoveries[3] ............................................ | 239 | 166 | 185 | 160 | 145 |
| Charge-offs, net ........................................ | (137) | (147) | (109) | (140) | (79) |
| Adjustment for change in accounting[4] .................... | — | — | — | — | 42 |
| Transfers, net[5] ........................................ | (514) | (78) | (5) | (25) | (11) |
| Ending balance ......................................... | $2,822 | $ 619 | $ 548 | $ 355 | $ 356 |

(1) Includes reserves for loans held for investment in the retained portfolio and reserves for guarantee losses on Participation Certificates.
(2) Charge-offs related to retained mortgages represent the amount of the unpaid principal balance of a loan that has been discharged using the reserve balance to remove the loan from our retained portfolio at the time of resolution. Charge-offs exclude $156 million in 2007 related to reserve amounts previously transferred to reduce the carrying value of loans purchased under financial guarantees.
(3) Includes recoveries of charge-offs primarily resulting from foreclosure alternatives and REO acquisitions on loans where a share of default risk has been assumed by mortgage insurers, servicers or third parties through credit enhancements. Recoveries of charge-offs through credit enhancements are limited in some instances to amounts less than the full amount of the loss.
(4) On January 1, 2003, $42 million of recognized guarantee obligation attributable to estimated incurred losses on outstanding PCs or Structured Securities was reclassified to reserve for guarantee losses on Participation Certificates.
(5) Consist of: (a) the transfer of reserves associated with non-performing loans purchased from mortgage pools underlying our PCs, Structured Securities and long-term standby agreements to establish the initial recorded investment in these loans at the date of our purchase; (b) amounts attributable to uncollectible interest on PCs and Structured Securities in our retained portfolio; and (c) other transfers, net.

Our total loan loss reserves increased in 2007 as we recorded additional reserves to reflect increased estimates of incurred losses, an observed increase in delinquency rate and increases in the expected severity of losses on a per-property basis related to our single-family portfolio. In addition, in 2006, we reversed $82 million of our provision for credit losses recorded in 2005 associated with Hurricane Katrina because the expected payment and delinquency experience on affected properties was more favorable than expected. See "MD&A — CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Expense — *Provision for Credit Losses*," for additional information.

*Credit Risk Sensitivity*

Our credit risk sensitivity analysis assesses the assumed increase in the present value of expected single-family mortgage portfolio credit losses over ten years as the result of an estimated immediate 5% decline in home prices nationwide, followed by a return to more normal growth in home prices based on historical experience. We use an internally developed Monte Carlo simulation-based model to generate our credit risk sensitivity analyses. The Monte Carlo model uses a simulation program to generate numerous potential interest-rate paths that, in conjunction with a prepayment model, are used to estimate mortgage cash flows along each path. In the credit risk sensitivity analysis, we adjust the home-price assumption used in the base case to estimate the level and sensitivity of potential credit costs resulting from a sudden decline in home prices. Our credit risk sensitivity results are presented in "RISK MANAGEMENT AND DISCLOSURE COMMITMENTS."

**Institutional Credit Risk**

Our primary institutional credit risk exposure, other than counterparty credit risk relating to derivatives, arises from agreements with:

- mortgage insurers;
- mortgage seller/servicers;
- issuers, guarantors or third-party providers of credit enhancements (including bond insurers);
- mortgage investors;
- multifamily mortgage guarantors,
- issuers, guarantors and insurers of investments held in both our retained portfolio and cash and investments portfolio; and
- derivative counterparties.

A significant failure by a major entity in one of these categories to perform could have a material adverse effect on our retained portfolio, cash and investments portfolio or credit guarantee activities. The recent challenging market conditions

*Freddie Mac*

have adversely affected, and are expected to continue to adversely affect, the liquidity and financial condition of a number of our counterparties. For example, some of our largest mortgage seller/servicers have experienced ratings downgrades and liquidity constraints and other of our counterparties may also experience these concerns. The weakened financial condition and liquidity position of some of our counterparties may adversely affect their ability to perform their obligations to us, or the quality of the services that they provide to us. During 2007, we terminated our arrangements with certain mortgage seller/servicers due to their failure to meet our eligibility requirements and we continue to closely monitor the eligibility of mortgage seller/servicers under our standards. The failure of any of our primary counterparties to meet their obligations to us could have a material adverse effect on our results of operations and financial condition.

Investments in our retained portfolio expose us to institutional credit risk on non-Freddie Mac mortgage-related securities to the extent that servicers, issuers, guarantors, or third parties providing credit enhancements become insolvent or do not perform. Our non-Freddie Mac mortgage-related securities portfolio consists of both agency and non-agency mortgage-related securities. Agency securities present minimal institutional credit risk due to the prevailing view that these securities have a credit quality at least equivalent to non-agency securities rated AAA (based on the S&P or equivalent rating scale of other nationally recognized statistical rating organizations). We seek to manage institutional credit risk on non-Freddie Mac mortgage-related securities by only purchasing securities that meet our investment guidelines and performing ongoing analysis to evaluate the creditworthiness of the issuers and servicers of these securities and the bond insurers that guarantee them. See "MD&A — CONSOLIDATED BALANCE SHEETS ANALYSIS — Table 22 — Characteristics of Mortgage Loans and Mortgage-Related Securities in our Retained Portfolio" for more information regarding the non-Freddie Mac securities in our retained portfolio.

### Mortgage Insurers

We have institutional credit risk relating to the potential insolvency or non-performance of mortgage insurers that insure mortgages we purchase or guarantee. We manage this risk by establishing eligibility standards for mortgage insurers and by regularly monitoring our exposure to individual mortgage insurers. Our monitoring includes regularly performing analysis of the estimated financial capacity of mortgage insurers under different adverse economic conditions. We also monitor the mortgage insurers' credit ratings, as provided by nationally recognized statistical rating organizations, and we periodically review the methods used by the nationally recognized statistical rating organizations. Recently, the mortgage insurance industry has been subject to increased public and regulatory scrutiny. In addition, certain large insurers have been downgraded by nationally recognized rating agencies.

We announced that effective June 1, 2008, our private mortgage insurer counterparties may not cede new risk if the gross risk or gross premium ceded to captive reinsurers is greater than 25%. We also announced that we are temporarily suspending certain requirements for our mortgage insurance counterparties that are downgraded below AA— or Aa3 by any one of the rating agencies, provided the mortgage insurer commits to providing a remediation plan for our approval within 90 days of the downgrade. We periodically perform on-site reviews of mortgage insurers to confirm compliance with our eligibility requirements and to evaluate their management and control practices. In addition, state insurance authorities regulate mortgage insurers. In the event one of our mortgage insurers were to become insolvent, the insurer's future premiums would be used to pay claims. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" to our consolidated financial statements for additional information.

### Mortgage Seller/Servicers

We are exposed to institutional credit risk arising from the insolvency or non-performance by our mortgage seller/servicers, including non-performance of their repurchase obligations arising from the representations and warranties made to us for loans they underwrote and sold to us. The servicing fee charged by mortgage servicers varies by mortgage product. We generally require our single-family servicers to retain a minimum percentage fee for mortgages serviced on our behalf, typically 0.25% of the unpaid principal balance of the mortgage loans. However, on an exception basis, we allow a lower or no minimum servicing amount. The credit risk associated with servicing fees relates to whether we could transfer the applicable servicing rights to a successor servicer and recover amounts owed to us by the defaulting servicer in the event the defaulting servicer is unable to fulfill its responsibilities.

In order to manage the credit risk associated with our mortgage seller/servicers, we require them to meet minimum financial capacity standards, insurance and other eligibility requirements. We institute remedial actions against seller/servicers that fail to comply with our standards. These actions may include transferring mortgage servicing to other qualified servicers or terminating our relationship with the seller/servicer. We conduct periodic operational reviews of our single-family mortgage seller/servicers to help us better understand their control environment and its impact on the quality of loans sold to us. We use this information to determine the terms of business we conduct with a particular seller/servicer. We do not believe we have any significant exposure to seller/servicers identified as primarily subprime lenders that are not currently in compliance with our financial monitoring standards.

We manage the credit risk associated with our multifamily seller/servicers by establishing eligibility requirements for participation in our multifamily programs. These seller/servicers must also meet our standards for originating and servicing multifamily loans. We conduct regular quality control reviews of our multifamily mortgage seller/servicers to determine whether they remain in compliance with our standards.

### Non-Freddie Mac Mortgage-Related Securities

Investments in our retained portfolio expose us to institutional credit risk related to non-Freddie Mac mortgage-related securities to the extent that servicers, issuers, guarantors, or third parties providing credit enhancements become insolvent or do not perform. See "MD&A — CONSOLIDATED BALANCE SHEETS ANALYSIS — Table 22 — Characteristics of Mortgage Loans and Mortgage-Related Securities in our Retained Portfolio" for more information concerning our retained portfolio.

Our non-Freddie Mac mortgage-related securities portfolio consists of both agency and non-agency mortgage-related securities. Agency mortgage-related securities, which are securities issued or guaranteed by Fannie Mae or Ginnie Mae, present minimal institutional credit risk due to the high credit quality of Fannie Mae and Ginnie Mae. Ginnie Mae securities are backed by the full faith and credit of the U.S. Agency mortgage-related securities are generally not separately rated by nationally recognized statistical rating organizations, but are viewed as having a level of credit quality at least equivalent to non-agency mortgage-related securities rated AAA (based on the S&P rating scale or an equivalent rating from other nationally recognized statistical rating organizations). At December 31, 2007, we held approximately $48 billion of agency securities, representing approximately 2% of our total mortgage portfolio.

Non-agency mortgage-related securities expose us to institutional credit risk if the nature of the credit enhancement relies on a third party to cover potential losses. However, most of our non-agency mortgage-related securities rely primarily on subordinated tranches to provide credit loss protection and therefore expose us to limited counterparty risk. In those instances where we desire further protection, we may choose to mitigate our exposure with bond insurance or by purchasing additional subordination. Bond insurance exposes us to the risks related to the bond insurer's ability to satisfy claims. As of December 31, 2007, we had insurance coverage, including secondary policies, on securities totaling $17.9 billion of unpaid principal balance, consisting of $16.1 billion and $1.8 billion, of coverage for bonds in our retained and investment portfolios, respectively. As of December 31, 2007, the top three of our bond insurers, each accounting for more than 20% of our overall bond insurance coverage (including secondary policies), collectively represented approximately 80% of our bond insurance coverage.

At December 31, 2007, all of the bond insurers providing coverage for non-agency mortgage-related securities held by us were rated AAA or equivalent by at least one nationally recognized statistical rating organization. However, the bond insurance industry has been adversely affected by the increased volatility in the credit and mortgage markets. Consequently, certain large insurers have been downgraded by nationally recognized statistical rating agencies. Subsequent to December 31, 2007, three of those bond insurers, representing approximately 62% of our total bond insurer coverage, have been downgraded below AAA by at least one rating agency.

We manage institutional credit risk on non-Freddie Mac mortgage-related securities by only purchasing securities that meet our investment guidelines and performing ongoing analysis to evaluate the creditworthiness of the issuers and servicers of these securities and the bond insurers that guarantee them. To assess the creditworthiness of these entities, we may perform additional analysis, including on-site visits, verification of loan documentation, review of underwriting or servicing processes and similar due diligence measures. In addition, we regularly evaluate our investments to determine if any impairment in fair value requires an impairment loss recognition in earnings, warrants divestiture or requires a combination of both. See "RISK FACTORS — Legal and Regulatory Risks" for more information.

### Mortgage Investors and Originators

We are exposed to pre-settlement risk through the purchase, sale and financing of mortgage loans and mortgage-related securities with mortgage investors and originators. The probability of such a default is generally remote over the short time horizon between the trade and settlement date. We manage this risk by evaluating the creditworthiness of our counterparties and monitoring and managing our exposures. In some instances, we may require these counterparties to post collateral.

### Cash and Investments Portfolio

Institutional credit risk also arises from the potential insolvency or non-performance of issuers or guarantors of investments held in our cash and investments portfolio. Instruments in this portfolio are investment grade at the time of purchase and primarily short-term in nature, thereby substantially mitigating institutional credit risk in this portfolio. We regularly evaluate these investments to determine if any impairment in fair value requires an impairment loss recognition in earnings, warrants divestiture or requires a combination of both.

## OPERATIONAL RISKS

Operational risks are inherent in all of our business activities and can become apparent in various ways, including accounting or operational errors, business interruptions, fraud, failures of the technology used to support our business activities and other operational challenges from failed or inadequate internal controls. These operational risks may expose us to financial loss, interfere with our ability to sustain timely financial reporting, or result in other adverse consequences. Governance over the management of our operational risks takes place through the enterprise risk management framework. Business areas retain primary responsibility for identifying, assessing and reporting their operational risks.

Our business processes are highly dependent on our use of technology and business and financial models. While we believe that we have remediated material weaknesses in our information technology general controls, we continue to face challenges in ensuring that the new controls will operate effectively (see "CONTROLS AND PROCEDURES — Internal Control Over Financial Reporting" for more information). Although we have strengthened our model oversight and governance processes to validate model assumptions, code, theory and the system applications that utilize our models, the complexity of the models and the impact of the recent turmoil in the housing and credit markets create additional risk regarding the reliability of our models.

We continue to make significant investments to build new financial accounting systems and move to more effective and efficient business processing systems. Until those systems are fully implemented, we continue to remain more reliant on end-user computing systems than is desirable. We are also challenged to effectively and timely deliver integrated production systems. Reliance on certain of these end-user computing systems increases the risk of errors in some of our core operational processes and increases our dependency on monitoring controls. We are mitigating this risk by improving our documentation and process controls over these end-user computing systems and implementing more rigorous change management controls over certain key end-user systems using change management controls over tools which are subject to our information technology general controls.

In recognition of the importance of the accuracy and reliability of our valuation of financial instruments, we engage in an ongoing internal review of our valuations. We perform analysis of internal valuations on a monthly basis to confirm the reasonableness of the valuations. This analysis is performed by a group that is independent of the business area responsible for valuing the positions. Our verification and validation procedures depend on the nature of the security and valuation methodology being reviewed and may include: comparisons with external pricing sources, comparisons with observed trades, independent verification of key valuation model inputs and independent security modeling. Results of the monthly verification process, as well as any changes in our valuation methodologies, are reported to a management committee that is responsible for reviewing and approving the approaches used in our valuations to ensure that they are well controlled and effective, and result in reasonable fair values.

## RISK MANAGEMENT AND DISCLOSURE COMMITMENTS

In October 2000, we announced our voluntary adoption of a series of commitments designed to enhance market discipline, liquidity and capital. In September 2005, we entered into a written agreement with OFHEO that updated these commitments and set forth a process for implementing them. The letters between the company and OFHEO dated September 1, 2005 constituting the written agreement are available on the Investor Relations page of our website at www.freddiemac.com/investors/reports.html#commit. The status of our commitments at December 31, 2007 follows:

| Description | Status |
| --- | --- |
| 1. *Periodic Issuance of Subordinated Debt:* <br> • We will issue Freddie SUBS® securities for public secondary market trading that are rated by no fewer than two nationally recognized statistical rating organizations. <br><br> • Freddie SUBS® securities will be issued in an amount such that the sum of total capital (core capital plus general allowance for losses) and the outstanding balance of "Qualifying subordinated debt" will equal or exceed the sum of 0.45% of outstanding PCs and Structured Securities we guaranteed and 4% of total on-balance sheet assets. Qualifying subordinated debt is discounted by one-fifth each year during the instrument's last five years before maturity; when the remaining maturity is less than one year, the instrument is entirely excluded. We will take reasonable steps to maintain outstanding subordinated debt of sufficient size to promote liquidity and reliable market quotes on market values. <br><br> • Each quarter we will submit to OFHEO calculations of the quantity of qualifying Freddie SUBS® securities and total capital as part of our quarterly capital report. <br><br> • Every six months, we will submit to OFHEO a subordinated debt management plan that includes any issuance plans for the six months following the date of the plan. | • During 2007, we did not issue any Freddie SUBS® securities; however, we called $1.9 billion of higher-cost Freddie SUBS® securities. During 2006, we issued approximately $3.3 billion of Freddie SUBS® securities, including approximately $1.5 billion issued in exchange for previously issued Freddie SUBS® securities, and called approximately $1.0 billion of Freddie SUBS® securities. We did not issue, call or repurchase any Freddie SUBS® securities during 2005. <br><br> • Based upon an amended total capital plus qualifying subordinated debt report, we will report to OFHEO that at December 31, 2007 we had $44.6 billion in total capital plus qualifying subordinated debt, resulting in a surplus of $6.6 billion. During 2007, we submitted our quarterly total capital plus qualifying subordinated debt reports to OFHEO and we will amend these quarterly reports during the first quarter of 2008 to reflect our adjusted results. <br><br> • We submitted our semi-annual subordinated debt management plans to OFHEO. |
| 2. *Liquidity Management and Contingency Planning:* <br> • We will maintain a contingency plan providing for at least three months' liquidity without relying upon the issuance of unsecured debt. We will also periodically test the contingency plan in consultation with OFHEO. | • We have in place a liquidity contingency plan, upon which we report to OFHEO on a weekly basis. We periodically test this plan in accordance with our agreement with OFHEO. |
| 3. *Interest-Rate Risk Disclosures:* <br> • We will provide public disclosure of our duration gap, PMVS-L and PMVS-YC interest-rate risk sensitivity results on a monthly basis. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks — *Portfolio Market Value Sensitivity and Measurement of Interest-Rate Risk*" for a description of these metrics. | • For the year ended December 31, 2007, our duration gap averaged zero months, PMVS-L averaged $261 million and PMVS-YC averaged $31 million. Our 2007 monthly average duration gap, PMVS results and related disclosures are provided in our Monthly Volume Summary which is available on our website, www.freddiemac.com/investors/volsum. |

| Description | Status |
|---|---|
| **4. Credit Risk Disclosures:** | |
| • We will make quarterly assessments of the impact on expected credit losses from an immediate 5% decline in single-family home prices for the entire U.S. We will disclose the impact in present value terms and measure our losses both before and after receipt of private mortgage insurance claims and other credit enhancements. | • Our quarterly credit risk sensitivity estimates are as follows: |

| | Before Receipt of Credit Enhancements[2] | | After Receipt of Credit Enhancements[3] | |
|---|---|---|---|---|
| | Net Present Value, or NPV[2] | NPV Ratio[4] | NPV[3] | NPV Ratio[4] |
| | | (dollars in millions) | | |
| At: | | | | |
| 12/31/07[1] | $4,036 | 23.2 bps | $3,087 | 17.8 bps |
| 09/30/07 | $1,959 | 11.7 bps | $1,415 | 8.4 bps |
| 06/30/07 | $1,768 | 11.0 bps | $1,292 | 8.1 bps |
| 03/31/07 | $1,327 | 8.6 bps | $ 929 | 6.0 bps |
| 12/31/06 | $1,128 | 7.6 bps | $ 770 | 5.2 bps |

(1) Assumes that none of the credit enhancements currently covering our mortgage loans has any mitigating impact on our credit losses.
(2) Assumes we collect amounts due from credit enhancement providers after giving effect to certain assumptions about counterparty default rates.
(3) Based on single-family total mortgage portfolio, excluding Structured Securities backed by Ginnie Mae Certificates.
(4) Calculated as the ratio of NPV of the increase in credit losses to the single-family total mortgage portfolio, defined in footnote (3) above.
(5) The significant increase in our credit risk sensitivity estimates in Q4 2007 was primarily attributable to changes in our assumptions employed to calculate the credit risk sensitivity disclosure. Given deterioration in housing fundamentals at the end of 2007, we modified our assumptions for forecasted home prices subsequent to the immediate 5% decline.

| Description | Status |
|---|---|
| **5. Public Disclosure of Risk Rating:** | |
| • We will seek to obtain a rating, that will be continuously monitored by at least one nationally recognized statistical rating organization, assessing "risk-to-the-government" or independent financial strength. | • At February 1, 2008 and December 31, 2007, our "risk-to-the-government" rating from S&P was "AA–" with a negative outlook. An S&P rating outlook assesses the potential direction of a long-term credit rating over the intermediate term (typically six months to two years). A modifier of "negative" means that a rating may be lowered. |
| | • At February 1, 2008 and December 31, 2007, Moody's "Bank Financial Strength" rating for us was "A–" and "A–" with a negative outlook, respectively. A Moody's rating outlook is an opinion of the likely direction of a rating over the medium term. On January 9, 2008 Moody's placed our "Bank Financial Strength" rating on review for possible downgrade, which overrode the negative outlook designation. |

*Freddie Mac*

FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

## REPORT OF INDEPENDENT AUDITORS

To the Board of Directors and Stockholders of Freddie Mac:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income, of cash flows, and of stockholders' equity present fairly, in all material respects, the financial position of Freddie Mac, a stockholder-owned government-sponsored enterprise and its subsidiaries (the "company") at December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2007 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with generally accepted auditing standards as established by the Auditing Standards Board (United States) and in accordance with the auditing standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

We have also audited in accordance with generally accepted auditing standards as established by the Auditing Standards Board (United States) and in accordance with the auditing standards of the Public Company Accounting Oversight Board (United States), the supplemental consolidated fair value balance sheets of the company as of December 31, 2007 and 2006. As described in "NOTE 16: FAIR VALUE DISCLOSURES," the supplemental consolidated fair value balance sheets have been prepared by management to present relevant financial information that is not provided by the historical-cost consolidated balance sheets and is not intended to be a presentation in conformity with accounting principles generally accepted in the United States of America. In addition, the supplemental consolidated fair value balance sheets do not purport to present the net realizable, liquidation, or market value of the company as a whole. Furthermore, amounts ultimately realized by the company from the disposal of assets or amounts required to settle obligations may vary significantly from the fair values presented. In our opinion, the supplemental consolidated fair value balance sheets referred to above present fairly, in all material respects, the information set forth therein as described in "NOTE 16: FAIR VALUE DISCLOSURES."

As discussed in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," the company elected to offset amounts related to certain derivative contracts as of October 1, 2007, changed its method of accounting for uncertainty in income taxes as of January 1, 2007, elected to measure newly acquired interests in securitized financial assets that contain embedded derivatives at fair value as of January 1, 2007, changed its method of accounting for defined benefit plans as of December 31, 2006, changed its method for determining gains and losses on sales of certain guaranteed securities as of October 1, 2005, and changed its method of accounting for interest expense related to callable debt instruments as of January 1, 2005.

As discussed in "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES," the company changed the manner in which it accounts for the guarantee obligation as of December 31, 2007.

PricewaterhouseCoopers LLP

McLean, Virginia
February 27, 2008

*Freddie Mac*

## FREDDIE MAC
## CONSOLIDATED STATEMENTS OF INCOME

| | Year Ended December 31, | | |
| | | Adjusted | |
| | 2007 | 2006 | 2005 |
| | (dollars in millions, except share-related amounts) | | |
|---|---|---|---|
| **Interest income** | | | |
| Mortgage loans | $ 4,449 | $ 4,152 | $ 4,010 |
| Mortgage-related securities | 34,893 | 33,850 | 28,968 |
| Cash and investments | 3,568 | 4,262 | 2,606 |
| Total interest income | 42,910 | 42,264 | 35,584 |
| **Interest expense** | | | |
| Short-term debt | (8,916) | (8,665) | (6,102) |
| Long-term debt | (29,148) | (28,218) | (23,246) |
| Total interest expense on debt securities | (38,064) | (36,883) | (29,348) |
| Due to Participation Certificate investors | (418) | (387) | (551) |
| Total interest expense | (38,482) | (37,270) | (29,899) |
| Expense related to derivatives | (1,329) | (1,582) | (1,058) |
| *Net interest income* | 3,099 | 3,412 | 4,627 |
| **Non-interest income** | | | |
| Management and guarantee income (includes interest on guarantee asset of $549, $580 and $450, respectively) | 2,635 | 2,393 | 2,076 |
| Gains (losses) on guarantee asset | (1,484) | (978) | (1,409) |
| Income on guarantee obligation | 1,905 | 1,519 | 1,428 |
| Derivative gains (losses) | (1,904) | (1,173) | (1,321) |
| Gains (losses) on investment activity | 294 | (473) | (97) |
| Gains on debt retirement | 345 | 466 | 206 |
| Recoveries on loans impaired upon purchase | 505 | — | — |
| Foreign-currency gains (losses), net | (2,348) | 96 | (6) |
| Other income | 246 | 236 | 126 |
| *Non-interest income* | 194 | 2,086 | 1,003 |
| **Non-interest expense** | | | |
| Salaries and employee benefits | (896) | (830) | (805) |
| Professional services | (443) | (460) | (386) |
| Occupancy expense | (64) | (61) | (58) |
| Other administrative expenses | (271) | (290) | (286) |
| Total administrative expenses | (1,674) | (1,641) | (1,535) |
| Provision for credit losses | (2,854) | (296) | (307) |
| Real estate owned operations expense | (206) | (60) | (40) |
| Losses on certain credit guarantees | (1,588) | (406) | (272) |
| Losses on loans purchased | (1,865) | (148) | — |
| Low-income housing tax credit partnerships | (469) | (407) | (320) |
| Minority interests in earnings of consolidated subsidiaries | 8 | (58) | (96) |
| Other expenses | (222) | (200) | (530) |
| *Non-interest expense* | (9,270) | (3,216) | (3,100) |
| Income (loss) before income tax (expense) benefit and cumulative effect of change in accounting principle | (5,977) | 2,282 | 2,530 |
| Income tax (expense) benefit | 2,883 | 45 | (358) |
| Net income (loss) before cumulative effect of change in accounting principle | (3,094) | 2,327 | 2,172 |
| Cumulative effect of change in accounting principle, net of tax benefit of $—, $— and $32, respectively | — | — | (59) |
| *Net income (loss)* | $ (3,094) | $ 2,327 | $ 2,113 |
| Preferred stock dividends and issuance costs on redeemed preferred stock (including $6, $— and $— of issuance costs on redeemed preferred stock, respectively) | (404) | (270) | (223) |
| Amount allocated to participating security option holders | (5) | (6) | — |
| *Net income (loss) available to common stockholders* | $ (3,503) | $ 2,051 | $ 1,890 |
| Basic earnings (loss) per common share: | | | |
| Earnings (loss) before cumulative effect of change in accounting principle | $ (5.37) | $ 3.01 | $ 2.82 |
| Cumulative effect of change in accounting principle, net of taxes | — | — | (0.09) |
| *Basic earnings (loss) per common share* | $ (5.37) | $ 3.01 | $ 2.73 |
| Diluted earnings (loss) per common share: | | | |
| Earnings (loss) before cumulative effect of change in accounting principle | $ (5.37) | $ 3.00 | $ 2.81 |
| Cumulative effect of change in accounting principle, net of taxes | — | — | (0.08) |
| *Diluted earnings (loss) per common share* | $ (5.37) | $ 3.00 | $ 2.73 |
| Weighted average common shares outstanding (in thousands) | | | |
| Basic | 651,881 | 680,856 | 691,582 |
| Diluted | 651,881 | 682,664 | 693,511 |
| Dividends per common share | $ 1.75 | $ 1.91 | $ 1.52 |

*The accompanying notes are an integral part of these financial statements.*

*Freddie Mac*

FREDDIE MAC
CONSOLIDATED BALANCE SHEETS

|  | December 31, | |
|---|---|---|
|  | 2007 | Adjusted 2006 |
|  | (in millions, except share-related amounts) | |

**Assets**

*Retained portfolio*
Mortgage loans:

| | | |
|---|---|---|
| Held-for-investment, at amortized cost (net of allowance for loan losses of $256 and $69, respectively) | $ 76,347 | $ 63,697 |
| Held-for-sale, at lower-of-cost-or-market | 3,685 | 1,908 |
| Mortgage loans, net | 80,032 | 65,605 |

Mortgage-related securities:

| | | |
|---|---|---|
| Available-for-sale, at fair value (includes $17,010 and $20,463, respectively, pledged as collateral that may be repledged) | 615,665 | 626,731 |
| Trading, at fair value | 14,089 | 7,597 |
| Total mortgage-related securities | 629,754 | 634,328 |
| Retained portfolio | 709,786 | 699,933 |

*Cash and investments*

| | | |
|---|---|---|
| Cash and cash equivalents | 8,574 | 11,359 |

Investments:
Non-mortgage-related securities:

| | | |
|---|---|---|
| Available-for-sale, at fair value | 35,101 | 45,586 |
| Securities purchased under agreements to resell and federal funds sold | 6,562 | 23,028 |
| Cash and investments | 50,237 | 79,973 |
| Accounts and other receivables, net | 5,003 | 5,073 |
| Derivative assets, net | 827 | 665 |
| Guarantee asset, at fair value | 9,591 | 7,389 |
| Real estate owned, net | 1,736 | 743 |
| Deferred tax asset | 10,304 | 4,346 |
| Other assets | 6,884 | 6,788 |
| Total assets | $794,368 | $804,910 |

**Liabilities and stockholders' equity**

*Debt securities, net*
Senior debt:

| | | |
|---|---|---|
| Due within one year | $295,921 | $285,264 |
| Due after one year | 438,147 | 452,677 |
| Subordinated debt, due after one year | 4,489 | 6,400 |
| Total debt securities, net | 738,557 | 744,341 |
| Due to Participation Certificate investors | — | 11,123 |
| Accrued interest payable | 7,864 | 8,307 |
| Guarantee obligation | 13,712 | 9,482 |
| Derivative liabilities, net | 582 | 165 |
| Reserve for guarantee losses on Participation Certificates | 2,566 | 550 |
| Other liabilities | 4,187 | 3,512 |
| Total liabilities | 767,468 | 777,480 |

Commitments and contingencies (Notes 1, 2, 3, 12 and 13)

| | | |
|---|---|---|
| Minority interests in consolidated subsidiaries | 176 | 516 |

*Stockholders' equity*

| | | |
|---|---|---|
| Preferred stock, at redemption value | 14,109 | 6,109 |
| Common stock, $0.21 par value, 806,000,000 and 726,000,000 shares authorized, respectively, 725,863,886 shares issued and 646,266,701 and 661,254,178 shares outstanding, respectively | 152 | 152 |
| Additional paid-in capital | 871 | 962 |
| Retained earnings | 26,909 | 31,372 |

Accumulated other comprehensive income (loss), or AOCI, net of taxes, related to:

| | | |
|---|---|---|
| Available-for-sale securities | (7,040) | (3,332) |
| Cash flow hedge relationships | (4,059) | (5,032) |
| Defined benefit plans | (44) | (87) |
| Total AOCI, net of taxes | (11,143) | (8,451) |
| Treasury stock, at cost, 79,597,185 shares and 64,609,708 shares, respectively | (4,174) | (3,230) |
| Total stockholders' equity | 26,724 | 26,914 |
| Total liabilities and stockholders' equity | $794,368 | $804,910 |

·

*The accompanying notes are an integral part of these financial statements.*

*Freddie Mac*

FREDDIE MAC
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | | | Adjusted | | |
| | 2007 | | 2006 | | 2005 | |
| | Shares | Amount | Shares | Amount | Shares | Amount |
| | | | (in millions) | | | |
| *Preferred stock, at redemption value* | | | | | | |
| Balance, beginning of year | 132 | $ 6,109 | 92 | $ 4,609 | 92 | $ 4,609 |
| Preferred stock issuances | 344 | 8,600 | 40 | 1,500 | — | — |
| Preferred stock redemptions | (12) | (600) | — | — | — | — |
| *Preferred stock, end of year* | 464 | 14,109 | 132 | 6,109 | 92 | 4,609 |
| *Common stock, par value* | | | | | | |
| Balance, beginning of year | 726 | 152 | 726 | 152 | 726 | 152 |
| *Common stock, end of year* | 726 | 152 | 726 | 152 | 726 | 152 |
| *Additional paid-in capital* | | | | | | |
| Balance, beginning of year | | 962 | | 924 | | 873 |
| Stock-based compensation | | 81 | | 60 | | 67 |
| Income tax benefit from stock-based compensation | | — | | 9 | | 6 |
| Preferred stock issuance costs | | (116) | | (15) | | — |
| Common stock issuances | | (42) | | (15) | | (13) |
| Real Estate Investment Trust, or REIT, preferred stock repurchase | | (14) | | (1) | | (9) |
| *Additional paid-in capital, end of year* | | 871 | | 962 | | 924 |
| *Retained earnings* | | | | | | |
| Balance, beginning of year, as previously reported | | | | | | 30,728 |
| Beginning balance adjustments, net of taxes | | | | | | (904) |
| Balance, beginning of year, as adjusted before cumulative effect of change in accounting principle | | 31,372 | | 30,638 | | 29,824 |
| Cumulative effect of change in accounting principle, net of taxes | | 181 | | (13) | | — |
| Balance, beginning of year, as adjusted | | 31,553 | | 30,625 | | 29,824 |
| Net income (loss) | | (3,094) | | 2,327 | | 2,113 |
| Preferred stock dividends declared | | (398) | | (270) | | (223) |
| Common stock dividends declared | | (1,152) | | (1,310) | | (1,076) |
| *Retained earnings, end of year* | | 26,909 | | 31,372 | | 30,638 |
| *AOCI, net of taxes* | | | | | | |
| Balance, beginning of year, as previously reported | | | | | | (3,593) |
| Beginning balance adjustments, net of taxes | | | | | | (587) |
| Balance, beginning of year, as adjusted before cumulative effect of change in accounting principle | | (8,451) | | (9,352) | | (4,180) |
| Changes in unrealized gains (losses) related to available-for-sale securities, net of reclassification adjustments | | (3,708) | | (267) | | (6,816) |
| Changes in unrealized gains (losses) related to cash flow hedge relationships, net of reclassification adjustments | | 973 | | 1,254 | | 1,637 |
| Changes in defined benefit plans | | 43 | | (2) | | 7 |
| Change in other comprehensive income, net of taxes, net of reclassification adjustments | | (2,692) | | 985 | | (5,172) |
| Adjustment to initially apply Statement of Financial Accounting Standard, or SFAS, No. 158, net of tax | | — | | (84) | | — |
| *AOCI, net of taxes, end of year* | | (11,143) | | (8,451) | | (9,352) |
| *Treasury stock, at cost* | | | | | | |
| Balance, beginning of year | 65 | (3,230) | 33 | (1,280) | 35 | (1,353) |
| Common stock issuances | (1) | 56 | (1) | 50 | (2) | 73 |
| Common stock repurchases | 16 | (1,000) | 33 | (2,000) | — | — |
| *Treasury stock, end of year* | 80 | (4,174) | 65 | (3,230) | 33 | (1,280) |
| *Total stockholders' equity* | | $26,724 | | $26,914 | | $25,691 |
| *Comprehensive income (loss)* | | | | | | |
| Net income (loss) | | $(3,094) | | $ 2,327 | | $ 2,113 |
| Changes in other comprehensive income, net of taxes, net of reclassification adjustments | | (2,692) | | 985 | | (5,172) |
| *Total comprehensive income (loss)* | | $(5,786) | | $ 3,312 | | $(3,059) |

*The accompanying notes are an integral part of these financial statements.*

*Freddie Mac*

## FREDDIE MAC
## CONSOLIDATED STATEMENTS OF CASH FLOWS

|  | Year Ended December 31, | | |
|  | | Adjusted | |
|  | 2007 | 2006 | 2005 |
|  | | (in millions) | |
| **Cash flows from operating activities** | | | |
| Net income (loss) | $ (3,094) | $ 2,327 | $ 2,113 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Cumulative effect of change in accounting principle, net | — | — | 59 |
| Hedge accounting gains | — | (2) | (22) |
| Derivative losses | 2,231 | 1,262 | 977 |
| Asset related amortization — premiums, discounts and basis adjustments | (91) | 128 | 871 |
| Debt related amortization — premiums and discounts on certain debt securities and basis adjustments | 10,894 | 11,176 | 9,149 |
| Net discounts paid on retirements of debt | (8,405) | (7,429) | (5,206) |
| Gains on debt retirement | (345) | (466) | (206) |
| Provision for credit losses | 2,854 | 296 | 311 |
| Low-income housing tax credit partnerships | 469 | 407 | 320 |
| Losses on loans purchased | 1,865 | 148 | — |
| (Gains) losses on investment activity | (305) | 538 | 267 |
| Foreign-currency (gains) losses, net | 2,348 | (96) | 6 |
| Deferred income taxes | (3,943) | (1,012) | (1,462) |
| Purchases of held-for-sale mortgages | (21,678) | (18,352) | (26,763) |
| Sales of held-for-sale mortgages | 19,545 | 18,710 | 23,669 |
| Repayments of held-for-sale mortgages | 138 | 104 | 118 |
| Due to PCs and Structured Securities Trust | 946 | | |
| Change in trading securities | (1,922) | 1,085 | 2,594 |
| Change in accounts and other receivables, net | (711) | (763) | 28 |
| Change in amounts due to Participation Certificate investors, net | (10,624) | 302 | (3,121) |
| Change in accrued interest payable | (263) | 718 | 331 |
| Change in income taxes payable | 134 | (282) | 607 |
| Change in guarantee asset, at fair value | (2,203) | (1,125) | (726) |
| Change in guarantee obligation | 4,245 | 1,536 | 1,779 |
| Other, net | 565 | (473) | 449 |
| Net cash provided by (used for) operating activities | (7,350) | 8,737 | 6,142 |
| **Cash flows from investing activities** | | | |
| Purchases of available-for-sale securities | (319,213) | (386,407) | (414,062) |
| Proceeds from sales of available-for-sale securities | 109,973 | 86,737 | 95,029 |
| Proceeds from maturities of available-for-sale securities | 219,047 | 305,329 | 249,875 |
| Purchases of held-for-investment mortgages | (25,059) | (15,382) | (12,826) |
| Repayments of held-for-investment mortgages | 9,177 | 10,466 | 11,893 |
| Proceeds from mortgage insurance and sales of real estate owned | 1,798 | 1,486 | 1,679 |
| Net (increase) decrease in securities purchased under agreements to resell and Federal funds sold | 16,466 | (7,869) | 17,038 |
| Derivative premiums and terminations and swap collateral, net | (2,484) | 910 | (6,859) |
| Investments in low-income housing tax credit partnerships | (158) | (161) | (127) |
| Net cash provided by (used for) investing activities | 9,547 | (4,891) | (58,360) |
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of short-term debt | 1,016,933 | 750,201 | 857,364 |
| Repayments of short-term debt | (986,489) | (767,427) | (854,665) |
| Proceeds from issuance of long-term debt | 183,161 | 177,361 | 153,504 |
| Repayments of long-term debt | (222,541) | (159,204) | (125,959) |
| Repayments of minority interest in consolidated subsidiaries | — | (468) | (435) |
| Repurchase of Real Estate Investment Trust preferred stock | (320) | (27) | (142) |
| Proceeds from the issuance of preferred stock | 8,484 | 1,485 | — |
| Redemption of preferred stock | (600) | — | — |
| Proceeds from issuance of common stock | 14 | 36 | 59 |
| Repurchases of common stock | (1,000) | (2,000) | — |
| Payment of cash dividends on preferred stock and common stock | (1,553) | (1,579) | (1,299) |
| Excess tax benefits associated with stock-based awards | 5 | 14 | — |
| Payments of low-income housing tax credit partnerships notes payable | (1,068) | (1,382) | (940) |
| Increase (decrease) in cash overdraft | (8) | 35 | (54) |
| Net cash provided by (used for) financing activities | (4,982) | (2,955) | 27,433 |
| Net increase (decrease) in cash and cash equivalents | (2,785) | 891 | (24,785) |
| Cash and cash equivalents at beginning of year | 11,359 | 10,468 | 35,253 |
| Cash and cash equivalents at end of year | $ 8,574 | $ 11,359 | $ 10,468 |
| **Supplemental cash flow information** | | | |
| Cash paid (received) for: | | | |
| Debt interest | $ 37,473 | $ 33,973 | $ 27,186 |
| Swap collateral interest | 445 | 479 | 322 |
| Derivative interest carry, net | (1,070) | 325 | (590) |
| Income taxes | 927 | 1,250 | 1,212 |
| Non-cash investing and financing activities: | | | |
| Held-for-sale mortgages securitized and retained as available-for-sale securities | 169 | 13 | 175 |
| Transfers from mortgage loans to real estate owned | 3,130 | 1,603 | 1,517 |
| Investments in low-income housing tax credit partnerships financed by notes payable | 286 | 324 | 1,095 |
| Transfers from held-for-sale mortgages to held-for-investment mortgages | 41 | 123 | 291 |
| Transfers from held-for-investment mortgages to held-for-sale mortgages | — | 950 | — |
| Transfers from retained portfolio Participation Certificates to held-for-investment mortgages | 2,229 | 1,304 | 1,354 |

*The accompanying notes are an integral part of these financial statements.*

*Freddie Mac*

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

We are a stockholder-owned government-sponsored enterprise, or GSE, established by Congress in 1970 to provide a continuous flow of funds for residential mortgages. Our obligations are ours alone and are not insured or guaranteed by the U.S. government, or any other agency or instrumentality of the U.S. We play a fundamental role in the U.S. housing finance system, linking the domestic mortgage market and the global capital markets. Our participation in the secondary mortgage market includes providing our credit guarantee for residential mortgages originated by mortgage lenders and investing in mortgage loans and mortgage-related securities that we hold in our retained portfolio. Through our credit guarantee activities, we securitize mortgage loans by issuing Mortgage Participation Certificates, or PCs, to third-party investors. We also resecuritize mortgage-related securities that are issued by us or the Government National Mortgage Association, or Ginnie Mae, as well as non-agency entities. We also guarantee multifamily mortgage loans that support housing revenue bonds issued by third parties and we guarantee other mortgage loans held by third parties. Securitized mortgage-related assets that back PCs and Structured Securities that are held by third parties are not reflected as our assets. In return for providing our guarantee on issued PCs and Structured Securities, we may earn a management and guarantee fee that is paid to us over the life of the related PCs and Structured Securities. Our obligation to guarantee the payment of principal and interest on issued PCs and Structured Securities usually results in the recognition of a guarantee asset and guarantee obligation.

Our financial reporting and accounting policies conform to U.S. generally accepted accounting principles, or GAAP. Effective December 31, 2007, we retrospectively applied certain changes to our accounting methods to other allowable methods considered preferable under GAAP. Our current accounting policies are described below; see "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES" for additional information. Certain amounts in prior periods have been reclassified to conform to the current presentation. We evaluate the materiality of identified errors in the financial statements using both an income statement, or "rollover," and a balance sheet, or "iron-curtain," approach, based on relevant quantitative and qualitative factors. Our approach is consistent with the Securities and Exchange Commission's Staff Accounting Bulletin No. 108, "Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements," or SAB 108, which is effective for the years ended December 31, 2007 and 2006.

### Estimates

The preparation of financial statements requires us to make estimates and assumptions that affect (a) the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and (b) the reported amounts of revenues and expenses and gains and losses during the reporting period. Actual results could differ from those estimates.

Our estimates and judgments include, but are not limited to the following:

- estimating fair value for financial instruments (See "NOTE 16: FAIR VALUE DISCLOSURES" for a discussion of our fair value estimates);
- estimating the expected amounts of forecasted issuances of debt;
- establishing the allowance for loan losses on loans held-for-investment and the reserve for guarantee losses on PCs;
- applying the static effective yield method of amortizing our guarantee obligation into earnings based on forecasted unpaid principal balances, which requires adjustment when significant changes in economic events cause a shift in the pattern of our economic release from risk;
- applying the effective interest method, which requires estimates of the expected future amounts of prepayments of mortgage-related assets; and
- assessing when impairments should be recognized on investments in securities.

### Consolidation and Equity Method of Accounting

The consolidated financial statements include our accounts and those of our subsidiaries. The equity and net earnings attributable to the minority shareholder interests in our consolidated subsidiaries are reported separately on our consolidated balance sheets as minority interests in consolidated subsidiaries and in the consolidated statements of income as minority interests in earnings of consolidated subsidiaries. All material intercompany transactions have been eliminated in consolidation.

For each entity with which we are involved, we determine whether the entity should be considered a subsidiary and thus consolidated in our financial statements. These subsidiaries include entities in which we hold more than 50% of the voting rights or over which we have the ability to exercise control. Accordingly, we consolidate our two majority-owned REITs, Home Ownership Funding Corporation and Home Ownership Funding Corporation II.

The other subsidiaries consisted of variable interest entities, or VIEs, in which we are the primary beneficiary.

A VIE is an entity (a) that has a total equity investment at risk that is not sufficient to finance its activities without additional subordinated financial support provided by any parties or (b) where the group of equity holders does not have (i) the ability to make significant decisions about the entity's activities, (ii) the obligation to absorb the entity's expected losses or (iii) the right to receive the entity's expected residual returns. We are considered the primary beneficiary of a VIE and thus consolidate the VIE when we absorb a majority of its expected losses, receive a majority of its expected residual returns (unless another enterprise receives this majority), or both. We determine if we are the primary beneficiary when we become involved in the VIE. If we are the primary beneficiary, we reconsider this decision when we sell or otherwise dispose of all or part of our variable interests to unrelated parties or if the VIE issues new variable interests to parties other than us or our related parties. Conversely, if we are not the primary beneficiary, we reconsider this decision when we acquire additional variable interests in these entities. See "NOTE 3: VARIABLE INTEREST ENTITIES" for more information. We regularly invest as a limited partner in qualified low-income housing tax credit, or LIHTC, partnerships that are eligible for federal tax credits and that mostly are VIEs. We are the primary beneficiary for certain of these LIHTC partnerships.

We use the equity method of accounting for entities over which we have the ability to exercise significant influence, but not control, such as (a) entities that are not VIEs and (b) VIEs in which we have variable interests but are not the primary beneficiary. We report our recorded investment as part of other assets on our consolidated balance sheets and recognize our share of the entity's net income or losses in the consolidated statements of income as non-interest income (loss), with an offset to the recorded investment. Our share of losses is recognized only until the recorded investment is reduced to zero, unless we have guaranteed the obligations of or otherwise committed to provide further financial support to these entities. We periodically review these investments for impairment and adjust them to fair value when a decline in market value below the recorded investment is deemed to be other-than-temporary.

In applying the equity method of accounting to the LIHTC partnerships where we are not the primary beneficiaries, our obligations to make delayed equity contributions that are unconditional and legally binding are recorded at their present value in other liabilities on the consolidated balance sheets. In addition, to the extent our recorded investment in qualified LIHTC partnerships differs from the book basis reflected at the partnership level, the difference is amortized over the life of the tax credits and included in our share of earnings (losses) from housing tax credit partnerships. Any impairment losses under the equity method for these LIHTC partnerships are included in our consolidated statements of income as part of non-interest expense — low-income housing tax credit partnerships.

### Cash and Cash Equivalents and Statements of Cash Flows

Highly liquid investment securities that have an original maturity of three months or less and are used for cash management purposes are accounted for as cash equivalents. In addition, cash collateral we obtained from counterparties to derivative contracts where we are in a net unrealized gain position is recorded as cash and cash equivalents. The vast majority of the cash and cash equivalents balance is interest-bearing in nature.

In the consolidated statements of cash flows, cash flows related to the acquisition and termination of derivatives other than forward commitments were generally classified in investing activities, without regard to whether the derivatives are designated as a hedge of another item. Cash flows from commitments accounted for as derivatives that result in the acquisition or sale of mortgage securities or mortgage loans are classified in either: (a) operating activities for trading securities or mortgage loans classified as held-for-sale, or (b) investing activities for available-for-sale securities or mortgage loans classified as held-for-investment. Cash flows related to mortgage loans classified as held-for-sale are classified in operating activities until the loans have been securitized and retained as available-for-sale PCs, at which time the cash flows are classified as investing activities. Cash flows related to guarantee fees, including buy-up and buy-down payments, are classified as operating activities, along with the cash flows related to the collection and distribution of payments on the mortgage loans underlying PCs. Buy-up and buy-down payments are discussed further below in "Swap-Based Issuances of PCs and Structured Securities."

### Transfers of PCs and Structured Securities that Qualify as Sales

Upon completion of a transfer of a financial asset that qualifies as a sale under SFAS No. 140, "*Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities, a replacement of Financial Accounting Standards Board, or FASB, Statement No. 125,*" or SFAS 140, we de-recognize all assets sold and recognize all assets obtained and liabilities incurred. Upon sale, we recognize the fair value of our obligation to guarantee the payment of principal and interest of PCs and Structured Securities transferred in sale transactions. The portion of such obligation that relates to our non-contingent obligation to stand ready to perform under our guarantee is recognized as a guarantee obligation, while the portion of the obligation that relates to estimated incurred losses on securitized assets is recognized for

consolidated balance sheet purposes as reserve for guarantee losses on PCs. The resulting gain (loss) on sale of transferred PCs and Structured Securities is reflected in our consolidated statements of income as a component of gains (losses) on investment activity.

In recording a sales transaction, we also continue to carry on our consolidated balance sheets any retained interests in securitized financial assets. Such retained interests include our right to receive management and guarantee fees on PCs or Structured Securities, which is classified on our consolidated balance sheets as a guarantee asset. The carrying amount of all such retained interests is determined by allocating the previous carrying amount of the transferred assets between assets sold and the retained interests based upon their relative fair values at the date of transfer. Other retained interests include PCs or Structured Securities that are not transferred to third parties upon the completion of a securitization or resecuritization transaction.

## Swap-Based Issuances of PCs and Structured Securities

We issue PCs and Structured Securities through cash-based sales transactions and through various swap-based exchanges. In the case of PC-based swaps, we issue such securities to third parties through Guarantor and MultiLender Swap transactions. Guarantor Swaps are transactions in which financial institutions transfer mortgage loans to us in exchange for PCs we issue that are backed by such mortgage loans. MultiLender Swaps are similar to Guarantor Swaps, except that formed pools include loans that are contributed by more than one other party or by us. In Guarantor and MultiLender Swaps, as in sales transactions, in return for providing our guarantee, we earn a guarantee fee that is paid to us over the life of an issued PC. It is also common for buy-up or buy-down payments to be exchanged between our counterparties and us upon the issuance of a PC. Buy-ups are upfront payments made by us that increase the guarantee fee we will receive over the life of the PC. Buy-downs are upfront payments that are made to us that decrease (*i.e.*, partially prepay) the guarantee fee we will receive over the life of the PC. We may also receive upfront, cash-based payments as additional compensation for our guarantee of mortgage loans, referred to as credit fees. As additional consideration received on swap-based exchanges, we may receive various types of seller-provided credit enhancements related to the underlying mortgage loans. We also issue and transfer Structured Securities to third parties in exchange for PCs and non-Freddie Mac mortgage-related securities.

We recognize the fair value of our contractual right to receive guarantee fees as a guarantee asset at the inception of an executed guarantee. Additionally, at inception of an executed guarantee, we recognize a guarantee obligation at fair value. Similar to transfers of PCs and Structured Securities that qualify as sales, that portion of our estimated guarantee liability that relates to our non-contingent obligation to stand ready to perform under a PC guarantee is recognized as guarantee obligation, while that portion of such estimated guarantee liability that relates to our contingent obligation to make payments under our guarantee is recognized on our consolidated balance sheets as reserve for guarantee losses on Participation Certificates. Credit enhancements received in connection with Guarantor Swaps and other similar exchange transactions of PCs are measured at fair value and recognized as follows: (a) pool insurance is recognized as an other asset; (b) recourse and/or indemnifications that are provided by counterparties to Guarantor Swap transactions are recognized as other assets; and (c) primary loan-level mortgage insurance is recognized at inception as a component of the recognized guarantee obligation.

Because guarantee asset, guarantee obligation and credit enhancement-related assets are valued independently of each other, net differences between these recognized assets and liabilities may exist at inception. If the amount of the guarantee asset plus the credit enhancement-related assets is greater than the total amount of the guarantee obligation, the difference between such amounts is deferred on our consolidated balance sheets as a component of guarantee obligation and referred to as deferred guarantee income. If the amount of the guarantee asset and the credit enhancement-related assets is less than the total amount of the guarantee obligation, the difference between such amounts is expensed immediately to earnings as a component of non-interest expense — losses on certain credit guarantees. Additionally, cash payments that are made or received in connection with buy-ups and buy-downs are recognized as adjustments of recognized deferred guarantee income. Likewise, credit fees that we receive at inception are also recognized as adjustments of recognized deferred guarantee income.

We account for a portion of PCs that we issue through our MultiLender Swap Program in the same manner as transfers that are accounted for as sales if we contribute collateral. The remaining portion of such PC issuances is accounted for in a manner consistent with the accounting for PCs issued through the Guarantor Swap program.

For Structured Securities that we issue to third parties in exchange for PCs and non-Freddie Mac mortgage-related securities, we generally do not recognize any incremental guarantee asset or guarantee obligation. Rather, we defer and amortize into income on a straight-line basis that portion of the transaction fee that we receive that relates to the estimated fair value of our future administrative responsibilities for issued Structured Securities. In cases where we retain portions of Structured Securities issued in such transactions, a portion of the received transaction fee is deferred as a carrying value adjustment of retained Structured Securities. The balance of transaction fees received, which relates to compensation earned

in connection with structuring-related services we rendered to third parties, is recognized immediately in earnings as other non-interest income.

### Subsequent Measurement of Recognized Guarantee-Related Assets and Liabilities

#### Recognized Guarantee Asset

We account for a guarantee asset like a debt instrument classified as trading under SFAS No. 115, "*Accounting for Certain Investments in Debt and Equity Securities,*" or SFAS 115. Changes in the fair value of the recognized guarantee asset are reflected in earnings as a component of gains (losses) on guarantee asset. Cash collections of our contractual guarantee fee reduce the value of the guarantee asset. All guarantee-related compensation that is received over the life of the loan in cash is reflected in earnings as a component of management and guarantee income.

#### Recognized Guarantee Obligation

We amortize our guarantee obligation under the static effective yield method. The static effective yield will be calculated and fixed at inception of the guarantee based on forecasted unpaid principal balances. The static effective yield will be evaluated and adjusted when significant changes in economic events cause a shift in the pattern of our economic release from risk. For example, certain market environments may lead to sharp and sustained changes in home prices or prepayments of mortgages, leading to the need for an adjustment in the static effective yield for specific mortgage pools underlying the guarantee. When a change is required, a cumulative catch-up adjustment, which could be significant in a given period, will be recognized and a new static effective yield will be used to determine our guarantee obligation amortization. The resulting recorded amortization reflects our economic release from risk under changing economic scenarios. Periodic amortization of both our performance obligation and deferred income are reflected as components of the income on guarantee obligation. Separately, the subsequent measurement of our contingent obligation to make guarantee payments is further discussed below in "Allowance for Loan Losses and Reserve for Guarantee Losses."

See "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES" for further information regarding our guarantee obligation.

#### Recognized Credit Enhancements

Credit enhancements that are separately recognized as other assets are amortized into earnings as other non-interest expense under the static effective yield method in the same manner as our guarantee obligation. Recurring insurance premiums are recorded at the amount paid and amortized over their contractual life and, if provided quarterly, then the amortization period is three months.

### Due to Participation Certificate Investors

Beginning December 2007 we introduced separate legal entities, trusts, into our securities issuance process for the purpose of managing the receipt and payments of cash flow of our PCs and Structured Securities. In connection with the establishment of these trusts, we also established a separate custodial account in which cash remittances received on the underlying assets of our PCs and Structured Securities are deposited. These cash remittances include both scheduled and unscheduled principal and interest payments. The funds held in this account are segregated and are not commingled with our general operating funds. As securities administrator, we invest the cash held in the custodial account, pending distribution to our PC and Structured Securities holders, in short-term, risk-free investments and are entitled to trust management fees on the trust's assets which was recorded as other non-interest income. The funds are maintained in this separate custodial account until they are due to the PC and Structured Securities holders on their respective security payment dates.

Prior to December 2007, we managed the timing differences that exist for cash receipts from servicers on assets underlying our PCs and Structured Securities and the subsequent pass through of those payments on PCs owned by third-party investors. In those cases, the PC balances were not reduced for payments of principal received from servicers in a given month until the first day of the next month and we did not release the cash received (principal and interest) to the PC investors until the fifteenth day of that next month. We generally invested the principal and interest amounts we received in short-term investments from the time the cash was received until the time we paid the PC investors. In addition, for unscheduled principal prepayments on loans underlying our PCs and Structured Securities, these timing differences resulted in expenses, since the related PCs continued to bear interest due to the PC investor at the PC coupon rate from the date of prepayment until the date the PC security balance is reduced, while no interest is received from the mortgage on that prepayment amount during that period. The expense recognized upon prepayment was reported in interest expense — due to Participation Certificate investors. We report PC coupon interest amounts relating to our investment in PCs consistent with the method used for PCs held by third party investors.

121                                                                                                                          *Freddie Mac*

## Mortgage Loans

Upon loan acquisition, we classify the loan as either held-for-sale or held-for-investment. Mortgage loans that we have the ability and intent to hold for the foreseeable future are classified as held-for-investment. Held-for-investment mortgage loans are reported at their outstanding unpaid principal balances, net of deferred fees and cost basis adjustments (including unamortized premiums and discounts). These deferred items are amortized into interest income over the estimated lives of the mortgages using the effective interest method. We use actual prepayment experience and estimates of future prepayments to determine the constant yield needed to apply the effective interest method. For purposes of estimating future prepayments, the mortgages are aggregated by similar characteristics such as origination date, coupon and maturity. We recognize interest on mortgage loans on an accrual basis, except when we believe the collection of principal or interest is not probable.

Mortgage loans not classified as held-for-investment are classified as held-for-sale. Held-for-sale mortgages are reported at lower-of-cost-or-market, on a portfolio basis, with gains and losses reported in gains (losses) on investment activity. Premiums and discounts on loans classified as held-for-sale are not amortized during the period that such loans are classified as held-for-sale.

## Allowance for Loan Losses and Reserve for Guarantee Losses

We maintain an allowance for loan losses on mortgage loans held-for-investment and a reserve for guarantee losses on PCs, collectively referred to as our loan loss reserves, to provide for credit losses when it is probable that a loss has been incurred. The held-for-investment loan portfolio is shown net of the allowance for loan losses on the consolidated balance sheets. The reserve for guarantee losses is a liability account on our consolidated balance sheets. Increases in loan loss reserves are reflected in earnings as the provision for credit losses, while decreases are reflected through charging-off such balances (net of recoveries) when realized losses are recorded or as a reduction in the provision for credit losses. For both single-family and multifamily mortgages where the original terms of the mortgage loan agreement are modified, resulting in a concession to the borrower experiencing financial difficulties, losses are recorded at the time of modification and the loans are subsequently accounted for as troubled debt restructurings, or TDRs.

We estimate credit losses related to homogeneous pools of single-family and multifamily loans in accordance with SFAS No. 5, *"Accounting for Contingencies"* or SFAS 5. In accordance with SFAS 5, we recognize credit losses when it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated. We also estimate credit losses in accordance with SFAS No. 114,*"Accounting by Creditors for Impairment of a Loan"* or SFAS 114. Loans evaluated under SFAS 114, include single-family loans and multifamily loans whose contractual terms have previously been modified due to credit concerns (including TDRs), certain multifamily loans with observable collateral deficiencies or that become 60 days past due for principal and interest. In accordance with SFAS 114, we consider all available evidence, such as the present value of discounted expected future cash flows, the fair value of collateral for collateral dependent loans, and third-party credit enhancements, when establishing the loan loss reserves. Determining the adequacy of the loan loss reserves is a complex process that is subject to numerous estimates and assumptions requiring significant judgment. Loans not deemed to be impaired under SFAS 114 are grouped with other loans that share common characteristics for evaluation under SFAS 5.

### Single-Family Loan Portfolio

We estimate loan loss reserves on homogeneous pools of single-family loans using statistically based models that evaluate a variety of factors. The homogeneous pools of single-family mortgage loans are determined based on common underlying characteristics, including year of origination, loan-to-value ratio and geographic region. In determining the loan loss reserves for single-family loans at the balance sheet date, we evaluate factors including, but not limited to:

- the year of loan origination;
- geographic location;
- actual and estimated amounts for loss severity trends for similar loans;
- default experience;
- expected ability to partially mitigate losses through a level of estimated successful loan modification or other alternatives to foreclosure;
- expected proceeds from credit enhancements, including primary mortgage insurance, a seller's agreement to repurchase or replace any mortgage in default and other loss mitigation activities;

- pre-foreclosure real estate taxes and insurance; and
- estimated selling costs should the underlying property ultimately be sold.

Our credit loss reserves reflect our best estimates of incurred losses. Our reserve estimate includes projections related to strategic loss mitigation activities, including a higher rate of loan modifications for troubled borrowers, and projections of recoveries through repurchases by seller/servicers of defaulted loans due to failure to follow contractual underwriting requirements at the time of the loan origination.

Our reserve estimate also reflects our best projection of defaults we believe are likely to occur as a result of loss events that have occurred through December 31, 2007. However, the unprecedented deterioration in the national housing market and the uncertainty in other macro economic factors makes forecasting of default rates increasingly imprecise.

The inability to realize the benefits of our loss mitigation plans, a lower realized rate of seller/servicer repurchases or default rates that exceed our current projections will cause our losses to be significantly higher than those currently estimated.

We validate and update the models and factors to capture changes in actual loss experience, as well as changes in underwriting practices and in our loss mitigation strategies. We also consider macroeconomic and other factors that impact the quality of the portfolio including regional housing trends, applicable home price indices, unemployment and employment dislocation trends, consumer credit statistics and the extent of third party insurance. We determine our loan loss reserves based on our assessment of these factors.

### Multifamily Loan Portfolio

We estimate loan loss reserves on the multifamily loan portfolio based on all available evidence, including but not limited to, adequacy of third-party credit enhancements, evaluation of the repayment prospects, and fair value of collateral underlying the individual loans. The review of the repayment prospects and value of collateral underlying individual loans is based on property-specific and market-level risk characteristics including apartment vacancy and rental rates.

### Non-Performing Loans

Non-performing loans consist of: (a) loans whose terms have been modified due to previous delinquency or risk of delinquency (b) serious delinquencies and (c) non-accrual loans. Serious delinquencies are those single-family loans that are 90 days or more past due or in foreclosure, and multifamily loans that are more than 60 days past due or in foreclosure. Non-performing loans generally accrue interest in accordance with their contractual terms unless they are in non-accrual status. Non-accrual loans are loans where interest income is recognized on a cash basis, and includes single-family and multifamily loans 90 days or more past due.

### Impaired Loans

A loan is considered impaired when it is probable to not receive all amounts due (principal and interest), in accordance with the contractual terms of the original loan agreement. Impaired loans include single-family loans, both performing and non-performing, that are troubled debt restructurings, delinquent loans purchased from PC pools whose fair value was less than acquisition cost at the date of purchase and loans subject to AICPA Statement of Position 03-3, *"Accounting for Certain Loans or Debt Securities Acquired in a Transfer"* or SOP 03-3. Multifamily impaired loans include loans whose contractual terms have previously been modified due to credit concerns (including TDRs), certain loans with observable collateral deficiencies and loans 60 days or more past due (except for certain credit-enhanced loans).

We have the option to purchase mortgage loans out of PC pools under certain circumstances, such as to resolve an existing or impending delinquency or default. Through November 2007, our general practice was to purchase the mortgage loans out of pools after the loans were 120 days delinquent. Effective December 2007, our general practice was changed to purchase loans from pools when the loans have been modified or foreclosure sales occur, or when the loans have been delinquent for 24 months, unless we determine it is economically beneficial to do so sooner. Loans that are purchased from PC pools held by third parties are recorded on our consolidated balance sheets at fair value at the date of purchase and are subsequently carried at amortized cost. We record realized losses on loans purchased when, upon purchase, the fair value is less than the unpaid principal balance, net of related reserves. Recoveries on loans impaired upon purchase represent the recapture into income of basis adjustments recorded upon purchases of delinquent loans from our PCs and Structured Securities in conjunction with our guarantee activities. These basis adjustments were previously reflected on our income statements as expenses through a combination of provision for credit losses and losses on loans purchased. Recoveries occur when a non-performing loan is repaid in full or when at the time of foreclosure the estimated fair value of the acquired property, less costs to sell, exceeds the carrying value of the loan. For impaired loans where the borrower has made required payments that return to current status, the basis adjustments are accreted into interest income over time, as periodic payments are received.

**Investments in Securities**

Investments in securities consist primarily of mortgage-related securities. We classify securities as "available-for-sale" or "trading." We currently do not classify any securities as "held-to-maturity" although we may elect to do so in the future. Securities classified as available-for-sale and trading are reported at fair value with changes in fair value included in Accumulated other comprehensive income (loss), net of taxes, or AOCI, net of taxes, and gains (losses) on investment activity, respectively. See "NOTE 16: FAIR VALUE DISCLOSURES" for more information on how we determine the fair value of securities.

We record forward purchases and sales of securities that are specifically exempt from the requirements of SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," or SFAS 133, on a trade date basis. Securities underlying forward purchases and sales contracts that are not exempt from the requirements of SFAS 133 are recorded on the contractual settlement date with a corresponding commitment recorded on the trade date.

We often retain Structured Securities created through resecuritizations of mortgage-related securities held by us. The new Structured Securities we acquire in these transactions are classified as available-for-sale or trading based upon the predominant classification of the mortgage-related security collateral we contributed.

For most of our investments in securities, interest income is recognized using the retrospective effective interest method. Deferred items, including premiums, discounts and other basis adjustments, are amortized into interest income over the estimated lives of the securities. We use actual prepayment experience and estimates of future prepayments to determine the constant yield needed to apply the effective interest method. We recalculate the constant effective yield based on changes in estimated prepayments as a result of changes in interest rates and other factors. When the constant effective yield changes, an adjustment to interest income is made for the amount of amortization that would have been recorded if the new effective yield had been applied since the mortgage assets were acquired.

For certain securities investments, interest income is recognized using the prospective effective interest method. We specifically apply this accounting to beneficial interests in securitized financial assets that (a) can contractually be prepaid or otherwise settled in such a way that we may not recover substantially all of our recorded investment or (b) are not of high credit quality at the acquisition date. We recognize as interest income (over the life of these securities) the excess of all estimated cash flows attributable to these interests over their principal amount using the effective yield method. We update our estimates of expected cash flows periodically and recognize changes in calculated effective yield on a prospective basis.

We review securities for potential impairment on an ongoing basis. This review considers a number of factors, including the severity of the decline in fair value, credit ratings, the length of time the investment has been in an unrealized loss position, and the likelihood of sale in the near term. While market prices and rating agency actions are factors that are considered in the impairment analysis, cash flow analysis based on default and prepayment assumptions serves as an important factor in determining if an other than temporary impairment has occurred. We recognize impairment losses when quantitative and qualitative factors indicate that it is probable that the security will suffer a contractual principal loss or interest shortfall. We also recognize impairment when qualitative factors indicate that it is likely we will not recover the unrealized loss. When evaluating these factors, we consider our intent and ability to hold the investment until a point in time at which recovery of the unrealized loss can be reasonably expected to occur. Impairment losses on manufactured housing securities exclude the effects of separate financial guarantee contracts that are not embedded in the securities because the benefits of such contracts are not recognized until claims become probable of recovery under the contracts. We resecuritize securities held in our retained portfolio and we typically retain the majority of the cash flows from resecuritization transactions in the form of Structured Securities. Certain securities in our retained portfolio have a high probability of being resecuritized and therefore, for those in an unrealized loss position, we may not have the intent to hold for a period of time sufficient to recover those unrealized losses. In that case, the impairment is deemed other-than-temporary. For certain securities meeting the criteria of (a) or (b) in the preceding paragraph, other than-temporary impairment is defined as occurring whenever there is an adverse change in estimated future cash flows coupled with a decline in fair value below the amortized cost basis. When a security is deemed to be other-than-temporarily impaired, the cost basis of the security is written down to fair value, with the loss recorded to gains (losses) on investment activity. Based on the new cost basis, the adjusted deferred amounts related to the impaired security are amortized over the security's remaining life in a manner consistent with the amount and timing of the future estimated cash flows. The security cost basis is not changed for subsequent recoveries in fair value.

Gains and losses on the sale of securities are included in gains (losses) on investment activity, including those gains (losses) reclassified into earnings from AOCI. We use the specific identification method for determining the cost of a security in computing the gain or loss.

**Repurchase and Resale Agreements**

We enter into repurchase and resale agreements primarily as an investor or to finance our security positions. Such transactions are accounted for as purchases and sales when the transferor relinquishes control over transferred securities and as secured financings when the transferor does not relinquish control.

**Debt Securities Issued**

Debt securities that we issue are classified on our consolidated balance sheets as either short-term (due within one year) or long-term (due after one year), based on their remaining contractual maturity. The classification of interest expense on debt securities as either short-term or long-term is based on the original contractual maturity of the debt security. Debt securities denominated in a foreign currency are translated into U.S. dollars using foreign exchange spot rates at the balance sheet dates and any resulting gains or losses are reported in non-interest income (loss) — foreign-currency gains (losses), net.

Premiums, discounts, and hedging-related basis adjustments, are reported as a component of debt securities, net. Issuance costs are reported as a component of other assets. These items are amortized and reported through interest expense using the effective interest method over the contractual life of the related indebtedness. Amortization of premiums, discounts and issuance costs begins at the time of debt issuance. Amortization of hedging-related basis adjustments is initiated upon the termination of the related hedge relationship.

When debt securities are extinguished prior to its contractual maturity, the balances of deferred items remaining are reflected in earnings in the period of extinguishment as a component of gains (losses) on debt retirement. Contemporaneous transfers of cash between us and a creditor in connection with the issuance of a new debt obligation and satisfaction of an existing debt obligation are accounted for as either extinguishments or exchanges. If the debt instruments have substantially different terms, the transaction is accounted as an extinguishment with recognition of any gains or losses in earnings. If not, the transaction is accounted for as an exchange. In an exchange, the following are considered to be a basis adjustment on the new debt obligation and are amortized as an adjustment of interest expense over the remaining term of the new debt obligation: the fees associated with the new debt obligation and any existing unamortized premium or discount, concession fees and hedge gains and losses on the existing debt obligation.

**Derivatives**

We account for our derivatives pursuant to SFAS 133, as amended. Derivatives are reported at their fair value on our consolidated balance sheets. Derivatives in an asset position, including net derivative interest receivable or payable, are reported as derivative assets, net. Similarly, derivatives in a net liability position, including net derivative interest receivable or payable, are reported as derivative liabilities, net. We offset fair value amounts recognized for the right to reclaim cash collateral or the obligation to return cash collateral against fair value amounts recognized for derivative instruments executed with the same counterparty under a master netting agreement, in accordance with FASB Interpretation No. 39-1, "*Amendment of FASB Interpretation No. 39*," or FSP FIN 39-1. Changes in fair value and interest accruals on derivatives are recorded as derivative gains (losses) in our consolidated statements of income.

We evaluate whether financial instruments that we purchase or issue contain embedded derivatives. In connection with the adoption of SFAS No. 155, "*Accounting for Certain Hybrid Financial Instruments, an amendment of FASB Statements No. 133 and 140*," or SFAS 155, on January 1, 2007, we elected to measure newly acquired or issued financial instruments that contain embedded derivatives at fair value, with changes in fair value recorded in our consolidated statements of income. At December 31, 2007, we do not have any embedded derivatives that are bifurcated and accounted for as freestanding derivatives.

At December 31, 2007, we did not have any derivatives in hedge accounting relationships; however, there are amounts recorded in AOCI related to terminated or de-designated cash flow hedge relationships. These deferred gains and losses on closed cash flow hedges are recognized in earnings as the originally forecasted transactions affect earnings. If it is probable the originally forecasted transaction will not occur, the associated deferred gain or loss in AOCI would be reclassified to earnings immediately. When market conditions warrant, we may enter into certain commitments to forward sell mortgage-related securities that we will account for as cash flow hedges.

During 2006 and 2005, our hedge accounting relationships primarily consisted of hedging interest-rate risk related to the forecasted issuances of debt that were designated as cash flow hedges, and fair value hedges of benchmark interest-rate risk and/or foreign currency risk on existing fixed-rate debt.

The changes in fair value of the derivatives in cash flow hedge relationships were recorded as a separate component of AOCI to the extent the hedge relationships were effective, and amounts were reclassified to earnings when the forecasted transaction affects earnings.

The changes in fair value of the derivatives in fair value relationships were recorded in earnings along with the change in the fair value of the hedged debt. Any difference was reflected as hedge ineffectiveness and was recorded in other income.

### Real Estate Owned

Real estate owned, or REO, is initially recorded at fair value, net of estimated disposition costs and is subsequently carried at the lower-of-cost-or-market. When a loan is transferred to REO, losses arise when the carrying basis of the loan (including accrued interest) exceeds the fair value of the foreclosed property, net of estimated costs to sell and credit enhancements. Losses are charged-off against the allowance for loan losses at the time of transfer. REO gains arise and are recognized immediately in earnings when the fair market value of the acquired asset (after deduction for estimated disposition costs) exceeds the carrying value of the mortgage (including accrued interest). Amounts we expect to receive from third-party insurance or other credit enhancements are recorded when the asset is acquired. The receivable is adjusted when the actual claim is filed, and is a component of accounts and other receivables, net on our consolidated balance sheets. Material development and improvement costs relating to REO are capitalized. Operating expenses on the properties, net of any rental or other income, are included in REO operations income (expense). Estimated declines in REO fair value that result from ongoing valuation of the properties are provided for and charged to REO operations income (expense) when identified. Any gains and losses on REO dispositions are included in REO operations income (expense).

### Income Taxes

We use the asset and liability method of accounting for income taxes pursuant to SFAS No. 109, "*Accounting for Income Taxes.*" Under this method, deferred tax assets and liabilities are recognized based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates. To the extent tax laws change, deferred tax assets and liabilities are adjusted, when necessary, in the period that the tax change is enacted. Valuation allowances are recorded to reduce deferred tax assets when it is more likely than not that a tax benefit will not be realized. For all periods presented, no such valuation allowance was deemed necessary by our management.

We account for tax positions taken or expected to be taken (and any associated interest and penalties) in accordance with FASB Interpretation No. 48, "*Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109,*" *or FIN 48.* In particular, we recognize a tax position so long as it is more likely than not that it will be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. We measure the tax position at the largest amount of benefit that is greater than 50% likely of being realized upon ultimate settlement. See "NOTE 13: INCOME TAXES" for additional information related to FIN 48.

Income tax expense includes (a) deferred tax expense, which represents the net change in the deferred tax asset or liability balance during the year plus any change in a valuation allowance, if any, and (b) current tax expense, which represents the amount of tax currently payable to or receivable from a tax authority including any related interest and penalties plus amounts accrued for unrecognized tax benefits (also including any related interest and penalties). Income tax expense excludes the tax effects related to adjustments recorded to equity as well as the tax effects of the cumulative effect of changes in accounting principles.

### Stock-Based Compensation

We record compensation expense for stock-based compensation awards based on the grant-date fair value of the award and expected forfeitures. Compensation expense is recognized over the period during which an employee is required to provide service in exchange for the stock-based compensation award. The recorded compensation expense is accompanied by an adjustment to additional paid-in capital on our consolidated balance sheets. The vesting period for stock-based compensation awards is generally three to five years for options, restricted stock and restricted stock units. The vesting period for the option to purchase stock under the Employee Stock Purchase Plan, or ESPP, is three months. See "NOTE 10: STOCK-BASED COMPENSATION" for additional information.

The fair value of options to purchase shares of our common stock, including options issued pursuant to the ESPP, is estimated using a Black-Scholes option pricing model, taking into account the exercise price and an estimate of the expected life of the option, the market value of the underlying stock, expected volatility, expected dividend yield, and the risk-free interest rate for the expected life of the option. The fair value of restricted stock and restricted stock unit awards is based on the fair value of our common stock on the grant date.

Incremental compensation expense related to the modification of awards is based on a comparison of the fair value of the modified award with the fair value of the original award before modification. We generally expect to settle our stock-based compensation awards in shares. In limited cases, an award may be cash-settled upon a contingent event such as involuntary termination. These awards are accounted for as an equity award until the contingency becomes probable of occurring, when the award is reclassified from equity to a liability. We initially measure the cost of employee service received

in exchange for a stock-based compensation award of liability instruments based on the fair value of the award at the grant date. The fair value of that award is remeasured subsequently at each reporting date through the settlement date. Changes in the fair value during the service period are recognized as compensation cost over that period.

Excess tax benefits are recognized in additional paid-in capital. Cash retained as a result of the excess tax benefits is presented in the consolidated statements of cash flows as financing cash inflows. The write-off of deferred tax assets relating to unrealized tax benefits associated with recognized compensation costs reduces additional paid-in capital to the extent there are excess tax benefits from previous stock-based awards remaining in additional paid-in capital, with any remainder reported as part of income tax expense.

### Earnings Per Common Share

Because we have participating securities, we use the "two-class" method of computing earnings per common share. The "two-class" method is an earnings allocation formula that determines earnings per share for common stock and participating securities based on dividends declared and participation rights in undistributed earnings. Our participating securities consist of vested options to purchase common stock and vested restricted stock units that earn dividend equivalents at the same rate when and as declared on common stock.

Basic earnings per common share is computed as net income available to common stockholders divided by the weighted average common shares outstanding for the period. Diluted earnings per common share is determined using the weighted average number of common shares during the period, adjusted for the dilutive effect of common stock equivalents. Dilutive common stock equivalents reflect the assumed net issuance of additional common shares pursuant to certain of our stock-based compensation plans that could potentially dilute earnings per common share.

### Comprehensive Income

Comprehensive income is the change in equity, on a net of tax basis, resulting from transactions and other events and circumstances from non-owner sources during a period. It includes all changes in equity during a period, except those resulting from investments by stockholders. We define comprehensive income as consisting of net income plus changes in the unrealized gains and losses on available-for-sale securities, the effective portion of derivatives accounted for as cash flow hedge relationships and changes in defined benefit plans.

### Reportable Segments

We have three business segments for financial reporting purposes under SFAS No. 131, *"Disclosures about Segments of an Enterprise and Related Information,"* or SFAS 131, for all periods presented on our consolidated financial statements. See "NOTE 15: SEGMENT REPORTING" for additional information.

### Recently Adopted Accounting Standards

#### *Accounting for Employers' Defined Benefit Pension and Other Postretirement Plans*

On December 31, 2006, we adopted SFAS 158, *"Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an Amendment of FASB Statements No. 87, 88, 106 and 132(R),"* or SFAS 158. In accordance with this standard, on December 31, 2006, we recorded the funded status of each of our defined benefit pension and postretirement plans as an asset or liability on our consolidated balance sheet with a corresponding offset, net of taxes, recorded in AOCI within stockholders' equity.

Effective December 31, 2008, SFAS 158 also requires our defined benefit plan assets and obligations to be measured as of the date of our consolidated balance sheet. We expect that the effect of implementing the change in measurement date from September 30 to December 31 will not be material to our financial condition or our results of operations.

#### *Accounting for Uncertainty in Income Taxes*

On January 1, 2007, we adopted FIN 48. FIN 48 provides a single model to account for uncertain tax positions and clarifies accounting for income taxes by prescribing a minimum threshold that a tax position is required to meet before being recognized in the financial statements. FIN 48 also provides guidance on derecognition, measurement, classification, interest and penalties, accounting in interim periods, disclosure and transition. As a result of the adoption of FIN 48, we recorded a $181 million increase to retained earnings at January 1, 2007. See "NOTE 13: INCOME TAXES" for additional information related to FIN 48.

#### *Accounting for Certain Hybrid Instruments*

On January 1, 2007, we adopted SFAS 155. SFAS 155 permits the fair value measurement for any hybrid financial instrument with an embedded derivative that otherwise would require bifurcation. In addition, this statement requires an evaluation of interests in securitized financial assets to identify instruments that are freestanding derivatives or that are hybrid financial instruments containing an embedded derivative requiring bifurcation. We adopted SFAS 155 prospectively,

and, therefore, there was no cumulative effect of a change in accounting principle. In connection with the adoption of SFAS 155 on January 1, 2007, we elected to measure newly acquired interests in securitized financial assets that contain embedded derivatives requiring bifurcation at fair value, with changes in fair value reflected in our consolidated statements of income. See "NOTE 4: RETAINED PORTFOLIO AND CASH AND INVESTMENTS PORTFOLIO" for additional information.

### Offsetting of Amounts Related to Certain Contracts

On October 1, 2007, we adopted FSP FIN 39-1, which permits a reporting entity to offset fair value amounts recognized for the right to reclaim cash collateral or the obligation to return cash collateral against fair value amounts recognized for derivative instruments executed with the same counterparty under a master netting agreement. When offsetting of fair value amounts recognized for derivative instruments is elected, as permitted under a master netting agreement, the position requires the offsetting of amounts recognized for cash collateral held or posted when the collateral represents "fair value amounts." Our adoption of FSP FIN 39-1 resulted in a decrease to total assets and total liabilities of $8.7 billion.

In conjunction with our adoption of FSP FIN 39-1, we elected to reclassify net derivative interest receivable or payable and, where applicable, cash collateral held or posted on our consolidated balance sheets to derivative asset, net and derivative liability, net, as applicable. Prior to adoption these amounts were recorded in accounts and other receivables, net, accrued interest payable, other assets and senior debt: due within one year, as applicable. Certain amounts in prior periods' consolidated balance sheets and consolidated statements of cash flows have been reclassified to conform to the current presentation. There was no impact to our consolidated statements of income.

### Recently Issued Accounting Standards, Not Yet Adopted

### Fair Value Measurements

In September 2006, the FASB issued SFAS No. 157, "*Fair Value Measurements*," or SFAS 157. This statement defines fair value, establishes a framework for measuring fair value in GAAP and expands disclosures about fair value measurements. SFAS 157 applies under other accounting pronouncements that require or permit fair value measurements but does not change existing guidance as to whether or not a financial asset or liability is carried at fair value. SFAS 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007 with earlier adoption permitted. We adopted SFAS 157 on January 1, 2008 and the implementation did not result in a material difference to our fair value measurements.

### The Fair Value Option for Financial Assets and Financial Liabilities

In February 2007, the FASB issued SFAS No. 159, "*The Fair Value Option for Financial Assets and Financial Liabilities, Including an amendment of FASB Statement No. 115*," or SFAS 159. This statement permits companies to choose to measure certain financial assets and liabilities at fair value with changes in fair value recognized in earnings as they occur. The objective is to improve financial reporting by providing entities with the opportunity to measure both assets and liabilities at fair value without having to apply complex hedge accounting provisions. SFAS 159 is effective as of the beginning of an entity's first fiscal year beginning after November 15, 2007.

We adopted SFAS 159 on January 1, 2008 and elected the fair value option for certain available-for-sale mortgage-related securities that were identified as economic offsets to the changes in fair value of the guarantee asset, foreign-currency denominated debt, and investments in securities classified as available-for-sale securities and identified as within the scope of Emerging Issues Task Force Issue No. 99-20, "*Recognition of Interest Income and Impairment on Purchased Beneficial Interests and Beneficial Interests That Continue to Be Held by a Transferor in Securitized Financial Assets*," or EITF 99-20. As a result of the adoption, we recognized a $1.0 billion after-tax increase to our beginning retained earnings at January 1, 2008, representing the effect of changing our measurement basis to fair value for the above items with the fair value option elected.

Our election of the fair value option for the items discussed above was made in an effort to better reflect, in the financial statements, the economic offsets that exist related to items that were not previously recognized as changes in fair value through the income statement.

We elected the fair value option for certain other available-for-sale securities held in the retained portfolio to better reflect the natural offset these securities provide to fair value changes recorded on the guarantee asset. We record fair value changes on our guarantee asset through the income statement. However, we historically classified virtually all of our securities as available-for-sale and recorded those fair value changes in AOCI. The securities selected for the fair value option include principal only strips and certain pass-through and Structured Securities that contain positive duration features that provide offset to the negative duration associated with our guarantee asset. We will continually evaluate new security purchases to identify the appropriate security mix to classify as trading to match the changing duration features of the guarantee asset and the securities that provide offset.

*Freddie Mac*

In the case of foreign currency denominated debt, we have entered into derivative transactions that effectively convert these instruments to US dollar denominated floating rate instruments. We have historically recorded the fair value changes on these derivatives through the income statement in accordance with SFAS 133. However, the corresponding offsetting change in fair value that occurred in the debt was not permitted to be recorded in the income statement unless we pursued hedge accounting. As a result, our income statement reflected only the fair value changes of the derivatives and not the offsetting fair value changes in the debt. Therefore, we have elected the fair value option on the debt instruments to better reflect the economic offset that naturally results from the debt due to changes in interest rates. We currently do not issue foreign currency denominated debt and use of the fair value option in the future for these types of instruments will be evaluated on a case-by-case basis for any new issuances of this type of debt.

For available-for-sale securities identified as in the scope of EITF 99-20, we elected the fair value option to better reflect the economic recapture of losses that occur subsequent to impairment write-downs recorded on these instruments. Under EITF 99-20 for available-for-sale securities, when an impairment is considered other-than-temporary, the impairment amount is recorded in the income statement and subsequently accreted back through interest income as long as the contractual cash flows occur. Any subsequent periodic increases in the value of the security are recognized through AOCI. By electing the fair value option for these instruments, we will reflect any recapture of impairment losses through the income statement in the period they occur. We intend to classify all future purchases of securities identified as in the scope of impairment analysis under EITF 99-20 as trading securities on a going forward basis.

### Business Combinations and Noncontrolling Interests

In December 2007, the FASB issued SFAS No. 141(R), *"Business Combinations,"* or SFAS 141(R), and SFAS No. 160, *"Noncontrolling Interests in Consolidated Financial Statements, an amendment of ARB No. 51,"* or SFAS 160. SFAS 141(R) provides guidance relating to recognition of assets acquired and liabilities assumed in a business combination. SFAS 160 provides guidance related to accounting for noncontrolling (minority) interests as equity in the consolidated financial statements. SFAS 141(R) and SFAS 160 are effective for fiscal years beginning on or after December 15, 2008. We have not yet determined the impact on our consolidated financial statements of adopting these accounting standards.

## NOTE 2: FINANCIAL GUARANTEES AND TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS

### Financial Guarantees

#### Guaranteed PCs, Structured Securities and Other Mortgage Guarantees

As discussed in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," we issue two types of mortgage-related securities: PCs and Structured Securities. We guarantee the payment of principal and interest on issued PCs and Structured Securities that are backed by pools of mortgage loans, and we are obligated to purchase delinquent loans that are covered by long-term standby commitments. At December 31, 2007 and 2006, we had $1,738.8 billion and $1,477.0 billion, respectively, of issued PCs and Structured Securities and such other mortgage guarantees of which $357.0 billion and $354.3 billion were held in our retained portfolio at December 31, 2007 and 2006, respectively. There were $1,518.8 billion and $1,240.2 billion at December 31, 2007 and 2006, respectively, of Structured Securities backed by resecuritized PCs and other previously issued Structured Securities. These restructured securities do not increase our credit-related exposure and consist of single-class and multi-class Structured Securities backed by PCs, Real Estate Mortgage Investment Conduits, or REMICs, and principal-only strips.

Our guarantee obligation represents the recognized liability associated with our guarantee of PCs and Structured Securities net of cumulative amortization. At December 31, 2007 and 2006, our guarantee obligation includes our estimate of performance and other related costs of approximately $9.9 billion and $5.8 billion, respectively, and deferred guarantee income of $3.8 billion and $3.6 billion, respectively. In addition to our guarantee obligation, we recognized a reserve for guarantee losses on PCs that totaled $2.6 billion and $0.6 billion at December 31, 2007 and 2006, respectively.

Our guaranteed PCs, Structured Securities and other mortgage guarantees issued include single-family long-term stand-by commitments and multifamily housing revenue bonds issued by third parties, which totaled $37.9 billion and $6.7 billion at December 31, 2007 and 2006, respectively. Our guarantee of single-family long-term stand-by commitments was $32.2 billion and $0.7 billion at December 31, 2007 and 2006, respectively. Our guarantee of multifamily housing revenue bonds issued by third parties was $5.7 billion and $6.0 billion at December 31, 2007 and 2006, respectively.

Our approach for estimating the fair value of the guarantee obligation makes use of third-party market data as practicable. We divide the credit aspects of our guarantee obligation portfolio into three primary components: performing loans, non-performing loans and manufactured housing. For each component, we developed a specific valuation approach for capturing its unique characteristics.

*Freddie Mac*

For performing loans, we use capital markets information and rating agency models to estimate subordination levels and dealer price quotes on proxy non-agency securities with collateral characteristics matched to our portfolio to value the expected credit losses and the risk premium for unexpected losses related to our guarantee portfolio. We segmented the portfolio into distinct loan cohorts to differentiate between product types, coupon rate, seasoning, and interests retained by us versus those held by third parties.

For non-performing loans, we utilize a different method for estimating the fair value of the guarantee obligation. For loans that are extremely delinquent and have been purchased out of pools, we obtained dealer indications that reflect their non-performing status. For delinquent loans remaining in PCs, we began with the market driven performing loan and non-performing whole loan values and used empirically observed delinquency transition rates to interpolate the appropriate values in each phase of delinquency (i.e., 30 days, 60 days, 90 days).

For manufactured housing, we developed an approach, subject to our judgment, for estimating the incremental credit costs associated with the manufactured housing portfolio. For approximately 0.5% of our total guarantee portfolio and 9.3% of the fair value of the guarantee obligation, we determined that there is not sufficiently reliable market data to estimate the appropriate credit costs associated with the guarantee obligation for the manufactured housing portfolio. As such, we estimated the ratio of realized credit losses for performing loans and manufactured housing loans to determine a loss history ratio. We then applied the loss history ratio to market implied performing loan guarantee obligation fair value estimates to calculate the implied credit costs for the manufactured housing portfolio. We undertook a similar process for estimating the fair value of seriously delinquent manufactured housing loans.

The components of the guarantee obligation associated with administering the collection and distribution of payments on the mortgage loans underlying a PC are estimated based upon amounts we believe other market participants would charge. Finally, we use our models to estimate the present value of net cash flows related to security program cycles. This estimate is included in the guarantee obligation valuation.

We recognize guarantee assets and guarantee obligations for PCs in conjunction with transfers accounted for as sales under SFAS 140, "*Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities — a replacement of FASB Statement No. 125*," or SFAS 125/140, as well as, beginning on January 1, 2003, transactions that do not qualify as sales, but are accounted for as guarantees pursuant to the requirements of FIN 45, "*Guarantor's Accounting and Disclosure Requirement for Guarantees of Indebtedness of Others, an interpretation of FASB Statements No. 5, 57 and 107 and rescission of FASB Interpretation No. 34*," or FIN 45. At December 31, 2007 and 2006, approximately 91% and 88%, respectively, of our guaranteed PCs and Structured Securities issued had a corresponding guarantee asset or guarantee obligation recognized on our consolidated balance sheets.

## Derivative Instruments

Derivative instruments include written options, written swaptions, interest-rate swap guarantees and guarantees of stated final maturity of certain of our Structured Securities. In addition, we have entered into mortgage credit agreements whereby we assume default risk for mortgage loans held by third parties for up to a 90-day period in exchange for a monthly fee.

We guarantee the performance of interest-rate swap contracts in three circumstances. First, as part of a resecuritization transaction, we transfer certain swaps and related assets to a third party. We guarantee that interest income generated from the assets will be sufficient to cover the required payments under the interest-rate swap contracts. Second, we guarantee that a borrower will perform under an interest-rate swap contract linked to a customer's adjustable-rate mortgage. And third, in connection with certain Structured Securities, we guarantee that the sponsor of the securitized multifamily housing revenue bonds will perform under the interest-rate swap contract linked to the variable-rate certificates we issued, which are backed by the bonds.

In addition, we issue credit derivatives that guarantee the payments on (a) multifamily mortgage loans that are originated and held by state and municipal housing finance agencies to support tax-exempt multifamily housing revenue bonds; (b) Freddie Mac pass-through certificates which are backed by tax-exempt multifamily housing revenue bonds and related taxable bonds and/or loans; and (c) the reimbursement of certain losses incurred by third party providers of letters of credit secured by multifamily housing revenue bonds.

We issue Structured Securities with stated final maturities that are shorter than the stated maturity of the underlying mortgage loans. If the underlying mortgage loans to these securities have not been purchased by a third party or fully matured as of the stated final maturity date of such securities, we may sponsor an auction of the underlying assets. To the extent that purchase or auction proceeds are insufficient to cover unpaid principal amounts due to investors in such Structured Securities, we are obligated to fund such principal. Our maximum exposure represents the outstanding unpaid principal balance of the underlying mortgage loans.

### Servicing-Related Premium Guarantees

We provide guarantees to reimburse servicers for premiums paid to acquire servicing in situations where the original seller is unable to perform under its separate servicing agreement. The liability associated with these agreements was not material at December 31, 2007 and 2006.

Table 2.1 below presents our maximum potential amount of future payments, our recognized liability and the maximum remaining term of these guarantees.

### Table 2.1 — Financial Guarantees

| | December 31, 2007 | | | Adjusted December 31, 2006 | | |
|---|---|---|---|---|---|---|
| | Maximum Exposure | Recognized Liability | Maximum Remaining Term | Maximum Exposure | Recognized Liability | Maximum Remaining Term |
| | (dollars in millions, terms in years) | | | | | |
| Financial Guarantees: | | | | | | |
| Guaranteed PCs, Structured Securities and other mortgage guarantees issued[1][2] | $1,738,833 | $13,712 | 40 | $1,477,023 | $9,482 | 40 |
| Derivative instruments | 32,538 | 129 | 30 | 28,832 | 13 | 28 |
| Servicing-related premium guarantees | 37 | — | 5 | 44 | — | 5 |

(1) Exclude mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Effective December 2007, we established securitization trusts for the underlying assets of our PCs and Structured Securities issued. As a result, we adjusted the reported balance of our mortgage portfolios to reflect the publicly-available security balances of our PCs and Structured Securities. Previously, we reported these balances based on the unpaid principal balance of the underlying mortgage loans.

With the exception of interest-rate swap guarantees included in derivative instruments in Table 2.1, maximum exposure represents the contractual amounts that could be lost under the guarantees if underlying borrowers defaulted, without consideration of possible recoveries under recourse provisions or from collateral held or pledged. The maximum exposure related to interest-rate swap guarantees is based on contractual rates and without consideration of recovery under recourse provisions. The maximum exposure disclosed above is not representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation.

### Other Financial Commitments

As part of the guarantee arrangements pertaining to multifamily housing revenue bonds, we provided commitments to advance funds, commonly referred to as "liquidity guarantees," totaling $8.0 billion and $5.8 billion at December 31, 2007 and 2006, respectively. These guarantees enable the repurchase of any tendered tax-exempt and related taxable pass-through certificates and housing revenue bonds that are unable to be remarketed. Any repurchased securities would be pledged to us to secure funding until the time when the securities could be remarketed. We have not made any payments to date under these liquidity guarantees.

### Gains and Losses on Transfers of PCs and Structured Securities that are Accounted for as Sales

We recognized gains (losses) on transfers of PCs and Structured Securities that were accounted for as sales under SFAS 125/140. In 2007, 2006 and 2005, these adjusted net pre-tax gains (losses) were approximately $141 million, $235 million and $181 million, respectively.

### Valuation of Guarantee Asset

#### Guarantee Asset

Our approach for estimating the fair value of the guarantee asset at December 31, 2007 uses third-party market data as practicable. For approximately 74% of the fair value of the guarantee asset, the valuation approach involved obtaining dealer quotes on proxy securities with collateral similar to aggregated characteristics of our portfolio, effectively equating the guarantee asset with current, or "spot," market values for excess servicing interest-only, or IO, securities, which trade at a discount to trust IO security prices. We consider excess servicing securities to be comparable to the guarantee asset, in that they represent an IO-like income stream, have less liquidity than trust IO securities and do not have matching principal-only securities. The remaining 26% of the fair value of the guarantee asset related to underlying loan products for which comparable market prices were not readily available. This portion of the guarantee asset was valued using an expected cash flow approach with market input assumptions extracted from the dealer quotes provided on the more liquid products, reduced by an estimated liquidity discount.

#### Key Assumptions Used in the Valuation of the Guarantee Asset

Table 2.2 summarizes the key assumptions associated with the fair value measurements of the recognized guarantee asset. The fair values at the time of securitization and the subsequent fair value measurements were estimated using third-party information. However, the assumptions included in this table for those periods are those implied by our fair value

estimates, with the internal rates of return, or IRRs, adjusted where necessary to align our internal models with estimated fair values determined using third-party information. Prepayment rates are presented as implied by our internal models and have not been similarly adjusted.

At December 31, 2007 and 2006, our guarantee asset totaled $9.6 billion and $7.4 billion, respectively, on our consolidated balance sheets, of which approximately $0.2 billion, or 2%, related to PCs and Structured Securities backed by multifamily mortgage loans. The key assumptions utilized in fair value measurements of the guarantee asset presented in Table 2.2 and the sensitivity analysis presented in Table 2.3 relate solely to the guarantee asset associated with PCs and other financial guarantees backed by single-family mortgage loans.

**Table 2.2 — Key Assumptions Utilized in Fair Value Measurements of the Guarantee Asset**

| | | Adjusted | |
|---|---|---|---|
| Mean Valuation Assumptions[1] | 2007 | 2006 | 2005 |
| IRRs[2] | 6.4% | 8.3% | 8.4% |
| Prepayment rates[3] | 17.1% | 15.8% | 17.3% |
| Weighted average lives (years) | 5.2 | 5.5 | 5.1 |

(1) Mean values represent the weighted average of all IRRs, prepayment rate and weighted average lives assumptions.
(2) IRR assumptions represent an unpaid principal balance weighted average of the discount rates inherent in the fair value of the recognized guarantee asset. Weighted average lives assumptions reflect prepayment rate assumptions.
(3) Although prepayment rates are simulated monthly, the assumptions above represent annualized prepayment rates based on unpaid principal balances.

In order to report the hypothetical sensitivity of the carrying value of the guarantee asset to changes in key assumptions, we used internal models to approximate their reported carrying values. We then measured the hypothetical impact of changes in key assumptions using our models to estimate the potential view of fair value the market might have in response to those changes. In our models, the assumed internal rates of return were adjusted to calibrate our model results with the reported carrying value. However, the weighted average prepayment rate assumption used in this hypothetical sensitivity was based on our internal model which is benchmarked periodically to market prepayment estimates. The sensitivity analysis in Table 2.3 illustrates hypothetical adverse changes in the fair value of our guarantee asset for changes in key assumptions.

**Table 2.3 — Sensitivity Analysis of the Guarantee Asset (Single-Family Mortgages)**

| | December 31, | |
|---|---|---|
| | 2007 | Adjusted 2006 |
| | (dollars in millions) | |
| Fair value | $9,417 | $7,225 |
| Weighted average IRR assumptions: | 8.1% | 7.1% |
| Impact on fair value of 100 bps unfavorable change | $ (389) | $ (269) |
| Impact on fair value of 200 bps unfavorable change | $ (746) | $ (519) |
| Weighted average prepayment rate assumptions: | 16.5% | 18.4% |
| Impact on fair value of 10% unfavorable change | $ (516) | $ (368) |
| Impact on fair value of 20% unfavorable change | $ (977) | $ (695) |

**Valuation of Other Retained Interests**

Other retained interests include securities we issued as part of a resecuritization transaction, which was recorded as a sale. The majority of these securities are classified as available-for-sale. The fair value of other retained interests is generally based on independent price quotations obtained from third-party pricing services or dealer provided prices.

To report the hypothetical sensitivity of the carrying value of other retained interests, we used internal models adjusted where necessary to align with the fair values. The sensitivity analysis in Table 2.4 illustrates hypothetical adverse changes in the fair value of other retained interests for changes in key assumptions based on these models.

**Table 2.4 — Sensitivity Analysis of Other Retained Interests[1]**

| | December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | (dollars in millions) | |
| Fair value | $107,931 | $127,490 |
| Weighted average IRR assumptions: | 5.5% | 5.6% |
| Impact on fair value of 100 bps unfavorable change | $ (4,109) | $ (4,551) |
| Impact on fair value of 200 bps unfavorable change | $ (7,928) | $ (8,813) |
| Weighted average prepayment rate assumptions: | 8.7% | 11.0% |
| Impact on fair value of 10% unfavorable change | $ (30) | $ (66) |
| Impact on fair value of 20% unfavorable change | $ (57) | $ (132) |

(1) The sensitivity analysis includes only other retained interests whose fair value is impacted as a result of changes in IRR and prepayment assumptions. At December 31, 2007 and 2006, the fair values of other retained interests not included in the sensitivity analysis above were $44 million and $52 million, respectively.

## Cash Flows on Transfers of Securitized Interests and Corresponding Retained Interests

Table 2.5 below summarizes cash flows on retained interests as well as the amount of cash payments made to acquire delinquent loans to satisfy our financial performance obligations.

### Table 2.5 — Details of Cash Flows

| | Year Ended December 31, | | |
| | 2007 | Adjusted 2006 | 2005 |
| | | (in millions) | |
|---|---|---|---|
| Cash flows from: | | | |
| Transfers of Freddie Mac securities that were accounted for as sales | $62,644 | $79,565 | $93,828 |
| Cash flows received on the guarantee asset[1] | 2,288 | 1,873 | 1,565 |
| Other retained interests principal and interest | 22,713 | 24,784 | 25,612 |
| Purchases of delinquent or foreclosed loans | (9,011) | (4,698) | (4,366) |

(1) Represents contractual guarantee fees received by us in connection with the recognized guarantee asset.

### Credit Protection and Other Forms of Recourse

In connection with our guaranteed PCs and Structured Securities issued, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders and other forms of credit enhancements. Table 2.6 presents the amounts of potential loss recovery by type of credit protection.

### Table 2.6 — Credit Protection and Other Forms of Recourse[1]

| | December 31, | |
| | 2007 | Adjusted 2006 |
| | (in millions) | |
|---|---|---|
| PCs and Structured Securities: | | |
| Single-family: | | |
| Primary mortgage insurance | $51,897 | $40,208 |
| Lender recourse and indemnifications | 12,085 | 10,493 |
| Pool insurance | 3,813 | 3,669 |
| Other credit enhancements | 549 | 757 |
| Multifamily: | | |
| Credit enhancements | 1,233 | 1,093 |
| Structured Securities backed by Ginnie Mae Certificates[2] | 1,268 | 1,510 |

(1) Exclude credit enhancements related to Structured Transactions, which had unpaid principal balances that totaled $20.2 billion and $24.8 billion at December 31, 2007 and 2006, respectively.
(2) Ginnie Mae Certificates are backed by the full faith and credit of the U.S. government.

At December 31, 2007 and 2006, we recorded $655 million and $440 million, respectively, in total assets on our consolidated balance sheets related to these credit enhancements on securitized mortgages.

### Indemnifications

In connection with various business transactions, we may provide indemnification to counterparties for claims arising out of breaches of certain obligations (e.g., those arising from representations and warranties) in contracts entered into in the normal course of business. It is difficult to estimate our maximum exposure under these indemnification arrangements because in many cases there are no stated or notional amounts included in the indemnification clauses. Such indemnification provisions pertain to matters such as hold harmless clauses, adverse changes in tax laws, breaches of confidentiality, misconduct and potential claims from third parties related to items such as actual or alleged infringement of intellectual property. At December 31, 2007, our assessment is that the risk of any material loss from such a claim for indemnification is remote and there are no probable and estimable losses associated with these contracts. We have not recorded any liabilities related to these indemnifications on our consolidated balance sheets at December 31, 2007 and 2006.

## NOTE 3: VARIABLE INTEREST ENTITIES

We are a party to numerous entities that are considered to be VIEs. Our investments in VIEs include LIHTC partnerships, certain Structured Securities transactions and a mortgage reinsurance entity. In addition, we buy the highly-rated senior securities in non-mortgage-related, asset-backed investment trusts that are VIEs. Highly-rated senior securities issued by these securitization trusts are not designed to absorb a significant portion of the variability created by the assets/collateral in the trusts. Therefore, our investments in these securities do not represent a significant variable interest in the securitization trusts. Accordingly, we do not consolidate these securities. Additionally, we invest in securitization entities that are qualifying special purpose entities, which are not subject to consolidation because of our inability to unilaterally liquidate or change the qualifying special purpose entity. See "NOTE 1: SUMMARY OF SIGNIFICANT

ACCOUNTING POLICIES — Consolidation and Equity Method of Accounting" for further information regarding the consolidation practices of our VIEs.

### LIHTC Partnerships

We invest as a limited partner in LIHTC partnerships formed for the purpose of providing funding for affordable multifamily rental properties. The LIHTC partnerships invest as limited partners in lower-tier partnerships, which own and operate multifamily rental properties. These properties are rented to qualified low-income tenants, allowing the properties to be eligible for federal tax credits. Most of these LIHTC partnerships are VIEs. A general partner operates the partnership, identifying investments and obtaining debt financing as needed to finance partnership activities. Although these partnerships generate operating losses, we realize a return on our investment through reductions in income tax expense that result from tax credits and the deductibility of the operating losses of these partnerships. The partnership agreements are typically structured to meet a required 15-year period of occupancy by qualified low-income tenants. The investments in LIHTC partnerships, in which we were either the primary beneficiary or had a significant variable interest, were made between 1989 and 2007. At December 31, 2007 and 2006, we did not guarantee any obligations of these LIHTC partnerships and our exposure was limited to the amount of our investment. At December 31, 2007 and 2006, we were the primary beneficiary of investments in six partnerships and we consolidated these investments. The investors in the obligations of the consolidated LIHTC partnerships have recourse only to the assets of those VIEs and do not have recourse to us.

### Consolidated VIEs

Table 3.1 represents the carrying amounts and classification of consolidated assets that are collateral for the consolidated VIEs.

### Table 3.1 — Assets of Consolidated VIEs

| Consolidated Balance Sheets Line Item | December 31, | |
| --- | --- | --- |
| | 2007 | 2006 |
| | (in millions) | |
| Cash and cash equivalents | $ 41 | $ 44 |
| Accounts and other receivables, net | 153 | 173 |
| Total assets of consolidated VIEs | $194 | $217 |

### VIEs Not Consolidated

#### *LIHTC Partnerships*

At December 31, 2007 and 2006, we had unconsolidated investments in 189 and 179 LIHTC partnerships, respectively, in which we had a significant variable interest. The size of these partnerships at December 31, 2007 and 2006, as measured in total assets, was $10.3 billion and $8.9 billion, respectively. These partnerships are accounted for using the equity method, as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES." As a limited partner, our maximum exposure to loss equals the undiscounted book value of our equity investment. At both December 31, 2007 and 2006, our maximum exposure to loss on unconsolidated LIHTC partnerships, in which we had a significant variable interest, was $3.7 billion.

#### *Asset-Backed Investment Trusts*

We invest in a variety of non-mortgage-related, asset-backed investment trusts. These investments represent interests in trusts consisting of a pool of receivables or other financial assets, typically credit card receivables, auto loans or student loans. These trusts act as vehicles to allow originators to securitize assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the deal create the trusts and typically own the residual interest in the trust assets. At December 31, 2007 and 2006, we did not have a significant variable interest in and were not the primary beneficiary of any asset-backed investment trusts.

#### *Structured Transactions*

We periodically issue securities in Structured Transactions, which are backed by mortgage loans or non-Freddie Mac mortgage-related securities using collateral pools transferred to a trust specifically created for the purpose of issuing securities. These trusts also issue various senior interests and subordinated interests. We purchase interests, including senior interests, of the trusts and issue and guarantee Structured Securities backed by these interests. The subordinated interests are generally either held by the seller or other party or sold in the capital markets. Generally, the structure of the transactions and the trusts as qualifying special purpose entities exempts them from the scope of FASB Interpretation No. 46 (revised December 2003), "*Consolidation of Variable Interest Entities, an interpretation of ARB No. 51*," or FIN 46(R). However, at December 31, 2007 and 2006, we had interests in one and two Structured Transactions, respectively, that did not fall within this scope exception and in which we had a significant variable interest. Our involvement in this one Structured

Transaction at December 31, 2007 began in 2002. The sizes of the one Structured Transaction at December 31, 2007 and the two Structured Transactions at December 31, 2006, as measured in total assets, were $40 million and $67 million, respectively. At December 31, 2007 and 2006, our maximum exposure to loss on these transactions was $37 million and $55 million, respectively, consisting of the book value of our investments plus incremental guarantees of the senior interests that are held by third parties. At December 31, 2007 and 2006, we were not the primary beneficiary of any such transactions.

## NOTE 4: RETAINED PORTFOLIO AND CASH AND INVESTMENTS PORTFOLIO

Table 4.1 summarizes amortized cost, estimated fair values and corresponding gross unrealized gains and gross unrealized losses for available-for-sale securities by major security type.

Table 4.1 — Available-For-Sale Securities

| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| | | | (in millions) | |
| **December 31, 2007** | | | | |
| *Retained portfolio:* | | | | |
| Mortgage-related securities issued by: | | | | |
| Freddie Mac | $346,569 | $2,981 | $ (2,583) | $346,967 |
| Federal National Mortgage Association, or Fannie Mae | 45,688 | 513 | (344) | 45,857 |
| Ginnie Mae | 545 | 19 | (2) | 562 |
| Other | 218,848 | 673 | (11,820) | 207,701 |
| Obligations of states and political subdivisions | 14,783 | 146 | (351) | 14,578 |
| Total mortgage-related securities | 626,433 | 4,332 | (15,100) | 615,665 |
| *Cash and investments portfolio:* | | | | |
| Non-mortgage-related securities: | | | | |
| Asset-backed securities | 16,644 | 25 | (81) | 16,588 |
| Commercial paper | 18,513 | — | — | 18,513 |
| Total non-mortgage-related securities | 35,157 | 25 | (81) | 35,101 |
| Total available-for-sale securities | $661,590 | $4,357 | $(15,181) | $650,766 |
| **Adjusted December 31, 2006** | | | | |
| *Retained portfolio:* | | | | |
| Mortgage-related securities issued by: | | | | |
| Freddie Mac | $348,591 | $1,438 | $ (5,941) | $344,088 |
| Fannie Mae | 44,223 | 323 | (660) | 43,886 |
| Ginnie Mae | 720 | 17 | (4) | 733 |
| Other | 224,642 | 553 | (1,096) | 224,099 |
| Obligations of states and political subdivisions | 13,622 | 334 | (31) | 13,925 |
| Total mortgage-related securities | 631,798 | 2,665 | (7,732) | 626,731 |
| *Cash and investments portfolio:* | | | | |
| Non-mortgage-related securities: | | | | |
| Asset-backed securities | 32,179 | 23 | (80) | 32,122 |
| Commercial paper | 11,191 | — | — | 11,191 |
| Obligations of states and political subdivisions | 2,273 | — | — | 2,273 |
| Total non-mortgage-related securities | 45,643 | 23 | (80) | 45,586 |
| Total available-for-sale securities | $677,441 | $2,688 | $ (7,812) | $672,317 |

*Freddie Mac*

Table 4.2 shows the fair value of available-for-sale securities in a gross unrealized loss position and whether they have been in that position less than 12 months or 12 months or greater.

Table 4.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position

| December 31, 2007 | Less than 12 months | | 12 months or Greater | | Total | |
|---|---|---|---|---|---|---|
| | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses |
| | | | (in millions) | | | |
| **Retained portfolio:** | | | | | | |
| Mortgage-related securities issued by: | | | | | | |
| Freddie Mac | $ 22,546 | $ (254) | $135,966 | $(2,329) | $158,512 | $ (2,583) |
| Fannie Mae | 4,728 | (17) | 15,214 | (327) | 19,942 | (344) |
| Ginnie Mae | 2 | — | 74 | (2) | 76 | (2) |
| Other | 129,600 | (10,215) | 45,969 | (1,605) | 175,569 | (11,820) |
| Obligations of states and political subdivisions | 7,735 | (264) | 1,286 | (87) | 9,021 | (351) |
| Total mortgage-related securities | 164,611 | (10,750) | 198,509 | (4,350) | 363,120 | (15,100) |
| **Cash and investments portfolio:** | | | | | | |
| Non-mortgage-related securities: | | | | | | |
| Asset-backed securities | 8,236 | (63) | 3,222 | (18) | 11,458 | (81) |
| Total non-mortgage-related securities | 8,236 | (63) | 3,222 | (18) | 11,458 | (81) |
| Total available-for-sale securities in a gross unrealized loss position | $172,847 | $(10,813) | $201,731 | $(4,368) | $374,578 | $(15,181) |

| Adjusted December 31, 2006 | Less than 12 months | | 12 months or Greater | | Total | |
|---|---|---|---|---|---|---|
| | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses |
| | | | (in millions) | | | |
| **Retained portfolio:** | | | | | | |
| Mortgage-related securities issued by: | | | | | | |
| Freddie Mac | $41,249 | $(290) | $204,715 | $(5,651) | $245,964 | $(5,941) |
| Fannie Mae | 5,604 | (69) | 22,567 | (591) | 28,171 | (660) |
| Ginnie Mae | 146 | — | 99 | (4) | 245 | (4) |
| Other | 35,228 | (110) | 36,072 | (986) | 71,300 | (1,096) |
| Obligations of states and political subdivisions | 959 | (7) | 1,245 | (24) | 2,204 | (31) |
| Total mortgage-related securities | 83,186 | (476) | 264,698 | (7,256) | 347,884 | (7,732) |
| **Cash and investments portfolio:** | | | | | | |
| Non-mortgage-related securities: | | | | | | |
| Asset-backed securities | 6,402 | (7) | 9,141 | (73) | 15,543 | (80) |
| Total non-mortgage-related securities | 6,402 | (7) | 9,141 | (73) | 15,543 | (80) |
| Total available-for-sale securities in a gross unrealized loss position | $89,588 | $(483) | $273,839 | $(7,329) | $363,427 | $(7,812) |

At December 31, 2007, gross unrealized losses on available-for-sale securities were $15.2 billion, or approximately 4% of the fair value of such securities in an unrealized loss position, as noted in Table 4.2. The gross unrealized losses relate to approximately 69 thousand individual lots representing approximately 15 thousand separate securities. We routinely purchase multiple lots of individual securities at different times and at different costs. We determine gross unrealized gains and gross unrealized losses by specifically identifying investment positions at the lot level; therefore, some of the lots we hold for a single security may be in an unrealized gain position while other lots for that security are in an unrealized loss position, depending upon the amortized cost of the specific lot.

We have the ability and intent to hold the available-for-sale securities in an unrealized loss position for a period of time sufficient to recover all unrealized losses. Based on our ability and intent to hold these available-for-sale securities and our consideration of other factors described below, we have concluded that the impairment of these securities is temporary.

- Freddie Mac securities.    The unrealized losses on our securities are primarily a result of movements in interest rates. Because we guarantee the payment of principal and interest on these securities, we review the estimated credit exposure of the mortgages underlying these securities in evaluating potential impairment. The extent and duration of the decline in fair value relative to the amortized cost have met our criteria for determining that the impairment of these securities is temporary.

- Fannie Mae securities and obligations of states and political subdivisions.    The unrealized losses on Fannie Mae securities and obligations of states and political subdivisions are primarily a result of movements in interest rates. The extent and duration of the decline in fair value relative to the amortized cost have met our criteria for determining that the impairment of these securities is temporary and no other facts or circumstances existed to suggest that the

decline was not temporary. The issuer guarantees related to these securities have led us to conclude that any credit risk is minimal.

- Other securities in the retained portfolio and asset-backed securities in the cash and investments portfolio. The unrealized losses on mortgage-related securities included in other and asset-backed securities are principally a result of decreased liquidity and larger risk premiums in the subprime market. Our review of these securities included cash flow analyses based on default and prepayment assumptions that indicate that the impairment of these securities is temporary. Most of these securities are investment grade (*i.e.*, rated BBB— or better on a Standard and Poor's, or S&P, or equivalent scale).

For the years ended December 31, 2007, 2006 and 2005, we recorded impairments related to investments in securities of $399 million, $404 million and $292 million, respectively.

Table 4.3 below illustrates the gross realized gains and gross realized losses received from the sale of available-for-sale securities.

Table 4.3 — Gross Realized Gains and Gross Realized Losses on Available-For-Sale Securities

| | Year Ended December 31, | | |
| | | Adjusted | |
| | 2007 | 2006 | 2005 |
| | | (in millions) | |
| Gross realized gains | $688 | $ 376 | $762 |
| Gross realized (losses) | (456) | (516) | (392) |
| Net realized gains (losses) | $232 | $(140) | $370 |

Table 4.4 summarizes, by major security type, the remaining contractual maturities and weighted average yield of available-for-sale securities.

**Table 4.4 — Maturities and Weighted Average Yield of Available-For-Sale Securities**

| December 31, 2007 | Amortized Cost | Fair Value | Weighted Average Yield[1] |
|---|---|---|---|
| | (dollars in millions) | | |
| *Retained portfolio:* | | | |
| Total mortgage-related securities[2] | | | |
| Due 1 year or less | $    550 | $    548 | 4.12% |
| Due after 1 through 5 years | 1,776 | 1,810 | 5.77 |
| Due after 5 through 10 years | 25,486 | 25,659 | 5.32 |
| Due after 10 years | 598,621 | 587,648 | 5.39 |
| Total | $626,433 | $615,665 | 5.38 |
| *Cash and investments portfolio:* | | | |
| Non-mortgage-related securities: | | | |
| Asset-backed securities[2] | | | |
| Due 1 year or less | $     — | $     — | — |
| Due after 1 through 5 years | 11,327 | 11,302 | 4.99 |
| Due after 5 through 10 years | 4,665 | 4,640 | 5.04 |
| Due after 10 years | 652 | 646 | 4.98 |
| Total | 16,644 | 16,588 | 5.00 |
| Commercial paper | | | |
| Due 1 year or less | 18,513 | 18,513 | 5.93 |
| Due after 1 through 5 years | — | — | — |
| Due after 5 through 10 years | — | — | — |
| Due after 10 years | — | — | — |
| Total | 18,513 | 18,513 | 5.93 |
| Total non-mortgage-related securities | | | |
| Due 1 year or less | 18,513 | 18,513 | 5.93 |
| Due after 1 through 5 years | 11,327 | 11,302 | 4.99 |
| Due after 5 through 10 years | 4,665 | 4,640 | 5.04 |
| Due after 10 years | 652 | 646 | 4.98 |
| Total | $ 35,157 | $ 35,101 | 5.49 |
| *Total available-for-sale securities for retained portfolio and cash and investments portfolio:* | | | |
| Due 1 year or less | $ 19,063 | $ 19,061 | 5.88 |
| Due after 1 through 5 years | 13,103 | 13,112 | 5.10 |
| Due after 5 through 10 years | 30,151 | 30,299 | 5.28 |
| Due after 10 years | 599,273 | 588,294 | 5.38 |
| Total | $661,590 | $650,766 | 5.39 |

(1) The weighted average yield is calculated based on a yield for each individual lot held at December 31, 2007. The numerator for the individual lot yield consists of the sum of (a) the year-end interest coupon rate multiplied by the year-end unpaid principal balance and (b) the annualized amortization income or expense calculated for December 2007 (excluding any adjustments recorded for changes in the effective rate). The denominator for the individual lot yield consists of the year-end amortized cost of the lot excluding effects of other-than-temporary impairments on the unpaid principal balances of impaired lots.

(2) Maturity information provided is based on contractual maturities, which may not represent expected life, as obligations underlying these securities may be prepaid at any time without penalty.

Table 4.5 presents the changes in AOCI, net of taxes, related to available-for-sale securities. The net unrealized holding losses, net of tax, represents the net fair value adjustments recorded on available-for-sale securities throughout the year, after the effects of our federal statutory tax rate of 35%. The net reclassification adjustment for net realized losses (gains), net of tax, represents the amount of those fair value adjustments, after the effects of our federal statutory tax rate of 35%, that have been recognized in earnings due to a sale of an available-for-sale security or the recognition of an impairment loss. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information regarding the component of AOCI related to available-for-sale securities.

Table 4.5 — AOCI, Net of Taxes, Related to Available-For-Sale Securities

| | Year Ended December 31, | | |
|---|---|---|---|
| | | Adjusted | |
| | 2007 | 2006 | 2005 |
| | | (in millions) | |
| Beginning balance | $(3,332) | $(3,065) | $ 3,751 |
| Net unrealized holding losses, net of tax[1] | (3,792) | (551) | (6,755) |
| Net reclassification adjustment for net realized losses (gains), net of tax[2][3] | 84 | 284 | (61) |
| Ending balance | $(7,040) | $(3,332) | $(3,065) |

(1) Net of tax benefit of $2.0 billion, $0.3 billion and $3.6 billion for the years ended December 31, 2007, 2006 and 2005, respectively.
(2) Net of tax benefit (expense) of $45 million, $153 million and $(33) million for the years ended December 31, 2007, 2006 and 2005, respectively.
(3) Includes the reversal of previously recorded unrealized losses that have been recognized on our consolidated statements of income as impairment losses on available-for-sale securities of $234 million, $193 million and $180 million, net of taxes, for the years ended December 31, 2007, 2006 and 2005, respectively.

Table 4.6 summarizes the estimated fair values by major security type for trading securities held in our retained portfolio.

Table 4.6 — Trading Securities in our Retained Portfolio

| | December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | (in millions) | |
| Mortgage-related securities issued by: | | |
| Freddie Mac | $12,216 | $6,573 |
| Fannie Mae | 1,697 | 802 |
| Ginnie Mae | 175 | 222 |
| Other | 1 | — |
| Total trading securities in our retained portfolio | $14,089 | $7,597 |

For the years ended December 31, 2007, 2006 and 2005 we recorded net unrealized gains (losses) on trading securities held at December 31, 2007, 2006 and 2005 of $539 million, $(7) million and $(278) million, respectively.

Total trading securities in our retained portfolio include $4.2 billion of SFAS 155 related assets as of December 31, 2007. Gains (losses) on trading securities on our consolidated statements of income include gains of $324 million related to these SFAS 155 trading securities for the year ended December 31, 2007.

### Retained Portfolio Voluntary Growth Limit

We are currently operating under a voluntary, temporary limit on the growth of our retained portfolio that we instituted in response to a request by the Office of Federal Housing Enterprise Oversight, or OFHEO. Under this voluntary, temporary growth limit, the growth of our retained portfolio is limited to 2.0% annually. On September 19, 2007, OFHEO provided an interpretation regarding the calculation methodology of the voluntary, temporary growth limit. The interpretation changed the methodology for measuring the growth limit of our retained portfolio to be based on an unpaid principal balance measurement from a GAAP measurement. Compliance with the growth limit will not take into account any net increase in delinquent loan balances in the retained portfolio after September 30, 2007.

The average unpaid principal balance for the six months ended December 31, 2007, calculated using cumulative average month-end portfolio balances, was $26.9 billion below our voluntary growth limit of $742.4 billion.

### Collateral Pledged

#### Collateral Pledged to Freddie Mac

Our counterparties are required to pledge collateral for reverse repurchase transactions and most interest-rate swap transactions subject to collateral posting thresholds generally related to a counterparty's credit rating. Although it is our practice not to repledge assets held as collateral, a portion of the collateral may be repledged based on master agreements related to our interest-rate swap transactions. At December 31, 2007 and 2006, we did not have collateral in the form of securities pledged to and held by us under interest-rate swap agreements.

*Collateral Pledged by Freddie Mac*

We are also required to pledge collateral for margin requirements with third-party custodians in connection with secured financings, interest-rate swap agreements, futures and daily trade activities with some counterparties. The level of collateral pledged related to our interest-rate swap agreements is determined after giving consideration to our credit rating. As of December 31, 2007, we had two uncommitted intraday lines of credit with third parties, both of which are secured. In certain limited circumstances, the lines of credit agreements give the secured parties the right to repledge the securities underlying our financing to other third parties, including the Federal Reserve Bank.

Table 4.7 summarizes all securities pledged as collateral by us, including assets that the secured party may repledge and those that may not be repledged.

**Table 4.7 — Collateral in the Form of Securities Pledged**

|  | December 31, | |
|---|---|---|
|  | 2007 | 2006 |
|  | (In millions) | |
| Securities pledged with ability for secured party to repledge | | |
| Available-for-sale.................................................................................................. | $17,010 | $20,463 |
| Securities pledged without ability for secured party to repledge | | |
| Available-for-sale.................................................................................................. | 793 | 225 |
| Total securities pledged.............................................................................................. | $17,803 | $20,688 |

## NOTE 5: MORTGAGE LOANS AND LOAN LOSS RESERVES

We own both single-family mortgage loans, which are secured by one to four family residential properties, and multifamily mortgage loans, which are secured by properties with five or more residential rental units.

The following table summarizes the types of loans within our retained mortgage loan portfolio as of December 31, 2007 and 2006. These balances do not include mortgage loans underlying our guaranteed PCs and Structured Securities, since these are not consolidated on our balance sheets. See "NOTE 2: FINANCIAL GUARANTEES AND TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS" for information on our securitized mortgage loans.

**Table 5.1 — Mortgage Loans within the Retained Portfolio**

|  | December 31, | |
|---|---|---|
|  | 2007 | 2006 |
|  | (In millions) | |
| Single-family[1]: | | |
| Conventional | | |
| Fixed-rate............................................................................................ | $20,707 | $18,427 |
| Adjustable-rate...................................................................................... | 2,700 | 1,233 |
| Total conventional.................................................................................. | 23,407 | 19,660 |
| FHA/VA — Fixed-rate................................................................................ | 311 | 196 |
| Rural Housing Service and other federally guaranteed loans................................... | 871 | 784 |
| Total single-family..................................................................................... | 24,589 | 20,640 |
| Multifamily[1]: | | |
| Conventional | | |
| Fixed-rate............................................................................................ | 53,111 | 41,863 |
| Adjustable-rate...................................................................................... | 4,455 | 3,341 |
| Total conventional.................................................................................. | 57,566 | 45,204 |
| Rural Housing Service................................................................................ | 3 | 3 |
| Total multifamily....................................................................................... | 57,569 | 45,207 |
| Total unpaid principal balance of mortgage loans................................................... | 82,158 | 65,847 |
| Deferred fees, unamortized premiums, discounts and other cost basis adjustments ............. | (1,868) | (171) |
| Lower of cost or market adjustments on loans held-for-sale........................................ | (2) | (2) |
| Allowance for loan losses on loans held-for-investment........................................... | (256) | (69) |
| Total mortgage loans, net of allowance for loan losses.............................................. | $80,032 | $65,605 |

(1) Based on unpaid principal balances and excludes mortgage loans traded, but not yet settled.

For the years ended December 31, 2007 and 2006, we transferred $41 million and $123 million, respectively, of held-for-sale mortgage loans to held-for-investment. For the years ended December 31, 2007 and 2006, we transferred $— and $950, respectively, of held-for-investment mortgage loans to held-for-sale.

### Loan Loss Reserves

We maintain an allowance for loan losses on mortgage loans that we classify as held-for-investment and a reserve for guarantee losses for mortgage loans that underlie guaranteed PCs and Structured Securities, collectively referred to as loan loss reserves. Loan loss reserves are established to provide for credit losses when it is probable that a loss has been incurred.

Table 5.2 summarizes loan loss reserve activity:

### Table 5.2 — Detail of Loan Loss Reserves

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2007 | | | 2006 (Adjusted) | | | 2005 (Adjusted) | | |
| | Reserves related to: | | Total Loss Loss Reserves | Reserves related to: | | Total Loan Loss Reserves | Reserves related to: | | Total Loan Loss Reserves |
| | Retained Mortgages | PCs and Structured Securities | | Retained Mortgages | PCs and Structured Securities | | Retained Mortgages | PCs and Structured Securities | |
| | | | | | (in millions) | | | | |
| Beginning balance .................. | $  69 | $  550 | $  619 | $ 118 | $430 | $ 548 | $ 115 | $240 | $ 355 |
| Provision for credit losses .......... | 321 | 2,533 | 2,854 | 98 | 198 | 296 | 112 | 195 | 307 |
| Charge-offs[1][2] ................. | (373) | (3) | (376) | (313) | — | (313) | (294) | — | (294) |
| Recoveries[1] ................. | 239 | — | 239 | 166 | — | 166 | 185 | — | 185 |
| Transfers, net[3] ................. | — | (514) | (514) | — | (78) | (78) | — | (5) | (5) |
| Ending balance...................... | $ 256 | $2,566 | $2,822 | $  69 | $550 | $ 619 | $ 118 | $430 | $ 548 |

(1) Charge-offs or recoveries are presented in the retained mortgages columns above when credit losses related to off-balance sheet PCs have been preceded by the purchase of a delinquent mortgage loan from the PC pool.
(2) Charge-offs related to retained mortgages represent the amount of the unpaid principal balance of a loan that has been discharged using the reserve balance to remove the loan from our retained portfolio at the time of resolution. Charge-offs exclude $156 million in 2007 related to reserve amounts previously transferred to reduce the carrying value of loans purchased under financial guarantees.
(3) Consist of: (a) the transfer of reserves associated with non-performing loans purchased from mortgage pools underlying our PCs, Structured Securities and long-term standby agreements to establish the initial recorded investment in these loans at the date of our purchase; (b) amounts attributable to uncollectible interest on PCs and Structured Securities in our retained portfolio; and (c) other transfers, net.

### Impaired Loans

Single-family impaired loans include performing and non-performing troubled debt restructurings, as well as delinquent loans that were purchased from mortgage pools underlying our PCs and Structured Securities and long-term standby agreements. Multifamily impaired loans include loans whose contractual terms have previously been modified due to credit concerns (including TDRs), certain loans with observable collateral deficiencies, loans impaired based on management's judgments around other known facts and circumstances associated with those loans, and loans 60 days or more past due (except for certain credit-enhanced loans). Recorded investment on impaired loans includes the unpaid principal balance plus amortized basis adjustments, which are modifications to the loan's carrying value.

Total loan loss reserves, as presented in "Table 5.2 — Detail of Loan Loss Reserves," consists of a specific valuation allowance related to impaired loans, which is presented in Table 5.3, and an additional reserve for other probable incurred losses, which totaled $2,809 million, $613 million and $532 million at December 31, 2007, 2006 and 2005, respectively. Our recorded investment in impaired loans and the related valuation allowance are summarized in Table 5.3.

### Table 5.3 — Impaired Loans

| | December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2007 | | | 2006 (Adjusted) | | | 2005 | | |
| | Recorded Investment | Specific Reserve | Net Investment | Recorded Investment | Specific Reserve | Net Investment | Recorded Investment | Specific Reserve | Net Investment |
| | | | | | (in millions) | | | | |
| Impaired loans having: | | | | | | | | | |
| Related-valuation allowance ............ | $ 155 | $(13) | $ 142 | $  86 | $(6) | $  80 | $  54 | $(16) | $  38 |
| No related-valuation allowance[1] ..... | 8,579 | — | 8,579 | 5,818 | — | 5,818 | 2,536 | — | 2,536 |
| Total .............................. | $8,734 | $(13) | $8,721 | $5,904 | $(6) | $5,898 | $2,590 | $(16) | $2,574 |

(1) Impaired loans with no related valuation allowance primarily represent performing single-family troubled debt restructuring loans and those delinquent loans purchased out of PC pools that have not been impaired subsequent to acquisition.

For the years ended December 31, 2007, 2006 and 2005, the average recorded investment in impaired loans was $7.5 billion, $4.4 billion and $2.6 billion, respectively. The increase in impaired loans in 2007 is attributed to an increase in the average size of the unpaid principal balance for loans originated in 2006 and 2007, and higher delinquency rates overall, but especially for loans originated in these years. The increase in impaired loans in 2006 is primarily attributed to higher volumes of delinquent loans in the North Central region, which was affected by a downturn in that area's economy.

Interest income on multifamily impaired loans is recognized on an accrual basis for loans performing under the original or restructured terms and on a cash basis for non-performing loans, which collectively totaled approximately $22 million, $25 million and $24 million for the years ended December 31, 2007, 2006 and 2005, respectively. We recorded interest

income on impaired single-family loans that totaled $382 million, $177 million and $149 million for the years ended December 31, 2007, 2006 and 2005, respectively.

Interest income and management and guarantee income foregone on impaired loans approximated $141 million, $23 million and $128 million in 2007, 2006 and 2005, respectively.

**Loans Acquired under Financial Guarantees**

We have the option under our PC agreements to purchase mortgage loans from the loan pools that underlie our guarantees and standby commitments under certain circumstances to resolve an existing or impending delinquency or default. Effective December 2007, our general practice is to purchase loans that are delinquent from pools when the loans have been modified or foreclosure sales occur, or when the loans have been delinquent for 24 months, unless we determine it is economically beneficial to do so sooner. Prior to December 2007, our general practice was to purchase the mortgage loans when the loans were significantly past due, generally after 120 days of delinquency. Loans purchased from PC pools that underlie our guarantees or that are covered by our standby commitments are recorded at fair value. We recognize losses on loans purchased in our consolidated statements of income if our net investment in the acquired loan is higher than its fair value. At December 31, 2007 and 2006, the unpaid principal balances of these loans were $7.0 billion and $3.0 billion, respectively, while the carrying amounts of these loans were $5.2 billion and $2.8 billion, respectively.

We account for loans acquired in accordance with SOP 03-3 if, at acquisition, the loans had credit deterioration and we do not consider it probable that we will collect all contractual cash flows from the borrower. The following table provides details on impaired loans acquired under financial guarantees.

**Table 5.4 — Loans Acquired Under Financial Guarantees and Accounted for in Accordance with SOP 03-3**

| | Year Ended December 31, | |
|---|---|---|
| | 2007 | Adjusted 2006 |
| | (in millions) | |
| Contractual principal and interest payments at acquisition | $ 9,735 | $5,223 |
| Non-accretable difference | (549) | (142) |
| Cash flows expected to be collected at acquisition | 9,186 | 5,081 |
| Accretable balance | (2,717) | (648) |
| Initial investment in acquired loans at acquisition | $ 6,469 | $4,433 |

The excess of contractual principal and interest over the undiscounted amount of cash flows we expect to collect represents a non-accretable difference that is not accreted to interest income nor displayed on the consolidated balance sheets. The amount that may be accreted into interest income on such loans is limited to the excess of our estimate of undiscounted expected principal, interest and other cash flows from the loan over our initial investment in the loan. We consider estimated prepayments when calculating the accretable balance and the non-accretable difference. While these loans are seriously delinquent, no amounts are accreted to interest income. Subsequent changes in estimated future cash flows to be collected related to interest-rate changes are recognized prospectively in interest income over the remaining contractual life of the loan. Decreases in estimated future cash flows to be collected due to further credit deterioration are recognized as provision for credit losses and increase our loan loss reserve. Subsequent to acquisition, we recognized $12 million in provision for credit losses on our consolidated statement of income related to these loans in 2007.

The following table provides changes in the accretable balance of these loans.

**Table 5.5 — Changes in Accretable Balance**

| | Year Ended December 31, | |
|---|---|---|
| | 2007 | Adjusted 2006 |
| | (in millions) | |
| Beginning balance | $ 510 | $ — |
| Additions from new acquisitions | 2,717 | 648 |
| Accretion during the period | (193) | (104) |
| Reductions[1] | (504) | (58) |
| Change in estimated cash flows[2] | 121 | 31 |
| Reclassifications to or from nonaccretable difference | (244) | (7) |
| Ending balance | $2,407 | $ 510 |

(1) Represents the recapture of losses previously recognized due to borrower repayment or foreclosure on the loan. During 2006, these recoveries were included within our losses on loans purchased.
(2) Represents the change in expected cash flows due to troubled debt restructurings or change in prepayment assumptions of the related loans.

**Delinquency Rates**

Table 5.6 summarizes the delinquency performance for our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of Structured Securities backed by Ginnie Mae Certificates.

**Table 5.6 — Delinquency Performance**

|  | At December 31, | | |
| --- | --- | --- | --- |
|  | 2007 | 2006 | 2005 |
| **Delinquencies:** | | | |
| *Single-family:*[1] | | | |
| Non-credit-enhanced portfolio — excluding Structured Transactions: | | | |
| Delinquency rate | 0.45% | 0.25% | 0.30% |
| Total number of delinquent loans | 44,948 | 22,671 | 25,977 |
| Credit-enhanced portfolio — excluding Structured Transactions: | | | |
| Delinquency rate | 1.62% | 1.30% | 1.61% |
| Total number of delinquent loans | 34,621 | 24,106 | 29,336 |
| Total portfolio — excluding Structured Transactions: | | | |
| Delinquency rate | 0.65% | 0.42% | 0.53% |
| Total number of delinquent loans | 79,569 | 46,777 | 55,313 |
| Structured Transactions[2]: | | | |
| Delinquency rate | 9.86% | 8.36% | 12.34% |
| Total number of delinquent loans | 14,122 | 13,770 | 19,625 |
| Total single-family portfolio[2]: | | | |
| Delinquency rate | 0.76% | 0.54% | 0.71% |
| Total number of delinquent loans | 93,691 | 60,547 | 74,938 |
| *Multifamily:*[3] | | | |
| Delinquency rate | 0.02% | 0.06% | —% |
| Net carrying value of delinquent loans (in millions) | $ 10 | $ 30 | $ 2 |

(1) Based on the number of mortgages 90 days or more delinquent or in foreclosure. Delinquencies on mortgage loans underlying certain Structured Securities, long-term standby commitments and Structured Transactions may be reported on a different schedule due to variances in industry practice.

(2) Structured Transactions generally have underlying mortgage loans with higher risk characteristics but may provide inherent credit protections from losses due to underlying subordination, excess interest, overcollateralization and other features. Previously reported delinquency data for Structured Transactions excluded certain information when underlying loan servicing data was not previously available. Prior period information has been revised to conform to the current period presentation, which includes loan servicing data for all Structured Transactions.

(3) Multifamily delinquency performance is based on net carrying value of mortgages 60 days or more delinquent, and excludes multifamily Structured Transactions, which are approximately 1%, 2% and —% of our total multifamily portfolio as of December 31, 2007, 2006 and 2005, respectively. There were no delinquencies for our multifamily Structured Transactions as of December 31, 2007, 2006 and 2005.

## NOTE 6: REAL ESTATE OWNED

We obtain REO properties when we are the highest bidder at foreclosure sales of properties that collateralize non-performing single-family and multifamily mortgage loans owned by us. Upon acquiring single-family properties, we establish a marketing plan to sell the property as soon as practicable by either listing it with a sales broker or by other means, such as arranging a real estate auction. Upon acquiring multifamily properties, we may operate them with third-party property-management firms for a period to stabilize value and then sell the properties through commercial real estate brokers. For each of the years ended December 31, 2007 and 2006, the weighted average holding period for our disposed REO properties was less than one year. Table 6.1 provides a summary of our REO activity.

**Table 6.1 — Real Estate Owned**

|  | REO, Gross | Valuation Allowance | REO, Net |
| --- | --- | --- | --- |
|  | | (in millions) | |
| Balance, December 31, 2005 | $ 744 | $(115) | $ 629 |
| Additions | 1,484 | (85) | 1,399 |
| Dispositions and write-downs | (1,357) | 72 | (1,285) |
| Balance, December 31, 2006 | $ 871 | $(128) | $ 743 |
| Additions | 2,906 | (175) | 2,731 |
| Dispositions and write-downs | (1,710) | (28) | (1,738) |
| Balance, December 31, 2007 | $ 2,067 | $(331) | $ 1,736 |

We recognized net losses of $120 million, $59 million and $67 million on REO dispositions for the years ended December 31, 2007, 2006 and 2005, respectively, which are included in REO operations expense. The number of REO property additions increased by 39% in 2007 compared to those in 2006. Our REO additions have continued to be greatest in the North Central region of the U.S. and approximately 43% of our REO property count balance relates to properties located in this region.

## NOTE 7: DEBT SECURITIES AND SUBORDINATED BORROWINGS

Table 7.1 summarizes the balances and effective interest rates for debt securities, as well as subordinated borrowings.

### Table 7.1 — Total Debt Securities, Net

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2007 | | 2006 | |
| | Balance, Net[1] | Effective Rate[2] | Balance, Net[1] | Effective Rate[2] |
| | | (dollars in millions) | | |
| Senior debt, due within one year: | | | | |
| Short-term debt securities | $197,601 | 4.52% | $167,385 | 5.14% |
| Current portion of long-term debt | 98,320 | 4.44 | 117,879 | 4.10 |
| Senior debt, due within one year | 295,921 | 4.49 | 285,264 | 4.71 |
| Senior debt, due after one year | 438,147 | 5.24 | 452,677 | 5.08 |
| Subordinated debt, due after one year | 4,489 | 5.84 | 6,400 | 5.86 |
| Senior and subordinated debt, due after one year | 442,636 | 5.25 | 459,077 | 5.09 |
| Total debt securities, net | $738,557 | | $744,341 | |

(1) Represents par value, net of associated discounts, premiums and foreign-currency-related basis adjustments.
(2) Represents the weighted average effective rate at the end of the period, which includes the amortization of discounts or premiums and issuance costs.

### Senior Debt, Due Within One Year

As indicated in Table 7.2, a majority of senior debt, due within one year (excluding current portion of long-term debt) consisted of Reference Bills® securities and discount notes, paying only principal at maturity. Reference Bills® securities, discount notes and medium-term notes are unsecured general corporate obligations. Certain medium-term notes that have original maturities of one year or less are classified as short-term debt securities. Securities sold under agreements to repurchase are effectively collateralized borrowing transactions where we sell securities with an agreement to repurchase such securities. These agreements require the underlying securities to be delivered to the dealers who arranged the transactions. Federal funds purchased are unsecuritized borrowings from commercial banks that are members of the Federal Reserve System. At both December 31, 2007 and 2006, the balance of securities sold under agreements to repurchase and federal funds purchased was $—.

Table 7.2 provides additional information related to our debt securities due within one year.

### Table 7.2 — Senior Debt, Due Within One Year

| | December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2007 | | | 2006 | | |
| | Par Value | Balance, Net[1] | Effective Rate | Par Value | Balance, Net[1] | Effective Rate |
| | | | (dollars in millions) | | | |
| Reference Bills® securities and discount notes[2] | $198,323 | $196,426 | 4.52% | $159,503 | $157,553 | 5.14% |
| Medium-term notes[2] | 1,175 | 1,175 | 4.36 | 9,832 | 9,832 | 5.16 |
| Short-term debt securities | 199,498 | 197,601 | 4.52 | 169,335 | 167,385 | 5.14 |
| Current portion of long-term debt | 97,262 | 98,320 | 4.44 | 117,972 | 117,879 | 4.10 |
| Senior debt, due within one year | $296,760 | $295,921 | 4.49 | $287,307 | $285,264 | 4.71 |

(1) Represents par value, net of associated discounts, premiums and foreign-currency-related basis adjustments.
(2) Represents the approximate weighted average effective rate for each instrument outstanding at the end of the period, which includes the amortization of discounts or premiums and issuance costs.

## Senior and Subordinated Debt, Due After One Year

Table 7.3 summarizes our senior and subordinated debt, due after one year.

### Table 7.3 — Senior and Subordinated Debt, Due After One Year

| | | December 31, | | | | | |
| | | 2007 | | | 2006 | | |
| | Contractual Maturity[1] | Par Value | Balance, Net[2] | Interest Rates | Par Value | Balance, Net[2] | Interest Rates |
|---|---|---|---|---|---|---|---|
| | | | | (dollars in millions) | | | |
| **Senior debt, due after one year:[1]** | | | | | | | |
| *Fixed-rate:* | | | | | | | |
| Medium-term notes — callable[4] | 2009 – 2037 | $169,588 | $169,519 | 3.00% – 7.50% | $183,611 | $183,532 | 2.57% – 7.50% |
| Medium-term notes — non-callable | 2009 – 2028 | 7,122 | 7,399 | 1.00% – 14.32% | 5,764 | 5,798 | 1.00% – 10.27% |
| U.S. dollar Reference Notes® securities — non-callable | 2009 – 2032 | 202,139 | 201,745 | 3.38% – 7.00% | 195,289 | 194,772 | 2.75% – 7.00% |
| EReference Notes® securities — non-callable | 2009 – 2014 | 9,670 | 9,649 | 3.75% – 5.75% | 16,912 | 16,878 | 3.50% – 5.75% |
| *Variable-rate:* | | | | | | | |
| Medium-term notes — callable[5] | 2009 – 2030 | 22,913 | 22,909 | Various | 28,617 | 28,616 | Various |
| Medium-term notes — non-callable | 2009 – 2026 | 2,653 | 2,688 | Various | 421 | 460 | Various |
| *Zero-coupon:* | | | | | | | |
| Medium-term notes — callable[6] | 2014 – 2037 | 45,725 | 9,544 | —% | 43,248 | 8,610 | —% |
| Medium-term notes — non-callable[7] | 2009 – 2037 | 14,493 | 9,556 | —% | 10,535 | 6,204 | —% |
| Foreign-currency-related and hedging-related basis adjustments | | N/A | 5,138 | | N/A | 7,807 | |
| Total senior debt, due after one year | | 474,303 | 438,147 | | 484,397 | 452,677 | |
| **Subordinated debt, due after one year:** | | | | | | | |
| *Fixed-rate[8]* | 2011 – 2018 | 4,452 | 4,388 | 5.00% – 8.25% | 6,382 | 6,309 | 5.00% – 8.25% |
| *Zero-coupon[9]* | 2019 | 332 | 101 | —% | 332 | 91 | —% |
| Total subordinated debt, due after one year | | 4,784 | 4,489 | | 6,714 | 6,400 | |
| Total senior and subordinated debt, due after one year | | $479,087 | $442,636 | | $491,111 | $459,077 | |

(1) Represents contractual maturities at December 31, 2007.
(2) Represents par value of long-term debt securities and subordinated borrowings, net of associated discounts or premiums.
(3) For debt denominated in a currency other than the U.S. dollar, the outstanding balance is based on the exchange rate at the date of the debt issuance. Subsequent changes in exchange rates are reflected in foreign-currency-related and hedging-related basis adjustments.
(4) Includes callable Estate Notes℠ securities and FreddieNotes® securities of $14.1 billion and $13.0 billion at December 31, 2007 and 2006, respectively. These debt instruments represent medium-term notes that permit persons acting on behalf of deceased beneficial owners to require us to repay principal prior to the contractual maturity date.
(5) Includes callable Estate Notes℠ securities and FreddieNotes® securities at December 31, 2007 and 2006.
(6) The effective rates for zero-coupon medium-term notes — callable ranged from 5.57% – 7.17% at both December 31, 2007 and 2006.
(7) The effective rates for zero-coupon medium-term notes — non-callable ranged from 3.46% – 10.68% and 2.65% – 10.68% at December 31, 2007 and 2006, respectively.
(8) Balance, net includes callable subordinated debt of $— and $1.9 billion at December 31, 2007 and 2006, respectively.
(9) The effective rate for zero-coupon subordinated debt, due after one year was 10.20% at both December 31, 2007 and 2006.

A portion of our long-term debt is callable. Callable debt gives us the option to redeem the debt security at par on one or more specified call dates or at any time on or after a specified call date.

Table 7.4 summarizes the contractual maturities of long-term debt securities (including current portion of long-term debt) and subordinated borrowings outstanding at December 31, 2007, assuming callable debt is paid at contractual maturity.

### Table 7.4 — Senior and Subordinated Debt, Due After One Year (including current portion of long-term debt)

| Annual Maturities | Contractual Maturity[1][1] |
|---|---|
| | (in millions) |
| 2008 | $ 97,262 |
| 2009 | 79,316 |
| 2010 | 63,911 |
| 2011 | 45,966 |
| 2012 | 52,317 |
| Thereafter | 237,577 |
| Total[1] | $576,349 |
| Net discounts, premiums and foreign-currency-related basis adjustments[2] | (35,393) |
| Senior and subordinated debt, due after one year, including current portion of long-term debt | $540,956 |

(1) Represents par value of long-term debt securities and subordinated borrowings.
(2) For debt denominated in a currency other than the U.S. dollar, the par value is based on the exchange rate at the date of the debt issuance. Subsequent changes in exchange rates are reflected in net discounts, premiums and foreign-currency-related basis adjustments.

## Lines of Credit

We opened intraday lines of credit with third-parties to provide additional liquidity to fund our intraday activities through the Fedwire system in connection with the Federal Reserve Board's revised payments system risk policy, which restricts or eliminates daylight overdrafts by GSEs, including us. At December 31, 2007, we had two secured, uncommitted lines of credit totaling $17 billion. No amounts were drawn on these lines of credit at December 31, 2007. We expect to

continue to use these facilities from time to time to satisfy our intraday financing needs; however, since the lines are uncommitted, we may not be able to draw on them if and when needed.

## NOTE 8: STOCKHOLDERS' EQUITY

### Preferred Stock

During 2007, we completed five preferred stock offerings consisting of five classes. We had two preferred stock offerings consisting of three classes during 2006. All 24 classes of preferred stock outstanding at December 31, 2007 have a par value of $1 per share. We have the option to redeem these shares, on specified dates, at their redemption price plus dividends accrued through the redemption date. In addition, all 24 classes of preferred stock are perpetual and non-cumulative, and carry no significant voting rights or rights to purchase additional Freddie Mac stock or securities. Costs incurred in connection with the issuance of preferred stock are charged to additional paid-in capital.

Table 8.1 provides a summary of our preferred stock outstanding at December 31, 2007.

### Table 8.1 — Preferred Stock

| | Issue Date | Shares Authorized | Shares Outstanding | Total Par Value | Redemption Price per Share | Total Outstanding Balance[1] | Redeemable On or After[2] | NYSE Symbol[3] |
|---|---|---|---|---|---|---|---|---|
| | | | (in millions, except redemption price per share) | | | | | |
| 1996 Variable-rate[4] | April 26, 1996 | 5.00 | 5.00 | $ 5.00 | $50.00 | $ 250 | June 30, 2001 | FRE.prB |
| 5.81% | October 27, 1997 | 3.00 | 3.00 | 3.00 | 50.00 | 150 | October 27, 1998 | (5) |
| 5% | March 23, 1998 | 8.00 | 8.00 | 8.00 | 50.00 | 400 | March 31, 2003 | FRE.prF |
| 1998 Variable-rate[6] | September 23 and 29, 1998 | 4.40 | 4.40 | 4.40 | 50.00 | 220 | September 30, 2003 | FRE.prG |
| 5.10% | September 23, 1998 | 8.00 | 8.00 | 8.00 | 50.00 | 400 | September 30, 2003 | FRE.prH |
| 5.30% | October 28, 1998 | 4.00 | 4.00 | 4.00 | 50.00 | 200 | October 30, 2000 | (5) |
| 5.10% | March 19, 1999 | 3.00 | 3.00 | 3.00 | 50.00 | 150 | March 31, 2004 | (5) |
| 5.79% | July 21, 1999 | 5.00 | 5.00 | 5.00 | 50.00 | 250 | June 30, 2009 | FRE.prK |
| 1999 Variable-rate[7] | November 5, 1999 | 5.75 | 5.75 | 5.75 | 50.00 | 287 | December 31, 2004 | FRE.prL |
| 2001 Variable-rate[8] | January 26, 2001 | 6.50 | 6.50 | 6.50 | 50.00 | 325 | March 31, 2003 | FRE.prM |
| 2001 Variable-rate[9] | March 23, 2001 | 4.60 | 4.60 | 4.60 | 50.00 | 230 | March 31, 2003 | FRE.prN |
| 5.81% | March 23, 2001 | 3.45 | 3.45 | 3.45 | 50.00 | 173 | March 31, 2011 | FRE.prO |
| 6% | May 30, 2001 | 3.45 | 3.45 | 3.45 | 50.00 | 173 | June 30, 2006 | FRE.prP |
| 2001 Variable-rate[10] | May 30, 2001 | 4.02 | 4.02 | 4.02 | 50.00 | 201 | June 30, 2003 | FRE.prQ |
| 5.70% | October 30, 2001 | 6.00 | 6.00 | 6.00 | 50.00 | 300 | December 31, 2006 | FRE.prR |
| 5.81% | January 29, 2002 | 6.00 | 6.00 | 6.00 | 50.00 | 300 | March 31, 2007 | (5) |
| 2006 Variable-rate[11] | July 17, 2006 | 15.00 | 15.00 | 15.00 | 50.00 | 750 | June 30, 2011 | FRE.prS |
| 6.42% | July 17, 2006 | 5.00 | 5.00 | 5.00 | 50.00 | 250 | June 30, 2011 | FRE.prT |
| 5.90% | October 16, 2006 | 20.00 | 20.00 | 20.00 | 25.00 | 500 | September 30, 2011 | FRE.prU |
| 5.57% | January 16, 2007 | 44.00 | 44.00 | 44.00 | 25.00 | 1,100 | December 31, 2011 | FRE.prV |
| 5.66% | April 16, 2007 | 20.00 | 20.00 | 20.00 | 25.00 | 500 | March 31, 2012 | FRE.prW |
| 6.02% | July 24, 2007 | 20.00 | 20.00 | 20.00 | 25.00 | 500 | June 30, 2012 | FRE.prX |
| 6.55% | September 28, 2007 | 20.00 | 20.00 | 20.00 | 25.00 | 500 | September 30, 2017 | FRE.prY |
| 2007 Fixed-to-floating Rate[12] | December 4, 2007 | 240.00 | 240.00 | 240.00 | 25.00 | 6,000 | December 31, 2012 | FRE.prZ |
| Total | | 464.17 | 464.17 | $464.17 | | $14,109 | | |

(1) Amounts stated at redemption value.
(2) As long as the capital monitoring framework established by OFHEO in January 2004 remains in effect, any preferred stock redemption will require prior approval by OFHEO. See "NOTE 9: REGULATORY CAPITAL" for more information.
(3) Preferred stock is listed on the New York Stock Exchange, or NYSE, unless otherwise noted.
(4) Dividend rate resets quarterly and is equal to the sum of three-month London Interbank Offered Rate, or LIBOR, plus 1% divided by 1.377, and is capped at 9.00%.
(5) Not listed on any exchange.
(6) Dividend rate resets quarterly and is equal to the sum of three-month LIBOR plus 1% divided by 1.377, and is capped at 7.50%.
(7) Dividend rate resets on January 1 every five years after January 1, 2005 based on a five-year Constant Maturity Treasury, or CMT, rate, and is capped at 11.00%. Optional redemption on December 31, 2004 and on December 31 every five years thereafter.
(8) Dividend rate resets on April 1 every two years after April 1, 2003 based on the two-year CMT rate plus 0.10%, and is capped at 11.00%. Optional redemption on March 31, 2003 and on March 31 every two years thereafter.
(9) Dividend rate resets on April 1 every year based on 12-month LIBOR minus 0.20%, and is capped at 11.00%. Optional redemption on March 31, 2003 and on March 31 every year thereafter.
(10) Dividend rate resets on July 1 every two years after July 1, 2003 based on the two-year CMT rate plus 0.20%, and is capped at 11.00%. Optional redemption on June 30, 2003 and on June 30 every two years thereafter.
(11) Dividend rate resets quarterly and is equal to the sum of three-month LIBOR plus 0.50% but not less than 4.00%.
(12) Dividend rate is set at an annual fixed rate of 8.375% from December 4, 2007 through December 31, 2012. For the period beginning on or after January 1, 2013, dividend rate resets quarterly and is equal to the higher of (a) the sum of three-month LIBOR plus 4.16% per annum or (b) 7.875% per annum. Optional redemption on December 31, 2012, and on December 31 every five years thereafter.

### Stock Repurchase and Issuance Programs

During 2007, we completed five non-cumulative, perpetual preferred stock offerings with aggregate proceeds of $8.6 billion, including $6.0 billion of fixed-to-floating to increase our capital position and $500 million of 6.55% non-cumulative, perpetual preferred stock for general corporate purposes. We also issued $500 million of 6.02% and $500 million of 5.66% non-cumulative, perpetual preferred stock and repurchased $1.0 billion (approximately 16.1 million shares) of outstanding common stock, thereby completing our plan announced in March 2007 to replace $1.0 billion of common stock

146

*Freddie Mac*

with an equal amount of preferred stock. In addition, we issued $1.1 billion of 5.57% non-cumulative, perpetual preferred stock, consisting of $500 million to complete our plan announced in October 2005 to replace $2.0 billion of common stock with an equal amount of preferred stock and $600 million to replace higher-cost preferred stock that we redeemed.

During 2006, we repurchased $2.0 billion of outstanding shares of common stock and issued $1.5 billion of non-cumulative, perpetual preferred stock in connection with our plan announced in October 2005 to replace $2.0 billion of common stock with an equal amount of preferred stock.

In accordance with OFHEO's capital monitoring framework, we obtained OFHEO's approval for the preferred stock redemption and common stock repurchase activities described above.

### Common Stock Dividends Declared

Common stock dividends declared per share were $1.75, $1.91 and $1.52 for 2007, 2006 and 2005, respectively.

## NOTE 9: REGULATORY CAPITAL

### Regulatory Capital Standards

The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, or GSE Act, established minimum, critical and risk-based capital standards for us.

Those standards determine the amounts of core capital and total capital that we must maintain to meet regulatory capital requirements. Core capital consists of the par value of outstanding common stock (common stock issued less common stock held in treasury), the par value of outstanding non-cumulative, perpetual preferred stock, additional paid-in capital and retained earnings, as determined in accordance with GAAP. Total capital includes core capital and general reserves for mortgage and foreclosure losses and any other amounts available to absorb losses that OFHEO includes by regulation.

### *Minimum Capital*

The minimum capital standard requires us to hold an amount of core capital that is generally equal to the sum of 2.50% of aggregate on-balance sheet assets and approximately 0.45% of the sum of our PCs and Structured Securities outstanding and other aggregate off-balance sheet obligations. As discussed below, in 2004 OFHEO implemented a framework for monitoring our capital adequacy, which includes a mandatory target capital surplus of 30% over the minimum capital requirement.

### *Critical Capital*

The critical capital standard requires us to hold an amount of core capital that is generally equal to the sum of 1.25% of aggregate on-balance sheet assets and approximately 0.25% of the sum of our PCs and Structured Securities outstanding and other aggregate off-balance sheet obligations.

### *Risk-Based Capital*

The risk-based capital standard requires the application of a stress test to determine the amount of total capital that we must hold to absorb most projected losses resulting from adverse interest-rate and credit-risk conditions specified by the GSE Act and adds 30% additional capital to provide for management and operations risk. The adverse interest-rate conditions prescribed by the GSE Act include an "up-rate scenario" in which 10-year Treasury yields rise by as much as 75% and a "down-rate scenario" in which they fall by as much as 50%. The credit risk component of the stress tests simulates the performance of our mortgage portfolio based on loss rates for a benchmark region. The criteria for the benchmark region are established by the GSE Act and are intended to capture the credit-loss experience of the region that experienced the highest historical rates of default and severity of mortgage losses for two consecutive origination years.

### Classification

OFHEO monitors our performance with respect to the three regulatory capital standards by classifying our capital adequacy not less than quarterly.

To be classified as "adequately capitalized," we must meet both the risk-based and minimum capital standards. If we fail to meet the risk-based capital standard, we cannot be classified higher than "undercapitalized." If we fail to meet the minimum capital requirement but exceed the critical capital requirement, we cannot be classified higher than "significantly undercapitalized." If we fail to meet the critical capital standard, we must be classified as "critically undercapitalized." In addition, OFHEO has discretion to reduce our capital classification by one level if OFHEO determines that we are engaging in conduct OFHEO did not approve that could result in a rapid depletion of core capital or determines that the value of property subject to mortgage loans we hold or guarantee has decreased significantly.

If we were classified as adequately capitalized, we generally could pay a dividend on our common or preferred stock or make other capital distributions (which includes common stock repurchases and preferred stock redemptions) without prior

OFHEO approval so long as the payment would not decrease total capital to an amount less than our risk-based capital requirement and would not decrease our core capital to an amount less than our minimum capital requirement. However, because we are currently subject to the regulatory capital monitoring framework described below, we are required to obtain OFHEO's prior approval of certain capital transactions, including common stock repurchases, redemption of any preferred stock or payment of dividends on preferred stock above stated contractual rates.

If we were classified as undercapitalized, we would be prohibited from making a capital distribution that would reduce our core capital to an amount less than our minimum capital requirement. We also would be required to submit a capital restoration plan for OFHEO approval, which could adversely affect our ability to make capital distributions.

If we were classified as significantly undercapitalized, we would be prohibited from making any capital distribution that would reduce our core capital, to less than the critical capital level. We would otherwise be able to make a capital distribution only if OFHEO determined that the distribution would: (a) enhance our ability to meet the risk-based capital standard and the minimum capital standard promptly; (b) contribute to our long-term financial safety and soundness; or (c) otherwise be in the public interest. Also under this classification, OFHEO could take action to limit our growth, require us to acquire new capital or restrict us from activities that create excessive risk. We also would be required to submit a capital restoration plan for OFHEO approval, which could adversely affect our ability to make capital distributions.

If we were classified as critically undercapitalized, OFHEO would be required to appoint a conservator for us, unless OFHEO made a written finding that it should not do so and the Secretary of the Treasury concurred in that determination. We would be able to make a capital distribution only if OFHEO determined that the distribution would: (a) enhance our ability to meet the risk-based capital standard and the minimum capital standard promptly; (b) contribute to our long-term financial safety and soundness; or (c) otherwise be in the public interest.

### Performance Against Regulatory Capital Standards

OFHEO has never classified us as other than "adequately capitalized," the highest possible classification, reflecting our compliance with the minimum, critical and risk-based capital requirements.

Table 9.1 summarizes our regulatory capital requirements and surpluses.

### Table 9.1 — Regulatory Capital Requirements[1]

| | December 31, | |
| --- | --- | --- |
| | 2007 | (Adjusted) 2006 |
| | (in millions) | |
| *Minimum capital requirement*[1] | $26,473 | $25,607 |
| Core capital[2] | 37,867 | 35,365 |
| Minimum capital surplus[2] | 11,394 | 9,758 |
| *Critical capital requirement*[2] | $13,618 | $13,119 |
| Core capital[2] | 37,867 | 35,365 |
| Critical capital surplus[2] | 24,249 | 22,246 |
| *Risk-based capital requirement*[3] | N/A | $15,320 |
| Total capital[2] | N/A | 36,742 |
| Risk-based capital surplus[3] | N/A | 21,422 |

(1) OFHEO is the authoritative source of the capital calculations that underlie our capital classifications.
(2) Amounts for 2007 and 2006 are based on amended reports we will submit to OFHEO.
(3) OFHEO determines the amounts reported with respect to our risk-based capital requirement. Amounts for 2007 are not yet available and amounts for 2006 are those calculated by OFHEO prior to the adjustment of our 2006 financial results.

Factors that could adversely affect the adequacy of our capital in future periods include GAAP net losses; continued declines in home prices; increases in our credit and interest-rate risk profiles; adverse changes in interest-rate or implied volatility; adverse option-adjusted spread, or OAS, changes; legislative or regulatory actions that increase capital requirements; or changes in accounting practices or standards. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Issued Accounting Standards, Not Yet Adopted" for more information. In particular, interest-rate levels or implied volatility can affect the amount of our core capital, even if we were economically well hedged against interest-rate changes, because certain gains or losses are recognized through GAAP earnings while other offsetting gains or losses may not be. Changes in OAS can also affect the amount of our core capital, because OAS are a factor in the valuation of our guaranteed mortgage portfolio.

### Subordinated Debt Commitment

In October 2000, we announced our voluntary adoption of a series of commitments designed to enhance market discipline, liquidity and capital. In September 2005, we entered into a written agreement with OFHEO that updated those commitments and set forth a process for implementing them. Under the terms of this agreement, we committed to issue qualifying subordinated debt for public secondary market trading and rated by no fewer than two nationally recognized

statistical rating organizations in a quantity such that the sum of total capital plus the outstanding balance of qualifying subordinated debt will equal or exceed the sum of 0.45% of our PCs and Structured Securities outstanding and 4% of our on-balance sheet assets at the end of each quarter. Qualifying subordinated debt is defined as subordinated debt that contains a deferral of interest payments for up to five years if our core capital falls below 125% of our critical capital requirement or our core capital falls below our minimum capital requirement and pursuant to our request, the Secretary of the Treasury exercises discretionary authority to purchase our obligations under Section 306(c) of our charter. Qualifying subordinated debt will be discounted for the purposes of this commitment as it approaches maturity with one-fifth of the outstanding amount excluded each year during the instrument's last five years before maturity. When the remaining maturity is less than one year, the instrument is entirely excluded.

Table 9.2 summarizes our compliance with our subordinated debt commitment.

Table 9.2 — Subordinated Debt Commitment

|  | December 31, | |
| --- | --- | --- |
|  | 2007 | (Adjusted) 2006 |
|  | (In millions) | |
| Total on-balance sheet assets and PCs and Structured Securities outstanding target[1][2] | $38,000 | $37,249 |
| Total capital plus qualifying subordinated debt[2] | 44,559 | 41,997 |
| Surplus[1] | 6,559 | 4,748 |

(1) Equals the sum of 0.45% of our PCs and Structured Securities held by third parties and 4% of on-balance sheet assets.
(2) Amounts for 2007 and 2006 are based on amended reports we will submit to OFHEO.

### Regulatory Capital Monitoring Framework

In a letter dated January 28, 2004, OFHEO created a framework for monitoring our capital. The letter directed that we maintain a 30% mandatory target capital surplus over our minimum capital requirement, subject to certain conditions and variations; that we submit weekly reports concerning our capital levels; and that we obtain prior approval of certain capital transactions.

Our failure to meet the 30% mandatory target capital surplus would result in an OFHEO inquiry regarding the reason for such failure. If OFHEO were to determine that we had acted unreasonably regarding our compliance with the framework, as set forth in OFHEO's letter, OFHEO could seek to require us to submit a remedial plan or take other remedial steps.

In addition, under this framework, we are required to obtain prior written approval from the Director of OFHEO before engaging in certain capital transactions, including common stock repurchases, redemption of any preferred stock or payment of dividends on preferred stock above stated contractual rates. We must also submit a written report to the Director of OFHEO after the declaration, but before the payment, of any dividend on our common stock. The report must contain certain information on the amount of the dividend, the rationale for the payment and the impact on our capital surplus.

This framework will remain in effect until the Director of OFHEO determines that it should be modified or expire. OFHEO's letter indicated that this determination would consider our resumption of timely financial and regulatory reporting that complies with GAAP, among other factors.

Table 9.3 summarizes our compliance with the 30% mandatory target capital surplus portion of OFHEO's capital monitoring framework.

Table 9.3 — Mandatory Target Capital Surplus

|  | December 31, | |
| --- | --- | --- |
|  | 2007 | (Adjusted) 2006 |
|  | (in millions) | |
| Minimum capital requirement plus 30% add-on[1] | $34,415 | $33,289 |
| Core capital[1] | 37,867 | 35,365 |
| Surplus[1] | 3,452 | 2,076 |

(1) Amounts for 2007 and 2006 are based on amended reports we will submit to OFHEO.

### NOTE 10: STOCK-BASED COMPENSATION

We have three stock-based compensation plans under which grants are being made: (a) the ESPP; (b) the 2004 Stock Compensation Plan, or 2004 Employee Plan; and (c) the 1995 Directors' Stock Compensation Plan, as amended and restated, or Directors' Plan. Prior to the stockholder approval of the 2004 Employee Plan, employee stock-based compensation was awarded in accordance with the terms of the 1995 Stock Compensation Plan, or 1995 Employee Plan. Although grants are no longer made under the 1995 Employee Plan, we currently have awards outstanding under this plan. We collectively refer to the 2004 Employee Plan and 1995 Employee Plan as the Employee Plans.

149

*Freddie Mac*

Common stock delivered under these plans may consist of authorized but previously unissued shares, treasury stock or shares acquired in market transactions on behalf of the participants. During 2007, we granted restricted stock units as stock-based awards. Such awards, discussed below, are generally forfeitable for at least one year after the grant date, with vesting provisions contingent upon service requirements.

**Stock Options**

Stock options granted allow for the purchase of our common stock at an exercise price equal to the fair market value of our common stock on the grant date. During 2006, the 2004 Employee Plan was amended to change the definition of fair market value to the closing sales price of a share of common stock from the average of the high and low sales prices, effective for all grants after December 6, 2006. Options generally may be exercised for a period of 10 years from the grant date, subject to a vesting schedule commencing on the grant date.

Stock options that we previously granted included dividend equivalent rights. Depending on the terms of the grant, the dividend equivalents may be paid when and as dividends on our common stock are declared. Alternatively, dividend equivalents may be paid upon exercise or expiration of the stock option. Subsequent to November 30, 2005, dividend equivalent rights were no longer granted in connection with awards of stock options to grantees to address Internal Revenue Code Section 409A.

**Restricted Stock Units**

A restricted stock unit entitles the grantee to receive one share of common stock at a specified future date. Restricted stock units do not have voting rights, but do have dividend equivalent rights, which are (a) paid to restricted stock unit holders who are employees as and when dividends on common stock are declared or (b) accrued as additional restricted stock units for non-employee members of our board of directors.

**Restricted Stock**

Restricted stock entitles participants to all the rights of a stockholder, including dividends, except that the shares awarded are subject to a risk of forfeiture and may not be disposed of by the participant until the end of the restriction period established at the time of grant.

**Stock-Based Compensation Plans**

The following is a description of each of our stock-based compensation plans under which grants are currently being made.

*ESPP*

We have an ESPP that is qualified under Internal Revenue Code Section 423. Under the ESPP, substantially all full-time and part-time employees that choose to participate in the ESPP have the option to purchase shares of common stock at specified dates, with an annual maximum market value of $20,000 per employee as determined on the grant date. The purchase price is equal to 85% of the lower of the average price (average of the daily high and low prices) of the stock on the grant date or the average price of the stock on the purchase (exercise) date.

At December 31, 2007, the maximum number of shares of common stock authorized for grant to employees totaled 6.8 million shares, of which approximately 0.7 million shares had been issued and approximately 6.1 million shares remained available for grant. At December 31, 2007, no options to purchase stock were exercisable under the ESPP, as the options to purchase stock outstanding at year-end become exercisable subsequent to year-end, and are exercised or forfeited during the subsequent year.

*2004 Employee Plan*

Under the 2004 Employee Plan, we may grant employees stock-based awards, including stock options, restricted stock units and restricted stock. In addition, we have the right to impose performance conditions with respect to these awards. Employees may also be granted stock appreciation rights; however, at December 31, 2007, no stock appreciation rights had been granted under the 2004 Employee Plan. At December 31, 2007, the maximum number of shares of common stock authorized for grant to employees in accordance with the 2004 Employee Plan totaled 14.5 million shares, of which approximately 4.2 million shares had been issued and approximately 10.3 million shares remained available for grant.

*Directors' Plan*

Under the Directors' Plan, we are permitted to grant stock options, restricted stock units and restricted stock to non-employee members of our board of directors. At December 31, 2007, the maximum number of shares of common stock authorized for grant to members of our board of directors in accordance with the Directors' Plan totaled 2.4 million shares, of which approximately 0.9 million shares had been issued and approximately 1.5 million shares remained available for grant.

See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for a description of the accounting treatment for stock-based compensation, including grants under the ESPP, Employee Plans and Directors' Plan.

Estimates used to determine the assumptions noted in the table below are determined as follows:

(a) the expected volatility is based on the historical volatility of the stock over a time period equal to the expected life;

(b) the weighted average volatility is the weighted average of the expected volatility;

(c) the weighted average expected dividend yield is based on the most recent dividend announcement relative to the grant date and the stock price at the grant date;

(d) the weighted average expected life is based on historical option exercise experience; and

(e) the weighted average risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of the grant.

Changes in the assumptions used to calculate the fair value of stock options could result in materially different fair value estimates. The actual value of stock options will depend on the market value of our common stock when the stock options are exercised.

Table 10.1 summarizes the assumptions used in determining the fair values of options granted under our stock-based compensation plans using a Black-Scholes option-pricing model as well as the weighted average grant-date fair value of options granted and the total intrinsic value of options exercised.

### Table 10.1 — Assumptions and Valuations

| | ESPP | | | Employee Plans and Directors' Plan | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2007[1] | 2006 | 2005[1] |
| | (dollars in millions, except share-related amounts) | | | | | |
| **Assumptions:** | | | | | | |
| Expected volatility | 11.1% to 45.4% | 11.2% to 18.7% | 16.8% to 21.1% | N/A | 27.8% to 28.9% | 18.4% to 30.3% |
| Weighted average: | | | | | | |
| Volatility | 26.22% | 15.7% | 19.7% | N/A | 28.7% | 30.0% |
| Expected dividend yield | 3.44% | 2.98% | 2.15% | N/A | 3.09% | — |
| Expected life | 3 months | 3 months | 3 months | N/A | 7.1 years | 7.4 years |
| Risk-free interest rate | 4.57% | 4.82% | 3.20% | N/A | 4.91% | 4.23% |
| **Valuations:** | | | | | | |
| Weighted average grant-date fair value of options granted | $11.25 | $11.20 | $11.56 | N/A | $16.78 | $26.84 |
| Total intrinsic value of options exercised | $2 | $3 | $2 | $7 | $20 | $32 |

(1) No options were granted under the Employee Plans and Directors' Plan.

(2) The value of the dividend equivalent feature of options for the Employee Plans and Directors' Plan was incorporated into the Black-Scholes model by using an expected dividend yield of —%. To account for a modification of stock options on November 30, 2005, the dividend equivalent feature of affected stock options for the Employee Plans and Directors' Plan was valued separately. Other assumptions used to value the affected stock options were as follows: (a) expected volatility of 25.4%, (b) expected dividend yield of 2.96%, (c) expected life of 5.1 years and (d) risk-free interest rate of 4.34%. Subsequent to November 30, 2005, dividend equivalent rights are no longer granted in connection with new awards of stock options to grantees.

Table 10.2 provides a summary of activity under the ESPP for the year ended December 31, 2007 and those options to purchase stock that are exercisable at December 31, 2007.

### Table 10.2 — ESPP Activity

| | Options to Purchase Stock | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|
| | (dollars in millions, except share-related amounts) | | | |
| Outstanding at January 1, 2007[1] | 52,898 | $58.09 | | |
| Granted[2] | 277,091 | 49.73 | | |
| Exercised | (238,913) | 50.73 | | |
| Forfeited or expired | (8,510) | 51.78 | | |
| Outstanding at December 31, 2007[1] | 82,566 | 42.71 | 1 month | $— |
| Exercisable at December 31, 2007 | — | — | — | $— |

(1) Weighted average exercise price noted for options to purchase stock granted under the ESPP is calculated based on the average price on the grant date.

Table 10.3 provides a summary of option activity under the Employee Plans and Directors' Plan for the year ended December 31, 2007, and options exercisable at December 31, 2007.

### Table 10.3 — Employee Plans and Directors' Plan Option Activity

| | Stock Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|
| | | | (dollars in millions, except share-related amounts) | |
| Outstanding at January 1, 2007 | 5,851,925 | $58.43 | | |
| Granted | — | — | | |
| Exercised | (390,891) | 45.67 | | |
| Forfeited or expired | (366,179) | 61.73 | | |
| Outstanding at December 31, 2007 | 5,094,855 | 59.17 | 4.82 years | $— |
| Exercisable at December 31, 2007 | 4,070,825 | 58.84 | 4.25 years | $— |

We received cash of $18 million from the exercise of stock options under the Employee Plans and the Directors' Plan during 2007. We realized a tax benefit of $2 million as a result of tax deductions available to us upon the exercise of stock options under the Employee Plans and the Directors' Plan during 2007. During 2007 and 2006, we did not pay cash to settle share-based liability awards granted under share-based payment arrangements associated with the Employee Plans and the Directors' Plan. During 2005, we paid $1 million to settle share-based awards.

Table 10.4 provides a summary of activity related to restricted stock units and restricted stock under the Employee Plans and the Directors' Plan.

### Table 10.4 — Employee Plans and Directors' Plan Restricted Stock Units and Restricted Stock Activity

| | Restricted Stock Units | Weighted Average Grant-Date Fair Value | Restricted Stock | Weighted Average Grant-Date Fair Value |
|---|---|---|---|---|
| Outstanding at January 1, 2007 | 2,404,575 | $63.35 | 41,160 | $60.75 |
| Granted[1] | 1,592,659 | 58.84 | — | — |
| Lapse of restrictions | (773,660) | 63.76 | — | — |
| Forfeited | (325,681) | 61.37 | — | — |
| Outstanding at December 31, 2007 | 2,897,893 | 60.96 | 41,160 | 60.75 |

(1) During 2007, restricted stock units granted under the Employee Plans and the Directors' Plan were 1,572,232 and 20,427, respectively.

The total fair value of restricted stock units vested during 2007, 2006 and 2005 was $44 million, $24 million and $42 million, respectively. No restricted stock vested in 2007. The total fair value of restricted stock vested during 2006 and 2005 was $2 million and $5 million, respectively. We realized a tax benefit of $15 million and $9 million, respectively, as a result of tax deductions available to us upon the lapse of restrictions on restricted stock units and restricted stock under the Employee Plans and the Directors' Plan during 2007 and 2006.

Table 10.5 provides information on compensation expense related to stock-based compensation plans.

### Table 10.5 — Compensation Expense Related to Stock-based Compensation

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | (in millions) | | |
| Stock-based compensation expense recorded on our consolidated statements of stockholders' equity | $81 | $60 | $67 |
| Other stock-based compensation expense[1] | 1 | 3 | 2 |
| Total stock-based compensation expense[2] | $82 | $63 | $69 |
| Tax benefit related to compensation expense recognized on our consolidated statements of income | $28 | $21 | $23 |
| Compensation expense capitalized within other assets on our consolidated balance sheets | 7 | 5 | 5 |

(1) For 2007 and 2006, primarily consisted of dividend equivalents paid on stock options and restricted stock units that have been or are expected to be forfeited. Also included expense related to share-based liability awards granted under share-based payment arrangements.
(2) Component of salaries and employee benefits expense as recorded on our consolidated statements of income.

As of December 31, 2007, $107 million of compensation expense related to non-vested awards had not yet been recognized in earnings. This amount is expected to be recognized in earnings over the next four years. During 2007, the modifications of individual awards, which provided for continued or accelerated vesting, were made to fewer than 60 employees and resulted in a reduction of compensation expense of $0.3 million. During 2006, the modification of individual awards, which provided for continued or accelerated vesting, was made to fewer than 20 employees and resulted in incremental compensation expense of $0.1 million.

## NOTE 11: DERIVATIVES

We use derivatives to conduct our risk management activities. We principally use the following types of derivatives:

- LIBOR- and the Euro Interbank Offered Rate, or Euribor-, based interest-rate swaps;
- LIBOR- and Treasury-based options (including swaptions);
- LIBOR- and Treasury-based exchange-traded futures; and
- Foreign-currency swaps.

Our derivative portfolio also includes certain forward purchase and sale commitments and other contractual agreements, including credit derivatives and swap guarantee derivatives in which we guarantee the sponsor's or the borrower's performance as a counterparty on certain interest-rate swaps.

At December 31, 2007, we did not have any derivatives in hedge accounting relationships. However, there are amounts recorded in AOCI related to terminated or de-designated cash flow relationships. These deferred gains and losses on closed cash flow hedges are recognized in earnings as the originally forecasted transactions affect earnings. During 2006 and 2005, we discontinued hedge accounting for substantially all of our hedge relationships. We record changes in the fair value of derivatives not in hedge accounting relationships as derivative gains (losses) on our consolidated statements of income. Any associated interest received or paid is recognized on an accrual basis and also recorded in derivative gains (losses) on our consolidated statements of income.

The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net asset position are reported as derivative assets, net. Similarly, derivatives in a net liability position are reported as derivative liabilities, net.

Cash collateral we obtained from counterparties to derivative contracts that has been offset against derivative assets, net at December 31, 2007 and December 31, 2006 was $6.5 billion and $9.6 billion, respectively. Cash collateral we posted to counterparties to derivative contracts that has been offset against derivative liabilities, net at December 31, 2007 and December 31, 2006 was $344 million and $57 million, respectively.

At December 31, 2007 and December 31, 2006, there were no amounts of cash collateral that were not offset against derivative assets, net or derivative liabilities, net, as applicable. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information related to our derivative counterparties.

As shown in Table 11.1, the total AOCI, net of taxes, related to cash flow hedge relationships was a loss of $4.1 billion at December 31, 2007, composed of deferred net losses on closed cash flow hedges. Closed cash flow hedges involve derivatives that have been terminated or are no longer designated as cash flow hedges. Fluctuations in prevailing market interest rates have no impact on the deferred portion of AOCI relating to losses on closed cash flow hedges.

Over the 12 months beginning January 1, 2008, we estimate that approximately $865 million of deferred losses in AOCI, net of taxes, will be reclassified into earnings. The maximum remaining length of time over which we have hedged the exposure related to the variability in future cash flows on forecasted transactions, primarily interest payments on forecasted debt issuances, is 26 years. However, over 70% and 90% of the AOCI, net of taxes, balance relating to cash flow hedges at December 31, 2007 is linked to forecasted transactions occurring in the next five and ten years, respectively. The occurrence of forecasted transactions may be satisfied by either periodic issuances of short-term debt over the required time period or longer-term debt, such as Reference Notes® securities.

Table 11.1 presents the changes in AOCI, net of taxes, related to derivatives designated as cash flow hedges. Net change in fair value related to cash flow hedging activities, net of tax, represents the net change in the fair value of the derivatives that were designated as cash flow hedges, after the effects of our federal statutory tax rate of 35%, to the extent the hedges were effective. Net reclassifications of losses to earnings, net of tax, represents the AOCI amount, after the effects of our federal statutory tax rate of 35%, that was recognized in earnings as the originally hedged forecasted transactions affected earnings, unless it was deemed probable that the forecasted transaction would not occur. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the hedge related to the forecasted transaction would be reclassified into earnings immediately.

·

*Freddie Mac*

Table 11.1 — AOCI, Net of Taxes, Related to Cash Flow Hedge Relationships

| | Year Ended December 31, | | |
|---|---|---|---|
| | | Adjusted | |
| | 2007 | 2006 | 2005 |
| | (in millions) | | |
| Beginning balance[1] | $(5,032) | $(6,286) | $(7,923) |
| Net change in fair value related to cash flow hedging activities, net of tax[2] | (30) | (8) | 66 |
| Net reclassifications of losses to earnings, net of tax[3] | 1,003 | 1,262 | 1,571 |
| Ending balance[1] | $(4,059) | $(5,032) | $(6,286) |

(1) Represents the effective portion of the fair value of open derivative contracts (*i.e.*, net unrealized gains and losses) and net deferred gains and losses on closed (*i.e.*, terminated or redesignated) cash flow hedges.
(2) Net of tax (benefit) expense of $(16) million, $(5) million, and $36 million for years ended December 31, 2007, 2006 and 2005, respectively.
(3) Net of tax benefit of $540 million, $680 million and $846 million for years ended December 31, 2007, 2006 and 2005, respectively.

During 2006 and 2005, our hedge accounting relationships primarily consisted of hedging benchmark interest-rate risk related to the forecasted issuances of debt that were designated as cash flow hedges, and fair value hedges of benchmark interest-rate risk and/or foreign currency risk on existing fixed-rate debt. Table 11.2 summarizes certain gains (losses) and hedge ineffectiveness recognized related to our hedge accounting categories.

Table 11.2 — Hedge Accounting Categories Information

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | (in millions) | | |
| **Fair value hedges** | | | |
| Hedge ineffectiveness recognized in other income — pre-tax[1] | $— | $2 | $22 |
| **Cash flow hedges** | | | |
| Hedge ineffectiveness recognized in other income — pre-tax[1] | — | — | — |
| Net pre-tax gains (losses) resulting from the determination that it was probable that forecasted transactions would not occur[2] | — | — | (25) |

(1) No amounts have been excluded from the assessment of effectiveness.
(2) These forecasted transactions relate to the purchase or sale of mortgage loans and mortgage-related securities.

## NOTE 12: LEGAL CONTINGENCIES

We are involved as a party to a variety of legal proceedings arising from time to time in the ordinary course of business including, among other things, contractual disputes, personal injury claims, employment-related litigation and other legal proceedings incidental to our business. We are frequently involved, directly or indirectly, in litigation involving mortgage foreclosures. From time to time, we are also involved in proceedings arising from our termination of a seller/servicer's eligibility to sell mortgages to, and service mortgages for, us. In these cases, the former seller/servicer sometimes seeks damages against us for wrongful termination under a variety of legal theories. In addition, we are sometimes sued in connection with the origination or servicing of mortgages. These suits typically involve claims alleging wrongful actions of seller/servicers. Our contracts with our seller/servicers generally provide for indemnification against liability arising from their wrongful actions.

Litigation and claims resolution are subject to many uncertainties and are not susceptible to accurate prediction. Any additional losses that might result from the adverse resolution of any of the remaining legal proceedings could be greater than our current reserves.

**Recent Putative Securities Class Action Lawsuits.** *Reimer vs. Freddie Mac, Syron, Cook, Piszel and McQuade* and *Ohio Public Employees Retirement System vs. Freddie Mac, Syron, et al.* Two virtually identical putative securities class action lawsuits were filed against Freddie Mac and certain of our current and former officers alleging that the defendants violated federal securities laws by making "false and misleading statements concerning our business, risk management and the procedures we put into place to protect the company from problems in the mortgage industry." One suit was filed on November 21, 2007 in the US District Court for the Southern District of New York and the other was filed on January 18, 2008 in the US District Court for the Northern District of Ohio. The plaintiffs are seeking unspecified damages and interest, reasonable costs including attorneys' fees and equitable and other injunctive relief. At present, it is not possible to predict the probable outcomes of these lawsuits or any potential impact on our business, financial condition, or results of operation.

**Recent Shareholder Demand Letters.** In late 2007, the Board of Directors received two letters from purported shareholders of Freddie Mac alleging corporate mismanagement and breaches of fiduciary duty in connection with the company's risk management. One letter demands that the Board commence an independent investigation into the alleged conduct, institute legal proceedings to recover damages from the responsible individuals, and implement corporate governance initiatives to ensure that the alleged problems do not recur. The other letter demands that Freddie Mac

commence legal proceedings to recover damages from responsible Board members, senior officers, Freddie Mac's outside auditors, and other parties who allegedly aided or abetted the improper conduct. The Board of Directors formed a special committee to investigate the purported shareholders' allegations.

**Antitrust Lawsuits.**  Consolidated lawsuits were filed against Fannie Mae and us in the U.S. District Court for the District of Columbia, originally filed on January 10, 2005, alleging that both companies conspired to establish and maintain artificially high guarantee fees. The complaint covers the period January 1, 2001 to the present and asserts a variety of claims under federal and state antitrust laws, as well as claims under consumer-protection and similar state laws. The plaintiffs seek injunctive relief, unspecified damages (including treble damages with respect to the antitrust claims and punitive damages with respect to some of the state claims) and other forms of relief. We filed a motion to dismiss the action and are awaiting a ruling from the court. At present, it is not possible for us to predict the probable outcome of the consolidated lawsuit or any potential impact on our business, financial condition or results of operations.

**Securities Class Action Lawsuits.**  In June 2003 and thereafter, securities class action lawsuits were brought against us and certain former executive officers in connection with the restatement and eventually were consolidated in the U.S. District Court for the Southern District of New York. The plaintiffs claimed that the defendants improperly managed earnings to create a misleading impression of steady earnings by Freddie Mac, that they engaged in a number of improper transactions that violated GAAP and that they made false and misleading statements regarding the same. On October 26, 2006, the court approved a settlement of the securities class action lawsuits, as well as the shareholder derivative actions described below. The settlement of these actions included a cash payment of $410 million. The settlement does not include any admission of wrongdoing by the company.

**Shareholder Derivative Lawsuits.**  Two shareholder derivative lawsuits were filed during 2003 against certain former and current executives and, in one of the suits, certain former and current members of the board of directors and five counterparties. The plaintiffs alleged claims for breach of fiduciary duties, indemnification, waste of corporate assets, unjust enrichment and aiding and abetting breach of fiduciary duties in connection with the restatement. Both cases were ultimately assigned to the same judge in New York who handled the securities class action lawsuits described above. As described above, on October 26, 2006, the court approved a settlement of both shareholder derivative actions, as well as the securities class action lawsuits. The settlement of these cases was based in part on corporate governance reforms we instituted under our current management.

**The New York Attorney General's Investigation.**  In connection with the New York Attorney General's suit filed against eAppraiseIT and its parent corporation, First American, alleging appraisal fraud in connection with loans originated by Washington Mutual, in November 2007, the New York Attorney General demanded that we either retain an independent examiner to investigate our mortgage purchases from Washington Mutual supported by appraisals conducted by eAppraiseIT, or immediately cease and desist from purchasing or securitizing Washington Mutual loans and any loans supported by eAppraiseIT appraisals. We also received a subpoena from the New York Attorney General's office for information regarding appraisals and property valuations as they relate to our mortgage purchases and securitizations from January 1, 2004 to the present. Currently, we are discussing with the New York Attorney General and OFHEO resolution of the matter.

**Settlement of the SEC Investigation.**  On September 27, 2007, we reached an agreement with the SEC to settle its investigation relating to the restatement of our previously issued consolidated financial statements for 2000, 2001, and the first three quarters of 2002, and the revision of fourth quarter and full-year consolidated financial statements for 2002. Under the terms of the settlement, Freddie Mac neither admitted nor denied allegations of federal securities law violations. The settlement included a payment of $50 million.

## NOTE 13: INCOME TAXES

We are exempt from state and local income taxes. Table 13.1 presents the components of our provision for income taxes for 2007, 2006, and 2005.

### Table 13.1 — Provision for Federal Income Taxes

| | Year Ended December 31, | | |
|---|---|---|---|
| | | Adjusted | |
| | 2007 | 2006 | 2005 |
| | (in millions) | | |
| Current income tax expense (benefit) | $ 1,060 | $ 966 | $ 1,820 |
| Deferred income tax expense (benefit) | (3,943) | (1,011) | (1,462) |
| Total income tax expense (benefit) [1] | $(2,883) | $ (45) | $ 358 |

(1) Does not reflect (a) the deferred tax effects of unrealized (gains) losses on available-for-sale securities, net (gains) losses related to the effective portion of derivatives designated in cash flow hedge relationships, and certain changes in our defined benefit plans which are reported as part of AOCI, (b) certain stock-based compensation tax effects reported as part of additional paid-in capital, and (c) the tax effect of cumulative effect of change in accounting principles.

A reconciliation between our federal statutory income tax rate and our effective tax rate for 2007, 2006, and 2005 is presented in Table 13.2.

### Table 13.2 — Reconciliation of Statutory to Effective Tax Rate

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | | (Adjusted) | | | |
| | 2007 | | 2006 | | 2005 | |
| | Amount | Percent | Amount | Percent | Amount | Percent |
| | | | (dollars in millions) | | | |
| Statutory corporate tax rate | $(2,092) | 35.0% | $ 799 | 35.0% | $ 885 | 35.0% |
| Tax credits | (534) | 8.9 | (461) | (20.2) | (365) | (14.4) |
| Tax-exempt interest | (255) | 4.3 | (255) | (11.2) | (221) | (8.7) |
| Unrecognized tax benefits and related interest/contingency reserves | 32 | (0.5) | (135) | (5.9) | 49 | 1.9 |
| Penalties | — | — | — | — | 1 | 0.1 |
| Other | (34) | 0.5 | 7 | 0.3 | 9 | 0.3 |
| Effective tax rate | $(2,883) | 48.2% | $ (45) | (2.0)% | $ 358 | 14.2% |

Our effective tax rate differs from the federal statutory tax rate of 35% primarily due to the benefits of our investments in LIHTC partnerships and tax-exempt housing-related securities. In 2006, we released $174 million of tax reserves primarily as a result of a U.S. Tax Court decision and a separate settlement with the IRS.

The sources and tax effects of temporary differences that give rise to significant portions of deferred tax assets and liabilities for the years ended December 31, 2007 and 2006 are presented in Table 13.3.

### Table 13.3 — Deferred Tax Assets and (Liabilities)

| | December 31, | |
|---|---|---|
| | | (Adjusted) |
| | 2007 | 2006 |
| | (in millions) | |
| Deferred tax assets: | | |
| Deferred fees related to securitizations | $ 3,680 | $ 2,146 |
| Basis differences related to derivative instruments | 3,477 | 1,698 |
| Credit related items and reserve for loan losses | 1,013 | 226 |
| Employee compensation and benefit plans | 196 | 195 |
| Unrealized (gains) losses related to available-for-sale securities | 3,791 | 1,794 |
| Total deferred tax asset | 12,157 | 6,059 |
| Deferred tax liabilities: | | |
| Premium and discount amortization | (1,380) | (1,320) |
| Basis differences related to assets held for investment | (431) | (341) |
| Other items, net | (42) | (52) |
| Total deferred tax (liability) | (1,853) | (1,713) |
| Net deferred tax asset/ (liability) | $10,304 | $ 4,346 |

Management believes that the realization of our gross deferred tax asset of $12 billion at December 31, 2007 is more likely than not. We are in a cumulative loss position for the three years ended December 31, 2007 due to the loss incurred in 2007. However, we believe we will generate sufficient taxable income in the future to realize these deferred tax assets. In making this determination we considered the nature of the book losses, our earnings history, forecasts of future profitability, capital adequacy, management's intent to hold investments until losses can be recovered and the duration of statutory

carryback and carryforward periods. If future events significantly differ from our current forecasts, a valuation allowance may need to be established.

As of December 31, 2007, based on estimates of taxable income, we have no tax credit carryforwards. However, management expects that our ability to use all of the tax credits generated by existing or future investments in LIHTC partnerships to reduce our federal income tax liability may be limited by the alternative minimum tax in future years.

We adopted the provisions of FIN 48 effective January 1, 2007 and as a result recorded a $181 million increase to retained earnings. A reconciliation of the balance of unrecognized tax benefits from January 1, 2007 to December 31, 2007 is presented in Table 13.4.

Table 13.4 — Unrecognized Tax Benefits

|  | (in millions) |
|---|---|
| Balance at January 1, 2007 | $677 |
| Increases based on tax positions prior to 2007 | — |
| Decreases based on tax positions prior to 2007 | — |
| Change to tax positions that only affect timing | (40) |
| Increases based on tax positions related to 2007 | — |
| Balance at December 31, 2007 | $637 |

At December 31, 2007, we had total unrecognized tax benefits, exclusive of interest, of $637 million. Included in the $637 million are $76 million of unrecognized tax benefits that, if recognized, would favorably affect our effective tax rate. The remaining $561 million of unrecognized tax benefits relate to tax positions for which ultimate deductibility is highly certain, but for which there is uncertainty as to the timing of such deductibility. Recognition of these tax benefits, other than applicable interest, would not affect our effective tax rate.

We recognize interest and penalties, if any, in income tax expense. As of December 31, 2007, we had total accrued interest receivable, net of tax effect, of $55 million. Amounts included in total accrued interest relate to: (a) unrecognized tax benefits; (b) pending claims with the IRS for open tax years; (c) the tax benefit related to tax refund claims; and (d) the impact of payments made to the IRS in prior years in anticipation of potential tax deficiencies. Of the $55 million of accrued interest receivable as of December 31, 2007, approximately $137 million of accrued interest payable, net of tax effect, is allocable to unrecognized tax benefits. During 2007 we recognized within tax expense $32 million of interest expense allocable to unrecognized tax benefits. We have no amount accrued for penalties.

The statute of limitations for federal income tax purposes is open on corporate income tax returns filed for years 1985 to 2006. The IRS is currently examining tax years 2003 to 2005. The IRS has completed its examination of years 1998 to 2002. The principal matter in controversy as the result of the examination involves questions of timing and potential penalties regarding our tax accounting method for certain hedging transactions. Tax years 1985 to 1997 are before the U.S. Tax Court. We are currently in settlement discussions with the IRS regarding the tax treatment of the customer relationship intangible asset recognized upon our transition from non-taxable to taxable status in 1985. We believe it is reasonably possible that significant changes in the gross balance of unrecognized tax benefits may occur within the next 12 months that could have a material impact on income tax expense or benefit in the period the issue is resolved; however, we cannot predict the amount of such change or the range of potential changes.

## NOTE 14: EMPLOYEE BENEFITS

### Defined Benefit Plans

We maintain a tax-qualified, funded defined benefit pension plan, or Pension Plan, covering substantially all of our employees. Pension Plan benefits are based on an employee's years of service and highest average compensation, up to legal plan limits, over any consecutive 36 months of employment. Pension Plan assets are held in trust and the investments consist primarily of funds consisting of listed stocks and corporate bonds. In addition to our Pension Plan, we maintain a nonqualified, unfunded defined benefit pension plan for our officers, as part of our Supplemental Executive Retirement Plan, or SERP. The related retirement benefits for our SERP are paid from our general assets. Our qualified and nonqualified defined benefit pension plans are collectively referred to as defined benefit pension plans.

We maintain a defined benefit postretirement health care plan, or Retiree Health Plan, that generally provides postretirement health care benefits on a contributory basis to retired employees age 55 or older who rendered at least 10 years of service (five years of service if the employee was eligible to retire prior to March 1, 2007) and who, upon separation or termination, immediately elected to commence benefits under the Pension Plan in the form of an annuity. Our Retiree Health Plan is currently unfunded and the benefits are paid from our general assets. This plan and our defined benefit pension plans are collectively referred to as the defined benefit plans.

For financial reporting purposes, we use a September 30 valuation measurement date for all of our defined benefit plans. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information regarding the pending change to our measurement date.

We accrue the estimated cost of retiree benefits as employees render the services necessary to earn their pension and postretirement health benefits. Our pension and postretirement health care costs related to these defined benefit plans for 2007, 2006 and 2005 presented in the following tables were calculated using assumptions as of September 30, 2006, 2005 and 2004, respectively. The funded status of our defined benefit plans for 2007 and 2006 presented in the following tables was calculated using assumptions as of September 30, 2007 and 2006, respectively.

Table 14.1 shows the changes in our benefit obligations and fair value of plan assets using a September 30 valuation measurement date for amounts recognized on our consolidated balance sheets at December 31, 2007 and 2006, respectively.

### Table 14.1 — Obligation and Funded Status of our Defined Benefit Plans

| | Pension Benefits | | Postretirement Health Benefits | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | | (in millions) | | |
| **Change in benefit obligation:** | | | | |
| Benefit obligation at October 1 (prior year) | $504 | $457 | $ 121 | $ 110 |
| Service cost | 34 | 31 | 9 | 9 |
| Interest cost | 30 | 26 | 7 | 6 |
| Net actuarial gain | (21) | (1) | (9) | (3) |
| Benefits paid | (8) | (9) | (1) | (1) |
| Benefit obligation at September 30 | 539 | 504 | 127 | 121 |
| **Change in plan assets:** | | | | |
| Fair value of plan assets at October 1 (prior year) | $501 | $333 | | |
| Actual return on plan assets | 65 | 31 | | |
| Employer contributions | 1 | 146 | | |
| Benefits paid | (8) | (9) | | |
| Fair value of plan assets at September 30 | 559 | 501 | | |
| Funded status at September 30 | $ 20 | $ (3) | $(127) | $(121) |
| **Amounts recognized on our consolidated balance sheets at December 31:** | | | | |
| Other assets | $ 77 | $ 42 | $ — | $ — |
| Other liabilities | (57) | (45) | (127) | (121) |
| **AOCI, net of taxes related to defined benefit plans:** | | | | |
| Net actuarial loss | $ 37 | $ 72 | $ 8 | $ 17 |
| Prior service cost (credit) | 1 | 1 | (2) | (3) |
| Total AOCI, net of taxes[1] | $ 38 | $ 73 | $ 6 | $ 14 |

(1) These amounts represent a reduction to AOCI.

The amount included in AOCI, net of taxes, arising from a change in the minimum pension liability was a loss of $2 million for the year ended December 31, 2006.

The accumulated benefit obligation for all defined benefit pension plans was $393 million and $362 million at September 30, 2007 and 2006, respectively. The accumulated benefit obligation represents the actuarial present value of future expected benefits attributed to employee service rendered before the measurement date and based on employee service and compensation prior to that date.

Table 14.2 provides additional information for our defined benefit pension plans. The aggregate accumulated benefit obligation and fair value of plan assets are disclosed as of September 30, 2007, with the projected benefit obligation included for illustrative purposes.

### Table 14.2 — Additional Information for Defined Benefit Pension Plans

| | 2007 | | | 2006 | | |
|---|---|---|---|---|---|---|
| | Pension Plan | SERP | Total | Pension Plan | SERP | Total |
| | | | (in millions) | | | |
| Projected benefit obligation | $482 | $ 57 | $539 | $458 | $ 46 | $504 |
| Fair value of plan assets | $559 | $ — | $559 | $501 | $ — | $501 |
| Accumulated benefit obligation | 353 | 40 | 393 | 329 | 33 | 362 |
| Fair value of plan assets over (under) accumulated benefit obligation | $206 | $(40) | $166 | $172 | $(33) | $139 |

The measurement of our benefit obligations includes assumptions about the rate of future compensation increases included in Table 14.3.

## Table 14.3 — Weighted Average Assumptions Used to Determine Projected and Accumulated Benefit Obligations

| | Pension Benefits | | Postretirement Health Benefits | |
|---|---|---|---|---|
| | September 30, | | September 30, | |
| | 2007 | 2006 | 2007 | 2006 |
| Discount rate | 6.25% | 6.00% | 6.25% | 6.00% |
| Rate of future compensation increase | 5.10% to 6.50% | 5.10% to 6.50% | — | — |

Table 14.4 presents the components of the net periodic benefit cost with respect to pension and postretirement health care benefits for the years ended December 31, 2007, 2006 and 2005. Net periodic benefit cost is included in salaries and employee benefits on our consolidated statements of income.

## Table 14.4 — Net Periodic Benefit Cost Detail

| | Pension Benefits | | | Postretirement Health Benefits | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Year Ended December 31, | | |
| | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
| | | | (In millions) | | | |
| Net periodic benefit cost detail: | | | | | | |
| Service cost | $ 34 | $ 31 | $ 27 | $ 9 | $ 9 | $ 9 |
| Interest cost on benefit obligation | 30 | 26 | 22 | 7 | 6 | 6 |
| Expected return on plan assets | (37) | (24) | (18) | — | — | — |
| Recognized net (gain) loss | 4 | 6 | 5 | 1 | 2 | 3 |
| Recognized prior service cost (credit) | — | — | 1 | (1) | (1) | (1) |
| Net periodic benefit cost | $ 31 | $ 39 | $ 37 | $16 | $16 | $17 |

Table 14.5 presents the changes in AOCI, net of taxes, related to our defined benefit plans recorded to AOCI throughout the year, after the effects of our federal statutory tax rate of 35%.

## Table 14.5 — AOCI, Net of Taxes, Related to Defined Benefit Plans

| | Year Ended December 31, 2007 |
|---|---|
| | (In millions) |
| Beginning balance | $(87) |
| Amounts recognized in AOCI, net of tax: | |
| Recognized net gain (loss)[1] | 41 |
| Net reclassification adjustments, net of tax:[2] | |
| Recognized net loss (gain)[3] | 3 |
| Recognized prior service cost (credit) | (1) |
| Ending balance | $(44) |

(1) Includes the correction of deferred taxes of $5 million related to previously recorded Medicare Part D subsidies from prior years. Net of tax expense of $18 million for the year ended December 31, 2007.
(2) Represent amounts subsequently recognized as adjustments to other comprehensive income as those amounts are recognized as components of net periodic benefit cost.
(3) Net of tax benefit of $2 million for the year ended December 31, 2007.

Table 14.6 includes the assumptions used in the measurement of our net periodic benefit cost.

## Table 14.6 — Weighted Average Assumptions Used to Determine Net Periodic Benefit Cost

| | Pension Benefits | | | Postretirement Health Benefits | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Year Ended December 31, | | |
| | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
| Discount rate | 6.00% | 5.75% | 5.75% | 6.00% | 5.75% | 5.75% |
| Rate of future compensation increase | 5.10% to 6.50% | 5.10% to 6.50% | 4.50% | — | — | — |
| Expected long-term rate of return on plan assets | 7.50% | 7.25% | 7.00% | — | — | — |

For the 2007 and 2006 benefit obligations, we determined the discount rate using a yield curve consisting of spot interest rates at half-year increments for each of the next 30 years, developed with pricing and yield information from high-quality bonds. The future benefit plan cash flows were then matched to the appropriate spot rates and discounted back to the measurement date. Finally, a single equivalent discount rate was calculated that, when applied to the same cash flows, results in the same present value of the cash flows as of the measurement date.

The expected long-term rate of return on plan assets was estimated using a portfolio return calculator model. The model considered the historical returns and the future expectations of returns for each asset class in our defined benefit plans in conjunction with our target investment allocation to arrive at the expected rate of return.

The assumed health care cost trend rates used in measuring the accumulated postretirement benefit obligation as of September 30, 2007 are 9% in 2008, gradually declining to an ultimate rate of 5% in 2012 and remaining at that level thereafter.

Table 14.7 sets forth the effect on the accumulated postretirement benefit obligation for health care benefits as of September 30, 2007, and the effect on the service cost and interest cost components of the net periodic postretirement health benefit cost that would result from a 1% increase or decrease in the assumed health care cost trend rate.

### Table 14.7 — Selected Data Regarding our Retiree Medical Plan

|  | 1% Increase | 1% Decrease |
|---|---|---|
|  | (in millions) | |
| Effect on the accumulated postretirement benefit obligation for health care benefits........................... | $28 | $(22) |
| Effect on the service and interest cost components of the net periodic postretirement health benefit cost ......... | 4 | (3) |

### Plan Assets

Table 14.8 sets forth our Pension Plan asset allocations, based on fair value, at September 30, 2007 and 2006, and target allocation by asset category.

### Table 14.8 — Pension Plan Assets by Category

| Asset Category | Target Allocation | Plan Assets at September 30, | |
|---|---|---|---|
|  |  | 2007 | 2006 |
| Equity securities................................................................................. | 65.0% | 66.5% | 49.6% |
| Debt securities ................................................................................. | 35.0 | 33.4 | 25.9 |
| Other[1] ............................................................................................. | — | 0.1 | 24.5 |
| Total ......................................................................................... | 100.0% | 100.0% | 100.0% |

(1) Consists of cash contributions made on September 29, 2006, which were not fully invested by September 30th of that year.

The Pension Plan's retirement investment committee has fiduciary responsibility for establishing and overseeing the investment policies and objectives of our Pension Plan. The Pension Plan's retirement investment committee reviews the appropriateness of our Pension Plan's investment strategy on an ongoing basis. Our Pension Plan employs a total return investment approach whereby a diversified blend of equities and fixed income investments is used to maximize the long-term return of plan assets for a prudent level of risk. Risk tolerance is established through careful consideration of plan characteristics, such as benefit commitments, demographics and actuarial funding policies. Furthermore, equity investments are diversified across U.S. and non-U.S. listed companies with small and large capitalizations. Derivatives may be used to gain market exposure in an efficient and timely manner; however, derivatives may not be used to leverage the portfolio beyond the market value of the underlying investments. Investment risk is measured and monitored on an ongoing basis through quarterly investment portfolio reviews, annual liability measurements and periodic asset and liability studies.

Our Pension Plan assets did not include any direct ownership of our securities at September 30, 2007 and 2006.

### Cash Flows Related to Defined Benefit Plans

Our general practice is to contribute to our Pension Plan an amount equal to at least the minimum required contribution, if any, but no more than the maximum amount deductible for federal income tax purposes each year. During 2007, we made no contributions to our Pension Plan. During 2006, we made two contributions totaling $143 million to our Pension Plan. We have not yet determined whether a contribution to our Pension Plan is required for the 2008 plan year.

In addition to the Pension Plan contributions noted above, we paid $1 million during 2007 and $3 million during 2006 in benefits under our SERP. Allocations under our SERP, as well as our Retiree Health Plan, are in the form of benefit payments, as these plans are required to be unfunded.

Table 14.9 sets forth estimated future benefit payments expected to be paid for our defined benefit plans. The expected benefits are based on the same assumptions used to measure our benefit obligation at September 30, 2007.

### Table 14.9 — Estimated Future Benefit Payments

|  | Pension Benefits | Postretirement Health Benefits |
|---|---|---|
|  | (in millions) | |
| 2008 ...................................................................................................... | $ 9 | $ 2 |
| 2009 ...................................................................................................... | 12 | 2 |
| 2010 ...................................................................................................... | 12 | 3 |
| 2011 ...................................................................................................... | 14 | 3 |
| 2012 ...................................................................................................... | 16 | 4 |
| Years 2013-2017 ...................................................................................... | 140 | 27 |

**Defined Contribution Plans**

Our Thrift/401(k) Savings Plan, or Savings Plan, is a tax-qualified defined contribution pension plan offered to all eligible employees. Employees are permitted to contribute from 1% to 25% of their eligible compensation to the Savings Plan, subject to limits set by the Internal Revenue Code. We match employees' contributions up to 6% of their eligible compensation per year, with such matching contributions being made each pay period; the percentage matched depends upon the employee's length of service. Employee contributions and our matching contributions are immediately vested. We also have discretionary authority to make additional contributions to our Savings Plan that are allocated to each eligible employee, based on the employee's eligible compensation. Effective January 1, 2007, employees become vested in our discretionary contributions ratably over such employee's first five years of service, after which time employees are fully vested in their discretionary contribution accounts. In addition to our Savings Plan, we maintain a non-qualified defined contribution plan for our officers, designed to make up for benefits lost due to limitations on eligible compensation imposed by the Internal Revenue Code and to make up for deferrals of eligible compensation under our Executive Deferred Compensation Plan. We incurred costs of $36 million, $34 million and $31 million for the years ended December 31, 2007, 2006 and 2005, respectively, related to these plans. These expenses were included in salaries and employee benefits on our consolidated statements of income.

**Executive Deferred Compensation Plan**

Our Executive Deferred Compensation Plan is an unfunded, non-qualified plan that allowed certain key employees to elect to defer substantially all or a portion of their annual salary and cash bonus, and certain key management employees to defer the settlement of restricted stock units received from us in 2007, as well as substantially all or a portion of their annual salary and cash bonus, for any number of years specified by the employee. However, under no circumstances may the period elected exceed his or her life expectancy. As of January 1, 2008, only officers are permitted to participate in the Executive Deferred Compensation Plan. Distributions are paid from our general assets. We record a liability equal to the accumulated deferred salary, cash bonus and accrued interest as set forth in the plan, net of any related distributions made to plan participants. We recognize expense equal to the interest accrued on deferred salary and bonus throughout the year. Expense associated with unvested deferred restricted stock units is recognized as part of stock-based compensation.

## NOTE 15: SEGMENT REPORTING

Effective December 1, 2007, management determined that our operations consist of three reportable segments. As discussed below, we use Adjusted operating income to measure and assess the financial performance of our segments. Adjusted operating income is calculated for the segments by adjusting net income for certain investment-related activities and credit guarantee-related activities. Prior to December 1, 2007, we reported as a single segment using GAAP-basis income. We have revised the financial information and disclosures for prior periods to reflect the segment disclosures as if they had been in effect throughout all periods reported.

### Segments

Our business operations include three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee and Multifamily. Certain activities that are not part of a segment are included in the All Other category, which primarily includes certain unallocated corporate items, such as costs associated with remediating our internal controls and near-term restructuring costs, costs related to the resolution of certain legal matters and certain income tax items. We evaluate our performance and allocate resources based on Adjusted operating income, which we describe and present in this note. We do not consider our assets by segment when making these evaluations or allocations.

### Investments

In this segment, we invest principally in mortgage-related securities and single-family mortgage loans through our mortgage-related investment portfolio. Adjusted operating income consists primarily of the returns on these investments, less the related financing costs and administrative expenses. Within this segment, our activities may include the purchase of mortgage loans and mortgage-related securities with less attractive investment returns and with incremental risk in order to achieve our affordable housing goals and subgoals. We maintain a cash and a non-mortgage-related securities investment portfolio in this segment to help manage our liquidity. We finance these activities primarily through issuances of short- and long-term debt in the public markets. Results also include derivative transactions we enter into to help manage interest-rate and other market risks associated with our debt financing and mortgage-related investment portfolio.

### Single-family Guarantee

In this segment, we guarantee the payment of principal and interest on single-family mortgage-related securities, including those held in our retained portfolio, in exchange for guarantee fees received over time and other up-front

compensation. Earnings for this segment consist of guarantee fee revenues less the related credit costs (*i.e.*, provision for credit losses) and operating expenses. Also included is the interest earned on assets held in the Investments segment related to single-family guarantee activities, net of allocated funding costs and amounts related to net float benefits. Float arises from timing differences between when the borrower makes principal payments on the loan and the reduction of the PC balance.

### Multifamily

In this segment, we purchase multifamily mortgages for our retained portfolio and guarantee the payment of principal and interest on multifamily mortgage-related securities and mortgages underlying multifamily housing revenue bonds. These activities support our mission to supply financing for affordable rental housing. This segment also includes certain equity investments in various limited partnerships that sponsor low- and moderate-income multifamily rental apartments, which benefit from low-income housing tax credits. Also included is the interest earned on assets held in the Investments segment related to multifamily guarantee activities, net of allocated funding costs.

### All Other

All Other includes corporate-level expenses not allocated to any of our reportable segments such as costs associated with remediating our internal controls and near-term restructuring costs, and costs related to the resolution of certain legal matters and certain income tax items.

### Segment Allocations

Results of each reportable segment include directly attributable revenues and expenses. Administrative expenses that are not directly attributable to a segment are allocated ratably using alternative quantifiable measures such as headcount distribution or segment usage if considered semi-direct or on a pre-determined basis if considered indirect. Expenses not allocated to segments consist primarily of costs associated with remediating our internal controls and near-term restructuring costs and are included in the All Other category. Net interest income for each segment includes an allocation related to investments and debt based on each segment's assets and off-balance sheet obligations. The LIHTC tax benefit is allocated to the Multifamily segment. All remaining taxes are calculated based on a 35% federal statutory rate as applied to Adjusted operating income.

### Adjusted Operating Income

In managing our business, we present the operating performance of our segments using Adjusted operating income. Adjusted operating income differs significantly from, and should not be used as a substitute for net income (loss) before cumulative effect of change in accounting principle or net income (loss) as determined in accordance with GAAP. There are important limitations to using Adjusted operating income as a measure of our financial performance. Among other things, our regulatory capital requirements are based on our GAAP results. Adjusted operating income adjusts for the effects of certain gains and losses and mark-to-market items which, depending on market circumstances, can significantly affect, positively or negatively, our GAAP results and which, in recent periods, have caused us to record GAAP net losses. GAAP net losses will adversely impact our regulatory capital, regardless of results reflected in Adjusted operating income. Also, our definition of Adjusted operating income may differ from similar measures used by other companies. However, we believe that the presentation of Adjusted operating income highlights the results from ongoing operations and the underlying results of the segments in a manner that is useful to the way we manage and evaluate the performance of our business.

The objective of Adjusted operating income is to present our results on an accrual basis as the cash flows from our segments are earned over time. We are primarily a buy and hold investor in mortgage assets, and given our business objectives, we believe it is meaningful to measure performance of our investment business using long-term returns, not on a short-term fair value basis. The business model for our investment activity is one where we generally hold our investments for the long term, fund the investments with debt and derivatives to minimize interest rate risk, and generate net interest income in line with our return on equity objectives. The business model for our credit guarantee activity is one where we are a long-term guarantor of the conforming mortgage markets, manage credit risk, and generate guarantee and credit fees, net of incurred credit losses. As a result of these business models, we believe that an accrual-based metric is a meaningful way to present the emergence of our results as actual cash flows are realized, net of credit losses and impairments. In summary, adjusted operating results provide a view of our financial results that is more consistent with our business objectives, which helps us better evaluate the performance of our business, both from period to period and over the longer term.

As described below, Adjusted operating income is calculated for the segments by adjusting net income (loss) before cumulative effect of change in accounting principle for certain investment-related activities and credit guarantee-related activities. Adjusted operating income includes certain reclassifications among income and expense categories that have no impact on net income (loss) but provide us with a meaningful metric to assess the performance of each segment and the company as a whole.

*Investment Activity-Related Adjustments*

The most significant risk inherent in our investing activities is interest-rate risk, including duration, convexity and volatility. We actively manage these risks through asset selection and structuring, financing asset purchases with a broad range of both callable and non-callable debt and the use of interest-rate derivatives, designed to economically hedge a significant portion of our interest-rate exposure. Our interest-rate derivatives include interest-rate swaps, exchange-traded futures, and both purchased and written options (including swaptions). GAAP-basis earnings related to investment activities of our Investments segment, and to a lesser extent, our Multifamily segment, are subject to significant period-to-period variability, which we believe is not necessarily indicative of the risk management techniques that we employ and the performance of these segments.

Our derivative instruments are adjusted to fair value under GAAP with resulting gains or losses recorded in GAAP-basis income. Certain other assets are also adjusted to fair value under GAAP with resulting gains or losses recorded in GAAP-basis income. These assets consist primarily of mortgage-related securities classified as trading and mortgage-related securities classified as available-for-sale when a decline in fair value of available-for-sale securities is deemed to be other than temporary.

To help us assess the performance of our investment-related activities, we make the following adjustments to earnings as determined under GAAP. We believe this measure of performance, which we call Adjusted operating income, enhances the understanding of operating performance for specific periods, as well as trends in results over multiple periods, as this measure is consistent with assessing our performance against our investment objectives and the related risk-management activities.

- Derivative and foreign currency translation-related adjustments:
  - Fair value adjustments on derivative positions, recorded pursuant to GAAP, are not recognized in Adjusted operating income as these positions economically hedge our investment activities.
  - Payments or receipts to terminate derivative positions are amortized prospectively into Adjusted operating income on a straight-line basis over the associated term of the derivative instrument.
  - Payments of up-front premiums (*e.g.*, payments made to third parties related to purchased swaptions) are amortized prospectively on a straight-line basis into Adjusted operating income over the contractual life of the instrument. The up-front payments, primarily for option premiums, are amortized to reflect the periodic cost associated with the protection provided by the option contract.
  - Foreign-currency translation gains and losses associated with foreign-currency denominated debt along with the foreign currency derivatives gains and losses are excluded from Adjusted operating income because the fair value adjustments on the foreign-currency swaps that we use to manage foreign-currency exposure are also excluded through the fair value adjustment on derivative positions as described above as the foreign currency exposure is economically hedged.
- Investment sales, debt retirements and fair value-related adjustments:
  - Gains and losses on investment sales and debt retirements that are recognized at the time of the transaction pursuant to GAAP are not immediately recognized in Adjusted operating income. Gains and losses on securities sold out of the retained portfolio and cash and investments portfolio are amortized prospectively into Adjusted operating income on a straight-line basis over five years and three years, respectively. Gains and losses on debt retirements are amortized prospectively into Adjusted operating income on a straight-line basis over the original terms of the repurchased debt.
  - Trading losses or impairments that reflect expected or realized credit losses are realized immediately pursuant to GAAP and in Adjusted operating income since they are not economically hedged. Fair value adjustments to trading securities related to investments that are economically hedged are not included in Adjusted operating income. Similarly, non-credit related impairment losses on securities are not included in Adjusted operating income. These amounts are deferred and amortized prospectively into Adjusted operating income on a straight-line basis over five years for securities in the retained portfolio and over three years for securities in the cash and investments portfolio. GAAP-basis accretion income that may result from impairment adjustments is also not included in Adjusted operating income.
- Fully taxable-equivalent adjustment:
  - Interest income generated from tax-exempt investments is adjusted in Adjusted operating income to reflect its equivalent yield on a fully taxable basis.

We fund our investment assets with debt and derivatives to minimize interest-rate risk as evidenced by our PMVS and duration gap metrics. As a result, in situations where we record gains and losses on derivatives, securities or debt buybacks,

these gains and losses are offset by economic hedges that we do not mark-to-market for GAAP purposes. For example, when we realize a gain on the sale of a security, the debt which is funding the security has an embedded loss that is not recognized under GAAP, but instead over time as we realize the interest expense on the debt. As a result, in Adjusted operating income, we defer and amortize the security gain to interest income to match the interest expense on the debt that funded the asset. Because of our risk management strategies, we believe that amortizing gains or losses on economically hedged positions in the same periods as the offsetting gains or losses is a meaningful way to assess performance of our investment activities.

We believe it is useful to measure our performance using long-term returns, not on a short-term fair value basis. Fair value fluctuations in the short-term are not an accurate indication of long-term returns. In calculating Adjusted operating income, we make adjustments to our GAAP-basis results that are designed to provide a more consistent view of our financial results, which helps us better assess the performance of our business segments, both from period to period and over the longer term. The adjustments we make to present our Adjusted operating income results are consistent with the financial objectives of our investment activities and related hedging transactions and provide us with a view of expected investment returns and effectiveness of our risk management strategies that we believe is useful in managing and evaluating our investment-related activities. Although we seek to mitigate the interest-rate risk inherent in our investment-related activities, our hedging and portfolio management activities do not eliminate risk. We believe that a relevant measure of performance should closely reflect the economic impact of our risk management activities. Thus, we amortize the impact of terminated derivatives, as well as gains and losses on asset sales and debt retirements, into Adjusted operating income. Although our interest-rate risk and asset/liability management processes ordinarily involve active management of derivatives as well as asset sales and debt retirements, we believe that Adjusted operating income, although it differs significantly from, and should not be used as a substitute for GAAP-basis results, is indicative of the longer-term time horizon inherent in our investment-related activities.

### Credit Guarantee Activity-Related Adjustments

Credit guarantee activities consist largely of our guarantee of the payment of principal and interest on mortgages and mortgage-related securities in exchange for guarantee and other fees. Over the longer-term, earnings consist almost entirely of the guarantee fee revenues we receive less related credit costs (*i.e.*, provision for credit losses) and operating expenses. Our measure of Adjusted operating income for these activities consists primarily of these elements of revenue and expense. We believe this measure is a relevant indicator of operating performance for specific periods, as well as trends in results over multiple periods because it more closely aligns with how we manage and evaluate the performance of the credit guarantee business.

We purchase mortgages from sellers/servicers in order to securitize and issue PCs and Structured Securities. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for a discussion of the accounting treatment of these transactions. In addition to the components of earnings noted above, GAAP-basis earnings for these activities include gains or losses upon the execution of such transactions, subsequent fair value adjustments to the guarantee asset and amortization of the guarantee obligation.

Our credit-guarantee activities also include the purchase of significantly past due mortgage loans from loan pools that underlie our guarantees. Pursuant to GAAP, at the time of our purchase, the loans are recorded at fair value. To the extent the adjustment of a purchased loan to market value exceeds our own estimate of the losses we will ultimately realize on the loan, as reflected in our loan loss reserve, an additional loss is recorded in our GAAP-basis results.

When we determine Adjusted operating income for our credit guarantee-related activities, the adjustments we apply to earnings computed on a GAAP-basis include the following:

- Amortization and valuation adjustments pertaining to the guarantee asset and guarantee obligation are excluded from Adjusted operating income. Cash compensation exchanged at the time of securitization, excluding buy-up and buy-down fees, is amortized into earnings.

- The initial recognition of gains and losses in connection with the execution of either securitization transactions that qualify as sales or guarantor swap transactions, such as losses on certain credit guarantees, is excluded from Adjusted operating income.

- Fair value adjustments recorded upon the purchase of delinquent loans from pools that underlie our guarantees are excluded from Adjusted operating income. However, for Adjusted operating income reporting, our GAAP-basis loan loss provision is adjusted to reflect our own estimate of the losses we will ultimately realize on such items.

While both GAAP-basis results and Adjusted operating income reflect a provision for credit losses determined in accordance with SFAS No. 5, GAAP-basis results also include, as noted above, measures of future cash flows (the Guarantee asset) that are recorded at fair value and, therefore, are subject to significant adjustment from period-to-period as

market conditions, such as interest rates, change. Over the longer-term, Adjusted operating income and GAAP-basis income both capture the aggregate cash flows associated with our guarantee-related activities. Although Adjusted operating income differs significantly from, and should not be used as a substitute for GAAP-basis income, we believe that excluding the impact of changes in the fair value of expected future cash flows from our Adjusted operating income provides a meaningful measure of performance for a given period as well as trends in performance over multiple periods because it more closely aligns with how we manage and evaluate the performance of the credit guarantee business.

Table 15.1 reconciles Adjusted operating income to GAAP net income (loss).

### Table 15.1 — Reconciliation of Adjusted Operating Income to GAAP Net Income (Loss)

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | | (in millions) | |
| Adjusted operating income (loss) after taxes: | | | |
| Investments | $ 2,028 | $ 2,111 | $ 2,284 |
| Single-family Guarantee | (256) | 1,289 | 965 |
| Multifamily | 398 | 434 | 363 |
| All Other | (103) | 19 | (437) |
| Total Adjusted operating income, net of taxes | 2,067 | 3,853 | 3,175 |
| Reconciliation to GAAP net income (loss): | | | |
| Derivative- and foreign currency translation-related adjustments | (5,667) | (2,371) | (1,644) |
| Credit guarantee-related adjustments | (3,268) | (201) | (458) |
| Investment sales, debt retirements and fair value-related adjustments | 987 | 231 | 570 |
| Fully taxable-equivalent adjustments | (388) | (388) | (336) |
| Total pre-tax adjustments | (8,336) | (2,729) | (1,868) |
| Tax-related adjustments | 3,175 | 1,203 | 865 |
| Total reconciling items, net of taxes | (5,161) | (1,526) | (1,003) |
| Net income (loss)[1] | $(3,094) | $ 2,327 | $ 2,172 |

(1) Net income (loss) reflects the impact of the adjustments described in "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES." Additionally, Net income (loss) is presented before the cumulative effect of a change in accounting principle related to 2005.

Table 15.2 presents certain financial information for our reportable segments and All Other.

## Table 15.2 — Adjusted Operating Income Results and Reconciliation to GAAP Results

### Year Ended December 31, 2007

| | Net Interest Income (Expense) | Management and Guarantee Income | Other Non-Interest Income (Loss) | Administrative Expenses | Provision for Credit Losses | REO Operations Expense | LIHTC Partnerships | Other Non-Interest Expense | LIHTC Partnerships Tax Benefit | Income Tax (Expense) Benefit | Net Income (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in millions) | | | | | | |
| Investments | $3,626 | $ — | $40 | $(515) | $ — | $ — | $ — | $(31) | $ — | $(1,092) | $2,028 |
| Single-family Guarantee | 703 | 2,889 | 117 | (806) | (3,014) | (205) | — | (78) | — | 138 | (256) |
| Multifamily | 426 | 59 | 24 | (189) | (38) | (1) | (469) | (21) | 534 | 73 | 398 |
| All Other | (1) | — | 11 | (164) | — | — | — | (4) | — | 55 | (103) |
| Total Adjusted operating income (loss), net of taxes | 4,754 | 2,948 | 192 | (1,674) | (3,052) | (206) | (469) | (134) | 534 | (826) | 2,067 |
| Reconciliation to GAAP net income (loss): | | | | | | | | | | | |
| Derivative- and foreign currency translation-related adjustments | (1,066) | — | (4,601) | — | — | — | — | — | — | — | (5,667) |
| Credit guarantee-related adjustments | (106) | (342) | 915 | — | 198 | — | — | (3,933) | — | — | (3,268) |
| Investment sales, debt retirements and fair value-related adjustments | 266 | — | 721 | — | — | — | — | — | — | — | 987 |
| Fully taxable-equivalent adjustments | (388) | — | — | — | — | — | — | — | — | — | (388) |
| Reclassifications[1] | (361) | 29 | 332 | — | — | — | — | — | — | — | — |
| Tax-related adjustments | — | — | — | — | — | — | — | — | — | 3,175 | 3,175 |
| Total reconciling items, net of taxes | (1,655) | (313) | (2,633) | — | 198 | — | — | (3,933) | — | 3,175 | (5,161) |
| Total per consolidated statement of income[2] | $3,099 | $2,635 | $(2,441) | $(1,674) | $(2,854) | $(206) | $(469) | $(4,067) | $534 | $2,349 | $(3,094) |

### Year Ended December 31, 2006

| | Net Interest Income (Expense) | Management and Guarantee Income | Other Non-Interest Income (Loss) | Administrative Expenses | Provision for Credit Losses | REO Operations Expense | LIHTC Partnerships | Other Non-Interest Expense | LIHTC Partnerships Tax Benefit | Income Tax (Expense) Benefit | Net Income (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in millions) | | | | | | |
| Investments | $3,736 | $ — | $38 | $(495) | $ — | $ — | $ — | $(31) | $ — | $(1,137) | $2,111 |
| Single-family Guarantee | 556 | 2,541 | 159 | (815) | (313) | (61) | — | (84) | — | (694) | 1,289 |
| Multifamily | 479 | 61 | 28 | (182) | (4) | 1 | (407) | (17) | 461 | 14 | 434 |
| All Other | (3) | — | 15 | (149) | — | — | — | (42) | — | 198 | 19 |
| Total Adjusted operating income (loss), net of taxes | 4,768 | 2,602 | 240 | (1,641) | (317) | (60) | (407) | (174) | 461 | (1,619) | 3,853 |
| Reconciliation to GAAP net income (loss): | | | | | | | | | | | |
| Derivative- and foreign currency translation-related adjustments | (1,215) | — | (1,156) | — | — | — | — | — | — | — | (2,371) |
| Credit guarantee-related adjustments | (12) | (172) | 600 | — | 21 | — | — | (638) | — | — | (201) |
| Investment sales, debt retirements and fair value-related adjustments | 315 | — | (84) | — | — | — | — | — | — | — | 231 |
| Fully taxable-equivalent adjustments | (388) | — | — | — | — | — | — | — | — | — | (388) |
| Reclassifications[1] | (56) | (37) | 93 | — | — | — | — | — | — | — | — |
| Tax-related adjustments | — | — | — | — | — | — | — | — | — | 1,203 | 1,203 |
| Total reconciling items, net of taxes | (1,356) | (209) | (547) | — | 21 | — | — | (638) | — | 1,203 | (1,526) |
| Total per consolidated statement of income[2] | $3,412 | $2,393 | $(307) | $(1,641) | $(296) | $(60) | $(407) | $(812) | $461 | $(416) | $2,337 |

| | Net Interest Income (Expense) | Management and Guarantee Income | Other Non-Interest Income (Loss) | Administrative Expenses | Provision for Credit Losses | REO Operations Expense | LIHTC Partnerships | Other Non-Interest Expense | LIHTC Partnerships Tax Benefit | Income Tax (Expense) Benefit | Net Income (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (In millions) | | | | | |
| Investments............ | $ 4,117 | $ — | $ (74) | $ (466) | $ — | $ — | $ — | $ (63) | $ — | $(1,230) | $ 2,284 |
| Single-family Guarantee .. | 349 | 2,341 | 78 | (767) | (447) | (40) | — | (30) | — | (519) | 965 |
| Multifamily.............. | 417 | 59 | 19 | (151) | (7) | — | (320) | (20) | 365 | 1 | 363 |
| All Other................ | (3) | — | (7) | (151) | — | — | — | (456) | — | 160 | (437) |
| Total Adjusted operating income (loss), net of taxes ............ | 4,880 | 2,400 | 16 | (1,535) | (454) | (40) | (320) | (549) | 365 | (1,588) | 3,175 |
| Reconciliation to GAAP net income (loss): | | | | | | | | | | | |
| Derivative- and foreign currency translation-related adjustments... | (694) | — | (950) | — | — | — | — | — | — | — | (1,644) |
| Credit guarantee-related adjustments ........... | (131) | (315) | 190 | — | 147 | — | — | (349) | — | — | (458) |
| Investment sales, debt retirements and fair value-related adjustments ......... | 562 | — | 8 | — | — | — | — | — | — | — | 570 |
| Fully taxable-equivalent adjustments ......... | (336) | — | — | — | — | — | — | — | — | — | (336) |
| Reclassifications[(b)] ..... | 346 | (9) | (337) | — | — | — | — | — | — | — | — |
| Tax-related adjustments | — | — | — | — | — | — | — | — | — | 865 | 865 |
| Total reconciling items, net of taxes ....... | (253) | (324) | (1,089) | — | 147 | — | — | (349) | — | 865 | (1,003) |
| Total per consolidated statement of income[(2)] .. | $ 4,627 | $2,076 | $(1,073) | $(1,535) | $(307) | $(40) | $(320) | $(898) | $365 | $ (723) | $ 2,172 |

(1) Includes the reclassification of: a) the accrual of periodic cash settlements of all derivatives not in qualifying hedge accounting relationships from Other non-interest income (loss) to Net interest income (expense) within the Investments segment; b) implied guarantee fees on whole loans from Investments segment's Net interest income (expense) to Single-family Guarantee segment's Other non-interest income (loss); and c) net buy-up and buy-down fees from Single-family Guarantee segment's Management and guarantee income to Investments segment's Net interest income (expense).

(2) Total per consolidated statement of income reflects the impact of the adjustments described in "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES." Additionally, Net income (loss) is presented before the cumulative effect of a change in accounting principle related to 2005.

We conduct our operations solely in the United States and its territories. Therefore, we do not generate any revenue from geographic locations outside of the United States and its territories.

### NOTE 16: FAIR VALUE DISCLOSURES

The supplemental consolidated fair value balance sheets in Table 16.1 present our estimates of the fair value of our recorded financial assets and liabilities and off-balance sheet financial instruments at December 31, 2007 and 2006. Our consolidated fair value balance sheets include the estimated fair values of financial instruments recorded on our consolidated balance sheets prepared in accordance with GAAP, as well as off-balance sheet financial instruments that represent our assets or liabilities that are not recorded on our GAAP consolidated balance sheets. These off-balance sheet items predominantly consist of: (a) the unrecognized guarantee asset and guarantee obligation associated with our PCs issued through our Guarantor Swap program prior to the implementation of FIN 45 "*Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, an interpretation of FASB Statements No. 5, 57 and 107 and rescission of FASB Interpretation No. 34,*" (b) certain commitments to purchase mortgage loans and (c) certain credit enhancements on manufactured housing asset-backed securities. The fair value balance sheets also include certain assets and liabilities that are not financial instruments (such as property and equipment and real estate owned, which are included in other assets) at their carrying value in accordance with GAAP. The valuations of financial instruments on our consolidated fair value balance sheets are in accordance with GAAP fair value guidelines prescribed by SFAS No. 107, "*Disclosures about Fair Value of Financial Instruments,*" and other relevant pronouncements.

## Table 16.1 — Consolidated Fair Value Balance Sheets[1]

| | December 31, | | | |
| | 2007 | | 2006 (adjusted) | |
| | Carrying Amount[2] | Fair Value | Carrying Amount[2] | Fair Value |
| | (In billions) | | | |
| **Assets** | | | | |
| Mortgage loans | $ 80.0 | $ 76.8 | $ 65.6 | $ 65.4 |
| Mortgage-related securities | 629.8 | 629.8 | 634.3 | 634.3 |
| Retained portfolio | 709.8 | 706.6 | 699.9 | 699.7 |
| Cash and cash equivalents | 8.6 | 8.6 | 11.4 | 11.4 |
| Investments | 35.1 | 35.1 | 45.6 | 45.6 |
| Securities purchased under agreements to resell and federal funds sold | 6.6 | 6.6 | 23.0 | 23.0 |
| Derivative assets, net | 0.8 | 0.8 | 0.7 | 0.7 |
| Guarantee asset[3] | 9.6 | 10.4 | 7.4 | 8.3 |
| Other assets[4] | 23.9 | 31.8 | 16.9 | 14.4 |
| Total assets | $794.4 | $799.9 | $804.9 | $803.1 |
| **Liabilities and minority interests** | | | | |
| Total debt securities, net | $738.6 | $749.3 | $744.3 | $742.7 |
| Guarantee obligation | 13.7 | 26.2 | 9.5 | 6.1 |
| Derivative liabilities, net | 0.6 | 0.6 | 0.2 | 0.2 |
| Reserve for guarantee losses on PCs | 2.6 | — | 0.6 | — |
| Other liabilities | 12.0 | 11.0 | 22.9 | 21.8 |
| Minority interests in consolidated subsidiaries | 0.2 | 0.2 | 0.5 | 0.5 |
| Total liabilities and minority interests | 767.7 | 787.3 | 778.0 | 771.3 |
| **Net assets attributable to stockholders** | | | | |
| Preferred stockholders | 14.1 | 12.3 | 6.1 | 5.8 |
| Common stockholders | 12.6 | 0.3 | 20.8 | 26.0 |
| Total net assets | 26.7 | 12.6 | 26.9 | 31.8 |
| Total liabilities, minority interests and net assets | $794.4 | $799.9 | $804.9 | $803.1 |

(1) The consolidated fair value balance sheets do not purport to present our net realizable, liquidation or market value as a whole. Furthermore, amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary significantly from the fair values presented.
(2) Equals the amounts reported on our GAAP consolidated balance sheets.
(3) The fair value of the guarantee asset reported exceeds the carrying value primarily because the fair value includes the guarantee asset related to PCs that were issued prior to the implementation of FIN 45 in 2003 and thus are not recognized on our GAAP consolidated balance sheets.
(4) Fair values include estimated income taxes calculated using the 35% federal statutory rate on the difference between the consolidated fair value balance sheets net assets, including deferred taxes from our GAAP consolidated balance sheets, and the GAAP consolidated balance sheets equity attributable to common stockholders.

### Limitations

Our consolidated fair value balance sheets do not capture all elements of value that are implicit in our operations as a going concern because our consolidated fair value balance sheets only capture the values of the current investment and securitization portfolios. For example, our consolidated fair value balance sheets do not capture the value of new investment and securitization business that would likely replace prepayments as they occur. In addition, our consolidated fair value balance sheets do not capture the value associated with future growth opportunities in our investment and securitization portfolios. Thus, the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets does not represent an estimate of our net realizable, liquidation or market value as a whole.

We report certain assets and liabilities that are not financial instruments (such as property and equipment and real estate owned), as well as certain financial instruments that are not covered by the SFAS 107, "*Disclosures about Fair Value of Financial Instruments*," or SFAS 107, disclosure requirements (such as pension liabilities) at their carrying amounts in accordance with GAAP on our consolidated fair value balance sheets. We believe these items do not have a significant impact on our overall fair value results. Other non-financial assets and liabilities on our GAAP consolidated balance sheets represent deferrals of costs and revenues that are amortized in accordance with GAAP, such as deferred debt issuance costs and deferred credit fees. Cash receipts and payments related to these items are generally recognized in the fair value of net assets when received or paid, with no basis reflected on our fair value balance sheets.

### Valuation Methods and Assumptions

Fair value is generally based on independent price quotations obtained from third-party pricing services, dealer marks or direct market observations, where available. During the second half of 2007, the market for non-agency securities has become significantly less liquid, which has resulted in lower transaction volumes, wider credit spreads and less transparency with pricing for these assets. In addition, we have observed more variability in the quotations received from dealers and third-party pricing services. However we believe that these quotations provide reasonable estimates of fair value. If quoted

prices or market data are not available, fair value is based on internal valuation models using market data inputs or internally developed assumptions, where appropriate.

The following methods and assumptions were used to estimate the fair value of assets and liabilities at December 31, 2007 and 2006.

### Mortgage Loans

Mortgage loans represent single-family and multifamily mortgage loans held in our retained portfolio. For GAAP purposes, we must determine the fair value of these mortgage loans to calculate lower-of-cost-or-market adjustments for mortgages classified as held-for-sale. For fair value balance sheet purposes, we used this same approach when determining the fair value of mortgage loans, including those held-for-investment.

We determine the fair value of mortgage loans, excluding delinquent single-family loans purchased out of pools, based on comparisons to actively traded mortgage-related securities with similar characteristics, with adjustments for yield, credit and liquidity differences. Specifically, we aggregate mortgage loans into pools by product type, coupon and maturity and then convert the pools into notional mortgage-related securities based on their specific characteristics. We then calculate fair values for these notional mortgage-related securities as described below in *"Mortgage-Related Securities."*

Part of the adjustments for yield, credit and liquidity differences represent an implied guarantee fee. To accomplish this, the fair value of the single-family mortgage loans, excluding delinquent single-family loans purchased out of pools, includes an adjustment representing the estimated present value of the additional cash flows on the mortgage coupon in excess of the coupon expected on the notional mortgage-related securities. For multifamily mortgage loans, the fair value adjustment is estimated by calculating the net present value of guarantee fees we expect to retain. This retained guarantee fee is estimated by subtracting the expected cost of funding and securitizing a multifamily whole loan of a comparable maturity and credit rating from the coupon on the whole loan at the time of purchase.

The implied guarantee fee for both single-family and multifamily mortgage loans is also net of the related credit and other components inherent in our guarantee obligation. For single-family mortgage loans, the process for estimating the related credit and other guarantee obligation components is described in the *"Guarantee Obligation"* section. For multifamily mortgage loans, through the second quarter of 2007, the related credit and other guarantee obligation components were estimated by extracting the credit risk premium that multifamily whole loan investors require from market prices on similar securities. This credit risk premium is net of expected funding, liquidity and other risk premiums that are embedded in the market price of the reference securities. Beginning in the third quarter of 2007, the process was modified to include all related credit and other guarantee obligation components within the value of multifamily whole loans.

### Mortgage-Related Securities

Mortgage-related securities represent pass-throughs and other mortgage-related securities classified as available-for-sale and trading, which are already reflected at fair value on our GAAP consolidated balance sheets. Mortgage-related securities consist of securities issued by us, Fannie Mae and Ginnie Mae, as well as non-agency mortgage-related securities.

The fair value of securities with readily available third-party market prices is generally based on market prices obtained from broker/dealers or reliable third-party pricing service providers. Fair value may be estimated by using third-party quotes for similar instruments, adjusted for differences in contractual terms. For other securities, a market OAS approach based on observable market parameters is used to estimate fair value. OAS for certain securities are estimated by deriving the OAS for the most closely comparable security with an available market price, using proprietary interest-rate and prepayment models. If necessary, our judgment is applied to estimate the impact of differences in prepayment uncertainty or other unique cash flow characteristics related to that particular security. Fair values for these securities are then estimated by using the estimated OAS as an input to the interest-rate and prepayment models and estimating the net present value of the projected cash flows. The remaining instruments are priced using other modeling techniques or by using other securities as proxies.

### Cash and Cash Equivalents

Cash and cash equivalents largely consist of highly liquid investment securities with an original maturity of three months or less used for cash management purposes, as well as cash collateral posted by our derivative counterparties. Given that these assets are short-term in nature with limited market value volatility, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value.

### Investments

At December 31, 2007 and 2006, investments consists solely of non-mortgage-related securities, which are reported at fair value on our GAAP consolidated balance sheets. The fair values of investments were estimated using the same methods described above in *"Mortgage-Related Securities."*

*Securities Purchased Under Agreements to Resell and Federal Funds Sold*

Securities purchased under agreements to resell and federal funds sold principally consists of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities, federal funds sold and Eurodollar time deposits. Given that these assets are short-term in nature, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value.

*Derivative Assets, Net*

Derivative assets largely consist of interest-rate swaps, option-based derivatives, futures and forward purchase and sale commitments that we account for as derivatives. The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in net unrealized gain position are reported as derivative assets, net. Similarly, derivatives in a net unrealized loss position are reported as derivative liabilities, net. As of October 1, 2007, we elected to reclassify net derivative interest receivable or payable and cash collateral held or posted on our consolidated balance sheets to derivative asset, net and derivative liability, net, as applicable. Prior to this reclassification these amounts were recorded in accounts and other receivables, net, accrued interest payable, other assets and senior debt, due within one year, as applicable. Certain amounts in prior periods' consolidated balance sheets have been reclassified to conform to the current presentation.

The fair values of interest-rate swaps are determined by using the appropriate yield curves to calculate and discount the expected cash flows for both the fixed-rate and variable-rate components of the swap contracts. Option-based derivatives, which principally include call and put swaptions, are valued using an option-pricing model. This model uses market interest rates and market-implied option volatilities, where available, to calculate the option's fair value. Market-implied option volatilities are based on information obtained from broker/dealers. The fair value of exchange-traded futures is based on end-of-day closing prices obtained from third-party pricing services. Derivative forward purchase and sale commitments are valued using the methods described for mortgage-related securities valuation above.

The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. Our fair value of derivatives is not adjusted for expected credit losses because we obtain collateral from most counterparties typically within one business day of the daily market value calculation and substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above.

*Guarantee Asset*

At December 31, 2007 and 2006, approximately 91% and 88%, respectively, of PCs and Structured Securities issued had a corresponding guarantee asset recognized on our consolidated balance sheets. For more information regarding the accounting for the guarantee asset related to PCs and Structured Securities, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES."

For fair value balance sheet purposes, the guarantee asset is reflected for all PCs and Structured Securities and is valued using the same method as used for GAAP fair value purposes. For a description of how we determine the fair value of our guarantee asset, see "NOTE 2: FINANCIAL GUARANTEES AND TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS."

*Other Assets*

Other assets consists of investments in qualified LIHTC partnerships that are eligible for federal tax credits, credit enhancement contracts related to PCs and Structured Securities (pool insurance and recourse and/or indemnification agreements), financial guarantee contracts for additional credit enhancements on certain manufactured housing asset-backed securities, REO, property and equipment, and other miscellaneous assets.

Our investments in LIHTC partnerships, reported as consolidated entities or equity method investments in the GAAP financial statements, are not within the scope of SFAS 107 disclosure requirements. However, we present the fair value of these investments in other assets. For the LIHTC partnerships, the fair value of expected tax benefits is estimated using expected cash flows discounted at a market-based yield.

For the credit enhancement contracts related to PCs and Structured Securities (pool insurance and recourse and/or indemnification agreements), fair value is estimated using an expected cash flow approach, and is intended to reflect the estimated amount that a third party would be willing to pay for the contracts. On our consolidated fair value balance sheets, these contracts are reported at fair value at each balance sheet date based on current market conditions. On our GAAP consolidated balance sheets, these contracts are initially recorded at fair value at inception, then amortized to expense.

For the credit enhancements on manufactured housing asset-backed securities, the fair value is based on the difference between the market price of non-credit-impaired manufactured housing securities and credit-impaired manufactured

housing securities that are likely to produce future credit losses, as adjusted for our estimate of a risk premium attributable to the financial guarantee contracts. The value of the contracts, over time, will be determined by the actual credit-related losses incurred and, therefore, may have a value that is higher or lower than our market-based estimate. On our GAAP consolidated financial statements, these contracts are recognized as realized.

The other categories of assets that comprise other assets are not financial instruments required to be valued at fair value under SFAS 107, such as REO and property and equipment. For the majority of these non-financial assets in other assets, we use the carrying amounts from our GAAP consolidated balance sheets as the reported values on our consolidated fair value balance sheets, without any adjustment. These assets represent an insignificant portion of our GAAP consolidated balance sheets. Certain non-financial assets in other assets on our GAAP consolidated balance sheets are assigned a zero value on our consolidated fair value balance sheets. This treatment is applied to deferred items such as deferred debt issuance costs.

We adjust the GAAP-basis deferred taxes reflected on our consolidated fair value balance sheets to include estimated income taxes on the difference between our consolidated fair value balance sheets net assets, including deferred taxes from our GAAP consolidated balance sheets, and our GAAP consolidated balance sheets equity attributable to common stockholders. To the extent the adjusted deferred taxes are a net asset, this amount is included in other assets. If the adjusted deferred taxes are a net liability, this amount is included in other liabilities.

### Total Debt Securities, Net

Total debt securities, net represents short-term and long-term debt used to finance our assets and, on our consolidated GAAP balance sheets, debt securities are reported at amortized cost, which is net of deferred items, including premiums, discounts and hedging-related basis adjustments. This item includes both non-callable and callable debt as well as short-term zero-coupon discount notes. The fair value of the short-term zero-coupon discount notes is based on a discounted cash flow model with market inputs. The valuation of other debt securities is generally based on market prices obtained from broker/dealers, reliable third-party pricing service providers or direct market observations.

### Guarantee Obligation

We did not establish a guarantee obligation for GAAP purposes for PCs and Structured Securities that were issued through our Guarantor Swap program prior to adoption of FIN 45. In addition, after it is initially recorded at fair value the guarantee obligation is not subsequently carried at fair value for GAAP purposes. On our consolidated fair value balance sheets, the guarantee obligation reflects the fair value of our guarantee obligation on all PCs. Additionally, for fair value balance sheet purposes, the guarantee obligation is valued using the same method as used for GAAP to determine its initial fair value. Because guarantee asset, guarantee obligation and credit enhancement-related assets that are recognized at the inception of an executed Guarantor Swap are valued independently of each other, net differences between these recognized assets and liabilities may exist at inception. If the amount of the guarantee asset plus the credit enhancement-related assets is greater than the amount of the guarantee obligation, the difference between such amounts is deferred on our GAAP consolidated balance sheets as a component of the guarantee obligation. This component of the guarantee obligation is not recorded on the consolidated fair value balance sheets. The difference between the fair value and carrying value of the guarantee obligation shown in Table 16.1 reflects the different basis of accounting for this liability. For example, the fair value of the guarantee obligation does not include the unamortized balance of deferred guarantee income that is a component of its carrying value on the GAAP consolidated balance sheets. For information concerning our valuation approach and accounting policies related to our guarantees of mortgage assets, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 2: FINANCIAL GUARANTEES AND TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS."

### Derivative Liabilities, Net

See discussion under *"Derivative Assets, Net"* above.

### Reserve For Guarantee Losses on PCs

The carrying amount of the reserve for guarantee losses on PCs on our GAAP consolidated balance sheets represents the contingent losses contained in the loans that back our PCs. This line item has no basis on our consolidated fair value balance sheets, because the estimated fair value of all expected default losses (both contingent and non-contingent) is included in the guarantee obligation reported on our consolidated fair value balance sheets.

### Other Liabilities

Other liabilities principally consists of amounts due to PC investors (*i.e.*, principal and interest), funding liabilities associated with investments in LIHTC partnerships, accrued interest payable on debt securities and other miscellaneous obligations of less than one year. We believe the carrying amount of these liabilities is a reasonable approximation of their

fair value, except for funding liabilities associated with investments in LIHTC partnerships, for which fair value is estimated using expected cash flows discounted at a market-based yield. Furthermore, certain deferred items reported as other liabilities on our GAAP consolidated balance sheets are assigned zero value on our consolidated fair value balance sheets, such as deferred credit fees. Also, as discussed in "*Other Assets*," other liabilities may include a deferred tax liability adjusted for fair value balance sheet purposes.

In addition, effective December 2007, we established securitization trusts for the assets underlying our PCs and Structured Securities. Consequently, we hold remittances in a segregated account and administer payments due to the PC investors. Other liabilities at December 31, 2007 does not reflect amounts due to PC investors since this is a liability of the off-balance sheet trusts.

### Minority Interests in Consolidated Subsidiaries

Minority interests in consolidated subsidiaries primarily represent preferred stock interests that third parties hold in our two majority-owned REIT subsidiaries. In accordance with GAAP, we consolidated the REITs. The preferred stock interests are not within the scope of SFAS 107 disclosure requirements. However, we present the fair value of these interests on our consolidated fair value balance sheets. The fair value of the third-party minority interests in these REITs was based on the estimated value of the underlying REIT preferred stock we determined based on a valuation model.

### Net Assets Attributable to Preferred Stockholders

To determine the preferred stock fair value, we use a market-based approach incorporating quoted dealer prices.

### Net Assets Attributable to Common Stockholders

Net assets attributable to common stockholders is equal to the difference between the fair value of total assets and the sum of total liabilities and minority interests reported on our consolidated fair value balance sheets, less the fair value of net assets attributable to preferred stockholders.

## NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS

### Mortgages and Mortgage-Related Securities

Table 17.1 summarizes the geographical concentration of mortgages and mortgage-related securities that are held by us or that are collateral for PCs and Structured Securities, excluding:

- $1.3 billion and $1.5 billion of mortgage-related securities issued by Ginnie Mae that back Structured Securities at December 31, 2007 and 2006, respectively, because these securities do not expose us to meaningful amounts of credit risk;

- $47.8 billion and $45.4 billion of other agency mortgage-related securities at December 31, 2007 and 2006, respectively, because these securities do not expose us to meaningful amounts of credit risk; and

- $233.8 billion and $238.5 billion of non-agency mortgage-related securities held in the retained portfolio at December 31, 2007 and 2006, respectively, because geographic information regarding these securities is not available. With respect to these securities, we look to third party credit enhancements (*e.g.*, bond insurance) or other credit enhancements resulting from the securitization structure supporting such securities (*e.g.*, subordination levels) as a primary means of managing credit risk.

See "NOTE 4: RETAINED PORTFOLIO AND CASH AND INVESTMENTS PORTFOLIO" and "NOTE 5: MORTGAGE LOANS AND LOAN LOSS RESERVES" for more information about the securities and loans, respectively, we hold on our consolidated balance sheets.

**Table 17.1 — Concentration of Credit Risk**

| | December 31, | | | |
| | 2007 | | 2006 | |
| | Amount[1][2] | Percentage | Amount[1][2] | Percentage |
| | (dollars in millions) | | | |
| **By Region[3]** | | | | |
| West | $ 455,051 | 25% | $ 366,492 | 24% |
| Northeast | 443,813 | 24 | 375,844 | 24 |
| North Central | 353,522 | 19 | 324,255 | 21 |
| Southeast | 335,386 | 19 | 279,984 | 18 |
| Southwest | 231,951 | 13 | 194,785 | 13 |
| | $1,819,723 | 100% | $1,541,360 | 100% |
| **By State** | | | | |
| California | $ 243,225 | 13% | $ 195,964 | 13% |
| Florida | 124,092 | 7 | 101,901 | 7 |
| Illinois | 91,835 | 5 | 80,130 | 5 |
| Texas | 91,130 | 5 | 74,764 | 5 |
| New York | 90,686 | 5 | 77,614 | 5 |
| All others | 1,178,755 | 65 | 1,010,987 | 65 |
| | $1,819,723 | 100% | $1,541,360 | 100% |

(1) Calculated as total mortgage portfolio less Structured Securities backed by Ginnie Mae Certificates and non-Freddie Mac mortgage-related securities held in the retained portfolio.

(2) Effective December 2007, we established securitization trusts for the underlying assets of our guaranteed PCs and Structured Securities issued. As a result, we adjusted the reported balance of our mortgage portfolios to reflect the publicly-available security balances of guaranteed PCs and Structured Securities. Previously we reported these balances based on the unpaid principal balance of the underlying mortgage loans. The trust holds remittances from loans underlying our securities in a segregated account. Consequently, we no longer commingle those funds with our general operating funds.

(3) Region Designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

## Higher-Risk Mortgage Loans

There have been an increasing amount of residential loan products originated in the mortgage industry that are designed to offer borrowers greater choices in their payment terms. Interest-only mortgages allow the borrower to pay only interest for a fixed period of time before the loan begins to amortize. Option ARM loans permit a variety of repayment options, which include minimum, interest only, fully amortizing 30-year and fully amortizing 15-year payments. The minimum payment alternative for option ARM loans allows the borrower to make monthly payments that are less than the interest accrued for the period. The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance. At December 31, 2007 and 2006, interest-only and option ARM loans collectively represented approximately 10% and 7%, respectively, of loans underlying our issued guaranteed PCs and Structured Securities.

In addition to these products, there has been an increase of residential mortgage loans originated in the market with lower or alternative documentation requirements than full documentation mortgage loans. These reduced documentation mortgages have been categorized in the mortgage industry as Alt-A loans. We have classified mortgage loans as Alt-A if the lender that delivers them to us has classified the loans as Alt-A, or if the loans had reduced documentation requirements that indicate that the loans should be classified as Alt-A. As of December 31, 2007, approximately 9% of our single-family PCs and Structured Securities were backed by Alt-A mortgage loans.

A combination of certain loan characteristics with any mortgage loan product often can indicate a higher degree of credit risk. For example, mortgages with both high loan-to-value, or LTV ratios and borrowers who have lower credit scores typically experience higher rates of delinquency, default and credit losses. As of December 31, 2007, approximately 1% of single-family mortgage loans we have guaranteed were made to borrowers with credit scores below 620 and had original LTV ratios above 90% at the time of mortgage origination. In addition, as of December 31, 2007, 4% of the Alt-A and interest-only single-family loans we have guaranteed have been made to borrowers with credit scores below 620 at mortgage origination. As home prices increased during 2006 and prior years, many borrowers used second liens at the time of purchase to potentially reduce their LTV ratio to below 80%. Including this secondary financing, we estimate that the percentage of loans we have guaranteed with total LTV ratios above 90% was 14% as of December 31, 2007.

## Mortgage Lenders and Insurers

A significant portion of our single-family mortgage purchase volume is generated from several key mortgage lenders that have entered into business arrangements with us. These arrangements generally involve a lender's commitment to sell a high proportion of its conforming mortgage origination volume to us. Our largest mortgage lender in 2007 reduced its minimum mortgage volume commitment to us upon renewal of its contract at July 1, 2007. In addition, ABN Amro Mortgage Group, Inc., which accounted for more than 8% of our mortgage purchase volume for the six months ended June 30, 2007, was

acquired and its contract was not renewed when it expired in the third quarter 2007. During 2007, three mortgage lenders each accounted for 12% or more of our mortgage purchase volume. These lenders collectively accounted for approximately 45% of this volume. In addition, in 2007, our top ten single-family lenders represented approximately 79% of our single-family mortgage purchase volume. In 2007, our top three multifamily lenders collectively represented approximately 44% of our multifamily purchase volume and top ten multifamily lenders represented approximately 80% of our multifamily purchase volume. These top lenders are among the largest mortgage loan originators in the U.S. We are exposed to the risk that we could lose purchase volume to the extent these arrangements are terminated or modified without replacement from other lenders.

We have institutional credit risk relating to the potential insolvency or non-performance of mortgage insurers that insure mortgages we purchase or guarantee. Excluding insurers of our non-agency mortgage-related securities portfolio at December 31, 2007, our top four mortgage insurers, each accounted for more than 10% of our overall mortgage insurance coverage, collectively represented approximately 75% of our overall mortgage insurance coverage.

### Bond Insurers

For certain non-agency securities in both our retained and investment portfolios, we rely on subordination and bond insurance of the trust issuing the security as credit enhancement to provide protection from credit loss. In those instances where we seek further protection, we may obtain additional credit enhancement with secondary bond insurance; however this increases our exposure to the risks related to the bond insurer's ability to satisfy claims. As of December 31, 2007, we had insurance coverage, including secondary policies, on securities totaling $17.9 billion of unpaid principal balance, consisting of $16.1 billion and $1.8 billion, of coverage for bonds in our retained and investment portfolio, respectively. As of December 31, 2007, the top three of our bond insurers, each accounting for more than 20% of our overall bond insurance coverage (including secondary policies), collectively represented approximately 80% of our bond insurance coverage.

### Derivative Portfolio

On an ongoing basis, we review the credit fundamentals of all of our derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or events affecting an individual counterparty occur.

#### Derivative Counterparties

Our use of derivatives exposes us to counterparty credit risk, which arises from the possibility that the derivative counterparty will not be able to meet its contractual obligations. Exchange-traded derivatives, such as futures contracts, do not measurably increase our counterparty credit risk because changes in the value of open exchange-traded contracts are settled daily through a financial clearinghouse established by each exchange. Over-the-counter, or OTC, derivatives, however, expose us to counterparty credit risk because transactions are executed and settled between us and our counterparty. Our use of OTC interest-rate swaps, option-based derivatives and foreign-currency swaps is subject to rigorous internal credit and legal reviews. Our derivative counterparties carry external credit ratings among the highest available from major rating agencies. All of these counterparties are major financial institutions and are experienced participants in the OTC derivatives market.

#### Master Netting and Collateral Agreements

We use master netting and collateral agreements to reduce our credit risk exposure to our active OTC derivative counterparties for interest-rate swaps, option-based derivatives and foreign-currency swaps. Master netting agreements provide for the netting of amounts receivable and payable from an individual counterparty, which reduces our exposure to a single counterparty in the event of default. On a daily basis, the market value of each counterparty's derivatives outstanding is calculated to determine the amount of our net credit exposure, which is equal to derivatives in a net gain position by counterparty after giving consideration to collateral posted. Our collateral agreements require most counterparties to post collateral for the amount of our net exposure to them above the applicable threshold. Bilateral collateral agreements are in place for the majority of our counterparties. Collateral posting thresholds are tied to a counterparty's credit rating. Derivative exposures and collateral amounts are monitored on a daily basis using both internal pricing models and dealer price quotes. Collateral is typically transferred within one business day based on the values of the related derivatives. This time lag in posting collateral can affect our net uncollateralized exposure to derivative counterparties.

Collateral posted by a derivative counterparty is typically in the form of cash, although U.S. Treasury securities, our PCs and Structured Securities or our debt securities may also be posted. In the event a counterparty defaults on its obligations under the derivatives agreement and the default is not remedied in the manner prescribed in the agreement, we have the right under the agreement to direct the custodian bank to transfer the collateral to us or, in the case of non-cash collateral, to sell the collateral and transfer the proceeds to us.

Our uncollateralized exposure to counterparties for OTC interest-rate swaps, option-based derivatives and foreign-currency swaps, after applying netting agreements and collateral, was $339 million and $672 million at December 31, 2007 and 2006, respectively. In the event that all of our counterparties for these derivatives were to have defaulted simultaneously on December 31, 2007, our maximum loss for accounting purposes would have been approximately $339 million.

Our exposure to counterparties for OTC forward purchase and sale commitments treated as derivatives was $465 million and $18 million at December 31, 2007 and 2006, respectively. Because the typical maturity for our OTC commitments is less than one year, we do not require master netting and collateral agreements for the counterparties of these commitments. Therefore, the exposure to our OTC commitments counterparties is uncollateralized. Similar to counterparties for our OTC interest-rate swaps, option-based derivatives and foreign-currency swaps, we monitor the credit fundamentals of our OTC commitments counterparties on an ongoing basis to ensure that they continue to meet our internal risk-management standards.

## NOTE 18: MINORITY INTERESTS

The equity and net earnings attributable to the minority stockholder interests in consolidated subsidiaries are reported on our consolidated balance sheets as Minority interests in consolidated subsidiaries and on our consolidated statements of income as Minority interests in earnings of consolidated subsidiaries. The majority of the balances in these accounts relate to our two majority-owned REITs.

In February 1997, we formed two majority-owned REIT subsidiaries funded through the issuance of common stock (99.9% of which is held by us) and a total of $4.0 billion of perpetual, step-down preferred stock issued to outside investors. Beginning in 2007, the dividend rate on the step-down preferred stock was 1.0%. The dividend rate on the step-down preferred stock was 13.3% from initial issuance through December 2006 (the initial term). Dividends on this preferred stock accrue in arrears. The balance of the two step-down preferred stock issuances as recorded within Minority interests in consolidated subsidiaries on our consolidated balance sheets totaled $167 million and $503 million at December 31, 2007 and 2006, respectively. The preferred stock continues to be redeemable by the REITs under certain circumstances described in the preferred stock offering documents as a "tax event redemption."

## NOTE 19: EARNINGS PER SHARE

We have participating securities related to options with dividend equivalent rights that receive dividends as declared on an equal basis with common shares. Consequently, in accordance with Emerging Issues Task Force, or EITF, No. 03-6, *"Participating Securities and the Two-Class Method under FASB Statement No. 128"*, we use the "two-class" method of computing earnings per share. Participating security option holders are not obligated to participate in undistributed net losses. Basic earnings per common share are computed by dividing net income (loss) available per common share by weighted average common shares outstanding — basic for the period. Diluted earnings (loss) per common share are computed as net income (loss) available to common stockholders divided by weighted average common shares outstanding — diluted for the period, which consider the effect of dilutive common equivalent shares outstanding. For periods with net income the effect of dilutive common equivalent shares outstanding includes: (a) the weighted average shares related to stock options (including the Employee Stock Purchase Plan) that have an exercise price lower than the average market price during the period; (b) the weighted average of non-vested restricted shares; and (c) all restricted stock units. Such items are excluded from the weighted average common shares outstanding — basic.

Table 19.1 — Earnings (Loss) Per Common Share — Basic and Diluted

| | Year Ended December 31, | | |
| | | Adjusted | |
| | 2007 | 2006 | 2005 |
| | (dollars in millions, except per share amounts) | | |
| Net income (loss) | $ (3,094) | $ 2,327 | $ 2,113 |
| Preferred stock dividends and issuance costs on redeemed preferred stock | (404) | (270) | (223) |
| Amounts allocated to participating security option holders[1] | (5) | (6) | — |
| Net income (loss) available to common shareholders — basic[2] | $ (3,503) | $ 2,051 | $ 1,890 |
| Weighted average common shares outstanding — basic (in thousands) | 651,881 | 680,856 | 691,582 |
| Dilutive potential common shares (in thousands) | — | 1,808 | 1,929 |
| Weighted average common shares outstanding — diluted (in thousands) | 651,881 | 682,664 | 693,511 |
| Antidilutive potential common shares excluded from the computation of dilutive potential common shares (in thousands) | 6,161 | 1,892 | 2,297 |
| Basic earnings (loss) per common share | $ (5.37) | $ 3.01 | $ 2.73 |
| Diluted earnings (loss) per common share | $ (5.37) | $ 3.00 | $ 2.73 |

(1) Participating security option holders do not participate in undistributed earnings during periods of net losses.
(2) Includes distributed and undistributed earnings to common shareholders.

*Freddie Mac*

## NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES

Effective December 31, 2007, we retrospectively changed our method of accounting for our guarantee obligation: 1) to a policy of no longer extinguishing our guarantee obligation when we purchase all or a portion of a guaranteed PC and Structured Security, or PC, from a policy of effective extinguishment through the recognition of a Participation Certificate residual, or PC residual, and 2) to a policy that amortizes our guarantee obligation into earnings in a manner that corresponds more closely to our economic release from risk under our guarantee than our former policy, which amortized our guarantee obligation according to the contractual expiration of our guarantee as observed by the decline in the unpaid principal balance of securitized mortgage loans. While our previous accounting is acceptable, we believe the newly adopted method of accounting for our guarantee obligation is preferable in that it significantly enhances the transparency and understandability of our financial results, promotes uniformity in the accounting model for the credit risk retained in our primary credit guarantee business, better aligns revenue recognition to the release from economic risk of loss under our guarantee, and increases comparability with other similar financial institutions. Comparative financial statements of prior periods have been adjusted to apply the new methods, retrospectively. Summarized impacts of the changes in accounting principles are as follows:

### Table 20.1 — Net Income (Expense) Impact of Changes in Accounting Principles

|                                                                      | 2007        | 2006        | 2005      |
|----------------------------------------------------------------------|-------------|-------------|-----------|
|                                                                      | (in millions) |           |           |
| Changes in accounting principles:                                    |             |             |           |
| Guarantee obligation no longer extinguished when a PC is purchased   | $ 2,289     | $(461)      | $(545)    |
| Guarantee obligation amortization methodology                        | 922         | 640         | 519       |
| Total pre-tax impact of changes in accounting principles             | 3,211       | 179         | (26)      |
| Tax impact of changes in accounting principles                       | (1,124)     | (63)        | 9         |
| Total net income impact of changes in accounting principles          | $ 2,087     | $ 116       | $ (17)    |

### Changes in Accounting Principles

#### *Guarantee Obligation No Longer Extinguished When PC is Purchased*

The change to no longer extinguish our guarantee obligation when we purchase all or a portion of a PC reflects changes made to our PC issuance process, including introducing the use of securitization trusts that are qualifying special purpose entities, or QSPE, upon PC issuance. When we subsequently purchase a PC, our guarantee obligation remains outstanding to the QSPE, an unconsolidated entity, and consequently our guarantee obligations remain outstanding. The guarantee asset also continues to remain outstanding. Application of a model that does not extinguish our guarantee asset and guarantee liability is consistent with predominant industry practice for similar transactions. Under this new model, PCs held by us are accounted for as guaranteed securities; accordingly, credit losses are recognized on an incurred basis in the provision for credit losses rather than through the recognition of a PC residual at fair value with changes in earnings or through security impairments.

We applied the change to no longer extinguish our guarantee obligation retrospectively in accordance with SFAS 154, "*Accounting Changes and Error Corrections, a replacement of APB Opinion No. 20 and FASB Statement No. 3,*" or SFAS 154. This presentation significantly enhances the transparency and understandability of our financial statements in that our guarantee obligation is presented as a separate liability relative to all PCs outstanding (whether held by third parties or us). Consequently, all credit losses, except for initial losses on loans purchased as impaired loans under SOP 03-3, stemming from guarantee-related activities are now accounted for in our provision for credit losses using a single measurement attribute (*i.e.*, an incurred loss model). Gains and losses related to our previous extinguishment model have been eliminated. As such, the results of our guarantee business are less difficult to compare to other financial guarantors.

Our previous accounting method resulted in a mixed model with a portion of our guarantee obligation recorded at fair value through earnings when we held PCs, and a portion of the guarantee obligation carried at historical cost subject to credit losses recognized for probable incurred losses when the PCs were held by third parties. Under the previous model, we reflected PCs held by us as unguaranteed securities. Accordingly, these securities were subject to security impairments and the guarantee fees received reflected additional interest income.

#### *Guarantee Obligation Amortization Method*

The change in the method of amortizing our guarantee obligation into earnings uses a static effective yield calculated and fixed at inception of the guarantee based on forecasted unpaid principal balances. The static effective yield will be evaluated and adjusted when significant changes in economic events cause a shift in the pattern of our economic release from risk. For example, certain market environments may lead to sharp and sustained changes in home prices or prepayments of mortgages, leading to the need for an adjustment in the static effective yield for specific mortgage pools underlying the guarantee. When a change is required, a cumulative catch-up adjustment, which could be significant in a

given period, will be recognized and a new static effective yield will be used to determine our guarantee obligation amortization. The new method amortizes our guarantee obligation into earnings commensurate with our economic release from risk under changing economic conditions and is more consistent with our competitors than the prior amortization method. The new method has been retrospectively applied to all prior periods.

The previous method amortized our guarantee obligation according to the contractual expiration of the guarantee as observed by the decline in the unpaid principal balance of securitized mortgage loans. The previous method amortized our guarantee obligation in a manner that was reflective of the pattern of economic release from risk in periods of normal or high prepayments and normal or high house price appreciation. However, the new amortization method more closely aligns our guarantee obligation amortization with our economic release from risk, particularly in periods of slowing prepayments and slowing house price appreciation (or house price depreciation in some areas) such as experienced during the fourth quarter of 2007.

### Financial Statement Impacts of the Accounting Changes

Retrospective adoption of the accounting changes impacted several financial statement line items. Because our guarantee asset and guarantee obligation remain outstanding whether held by us or third parties, line item impacts include: 1) reduced gains (losses) on investment activity resulting from the removal of PC residual fair value changes, 2) increased gains (losses) on guarantee asset relating to PCs held by us that were previously recognized as part of PC residual, 3) increased income on guarantee obligation reflecting both a change in our guarantee obligation balance resulting from no longer extinguishing our guarantee obligation and a change in our amortization policy for the guarantee obligation to one that recognizes revenue in a manner that corresponds more closely to our economic release from risk under the guarantee, 4) increased management and guarantee income and reduced interest income resulting from the reclassification of guarantee and delivery fees on PCs held by us previously recognized as interest income when our guarantee was considered extinguished, 5) increased provision for credit losses relating to additional PCs subject to our loan loss reserve model, 6) increased losses on loans purchased relating to PCs held by us that were previously recognized as part of PC residual, 7) reduced gains (losses) on investment activity resulting from the removal of adjustments to the carrying value of our securities that were previously recognized upon purchase related to the extinguishment of deferred income items and 8) reduced gains (losses) on investment activity resulting from elimination of impairments on PCs held by us that are now subject to a guarantee.

With respect to 3) above, it is important to note that the accounting change from the previous model results in an increase in our guarantee obligation balance for PCs held by us and a decrease in our guarantee obligation balance because our guarantee obligation is not re-measured at fair value when PCs previously purchased by us are subsequently sold. As such, the change in the income on guarantee obligation line item is not distinguished between no longer extinguishing our guarantee obligation and our guarantee obligation amortization change, as doing so is not operationally feasible given activity levels in the various periods presented. This difficulty highlights the fact that the change will provide financial statement users with improved transparency of operating results under the new method, in that it presents results using a single model.

### Other Changes in Accounting Principles

On October 1, 2007, we adopted FSP FIN 39-1 which permits a reporting entity to offset fair value amounts recognized for the right to reclaim cash collateral or the obligation to return cash collateral against fair value amounts recognized for derivative instruments executed with the same counterparty under a master netting agreement. We elected to reclassify net derivative interest receivable or payable and cash collateral held or posted, on our consolidated balance sheets, to derivative asset, net and derivative liability, net, as applicable. Prior to reclassification, these amounts were recorded on our consolidated balance sheets in accounts and other receivables, net, accrued interest payable, other assets and senior debt, due within one year, as applicable. The change resulted in a decrease to total assets and total liabilities of $8.7 billion at the date of adoption, October 1, 2007, and $7.2 billion at December 31, 2007. The adoption of FSP FIN 39-1 had no effect on our consolidated statements of income.

On January 1, 2007, we adopted FIN 48, and as a result of adoption, we recorded a $181 million increase to retained earnings at January 1, 2007. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for more information.

At December 31, 2006, we adopted SFAS 158 which requires the recognition of our pension and other postretirement plans' overfunded or underfunded status in the statement of financial position beginning December 31, 2006. As a result of the adoption, we recorded the funded status of each of our defined benefit plans as an asset or liability on our consolidated balance sheet with a corresponding offset, net of taxes, recorded in AOCI within stockholders' equity, resulting in an after-tax decrease in equity of $84 million at December 31, 2006.

Effective January 1, 2006, we made a change to our method of amortization for certain types of non-agency securities resulting in a $13 million (after-tax) reduction to the opening balance of retained earnings.

Beginning October 1, 2005, we changed our method for determining gains and losses upon the resale of PCs related to deferred items recognized in connection with our guarantee of those securities. This change in accounting principle was facilitated by system changes that now allow us to apply and track these deferred items relative to the specific portions of the purchased PCs. The lack of certain historical data precluded us from calculating the cumulative effect of the change. We were not able to determine the pro forma effects of applying the new method retrospectively.

Effective January 1, 2005, we changed our method of accounting for interest expense related to callable debt instruments to recognize interest expense using an effective interest method over the contractual life of the debt. For periods prior to 2005, we amortized premiums, discounts, deferred issuance costs and other basis adjustments into interest expense using an effective interest method over the estimated life of the debt. We implemented this change in accounting method to facilitate improved financial reporting, particularly to promote the comparability of our financial reporting with that of our primary competitor. The change in accounting method also reduced the operational complexity associated with determining the estimated life of callable debt. The cumulative effect of this change was a $59 million (after-tax) reduction in net income for 2005.

### Tax Adjustments

As a result of the changes in accounting principles, our cumulative income tax expense increased by $0.7 billion resulting in a deferred tax asset decrease of $0.7 billion at December 31, 2007. In addition, due to the changes in accounting principles, our deferred tax asset related to our AOCI increased by $0.1 billion.

Table 20.2 summarizes the effect of the changes in accounting principles related to our guarantee obligation on the consolidated statements of income line items for 2007, 2006 and 2005.

### Table 20.2 — Effect of Changes in Accounting Principles to Consolidated Statements of Income

| | Year Ended December 31, | | | | | | | | |
| | 2007 | | | 2006 | | | 2005 | | |
| | As computed without changes in accounting principles | As reported with changes in accounting principles | Effect of Changes | As Previously Reported | As Adjusted | Effect of Changes | As Previously Reported | As Adjusted | Effect of Changes |
| | (in millions, except per share amounts) | | | | | | | | |
| **Interest income:** | | | | | | | | | |
| Mortgage loans .................... | $ 4,446 | $ 4,449 | $    3 | $ 4,152 | $ 4,152 | $  — | $ 4,037 | $ 4,010 | $ (27) |
| Mortgage-related securities............ | 35,707 | 34,893 | (814) | 34,673 | 33,850 | (823) | 29,684 | 28,968 | (716) |
| Management and guarantee income ......... | 2,010 | 2,635 | 625 | 1,672 | 2,393 | 721 | 1,450 | 2,076 | 626 |
| Gains (losses) on guarantee asset .......... | (1,212) | (1,484) | (272) | (800) | (978) | (178) | (1,064) | (1,409) | (345) |
| Income on guarantee obligation ........... | 985 | 1,905 | 920 | 867 | 1,519 | 652 | 920 | 1,428 | 508 |
| Derivative gains (losses).................. | (1,906) | (1,904) | 2 | (1,164) | (1,173) | (9) | (1,357) | (1,321) | 36 |
| Gains (losses) on investment activity ........ | (3,310) | 294 | 3,604 | (474) | (473) | 1 | (127) | (97) | 30 |
| Recoveries on loans impaired upon purchase .. | 438 | 505 | 67 | — | — | — | — | — | — |
| Other income[1] ...................... | 246 | 246 | — | 252 | 236 | (16) | 177 | 126 | (51) |
| Provision for credit losses ................. | (2,371) | (2,854) | (483) | (215) | (296) | (81) | (251) | (307) | (56) |
| Losses on certain credit guarantees[1] ........ | (1,992) | (1,988) | 4 | (350) | (406) | (56) | (234) | (272) | (38) |
| Losses on loans purchased[1] ................ | (1,419) | (1,865) | (446) | (126) | (148) | (22) | — | — | — |
| Other expenses....................... | (223) | (222) | 1 | (190) | (200) | (10) | (537) | (530) | 7 |
| Income tax (expense) benefit ............. | 4,007 | 2,883 | (1,124) | 108 | 45 | (63) | (367) | (358) | 9 |
| Net income (loss) .................... | (5,181) | (3,094) | 2,087 | 2,211 | 2,327 | 116 | 2,130 | 2,113 | (17) |
| Basic earnings (loss) per common share ..... | (8.58) | (5.37) | 3.21 | 2.84 | 3.01 | 0.17 | 2.76 | 2.73 | (0.03) |
| Diluted earnings (loss) per common share .... | (8.58) | (5.37) | 3.21 | 2.84 | 3.00 | 0.16 | 2.75 | 2.73 | (0.02) |

(1) Hedge accounting gains previously reported separately are included in other income. Foreign-currency gains (losses), net is excluded from Other income to conform to current period presentation. Similarly, losses on certain credit guarantees and losses on loans purchased are presented separately to conform to current period presentation.

Table 20.3 summarizes the effect of the changes in accounting principles related to our guarantee obligation and adoption of FSP FIN 39-1 on the consolidated balance sheet line items as of December 31, 2007 and 2006.

**Table 20.3 — Effect of Changes in Accounting Principles to Consolidated Balance Sheets**

| | December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2007** | | | | **2006** | | |
| | As computed without changes in accounting principles | As reported with changes in accounting principles | Effect of Changes | As Previously Reported | As Adjusted | Effect of Changes | |
| | | | (in millions) | | | | |
| **Assets:** | | | | | | | |
| Mortgage loans, net | $ 80,167 | $ 80,032 | $ (135) | $ 65,618 | $ 65,605 | $ (13) | |
| Total mortgage-related securities | 626,427 | 629,754 | 3,327 | 634,925 | 634,328 | (597) | |
| Accounts and other receivables, net | 6,953 | 5,003 | (1,950) | 7,461 | 5,073 | (2,388) | |
| Derivative assets, net | 5,760 | 827 | (4,933) | 7,908 | 665 | (7,243) | |
| Guarantee asset, at fair value | 8,056 | 9,591 | 1,535 | 6,070 | 7,389 | 1,319 | |
| Deferred tax asset | 10,903 | 10,304 | (599) | 3,600 | 4,346 | 746 | |
| Other assets | 7,270 | 6,884 | (386) | 6,783 | 6,788 | 5 | |
| Total assets | 797,509 | 794,368 | (3,141) | 813,081 | 804,910 | (8,171) | |
| **Liabilities:** | | | | | | | |
| Total debt securities, net | 745,105 | 738,557 | (6,548) | 753,938 | 744,341 | (9,597) | |
| Accrued interest payable | 8,132 | 7,864 | (268) | 8,345 | 8,307 | (38) | |
| Guarantee obligation | 11,565 | 13,712 | 2,147 | 7,117 | 9,482 | 2,365 | |
| Derivative liabilities, net | 975 | 582 | (393) | 179 | 165 | (14) | |
| Reserve for guarantee losses on Participation Certificates | 2,001 | 2,566 | 565 | 350 | 550 | 200 | |
| Other liabilities | 3,942 | 4,187 | 245 | 3,212 | 3,512 | 300 | |
| Total liabilities | 771,720 | 767,468 | (4,252) | 784,264 | 777,480 | (6,784) | |
| **Stockholders' Equity:** | | | | | | | |
| Retained earnings | 25,627 | 26,909 | 1,282 | 32,177 | 31,372 | (805) | |
| AOCI, net of taxes | (10,972) | (11,143) | (171) | (7,869) | (8,451) | (582) | |
| Total stockholders' equity | 25,613 | 26,724 | 1,111 | 28,301 | 26,914 | (1,387) | |

Table 20.4 summarizes the effect of the changes in accounting principles related to our guarantee obligation on the effected consolidated statements of stockholders' equity line items for 2007, 2006 and 2005.

**Table 20.4 — Effect of Changes in Accounting Principles to Consolidated Statements of Stockholders' Equity**

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2007** | | | **2006** | | | **2005** | | |
| | As computed without changes in accounting principles | As reported with changes in accounting principles | Effect of Changes | As Previously Reported | As Adjusted | Effect of Changes | As Previously Reported | As Adjusted | Effect of Changes |
| | | | | (in millions) | | | | | |
| **Retained earnings:** | | | | | | | | | |
| Balance, beginning of year | $ 32,177 | $ 31,372 | $ (805) | $31,559 | $30,638 | $(921) | $30,728 | $29,824 | $(904) |
| Net income (loss) | (5,181) | (3,094) | 2,087 | 2,211 | 2,327 | 116 | 2,130 | 2,113 | (17) |
| Retained earnings, end of year | 25,627 | 26,909 | 1,282 | 32,177 | 31,372 | (805) | 31,559 | 30,638 | (921) |
| **AOCI, net of taxes:** | | | | | | | | | |
| Balance, beginning of year | (7,869) | (8,451) | (582) | (8,773) | (9,352) | (579) | (3,593) | (4,180) | (587) |
| Changes in unrealized gains (losses) related to available-for-sale securities, net of reclassification adjustments | (4,108) | (3,708) | 400 | (264) | (267) | (3) | (6,824) | (6,816) | 8 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships, net of reclassification adjustments | 962 | 973 | 11 | 1,254 | 1,254 | — | 1,637 | 1,637 | — |
| AOCI, net of taxes, end of year | (10,972) | (11,143) | (171) | (7,869) | (8,451) | (582) | (8,773) | (9,352) | (579) |

179

*Freddie Mac*

Table 20.5 summarizes the effect of the changes in accounting principles related to our guarantee obligation and adoption of FSP FIN 39-1 on the consolidated statement of cash flow line items for 2007, 2006, and 2005.

**Table 20.5 — Effect of Changes in Accounting Principles to Consolidated Statements of Cash Flows**

Year Ended December 31,

| | 2007 | | | 2006 | | | 2005 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As computed without changes in accounting principles | As reported with changes in accounting principles[1] | Effect of Changes | As Previously Reported | As Adjusted[1] | Effect of Changes | As Previously Reported | As Adjusted[1] | Effect of Changes |
| | | | | (in millions) | | | | | |
| **Cash flows from operating activities** | | | | | | | | | |
| Net income (loss) | $ (5,181) | $ (3,094) | $ 2,087 | $ 2,211 | $ 2,327 | $ 116 | $ 2,130 | $ 2,113 | $ (17) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | | | | | | | |
| Derivative losses | 2,280 | 2,275 | (5) | 1,253 | 1,262 | 9 | 1,014 | 977 | (37) |
| Asset related amortization | (263) | (91) | 172 | 26 | 128 | 102 | 791 | 881 | 90 |
| Provision for credit losses | 2,371 | 2,854 | 483 | 215 | 296 | 81 | 260 | 311 | 51 |
| Losses on loans purchased | 1,419 | 1,865 | 446 | 126 | 148 | 22 | — | — | — |
| Gains (losses) on investment activity | 509 | (305) | (814) | 494 | 538 | 44 | 343 | 267 | (76) |
| Deferred income taxes | (5,082) | (3,958) | 1,124 | (1,074) | (1,012) | 62 | (1,452) | (1,462) | (10) |
| Sales of held-for-sale mortgages | — | — | — | 18,722 | 18,711 | (11) | 23,662 | 23,669 | 7 |
| Change in trading securities | (1,913) | (1,922) | (9) | — | — | — | 2,598 | 2,594 | (4) |
| Change in accounts and other receivables, net | 1,743 | (711) | (2,454) | (1,237) | (763) | 474 | 661 | 470 | (191) |
| Change in accrued interest payable | (301) | (263) | 38 | 713 | 718 | 5 | 282 | 290 | 8 |
| Change in guarantee asset, at fair value | (1,986) | (2,203) | (217) | (987) | (1,125) | (138) | (567) | (726) | (159) |
| Change in guarantee obligation | 4,515 | 4,245 | (270) | 1,540 | 1,536 | (4) | 1,413 | 1,779 | 366 |
| Participation Certificate residuals, at fair value | 2,416 | — | (2,416) | 6 | — | (6) | 112 | — | (112) |
| Other, net | 1,131 | 3,443 | 2,312 | 445 | (489) | (934) | 43 | 339 | 296 |
| Net cash provided by (used for) operating activities | 1,658 | 2,135 | 477 | 22,453 | 22,275 | (178) | 31,290 | 31,502 | 212 |
| **Cash flows from investing activities** | | | | | | | | | |
| Proceeds from sales of available-for-sale securities | 109,967 | 109,973 | 6 | 86,745 | 86,745 | — | 94,961 | 95,029 | 68 |
| Proceeds from maturities of available-for-sale securities | 219,263 | 219,047 | (216) | — | — | — | — | — | — |
| Derivative premiums and terminations and swap collateral, net | 833 | (2,484) | (3,317) | (97) | 910 | 1,007 | 932 | (6,859) | (7,791) |
| Net cash provided by (used for) investing activities | 330,063 | 326,536 | (3,527) | 86,648 | 87,655 | 1,007 | 95,893 | 88,170 | (7,723) |
| **Cash flows from financing activities** | | | | | | | | | |
| Proceeds from issuance of short-term debt | 1,018,040 | 1,016,933 | (1,107) | — | — | — | — | — | — |
| Repayments of short-term debt | (990,646) | (986,489) | 4,157 | (766,593) | (767,427) | (829) | (862,176) | (854,665) | 7,511 |
| Net cash provided by (used for) financing activities | 27,394 | 30,444 | 3,050 | (766,593) | (767,427) | (829) | (862,176) | (854,665) | 7,511 |
| Net change in cash and cash equivalents | $ 359,115 | $ 359,115 | $ 0 | $(657,497) | $(657,497) | $ 0 | $(734,993) | $(734,993) | $ 0 |
| **Supplemental cash flow information** | | | | | | | | | |
| Cash paid (received) for: | | | | | | | | | |
| Debt interest | 37,918 | 37,473 | (445) | 34,452 | 33,973 | (479) | 26,797 | 26,467 | (330) |
| Swap collateral interest | — | 445 | 445 | — | 479 | 479 | — | 322 | 322 |

(1) 2007 As reported with changes in accounting principles and 2006 and 2005 As Adjusted amounts exclude adjustments which were made to our consolidated Statement of Cash Flows to conform to current period presentation.

**END OF FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

## QUARTERLY SELECTED FINANCIAL DATA

The unaudited financial data for each quarter and full-year 2007 and 2006 reflects the reconciliation of previously reported to adjusted captions on the consolidated statements of income. See "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES" to our consolidated financial statements for more information regarding the adjustments.

|  | 2007 | | | | |
|---|---|---|---|---|---|
|  | 1Q | 2Q | 3Q | 4Q | Full-Year |
|  | (In millions, except share-related amounts) | | | | |
| Net interest income, as computed without changes in accounting principles | $ 978 | $ 973 | $ 987 | $ 972 | $ 3,910 |
| Impact of changes in accounting principles | (207) | (180) | (226) | (198) | (811) |
| Net interest income, as adjusted | $ 771 | $ 793 | $ 761 | $ 774 | $ 3,099 |
| Non-interest income (loss), as computed without changes in accounting principles | $ (554) | $ 1,282 | $(1,665) | $(3,815) | $(4,752) |
| Impact of changes in accounting principles | 477 | 267 | 1,782 | 2,420 | 4,946 |
| Non-interest income (loss), as adjusted | $ (77) | $ 1,549 | $ 117 | $(1,395) | $ 194 |
| Non-interest expense, as computed without changes in accounting principles | $(1,074) | $(1,378) | $(2,731) | $(3,163) | $(8,346) |
| Impact of changes in accounting principles | (150) | (141) | (339) | (294) | (924) |
| Non-interest expense, as adjusted | $(1,224) | $(1,519) | $(3,070) | $(3,457) | $(9,270) |
| Income tax (expense) benefit, as computed without changes in accounting principles | $ 439 | $ (113) | $ 1,380 | $ 2,301 | $ 4,007 |
| Impact of changes in accounting principles | (42) | 19 | (426) | (675) | (1,124) |
| Income tax (expense) benefit, as adjusted | $ 397 | $ (94) | $ 954 | $ 1,626 | $ 2,883 |
| Net income (loss), as computed without changes in accounting principles | $ (211) | $ 764 | $(2,029) | $(3,705) | $(5,181) |
| Impact of changes in accounting principles | 78 | (35) | 791 | 1,253 | 2,087 |
| Net income (loss), as adjusted | $ (133) | $ 729 | $(1,238) | $(2,452) | $(3,094) |
| Basic earnings (loss) per common share, as computed without changes in accounting principles[1] | $ (0.46) | $ 1.02 | $ (3.29) | $ (5.91) | $ (8.58) |
| Impact of changes in accounting principles[1] | 0.11 | (0.05) | 1.22 | 1.94 | 3.21 |
| Basic earnings (loss) per common share, as adjusted[1] | $ (0.35) | $ 0.97 | $ (2.07) | $ (3.97) | $ (5.37) |
| Diluted earnings (loss) per common share, as computed without changes in accounting principles[1] | $ (0.46) | $ 1.02 | $ (3.29) | $ (5.91) | $ (8.58) |
| Impact of changes in accounting principles[1] | 0.11 | (0.06) | 1.22 | 1.94 | 3.21 |
| Diluted earnings (loss) per common share, as adjusted[1] | $ (0.35) | $ 0.96 | $ (2.07) | $ (3.97) | $ (5.37) |

|  | 2006 | | | | |
|---|---|---|---|---|---|
|  | 1Q | 2Q | 3Q | 4Q | Full-Year |
|  | (In millions, except share-related amounts) | | | | |
| Net interest income, as previously reported | $1,131 | $1,172 | $ 959 | $ 973 | $ 4,235 |
| Impact of changes in accounting principles | (192) | (189) | (230) | (212) | (823) |
| Net interest income, as adjusted | $ 939 | $ 983 | $ 729 | $ 761 | $ 3,412 |
| Non-interest income (loss), as previously reported | $1,347 | $ 979 | $ (868) | $ (543) | $ 915 |
| Impact of changes in accounting principles | 201 | 199 | 404 | 367 | 1,171 |
| Non-interest income (loss), as adjusted | $1,548 | $1,178 | $ (464) | $ (176) | $ 2,086 |
| Non-interest expense, as previously reported | $ (584) | $ (714) | $ (827) | $ (922) | $(3,047) |
| Impact of changes in accounting principles | (30) | (35) | (19) | (85) | (169) |
| Non-interest expense, as adjusted | $ (614) | $ (749) | $ (846) | $(1,007) | $(3,216) |
| Income tax (expense) benefit, as previously reported | $ 115 | $ (40) | $ 21 | $ 12 | $ 108 |
| Impact of changes in accounting principles | (46) | (36) | 10 | 9 | (63) |
| Income tax (expense) benefit, as adjusted | $ 69 | $ (76) | $ 31 | $ 21 | $ 45 |
| Net income (loss), as previously reported | $2,009 | $1,397 | $ (715) | $ (480) | $ 2,211 |
| Impact of changes in accounting principles | (67) | (61) | 165 | 79 | 116 |
| Net income (loss), as adjusted | $1,942 | $1,336 | $ (550) | $ (401) | $ 2,327 |
| Basic earnings (loss) per common share, as previously reported[1] | $ 2.81 | $ 1.93 | $(1.17) | $ (0.85) | $ 2.84 |
| Impact of changes in accounting principles[1] | (0.10) | (0.09) | 0.25 | 0.12 | 0.17 |
| Basic earnings (loss) per common share, as adjusted[1] | $ 2.71 | $ 1.84 | $(0.92) | $ (0.73) | $ 3.01 |
| Diluted earnings (loss) per common share, as previously reported[1] | $ 2.80 | $ 1.93 | $(1.17) | $ (0.85) | $ 2.84 |
| Impact of changes in accounting principles[1] | (0.09) | (0.09) | 0.25 | 0.12 | 0.16 |
| Diluted earnings (loss) per common share, as adjusted[1] | $ 2.71 | $ 1.84 | $(0.92) | $ (0.73) | $ 3.00 |

(1) Earnings (loss) per share is computed independently for each of the quarters presented. Due to the use of weighted average common shares outstanding when calculating earnings (loss) per share, the sum of the four quarters may not equal the full-year amount. Earnings (loss) per share amounts may not recalculate using the amounts in this table due to rounding.

## CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## CONTROLS AND PROCEDURES

### Disclosure Controls and Procedures

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that the information we are required to disclose in our financial reports is accumulated and communicated to senior management as appropriate to allow timely decisions regarding required disclosure. We have documented our disclosure controls and procedures. We are currently in the process of assessing the effectiveness of our disclosure controls and procedures.

### Internal Control Over Financial Reporting

During 2007 and continuing into 2008 we have continued to execute our plan to remediate known material weaknesses and significant deficiencies in internal control over financial reporting, improve our financial reporting processes and infrastructure, and review our processes and controls over the recording, processing and reporting of financial transactions ("business process design review"). Management believes the measures that we have implemented during 2007 to remediate the material weaknesses in internal control over financial reporting have had a positive impact on our internal control over financial reporting. The changes we have made in our internal control over financial reporting from January 1, 2007 through the date of this report that have affected, or are reasonably likely to affect, our internal control over financial reporting are described below. We have:

- designed and implemented the controls we believe are necessary to remediate all known material weaknesses;
- remediated, through demonstration of the operating effectiveness of the controls we implemented, material weaknesses around adequacy of staffing, IT general controls over access to data, security administration and change management, but identified certain new significant deficiencies in IT General Controls in connection with testing the controls implemented by the company;
- implemented new financial accounting applications for guarantee asset valuation in the fourth quarter of 2007 and for our entire mortgage-related securities portfolio and credit guarantees as of January 1, 2008;
- made several changes in our accounting policies that simplified our accounting processes (see "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES" to our consolidated financial statements for additional information on our accounting changes); and
- substantially completed our business process design review through which we assessed significant risks to the business processes that are important to our financial reporting process, identified the controls to mitigate those risks, and identified for remediation any deficiencies in the design of those controls.

As discussed below, as of December 31, 2007, we have either remediated or implemented the activities we believe are necessary to remediate the material weaknesses in our internal control over financial reporting. Because we have not yet conducted a complete evaluation of the operating effectiveness of our internal control over financial reporting, which would include comprehensive testing of the operating effectiveness of individual controls, we cannot conclude on the effectiveness of our internal control over financial reporting. We may identify additional control issues when we perform operating effectiveness testing of controls or from on-going remediation activities. However, we have identified no additional material weaknesses through our remediation activities, business process design review or other assessment activities we have undertaken. In the course of their audit of our consolidated financial statements, our external auditors have not evaluated our internal control over financial reporting or the specific controls we have implemented through the remediation activities discussed below.

While we have made significant progress toward addressing our material weaknesses and significant deficiencies in internal control over financial reporting, we continued to perform extensive verification and validation procedures to compensate for those deficiencies during 2007. In view of our remediation efforts through December 31, 2007 and the additional verification and validation procedures we performed, we believe that our consolidated financial statements for the year ended December 31, 2007, have been prepared in conformity with GAAP.

### Material Weaknesses and Progress toward Remediation

As disclosed in our 2006 Annual Report, we had the following material weaknesses in internal control over financial reporting as of December 31, 2006:

*Integration between Operations and Finance.* Our systems and processes related to our operational and financial accounting systems, business units and external service providers were not adequately integrated. This inadequate integration increased the risk of error in our financial reporting due to: (a) the potential failure to correctly pass information between

182                                                                                                          *Freddie Mac*

systems and processes; (b) incompatibility of data between systems; (c) incompatible systems; or (d) a lack of clarity in process ownership. We defined four components of this weakness for purposes of planning our remediation effort:

- *Data Hand-offs* — Controls over data hand-offs between business units and from external providers needed to be improved.
- *Financial Close Process* — The financial close process needed better coordination between business unit accounting teams and corporate accounting and reporting teams, and improved monitoring of the process.
- *Complex Transactions Processing* — Controls over the processing of complex structured securitization transactions needed to be improved.
- *Accounting Policy Linkage* — Processing performed by financial applications needed to be evaluated for appropriate linkage to accounting policies.

*Monitoring Controls within Financial Operations.* The controls we used to monitor the results of our financial reporting process, such as the performance of financial analytics and account reconciliations, failed to identify certain issues that required adjustments to our financial results prior to our reporting them.

*Information Technology General Controls — Access to Data and Security Administration.* Our controls over information systems security administration and management functions needed to improve in the following areas: (a) granting and revoking user access rights; (b) segregation of duties; (c) monitoring user access rights; and (d) periodic review of the appropriateness of access rights. Weaknesses in these controls could have allowed unauthorized users to access, enter, delete or change data in these systems, as well as increased the possibility that entries could be duplicated or omitted inadvertently.

*Information Technology General Controls — Change Management.* Our controls over managing the introduction of program and data changes needed improvement. Weaknesses in these controls included a lack of consistent standards and inadequate testing of changes prior to deployment; an environment and processes that increased the difficulties of establishing and maintaining internal control; and issues that arose from inherent system limitations.

*Management Self-Assessment.* We did not have a self-assessment process for our internal control over financial reporting that would reliably enable management to identify deficiencies in our internal control, evaluate the effectiveness of internal control or modify our control procedures in response to changes in risk in a timely manner.

*Adequacy of Staffing.* Vacancies in leadership and key staff positions increased operational risk in our financial reporting processes. Undesirable voluntary turnover strained existing resources and contributed to increased operational risk. Furthermore, our standards of performance needed to be enforced in order to create a more effective culture of accountability.

We report progress towards remediation of material weaknesses and significant deficiencies in the following stages:

- In process — We are in the process of designing and implementing controls to correct identified internal control deficiencies and conducting ongoing evaluations to ensure all deficiencies have been identified.
- Remediation activities implemented — We have designed and implemented the controls that we believe are necessary to remediate the identified internal control deficiencies.
- Remediated — After a sufficient period of operation of the controls implemented to remediate the control deficiencies, management has evaluated the controls and found them to be operating effectively.

Our progress toward remediation of these material weaknesses is summarized below.

| Material Weaknesses | Remediation Progress as of December 31, 2007 | Remediation Progress as of February 28, 2008 |
|---|---|---|
| **Integration between Operations and Finance** | | |
| • Data Hand-offs | Remediation activities implemented | Remediation activities implemented |
| • Financial Close Process | Remediated | Remediated |
| • Complex Transactions Processing | Remediated | Remediated |
| • Accounting Policy Linkage | Remediated | Remediated |
| **Monitoring Controls within Financial Operations** | Remediation activities implemented | Remediation activities implemented |
| **Information Technology General Controls — Access to Data and Security Administration** | Remediation activities implemented | Remediated[1] |
| **Information Technology General Controls — Change Management** | Remediation activities implemented | Remediated[1] |
| **Management Self-Assessment** | Remediation activities implemented | Remediation activities implemented |
| **Adequacy of Staffing** | Remediated | Remediated |

(1) This material weakness has been remediated but operational issues we identified in evaluating the controls we implemented have been classified as two significant deficiencies and are discussed below under *"Material Weaknesses We Remediated."*

## Material Weaknesses We Remediated

*Integration between Operations and Finance*

We completed remediation of three of the four components of this material weakness as described below.

- *Financial Close Process* — We have made significant improvements in the coordination and execution of and control over our financial close process. These improvements include substantive enhancements to the coordination of our close process activities among our business unit accounting teams and corporate accounting and reporting teams as well as improvements in monitoring controls around critical elements of the financial close process. Based on our evaluation of the changes to the financial close process and related monitoring controls over the 2007 quarterly reporting cycles, we have concluded that the process and controls are operating effectively. Although we are continuing our efforts to improve the timeliness of our financial reporting, we have concluded that this component of the material weakness is remediated.

- *Complex Transactions Processing* — We performed an in-depth review of our controls related to the processing and reporting of our more complex structured securitization transactions. For the specific deficiencies identified, we designed and implemented the controls that we believe are necessary for remediation. We have tested those controls and concluded that they are operating effectively.

- *Accounting Policy Linkage* — We reviewed and ranked the relative risk of our financial applications for their impact on the application of our accounting policies. We have evaluated the higher risk financial applications and concluded that those applications are appropriately applying our accounting policies.

*Information Technology General Controls — Access to Data and Security Administration*

We completed the design assessment of our information technology general controls over security administration utilizing the Information Technology Governance Institute's® Control Objectives for Information and related Technology® framework. We have designed and implemented controls, where necessary, to ensure that data is secure and available only to authorized and appropriate users. We have evaluated these controls, which identified certain operational issues around shared system and user IDs and periodic recertification of application level and technical platform user access rights. While we believe these operational issues constitute two significant deficiencies that warrant the attention of senior management, we have concluded that they do not, in the aggregate, represent a material weakness. Accordingly, we believe this material weakness is remediated.

*Information Technology General Controls — Change Management*

We developed and deployed a new change management process and a new systems development life cycle process that are based on methodologies acquired from a third party. We now require adherence to these processes and related controls for new systems development projects. Critical financial projects that were already in progress were subject to a management evaluation of compliance with specific development control requirements prior to implementation. We have evaluated these controls, which identified certain operational issues around the inclusion of process controls in the business requirements for new financial projects and the sufficiency of testing of application functionality and approval prior to deployment. While we believe these operational issues constitute two significant deficiencies that warrant the attention of senior management, we have concluded that they do not, in the aggregate, represent a material weakness. Accordingly, we believe this material weakness is remediated.

*Adequacy of Staffing*

We filled our leadership and critical staff position vacancies and have made significant progress in resolving single-person critical dependencies. We also implemented an on-going process designed to identify and resolve critical vacancies in an expeditious manner through better coordination between our human resources professionals and our business units. In addition, we developed and have initiated a series of programs designed to enhance our management of human resources and to create and sustain a more effective culture of accountability. These programs include improvements to our performance management process, development of broad-based risk and control training programs and more effective workforce planning. Management has evaluated these programs and concluded they are effective.

### Progress Toward Remediation of Other Material Weaknesses

The remaining material weaknesses are pending a sufficient period of operation of the controls we have implemented to resolve the deficiencies to enable us to evaluate whether those controls are operating effectively. Until we evaluate operational effectiveness of those controls, we cannot conclude that these material weaknesses have been remediated. The discussion below describes the actions that we have taken to resolve these material weaknesses.

*Integration between Operations and Finance — Data Hand-offs*

We developed policies and standards to define control objectives related to hand-offs of information between people, processes and systems. We identified the controls in place over higher risk hand-offs through the business process review as well as focused data hand-off assessments and identified deficiencies in the design of controls at the data hand-off level. For specific control deficiencies identified, we designed and implemented controls in the process to remediate the deficiencies.

Additionally, in the fourth quarter of 2007, we implemented a new financial accounting application for guarantee asset valuation and began parallel processing of a new financial accounting application for our entire mortgage-related securities portfolio, which became our system of record as of January 1, 2008.

*Monitoring Controls within Financial Operations*

We developed and implemented monitoring controls and standards to support the accounting processes at both the business unit and corporate levels, including a more structured, in-depth analytics process. These monitoring controls, combined with a newly implemented governance and review structure, have been designed and implemented to provide for detection, escalation and remediation of accounting and reporting issues prior to external disclosure of financial results. We believe that additional operational enhancements and repeated control execution are necessary to support the evaluation of operational effectiveness and achieve remediation of this weakness.

*Management Self-Assessment*

We designed a management self-assessment process that will provide more timely and effective identification, documentation and remediation of control deficiencies within the financial reporting process. The process assigns accountability for assessment of control design and operating effectiveness to business officers who have organizational oversight responsibility for business, information technology and entity-level processes that impact the financial reporting process. We have established a centralized internal control office to govern and manage the management self-assessment process, as well as a formal assessment reporting, aggregation and review process. We have deployed the management self-assessment process across the organization for the fourth quarter 2007. The process has not yet operated for a sufficient period of time for us to evaluate its operating effectiveness.

### Significant Deficiencies and Progress Toward Remediation

In addition to the material weaknesses discussed above, we are also remediating significant deficiencies in our internal controls over financial reporting that existed at December 31, 2006 or that were subsequently identified through our material

weakness remediation efforts. Those significant deficiencies and progress toward their remediation are summarized in the table below:

| Significant Deficiencies that Existed as of December 31, 2006 | Remediation Progress as of December 31, 2007 | Remediation Progress as of February 28, 2008 |
|---|---|---|
| **Guarantee Asset/Guarantee Obligation Governance** Our process for valuation of and accounting for our guarantee asset and guarantee obligation was complex, manually intensive and dependent on end-user computing solutions, resulting in an unacceptable likelihood of risk of significant error. | Remediation activities implemented | Remediation activities implemented |
| **End-User Computing Controls** Our financial reporting processes relied on models and end-user computing solutions (exclusive of those addressed through the Guarantee Asset/Guarantee Obligation Governance significant deficiency described above) that were not subject to adequate controls over their development, nor were they subject to adequate change control procedures. | In process | Remediation activities implemented |
| **New Products Governance** Our policies and procedures for the introduction of new products were insufficient and related governance processes did not adequately ensure adherence to policies and procedures. | Remediated | Remediated |
| **Tax Basis Balance Sheet** We do not maintain a tax basis balance sheet to support deferred tax accounting under GAAP, which could result in balance sheet misclassifications and potential income statement adjustments. | In process | In process |
| **Controls over Data Quality** Controls over the quality of data used in our financial reporting process were not effective. | Remediation activities implemented | Remediation activities implemented |
| **Simplifying Assumptions** Our financial reporting process was over-reliant on simplifying assumptions, or manual work around solutions, in the application of our accounting policies. In addition, we did not adequately monitor the potential impact of these simplifying assumptions on the financial statements. | Remediated | Remediated |
| **Oversight of Models and Model Applications** Our model governance and monitoring procedures (exclusive of those addressed through the Guarantee Asset/Guarantee Obligation Governance significant deficiency described above) did not effectively ensure that changes to and our use of models in our financial reporting process are appropriate. | Remediation activities implemented | Remediation activities implemented |
| **Subsequently Identified Significant Deficiencies** | | |
| **IT Security — Shared IDs** We have not consistently executed security controls over system and user accounts that can be used by multiple individuals. | (1) | In process |
| **User Access Recertification** We have not effectively executed periodic review and recertification of user access to financial applications and related technical platforms. | (1) | In process |
| **Consideration of Controls in Application Design** Our business or technical design requirements for financial application development projects have not adequately considered requirements for automating process controls. | (1) | In process |
| **Pre-Deployment Application Testing and Maintenance Approval** We have not consistently executed the appropriate testing of new financial applications prior to their deployment nor have we consistently obtained the appropriate approvals of application maintenance changes. | (1) | In process |

(1) These significant deficiencies were identified through the material weakness remediation efforts related to *Information Technology General Controls — Access to Data and Security Administration* and *Information Technology General Controls — Change Management.* Therefore, "Remediation Progress as of December 31, 2007" is not applicable.

*Freddie Mac*

## DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

### Our Board of Directors (as of the date of this report)[1]

**Richard F. Syron**
*Chairman and Chief Executive Officer*
Freddie Mac
McLean, Virginia

**Barbara T. Alexander**[D, D, E]
*Independent Consultant*
Monarch Beach, California

**Geoffrey T. Boisi**[B, D, E]
*Chairman and CEO*
Roundtable Investment Partners, LLC
A private investment management firm
New York, New York

**Michelle Engler**[B, E]
*Trustee*
JNL Investor Series Trust and JNL Series Trust
and *Member of Board of Managers*
JNL Variable Fund L.L.C.
Each an investment company
Lansing, Michigan

**Robert R. Glauber**[A, C]
*Retired Chairman and Chief Executive Officer*
National Association of Securities Dealers, Inc.
A former private-sector regulator of the securities industry
Washington, District of Columbia

**Richard Karl Goeltz**[A, C, D]
*Retired Vice Chairman and Chief Financial Officer*
American Express Company
A financial services company
New York, New York

**Thomas S. Johnson**[A, B, D]
*Retired Chairman and Chief Executive Officer*
GreenPoint Financial Corporation
A financial services company
New York, New York

**William M. Lewis, Jr.**[C, E]
*Managing Director and Co-Chairman*
  *of Investment Banking*
Lazard Ltd.
An investment banking company
New York, New York

**Shaun F. O'Malley** (Lead Director)[A, B, D]
*Chairman Emeritus*
Price Waterhouse LLP
An accounting and consulting firm
Philadelphia, Pennsylvania

**Nicholas P. Retsinas**[C, E]
*Director*
Joint Center for Housing Studies
Harvard University
Cambridge, Massachusetts

**Stephen A. Ross**[A, C, D]
*Franco Modigliani Professor of Financial Economics*
Massachusetts Institute of Technology
Cambridge, Massachusetts

Committees   A Audit
             B Compensation and Human Resources
             C Finance and Capital Deployment
             D Governance, Nominating and Risk Oversight
             E Mission, Sourcing and Technology

---

(1) Our enabling legislation establishes the membership of the board of directors at 18 directors: 13 directors elected by the stockholders and 5 directors appointed by the President of the United States. Prior to our March 31, 2004 Annual Meeting, the Office of Counsel to the President informed us that the President did not intend to reappoint any of his then-current presidential appointees. Consequently, each of their terms as presidential appointees ended on the date of that annual meeting. No new appointees have been named by the President as of the date of this report.

Additional information regarding our directors and executive officers is set forth in our proxy statement for our annual meeting of stockholders to be held on June 6, 2008, and is incorporated here by reference. Additional information concerning our Audit Committee may be found in our proxy statement. We also provide information regarding beneficial ownership reporting compliance in our proxy statement, incorporated here by reference. Information regarding the procedures for stockholder nominations to our Board of Directors is set forth in our proxy statement, incorporated here by reference.

We have adopted a code of conduct for employees which is available on our website at www.freddiemac.com. Printed copies of the code of conduct may be obtained free of charge upon request from our Investor Relations department. We intend to disclose on our website any amendments to, or waivers from, the employee code of conduct on behalf of the chief executive officer, chief financial officer, controller and persons performing similar functions.

## EXECUTIVE COMPENSATION

Information regarding executive compensation is set forth in our proxy statement and is incorporated here by reference. Information regarding compensation of our board of directors and information concerning members of the Compensation and Human Resources Committee is set forth in our proxy statement and is incorporated here by reference.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

### Securities Authorized for Issuance Under Equity Compensation Plans

Information about our common stock that may be issued upon the exercise of options, warrants and rights under our existing equity compensation plans at December 31, 2007 is set forth in our proxy statement and is incorporated here by reference.

### Security Ownership of Management

Information regarding the beneficial ownership of our common stock by each of our directors, each director nominee, certain executive officers and by all directors and executive officers as a group is set forth in our proxy statement and is incorporated here by reference.

### Security Ownership of Certain Beneficial Owners

Information regarding the beneficial ownership of our common stock by certain beneficial owners is set forth in our proxy statement and is incorporated here by reference.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE

Information regarding director independence, certain relationships and related transactions is set forth in our proxy statement and is incorporated here by reference.

## PRINCIPAL ACCOUNTANT FEES AND SERVICES

Information regarding principal accountant fees and services is set forth in our proxy statement and is incorporated here by reference.

## RATIO OF EARNINGS TO FIXED CHARGES

| | Year Ended December 31, | | | | |
| | | | Adjusted | | |
| | 2007[1] | 2006 | 2005 | 2004 | 2003 |
| | | | (dollars in millions) | | |
| Net income (loss) before cumulative effect of change in accounting principle ......... | $(3,094) | $ 2,327 | $ 2,172 | $ 2,603 | $ 4,809 |
| Add: | | | | | |
| Income tax expense (benefit) ......................................................... | (2,883) | (45) | 358 | 609 | 2,198 |
| Minority interests in earnings of consolidated subsidiaries........................... | (8) | 58 | 96 | 129 | 157 |
| Low-income housing tax credit partnerships ......................................... | 469 | 407 | 320 | 282 | 199 |
| Total interest expense ........................................................... | 38,482 | 37,270 | 29,899 | 26,566 | 26,509 |
| Interest factor in rental expenses ................................................. | 7 | 6 | 6 | 6 | 5 |
| Earnings, as adjusted ................................................................ | $32,973 | $40,023 | $32,851 | $30,195 | $33,877 |
| Fixed charges: | | | | | |
| Total interest expense................................................................ | $38,482 | $37,270 | $29,899 | $26,566 | $26,509 |
| Interest factor in rental expenses ................................................... | 7 | 6 | 6 | 6 | 5 |
| Capitalized interest ................................................................. | — | — | — | 1 | — |
| Total fixed charges .................................................................. | $38,489 | $37,276 | $29,905 | $26,573 | $26,514 |
| Ratio of earnings to fixed charges[2] ................................................. | — | 1.07 | 1.10 | 1.14 | 1.28 |

(1) For the Ratio of earnings to fixed charges to equal 1.00, Earnings, as adjusted must increase by $5.5 billion.
(2) Ratio of earnings to fixed charges is computed by dividing Earnings, as adjusted by Total fixed charges.

## RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS

| | Year Ended December 31, | | | | |
| | | | Adjusted | | |
| | 2007[1] | 2006 | 2005 | 2004 | 2003 |
| | | | (dollars in millions) | | |
| Net income (loss) before cumulative effect of change in accounting principle ......... | $(3,094) | $ 2,327 | $ 2,172 | $ 2,603 | $ 4,809 |
| Add: | | | | | |
| Income tax expense (benefit) ......................................................... | (2,883) | (45) | 358 | 609 | 2,198 |
| Minority interests in earnings of consolidated subsidiaries........................... | (8) | 58 | 96 | 129 | 157 |
| Low-income housing tax credit partnerships ......................................... | 469 | 407 | 320 | 282 | 199 |
| Total interest expense ........................................................... | 38,482 | 37,270 | 29,899 | 26,566 | 26,509 |
| Interest factor in rental expenses ................................................. | 7 | 6 | 6 | 6 | 5 |
| Earnings, as adjusted ................................................................ | $32,973 | $40,023 | $32,851 | $30,195 | $33,877 |
| Fixed charges: | | | | | |
| Total interest expense................................................................ | $38,482 | $37,270 | $29,899 | $26,566 | $26,509 |
| Interest factor in rental expenses ................................................... | 7 | 6 | 6 | 6 | 5 |
| Capitalized interest................................................................. | — | — | — | 1 | — |
| Preferred stock dividends[3] .......................................................... | 398 | 270 | 260 | 260 | 315 |
| Total fixed charges including preferred stock dividends ............................. | $38,887 | $37,546 | $30,165 | $26,833 | $26,829 |
| Ratio of earnings to combined fixed charges and preferred stock dividends[3] .......... | — | 1.07 | 1.09 | 1.13 | 1.26 |

(1) For the Ratio of earnings to combined fixed charges and preferred stock dividends to equal 1.00, Earnings, as adjusted must increase by $5.9 billion.
(2) Preferred stock dividends represent pre-tax earnings required to cover any preferred stock dividend requirements computed using our effective tax rate, whenever there is an income tax provision, for the relevant periods.
(3) Ratio of earnings to combined fixed charges and preferred stock dividends is computed by dividing Earnings, as adjusted by Total fixed charges including preferred stock dividends.

## ADDITIONAL INFORMATION

### ANNUAL MEETING

The annual meeting of Freddie Mac's stockholders will be held:
June 6, 2008
8000 Jones Branch Drive
McLean, Virginia 22102
Proxy materials will be mailed to stockholders of record in accordance with Freddie Mac's bylaws and NYSE Euronext requirements.

### DIVIDEND PAYMENTS

Approved by Freddie Mac's board of directors, dividends on the company's common stock and non-cumulative, preferred stock in 2007 were paid on:
March 30, 2007
June 29, 2007
September 28, 2007
December 31, 2007

Subject to approval by Freddie Mac's board of directors, dividends on the company's common stock and non-cumulative, preferred stock in 2008 are expected to be paid on or about:
March 31, 2008
June 30, 2008
September 30, 2008
December 31, 2008

## CERTIFICATION*

I, Richard F. Syron, certify that:

1. I have reviewed this Information Statement of the Federal Home Loan Mortgage Corporation, or Freddie Mac;

2. Based on my knowledge, this Information Statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Information Statement; and

3. Based on my knowledge, the consolidated financial statements, and other financial information included in this Information Statement, fairly present in all material respects the financial condition, results of operations and cash flows of Freddie Mac as of, and for, the periods presented in this Information Statement.

Date: February 28, 2008

Richard F Syron

Richard F. Syron
Chairman and Chief Executive Officer

## CERTIFICATION*

I, Anthony S. Piszel, certify that:

1. I have reviewed this Information Statement of the Federal Home Loan Mortgage Corporation, or Freddie Mac;

2. Based on my knowledge, this Information Statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Information Statement; and

3. Based on my knowledge, the consolidated financial statements, and other financial information included in this Information Statement, fairly present in all material respects the financial condition, results of operations and cash flows of Freddie Mac as of, and for, the periods presented in this Information Statement.

Date: February 28, 2008

Anthony S. Piszel
Executive Vice President and Chief Financial Officer

---

* For a discussion of our progress with respect to our internal control over financial reporting and disclosure controls and procedures, see "CONTROLS AND PROCEDURES."



We make home possible[*]

# EXHIBIT C

**BYLAWS OF THE FEDERAL HOME LOAN MORTGAGE CORPORATION**

**As amended and restated June 6, 2008**

# FREDDIE MAC BYLAWS
## TABLE OF CONTENTS

**Page**

ARTICLE 1      OFFICES.................................................................. 1

Section 1.1      Offices. .............................................................. 1

ARTICLE 2      CAPITAL STOCK ................................................... 1

Section 2.1      Issuance. ........................................................... 1

Section 2.2      Common Stock. ................................................. 1

Section 2.3      Preferred Stock ................................................. 1

Section 2.4      Consideration.................................................... 1

Section 2.5      Shares Owned by the Corporation........................ 1

Section 2.6      Fractional Shares.............................................. 2

Section 2.7      Certificates. ..................................................... 2

Section 2.8      Transfer of Shares ............................................ 2

Section 2.9      Lost, Destroyed and Mutilated Certificates ........... 3

Section 2.10     Fixing a Record Date ......................................... 3

Section 2.11     Record of Stockholders ..................................... 4

Section 2.12     Ownership of Shares ......................................... 4

Section 2.13     Share Options and Other Instruments ................. 4

ARTICLE 3      MEETINGS OF THE STOCKHOLDERS ................... 4

Section 3.1      Annual Meetings ............................................... 4

Section 3.2      Special Meetings. ............................................. 5

Section 3.3      Notice of Meetings ............................................ 6

Section 3.4      Quorum............................................................ 7

Section 3.5      Organization .................................................... 8

Section 3.6      Conduct of Business.......................................... 8

Section 3.7      Voting ............................................................. 10

Section 3.8      Voting Entitlement of Shares ............................. 11

Section 3.9      Proxies........................................................... 12

Section 3.10     Stockholders' List............................................ 12

ARTICLE 4      BOARD OF DIRECTORS...................................... 13

Section 4.1      General Powers. .............................................. 13

**TABLE OF CONTENTS**
(continued)

Page

Section 4.2     Number, Qualification and Term of Office ............................. 13

Section 4.3     Nominations ......................................................................... 13

Section 4.4     Vacancies ............................................................................ 14

Section 4.5     Elections. ............................................................................. 15

Section 4.6     Chairman ............................................................................. 16

Section 4.7     Lead Director ....................................................................... 16

Section 4.8     Regular Meetings ................................................................. 16

Section 4.9     Special Meetings .................................................................. 16

Section 4.10    Quorum ................................................................................ 17

Section 4.11    Participation in Meetings ..................................................... 17

Section 4.12    Conduct of Business ............................................................ 17

Section 4.13    Reimbursement and Compensation of Directors .................. 18

Section 4.14    Committees of the Board of Directors ................................... 18

Section 4.15    Resignation .......................................................................... 19

Section 4.16    Removal of Directors ........................................................... 19

Section 4.17    Termination of Voluntary Registration of Common Stock ....... 19

ARTICLE 5      OFFICERS ............................................................................ 19

Section 5.1     Number ................................................................................ 19

Section 5.2     Appointment and Term ......................................................... 20

Section 5.3     Removal, Resignation, Vacancy ........................................... 20

Section 5.4     Compensation ...................................................................... 20

Section 5.5     Duties .................................................................................. 20

Section 5.6     Chief Executive Officer ........................................................ 20

Section 5.7     President .............................................................................. 21

Section 5.8     Chief Operating Officer ........................................................ 21

Section 5.9     Senior Vice President – General Auditor ............................... 21

Section 5.10    Vice Presidents .................................................................... 21

Section 5.11    Corporate Secretary ............................................................ 21

Section 5.12    Delegation of Authority ........................................................ 22

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE 6      INSPECTION OF RECORDS ........................................................... 22
    Section 6.1      Inspection of Records by Stockholders ................................ 22
    Section 6.2      Inspection of Records by Directors ........................................ 23
ARTICLE 7      NOTICES ................................................................................ 23
    Section 7.1      Notices ................................................................................. 23
    Section 7.2      Written Waivers ................................................................... 25
ARTICLE 8      INDEMNIFICATION AND LIMITATION OF LIABILITY ..................... 25
    Section 8.1      Indemnification ..................................................................... 25
    Section 8.2      Right of Indemnitee to Bring Suit ........................................ 27
    Section 8.3      Non-Exclusivity of Rights ..................................................... 28
    Section 8.4      Insurance .............................................................................. 28
    Section 8.5      Limitation of Liability ............................................................. 28
ARTICLE 9      SEAL ....................................................................................... 29
    Section 9.1      Corporate Seal ...................................................................... 29
ARTICLE 10    FISCAL YEAR .......................................................................... 29
    Section 10.1    Fiscal Year ............................................................................. 29
ARTICLE 11    MISCELLANEOUS ................................................................... 29
    Section 11.1    Time Periods .......................................................................... 29
    Section 11.2    Severability ............................................................................ 29
    Section 11.3    Corporate Governance Practices and Procedures and
                          Governing Law ...................................................................... 29
    Section 11.4    Certificates of Designation ................................................... 30
    Section 11.5    Statutory References ............................................................ 30
ARTICLE 12    AMENDMENTS ....................................................................... 30
    Section 12.1    General ................................................................................... 30
    Section 12.2    Amendment by the Board of Directors .................................. 30
    Section 12.3    Amendment by the Stockholders .......................................... 30

# ARTICLE 1 – OFFICES

**Section 1.1   Offices.**  The principal office of the Corporation shall be in Fairfax County, Virginia or at any other place determined by the Board of Directors.  The Corporation may have such other offices as the Board of Directors or the Chief Executive Officer shall determine appropriate.

# ARTICLE 2 – CAPITAL STOCK

**Section 2.1   Issuance.**  The Board of Directors shall have the power to authorize the issuance of one or more classes or series of stock of the Corporation, including, without limitation, voting common and preferred stock.  All stock shall be issued on such terms and conditions as the Board of Directors shall prescribe from time to time.

**Section 2.2   Common Stock.**  The voting common stock of the Corporation (the "Common Stock") shall consist of such number of shares as may be issued or authorized for issuance from time to time by the Board of Directors (without limitation upon the authority of the Board of Directors to authorize the issuance of additional shares from time to time). The Common Stock shall have the designation, powers, rights, privileges, qualifications, limitations, restrictions, terms and conditions set forth in the Seventh Restated Certificate of Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitation, Restrictions, Terms and Conditions of Voting Common Stock adopted on February 27, 2008, as further amended or restated from time to time (the "Common Stock Certificate of Designation").  No holder of Common Stock shall as such holder have any preemptive right to purchase or subscribe for any other shares, rights, options, or other securities of any class of the Corporation which at any time may be sold or offered for sale by the Corporation.

**Section 2.3   Preferred Stock.**  The preferred stock of the Corporation shall consist of such number of shares as may be issued or authorized for issuance from time to time by the Board of Directors (without limitation upon the authority of the Board of Directors to authorize the issuance of additional shares from time to time).  Each class of preferred stock shall have the designation, powers, preferences, rights, privileges, qualifications, limitations, restrictions, terms and conditions set forth in the certificate of designation approved by the Board of Directors for such class.

**Section 2.4   Consideration.**  Shares of stock may be issued to the Corporation's stockholders pro rata and without consideration.  Shares of stock may also be issued for consideration consisting of any tangible or intangible property or benefit to the Corporation as the Board of Directors deems appropriate.  Upon the Board of Directors making a good faith determination that the consideration received for the shares to be issued is adequate, the shares issued therefor shall be fully paid and nonassessable.

**Section 2.5   Shares Owned by the Corporation.**  Any shares of capital stock owned by the Corporation shall retain the status of issued shares, unless and until the

Freddie Mac Bylaws
June 6, 2008
Page 2

Corporation shall retire and cancel the same, but such shares shall not be regarded as outstanding while so owned.

**Section 2.6  <u>Fractional Shares.</u>**  No fractional interests in shares of common stock will be created or recognized by the Corporation except as otherwise provided in the Corporation's Employee Stock Purchase Plan or any other executive compensation or employee benefit plan or any direct stock purchase plan currently in effect or hereafter adopted by the Corporation.  The holder of a fractional share is entitled to exercise the rights of a shareholder, including the right to vote, to receive dividends, and to participate in the assets of the Corporation upon dissolution.

**Section 2.7  <u>Certificates.</u>**

(a)    The Board of Directors may authorize the issuance of shares of stock of the Corporation with or without certificates.  The rights and obligations of stockholders shall be identical whether or not their shares are represented by certificates.  Stock certificates shall be in the form approved by the Corporate Secretary.  Each stock certificate shall contain the name of the Corporation, the name of the stockholder, the number and kind of shares of stock owned by such stockholder, and reference to any other material terms of the stock represented thereby, including, without limitation, the information required to be set forth on such certificates by the Common Stock Certificate of Designation, shall be signed by the Chief Executive Officer or President and countersigned by the Corporate Secretary or an Assistant Secretary, and shall be sealed with the Corporation's seal or a facsimile of such seal.  Within a reasonable time after the issuance or transfer of shares without certificates, the Corporation shall send to the registered stockholder a written statement containing the information required to be set forth on the certificates, including, without limitation, the information required to be set forth on such certificates by the Common Stock Certificate of Designation, or a statement that the Corporation will furnish such information upon request and without charge.

(b)    When any stock certificate is countersigned by a transfer agent or a registrar, other than the Corporation or its employee, any other signature on such certificate may be a facsimile.  If any corporate officer who has signed any certificate ceases to be a corporate officer before such certificate is issued, whether because of death, resignation or otherwise, the certificate may nevertheless be issued and delivered by the Corporation as if such officer had not ceased to be such as of the certificate's issue date.

**Section 2.8  <u>Transfer of Shares.</u>**  Except as otherwise provided in the Corporation's Employee Stock Purchase Plan or any other executive compensation or employee benefit plan or any direct stock purchase plan currently in effect or hereafter adopted by the Corporation, the Common Stock shall be transferable only in whole shares.  Subject to the foregoing, the stock of the Corporation shall be transferable or

Freddie Mac Bylaws
June 6, 2008
Page 3

assignable only on the transfer books of the Corporation or by transfer agents designated to transfer shares of stock of the Corporation by the registered holder thereof, in person or by a duly authorized attorney, and, in the case of certificated shares, upon the surrender and cancellation of such certificates representing the shares to be transferred, properly endorsed and, if sought to be transferred by such attorney, accompanied by a written power of attorney to have the same transferred on the books of the Corporation.  The Board of Directors shall have power and authority to make such other rules and regulations concerning the issuance, transfer and registration of certificates of stock as it may deem appropriate.

      **Section 2.9**   <u>**Lost, Destroyed and Mutilated Certificates.**</u>   If any holder of the shares of the Corporation in certificated form shall notify the Corporation of any loss, theft, destruction or mutilation of such certificate(s), the Chief Executive Officer may, in his or her discretion, cause one or more new certificate(s) for the same number of shares in the aggregate to be issued to such stockholder upon the surrender of the mutilated certificate, or upon delivery by the stockholder or such stockholder's legal representative of a bond, with or without surety, or such other agreement, undertaking or security as the Corporate Secretary shall determine is appropriate, to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of any such certificate(s) or the issuance of any new certificate(s).

      **Section 2.10**   <u>**Fixing a Record Date.**</u>   Except as otherwise provided in the Common Stock Certificate of Designation, or any other certificate of designation relating to any class of the Corporation's preferred stock, for the purpose of determining stockholders entitled to notice of, or to vote at, any meeting of stockholders or any adjournment thereof, or entitled to receive payment of any dividend, or in order to make a determination of stockholders for any other proper purpose, the Board of Directors may fix in advance a date as the record date for any such determination of stockholders, such date in any case to be not more than 70 days before the meeting or action requiring a determination of stockholders and, in the case of record dates for dividends on the preferred stock, subject to any additional limitations set forth in the related certificate of designation.  If no record date is fixed for the determination of (i) stockholders entitled to notice of, or to vote at, a meeting of stockholders or (ii) stockholders entitled to receive payment of a dividend, the date on which notices of the meeting are first mailed or otherwise given or the date on which the resolution of the Board of Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of stockholders.  When a determination of stockholders entitled to vote at any meeting of stockholders has been made as provided in this Section, such determination shall apply to any adjournment thereof unless the Board of Directors fixes a new record date, which it shall do if the meeting is adjourned to a date more than 120 days after the date fixed for the original meeting.

Freddie Mac Bylaws
June 6, 2008
Page 4

**Section 2.11  Record of Stockholders.**  A record shall be kept of the names of the persons and entities owning the stock represented by each share of stock of the Corporation, the number of shares represented by each certificate or information statement issued in respect of noncertificated shares and the dates of issuance thereof in a form that permits the preparation of a list of the names and addresses of all stockholders in alphabetical order showing the number of shares held by each.

**Section 2.12  Ownership of Shares.**  The Corporation and any agent thereof may deem and treat the holder of a share or shares of stock, as shown in the Corporation's books and records, as the absolute owner of such share or shares of stock for the purpose of receiving payment of dividends in respect of such share or shares of stock and for all other purposes whatsoever, and neither the Corporation nor any agent thereof shall be affected by any notice to the contrary.  All payments made to or upon the order of any such person shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge liabilities for moneys payable by the Corporation on or with respect to any such share or shares of stock.

**Section 2.13  Share Options and Other Instruments.**  The Corporation may issue rights, options or warrants for the purchase of shares or other securities of the Corporation, subject to stockholder approval to the extent required by applicable laws, regulations or listing standards.  The Board of Directors may authorize the issuance of rights, options or warrants and determine  the terms upon which the rights, options or warrants are issued, including, without limitation, the consideration for which the shares or other securities are to be issued.  The authorization for the Corporation to issue such rights, options or warrants constitutes authorization of the issuance of the shares or other securities for which the rights, options or warrants are exercisable.

## ARTICLE 3 – MEETINGS OF THE STOCKHOLDERS

**Section 3.1  Annual Meetings.**

(a)    An annual meeting of the stockholders, for the election of directors and for the transaction of such other business as may properly come before the meeting, shall be held on such date, at such time and at such place as the Board of Directors shall each year fix, which date shall be within 15 months after the immediately preceding meeting of stockholders.  The failure to hold an annual meeting at the time stated in, or fixed in accordance with, these Bylaws shall not affect the validity of any corporate action.

(b)    Upon notice to the Corporation, any stockholder of the Corporation entitled to participate in an annual meeting may petition the United States District Court for the district within which the Corporation's principal office is located to order an annual meeting of stockholders if an annual meeting has not been held within 15 months after the Corporation's immediately preceding annual meeting.  The court may fix the time and place of the meeting, determine the shares entitled to notice of and to vote at the

Freddie Mac Bylaws
June 6, 2008
Page 5

meeting, prescribe the form and content of the meeting notice and enter other orders necessary to accomplish the purpose or purposes of the meeting.

### Section 3.2    Special Meetings.

(a)    Special meetings of the stockholders, for any purpose or purposes prescribed in the notice of the meeting, may be called by a majority of the directors then in office or the Chairman of the Board ("Chairman"), and shall be held on such date, at such time and at such place as they or he or she shall fix.

(b)    Special meetings of the stockholders, for any purpose or purposes prescribed in the notice of the meeting, may also be called by the Corporate Secretary upon the written request of the holders of at least a majority of all shares of voting stock entitled to vote; provided, however, a special meeting of the stockholders for the purposes of Section 4.16 of these Bylaws must be requested by the holders of at least one-third of all shares of voting stock entitled to vote. A special meeting of the stockholders called pursuant to the preceding sentence shall be referred to in these Bylaws as a "Stockholder Requested Special Meeting". A Stockholder Requested Special Meeting shall be held on such date, at such time and at such place as determined by the Corporate Secretary as soon as is reasonably practicable following the Corporation's receipt of a written request that is in compliance with this Section 3.2 (the "Delivery Date") and, unless the penultimate paragraph of this Section applies, within 75 calendar days of the Delivery Date. The record date for determining stockholders entitled to request for a Stockholder Requested Special Meeting shall be the later of (i) the date the first stockholder signs the request, or (ii) the earliest record date permitted by Section 2.10 of these Bylaws.

Upon notice to the Corporation, any stockholder of the Corporation who signed the request for a Stockholder Requested Special Meeting, may petition the United States District Court for the district within which the Corporation's principal office is located to order a special meeting of stockholders if a special meeting notice has not been held as provided herein. The court may fix the time and place of the meeting, determine the shares entitled to notice of and to vote at the meeting, prescribe the form and content of the meeting notice, and enter other orders necessary to accomplish the purpose or purposes of the meeting.

A written request of the holders of the voting stock made pursuant to this Section 3.2 must (i) be signed, dated and delivered to the Corporate Secretary at the principal executive offices of the Corporation by each stockholder making the request for a Stockholder Requested Special Meeting, (ii) identify the name and record address of each stockholder making the request for a Stockholder Requested Special Meeting, (iii) include a brief description of the business desired to be brought before such Stockholder Requested Special Meeting, the reasons for conducting such business, a statement of specific purpose(s) of the meeting and the matter proposed to be acted on

Freddie Mac Bylaws
June 6, 2008
Page 6

at it, which matter must be a proper subject for stockholder action, (iv) shall be accompanied by documentation to verify the class and number of shares of the Corporation that are beneficially owned by each stockholder making such request in accordance with the Securities Exchange Act of 1934, as amended (the "Exchange Act"), specifically Rule 14a-8(b)(2) of Regulation 14A (Solicitation of Proxies) (the "Proxy Rules Requirement"), (v) contain a representation that each stockholder submitting the request intends to appear in person or by proxy at the Stockholder Requested Special Meeting to transact the business specified, and (vi) contain a representation that each stockholder submitting the request intends to continue ownership of shares of the voting stock through the date of the Stockholder Requested Special Meeting.  The Corporation may require any stockholder making such request to furnish such other information as may reasonably be required by the Corporation to determine the eligibility of stockholders to make a written request pursuant to this Section 3.2.  Failure of the stockholders who sign the request for a Stockholder Requested Special Meeting to comply with the representations identified in (v) and (vi) above, shall be deemed to constitute a revocation of such request.  Any stockholder who submitted a request for a Stockholder Requested Special Meeting may revoke such request at any time by written revocation delivered to the Corporate Secretary at the principal executive offices of the Corporation.

The Corporate Secretary shall not be required to call a Stockholder Requested Special Meeting if (i) the Board of Directors calls an annual or special meeting of stockholders to be held not later than 75 days after the Delivery Date and the purpose(s) of such meeting includes the purpose(s) specified by the requisite number of stockholders in the special meeting request(s), or (ii) an annual or special meeting was held not more than 12 months before the Delivery Date, which included the purpose(s) specified by the requisite number of stockholders in the special meeting request(s), with such determination being made in good faith by the Board of Directors.  In determining whether a request for a Stockholder Requested Special Meeting has been submitted by stockholders holding the requisite number of shares of voting stock, there may be excluded from the computation, the shares of the voting stock owned by any stockholder who has signed the request for a Stockholder Requested Special Meeting at any time during the 2 calendar years preceding the Delivery Date and has failed to comply with the representations identified in (v) and (vi) above.

(c)    At a special meeting, no business shall be transacted and no action shall be taken other than as stated in the notice of the meeting; provided that nothing herein shall prohibit the Board of Directors from submitting other matters to the stockholders at a Stockholder Requested Special Meeting.

**Section 3.3    <u>Notice of Meetings.</u>**

(a)    Written or printed notice of the date, time and place of all meetings of the stockholders and, in the case of a special meeting, the purpose or purposes for which

Freddie Mac Bylaws
June 6, 2008
Page 7

the meeting is called, shall be given no fewer than 10 nor more than 60 days before the date on which the meeting is to be held, to each holder of voting stock entitled to vote at such meeting, except as otherwise provided in these Bylaws.

When a meeting is adjourned to another date, time or place, written notice need not be given of the adjourned meeting if the date, time or place thereof are announced at the meeting at which the adjournment is taken; provided, however, that, if the date of any adjourned meeting is more than 120 days after the date for which the meeting was originally noticed, or if a new record date is fixed for the adjourned meeting, written notice of the date, time or place of the adjourned meeting shall be given in conformity herewith.

(b)     A stockholder's attendance at a meeting, whether in person or by proxy, (i) waives objection to lack of notice or defective notice of the meeting, unless the stockholder at the beginning of the meeting objects to holding the meeting or transacting business at the meeting; and (ii) waives objection to consideration of a particular matter at the meeting that is not within the purpose or purposes described in the meeting notice unless the stockholder objects to considering the matter when it is presented.

Notwithstanding the foregoing, no notice of a stockholders' meeting need be given to a stockholder if (i) an annual report and proxy statements for two consecutive annual meetings of stockholders or (ii) all, and at least two, checks for payment of dividends or interest on securities during a twelve-month period have been sent by first-class United States mail, addressed to the stockholder at his or her address as it appears on the stock transfer books of the Corporation, and have been returned undeliverable.  The obligation of the Corporation to give notice of stockholders' meetings to any such stockholder shall be reinstated once the Corporation has received a new address for such stockholder for entry on its stock transfer books, a reaffirmation of the address appearing therein or a written consent from the stockholder to the receipt of notices by electronic transmission, specifying the address to which such notices should be electronically transmitted.

(c)     For purposes of these Bylaws, "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such recipient through an automated process.

### Section 3.4    Quorum.

(a)     At any meeting of the stockholders, the holders of a majority of all shares of voting stock entitled to vote at the meeting, present in person or by proxy, shall constitute a quorum, except as otherwise provided in this Section.  If a quorum shall fail to attend a meeting, the chairman of the meeting or the holders of a majority of all

Freddie Mac Bylaws
June 6, 2008
Page 8

shares of voting stock entitled to vote at the meeting who are present, in person or by proxy, may adjourn the meeting to another date, time or place.

(b)     Once a share of stock is represented for any purpose at a meeting, it is deemed present for quorum purposes for the remainder of the meeting and for any adjournment of that meeting unless a new record date is or shall be set for that adjourned meeting.

**Section 3.5     Organization.** The Chairman or, in the absence of the Chairman, another director designee of the Board of Directors or, in the absence of the Chairman and such a designation, the Chief Executive Officer or in his or her absence, the President or, in the absence of both such officers, such person as may be chosen by the holders of a majority of all shares of voting stock entitled to vote who are present, in person or by proxy, shall call to order any meeting of the stockholders and shall act as chairman of the meeting.  In the absence of the Corporate Secretary, the secretary of the meeting shall be such person as the chairman of the meeting appoints.

**Section 3.6     Conduct of Business.**

(a)     The chairman of any meeting of stockholders shall determine the order of business and shall have the authority to establish rules for the conduct of the meeting, including such regulation of the manner of voting and the conduct of discussion, restrictions on attendance at a meeting so long as stockholders or their proxies are not excluded, and adjournment of the meeting to be reconvened at a later date, as seem to him or her in order and not inconsistent with these Bylaws.

(b)     No business shall be brought before any meeting except in accordance with the procedures set forth in these Bylaws, and the rules, if any, established by the chairman of the meeting for the conduct of the meeting; provided, however, that nothing in this Section shall be deemed to preclude discussion by any stockholder of any business properly brought before such meeting.

(c)     At any meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting. The chairman of any meeting shall, if the facts warrant, determine that business was not properly brought before the meeting, and, if the chairman should so determine, he or she shall so declare to the meeting and any such business not properly brought before the meeting shall not be conducted. At any adjourned meeting, any business may be transacted and any action taken which might have been transacted or taken at the original meeting.

(d)     To be properly brought before an annual meeting, business must be specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors, or otherwise brought before the meeting by or at the direction of the Board of Directors, or otherwise properly brought before the meeting by a stockholder.  In addition to any other applicable requirements, including, without

Freddie Mac Bylaws
June 6, 2008
Page 9

limitation, Rule 14a-8 under the Exchange Act, if applicable, for business other than a director nomination to be properly brought before an annual meeting by a stockholder, the stockholder must have given timely notice thereof in writing to the Corporate Secretary at the principal executive office of the Corporation. (The exclusive procedures for stockholders to make nominations for the election of directors at any annual meeting are set forth in Section 4.3.) The content of the stockholders' notice must comply with the requirements of this Section 3.6. The requirements of this Section 3.6 shall apply to any business a stockholder wishes to bring before an annual meeting, whether under Rule 14a-8 under the Exchange Act or otherwise. To be timely, a stockholder's notice must be received at the principal office of the Corporation no fewer than 75 days prior to such annual meeting. In the event that fewer than 90 days' notice or prior public disclosure of the date of such annual meeting is given or made to stockholders, notice by the stockholder, to be timely, must be so received not later than the close of business on the 15th day following the day on which such notice of the date of such annual meeting was mailed or such public disclosure was made, whichever first occurs. A written notice must (i) be signed, dated and delivered to the Corporate Secretary at the principal executive offices of the Corporation by the stockholder, (ii) identify the name and record address of the stockholder submitting the notice, (iii) include a brief description of the business, which must be a proper subject for stockholder action, desired to be brought before such annual meeting and the reasons for conducting such business, (iv) shall be accompanied by documentation to verify the class and number of shares of the Corporation that are beneficially owned by the stockholder submitting such notice in accordance with the Exchange Act, specifically the Proxy Rules Requirement, (v) contain a representation that the stockholder submitting the notice intends to appear in person or by proxy at the annual meeting to transact the business specified, (vi) contain a representation that the stockholder submitting the notice intends to continue ownership of shares of the voting stock through the date of the annual meeting, and (vii) set forth any material interest of the stockholder in the matter identified in (iii) above. The Corporation may require any stockholder submitting such notice to furnish such other information as may reasonably be required by the Corporation to determine the eligibility of stockholders to give a written notice pursuant to this Section 3.6.

(e)    At a special meeting, no business shall be transacted and no action shall be taken other than as stated in the notice of the meeting; provided that nothing herein shall prohibit the Board of Directors from submitting other matters to the stockholders at a Stockholder Requested Special Meeting.

(f)    To the extent authorized by the Board of Directors with respect to any meeting, stockholders may participate in such a meeting by use of any means of communication by which all stockholders participating may simultaneously hear each other during the meeting including, without limitation, by use of internet accessible electronic meeting facilities. A stockholder participating in a stockholders' meeting by such means is deemed to be present in person at the meeting. Authorization of such

Freddie Mac Bylaws
June 6, 2008
Page 10

electronic participation in such a meeting shall not eliminate the requirement that the meeting take place at a physical location at which stockholders may attend the meeting in person.

### Section 3.7    Voting.

(a)    Except as otherwise provided in Section 8.1(c) of these Bylaws, each stockholder shall have one vote for every share of stock entitled to vote which is registered in his or her name on the record date for the meeting; provided, however, that the right of a stockholder to vote stock held in violation of the ownership reporting requirements contained in the Common Stock Certificate of Designation relating to such stock shall be limited as provided in the Common Stock Certificate of Designation so long as the ownership reporting requirements remain in effect.

(b)    Subject to the determination of the Board of Directors of the Corporation to authorize action by written consent under Section 3(b) of the Common Stock Certificate of Designation, votes shall be cast in person or by proxy at annual or special meetings of the holders of the shares of voting stock entitled to vote. All voting, including the election of directors, may be by a voice vote; provided, however, that upon demand by a holder of voting stock entitled to vote or his or her proxy or in the discretion of the chairman of the meeting, a vote shall be taken by ballots, each of which shall state the name of the stockholder or proxy voting and such other information as may be required under the rules of conduct established for the meeting.

(c)    The Corporation shall appoint one or more inspectors to oversee, determine and certify attendance and results of any voting at the meeting and make a written report of the inspector's determinations. Each inspector, before entering upon the discharge of his duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspectors may appoint or retain other persons or entities to assist the inspectors in the performance of their duties.

(d)    All elections for an elective seat on the Board of Directors shall be determined as provided by Section 4.5 of these Bylaws, and on all other matters, action shall be approved if the votes cast favoring the action exceed the votes cast opposing the action, unless a greater vote is prescribed by the Board of Directors or other person proposing the matter or otherwise required by these Bylaws.

(e)    An abstention or an election by a stockholder not to vote on an action because of failure to receive voting instructions from the beneficial owner of the shares shall not be considered a vote cast.

(f)    Stockholders-shall not vote their shares cumulatively.

Freddie Mac Bylaws
June 6, 2008
Page 11

### Section 3.8    <u>Voting Entitlement of Shares.</u>

(a)    Shares standing in the name of another corporation may be voted by such officer, agent or proxy as the bylaws of such corporation may prescribe, or, in the absence of such provision, as the board of directors of such corporation may determine.

(b)    Shares standing in the name of a partnership may be voted by any partner.  Shares standing in the name of a limited liability company may be voted as the articles of organization or an operating agreement may prescribe, or in the absence of any such provision as the managers, or if there are no managers, the members of the limited liability company may determine.

(c)    Shares held by two or more persons as joint tenants or tenants in common or tenants by the entirety may be voted by any of such persons.  If more than one of such tenants vote such shares, the vote shall be divided among them in proportion to the number of such tenants voting.

(d)    Shares held by an administrator, executor, guardian, committee or curator representing the holder of voting stock may be voted by such person without a transfer of such shares into such person's name.  Shares standing in the name of a trustee may be voted by the trustee, but no trustee shall be entitled to vote shares held by him or her without a transfer of such shares into the trustee's name.

(e)    Shares standing in the name of a receiver or a trustee in proceedings under the applicable bankruptcy laws may be voted by such person.  Shares held by or under the control of a receiver or a trustee in proceedings under the applicable bankruptcy laws may be voted by such person without the transfer thereof into his or her name if authority to do so is contained in an order of the court by which such person was appointed.

(f)    Nothing herein contained shall prevent trustees or other fiduciaries holding shares registered in the name of a nominee from causing such shares to be voted by such nominee as the trustee or other fiduciary may direct.  Such nominee may vote shares as directed by a trustee or other fiduciary without the necessity of transferring the shares to the name of the trustee or other fiduciary.

(g)    When shares are held by more than one fiduciary, the shares shall be voted as determined by a majority of such fiduciaries, except that: (i) if they are equally divided as to a vote, the vote of shares shall be divided equally and (ii) if only one of such fiduciaries is present in person or by proxy at a meeting, such fiduciary shall be entitled to vote all the shares.

(h)    A holder of voting stock whose shares are pledged shall be entitled to vote such shares until the shares have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote the shares so transferred.

Freddie Mac Bylaws
June 6, 2008
Page 12

### Section 3.9    <u>Proxies.</u>

(a)    At any meeting of the stockholders, every holder of voting stock entitled to vote may vote in person or by proxy.  A stockholder or the stockholder's agent or attorney-in-fact may appoint a proxy to vote or otherwise act for the stockholder by signing an appointment form or by an electronic transmission.  An electronic transmission shall contain or be accompanied by information from which one can determine that the stockholder, the stockholder's agent or the stockholder's attorney-in-fact authorized the transmission.  Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to this Subsection may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used, provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.  No proxy shall be voted after eleven months from its date, unless a longer period is expressly provided in the appointment form or electronic transmission.

(b)    An appointment of a proxy is revocable unless the appointment form or electronic transmission states that it is irrevocable and the appointment is coupled with an interest.  An appointment made irrevocable in accordance with the immediately preceding sentence is revoked when the interest with which it is coupled is extinguished.

(c)    The death or incapacity of the stockholder appointing a proxy does not affect the right of the Corporation to accept the proxy's authority unless notice of the death or incapacity is received by the Corporate Secretary or other officer or agent authorized to tabulate votes before the proxy exercises his or her authority under the appointment.

(d)    Subject to Section 3.8 of these Bylaws and to any express limitation on the proxy's authority stated in the appointment form or electronic transmission, the Corporation is entitled to accept the proxy's vote or other action as that of the stockholder making the appointment.

(e)    Any fiduciary who is entitled to vote any shares may vote such shares by proxy.

### Section 3.10  <u>Stockholders' List.</u>

(a)    A complete list of stockholders entitled to vote at any meeting of stockholders, showing the address of each such stockholder and the number of shares registered in his or her name, shall be open to the examination of any such stockholder, for any purpose germane to the meeting, during ordinary business hours for a period of at least 10 days prior to the meeting, either at the principal office of the Corporation or at the office of its transfer agent.

Freddie Mac Bylaws
June 6, 2008
Page 13

(b)     The stockholders' list shall also be kept at the place of the meeting during the whole time thereof and shall be open to the examination of any such stockholder who is present.  This list shall presumptively determine the identity of the stockholders entitled to vote at the meeting and the number of shares held by each of them.

(c)     If the requirements of this Section have not been substantially complied with, the meeting shall, on the demand of any stockholder in person or by proxy, be adjourned until such requirements are complied with.  Refusal or failure to prepare or make available the stockholders' list shall not affect the validity of action taken at the meeting prior to the making of any such demand, but any action taken by the stockholders after the making of any such demand shall be invalid and of no effect.

## ARTICLE 4 – BOARD OF DIRECTORS

**Section 4.1     General Powers.**  Subject to the limitations of law and regulation, the Board of Directors shall determine the general policies that govern the operations of the Corporation, and the Corporation shall be under the direction of the Board of Directors.

**Section 4.2     Number, Qualification and Term of Office.**

(a)     The Board of Directors of the Corporation shall consist of 18 persons, five of whom shall be appointed annually by the President of the United States and the remainder of whom shall be elected annually by the stockholders.  The Board of Directors at all times have as members appointed by the President of the United States at least one person from the homebuilding industry, at least one person from the mortgage lending industry and at least one person from the real estate industry.

(b)     Each member of the Board of Directors shall be appointed or elected for a term ending on the date of the next annual meeting of the stockholders.

(c)     The Board of Directors shall establish standards and qualifications relating to independence from management and may establish other qualifications for service on the Board of Directors, including limitations on length of service and age, as required under, or consistent with, applicable laws, regulations and stock exchange listing standards.

**Section 4.3     Nominations.**

(a)     Only persons who are nominated in accordance with the following procedures shall be eligible for election as directors at any annual meeting of stockholders.  Nominations of persons for election to the Board of Directors of the Corporation at any annual meeting of stockholders may be made only by (i) the Board of Directors, or (ii) by any stockholder of the Corporation entitled to vote for the election of directors at the meeting who complies with the notice procedures set forth in this

Freddie Mac Bylaws
June 6, 2008
Page 14

Section; this clause (ii) shall be the exclusive means for a stockholder to make nominations for election of directors at any annual meeting of stockholders. (The exclusive procedures for stockholders to bring business other than nominations before a stockholders' meeting are set forth in Section 3.6.) Such nominations made by a stockholder entitled to vote in the election of directors shall be made pursuant to timely notice in writing to the Corporate Secretary at the principal executive office of the Corporation. To be timely, a stockholder's notice shall be received no fewer than 75 days prior to the meeting. In the event that fewer than 90 days' notice or prior public disclosure of the date of the meeting is given or made to stockholders, notice by the stockholder, to be timely, must be so received not later than the close of business on the 15th day following the day on which such notice of the date of the meeting was mailed or such public disclosure was made, whichever first occurs. Such stockholder's notice to the Corporate Secretary shall set forth (a) as to each person who the stockholder proposes to nominate for election or reelection as a director, (i) the name, age, business address and residential address of the person, (ii) the principal occupation or employment of the person, (iii) a description of all arrangements or understandings between the stockholder and each nominee and any other person(s) (naming such person(s)) pursuant to which arrangements or understandings the nominations(s) are to be made by the stockholder and (iv) such other information regarding each nominee proposed by such stockholder as is required to be disclosed in solicitations for proxies for election of directors pursuant to Section 14(a) of the Exchange Act; and (b) as to the stockholder submitting the notice, the notice must (i) be signed and dated by the stockholder, (ii) identify the name and record address of the stockholder submitting the notice, (iii) be accompanied by documentation to verify the class and number of shares of the Corporation that are beneficially owned by the stockholder submitting such notice in accordance with the Exchange Act, specifically the Proxy Rules Requirement, (iv) contain a representation that the stockholder submitting the notice intends to appear in person or by proxy at the annual meeting to make the nomination(s) the stockholder has proposed, and (v) contain a representation that the stockholder submitting the notice intends to continue ownership of shares of the voting stock through the date of the annual meeting. The Corporation may require any proposed nominee to furnish such other information as may reasonably be required by the Corporation to determine the eligibility of such proposed nominee to serve as director of the Corporation and such nominee's independence. No person shall be eligible for election as a director of the Corporation unless nominated in accordance with the procedures set forth in this Section.

(b)     The chairman of the meeting shall, if the facts warrant, determine that a nomination was not made in accordance with the foregoing procedures, and, if the chairman should so determine, he or she shall so declare to the meeting and the defective nomination shall be disregarded.

**Section 4.4    Vacancies.** Any appointive seat on the Board of Directors that becomes vacant may be filled only by appointment by the President of the United

Freddie Mac Bylaws
June 6, 2008
Page 15

States, but only for the unexpired portion of the term.  Any elective seat on the Board of Directors that becomes vacant after the annual election of the directors may be filled only by the Board of Directors, but only for the unexpired portion of the term.  If the directors remaining in office constitute fewer than six directors, the remaining directors may fill such vacant elective seats on the Board of Directors as may exist by the affirmative vote of a majority of such remaining directors.

### Section 4.5    Elections.

(a)    Each director nominated for an elective seat on the Board of Directors of the Corporation shall be elected only if he or she receives a majority of the votes cast with respect to his or her election at the annual meeting of stockholders, provided that if it is determined that the number of persons properly nominated to serve as elective directors of the Corporation exceeds the number of directors to be elected (a "contested election"), the directors shall be elected by a plurality of the votes of the shares represented at the meeting and entitled to vote on the election of directors.  A "majority of the votes cast" means that the number of votes cast "for" a director must exceed the number of votes cast "against" that director.

(b)    Following any uncontested election, any incumbent director who was a nominee for an elective seat and who did not receive a majority of the votes cast by the stockholders shall promptly tender to the committee responsible for nominating and governance matters his or her offer of resignation for consideration by the Board of Directors.  Within 60 days following certification of the election results, the committee of the Board of Directors responsible for nominating and governance matters shall recommend to the Board of Directors the action to be taken with respect to such offer of resignation.  Within 90 days following certification of the election results, the Board of Directors shall act on the offered resignation.  In determining whether or not to accept the offered resignation, the Board of Directors shall consider any recommendation of the committee responsible for nominating and governance matters, the factors considered by that committee and any additional information and factors that the Board of Directors believes to be relevant.  No director who submits his or her resignation pursuant to this Section 4.5 shall participate in the deliberations or decisions of the committee responsible for nominating and governance matters or the Board of Directors regarding such director's resignation.

(c)    If the submitted resignation is not accepted by the Board of Directors, the director shall continue to serve until the next annual meeting and until his or her successor is duly elected, or his or her death, resignation, retirement or removal in accordance with these Bylaws, applicable law or regulation, whichever event shall first occur.  If a director's resignation is accepted by the Board of Directors, or if a nominee for director who is not an incumbent director is not elected by the majority of the votes cast by the stockholders, then the Board of Directors, in its sole discretion, may fill any resulting vacancy in accordance with Section 4.4 of these Bylaws.

Freddie Mac Bylaws
June 6, 2008
Page 16

**Section 4.6    Chairman.**  Each year at the first meeting of the Board of
Directors following the annual stockholders' meeting, the Board of Directors shall elect
from among its members a person to serve as Chairman of the Board.  The Chairman
shall be a member of the Board of Directors and shall preside at all meetings of the
Board of Directors at which he or she is present.

**Section 4.7    Lead Director.**  If the Chairman is not independent from
management under standards established by the Board of Directors pursuant to Section
4.2 of these Bylaws, those directors who are not employed by the Corporation shall
elect from among themselves a person who is independent from management to serve
as Lead Director.  That election, if necessary, shall take place each year at the first
meeting of the Board of Directors following the annual stockholders' meeting and at any
other time that the Board of Directors lacks a Lead Director who is independent from
management.  If the Chairman is independent from management, the Chairman shall
serve as Lead Director unless the directors who are not employed by the Corporation
elect from among themselves another director who is independent from management to
serve as Lead Director.  The Lead Director shall preside at all meetings of the directors
who are not employees of the Corporation and of the directors who are independent
from management at which he or she is present and shall perform such other duties as
may be assigned by those directors.

**Section 4.8    Regular Meetings.**  A regular meeting of the Board of Directors
shall be held as soon as practicable after adjournment of the annual meeting of
stockholders at such place as the Board of Directors may designate by resolution and
without other notice than such resolution.  The Board of Directors may provide, by
resolution, for the date, time and place of additional regular meetings without other
notice than such resolution.

**Section 4.9    Special Meetings.**

(a)    Special meetings of the Board of Directors may be called by a majority of
the directors then in office or by the Chairman and shall be held on such date, at such
time and at such place as they or he or she shall fix.  Notice of the date, time and place
of each such special meeting shall be given each director by (i) written notice given by
mail, private courier or in person not less than 48 hours before the meeting, (ii) oral
notice given in person or by telephone not less than 24 hours before the meeting or (iii)
electronic transmission, in a form consented to by the director, not less than 24 hours
before the meeting.  Unless otherwise indicated in the notice thereof, any and all
business may be transacted at a special meeting.

(b)    A director's attendance at or participation in a meeting waives any
required notice to him or her of the meeting unless the director at the beginning of the
meeting or promptly upon arrival objects to holding the meeting or transacting business
at the meeting and does not thereafter vote for or assent to action taken at the meeting.

Freddie Mac Bylaws
June 6, 2008
Page 17

**Section 4.10  Quorum.**  At any meeting of the Board of Directors, the presence of a majority of the directors then in office shall constitute a quorum, provided that in no instance, other than the circumstances described in Section 4.4 of these Bylaws, shall a quorum consist of fewer than six directors.  If a quorum shall fail to attend any meeting, a majority of those present may adjourn the meeting to another date, time or place, without further notice or waiver thereof.  Members may not be represented by proxy at any meeting of the Board of Directors.

**Section 4.11  Participation in Meetings.**  Members of the Board of Directors, or of any committee thereof, may participate in a meeting of the Board of Directors or of such committee by any means of communication by which all members participating in the meeting can simultaneously hear each other during the meeting and such participation shall constitute presence in person at such meeting.

**Section 4.12  Conduct of Business.**

(a)    At each meeting of the Board of Directors, the Chairman shall preside or, in the absence of the Chairman, a director selected by the Board of Directors. The Corporate Secretary or an Assistant Secretary designated by the Corporate Secretary shall act as secretary for the meeting, unless the Chairman or director presiding at the meeting appoints another individual present at the meeting to act as secretary for the meeting.

(b)    At any meeting of the Board of Directors, business shall be transacted in such order and manner as the Board of Directors may from time to time determine, and all matters shall be determined by the vote of a majority of the directors present at a meeting at which a quorum is present, except as otherwise provided in these Bylaws or in the Virginia Stock Corporation Act.  A director shall not vote by proxy.  A director present at a meeting is presumed to assent to actions unless the director objects at the beginning of the meeting, or promptly upon his or her arrival, to holding the meeting or transacting specified business at the meeting or the director votes against or abstains from the action and such objection, dissent or abstention is entered into the minutes of the meeting.

(c)    Action may be taken by the Board of Directors without a meeting if each director signs a consent describing the action to be taken and delivers it to the Corporation.  A director's consent may be withdrawn by a revocation signed by the director and delivered to the Corporation prior to delivery to the Corporation of unrevoked written consents signed by all the directors.  Such written consent and the signing thereof may be accomplished by one or more electronic transmissions.

(d)    Action taken under the preceding paragraph shall be effective when the last director signs the consent unless the consent specifies a different effective date, in which event such action shall be effective as of the date specified therein, provided that the consent contains the date of execution of each director.

Freddie Mac Bylaws
June 6, 2008
Page 18

(e)    A consent signed under this Section shall have the effect of action taken at a meeting of the Board of Directors and may be described as such in any document.

**Section 4.13  Reimbursement and Compensation of Directors.**  Pursuant to resolution of the Board of Directors, directors, as such, may receive fixed fees and other compensation for their services as directors, including, without limitation, their services as members of committees of the Board of Directors and may receive reimbursement of expenses incurred in respect of rendering such services; except that any member of the Board of Directors who is a full-time officer or employee of the federal government or full-time officer or employee of the Corporation shall not receive compensation for services as a member of the Board of Directors or as a member of any committee of the Board of Directors.

**Section 4.14  Committees of the Board of Directors.**

(a)    The Board of Directors may, from time to time, designate committees of the Board of Directors (and subcommittees of those committees), with such delegable powers and duties as it thereby confers, to serve at the pleasure of the Board of Directors and shall, for those committees and any others provided for herein, elect at least two directors to serve as the members.  Any committee or subcommittee so designated may exercise the power and authority of the Board of Directors to the extent any resolution of the Board of Directors shall so provide, except that a committee or subcommittee may not: (i) approve or recommend to stockholders action that these Bylaws require be approved by stockholders; (ii) fill vacancies on the Board of Directors or on any of its committees; (iii) adopt, amend or repeal these Bylaws; (iv) approve a plan of merger not requiring stockholder approval; (v) authorize or approve a distribution, except according to a general formula or method prescribed by the Board of Directors; or (vi) authorize or approve the issuance or sale or contract for sale of shares, or determine the designation and rights, preferences and limitations of a class or series of shares, except that the Board of Directors may authorize a committee or the Chairman to do so subject to such limits, if any, as may be prescribed by the Board of Directors.

(b)    Unless otherwise provided by Board of Directors or committee or subcommittee resolution, the provisions of these Bylaws on date, time and place of, and notice required for, meetings of the Board of Directors shall govern committees of the Board of Directors (and their subcommittees).  A majority of directors then appointed as members of a committee or a subcommittee shall constitute a quorum and all matters shall be determined by a majority vote of the members present at a meeting at which a quorum is present.  Action may be taken by a committee (or a subcommittee) without a meeting if each member signs a consent describing the action to be taken and delivers it to the Corporation.  A member's consent may be withdrawn by a revocation signed by the member and delivered to the Corporation prior to delivery to the Corporation of unrevoked written consents signed by all the members.  Such written consent and the

Freddie Mac Bylaws
June 6, 2008
Page 19

signing thereof may be accomplished by one or more electronic transmissions. All minutes of committee or subcommittee meetings and unanimous consents of action taken by a committee or a subcommittee without a meeting shall also be submitted to the Board of Directors.

(c)     The Board of Directors shall designate committees responsible for overseeing the Corporation's financial statements and relationship with its independent auditor, executive compensation matters and governance and nominating matters. The membership of each of those committees shall consist solely of directors who are independent from management under the standards established pursuant to Section 4.2 of these Bylaws and shall comply with applicable laws, regulations and listing standards.

**Section 4.15   Resignation.**  Any director may resign at any time by delivering a written resignation to the Board of Directors, the Chairman or the Corporate Secretary. A resignation shall be effective upon delivery unless the notice specifies a later effective date. If a resignation is made effective at a later date, the Board of Directors may fill the pending vacancy before the effective date if the successor does not take office until the effective date.

**Section 4.16   Removal of Directors.**  At a Stockholder Requested Special Meeting called expressly for that purpose, any director elected by the stockholders may be removed with cause by a vote of the holders of a majority of the voting stock then entitled to vote at an election of directors. Any director appointed by the President of the United States may not be removed by a vote of the stockholders.

**Section 4.17   Termination of Voluntary Registration of Common Stock.** The Corporation shall take no action to terminate the registration of the Corporation's common stock under Section 12(g) of the Exchange Act, unless such action has been approved by unanimous action of all members of the Board of Directors then in office.

## ARTICLE 5 – OFFICERS

**Section 5.1   Number.**  There shall be a Chief Executive Officer of the Corporation and a Senior Vice President – General Auditor. Other officers of the Corporation may include a President, a Chief Operating Officer, a Chief Compliance Officer, a Chief Enterprise Risk Officer, one or more Vice Presidents (any one or more of whom may be designated Executive Vice President or Senior Vice President and may be given such other descriptive titles as the Chief Executive Officer may specify), a Corporate Secretary and all other officers or assistant officers deemed necessary and desirable for the conduct of the Corporation's business. Any of the above offices may be held by the same person, except that the office of the Corporate Secretary may not be held by the same person that holds the office of Chief Executive Officer, President, Chief Operating Officer or Senior Vice President – General Auditor.

Freddie Mac Bylaws
June 6, 2008
Page 20

**Section 5.2    Appointment and Term.**  The Board of Directors shall elect the Chief Executive Officer and, if the positions are to be filled, the President and the Chief Operating Officer.  The Audit Committee of the Board of Directors shall elect the Senior Vice President – General Auditor.  Except as otherwise determined by the Board of Directors, the Chief Executive Officer shall appoint all additional officers; provided, however, the appointment of a Chief Compliance Officer or a Chief Enterprise Risk Officer shall be subject to the approval of the Board of Directors.  Each officer elected by the Board of Directors or appointed by the Chief Executive Officer shall hold office until his or her successor is elected or appointed and qualified or until his or her death, resignation or removal as provided in this Article 5.  Election or appointment of an officer shall not, in and of itself, create any contract rights in the officer against the Corporation.

**Section 5.3    Removal, Resignation, Vacancy.**

(a)    Any officer may be removed, with or without cause, by a vote of the Board of Directors.  The Senior Vice President – General Auditor may be removed, with or without cause, by a vote of the Audit Committee.  Except as otherwise determined by the Board of Directors, the Chief Executive Officer may remove, with or without cause, any officer he or she may appoint; provided, however, the removal of a Chief Compliance Officer or a Chief Enterprise Risk Officer shall be subject to the approval of the Board of Directors.

(b)    Any officer may resign at any time by delivering a notice of resignation to the Board of Directors, the Chairman, the Chief Executive Officer or the Corporate Secretary.  A resignation shall be effective upon delivery unless the notice specifies a later effective time.  If a resignation is made effective at a later time, the Corporation may fill the pending vacancy before the effective time if the successor does not take office until the effective time.

(c)    A vacancy in any office shall be filled in the manner prescribed in these Bylaws for election or appointment to such office.

**Section 5.4    Compensation.**  The compensation of all officers of the Corporation shall be fixed by or under the authority of the Board of Directors.  No officer shall be prevented from receiving such compensation by reason of the fact that such officer is also a director of the Corporation.

**Section 5.5    Duties.**  The officers of the Corporation shall have such powers and duties as are provided for in these Bylaws as well as such other authority as provided by the Board of Directors or, in the case of the officers other than the Chief Executive Officer, by the Chief Executive Officer.

**Section 5.6    Chief Executive Officer.**  The Chief Executive Officer of the Corporation shall be primarily responsible for the implementation of the policies, orders and resolutions of the Board of Directors.  Subject to the direction of the Board of

Freddie Mac Bylaws
June 6, 2008
Page 21

Directors, he or she shall have general charge of and responsibility for supervision of the business and affairs of the Corporation. The Chief Executive Officer may sign and execute in the name of the Corporation all certificates, contracts and instruments. The Chief Executive Officer may vote stock in other corporations, in person or by proxy, and shall perform such other duties of management as may be commonly incident to the office of chief executive or as may be prescribed by resolution or as otherwise may be assigned to the Chief Executive Officer by the Board of Directors.

**Section 5.7    President.** The President shall perform such duties as from time to time may be assigned by the Board of Directors or the Chief Executive Officer.

**Section 5.8    Chief Operating Officer.** The Chief Operating Officer shall perform such duties as from time to time may be assigned by the Board of Directors or the Chief Executive Officer.

**Section 5.9    Senior Vice President – General Auditor.** The Senior Vice President – General Auditor shall report to, and be hired, supervised and terminated, if deemed appropriate, by the Audit Committee of the Board of Directors. The Senior Vice President – General Auditor shall be responsible for examining and evaluating the adequacy and effectiveness of the Corporation's system of internal controls. The Senior Vice President – General Auditor shall perform such other duties as from time to time may be assigned by the Audit Committee of the Board of Directors.

**Section 5.10    Vice Presidents.** The Corporation shall have one or more Vice Presidents, which may include Executive Vice Presidents or Senior Vice Presidents, elected or appointed as herein provided. Each such Vice President shall have such duties as from time to time may be assigned to him or her by the Board of Directors or the Chief Executive Officer.

**Section 5.11    Corporate Secretary.** The Corporate Secretary shall keep the minutes of the meetings of the stockholders and of the Board of Directors and of committees of the Board of Directors and their subcommittees in books provided for that purpose; shall see that all notices of such meetings are duly given in accordance with the provisions of these Bylaws; may sign certificates of stock of the Corporation with the Chief Executive Officer; shall be custodian of the corporate seal; shall see that the corporate seal is affixed to all documents as appropriate; shall certify all documents pertaining to actions of the stockholders and the Board of Directors and any of its committees (and their subcommittees) and all other corporate documents and, in general, shall perform all duties and have all powers as may be commonly incident to the office of a secretary of a corporation, and such other duties as from time to time may be assigned to the Corporate Secretary by the Board of Directors or the Chief Executive Officer. The Corporate Secretary may appoint such Assistant Secretaries as he or she deems appropriate. The duties of the Corporate Secretary may be performed by one or more Assistant Secretaries.

Freddie Mac Bylaws
June 6, 2008
Page 22

**Section 5.12    Delegation of Authority.**  Subject to the control of the Board of Directors, the functions delegated to the holder of a particular office pursuant to these Bylaws (the "Officer") shall be performed by such holder, or under his or her direction, by such individuals as may from time to time be delegated authority to perform such functions by the Officer.  A person to whom a function is delegated by the Board of Directors may further delegate that function to another person under his or her direction to the extent that such person is permitted to do so by the original delegation to him or her by the Board of Directors.

## ARTICLE 6 – INSPECTION OF RECORDS

**Section 6.1    Inspection of Records by Stockholders.**

(a)    The Corporation's Bylaws and all amendments thereto, all Board of Directors resolutions creating one or more classes or series of shares and minutes of all stockholders' meetings for the then most recent three years, all written communications to stockholders generally within the past three years (including all financial statements furnished for the past three years) and the names and business addresses of its current directors and officers shall be open to inspection at the Corporation's principal office during its regular business hours upon written request therefor, received by the Corporation at least five business days prior to the date such inspection is requested, from any person who is a stockholder.

(b)    Excerpts from the minutes of any meeting of the Board of Directors, records of any action of a committee of the Board of Directors (or a subcommittee of a committee) while acting in place of the Board of Directors on behalf of the Corporation, minutes of any meeting of the stockholders, and records of action taken by the Board of Directors without a meeting, to the extent not subject to inspection under Subsection (a), accounting records of the Corporation and the record of stockholders shall be open to inspection at a reasonable location specified by the Corporation during its regular business hours upon written request therefor, received by the Corporation at least five business days prior to the date such inspection is requested, provided that the request is made by a stockholder who has been a stockholder of record for at least six months immediately preceding such request or is the holder of record of at least five percent of all of the Corporation's outstanding shares, and provided further that (i) such request is made in good faith and for a proper purpose, (ii) such request describes with reasonable particularity the purpose of such request and the records to be inspected, and (iii) the records requested are directly connected with his or her purpose.  The stockholder's written request shall be accompanied by (i) documentation to verify the class and number of shares of the Corporation that are beneficially owned by the stockholder in accordance with the Proxy Rules Requirements and (ii) proof of the stockholder's ownership when making a request under this Subsection (b).

Freddie Mac Bylaws
June 6, 2008
Page 23

(c)     Any inspection made pursuant to this Section may be made in person or by an agent or attorney and shall include the right to make copies, including copies through an electronic transmission if available and so requested by the stockholder.  A request for any such inspection shall be served upon the Chief Executive Officer or the Corporate Secretary.  This right of inspection is in addition to the stockholders' right to inspect the stockholders' list as provided in Section 3.10 of these Bylaws.

(d)     For purposes of this Section, stockholder includes a beneficial owner whose shares are held in a voting trust or by a nominee on the stockholder's behalf.

**Section 6.2    Inspection of Records by Directors.**    A director of the Corporation is entitled to inspect and copy the books, records and documents of the Corporation at any reasonable time to the extent reasonably related to the performance of the director's duties as a director, including duties as a member of a committee or a subcommittee, but not for any other purpose or in any manner that would violate any duty to the Corporation.

## ARTICLE 7  – NOTICES

**Section 7.1    Notices.**

(a)     Except as otherwise specifically provided in these Bylaws, all notices required to be given to any stockholder, director, officer, employee or agent shall be in writing or shall be printed and may in every instance be effectively given by hand delivery; by mail or commercial courier; or by electronic means.  Notice by electronic transmission is written notice.  Where these Bylaws expressly permit oral notice, such notice may be communicated in person, by telephone, voice mail or by other electronic means.  If these forms of personal notice are impracticable, notice may be communicated by a newspaper of general circulation in the area where the notice is intended to be given or by radio, television or other form of public broadcast communication in the area where notice is intended to be given.  In addition to the manner in which notices may be given under these Bylaws, notices may also be given as set forth in the Common Stock Certificate of Designation.

(b)     Without limiting the manner by which notice otherwise may be given effectively to stockholders or directors, any notice to stockholders or directors given by the Corporation under these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder or the director to whom notice is given.  In the case of stockholders' meeting notices given to employee stockholders where such employees have regular access to electronic mail delivery in the course of their employment, consent to receipt of such notices by electronic transmission to the employee's employment related e-mail address shall be implied unless and until the employee specifies a different address to which notices should be electronically transmitted or requests delivery of notice in print.

Freddie Mac Bylaws
June 6, 2008
Page 24

(c)    Any consent to receive notices by electronic transmission shall be revocable by the stockholder or director by written notice to the Corporation.  Any such consent shall be deemed revoked if (i) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent and (ii) such inability becomes known to the Corporate Secretary or an Assistant Secretary of the Corporation or other person responsible for the giving of notice; provided however, that inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

(d)    Any such notice shall be addressed to such stockholder, director, officer, employee or agent at his or her last known address as the same appears on the books of the Corporation, or in the case of a notice given by electronic transmission with consent, to the address at which the stockholder or director has consented to receive notice.

(e)    Written notice to a stockholder or director, where given by mail or electronic transmission, is effective (i) upon deposit in the United States mail or (ii) when electronically transmitted to the stockholder or director in a manner authorized by the stockholder or director.  Except as otherwise provided in these Bylaws, written notice is effective at the earliest of the following: (i) when received; (ii) five days after its deposit in the United States mail; or (iii) on the date shown on the return receipt if sent by registered or certified mail, return receipt requested, and the receipt is signed by the addressee.  Oral notice is effective when communicated.  Notice given by electronic transmission to a stockholder or director with consent shall be deemed given: (a) if by facsimile telecommunication, when directed to a number at which the stockholder or director has consented to receive notice; (b) if by electronic mail, when directed to an electronic mail address at which the stockholder or director has consented to receive notice; (c) if by posting on an electronic network together with separate notice to the stockholder or director of such specific posting when such notice is directed to the record address of the stockholder or director or to such other address at which the stockholder or director has consented to receive notice, upon the later of such posting or the giving of such separate notice; and (d) if by any other form of electronic transmission previously consented to by the stockholder or director, when such stockholder or director acknowledges its receipt.

(f)    The Corporation shall be deemed to have delivered written notice of an annual or special meeting of stockholders who share a common address as shown on the Corporation's current record of stockholders if (i) the Corporation delivers one meeting notice to the common address; (ii) the Corporation addresses the meeting notice (or a proxy statement, annual report, or notice of Internet availability of proxy materials containing such meeting notice)(collectively, the "Meeting Notice") to those stockholders sharing a common address either as a group (for example, "Jane Doe and Household" or "The Smith Family"), to each of them individually (for example, "Jane Doe, John Doe and Richard Doe") or to the stockholders in a form to which each of

Freddie Mac Bylaws
June 6, 2008
Page 25

those stockholders has consented in writing; (iii) each of those stockholders consents, including any implied consent pursuant to Virginia Stock Corporation Act § 13.1-610.1(B), in accordance with procedures required by Rule 14a-3(e) of Regulation 14A (Solicitation of Proxies) under the Exchange Act of 1934, to the delivery of a single Meeting Notice to the stockholders' common address; (iv) the Corporation delivers a separate proxy card for each stockholder at the common address; and (v) the Corporation includes in the Meeting Notice an undertaking to deliver promptly, upon written or oral request, a separate copy of the Meeting Notice to a stockholder at a common address to which a single copy of the Meeting Notice was delivered. If a stockholder, orally or in writing revokes a consent to delivery of one Meeting Notice to a common address, the Corporation shall begin providing individual notices to the revoking stockholder no later than 30 days after the Corporation receives revocation of the stockholder's consent.

**Section 7.2    Written Waivers.**  A written waiver of any notice, signed by a stockholder, director, officer, employee or agent, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to the notice required to be given to such stockholder, director, officer, employee or agent.  Neither the business nor the purpose of any meeting need be specified in such a waiver.

## ARTICLE 8 – INDEMNIFICATION AND LIMITATION OF LIABILITY

### Section 8.1    Indemnification.

(a)    Subject to the conditions set forth in Subsection (b) of this Section, each person who was or is made a party or is threatened to be made a party to any action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative and whether formal or informal, including a derivative action or action brought by the Corporation (hereinafter, a "proceeding"), by reason of the fact that he or she is or was a director, officer or employee of the Corporation or is or was serving at the request of the Corporation as a director, officer, manager, partner, trustee, fiduciary, employee or agent of another corporation, limited liability company, partnership, joint venture, trust or other entity, including service with respect to an employee benefit plan (hereinafter, an "indemnitee"), shall be indemnified and held harmless by the Corporation against all liability (including the obligation to pay a judgment, settlement, penalty or fine, including any excise tax assessed with respect to an employee benefit plan) and expense (including attorneys' fees) reasonably incurred or suffered by such indemnitee in connection therewith, except such liabilities and expenses as are incurred because of the indemnitee's willful misconduct or knowing violation of the criminal law; provided, however, that the Corporation may not indemnify an indemnitee in connection with any proceeding charging improper personal benefit to the indemnitee, whether or not involving action in his or her official capacity, to the extent the indemnitee was adjudged liable on the basis that personal benefit was improperly received by the indemnitee. Such indemnification shall continue as to an indemnitee who has ceased to be a

Freddie Mac Bylaws
June 6, 2008
Page 26

director, officer or employee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.

(b)    Indemnification shall be made by the Corporation only as authorized in the specific case after a determination has been made as provided in Subsection (c) of this Section that the indemnitee met the relevant standard of conduct set forth in Subsection (a) of this Section.  The termination of a proceeding by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, is not, of itself, determinative that the indemnitee did not meet the standard of conduct set forth in Subsection (a) of this Section.

(c)    The determination of whether the indemnitee met the standard of conduct set forth in Subsection (a) of this Section shall be made: (i) by the Board of Directors by a majority vote of a quorum consisting of directors not at the time parties to the proceeding; (ii) by a majority vote of a committee duly designated by the Board of Directors (in which designation directors who are parties may participate), consisting solely of two or more directors not at the time parties to the proceeding; (iii) by special legal counsel (1) selected by the Board of Directors or its committee in a manner prescribed in Subsection (c)(i) or (c)(ii) hereof, or (2) if a quorum of the Board of Directors cannot be obtained under Subsection (c)(i) hereof and a committee cannot be designated under Subsection (c)(ii)  hereof, selected by a majority vote of the full Board of Directors (in which selection directors who are parties may participate); or (iv) by the stockholders, provided, however, that shares owned by or voted under the control of directors who are at the time parties to the proceeding may not be voted on the determination.

(d)    Authorization of indemnification and evaluation as to reasonableness of expenses shall be made in the same manner as the determination that indemnification is permissible, as provided in Subsection (c) of this Section, provided however, that, if the determination is made by special legal counsel, authorization of indemnification and evaluation as to the reasonableness of expenses shall be made by those entitled under Subsection (c)(iii) of this Section to select such special legal counsel.

(e)    Notwithstanding any other provision of this Section, the Corporation shall indemnify a director or indemnitee who entirely prevails, on the merits or otherwise, in the defense of any proceeding to which the indemnitee was a party because he or she is or was director or officer or employee of the Corporation or was serving at the request of the Corporation as a director, officer, manager, partner, trustee, fiduciary, employee or agent of another corporation, limited liability company, partnership, joint venture, trust or other entity, including service with respect to an employee benefit plan, against reasonable expenses (including attorneys' fees) incurred by the indemnitee in connection with the proceeding.

Freddie Mac Bylaws
June 6, 2008
Page 27

(f)    Except as provided in Section 8.2 of these Bylaws with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify an indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board of Directors.

(g)    The rights to indemnification and liability limitation conferred in this Article 8 shall be deemed a contract right between an individual indemnitee and the Corporation, and any subsequent repeal or modification of these Bylaws shall not diminish the indemnitee's rights under this Article 8 with respect to any act or omission occurring before such amendment.

(h)    The indemnitee shall have the right to be paid by the Corporation the expenses reasonably incurred or suffered in defending any proceeding in advance of its final disposition (hereinafter, an "advancement of expenses"); provided, however, that an advancement of expenses shall be made (i) only upon delivery to the Corporation of a written statement by the indemnitee of the indemnitee's good faith belief that he or she has met the standard of conduct set forth in Subsection (a) of this Section, and (ii) only if the indemnitee furnishes to the Corporation a written undertaking, executed by or on behalf of such indemnitee, to repay any funds advanced if the indemnitee is not entitled to mandatory indemnification under Subsection (e) of this Section and it is ultimately determined that such indemnitee did not meet the standard of conduct set forth in Subsection (a) of this Section. The undertaking required by provision (h)(ii) of this Subsection shall be an unlimited general obligation of the indemnitee but need not be secured and shall be accepted without reference to the financial ability of the indemnitee to make repayment.

(i)    The Corporation may, by action of its Board of Directors, provide indemnification to agents of the Corporation with the same scope and effect as the indemnification of indemnitees as provided in this Article 8.

(j)    The Chief Executive Officer is authorized to enter into contracts of indemnification with each indemnitee of the Corporation with respect to the indemnification provided in this Article 8 and renegotiate such contracts as necessary to reflect changing laws and business circumstances.

**Section 8.2    Right of Indemnitee to Bring Suit.** If a claim under Section 8.1 of these Bylaws is not paid in full by the Corporation within 90 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter apply to either the United States District Court for the district within which the Corporation's principal office is located or to the court where the proceeding is pending, if any, for an order directing the Corporation to make an advancement of expenses or to provide indemnification. The court shall order the

Freddie Mac Bylaws
June 6, 2008
Page 28

Corporation to make an advancement of expenses or to provide indemnification, as the case may be, if it determines that the indemnitee is entitled under these Bylaws to such an advancement of expenses or indemnification, and in such event shall order the Corporation to pay the indemnitee's reasonable expenses (including attorneys' fees) to obtain the order. Neither the failure of the Corporation (including its Board of Directors, committee, special legal counsel or its stockholders) to have made a determination, as provided in Subsection (c) of Section 8.1 of these Bylaws, prior to the commencement of such action permitted by this Section, that the indemnitee is entitled to receive an advancement of expenses or indemnification, nor the determination by the Corporation (including its Board of Directors, committee, special legal counsel or its stockholders) that the indemnitee is not entitled to an advancement of expenses or indemnification, shall create a presumption to that effect or otherwise itself be a defense to that indemnitee's application for an advancement of expenses or indemnification.

Section 8.3    **Non-Exclusivity of Rights.**  The rights to indemnification and to the advancement of expenses conferred in these Bylaws shall not be exclusive of any other right which any person may have or hereafter acquire under any statute (including the Corporation's enabling legislation), or any agreement, vote of stockholders or disinterested directors or otherwise.

Section 8.4    **Insurance.**  The Corporation may purchase and maintain insurance, at its expense, on behalf of itself and also on behalf of any individual who is or was a director, officer, employee or agent of the Corporation or who, while a director, officer, employee or agent of the Corporation, is or was serving at the request of the Corporation as a director, officer, manager, partner, trustee, employee, or agent of another corporation, limited liability company, partnership, joint venture, trust, employee benefit plan or other entity against any expense, liability or loss, asserted against or incurred or suffered by him or her in that capacity or arising from his or her status as a director, officer, manager, employee or agent, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under this Article 8.

Section 8.5    **Limitation of Liability.**  No monetary damages or monetary liability of any kind may be assessed against an officer or director in any proceeding brought by or in the right of the Corporation or brought by or on behalf of the stockholders of the Corporation; provided, however, that this elimination of liability shall not be applicable if the officer or director engaged in willful misconduct, a transaction from which the director or officer derived an improper personal benefit, or a knowing violation of the criminal law or of any federal or state securities law, including, without limitation, any claim of unlawful insider trading or the manipulation of the market for any security.

Freddie Mac Bylaws
June 6, 2008
Page 29

## ARTICLE 9 – SEAL

**Section 9.1    Corporate Seal.** The Board of Directors may adopt a suitable seal, containing the name of the Corporation, which seal shall be in the charge of the Corporate Secretary.

## ARTICLE 10 – FISCAL YEAR

**Section 10.1    Fiscal Year.** The fiscal year of the Corporation shall be the calendar year.

## ARTICLE 11 – MISCELLANEOUS

**Section 11.1    Time Periods.** In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used in making such computations, the day of the doing of the act shall be excluded and the day of the event shall be included.

**Section 11.2    Severability.** If any provision or provisions of these Bylaws shall be held invalid or unenforceable for any reason whatsoever, the validity and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and, to the fullest extent possible, the remaining provisions shall be construed so as to effectuate the intent manifested by the invalidated or unenforceable provision(s).

**Section 11.3    Corporate Governance Practices and Procedures and Governing Law.**

(a)    The corporate governance practices and procedures of the Corporation shall comply with the Corporation's enabling legislation and other Federal law, rules, and regulations, and shall be consistent with the safe and sound operation of the Corporation. To the extent not inconsistent with the foregoing, the Corporation shall follow the corporate governance practices and procedures of the law of the Commonwealth of Virginia, including without limitation the Virginia Stock Corporation Act as the same may be amended from time to time. Subject to all of the foregoing, these Bylaws and any rights and obligations created by these Bylaws shall be construed in accordance with, and governed by, the laws of the United States, using the law of the Commonwealth of Virginia as the federal rule of decision in all instances.

(b)    Section 1.1, Section 2.1, Section 2.2, Section 2.3, Section 2.4, Section 2.5, Section 2.6, Section 2.7, Section 3.2, Section 3.7, Section 4.1, Section 4.2, Section 4.5, Section 4.17, Article 8, Section 11.3, Section 11.4, Article 12 of these Bylaws, and any new bylaw which may be adopted from time to time and designated as a "Level 1 Provision" in accordance with Article 12 of these Bylaws shall collectively be referred to

Freddie Mac Bylaws
June 6, 2008
Page 30

herein as "Level 1 Provisions." Level 1 Provisions shall be deemed to constitute provisions of the Corporation's "articles of incorporation" for all purposes of the Virginia Stock Corporation Act.  Any bylaw that is not a Level 1 Provision and any new bylaw that may be adopted from time to time and is not designated as a "Level 1 Provision" by the Board of Directors shall collectively be referred to herein as "Level 2 Provisions."

Section 11.4  **Certificates of Designation.**  The provisions of these Bylaws shall supplement the terms of the Common Stock Certificate of Designation and any certificate of designation approved by the Board of Directors with respect to any class of the Corporation's preferred stock.  In the event of any conflict between the terms of any such certificate of designation and these Bylaws, the terms of the certificate of designation shall govern.

Section 11.5  **Statutory References.**  Each reference in these Bylaws to a particular statute or regulation, or a provision thereof, is a reference to such provision as amended or re-enacted or as modified by other statutory provisions from time to time and includes subsequent legislation and regulations made under the relevant statute.

## ARTICLE 12 – AMENDMENTS

Section 12.1  **General.**  Subject to the provisions of this Article 12, Level 1 Provisions or Level 2 Provisions may be amended, adopted, rescinded or repealed by the Board of Directors or the stockholders at any meeting, provided that in the case of such an action by the stockholders, notice of the proposed change must be given in the notice of the meeting.

Section 12.2  **Amendment by the Board of Directors.**  Any new bylaw adopted by the Board of Directors and any Level 1 Provision, may be amended only by the Board of Directors pursuant to Section 12.1 of these Bylaws.  Upon adopting or amending such bylaw, as the case may be, the Board of Directors shall designate such bylaw as a "Level 1 Provision" for all purposes under these Bylaws. If the Board of Directors does not designate a bylaw as a Level 1 Provision or if the Board of Directors is otherwise silent on the designation, the bylaw shall be deemed to be a Level 2 Provision.

Section 12.3  **Amendment by the Stockholders.**  Notwithstanding any other provisions of these Bylaws, or any provisions of law, which might otherwise permit a lesser vote or no vote, but in addition to any affirmative vote of the stockholders required by law, the Common Stock Certificate of Designation, or these Bylaws, the affirmative vote of the holders of at least a majority of all shares of voting stock then outstanding and entitled to vote shall be required to amend, adopt, rescind or repeal any Level 2 Provision of these Bylaws (the "Proposed Level 2 Provision"); provided, however, that, as determined by the Board of Directors, (i) the Proposed Level 2 Provision shall comply with the Corporation's enabling legislation and other Federal law, rules, regulations, regulatory guidance and other issuances, (ii) the Proposed Level 2

Freddie Mac Bylaws
June 6, 2008
Page 31

Provision shall be consistent with the safe and sound operation of the Corporation, (iii) the subject matter of the Proposed Level 2 Provision does not or would not involve the subject matter of any Level 1 Provision, the Common Stock Certificate of Designation or any other certificate of designation of the Corporation, and (iv) the Proposed Level 2 Provision does not or would not be inconsistent with any Level 1 Provision, the Common Stock Certificate of Designation or any other certificate of designation of the Corporation. The stockholders may not amend, adopt, rescind or repeal any Level 1 Provision unless such action is explicitly authorized and referred to the stockholders by the Board of Directors (for the avoidance of doubt, this Section 12.3 in no way obligates the Board of Directors to seek stockholder approval for any action pursuant to Section 12.2 of these Bylaws) in which case such amendment, adoption, rescission, or repeal shall be by the affirmative vote of the holders of at least a majority of all shares of the voting stock then outstanding and entitled to vote.