Kenneth I. Schacter
**BINGHAM McCUTCHEN LLP**
399 Park Avenue
New York, New York  10022
Tel: (212) 705-7000
Fax: (212) 752-5378
kenneth.schacter@bingham.com

Jordan D. Hershman
Jason D. Frank
**BINGHAM McCUTCHEN LLP**
One Federal Street
Boston, MA  02110-1726
Tel: (617) 951-8000
Fax: (617) 951-8736

*Attorneys for Nominal Defendant Freddie Mac*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

R.S. BASSMAN, Derivatively on Behalf of FREDDIE
MAC a/k/a Federal Home Loan Mortgage Corporation
and its shareholders,

                    Plaintiff,

        v.

RICHARD F. SYRON, PATRICIA L. COOK,
ANTHONY S. PISZEL, EUGENE M. McQUADE,
RICHARD KARL GOELTZ, STEPHEN A. ROSS,
SHAUN F. O'MALLEY, ROBERT R. GLAUBER,
BARBARA T. ALEXANDER, WILLIAM M. LEWIS,
JR., JEFFREY M. PEEK, GEOFFREY T. BOISI,
RONALD F. POE, WASHINGTON MUTUAL, INC.,
PRICEWATERHOUSECOOPERS, LLP, KERRY K.
KILLINGER, ANTHONY R. MERLO, JR., FIRST
AMERICAN CORPORATION, FIRST AMERICAN
EAPPRAISEIT, COUNTRYWIDE FINANCIAL
CORPORATION, COUNTRYWIDE HOME EQUITY
LOAN TRUST, COUNTRY-WIDE BANK, FSB,
COUNTRYWIDE HOME LOANS, INC.,
LANDSAFE, INC., and ANGELO R. MOZILO,

                    Defendants,

      and

FREDDIE MAC a/k/a Federal Home Loan Mortgage
Corporation,

                    Nominal Defendant.

Case No. 08 CV 02423-BSJ

------------------------------------------------------------------- x

**FREDDIE MAC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
<u>TO TRANSFER VENUE OR, ALTERNATIVELY, STAY THE PROCEEDINGS</u>**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS .................................................................................... 2

ARGUMENT ......................................................................................................... 5

I.     THIS CASE SHOULD BE TRANSFERRED TO THE EASTERN DISTRICT
OF VIRGINIA .......................................................................................... 5

     A.    This Suit Could Originally Have Been Filed In The Eastern District Of
Virginia ........................................................................................... 6

     B.    The Transfer Of This Case To The Eastern District Of Virginia Promotes
Convenience and Justice ................................................................. 6

          1.    The Convenience Of The Witnesses And Parties, The Location Of
Relevant Documents, And The Ease Of Access To Sources Of
Proof Favor Virginia ...................................................... 7

          2.    Virginia Is The Locus Of Operative Facts. ................................. 7

          3.    Trial Efficiency And The Interest Of Justice Favor Virginia ................... 8

          4.    Virginia Is The Forum Most Familiar With Governing Law. .................. 8

          5.    Plaintiff's Choice Of Forum Does Not Favor Keeping This Action
In The Southern District Of New York........................................ 8

II.    ALTERNATIVELY, THIS COURT SHOULD STAY THIS ACTION PENDING
THE OUTCOME OF THE SLC'S INVESTIGATION OF THE ALLEGATIONS ....... 10

CONCLUSION ...................................................................................................... 13

A/72568833.1/3007870-0000330424

TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

Adair v. Microfield Graphics, Inc., No. 00 Civ. 0629, 2000 WL 1716340
(S.D.N.Y. Nov. 16, 2000) .........................................................................................7

Cartier v. D & D Jewelry Imports, 510 F. Supp. 2d 344 (S.D.N.Y. 2007)............................5, 6, 9

Firestone v. Wiley, 485 F. Supp. 2d 694 (E.D. Va. 2007) ...........................................11

Foster v. Litton Indus., Inc., 431 F. Supp. 86 (S.D.N.Y. 1977).....................................8

Gilson v. Pittsburgh Forgings, Co., 284 F. Supp. 569 (S.D.N.Y. 1968) ......................................10

Greystone CDE, LLC v. Sante Fe Pointe L.P., No. 07 CV 8377, 2008 WL 482291
(S.D.N.Y. Feb. 20, 2008)......................................................................................10

Koster v. Lumbermen's Mut. Co., 330 U.S. 518 (1947).....................................................8

Laborers Local 100 & 397 Pension Fund v. Bausch & Lomb Inc., No. 06 Civ. 1942,
2006 WL 1524590 (S.D.N.Y. June 5, 2006) ......................................................7, 9

One Beacon Ins. Co. v. JNB Storage Trailer Rental Corp., 312 F. Supp. 2d 824
(E.D. Va. 2004)...................................................................................................6

Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981)...........................................................9

Questech Capital Corp. v. Flight Dynamics, Inc., 1984 WL 327
(S.D.N.Y. May 7, 1984)........................................................................................10

Ravenwoods Invest. Co., L.P. v. Bishop Capital Corp., No. 04 CV 9266,
2005 WL 236440 (S.D.N.Y. Feb. 1, 2005)................................................................8

In re Stillwater Min. Co. Sec. Litig., No. 02 Civ. 2806, 2003 WL 21087953
(S.D.N.Y. May 12, 2003)...............................................................................6, 8, 9, 10

In re Take-Two Interactive Software, Inc. Deriv. Litig., No. 06 Civ. 05279,
2007 WL 1875660 (S.D.N.Y. June 29, 2007) ......................................................12

U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd., 357 F. Supp. 2d 924 (E.D. Va. 2005) ......................6

Wolf v. Ackerman, 208 F. Supp. 1057 (S.D.N.Y. 1969)...................................................8

<u>TABLE OF AUTHORITIES CONTINUED</u>

<u>Page</u>

<u>Wright v. Krispy Kreme Doughnuts, Inc.</u>, No. 04 CV 00832, 2005 WL 1719927
(M.D.N.C. Apr. 4, 2005)........................................................................................12

**STATE CASES**

<u>Curtis v. Nevens</u>, 31 P.3d 146 (Colo. 2001) ...............................................................12

<u>In re InformationUSA, Inc. S'holders Litig.</u>, No. 1956-CC, 2008 WL 762482
(Del. Ch. Mar. 17, 2008)......................................................................................12

**FEDERAL STATUTES**

28 U.S.C. § 1391 ...........................................................................................................6

28 U.S.C. § 1404(a) ...........................................................................................1, 2, 5, 6

Fed. R. Civ. P. 23.1 ...............................................................................................1, 10

**STATE STATUTES**

Va Code Ann. § 13.1-601 <u>et</u> <u>seq.</u>....................................................................................3

Va Code Ann. § 13.1-672.1(B) ..................................................................................11

Va Code Ann. § 13.1-672.1(C) ......................................................................... <u>passim</u>

Va Code Ann. § 13.1-672.4...........................................................................................12

**TREATISES**

5C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure
§ 1360 (2008).......................................................................................................10

A/72568833.1/3007870-0000330424

## PRELIMINARY STATEMENT

Nominal Defendant Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Company") respectfully submits this memorandum of law in support of its motion to transfer venue pursuant to 28 U.S.C. § 1404(a) or, alternatively, stay the Plaintiff's Shareholder Derivative Complaint ("Complaint") pursuant to Rule 23.1 of the Federal Rules of Civil Procedure and VA CODE ANN. § 13.1-672.1(C), pending the outcome of the investigation of Plaintiff's allegations by the Special Litigation Committee ("SLC") formed by the Company's Board of Directors.

On December 6, 2007, Plaintiff Robert Bassman, an alleged shareholder of Freddie Mac, sent a letter to Freddie Mac's Board of Directors at its offices in Virginia demanding that the Company, inter alia, institute a lawsuit against:  (1) certain current and former officers and directors of Freddie Mac who in 2006 and 2007 allegedly mismanaged the Company, wasted Company assets, and breached their fiduciary duties to the Company; and (2) certain third parties that allegedly breached their contracts with, and warranties to, Freddie Mac and deceived and defrauded the Company.  See Compl., Ex. A at 1-2.  In response to Mr. Bassman's demand letter, the Company's Board of Directors formed the SLC, which commenced an investigation of the allegations that is ongoing.  See infra at 3.  Nonetheless, on March 10, 2008, Plaintiff filed this action purportedly on behalf of Freddie Mac, asserting essentially the same allegations that he made in his December 6, 2007 demand letter.  In light of the fact that the SLC had been formed and is investigating the Plaintiff's allegations, on March 14, 2008, Freddie Mac sent Plaintiff's counsel a letter requesting Plaintiff to withdraw the lawsuit because it was premature or, at a minimum, stay the case pending the outcome of the SLC's investigation.  Declaration of Steven Cole (hereafter, "Cole Dec."), ¶ 14.  Plaintiff did not respond to Freddie Mac's request. Id.

As discussed below, the balance of factors under 28 U.S.C. § 1404(a) weighs heavily in favor of transferring this case to the Eastern District of Virginia. It is beyond dispute that this suit could have been brought in the Eastern District of Virginia and that a transfer to that forum promotes convenience and justice. The majority of the parties, likely witnesses, and relevant documents are located in or near the Eastern District of Virginia, and the Eastern District of Virginia is the situs of the alleged misconduct underlying the lawsuit. Moreover, in accordance with its bylaws, Freddie Mac follows the corporate governing practices and procedures of the laws of Virginia. Cole Dec., ¶ 4; Exhibit C (Freddie Mac's Bylaws) §11.3(a). In the event that the Court denies the request for transfer, this Court should stay this action under the Virginia Stock Corporation Act, VA CODE ANN. § 13.1-672.1(C), which provides in pertinent part:

> If the corporation commences a review and evaluation of the allegations made in the demand or complaint, <u>the court may stay any derivative proceeding for such period as the court deems appropriate.</u>

VA CODE ANN. § 13.1-672.1(C) (emphasis added). Accordingly, pursuant to applicable Virginia statutory law and well-established precedent, this action should be stayed pending the completion of the SLC's investigation.[1]

## STATEMENT OF FACTS

Freddie Mac, headquartered in McLean, Virginia, is a government-sponsored enterprise created by Congress in 1970 to, among other things, provide stability in the secondary market for residential mortgages by increasing the liquidity of mortgage investments and offering mortgage

---

[1] In the event this Court transfers this action to the United States District Court for the Eastern District of Virginia, Freddie Mac intends to renew its motion to stay in that venue, in view of the propriety of a stay given the pendency of an SLC investigation.

lenders greater access to private capital.  Compl., ¶ 11; Cole Dec., ¶¶ 2, 5.  Freddie Mac purchases home mortgages from lenders ("Seller/Servicers") and pools those mortgages into securities that investors can purchase.  Cole Dec., ¶ 3.  In accordance with its corporate Bylaws, Freddie Mac follows the corporate governing practices and procedures of the law of the Commonwealth of Virginia, including the Virginia Stock Corporation Act, codified at VA CODE ANN. § 13.1-601 et seq.  Cole Dec., ¶ 4; Ex. C (Freddie Mac Bylaws) § 11.3(a).

Plaintiff Robert Bassman resides in New Jersey.  Compl., ¶ 10.  On December 6, 2007, Mr. Bassman's counsel sent a demand letter to Freddie Mac's Board of Directors at its offices in Virginia, demanding that the Company, inter alia, institute a lawsuit against those responsible for damages allegedly sustained by Freddie Mac and resulting from the Company's alleged mismanagement in 2006 and 2007.  See Compl., Ex. A at 1-2.  In the letter, Mr. Bassman claimed that this alleged mismanagement was due to the Company's failure to manage risk and to implement adequate credit standards, causing Freddie Mac to suffer billions of dollars in damages.  Id. at 2.

In response to the December 6, 2007 letter, Freddie Mac's Board of Directors formed the SLC to investigate Mr. Bassman's claims.  Compl., ¶ 5; Cole Dec., ¶ 12, Ex. B (Freddie Mac's Annual Report dated February 28, 2008, at 22-23).  The SLC is comprised of three independent directors of Freddie Mac.  Cole Dec., ¶ 12.  The SLC has retained Hunton & Williams LLP, a prominent law firm with several offices in Virginia, to assist the SLC with the investigation. Cole Dec., ¶ 13.  The SLC's investigation, which includes an extensive review of documents and interviews of witnesses, is currently ongoing.  Id.

On March 10, 2008, Mr. Bassman filed the instant complaint against Freddie Mac in the United States District Court for the Southern District of New York, in which Mr. Bassman

A/72568833.1/3007870-0000330424

alleges, <u>inter alia</u>, that certain current and former officers and directors of Freddie Mac mismanaged the Company, wasted Company assets, and breached their fiduciary duties to the Company.  Plaintiff also alleges that defendant PricewaterhouseCoopers, LLP, the Company's independent auditor, aided and abetted the Company and others in the alleged wrongdoing, and further, that defendants Washington Mutual, Inc., Countrywide Financial Corporation and its affiliates, assisted by defendants First American Corporation and First American eAppraiseIT and their respective senior officers, breached their contracts with, and warranties to, Freddie Mac and deceived and defrauded the Company.

Although Plaintiff asserts that many of the acts alleged in his Complaint occurred in the Southern District of New York, the "locus of operative facts" is Virginia.  In addition to having its headquarters in Virginia, 12 of Freddie Mac's 17 offices are also located in Virginia.  Cole Dec., ¶ 5.  Virtually all of Freddie Mac's business activities occur in Virginia, including activities relating to risk management, internal controls, investment decisions, credit policies, contracts with its Sellers/Servicers, financial reporting, and underwriting standards.  Cole Dec., ¶ 6.  In addition, the majority of Freddie Mac's press releases are issued from Virginia, and the majority of its investor conference calls take place from Virginia.  Cole Dec., ¶¶ 9-10.  All of the current and former officers who are named as defendants and against whom claims are asserted in this lawsuit perform (or performed) their work for Freddie Mac in Virginia.  Cole Dec., ¶ 7. Accordingly, the alleged failure to implement sufficient risk management controls (<u>see</u> Compl., ¶ 4(a)) and to tighten underwriting standards (<u>see</u> Compl., ¶ 4(g)), as well as the issuance of the alleged false statements to the Company's stockholders and the public (<u>see</u> Compl., ¶ 4(f)) -- core allegations in Plaintiff's Complaint -- all relate to supposed activities that would have occurred in Virginia by officers and directors who work in Freddie Mac's headquarters.

Moreover, the great majority of potential witnesses and potentially relevant documents are located in or close to McLean, Virginia. For instance, the overwhelming majority of Freddie Mac's officers and employees worked in Virginia. As of May 31, 2007, 4,752 of Freddie Mac's 5,267 employees (including 146 of Freddie Mac's 147 officers) work in Virginia. Cole Dec., ¶ 7. Likewise, the majority of relevant documents are located in Virginia. Freddie Mac's electronic documents are stored on servers located in Northern Virginia. Most paper documents are located within Freddie Mac's facilities in Northern Virginia, and those that are not are located in or near Northern Virginia. Cole Dec., ¶ 8. In addition, the agencies responsible for regulating Freddie Mac's activities, the United States Department of Housing and Urban Development ("HUD") and the Office of Federal Housing Enterprise Oversight ("OFHEO"), have close ties to Virginia because both are headquartered in Washington, D.C. (less than 15 miles from Freddie Mac's headquarters). Compl., ¶ 11; Cole Dec., ¶ 11. Thus, the convenience of the witnesses and parties and the location of relevant documents point to Virginia.

## ARGUMENT

### I.    THIS CASE SHOULD BE TRANSFERRED TO THE EASTERN DISTRICT OF VIRGINIA.

Section 1404(a) of Title 28 of the United States Code provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The moving party must demonstrate that: "(1) the action is one that might have been brought in the proposed transferee forum"; and "(2) the transfer promotes convenience and justice." Cartier v. D & D Jewelry Imports, 510 F. Supp. 2d 344, 345-46 (S.D.N.Y. 2007). As discussed further below, both elements are satisfied here.

### A.     This Suit Could Originally Have Been
### Filed In The Eastern District Of Virginia.

There is no question that this suit could originally have been filed in the Eastern District of Virginia.  Under § 1404(a), a claim could originally have been filed where jurisdiction would be appropriate under 28 U.S.C. § 1391.  <u>See</u> <u>U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd.</u>, 357 F. Supp. 2d 924, 935-36 (E.D. Va. 2005); <u>One Beacon Ins. Co. v. JNB Storage Trailer Rental Corp.</u>, 312 F. Supp. 2d 824, 829 (E.D. Va. 2004).  Section 1391(b) provides:

> A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b).

Freddie Mac's headquarters is located in the Eastern District of Virginia; a substantial part of the alleged events or omissions giving rise to the Complaint would have occurred in the Eastern District of Virginia; and the overwhelming majority of Freddie Mac's officers and employees -- including all of the officers or former officers named as Defendants -- work (or worked) in the Eastern District of Virginia.  <u>See</u> <u>infra</u> Section B.    Accordingly, venue would have been proper in the Eastern District of Virginia.

### B.     The Transfer Of This Case To The Eastern
### District Of Virginia Promotes Convenience and Justice.

Likewise, transferring this case to the Eastern District of Virginia promotes convenience and justice.  District courts have broad discretion in evaluating convenience and whether the transfer is in the interest of justice.  <u>Cartier</u>, 510 F. Supp. 2d at 346; <u>In re Stillwater Min. Co. Sec. Litig.</u>, No. 02 Civ. 2806, 2003 WL 21087953, at *3 (S.D.N.Y. May 12, 2003).  A non-exclusive list of factors that courts consider when making this determination includes:  (1) the convenience of witnesses; (2) the convenience and means of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of the

operative facts; (5) trial efficiency and the interest of justice based on the totality of the circumstances; (6) a forum's familiarity with the governing law; and (7) plaintiff's choice of forum.  See Cartier, 510 F. Supp. 2d at 346.  Courts routinely hold that the convenience of witnesses is the most important factor in the transfer of venue analysis.  Laborers Local 100 & 397 Pension Fund, No. 06 Civ. 1942, 2006 WL 1524590, at *5 (S.D.N.Y. June 5, 2006); Adair v. Microfield Graphics, Inc., No. 00 Civ. 0629, 2000 WL 1716340, at *2 (S.D.N.Y. Nov. 16, 2000).

**1.    The Convenience Of The Witnesses And Parties, The Location Of Relevant Documents, And The Ease Of Access To Sources Of Proof Favor Virginia.**

The convenience of the witnesses and the parties as well as the location of relevant documents and the relative ease of access to sources of proof greatly favor transferring this case to the Eastern District of Virginia.  Most of the potentially relevant witnesses in this action (i.e., the Freddie Mac officers named as defendants, other Freddie Mac employees and officers, and Freddie Mac's regulators) work in or near the Eastern District of Virginia.  Cole Dec., ¶¶ 7, 11. Indeed, virtually all of the Company's business activity occurs in the Eastern District of Virginia. Cole Dec., ¶ 6.  Not surprisingly, the great majority of potentially relevant documents and sources of proof would be located in or just outside of the Eastern District of Virginia, where Freddie Mac stores both paper and electronic documents.  Cole Dec., ¶ 8.

**2.    Virginia Is The Locus Of Operative Facts.**

The gravamen of Plaintiff's Complaint is the alleged mismanagement by certain current and former officers and directors, including alleged failures to implement sufficient risk management controls and to tighten underwriting standards (see Compl., ¶¶ 4(a), 4(g)), as well as the issuance of alleged false statements to the Company's stockholders and the public (see Compl., ¶ 4(f)).  Virtually all of this alleged wrongdoing would have occurred in Virginia, where Freddie Mac maintains its headquarters and most of its other offices, and where most of its employees work.  Without a doubt, Virginia is the locus of operative facts.

3.    **Trial Efficiency And The Interest Of Justice Favor Virginia.**

Similarly, transferring this action to the Eastern District of Virginia facilitates trial efficiency and is in the interest of justice. In evaluating these factors, courts are guided by the "center of gravity" of the litigation. Ravenwoods Invest. Co., L.P. v. Bishop Capital Corp., No. 04 CV 9266, 2005 WL 236440, at *9 (S.D.N.Y. Feb. 1, 2005) (granting motion to transfer venue from New York to Wyoming and stating: "[T]he 'center of gravity' of this litigation is in Wyoming. Almost all of the Defendants, and all of the non-party witnesses and the relevant and voluminous documents, are in or near Wyoming. The Defendant company's headquarters are in Wyoming and the alleged misrepresentations and omissions, which are at the heart of Plaintiffs' case, all occurred in Wyoming"); see also In re Stillwater Min. Co. Sec. Litig., 2003 WL 21087953, at *5. Clearly, for the same reasons provided above, see supra Section B(2), the "center of gravity" in the instant case is the Eastern District of Virginia.

4.    **Virginia Is The Forum Most Familiar With Governing Law.**

The forum's familiarity with the governing law also supports transferring the case to Virginia. In accordance with its by-laws, Freddie Mac has chosen Virginia law to apply to its corporate governance practices and procedures. Cole Dec., ¶ 4. Therefore, Virginia law will likely govern the substantive claims in the Complaint, and judges in the Eastern District of Virginia will be more familiar with Virginia law than those in the Southern District of New York.

5.    **Plaintiff's Choice Of Forum Does Not Favor
Keeping This Action In The Southern District Of New York.**

While the plaintiff's choice of forum is given substantial weight in other types of cases, it has little weight in a shareholder's derivative suit. See Foster v. Litton Indus., Inc., 431 F. Supp. 86, 87 (S.D.N.Y. 1977); Wolf v. Ackerman, 208 F. Supp. 1057 (S.D.N.Y. 1969); see also Koster v. Lumbermen's Mut. Co., 330 U.S. 518, 524 (1947) (a stockholder's derivative action) ("[W]here there are hundreds of potential plaintiffs, all equally entitled voluntarily to invest themselves with the corporation's cause of action and all of whom could with equal show of right

go into their many home courts, the claim of any one plaintiff that a forum is appropriate merely because it is his home forum is considerably weakened.").

Indeed, even in non-derivative cases, a plaintiff's choice of forum is given minimal deference where, as here, the plaintiff does not live in the district in which he brings suit. See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255-56 (1981) ("When the home forum has been chosen, it is reasonable to assume that this choice is convenient. When the plaintiff is foreign, however, this assumption is much less reasonable. Because the central purpose of any forum non conveniens inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference."). Here, because the Plaintiff resides in New Jersey, his choice of New York as the forum for this action should be given little weight.

In addition, a plaintiff's choice of forum is significantly diminished where the operative facts have no connection to the chosen district. See Cartier, 510 F. Supp. 2d at 346 ("[T]he weight accorded to a plaintiff's choice of venue is significantly diminished ... where the operative facts have no connection to the chosen district."). As discussed above, the facts at issue in the instant case are most closely connected to Virginia. Plaintiff has not, and cannot, demonstrate such a connection to New York.

The Complaint alleges in passing that Freddie Mac's stock trades on the NYSE. Compl., ¶ 11. Courts have made it clear that the fact that a company's stock is traded on the NYSE is not sufficient to withstand a motion to transfer venue. As one court explained:

> Plaintiffs do not allege, nor can they, that any of the allegedly false or misleading statements were issued from anywhere within this forum. Although Plaintiffs correctly point out that Bausch & Lomb's stock is traded on the New York Stock Exchange ("NYSE"), which is located in the SDNY, and many of the analysts who follow Bausch & Lomb stock are located in New York City, these contacts don't do it. If they did, the SDNY would have even more business and every plaintiff that sued a NYSE firm could nestle in right here at 500 Pearl Street.

Laborers Local 100 & 397 Pension Fund v. Bausch & Lomb Inc., 2006 WL 1524590, at *4 (granting motion to transfer venue) (emphasis added); see also In re Stillwater Min. Co. Sec.

Litig., 2003 WL 21087953, at *5; Gilson v. Pittsburgh Forgings, Co., 284 F. Supp. 569, 571 (S.D.N.Y. 1968).

As explained by the Court in Stillwater, "[t]he purpose of § 1404(a) is to prevent waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." 2003 WL 21087953, at *2 (internal quotations and citations omitted).  In view of the overwhelming connections that this case has to Virginia and the virtually nonexistent ones to New York, keeping this action in the Southern District of New York would unquestionably contravene the purpose of Section 1404(a).  The case should be transferred to the Eastern District of Virginia.

## II.    ALTERNATIVELY, THIS COURT SHOULD STAY THIS ACTION PENDING THE OUTCOME OF THE SLC'S INVESTIGATION OF THE ALLEGATIONS.

Alternatively, pursuant to Rule 23.1 and the Virginia Stock Corporation Act, this Court should stay the proceedings in this derivative suit to allow the SLC reasonable opportunity to review and evaluate Plaintiff's allegations pursuant to Virginia law.[2]  See Fed. R. Civ. P. 23.1 advisory committee's note ("The court has inherent power to provide for the conduct of the proceedings in a derivative action, including the power to determine the course of the

---

[2] By filing this motion to stay, Freddie Mac has tolled the time period within which it must answer or otherwise respond to the Complaint.  As Wright & Miller's seminal civil practice treatise states: "Historically, motions to stay have been recognized as tolling the time period for answering a complaint because consideration of these motions prior to the answer has been found to maximize the effective utilization of judicial resources."   5C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1360 (2008) (emphasis added).  A number of federal courts in New York have issued decisions consistent with this rule.  See Greystone CDE, LLC v. Sante Fe Pointe L.P., No. 07 CV 8377, 2008 WL 482291 (S.D.N.Y. Feb. 20, 2008) (denying cross-motion for default where defendant had filed motion to stay); Questech Capital Corp. v. Flight Dynamics, Inc., 1984 WL 327, at *1, n.1 (S.D.N.Y. May 7, 1984) ("It is clear . . . that [the defendant's] motion to stay all proceedings until final determination of the action pending between the parties in the Circuit Court for the State of Oregon, tolled its time to answer or otherwise move with respect to the complaint. . . . [The defendant] was under no affirmative duty to file further motions or proceedings.") (emphasis added).  The tolling rule is particularly appropriate here, where the applicable Virginia statute expressly contemplates a court staying a derivative action pending an SLC investigation and, thereafter, entertaining a motion to dismiss in the event the SLC determines not to pursue claims set forth in the demand.

proceedings….”); VA CODE ANN. § 13.1-672.1(C) (court may stay derivative allegation to allow corporation to review and evaluate claims).

The Virginia Stock Corporation Act, which is based on the Model Business Corporation Act, provides that "no shareholder shall commence a derivative suit unless the shareholder makes a demand and:  (1) 90 days have passed; (2) the shareholder's demand is rejected within 90 days; or (3) the corporation would suffer irreparable harm if the shareholder waited for the 90 days to expire.  VA. CODE ANN. § 13.1-672.1(B); see also Firestone v. Wiley, 485 F. Supp. 2d 694, 701 n.7 (E.D. Va. 2007) (dismissing claims where plaintiff failed to make demand).  This demand rule is "intended to give the derivative corporation itself the opportunity to take over a suit which was brought on its behalf in the first place, and thus to allow the directors the chance to occupy their normal status as conductors of the corporation's affairs." 2 Model Business Corporation Act Ann., § 7.42 (4th ed. 2008) (internal quotations and citation omitted) (emphasis added).  Further, "deference to directors' judgments may also result in the termination of meritless actions brought solely for their settlement or harassment value." Id.

Virginia's Act further provides that "[i]f the corporation commences a review and evaluation of the allegations made in the demand or complaint, the court may stay any derivative proceeding for such period as the court deems appropriate." VA CODE ANN. § 13.1-672.1(C) (emphasis added).  Like Virginia's demand requirement, the clear purpose of this provision is to give the corporation due opportunity to consider whether maintaining the suit is in the best interests of the corporation, on whose behalf the suit is brought.  Significantly, the SLC process provides a mechanism for the dismissal of a case in the event the SLC determines not to pursue claims set forth in the demand.  In essence, the statute provides that a court must dismiss a derivative complaint if a quorum of disinterested directors or a committee of disinterested directors appointed by a majority vote of disinterested directors:  (1) conducted a review and evaluation -- adequately informed in the circumstances -- of the allegations; (2) determined in good faith that the claim is not in the corporation's best interests; and (3) submits in support of a

motion to terminate a short and concise statement of its reasons for rejecting the demand. VA CODE ANN. § 13.1-672.4.

Upon receiving Mr. Bassman's demand letter, the Company's Board of Directors created the SLC to investigate the allegations in the demand letter - the same allegations that form the basis of the Complaint. In these circumstances, "[c]ourts normally grant a stay of proceedings for a reasonable period of time to permit an SLC to complete its investigation." In re Take-Two Interactive Software, Inc. Deriv. Litig., No. 06 Civ. 05279, 2007 WL 1875660, at *2 (S.D.N.Y. June 29, 2007). Indeed, if a case is not stayed while "a duly authorized litigation committee was investigating whether or not it would be in the best interests of the corporation" -- precisely the type of "review and evaluation" referred to in Virginia's stay provision -- then "the very justification for creating the litigation committee in the first place might well be subverted." In re infoUSA, Inc. S'holders Litig., No. 1956-CC, 2008 WL 762482, at *2 (Del. Ch. Mar. 17, 2008) (Chandler, C.) (granting stay under Delaware law).

For example, in Wright v. Krispy Kreme Doughnuts, Inc., No. 04 CV 00832, 2005 WL 1719927 (M.D.N.C. Apr. 4, 2005), the court granted a motion to stay under North Carolina's stay provision, North Carolina General Statutes § 55-7-43, which is identical to the Virginia provision. The court held that "because the findings of the Special Committee will play an important role in the outcome of the action, a stay is warranted." Id. at *1; see also In re Take-Two Interactive Software, Inc., 2007 WL 1875660, at *2 (noting that "[c]ourts normally grant a stay of proceedings for a reasonable period of time to permit an SLC to complete its investigation" and citing cases, including one in which a court granted stay of twelve months from the time that the special litigation committee was formed); Curtis v. Nevens, 31 P.3d 146, 149 (Colo. 2001) ("Most courts grant a stay once an SLC has been appointed. . . . The reason for granting a stay in such cases is to allow the SLC time to finish its task, that is to determine whether it is in the best interests of the corporation to maintain the derivative suit.") (citations omitted). Consistent with these authorities, a stay is warranted here under Virginia's statute so

that the SLC can fulfill its role in reviewing and evaluating whether the derivative action is in Freddie Mac's best interests.

Accordingly, in the event that this Court declines to transfer this action to the Eastern District of Virginia, Freddie Mac respectfully requests pursuant to § 13.1-672.1(C) that this Court stay the action to permit the SLC a reasonable opportunity to conclude its investigation of Mr. Bassman's allegations.

## CONCLUSION

For the foregoing reasons, Freddie Mac respectfully requests that this Court transfer this action to the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a), or, alternatively, stay this action pursuant to VA CODE ANN. § 13.1-672.1(C) pending the outcome of the SLC's investigation.

Dated: New York, New York
        June 16, 2008

BINGHAM McCUTCHEN LLP


By:  s/Kenneth I. Schacter
     Kenneth I. Schacter
     399 Park Avenue
     New York, NY  10022
     Tel: (212) 705-7000
     Fax: (212) 752-5378
     kenneth.schacter@bingham.com

     Jordan D. Hershman
     Jason D. Frank
     One Federal Street
     Boston, MA  02110-1726
     Tel: (617) 951-8000
     Fax: (617) 951-8736

     *Attorneys for Nominal Defendant*
     *Freddie Mac*

Kenneth I. Schacter
**BINGHAM McCUTCHEN LLP**
399 Park Avenue
New York, New York 10022
Tel: (212) 705-7000
Fax: (212) 752-5378
kenneth.schacter@bingham.com

Jordan D. Hershman
Jason D. Frank
**BINGHAM McCUTCHEN LLP**
One Federal Street
Boston, MA 02110-1726
Tel: (617) 951-8000
Fax: (617) 951-8736

*Attorneys for Nominal Defendant Freddie Mac*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

R.S. BASSMAN, Derivatively on Behalf of FREDDIE : 
MAC a/k/a Federal Home Loan Mortgage Corporation :
and its shareholders, :
 :
           Plaintiff, :
 :
    v. :
 :
RICHARD F. SYRON, PATRICIA L. COOK, :     Case No. 08 CV 02423-BSJ
ANTHONY S. PISZEL, EUGENE M. McQUADE, :
RICHARD KARL GOELTZ, STEPHEN A. ROSS, :
SHAUN F. O'MALLEY, ROBERT R. GLAUBER, :
BARBARA T. ALEXANDER, WILLIAM M. LEWIS, :
JR., JEFFREY M. PEEK, GEOFFREY T. BOISI, :
RONALD F. POE, WASHINGTON MUTUAL, INC., :
PRICEWATERHOUSECOOPERS, LLP, KERRY K. :
KILLINGER, ANTHONY R. MERLO, JR., FIRST :
AMERICAN CORPORATION, FIRST AMERICAN :
EAPPRAISEIT, COUNTRYWIDE FINANCIAL :
CORPORATION, COUNTRYWIDE HOME EQUITY :
LOAN TRUST, COUNTRY-WIDE BANK, FSB, :
COUNTRYWIDE HOME LOANS, INC., :
LANDSAFE, INC., and ANGELO R. MOZILO, :
 :
          Defendants, :
 :
    and :
 :
FREDDIE MAC a/k/a Federal Home Loan Mortgage :
Corporation, :
 :
          Nominal Defendant. :

------------------------------------------------------------- x

## APPENDIX OF UNREPORTED CASES CITED IN FREDDIE MAC'S
## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
## <u>TRANSFER VENUE OR, ALTERNATIVELY, STAY THE PROCEEDINGS</u>

.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1716340 (S.D.N.Y.)
(Cite as: 2000 WL 1716340 (S.D.N.Y.))

Page 1

C

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Sally ADAIR, individually and on behalf of all others similarly situated,
Plaintiff,
v.
MICROFIELD GRAPHICS, INC., and John B. Conroy, Defendants.
No. 00 Civ. 0629(MBM).

Nov. 16, 2000.
Brian Murray, Joseph Vincent McBride, Rabin & Peckel, New York, NY, for Plaintiffs.

Gregory A. Markel, Nancy I. Ruskin, Brobeck Phleger & Harrison, New York, NY, for Defendants.

OPINION & ORDER
MUKASEY, J.

*1 Plaintiffs Sally Adair, Richard Cerrato, Steve Chiaramonte, David Maxim and Robert Santopietro bring this putative class action against Microfield Graphics Inc. ("Microfield"), a developer of computer conferencing and telecommunications products, and its Chief Executive Officer, John B. Conroy, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa et seq. (1994) (the "1934 Act"), and Rule 10b-5 promulgated thereunder. Defendants move under 28 U.S.C. § 1404(a) (1994) to transfer this action to the District of Oregon. For the reasons set forth below, defendants' motion is granted.

I.

Microfield is an Oregon corporation with its principal place of business in Tigard, Oregon. (Conroy Aff. ¶ 3) Plaintiffs allege that on July 14, 1997, Microfield entered into a General Purchase and Development Agreement with Minnesota Mining and Manufacturing Company ("3M") providing for the sale of Microfield products to 3M. (Compl.¶ 19)

This agreement required 3M to submit all purchase orders to Microfield at least 90 days prior to shipment. (Id.) According to plaintiffs, Microfield's sales to 3M represented a significant percentage of Microfield's over-all sales from the end of 1997 through the second fiscal quarter of 1998. (Id. ¶¶ 20-26) Beginning in the third quarter, Microfield sales to 3M declined significantly, causing a decrease in the price of Microfield's common stock. (Id.)

Plaintiffs allege that from July 23, 1998 through April 2, 1999, defendants disseminated false and misleading statements regarding the volume of Microfield's sales to 3M. (Id. ¶¶ 27-35) According to plaintiffs, because 3M was required to submit purchase orders at least 90 days prior to shipment, defendants knew that Microfield's sales to 3M would decline well before any such information was actually disclosed. (Id. ¶¶ 27, 31, 33) Plaintiffs filed this putative class action on January 28, 2000, alleging violations of Sections 10(b) and 20(a) of the 1934 Act, and Rule 10b-5 promulgated thereunder. Defendants now move under 28 U.S.C. § 1404(a) to transfer this action to the District of Oregon.

II.

Transfer of venue under 28 U.S.C. § 1404(a) is appropriate if it serves the convenience of the parties and witnesses, and is otherwise in the interest of justice. Van Dusen v. Barrack, 376 U.S. 612 (1964). The threshold question in a § 1404(a) inquiry is whether venue is proper in the proposed transferee forum. See Purcell Graham, Inc. v. National Bank of Detroit, 1994 WL 584550,*3, 93 Civ. 8786 (S.D.N.Y. Oct. 24, 1994). Section 27 of the 1934 Act lays venue in any district in which an "act or transaction constituting a violation has occurred" or where the defendant is "found," "is an inhabitant or transacts business." 15 U.S.C. § 78aa. Here, the allegedly false and misleading statements were made at Microfield's headquarters in Oregon. In addition, both defendants are domiciled in Oregon. (Conroy Aff. ¶¶ 1, 3) Venue in the District of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2000 WL 1716340 (S.D.N.Y.)
(Cite as: 2000 WL 1716340 (S.D.N.Y.))

Oregon therefore is proper.

\*2 Once venue in the transferee forum is found, the following factors may be considered in resolving a motion to transfer: the convenience of the witnesses; the location of relevant physical evidence; the locus of operative facts; the convenience of the parties; the availability of process to compel testimony of unwilling witnesses; the forum's familiarity with the governing law; the relative means of the parties; trial efficiency and the interests of justice. *See National Patent Dev. Corp. v. American Hosp. Supply,* 616 F.Supp. 114, 119 (S.D.N.Y.1984) (Weinfeld, J.).

Of the factors outlined above, the convenience of the witnesses usually is the most important consideration. *Stein v. Microelectronic Pkg., Inc.,* 1999 WL 540443,\*7 (S.D.N.Y.1999) (citing *Viacom Int'l, Inc. v. Melvin Simon Prods., Inc.,* 774 F.Supp. 858, 868 (S.D.N.Y.1991)). As in most class actions brought under the 1934 Act, the key issues likely to be in dispute here are the accuracy of Microfield's statements and defendants' state of mind. Defendants identify numerous non-party witnesses whose testimony would touch on these issues, including several current and former Microfield employees and Microfield's outside accountant. (Conroy Aff. ¶ 12) All of these witnesses are located in Oregon. (*Id.*) Plaintiffs have not identified any non-party witnesses. Accordingly, the convenience of the witnesses factor weighs in favor of transfer.

The locus of operative facts in this case is Oregon. Misrepresentations and omissions are deemed to "occur" in the district where the misrepresentations are issued or the truth is withheld, not where the statements at issue are received. *See Morgan Guaranty Trust Co. v. Tisdale,* 1996 WL 544240,\*6, 95 Civ. 8023 (S.D.N.Y. Sept. 25, 1996). Here, the preparation and issuance of the allegedly misleading press releases and financial statements occurred in Oregon. (Conroy Aff. ¶ 10) Plaintiffs argue that the events which generated the operative facts of this case occurred "all over the United States." (Pl.

Mem. at 9) Specifically, plaintiffs claim that some events took place in New York, where some of the named plaintiffs reside and purchased their stock. (*Id.*) However, the purchase of shares in this state does not make New York a forum which has significant contact with the operative facts. *See In re Nematron Corp. Securities Litigation,* 30 F.Supp.2d 397, 404 (S.D.N.Y.1998). Indeed, New York appears to have no greater connection to this case than any other district in which a potential class member resides. *See id.*

The convenience of the parties to this action also weighs in favor of transfer. Microfield currently has 18 employees, all of whom work at Microfield's offices in Tigard, Oregon. (Conroy Aff. ¶ 8) Microfield has no offices or employees in New York. (*Id.* ¶ 7) Conducting a trial in New York would impose a significant burden on the defendants, especially because several of Microfield's employees are likely to testify at trial. Plaintiffs respond that a trial in Oregon would be burdensome because "[f]our of the five proposed Lead Plaintiffs either live in [the Southern District of New York] or in a county adjacent to it." (Pl. Mem. at 6) However, the central issues in this case relate to facts and circumstances outside the personal knowledge of the plaintiffs--including the accuracy of Microfield's statements and the defendants' state of mind. Even if the named plaintiffs participate at trial, it is unlikely that their participation will involve lengthy testimony. Moreover, as several courts have explained, the residence of a class representative is often a "mere happenstance," which may be discounted by a court when weighing transfer factors. *See Job Haines Home For The Aged v. Young,* 936 F.Supp. 223, 228 (D.N.J.1996); *IBJ Schroder Bank & Trust Co. v. Mellon Bank, N.A.,* 730 F.Supp. 1278, 1282 (S.D.N.Y.1990). The convenience of the parties favors transfer to Oregon.

\*3 The availability of process to compel testimony of unwilling witnesses also favors transfer. Although plaintiffs have not identified any non-party witnesses, defendants have identified several non-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1716340 (S.D.N.Y.)
(Cite as: 2000 WL 1716340 (S.D.N.Y.))

Page 3

party witnesses in Oregon whose testimony may be relevant at trial, including several former Microfield employees and Microfield's outside accountant. As defendants note, these out-of-state witnesses may be unwilling or unable to attend if trial is held in New York. *See* Fed.R.Civ.P. 45(c)(3)(B)(iii). These obstacles would be significantly reduced if this action were tried in Oregon.

Plaintiffs argue that transfer is inappropriate because the district court in Oregon, which is in the Ninth Circuit, would be required to apply the Second Circuit's interpretation of the 1934 Act. (Pl. Mem. at 10) However, the Ninth Circuit has held that, when reviewing federal claims, a transferee court in the Ninth Circuit is bound only by Ninth Circuit precedent. *See Newton v. Thomason,* 22 F.3d 1455, 1460 (9th Cir.1994). Thus, contrary to plaintiffs' assertions, if this case is transferred, the district court in Oregon would be bound to apply its *own* circuit's interpretation of the federal securities laws.

Finally, plaintiffs' choice of New York as a forum for this action does not warrant denial of defendants' motion. A plaintiff's choice of forum generally is entitled to considerable weight and should not be disturbed unless the balance of factors weighs strongly in favor of the defendant. *In re Nematron Corp. Sec. Litig.,* 30 F.Supp.2d 397, 405 (S.D.N.Y. 1998). Here, the balance of factors strongly weighs in favor of transfer—even if plaintiffs' choice of forum in this putative class action is accorded as much weight as one would accord an individual plaintiff's choice. *See DiRienzo v. Philip Services Corp.,* 2000 WL 1678026,*12, 99 Civ. 7825 (2nd Cir. Nov. 8, 2000) (holding that presumption favoring plaintiffs' choice of forum was not diminished in class action); *but see Warrick v. General Electric Co.,* 70 F.3d 736, 741 n. 7 (2d. Cir.1995) (noting that a "plaintiff's choice of forum is a less significant consideration in a ... class action than in an individual action.") As discussed, the convenience of the parties and witnesses strongly favors transfer to Oregon. Moreover, the events which generated the

operative facts in this case occurred in Oregon and bear little or no connection to New York. Finally, there is the risk that certain out-of-state, non-party witnesses may be unwilling or unable to appear at a trial in New York; these witnesses may be compelled to appear in Oregon. When taken together, these considerations significantly outweigh plaintiffs' choice of forum.

\* \* \*

For the reasons stated above, defendants' motion to transfer venue to the District of Oregon pursuant to 28 U.S.C. § 1404(a) is granted.

Not Reported in F.Supp.2d, 2000 WL 1716340 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

.

case. They argue that a stay is warranted because there is a concurrently pending federal action that "arises from the same nucleus of facts," citing *SST Global Technology, LLC v. Chapman*, 270 F.Supp.2d 444, 455 (S.D.N.Y.2003). The action in this Court arises out of a bridge loan agreement between Greystone CDE and Defendant Santa Fe Pointe, L.P., and the agreements executed by the remaining Defendants to guarantee that loan. Greystone CDE seeks to recover damages for breach of the loan and guaranty agreements in this action. The claims in the California action, on the other hand, "are not based on the guaranties with Greystone CDE," as Defendants argued and the Northern District of California agreed in denying the motion to transfer venue. *Santa Fe Pointe, LP v. Greystone Servicing Corp. Inc.*, No. 07-cv-5454, slip op. at 8, 9 (N.D.Ca. Feb. 4, 2008). Defendants' claims in the California action arise out of related claims sounding in tort, which principally involve the actions of Greystone Servicing, a separate corporation, to assist Defendants with a HUD application to acquire and rehabilitate a housing development in Oklahoma and do not directly involve the loan agreement in question in this action. The substantial differences between these actions weigh against a stay in this case.

*2 Furthermore, granting a stay would prejudice Plaintiff more than allowing the case to proceed would prejudice Defendants. *See Lasala v. Needham & Co.*, 399 F.Supp.2d 421, 428 (2005) ("Courts are generally reluctant to stay proceedings because they are concerned with vindicating the *plaintiff*'s right to proceed with its case."); *see also An Giang Agric. & Food Import Export Co. v. United States*, 350 F.Supp.2d 1162, 1164 n. 3 (2004) (stating that "underpinning much of the case law--implicitly, if not explicitly--is a concern for the rights of assertedly aggrieved plaintiffs to seek redress in the courts" while noting a lack of "comparable concern for the rights of defendants"). Plaintiff, which opposes the stay, should be able to proceed in this forum with its claim against Defendants for default and failure as guarantors to

make payment when due.

More importantly, Plaintiff selected this forum based on the forum selection clauses of the loan guaranties, which each Defendant executed in favor of Grey stone CDE. By signing the Guaranty and Suretyship Agreement, Defendant Theotis Oliphant irrevocably agreed that Grey stone CDE may bring an action arising out of the guaranty in any state or federal court located in New York, consented to the jurisdiction of such court in any action, and waived any objection to the laying of venue of any such action. (Compl., Ex. C at 11.) Defendants Santa Fe Pointe Management LLC, Theotis Oliphant, and Rant LLC also signed pledge agreements by which they irrevocably and unconditionally submitted themselves and their property in any legal action relating to those agreements to the non-exclusive general jurisdiction of the state, federal, and appellate courts of the State of New York. (Compl., Ex. D at 15-16; Ex. E at 14.) Subsequent to signing the loan and guaranty agreements, Defendant Oliphant's law office rendered a legal opinion as to the validity and enforceability of the bridge loan agreement and the partners' guaranties thereof. (Harnik Decl., Ex. G, ¶ 3.) Having previously agreed to litigate this case in New York should Plaintiff institute an action here, Defendants cannot now claim that their burden in doing so outweighs the interest of Plaintiff in proceeding with its action.

The interests of the courts, non-parties, and the public do not weigh strongly in favor of granting a stay. In view of the claims raised by the California action, a stay of this action is not likely to lead to a more expeditious resolution of this case but rather would enable Defendants to utilize the bridge loan to finance the California action.

Defendants urge the Court to decide the motion to stay on the first-to-file rule. Embracing the advice of the U.S. Supreme Court that wise judicial administration "does not counsel rigid mechanical solution of such problems," *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1950), the Court declines to grant a stay based on Defend-

Page 3

ants' technical first filing. Although it is true that Defendants filed an action in California state court prior to Plaintiff's filing of this action, they did not serve process until the day before Plaintiff filed its action here in New York, nor did they disclose the filing of their action while they negotiated with Plaintiff. Moreover, as Plaintiff points out, the California action was filed well after Defendants received a notice of default and of Greystone CDE's intent to pursue collection remedies. This sequence weighs against an application of the first to file rule. *See Capital Records, Inc. v. Optical Recording Corp .*, 810 F.Supp. 1350, 1355 (S.D.N.Y.1992) ("Another factor that weighs against application of the first-filed rule is that this action was essentially a victory in a race to the courthouse triggered by ORC's letter. ORC's letter served the dual purpose of proposing further settlement discussion and putting Capitol on notice that failure of the negotiations would lead to legal action").

## CONCLUSION

*3 Whether there is any merit to Defendants' claims in California can be determined by the California court, but Defendants here should not be in the position of spending the remaining proceeds of the bridge loan pursuing the action. Defendants' motion for a stay (Doc. No. 24) is denied. Plaintiff's motion to enter a default judgment (Doc. No. 30) is denied, and Plaintiffs motion to strike Defendants' personal jurisdiction defense (Doc. No. 30) is denied since such a defense has not been raised. Defendants are to answer the complaint or otherwise respond in ten (10) days of this opinion.

The parties and their principal counsel are to appear in court on Thursday, February 28, 2008, at 9:30 AM to discuss settlement so the legal fees in this case and the California case will not result in further injury to both parties.

IT IS SO ORDERED.

Slip Copy, 2008 WL 482291 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

-



Not Reported in A.2d
Not Reported in A.2d, 2008 WL 762482 (Del.Ch.)
(Cite as: 2008 WL 762482 (Del.Ch.))

Page 1

# H

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Re: In re INFOUSA, INC. SHAREHOLDERS LIT-
IGATION.
Civil Action No. 1956-CC.

Submitted: March 7, 2008.
Decided: March 17, 2008.

Andre G. Bouchard, Joel Friedlander, Bouchard
Margules & Friedlander, P.A., Wilmington, DE.

Martin P. Tully, Jay N. Moffitt, Morris, Nichols,
Arsht & Tunnell LLP, Wilmington, DE.

Elizabeth M. McGeever, Laina M. Herbert, Prick-
ett, Jones & Elliott, P.A., Wilmington, DE.

Collins J. Seitz, Jr., Kevin F. Brady, Jeremy D. An-
derson, Connolly Bove Lodge & Hutz LLP, Wilm-
ington, DE.

R. Bruce McNew, Taylor & McNew LLP, Wilm-
ington, DE.

Brian C. Ralston, Potter Anderson & Corroon LLP,
Wilmington, DE.

WILLIAM B. CHANDLER III, Chancellor.

*1 Dear Counsel:

Before me are the motion to stay of the Special Lit-
igation Committee ("SLC") of the Board of Direct-
ors of nominal defendant infoUSA and several oth-
er motions regarding discovery. For reasons I ex-
plain below, I hereby grant the SLC's motion and
stay this action until June 30, 2008. Consequently,
the other pending motions are held in abeyance un-
til then.

The long, sordid history of this case has been de-

tailed elsewhere, and in its most recent chapter I de-
termined that plaintiffs' amended complaint al-
leging waste and breach of fiduciary duties was suf-
ficient to withstand defendants' motion to dismiss.
[FN1] Since that time, the vast leviathan of discov-
ery in cases such as these has sprung to life, and the
quibbles and disputes attendant to such a process
have likewise arisen. On December 24, 2007, in re-
sponse to the derivative litigation in this Court and
an informal investigation by the Securities and Ex-
change Commission, the infoUSA board decided to
form a special committee to review and analyze the
facts and circumstances surrounding the claims
raised in plaintiffs' amended complaint. About a
month later, the SLC's authority was broadened to
include the SEC investigation.

> FN1. See In re infoUSA S'holders Litig.,
> C.A. No.1956-CC, 2007 WL 3325921
> (Del. Ch. Aug. 13, 2007).

The SLC is a five-member committee that includes
two directors the Court previously determined were
disinterested [FN2] and three newly appointed
members of the Company's board. The SLC has re-
tained as counsel the firms of Covington & Burling
LLP and Bouchard Margules & Friedlander, P.A.,
both of which are familiar with representing special
committees. On January 30, 2007, the SLC moved
to stay this case for 150 days to allow it to investig-
ate the claims and issues and to determine what ac-
tion is in the best interests of the Company's share-
holders.

> FN2. See id.

Plaintiffs oppose the stay. They argue that the SLC
was formed "too late" to now obtain a stay in this
case. Even if the SLC were properly formed,
plaintiffs contend, a stay should still be denied be-
cause the SLC is advisory, because the SLC has not
acted independently, and because the SLC's mem-
bers are not independent.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 762482 (Del.Ch.)
(Cite as: 2008 WL 762482 (Del.Ch.))

Page 2

It is well established that even in cases where demand is excused, a committee of disinterested directors may properly act for the corporation in the context of derivative litigation. [FN3] Over twenty years ago, Chancellor Brown explained the importance of staying such litigation when a corporation forms an SLC:

> FN3. *See Zapata Corp. v. Maldonado,* 430 A.2d 779 (Del.1981); 1 EDWARD P. WELCH, ANDREW J. TUREZYN, AND ROBERT S. SAUNDERS, FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 41.9 (5th ed.2007 supp.); *see also Kaufman v. Computer Assocs. Int'l, Inc.,* C.A., No. 699-N, 2005 WL 3470589, at *3 (Del. Ch. Dec. 13, 2005) ("A special litigation committee formed in accordance with the landmark decision in *Zapata Corp. v. Maldonado* has broad powers to control litigation filed nominally on behalf of a corporation. Once such a committee is formed and takes control of a derivative litigation, the committee typically moves for a stay of all proceedings to allow it to complete its investigation promptly and without undue interference." (footnotes omitted)).

If *Zapata* is to be meaningful, then it would seem that such an independent committee, once appointed, should be afforded a reasonable time to carry out its function. It would likewise seem reasonable to hold normal discovery and other matters in abeyance during this interval. If a derivative plaintiff were to be permitted to depose corporate officers and directors and to demand the production of corporate documents, etc. at the same time that a duly authorized litigation committee was investigating whether or not it would be in the best interests of the corporation to permit the suit to go forward, the very justification for the creating of the litigation committee in the first place might well be subverted. [FN4]

> FN4. *Abbey v. Computer & Commc'ns*

*Tech. Corp.,* 457 A.2d 368, 375 (Del. Ch.1983).

*2 Thus, this Court has routinely granted reasonable stays to allow SLCs to complete their investigations. [FN5]

> FN5. E.g., *Charal Inv. Co., Inc. v. Rockefeller,* C.A. No. 14397, 1995 WL 684869 (Del. Ch. Nov. 7, 1995).

Plaintiffs have not convinced me that this case presents an exception to the general rule. Plaintiffs' first argument--that the committee was somehow formed "too late"--misses the mark. The fact that I have already determined demand is excused demonstrates why the board *must* act by means of a committee; it does not in any way explain why it cannot act through an SLC. The Supreme Court has explicitly noted that "even in a demand-excused case, a board has the power to appoint a committee of one or more independent disinterested directors to determine whether the derivative action should be pursued or dismissal sought." [FN6] Indeed, this Court has previously granted an SLC's motion to stay *after* determining that demand is excused. [FN7]

> FN6. *Aronson v. Lewis,* 473 A.2d 805, 813 (Del.1984), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000).

> FN7. *Compare Katell v. Morgan Stanley Group, Inc.,* C.A. No. 12343, 1993 WL 205033, at *1 (Del. Ch. June 8, 1993) (determining that plaintiffs alleged demand futility and were excused from making demand on the board), *with Katell v. Morgan Stanley Group, Inc.,* C.A. No. 12343, 1993 WL 390525 at *4 (Del. Ch. Sept. 27, 1993) (granting SLC's motion to stay proceedings).

Second, plaintiffs express concern that the board resolution empowering the SLC created merely an advisory committee with little or no actual power. I

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 762482 (Del.Ch.)
(Cite as: 2008 WL 762482 (Del.Ch.))

Page 3

do not read the resolution to do so. The resolution affirms "that the SLC shall have the authority to investigate, review, and analyze the facts and circumstances that are the subject of the Derivative Litigation, as well as any additional facts and circumstances that may be at issue in any related governmental inquiry, investigation, or proceeding ...." The resolution further grants the SLC "full and exclusive authority to consider and determine whether or not the prosecution of the claims asserted in the Derivative Litigation ... is in the best interests of the Company and its shareholders, and to further consider and determine what action should be taken on behalf of the Company with respect to the Derivative Litigation and any related governmental inquiry, investigation, or proceeding...." This language is mandatory and vests the SLC with the "full and exclusive authority" to investigate the pending claims and to "determine" what course of action the Company should take. I am confident, therefore, that the SLC has the authority it needs to conduct its investigation and that the Company knows how unpleasant a forum this Court will become if it tries to impede or interfere with the SLC's work.

Finally, plaintiffs' challenge to the independence of the SLC is not appropriately considered at this time. Plaintiffs' allegations with respect to the independence of the committee's members and actions do not amount to the highly unusual circumstances present in *Biondi v. Scrushy* [FN8] and, therefore, I agree with Vice Chancellor Strine that "judicial economy is served by permitting [the independence] issue to be addressed after the committee has issued its report, because the court may then consider questions of committee independence at the same time it examines the reasonableness of the bases for the committee's conclusion." [FN9] I reiterate Vice Chancellor Lamb's admonition that "both the independence of the SLC and the good faith of its inquiry [will] be the subject of close scrutiny if the investigation result[s] in a recommendation that the litigation be dismissed." [FN10]

FN8. 820 A.2d 1148 (Del. Ch.2003).

FN9. *Id.* at 1164.

FN10. *Sutherland v. Sutherland*, C.A. No. 2399-VCL, 2008 WL 571253, at *1 (Del. Ch. Feb. 14, 2008).

*3 Consequently, as this Court "almost invariably" does, I hereby grant the SLC's motion to stay. [FN11] The SLC appears to have been properly formed, and the fact that it was formed after demand was excused does not render its formation "too late." Moreover, the SLC has been given adequate authority and power by the Company's board to conduct its investigation and determine what course of action is in the best interests of the shareholders. Because at present there are no "undisputed facts [that] will make it impossible for the court later to accept a decision of the special litigation committee to terminate the derivative litigation," [FN12] the Court will defer its evaluation of the SLC's independence until the time the SLC moves to dismiss-- should it ever do so. Moreover, because I am granting this stay, I need not rule on the pending discovery motions.

FN11. *Biondi*, 820 A.2d at 1164.

FN12. *Id.* at 1165.

IT IS SO ORDERED.

Very truly yours,

/s/ William B. Chandler III

William B. Chandler III

Not Reported in A.2d, 2008 WL 762482 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1524590 (S.D.N.Y.)
(Cite as: 2006 WL 1524590 (S.D.N.Y.))

Page 1

**C**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Laborers Local 100 and 397 Pension Fund, On be-
half of Itself and All Others
Similarly Situated, Plaintiffs,
v.
BAUSCH & LOMB INC., Ronald L. Zarella,
Stephen C. McCluski, John M. Loughlin,
Dwain L. Hahs, Angela J. Panzarella, Robert B.
Stiles, Kamal Sarbadhikari,
Geoffrey F. Ide, and William H. Waltrip, Defend-
ants.
James Brannon, Individually and On Behalf of All
Others Similarly Situated,
Plaintiffs,
v.
Bausch & Lomb Inc., Ronald L. Zarella, Stephen C.
McCluski, John M. Loughlin,
Dwain L. Hahs, Angela J. Panzarella, Robert B.
Stiles, Kamal Sarbadhikari,
Geoffrey F. Ide, and William H. Waltrip, Defend-
ants.
Fred Badaracco, Individually and On Behalf of All
Others Similarly Situated,
Plaintiffs,
v.
Bausch & Lomb Inc., Ronald L. Zarella, Stephen C.
McCluski, John M. Loughlin,
Dwain L. Hahs, Angela J. Panzarella, Robert B.
Stiles, Kamal Sarbadhikari,
Geoffrey F. Ide, and William H. Waltrip, Defend-
ants.
Diane JOHNSON, On Behalf of Herself and All
Others Similarly Situated,
Plaintiffs,
v.
Bausch & Lomb Inc., Ronald L. Zarella, Stephen C.
McCluski, John M. Loughlin,
Dwain L. Hahs, Angela J. Panzarella, Robert B.
Stiles, Kamal Sarbadhikari,

Geoffrey F. Ide, Paul A. Friedman, Jonathan S. Lin-
en, David Nachbar, The
Bausch & Lomb Employee Benefits Administration
Committee, and John Does 1-30,
Defendants.
Gaetano Rainone, Derivatively On Behalf of
Bausch & Lomb Incorporated,
Plaintiffs,
v.
Ronald L. Zarella, William H. Waltrip, William M.
Carpenter, Stephen C.
McCluski, John M. Loughlin, Dwain L. Hahs, An-
gelina J. Panzarella, Robert B.
Stiles, Kamal K. Sarbadhikari, Geoffrey F. Ide,
Ruth R. McMullin, Kenneth L.
Wolfe, Linda Johnson Rice, Jonathan S. Linen,
Domenico De Sole, Barry W.
Wilson, Paul A. Friedman, Alan M. Bennett, John
R. Purcell, Franklin E. Agnew,
and Alvin W. Trivelpiece, Defendants.
and
Bausch & Lomb Incorporated, a New York corpor-
ation, Nominal Defendant.
Perry Brown, Derivatively On behalf of Bausch &
Lomb Incorporated, Plaintiffs,
v.
Ronald L. Zarella, William H. Waltrip, William M.
Carpenter, Stephen C.
McCluski, John M. Loughlin, Dwain L. Hahs, An-
gelina J. Panzarella, Robert B.
Stiles, Kamal K. Sarbadhikari, Geoffrey F. Ide,
Ruth R. McMullin, Kenneth L.
Wolfe, Linda Johnson Rice, Jonathan S. Linen,
Domenico De Sole, Barry W.
Wilson, Paul A. Friedman, Alan M. Bennett, John
R. Purcell, Franklin E. Agnew,
and Alvin W. Trivelpiece, Defendants.
and
Bausch & Lomb Incorporated, a New York: corpor-
ation, Nominal Defendant.
Police and Fire Retirement System of the City of
Detroit, On Behalf of Itself
and All Others Similarly Situated, Plaintiffs,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1524590 (S.D.N.Y.)
(Cite as: 2006 WL 1524590 (S.D.N.Y.))

Page 2

v.

Bausch & Lomb Inc., Ronald L. Zarella, Stephen C.
Mccluski, John M. Loughlin,
Robert B. Stiles, Kamal Sarbadhikari, and Geoffrey
F. Ide, Defendants.
Nos. 06 Civ.1942(HB), 06 Civ.2025(HB), 06 Civ.
2659(HB), 06 Civ. 2916(HB), 06
Civ. 2918(HB), 06 Civ. 3106(HB), 06 Civ.
3653(HB).

June 5, 2006.

David Avi Rosenfeld, Lerach, Coughlin, Stoia,
Geller, Rudman & Robbins, LLP, Samuel Howard
Rudman, Mario Alba, Jr., Melville, NY, for
Plaintiffs Laborers Local 100 and 397 Pension
Fund.

Bradley P. Dyer, Eric James Belfi, Murray, Frank
& Sailer, L.L.P., New York, NY, Marc A. Topaz,
Richard A. Maniskas, Tamara Shvirsky, Schiffrin
& Barroway, L.L.P., Radnor, PA, for Plaintiffs
James Brannon.

Jeffrey M. Norton, Robert I. Harwood, Wechsler,
Harwood, L.L.P., New York, NY, for Plaintiffs
Fred Badaracco.

Stephen John Fearon, Jr., Squitieri & Fearon LLP,
New York, NY, for Plaintiffs Diane Johnson.

Nadeem Faruqi, Faruqi & Faruqi, LLP, New York,
NY, for Plaintiffs Gaetano Rainone, Perry Brown.

Douglas M. McKeige, Gerald Harlan Silk, Jai
Kamal Chandrasekhar, Bernstein, Litowitz, Berger
& Grossmann, L.L.P., New York, NY, for Plaintiffs
Police and Fire Retirement System of the City of
Detroit.

HAROLD BAER, JR., District Judge. [FN1]

> FN1. William Pollack, a Summer 2006 in-
> tern in my Chambers and second-year law
> student at the University of Michigan
> School of Law, provided substantive as-
> sistance in the research for this Opinion.

*1 Plaintiffs in the above captioned cases filed sev-
eral class action lawsuits that allege securities laws
violations against Bausch & Lomb and its corporate
officers (collectively "Defendants"). Lead plaintiff
motions were filed by four parties in this action on
May 12, 2006. Shortly thereafter, on May 15, 2006,
the Defendants moved to transfer venue, pursuant
to 28 U.S.C. § 1404(a), of the above-captioned
cases from this Court to the United States District
Court in the Western District of New York. I stayed
my decision on a lead plaintiff pending the decision
on this motion to transfer venue. For the reasons
below, the motion to transfer venue is GRANTED.

I. BACKGROUND

Plaintiffs' allegations, are in the main, concerned
with what might be characterized as misleading
press releases. The flavor of these allegations,
while not pivotal to this motion, is captured by the
following examples.

On January 27, 2005, Bausch & Lomb (also "Com-
pany") issued a press release that announced its fin-
ancial results for 2004. This press release reported
an 11 percent increase in worldwide sales to $2.23
billion and full-year earnings of $2.93 per share.
The press release provided in relevant part that:

  We surpassed the earnings per share expectations
  that we established at the beginning of the year
  and exited 2004 with increased momentum. We
  are well positioned for accelerated sales growth
  and continued strong financial performance in
  2005.

(Brannon Compl. ¶ 27). A few months later and on
April 19, 2005, the Company issued another press
release entitled "Bausch & Lomb Reports Solid
First Quarter." The April 19, 2005 press release re-
ported a six percent increase in total sales, which
resulted in a 47 percent increase in earnings per
share to $0.63, compared to $0.43 earnings per
share in the first quarter of 2004. (Laborer's Local
100 & 397 Pension Fund Am. Compl. ¶ 27; Bran-
non Compl. ¶ 32). The stock price hovered between
$75 and $76 per share in the days following this an-
nouncement. (Laborer's Local 100 & 397 Pension

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                        Page 3
Not Reported in F.Supp.2d, 2006 WL 1524590 (S.D.N.Y.)
(Cite as: 2006 WL 1524590 (S.D.N.Y.))

Fund Am. Compl. ¶ 34). Again on July 27, 2005, a press release entitled "Bausch & Lomb Earns 81 Cents Per Share on Seven-Percent Sales Gain Company Increases Full-Year Guidance by five Cents" surfaced that provided in relevant part that:

> We were very satisfied with our second-quarter performance ... further share gains are expected to accelerate top-line growth in the second half of 2005.

(Id. ¶ 28) On August 1, 2005, the Defendant's stock sold at $84 a share. (Laborer's Local 100 & 397 Pension Fund Am. Compl. ¶ 34; Brannon Compl. ¶ 53).

It was only later that year that Bausch & Lomb acknowledged internal accounting errors at two of their foreign subsidiaries. Specifically, on October 26, 2005, the Company announced that in September 2005 they had begun an internal investigation of their Brazilian subsidiary. This investigation had unearthed several accounting errors. (Laborer's Local 100 & 397 Pension Fund Am. Compl. ¶ 29, Brannon Compl. ¶ 37). As a result of these errors, the Brazilian tax authorities claimed that Bausch & Lomb owed the Brazilian government $5 million in taxes as well as $21 million in penalties. (Brannon Compl. ¶ 37). Upon release of this news, shares of Bausch & Lomb fell $2.74 per share to close at $71.36 per share. (Id. ¶ 38). However, Plaintiffs allege that the Company's press release downplayed the seriousness of the accounting errors and as a result, Bausch & Lomb shares rebounded soon thereafter and sold at around $80 a share in December 2005. (Laborer's Local 100 & 397 Pension Fund Am. Compl. ¶ 31).

*2 On December 22, 2005, Defendants issued a press release that informed its stockholders of the Company's need to restate financial results for 2000 through the second quarter of 2005 in order to account for the misfeasance and mistakes of its Brazilian subsidiary. (Id. ¶ 32). This press release also announced the investigation of Bausch & Lomb's Korean subsidiary for improper sales and accounting practices. In response to these revela-

tions, Bausch & Lomb shares fell from $79.07 to $67.20. (Id. ¶ 33). Plaintiffs further allege that throughout this period, the individual defendants' engaged in insider trading and thus, profited enormously from the artificially inflated stock price that resulted from their previous misstatements and nondisclosures. (Laborer's Local 100 & 397 Pension Fund Am. Compl. ¶ 34; Brannon Compl. ¶ 53).

In addition, the consolidated securities class action cases, *Laborers Local 100 & 397 Pension Fund v. Bausch & Lomb*, the related case, *Police and Fire Retirement Sys. of Detroit v. Bausch & Lomb, Inc*, and the ERISA case, *Johnson v. Bausch & Lomb*, include allegations that the Defendants concealed reports that the Company's contact lens solution, ReNu, had been associated with a high incidence of a potentially-blinding eye infection, fusarium keratitis. According to these complaints, as early as July 2005, Defendants received at least five reports of fusarium keratitis eye infections in consumers that used their product. (Johnson Am. Compl. ¶ 98).

On Feb 21, 2006 the Singapore Ministry of Health issued a press release identifying 39 cases of fusarium keratitis eye infections, 34 of which were diagnosed in ReNu users. (Johnson Am. Compl. ¶ 101). Soon thereafter, Bausch & Lomb suspended sales of ReNu in Singapore. (Id.).

Plaintiffs allege that despite the reports from Singapore, Defendants continued to market ReNu as a safe product in the United States and deny that it was a risk factor for fusarium keratitis. (Id. ¶ 102). On March 8, 2006, the Centers for Disease Control and Prevention ("CDC") launched an investigation into fusarium keratitis cases in the United States. (Id. ¶ 103). Plaintiffs claim that the Defendants continued to downplay the seriousness of these reported eye infections and did not suspend sales of ReNu in the United States until April 10, 2006. (Id. ¶ 109). Once the Company announced that this, Bausch & Lomb's stock price fell approximately $12 a share in two days and closed, on April 12, 2006, at $45.61 per share. (Id. ¶ 110).

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2006 WL 1524590 (S.D.N.Y.)
(Cite as: 2006 WL 1524590 (S.D.N.Y.))

## II. PROCEDURAL HISTORY

On March 13, 2006, Laborers Local 100 and 397 Pension Fund filed the first class action lawsuit against Bausch & Lomb pursuant to the Securities Exchange Act of 1934, §§ 10(b) and 20(a) as well as Rule 1 0b-5 in the Southern District of New York ("SDNY"). The Complaint alleged that Bausch & Lomb, along with present and former officers and directors of the Company, made materially false and misleading statements when they failed to disclose problems with the Brazilian and Korean subsidiaries, and thus, artificially inflated the stock price. The Complaint was later amended on May 5, 2006 to enlarge the relevant class period to include allegations that the Defendants failed to disclose reports that one of its contact lens products, ReNu, may cause eye infections among its users.

*3 The class was noticed pursuant to the Private Securities Litigation Reform Act ("PSLRA") and lead plaintiff motions were due on May 12, 2006. Four lead plaintiff motions were filed with this Court.

In the interim, six other cases have been filed in the SDNY that allege securities laws violations based on the same or substantially similar events. On consent of the parties, two of those cases, *Brannon v. Bausch & Lomb, Inc.* and *Badaracco v. Bausch & Lomb, Inc.*, were consolidated with *Local 100 and 397 Pension Fund v. Bausch & Lomb* by Order issued on April 21, 2006. These cases allege that Bausch & Lomb made false representations about the financial health of the Company and failed to disclose that the Company's Brazilian and Korean subsidiaries were engaged in fraudulent accounting practices. The Order provides that 30 days after appointment of lead plaintiff, the lead plaintiff shall file a Consolidated Complaint. Consolidated Order, ¶ 5. Furthermore, all other cases that arise out of the same or substantially the same events shall be governed by the Consolidated Order. Consolidated Order, ¶ 7.

I accepted the remaining cases. They were clearly related and mine was the lowest docket number.

At a pre-trial conference on May 16, 2006, where counsel for all plaintiffs and defendants were present, the parties agreed to an expedited briefing schedule with regard to the Defendants' motion to transfer venue of these cases to the Western District of New York ("WDNY"). [FN2] Fully briefed motions were due in chambers by May 26, 2006.

> FN2. At this time, Defendants had only moved to transfer cases in the consolidated securities class actions but had expressed, both prior to and during the conference, their intent to transfer all cases in front of me to the WDNY.

## III. DISCUSSION

Defendants have filed three transfer of venue motions--one with regard to the ERISA action, another with regard to the two securities derivative actions, and the last with regard to the three consolidated securities fraud actions. Since the facts are substantially similar in all of these cases, all three transfer motions are analyzed together.

Pursuant to 28 U.S.C. § 1404(a), district courts may transfer a civil case to another district if transfer would be in the interest of justice and benefit "the convenience of the parties and witnesses." The decision to transfer a case is within the discretion of the district judge. *See also In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 117 (2d Cir.1992) ("[M]otions for transfer lie within the broad discretion of the district court."). Courts make a case-by-case determination based on the particular facts of the case and no single factor is determinative. *See Red Bull Assocs. v. Best Western Intern. Inc.,* 862 F.2d 963, 967 (2d Cir.1988) (stating that district courts have "considerable discretion ... to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.' ").

A two-step inquiry is required. First, courts establish whether the case could have been filed in the transferee district and if so, determine whether convenience and the interests of justice favor transfer.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1524590 (S.D.N.Y.)
(Cite as: 2006 WL 1524590 (S.D.N.Y.))

See, e.g., *Fuji Photo Film Co., Ltd. v. Lexar Media, Inc.,* 415 F.Supp.2d 370, 373 (S.D.N.Y.2006). Courts consider the following in making this determination: 1) plaintiff's choice of forum, 2) location of operative facts, 3) convenience of parties and witnesses, 4) location of documents and ease of access to sources of proof, 5) relative means of the parties, 6) forum's familiarity with the governing law, 7) trial efficiency, and 8) interests of justice. *Id.*

*4 The plaintiff's choice of forum is generally respected, unless the balance of factors clearly favors transfer. *See, e.g., Royal & Sunalliance v. British Airways,* 167 F.Supp.2d 573, 576 (S.D.N.Y.2001) (internal citation omitted). The defendant bears the burden of demonstrating that transfer is appropriate. *See, e.g., Toy Biz, Inc. v. Centuri Corp.,* 990 F.Supp.328, 330 (S.D.N.Y.1998).

### A. Proper Transferee Forum

At the outset, the parties do not dispute that these cases could have been properly brought in the Western District of New York. Pursuant to 15 U.S.C. § 78aa, venue is proper in securities cases in the district "wherein the defendant is found or is an inhabitant or transacts business." The same standard applies in ERISA actions. *See* 28 U.S.C § 1132(e)(2) (stating that an ERISA action can be brought in the district "where a defendant resides or may be found."). Defendant Bausch & Lomb is headquartered in Rochester, New York, which is in the jurisdiction of the WDNY.

### B. Transfer Factors

Thus, this motion turns on whether convenience and the interests of justice warrant transfer of all of these cases to the WDNY.

As a preliminary matter, it is beyond peradventure that it is significantly more efficient to try all of these cases together. Although the complaints allege violations of different laws, they all deal with the same or substantially the same events. None of

the parties dispute this point, as all of the plaintiffs with cases in the SDNY have agreed to try their cases in front of one Judge. Further, the defendants have never suggested they would prefer to try these cases in separate districts and, indeed, have moved to transfer all of the cases to the WDNY.

### 1. Plaintiff's Choice of Forum

It is well-established that a plaintiff's forum choice should not be disturbed "unless the balance of factors weighs strongly in favor of transfer." *Caville v. Malibu Toys, Inc.,* 2004 WL 1516799, * (S.D.N.Y. July 7, 2004). Defendants argue, however, that courts have accorded "little weight" to plaintiff's choice of forum in securities class actions, due in large part to the distribution of numerous plaintiffs across several districts in these cases. *See, e.g. In re AtheroGenics Sec. Litigation,* 2006 WL 851708, at *3.

Whether that's so or not here, the other factors are persuasive. For instance, neither the defendants nor the name plaintiffs, with the exception of the two plaintiffs in the derivative actions, reside in SDNY. The Company maintains no offices or employees in the SDNY and the Company's auditors, PricewaterhouseCoopers, are not here either. And even in the case of the derivative plaintiffs that reside here, their district of residence is not persuasive since those claims are brought on behalf of the Company, which is headquartered in the WDNY.

Further, the contacts between the SDNY and the events underlying plaintiffs' allegations are also limited. Courts have accorded less deference to a plaintiff's choice of forum if the case lacks material or significant contacts with that forum. *See, e.g., Orb Factory, Ltd. v. Design Science Toys, Ltd.,* 6 F.Supp.2d 203, 210 (S.D.N.Y.1998). Plaintiffs do not allege, nor can they, that any of the allegedly false or misleading statements were issued from anywhere within this forum. Although Plaintiffs correctly point out that Bausch & Lomb's stock is traded on the New York Stock Exchange ("NYSE"), which is located in the SDNY, and

many of the analysts who follow Bausch & Lomb stock are located in New York City, these contacts don't do it. If they did, the SDNY would have even more business and every plaintiff that sued a NYSE firm could nestle in right here at 500 Pearl Street.

\*5 For these reasons, I accord less deference to the plaintiff's choice of forum in this case.

## 2. Location of Operative Facts

Plaintiffs argue that this factor does not support transfer because the events underlying these cases occurred all over world. I disagree.

No one disputes that the key facts in this case involve the allegedly false and misleading statements issued by the Company from their Rochester headquarters. Plaintiffs concede as much. See Diane Johnson Memorandum of Law in Opposition at 6 ("In this case, the operative events at issue will be the false and misleading statements made by the Company."); See also Gaetano Rainone Memorandum of Law in Opposition at 4 ("Although many of the operative facts giving rise to this litigation emanate from Bausch & Lomb's corporate headquarters in Rochester, New York, the Western District of New York is not the "center of gravity" as the Defendants would have this Court believe.").

Courts in this District have found that in securities fraud cases, misrepresentations and omissions are deemed to occur in the district from which they are transmitted or withheld, not where they are received. In re AtheroGenics Sec. Litig. 2006 WL 851708, \*3 (S.D.N.Y.) (internal quotations and citations omitted). In this case, all of the press releases and corporate filings, as well as the alleged misstatements, originated at Bausch & Lomb headquarters in Rochester. Plaintiffs do not demonstrate that any other forum has more substantive contacts with the facts underlying these cases, although it may be true that relevant facts may also be found in Brazil, Korea, and New York City for that matter. For these reasons, this factor favors transfer to the WDNY.

## 3. Convenience of Parties

Only two of the name plaintiffs reside in the SDNY. The majority of the individual defendants reside near or in Rochester and the Company is headquartered there also. Geisel Decl. ¶¶ 16(a)-(e). There is no question that it would be more convenient for the Defendants to litigate the case in the forum in which they reside. Since few of the name plaintiffs live in the SDNY, it really does not matter to them whether its tried here, except perhaps for their lawyers. In fact, for the majority of the plaintiffs, they would have to travel to the forum state anyway, and the difference between a flight to New York City as compared to Rochester is hardly a cogent distinction.

As plaintiffs point out, it is true that it would not be a substantial burden for Defendants to litigate the case in the SDNY, given the proximity of the two Districts. However, plaintiffs failed to show that it is more convenient for them to litigate the case here. They simply opine that all the plaintiffs have expressed a preference to be here.

## 4. Convenience of Witnesses

This factor is arguably the most important in deciding transfer motions, and in this case, weighs in favor transfer. See AEC One Stop Group. Inc. v. CD Listening Bar, Inc., 326 F.Supp.2d 525, 529 (S.D.N.Y.2004) (internal citation omitted). This case involves, in large part, statements that were made in press releases issued by the Company. Thus, the key witnesses in this case will be those Bausch & Lomb employees that participated in creating and issuing these statements. Plaintiffs do not dispute that those individuals either are located at the Company headquarters in Rochester, N.Y. or do not reside in New York State at all. Further, the Plaintiffs have not even identified any witnesses, or more importantly, any that reside in the SDNY. For these reasons, this factor favors transfer.

## 5. Location of Documents and Ease of Access to Sources of Proof

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2006 WL 1524590 (S.D.N.Y.)
(Cite as: 2006 WL 1524590 (S.D.N.Y.))

*6 Defendants argue that this factor favors transfer because the majority of relevant documents, if stored in New York State, will be found in Rochester. While doubtless true, given the relative ease with which documents can be transported today, I find that this factor is neutral.

*6. Relative Means of the Parties*

Neither party argues that their financial situation would affect their ability to conduct this trial in either forum, thus this factor is neutral.

*7. Forum's Familiarity with the Governing Law*

Since all of these cases are brought pursuant to federal law and Defendants seek transfer from one federal court to another, this factor must also be assessed neutral.

*8. Trial Efficiency and the Interests of Justice*

Plaintiffs argue that a comparison of the dockets of SDNY and WDNY judges, 689 and 786 cases respectively, favor keeping the case here. *See, e.g. AtheroGenics Sec. Litig.*, 2006 WL 851708, *5 (S .D.N.Y. Mar. 31, 2006) (internal citation omitted) (according docket congestion weight in transfer analysis). However, in the alternative, Defendants compare the median time for civil cases to move from filing to disposition in the SDNY and the WDNY, 8.8 months and 10.2 months respectively. While these statistics may well be true, they do not mean much, but for the sake of argument, I'll credit them and call it a draw.

But, as mentioned at the outset, trial efficiency and the interests of justice militate in favor of trying these cases together. Therefore, if venue is not proper in the SDNY with regard to one case, judicial economy would favor transferring all of the cases.

Although raised at the eleventh hour in their reply papers, [FN3] Defendants argue, with regard to the two derivative securities actions, that venue is not proper in the SDNY. Although for our purposes

here it not necessary to decide this matter, it is an open question, to say the least, whether plaintiffs allege enough contacts with the SDNY to vest venue here pursuant to 28 U.S.C. § 1391. This provision provides, in relevant part, that: [FN4]

> FN3. Defendants, rather than providing plaintiffs with notice of this argument before opposition papers were due--they had a week after the pre-trial conference to do this--instead elected to raise this novel argument in their reply.

> FN4. Neither side argues that any other section of 28 U.S.C. § 1391 would be applicable.

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in ... (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

28 U.S.C. § 1391(b)(2). In other words, plaintiffs in the derivative actions must allege that a substantial portion of the events with regard to the alleged misstatements occurred in the SDNY. Since I am skeptical that the derivative plaintiffs in fact do this, I find that this factor also favors transfer.

**IV. CONCLUSION**

On balance, since convenience as well as the interest of justice favor transfer of this matter to the Western District of New York, this motion to transfer venue for all of these cases is granted. The Clerk of the Court is instructed to close this matter and remove it from my docket.

**\*7 IT IS SO ORDERED.**

Not Reported in F.Supp.2d, 2006 WL 1524590 (S.D.N.Y.)

END OF DOCUMENT

.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1984 WL 327 (S.D.N.Y.)
(Cite as: 1984 WL 327 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court; S.D. New York.
QUESTECH CAPITAL CORPORATION,
Plaintiff,
v.
FLIGHT DYNAMICS, INC., Defendant.
No. 83 Civ. 6986 (GLG).

May 7, 1984.

SHEA & GOULD 330 Madison Avenue New York, New York 10017, for plaintiff; By: Joseph Ferraro, Esq. Kenneth S. Grossman, Esq. of counsel.

WINTHROP, STIMSON, PUTNAM & ROBERTS 40 Wall Street New York, New York 10005 By: William W. Karatz, Esq. Julie D. Fay, Esq. of counsel.

ACKER, UNDERWOOD & SMITH 1200 Orbanco Building 1001 SW Fifth Avenue Portland, Oregon 97204, for defendant; By: Timothy N. Brittle, Esq. of counsel.

OPINION

GOETTEL, District Judge:

*1 Defendant Flight Dynamics, Inc. ('Flight Dynamics') moves to transfer this action to the United States District Court for the District of Oregon pursuant to 28 U.S.C. § 1404(a) (1982). [FN1] Plaintiff Questech Capital Corporation ('Questech') opposes this motion on the ground that the convenience of the parties and witnesses and the interest of justice will not be furthered by the transfer.

Questech is a Delaware corporation with its principal place of business in New York. It is in the business of, among other things, lending money to worthy, start-up or development stage companies that are unable to obtain funding from other sources. Flight Dynamics is a small research and development firm incorporated in Oregon with its principal place of business in that state.

By an agreement dated April 8, 1981 (the 'Loan Agreement'), Questech agreed to lend $500,000 to Flight Dynamics. Flight Dynamics in turn issued a promissory note (the 'Note') to Questech, whereby Flight Dynamics agreed to repay the principal within five years and to make quarterly interest payments on the unpaid principal amount at the rate of 15% per year. The Loan Agreement provided that, in the event of default, the holder of the Note could declare the entire unpaid principal and accrued interest to be due. The Loan Agreement further provided that the holder of the Note could exercise the right to convert the principal amount of the Note into common stock of Flight Dynamics.

Questech alleges that, in the early part of 1982, it became aware that Flight Dynamics was in violation of certain covenants of the Loan Agreement, which constituted default. When brought to its attention, Flight Dynamics denied the existence of the violations, although the parties entered into negotiations at that time in an attempt to effect a waiver or compromise of the alleged violations.

On March 29, 1982, Questech advised Flight Dynamics that a default occurred and was continuing and, therefore, Questech was declaring the principal and interest on the Note due and payable. In April 1982, Flight Dynamics commenced an action in the Oregon state court seeking a declaratory judgment that there was no default and that Questech was not entitled to acceleration of the loan. Questech answered and asserted a counterclaim for breach of the Loan Agreement seeking judgment for the amount of the Note and interest.

In early fall of 1982, the parties met in New York to discuss the Oregon action and the parties' relationship. Shortly thereafter, on October 25, 1982, Flight Dynamics delivered to Questech a cashier's check in the amount of $516,208.3o representing the full payment of the principal and interest then due and owing under the Note.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1984 WL 327 (S.D.N.Y.)
(Cite as: 1984 WL 327 (S.D.N.Y.))

Sometime later, Questech asserted a demand to exercise its right to convert the Note into common stock of Flight Dynamics. Flight Dynamics refused and subsequently amended its complaint in the Oregon action seeking a judgment declaring that Questech could not compel the issuance of the stock. Questech amended its counterclaim arguing that Flight Dynamics had engaged in a deliberate course of conduct designed to mislead Questech as to Flight Dynamics' financial status, and thus causing Questech to forbear from exercising its right to convert the Note into stock. In support of this claim, Questech alleged it was not informed, as it should have been, about certain negotiations between Flight Dynamics and Pacific Telecom, Inc. ('Pacific Telecom'), a majority shareholder in Flight Dynamics, and Arthur Young & Company ('Arthur Young'), the outside accountant of Flight Dynamics. Questech sought a judgment declaring that it was entitled to receive stock pursuant to the Loan Agreement, and ordering Flight Dynamics to convert the principal amount of the Note into stock at the conversion rate specified in the Loan Agreement.

*2 On November 4, 1983, ten days prior to commencement of trial on the Oregon action, Questech withdrew its counterclaims and decided not to go to trial on any issue. On January 27, 1984, the Oregon court entered a default judgment against Questech, and held that Flight Dynamics' tender of a check to Questech was a conditional payment of Flight Dynamics' debt under the Loan Agreement. The court further held that Flight Dynamics was under no affirmative duty to perform and additional acts unless its check was dishonored. Flight Dynamics, Inc. v. Questech Capital Corp., No. A 8204-02006, slip op. at 3 (Cir. Ct. St. of Or., Cty of Multnomah Jan. 27, 1984).

Questech commenced the present action in October 1983, after the Oregon action had been pending for eighteen months. Questech's first claim is for breach of the Loan Agreement and its second claim is for violations of section 10(b) of the Securities

Exchange Act of 1934, Rule 10b-5 promulgated thereunder, and section 352-c of the New York General Business Law, as well as common law fraud. Facts that were at issue in the Oregon action are alleged as the basis for these claims. In particular, Questech alleges that Flight Dynamics made misrepresentations about its financial condition and prospects, and that Questech was not informed, as it should have been, about alleged discussions with Pacific Telecom and an alleged audit report prepared by Arthur Young.

Presently before the Court is Flight Dynamics' motion to transfer this action to the District Court of Oregon. Section 1404(a) of title 28 of the United States Code provides that, 'for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.' [FN2]

The disposition of a motion to transfer based on the above is committed to the sound discretion of the trial court. Leif Hoegh & Co. v. Alpha Motor Ways, Inc., 534 F. Supp. 624, 626 (S.D.N.Y. 1982). In exercising this discretion, courts have enumerated the approximately half dozen interrelated criteria that are considered. These criteria include:
   (1) the convenience to parties; (2) the convenience of witnesses; (3) the relative ease of access to sources of proof; (4) the availability of process to compel attendance of unwilling witnesses; (5) the cost of obtaining willing witnesses; (6) the practical problems indicating where the case can be tried more expeditiously and inexpensively; and (7) the interests of justice, a term broad enough to cover the particular circumstances of each case, which in sum indicate that the administration of justice will be advanced by a transfer. Schneider v. Sears, 265 F. Supp. 257, 263 (S.D.N.Y. 1967).

While the criteria afford some guidance, no magical formula exists for deciding these motions. Instead, 'the court must consider all the circumstances surrounding the individual case to determine where the

Not Reported in F.Supp.
Not Reported in F.Supp., 1984 WL 327 (S.D.N.Y.)
(Cite as: 1984 WL 327 (S.D.N.Y.))

Page 3

trial [should] proceed . . . .' Contractors Supply Corp. v. Kelly Klosure, Inc., No. 80- 4327, slip op. at 8 (S.D.N.Y. Feb. 20, 1981). Upon balancing the convenience and equities of the two district courts--New York and Oregon--as between the parties, the Court has determined that the action should be transferred to the District Court of Oregon.

\*3 The central issues in this case are whether Flight Dynamics breached the Loan Agreement and, subsequently, fraudulently induced Questech to forbear from exercising its right under the Loan Agreement to convert the principal amount of the Note into common stock of Flight Dynamics.

With the exception of three of Questech's officers in New York, it appears that all persons familiar with the subject matter of this action, who are potential witnesses, reside in Oregon. [FN3] Clearly, it would be more convenient for the four Flight Dynamics employees who dealt with Questech, and reside in Oregon, to have this action transferred. Of course, this factor taken alone would only balance the equities between the two district courts and thus be insufficient to support transferral. The importance of non-party witnesses in this action, however, strongly supports the conclusion that the action should be transferred to Oregon.

Questech's claims are for fraud and misrepresentation. The importance of live testimony in a case involving fraud is obvious. 'Since deposition testimony in a fraud case where credibility is crucial is not wholly satisfactory, transfer is warranted.' Helfant v. Louisiana & Southern Life Insurance Co., 82 F.R.D. 53, 58 (E.D.N.Y. 1979). The non-party witnesses whose testimony would be of critical importance and all of whom are residents of Oregon, are Mr. Schembs, former president of Flight Dynamics and the only Flight Dynamics representative specifically named by Questech as having made the allegedly false and misleading statements, and representatives of Pacific Telecom and the Portland, Oregon, office of Arthur Young.

None of these non-party witnesses could be com-

pelled to appear in New York, [FN4] but each of them could be compelled to appear by order of the Oregon District Court. Where the burden of testifying in New York, as opposed to Oregon, both as regards time and expense, would be so great for the non-party witnesses, transfer is warranted to ensure they can be compelled to appear. Commercial Solvents Corp. v. Liberty Mutual Insurance Co., 371 F. Supp. 247, 250 (S.D.N.Y. 1974) ('Courts generally transfer cases when important witnesses cannot be compelled to testify in the forum, but could be subpoenaed in the transferee court.').

An additional consideration is the fact that there has been a final determination in the Oregon action, arising out of the same events alleged here, that binds the parties on the causes of action and issues decided by the state court. The res judicata effect of the Oregon court's judgment will be determined by reference to Oregon law. [FN5] See 28 U.S.C. § 1738 (1982) ( 'The . . . judicial proceedings of any court of any such State . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State.'). Interpretation of a state's law is best left to the federal district court of that state, which is most familiar with it. Trover v. Kareagi, 488 F. Supp. 1200, 1207 (S.D.N.Y. 1980); Kreisner v. Hilton Hotel Corp., 468 F. Supp. 176, 179 (E.D.N.Y. 1979).

\*4 Another factor that weighs in favor of transfer is that both parties have been represented in Oregon for nineteen months by counsel who were scheduled to commence trial on November 14, 1983. [FN6] Oregon counsels' familiarity with the events at issue would substantially reduce the expense of litigation. See Hall v. Kittay, 396 F. Supp. 261, 264 (D. Del. 1975).

In summary, to the extent that virtually all non-party witnesses reside in Oregon, and that a prior action involving essentially the same issues, at least with regard to the state claims, was decided in that state, the District Court of Oregon is the logical forum to preside over this action.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1984 WL 327 (S.D.N.Y.)
(Cite as: 1984 WL 327 (S.D.N.Y.))

Under these circumstances, although the convenience of the parties is evenly balanced, the convenience of the witnesses and other interests of justice are overwhelmingly served by the transfer of this action. The action is, therefore, transferred to the United States District Court for the District of Oregon.

SO ORDERED.

> FN1 Flight Dynamics had made a motion to transfer or, in the alternative, to stay this proceeding pending completion of a related Oregon action, as discussed below. The Court, at the time, decided to reserve decision until the Oregon action was completed. Now that final judgment has been entered in that action, the Court will now rule on the motion to transfer.

> At the same time as Flight Dynamics' motion, Questech cross-moved for a default judgment pursuant to Rule 55 of the Federal Rules of Civil Procedure. Questech alleged as the basis for its motion the 'defendant's failure to answer or move with respect to the complaint.' It is clear, however, that Flight Dynamics' motion to stay all proceedings until final determination of the action pending between the parties in the Circuit Court for the State of Oregon, tolled its time to answer or otherwise move with respect to the complaint. Cf. Parker v. Transcontinental & Western Air, Inc., 4 F.R.D. 325, 326 (W.D. Mo. 1944) (the court denied the plaintiff's motion for default judgment, expressly stating that it was only after decision on the defendant's motion to stay the proceedings that 'it then became the duty of the defendant to file motions or other proceedings in the case'); 2A J. Moore & J. Lucas, Moore's Federal Practice ¶12.05 at 2240 n.1 (2d ed. 1948 & Supp. 1983). A motion to stay proceedings has been characterized as a pre-answer motion which, because it

> involves matters of judicial administration, is within the inherent powers of the court incident to the court's authority to regulate actions pending before it. 5 C. Wright & A. Miller, Federal Practice & Procedure, § 1360 at 633-34 (1969 & Supp. 1984).

> As the Court withheld judgment on the stay of this action, Flight Dynamics was under no affirmative duty to file further motions or proceedings.

> FN2 As a threshold matter, there can be no dispute that this action might have been brought in Oregon, where Flight Dynamics is incorporated and transacts business.

> FN3 Questech can obviously make any of its officers available for testimony in Oregon if necessary, and, in this regard, it should be noted that only Mr. Brian, the president of Questech, is mentioned in Questech's complaint as a representative of Questech to whom misrepresentations were made.

> FN4 Questech suggests, however, that Pacific Telecom and Arthur Young have an interest in testifying on Flight Dynamics' behalf, and that Schembs's live testimony would be unnecessary. This argument ignores that, in the first instance, the convenience of these witnesses would be best served in Oregon. Furthermore, Questech's argument that the testimony of Schembs may not be necessary is curious at best. Questech cannot seriously be suggesting that the testimony of others, or documentary evidence, would render unnecessary the testimony of the only individual alleged to have made misrepresentations.

> FN5 The affidavit of Questech's president, Mr. Brian, briefly addresses the point, raised nowhere else in Questech's papers, that the Loan Agreement provided that New York state law would govern any dis-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1984 WL 327 (S.D.N.Y.)
(Cite as: 1984 WL 327 (S.D.N.Y.))

pute arising under the Loan Agreement.
Questech, however, does not contest trans-
ferral on this basis.

FN6 Questech withdrew its counterclaims
and thus decided not to try the case only
ten days before the Oregon trial was sched-
uled to commence. Judge Dooley stated:
You [Questech's counsel] are not the guy
who decided to file a last-minute complaint
in the Southern District of New York. You
had this matter prepared, at least insofar as
the pleadings and pretrial matters are con-
cerned, you had it prepared to try right
here. Someone in the main office on
madison Avenue or Wall Street or some-
where apparently decided that they would
either have a more favorable or perhaps
more profitable-to-them forum on the east
coast.
Defendant's Reply Memorandum in Sup-
port of the Motion to Transfer, Exhibit A,
Transcript of the Proceedings in the Circuit
Court of the State of Oregon for the
County of Multnomah at 22.

Not Reported in F.Supp., 1984 WL 327 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 236440 (S.D.N.Y.)
(Cite as: 2005 WL 236440 (S.D.N.Y.))

Page 1

**C**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
RAVENSWOOD INVESTMENT COMPANY, LP,
Robotti & Company, Inc. and Robotti &
Company, LLC, Plaintiffs,
v.
BISHOP CAPITAL CORP., Robert E. Thrailkill,
Robert J. Thrailkill, and Sherry L.
Moore, Defendants.
No. 04CV9266KMK.

Feb. 1, 2005.

William C. Rand, Law Office of William Coudert
Rand, New York, New York, for Plaintiffs.

Richard A. Beran, Steven A. Beckelman, McCarter
& English, LLP, New York, New York, for De-
fendants.

*OPINION AND ORDER*
KARAS, J.

*1 Plaintiffs Ravenswood Investment Company,
LP, Robotti & Company, Inc., and Robotti & Com-
pany, LLC ("Plaintiffs"), on their own behalf and
derivatively on behalf of Bishop Capital Corp.,
bring this action under, *inter alia,* Sections 10,
14(a), 20(a) of the Securities Exchange Act of 1934
("the 1934 Act"), 15 U.S.C. §§ 78i(b), 78n, 78t
(West 1997 & Supp.2004), Rule 10b-5 promulgated
thereunder, 17 C.F.R. § 240.10b-5 (2004), and vari-
ous provisions of the Wyoming Business Corpora-
tions Act against Bishop Capital Corp. ("Bishop
Capital"), Bishop Capital's President, Chairman,
and Chief Executive Officer, Robert E. Thrailkill,
and two of its directors, Robert J. Thrailkill and
Sherry L. Moore ("Defendants"). Plaintiffs seek to
block a shareholder vote of a proposed reverse
stock split transaction that would, in effect, take
Bishop Capital private and relieve it of its reporting
requirements under the 1934 Act. In particular,

Plaintiffs allege that Defendants have fraudulently
misrepresented and/or omitted material facts re-
garding the assets of Bishop Capital, thereby under-
valuing the company and falsely inducing share-
holders to approve the proposed transaction. De-
fendants counter by moving for dismissal under
Fed.R.Civ.P. 12(b)(1) and (6), or in the alternative,
for transfer of this case to the District of Wyoming
pursuant to 28 U.S.C. § 1404(a). For the reasons set
forth on the record on December 21, 2004 and
herein, the motion to transfer is granted.

*I. Background*

*A. Facts*

The relevant facts are as follows: Robert E. Robotti
is the President and Treasurer of plaintiffs Robotti
& Company, Inc. and Robotti & Company, LLC,
and a managing member of Ravenswood Manage-
ment Company, LLC, which is the general partner
of plaintiff Ravenswood Investment Company, LP
("Ravenswood"). (Robotti Decl. ¶ 1) As of Novem-
ber 5, 2004, Plaintiffs owned approximately 55,000
shares of Bishop Capital stock, or approximately
5.7% of the approximately 969,127 shares outstand-
ing. (Compl. ¶ 24; 12/9/04 Tr. at 10) Plaintiffs are
all located in New York. (Compl.¶¶ 6-8)

Defendant Bishop Capital is a Wyoming corpora-
tion that has its principal place of business in River-
ton, Wyoming, where it keeps its corporate records.
(Moore Decl. ¶¶ 2-3; Compl. ¶ 9) It is a small busi-
ness that develops and operates real estate assets
owned directly and through partnership interests,
and that owns an interest in royalties from natural
gas leases. (Robert E. Thrailkill Decl. ¶ 3) Bishop
Capital's assets are located only in Wyoming and
Colorado, and the company conducts no business in
New York. (Moore Decl. ¶¶ 5-9) Defendants Moore
and Robert E. Thrailkill reside in Riverton, Wyom-
ing, while Defendant Robert J. Thrailkill resides in
Phoenix, Arizona. (Moore Decl. ¶ 10)

In December 2003, Bishop Capital filed a prelimin-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 236440 (S.D.N.Y.)
(Cite as: 2005 WL 236440 (S.D.N.Y.))

ary Schedule 14A proxy statement with the Securities and Exchange Commission ("SEC"). (Robert E. Thrailkill Decl. ¶ 9) Bishop Capital made modifications to the proxy statement after consultation with the SEC, and on or about October 12, 2004, filed a final proxy statement with the SEC. (Compl. ¶ 15; Robert E. Thrailkill Decl. ¶ 10) [FN1] Bishop Capital mailed the final proxy statement to shareholders on or about November 12, 2004. (Compl.¶ 15) The proxy statement solicited proxies to vote at a special shareholders meeting on December 16, 2004 ("the special shareholders meeting") to approve an amendment to the company's articles of incorporation to effect a 1 for 110 reverse stock split and the repurchase of fractional shares at $1.00 per share. (Compl.¶¶ 15-16, 21) The proposed transaction would have the effect of reducing the number of shareholders of record to below 300 and permit the company to go private. (Compl.¶ 15)

> FN1. Between January and October 2004, Ravenswood made several offers to purchase all the shares of Bishop Capital at prices ranging from $1.00 to $2.00 per share. (Robert E. Thrailkill Decl. ¶¶ 14-17)

*B. Procedural History*

**\*2** Plaintiffs initiated this case on their behalf and derivatively on behalf of Bishop Capital on November 23, 2004. The Complaint is in nine counts and includes alleged violations of the 1934 Act and the Wyoming Business Corporations Act. Plaintiff's primary claim is that Defendants made "false, misleading and unlawful" statements in the proxy statement mailed to shareholders on November 12, 2004 in violation of Section 14(a) of the 1934 Act. (Compl.¶ 1) In particular, Plaintiffs accuse Defendants of misleading the shareholders into believing that the fair value of Bishop Capital's stock is $1.00 per share, the price to be paid to fractional shareholders, when in fact the fair value of the stock is as high as $9.26 per share. *Id.* Plaintiffs contend that the falsely deflated valuation derives from a number of misleading statements regarding the value of Bishop Capital's various assets. For ex-

ample, Plaintiffs assert that Bishop Capital's interest in its gas royalties is worth in excess of $3.2 million, and not $351,605, as claimed in the proxy statement, and that its property assets are worth approximately $8.5 million more than reflected in the proxy statement. (Compl.¶¶ 28-50) Plaintiffs also allege that by failing to hold any shareholder meetings since Bishop Capital became a public company in 1997, and by failing to obtain shareholder approval for distribution of shares to Moore and the Thrailkills, Defendants breached their fiduciary duties to the shareholders. (Compl.¶¶ 67-77) The Complaint requests monetary and injunctive relief, including an order barring Defendants from going forward with the special shareholders meeting and/or consummating the reverse stock split transaction.

On December 3, 2004, Plaintiffs filed an Order to Show Case for a Temporary Restraining Order and a Preliminary Injunction seeking, *inter alia,* to restrain Defendants from holding the special shareholders meeting. On December 8, 2004, Defendants submitted opposition papers in response to Plaintiffs' Order to Show Cause, and simultaneously cross-moved to dismiss the Complaint or, in the alternative, to transfer the case to the District of Wyoming under 28 U.S.C. § 1404(a). At the Court's suggestion, the parties agreed to a standstill whereby the special shareholders meeting would be held but, if the proposed stock split was approved, nothing would be done to implement the transaction. [FN2] (Stipulation and Order, 12/14/04) After hearing oral argument on December 21, 2004, the Court granted Defendants' motion to transfer venue. This Opinion supplements and incorporates the reasons earlier provided by the Court. [FN3]

> FN2. The parties have reported that the proposed transaction was approved at the special shareholders meeting.
>
> FN3. Because the Court grants Defendants' motion to transfer this case to the District of Wyoming, Defendants' motion to dismiss need not be decided here. *See Eisenberg v. Wachovia Bank, N.A.,* No. 00 Civ.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 236440 (S.D.N.Y.)
(Cite as: 2005 WL 236440 (S.D.N.Y.))

Page 3

7910, 2001 WL 30452, at *1 (S.D.N.Y. Jan. 11, 2001) (granting motion to transfer venue and therefore not deciding Rule 12(b)(6) motion).

## II. Discussion
### A. Applicable Standards

Section 1404(a) permits the transfer of any civil action to any other district where the case might have been brought, as long as such a transfer serves "the convenience of parties and witnesses, [and is] in the interest of justice." 28 U.S.C. § 1404(a). "This section is a statutory recognition of the common law doctrine of *forum non conveniens* as a facet of venue in the federal courts." *Wilshire Credit Corp. v. Barrett Capital Mgmt. Corp.*, 976 F.Supp. 174, 180 (W.D.N.Y.1997). The purpose of Section 1404(a) is to "prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.' " *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (quoting *Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26, 27 (1960)). As such, the "core determination under § 1404(a) is the center of gravity of the litigation...." *Hubbell Inc. v. Pass & Seymour, Inc.*, 883 F.Supp. 955, 962 (S.D.N.Y.1995).

*3 "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.' " *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen*, 376 U.S. at 622); *see also In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 117 (2d Cir.1992) ( "[M]otions for transfer lie within the broad discretion of the district court and are determined upon notions of convenience and fairness...."). "The burden of demonstrating the desirability of transfer lies with the moving party, and in considering the motion for transfer, a court should not disturb a plaintiff's choice of forum 'unless the defendants make a clear and convincing showing that the balance of convenience favors defendants' choice.' " *Linzer v. EMI Blackwood Music, Inc.*, 904 F.Supp. 207, 216 (S.D.N.Y.1995)

(quoting *Hubbell, Inc.*, 883 F.Supp. at 962). "The defendant moving for a transfer must, therefore, demonstrate 'that transfer is in the best interests of the litigation.' " *Linzer*, 904 F.Supp. at 216 (quoting *Eskofot A/S v. E.I. du Pont de Nemours & Co.*, 872 F.Supp. 81, 95 (S.D.N.Y.1995)).

In determining whether transfer is appropriate, the court may consider the following factors: (a) the convenience of witnesses; (b) the convenience of the parties; (c) the locus of operative facts; (d) the location of relevant documents and relative ease of access to sources of proof; (e) the availability of process to compel the attendance of unwilling witnesses; (f) the forum's familiarity with the governing law; (g) the relative financial means of the parties; (h) the weight afforded plaintiff's choice of forum; and (i) trial efficiency and the interests of justice. *In re Stillwater Mining Co. Sec. Litig.*, No. 02 Civ. 2806, 2003 WL 21087953, at *3 (S.D.N.Y. May 12, 2003); *Lewis v. C.R.I., Inc.*, No. 03 Civ. 651, 2003 WL 1900859, at *2 (S.D.N.Y. Apr. 17, 2003); *Cento Group, S.P.A. v. OroAmerica, Inc.*, 822 F.Supp. 1058, 1060 (S.D.N.Y.1993); *Hernandez v. Graebel Van Lines*, 761 F.Supp. 983, 987 (E.D.N.Y.1991).

### B. Application

The threshold consideration in a transfer motion is whether venue is proper in the proposed transferee district. *See Adair v. Microfield Graphics, Inc.*, No. 00 Civ. 0629, 2000 WL 1716340, at *1 (S.D.N.Y. Nov. 16, 2000). In this case, as Plaintiffs note, venue is governed by Section 27 of the 1934 Act, 15 U.S.C. § 78aa, which provides that venue is proper in any district in which an "act or transaction constituting the violation occurred," or where "the Defendant is found or is an inhabitant or transacts business." Here, Defendants propose the District of Wyoming, which is home to two of the individual Defendants and the lone corporate Defendant, and where the allegedly false and misleading proxy statements originated. Thus, as Plaintiffs conceded at oral argument, the District of Wyoming is a proper venue for this case. (*See* 12/21/04 Tr. at 20)

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 236440 (S.D.N.Y.)
(Cite as: 2005 WL 236440 (S.D.N.Y.))

Page 4

*4 Next is the weighing of the above-listed factors to determine the best interests of the litigation. Taking them in turn, the balance of these factors overwhelmingly favors transfer of this action to the District of Wyoming.

*Convenience of Witnesses*

This is generally considered the most important factor in deciding a venue transfer motion. *See D'Angelo v. Amtrak Ros.,* No. 03 Civ. 2560, 2004 WL 2049262, at *3 (S.D.N.Y. Sept. 13, 2004); *Schauder v. Int'l Knife & Saw, Inc.,* No. 02 Civ. 8361, 2003 WL 1961611, at *3 (S.D.N.Y. Apr. 28, 2003). The convenience of witnesses is a matter of " 'the materiality, nature, and quality of each witness, not merely the number of witnesses in each district." ' *D'Angelo,* 2004 WL 2049262, at *3 (quoting *Royal & Sunalliance v. British Airways,* 167 F.Supp.2d 573, 577 (S.D.N.Y.2001)). Meeting Plaintiffs' explicit challenge to identify any witnesses who would be inconvenienced by this action remaining in New York (Pls.' Mem. Law at 12), Defendants produced a list of nine possible non-party witnesses, all of whom reside in either Wyoming or Colorado and all of whom would offer testimony regarding the valuation of Bishop Capital's assets in those states or, in the case of the witnesses from Colorado, Bishop Capital's financial affairs. (Robert E. Thrailkill Supplemental Decl. ¶¶ 2-5) [FN4] The inconvenience to these potentially critical witnesses is obvious on its face and weighs strongly in favor of transfer. *See Stillwater Mining,* 2003 WL 21087953, at *4 (noting that all fifteen defense witnesses lived in transferee state (Montana) or nearby states (Colorado and Arizona)); *In re Nematron Corp. Sec. Litig.,* 30 F.Supp.2d 397, 400-01 (S.D.N.Y.1998) (explaining that transfer was favored where majority of defense non-party witnesses resided in transferee state); *Fontana v. E.A.R., a Div. of Cabot Corp.,* 849 F.Supp. 212, 214 (S.D.N.Y.1994) (explaining that transfer to Wyoming was appropriate where all relevant third-party witnesses resided in Wyoming).

FN4. For example, Defendants have identi-

fied William Graves of Riverton, Wyoming, as being a petroleum geologist with whom defendant Robert E. Thrailkill spoke regarding the value of Bishop Capital's natural gas royalty interests, as well as William N. and Patricia Spratt of Lysite, Wyoming as being potential witnesses about Bishop Capital's royalty interests. (Robert E. Thrailkill Supplemental Decl. ¶ 2) Defendants also have identified Steven Engel, Chris Smith and James Spittler of Colorado Springs, Colorado, and Larry Unruh, Todd Gress and Jim Brendel of Denver, Colorado as being potential witnesses regarding Bishop Capital's other property interests and its financial affairs in general. (Robert E. Thrailkill Supplemental Decl. ¶¶ 3-5) Colorado Springs and Denver are only 170 and 101 miles, respectively, from Cheyenne. (Moore Decl. ¶ 12)

On the other side of the ledger, Plaintiffs have identified no witnesses other than Mr. Robotti, a principal in the plaintiff companies. However, "[i]t it is well known that trials in securities fraud [cases] focus almost entirely on the defendants' conduct." *Nematron Corp.,* 30 F.Supp. at 402. While Robotti may "reside[ ] in New York, and New York obviously is the most convenient forum for him, his testimony will most likely concern the more straightforward topic of the actual sale and purchase of the stock, and, as such is less likely to be as controversial, complex, or extensive as that of the witnesses proposed by" Defendants residing in and near Wyoming. *Id.; see also Morgan Guar. Trust Co. of N.Y. v. Tisdale,* No. 95 Civ. 8023, 1996 WL 544240, at *5 (S.D.N .Y. Sept. 25, 1996) ("Assessing the degree to which a transfer would inconvenience witnesses entails not merely counting the parties' prospective witnesses, but considering which are likely to provide important testimony."). [FN5] Thus, under these circumstances, the residence of Plaintiffs' potential fact witnesses "has diminished relevance." *Nematron Corp.,* 30

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 236440 (S.D.N.Y.)
(Cite as: 2005 WL 236440 (S.D.N.Y.))

Page 5

F.Supp.2d at 403.

> FN5. Counsel for Plaintiffs conceded at or-
> al argument that he had not determined
> whether Mr. Robotti was going to be an
> expert witness regarding the proper valu-
> ation of Bishop Capital's assets, and, in
> fact, that he had not yet identified an ex-
> pert to substantiate Plaintiffs' claims
> against Defendants regarding the fair value
> of Bishop Capital's stock. (12/21/04 Tr. at
> 23)

*Convenience of the Parties*

\*5 The convenience to the parties also weighs
heavily in favor of transfer. On this point, the facts
of this case precisely mirror those in *Stillwater
Mining,* only in that case the transferee forum was
the District of Montana. Here, to paraphrase Judge
Chin's analysis in that case, "[t]wo of the three indi-
vidual defendants reside within the District of
[Wyoming], [Bishop Capital's] headquarters are
also in the District of [Wyoming], and [Bishop
Capital] has no offices in the Southern District of
New York." *Stillwater Mining,* 2003 WL 21087953,
at *4. Moreover, as was true in *Stillwater Mining,*
because "the facts giving rise to this action lie with-
in the knowledge of the officers and employees of
[Bishop Capital] who participated in creating and
disseminating the allegedly false and misleading
statements," any inconvenience to a New York-
based Plaintiff is minor compared to the inconveni-
ence to the three individual Defendants, who col-
lectively comprise the senior management of Bish-
op Capital. *Id.* Simply put, forcing the individual
Defendants to travel to New York to defend this ac-
tion not only would be a personal inconvenience to
these individuals, but it would place a burden on
the management of Bishop Capital. *See Lewis,* 2003
WL 1900859, at *3 (noting that defendants would
"likely bear the burdens of the discovery process
and a potential trial"); *Nematron Corp.,* 30
F.Supp.2d at 401-03 (finding transfer appropriate,
among other reasons, where two individual defend-
ants were high-ranking officers of small defendant

corporation). [FN6]

> FN6. At oral argument, counsel for
> Plaintiffs focused on the third individual
> Defendant, Robert J. Thrailkill, who
> resides in Arizona, and suggested that it is
> no more inconvenient for him to travel to
> New York than to Cheyenne. (12/21/04 Tr.
> at 21-22) The Court is unpersuaded that
> the additional 1,500 miles in distance from
> Cheyenne to New York is insignificant.

The relative inconvenience to Plaintiffs is slight.
Mr. Robotti was prepared to travel to Wyoming in
pursuit of his companies' interest in Bishop Capital,
and would have done so if it was in his business in-
terest. (12/21/04 Tr. at 18) Moreover, as previously
noted, any participation by Plaintiffs or their rep-
resentatives in any hearing or trial would be minim-
al given that the focus of this action is the intent
and conduct of Defendants in Wyoming. *See Adair,*
2000 WL 1716340, at *2 ("[T]he central issues in
this case relate to facts and circumstances outside
the personal knowledge of plaintiffs—including the
accuracy of Microfield's statements and the defend-
ants' state of mind. Even if the named plaintiffs par-
ticipate at trial, it is unlikely that their participation
will involve lengthy testimony."). Thus, even tak-
ing into account Plaintiffs' location in New York,
the convenience of the parties weighs in favor of
transfer. *See Stillwater Mining,* 2003 WL
21087953, at *4.

*Locus of Operative Facts*

"Where the operative facts occurred is an obvious
factor to consider." *Pall Corp. v. PTI Techns., Inc.,*
992 F.Supp. 196, 200 (E.D.N.Y.1998). More to the
point, "where the operative facts are concentrated in
a specific district other than the district in which
plaintiff has sued, the action should be transferred
to that district, notwithstanding plaintiff's choice of
forum." *Lewis,* 2003 WL 1900859, at *3. Indeed,
"[c]ourts routinely transfer cases when the principal
events occurred and the principal witnesses are loc-
ated in another district." *Nematron Corp.,* 30

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 236440 (S.D.N.Y.)
(Cite as: 2005 WL 236440 (S.D.N.Y.))

F.Supp.2d at 404. Here, virtually all of the critical events occurred in Wyoming. The information used in the proxy statements was collected in Wyoming, the proxy statements were drafted in and issued from Wyoming principally by the individual Defendants, two of whom live in Wyoming, and all of the business decisions contested by Plaintiffs were made in Wyoming. *See Stillwater Mining, 2003 WL 21087953, at *4* (describing similar conduct in transferee forum).

\*6 The Southern District's most significant contact with the operative facts of this case is the mailing of the proxy statements to shareholders residing in New York. Focusing on this connection, Plaintiffs point to Defendants' apparent trading agreement with the Depository Trust Company in support of their threshold argument that venue is proper in the Southern District. (Matthew J. Day Decl. ¶¶ 11-13) According to Plaintiffs, there are 270 shareholders with addresses in New York State and these shareholders own a total of 351,021 shares (36.2% of Bishop Capital's outstanding shares). (Day Decl. ¶ 6) All but approximately 10,000 of those shares are owned by the Depository Trust Company, a New York trading operation. (Day Decl. ¶¶ 8-10)

The trading and holding of stock in New York is not, however, a significant contact with the *operative* facts of this action. *See Stillwater Mining, 2003 WL 21087953, at *5* (finding that one institutional investor meeting and the trading of defendant's stock on the New York Stock Exchange did not constitute material connections); *Nematron Corp., 30 F.Supp.2d at 404* ("[T]hat the shares were directed to New York does not make it a forum which has a significant contact with the operative facts."). "Misrepresentations and omissions are deemed to 'occur' in the district where they are transmitted or withheld, not where they are received." *Purcell Graham, Inc. v. Nat'l Bank of Detroit, No. 93 Civ. 8786, 1994 WL 584550, at *4 (S.D.N.Y. Oct. 24, 1994); accord Adair, 2000 WL 1716340, at *2; IBJ Schroder Bank & Trust Co. v. Mellon Bank, N.A., 730 F.Supp. 1278, 1281 (S.D.N.Y.1990).* Thus,

while the existence of New York shareholders of Bishop Capital stock may be sufficient to establish venue in this district, *see 15 U.S.C. § 78aa*, any "connection to a nonparty [such as DTC] performing a particular service for [Bishop Capital] is tenuous compared to the connection between [Plaintiffs'] claims and the ongoing activities in [Wyoming] that form the basis of this lawsuit." *Lewis, 2003 WL 1900859, at *3.* The "center of gravity of this case" plainly is in Wyoming. *Stillwater Mining, 2003 WL 21087953, at *4.* Therefore, this factor weighs in favor of transfer.

*Location of Relevant Documents*

The location of documents and ease of access to sources of proof "is clearly an important consideration in motions to transfer." *Aquatic Amusement Assoc., Ltd. v. Walt Disney World Co., 734 F.Supp. 54, 58 (N.D.N.Y.1990).* Here, the significant quantum of relevant documents is located in either Wyoming or Colorado. (Moore Decl. ¶ 3; Robert E. Thrailkill Supplemental Decl. ¶ 6) (describing 13 boxes and 11 file drawers of relevant files, and other records) In addition, proof of the proper valuation of these assets may require visits to the sites by expert and other witnesses. Coordination of expert assessments would be substantially easier if the case is litigated in Wyoming. "Of course the documents at issue here could be copied and shipped to New York. Yet this would impose an extra cost that is unnecessary," and therefore favors transfer, even if marginally. *Nematron Corp., 30 F.Supp.2d at 404; see also Stillwater Mining, 2003 WL 21087953, at *5* ("While it is true that documents can be transported from state to state, for purposes of weighing transfer factors, the fact that the documents are all currently located in Montana favors transfer.").

*Availability of Process*

\*7 Defendants' proposed witnesses are not within the control of the Defendants and reside outside this Court's subpoena power. However, Defendants have made no firm representation that these wit-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 236440 (S.D.N.Y.)
(Cite as: 2005 WL 236440 (S.D.N.Y.))

nesses would refuse to testify in New York, if asked. That said, it remains beyond dispute that at least some of the Defendants' witnesses would be subject to the subpoena power of the District Court in Wyoming. This would "substantially reduce[ ]" Defendants' burden in calling witnesses on their behalf. *Stillwater Mining*, 2003 WL 21087953, at *5 (describing this factor as weighing in favor of transfer even though defendants did not "specify whether any witnesses would be unwilling or unable to attend trial in New York"). Thus, this factor marginally weighs in favor of transfer. *See Adair*, 2000 WL 1716340, at *3 (listing as among the factors favoring transfer "the *risk* that certain out-of-state, non-party witnesses may be unwilling or unable to appear at a trial in New York") (emphasis added).

## Forum's Familiarity With Governing Law

This is a federal securities fraud action that also alleges violations of Wyoming business law. This Court and the District of Wyoming are equally capable of applying federal securities law to this case. *See Stillwater Mining*, 2003 21087953, at *5. Similarly, this Court can apply Wyoming law. *See Lewis*, 2003 WL 1900859, at *3 n. 3; *Prudential Sec., Inc. v. Norcom Dev., Inc.*, No. 97 Civ. 6308, 1998 WL 397889, at *6 (S.D.N.Y. July 16, 1998) ("[T]his Court has routinely held that the 'governing law' factor is to be accorded little weight on a motion to transfer venue because federal courts are deemed capable of applying the substantive law of other states."). *But see Fontana*, 849 F.Supp. at 215 ("[I]t is likely that Wyoming law will apply to this action. This is yet another factor favoring transfer of this action to Wyoming."). This factor is therefore neutral.

## Parties' Relative Financial Means

This factor is similarly neutral. Neither party asserts that it does not have the means to litigate this case in one or the other forum. Indeed, counsel for Plaintiffs conceded at oral argument that Plaintiffs' representatives travel west frequently in the interest of their business ventures. (12/21/04 Tr. at 18)

## Weight Afforded Plaintiff's Choice of Forum

"A plaintiff's choice of forum generally is entitled to considerable weight and should not be disturbed unless the balance of factors weighs strongly in favor of the defendant." *Adair*, 2000 WL 1716340, at *3. Thus, equally balanced factors favor the plaintiff's choice of forum. *See Nematron Corp.*, 30 F.Supp.2d at 405. However, "[w]here there is little material connection between the case and the chosen forum ... a plaintiff's choice of forum carries less weight." *Stillwater Mining*, 2003 WL 21087953, at *5; *see also Nieves v. Am. Airlines*, 700 F.Supp. 769, 772 (S.D.N.Y.1988); *The Charter Oak Fire Ins. Co. v. Broan-Nutone, L.L.C.*, 294 F.Supp.2d 218, 220 (D.Conn.2003); *Abramson v. INA Capital Mgmt. Corp.*, 459 F.Supp. 917, 921-22 (E. D.N.Y.1978). As discussed, Plaintiffs' chosen forum bears little, if any, connection to this district. Instead, this forum's only association with this case is the fact that Bishop Capital stock is owned by shareholders, including Plaintiffs, here in New York. However, in the context of a securities fraud action, this does not constitute a *material* connection to the forum. *See Stillwater Mining*, 2003 WL 21087953, at *5 (discussing immateriality of fact that defendant corporation's stock was traded on the New York Stock Exchange).

*8 Regarding this factor, Plaintiffs stress two points. First, Plaintiffs distinguish cases such as *Lewis* and *Nematron Corp.* because they are class actions in which the plaintiff's choice of forum may be accorded less weight because the plaintiff represents a dispersed class. However, in *Nematron*, although the existence of the class diluted plaintiffs' forum choice, Judge Sweet also specifically found that plaintiffs' selection bore little weight given the chosen forum's lack of material connection to the operable facts of that case. *Nematron Corp.*, 30 F.Supp.2d at 405; *see also Stillwater Mining*, 2003 WL 21087953, at *5 ("Even according plaintiffs' choice of forum substantial weight, [ ] the balance of factors strongly favors transfer...."). [FN7]

FN7. While Plaintiffs' action is in part a

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 236440 (S.D.N.Y.)
(Cite as: 2005 WL 236440 (S.D.N.Y.))

Page 8

derivative one on behalf of Bishop Capital, the Court does not discount Plaintiffs' choice of forum for this reason. Instead, the Court holds that Plaintiffs' choice of forum, afforded diminished weight because of the forum's lack of connection to the operative facts in this case, is simply outweighed by all the other factors that support transfer to the District of Wyoming.

Second, Plaintiffs claim that their choice of forum "is particularly strong in an action brought under [the 1934 Act] since the venue provision of the Act is designed to serve the underlying federal policy of allowing the plaintiff the widest possible choice of forums." (Pls.' Mem. Law at 10-11) (citing *Lemberger v. Westinghouse Elec. Corp.*, 76-C-552, 1976 WL 834 (E.D.N.Y.1976); *Zorn v. Anderson*, 263 F.Supp. 745, 748 (S.D.N.Y.1966)). Indeed, the provision to which Plaintiffs refer does afford broad venue options to securities fraud plaintiffs, by providing, for example, that an action can be brought in any district where the allegedly fraudulent statements are delivered. *See In re AES Corp. Sec. Litig.*, 240 F.Supp.2d 557 (E.D.Va.2003). However, "a court's discretion under § 1404(a) is not circumscribed by the jurisdictional provisions of" the 1934 Act. *Nematron Corp.*, 30 F.Supp.2d at 406. In fact, the clear weight of authority is that nothing in this provision "alter[s] the standard employed in deciding whether transfer is appropriate." *Id.; see also Securities & Exchange Comm'n v. Savoy Indus., Inc.*, 587 F.2d 1149, 1153 (D.C.Cir.1978) ("[Section 1404(a) ] applies to actions governed by special venue provisions ... of the federal securities statutes.") (citations omitted); *Ruo-Fang Lu v. Chang*, No. Civ. A. 03-3156, 2004 WL 307472, at *4 (E.D.La. Feb. 12, 2004) ("[W]hile this district may indeed be a proper venue for this action pursuant to the [1934] Act, the case may also be subject to transfer for reasons of convenience under 1404(a)."); *Burstein v. Applied Extrusion Tech., Inc.*, 829 F.Supp. 106, 111 (D.Del.1992) ("[Section 78aa]" does not, by its terms, prohibit a court from transferring an action

to a more convenient forum. Nor does it, by its terms, alter the standard that courts must follow in deciding whether to transfer an action."); *Belgiovine Enters., Inc. v. City Fed. Sav. Bank*, 748 F.Supp. 33, 35 n. 5 (D.D.C.1990) ( "Section 1404(a) has been held to apply to all cases, including those brought under 'special venue' statutes.") (citations omitted); *Minstar, Inc. v. Laborde*, 626 F.Supp. 142, 149 (D.Del.1985) ("[T]here is no authority in this circuit for the proposition that the burden to transfer a federal securities case is somehow higher than the burden in other types of civil actions. The Court is of the view that 28 U.S.C. § 1404(a) applies in the same form to all types of civil actions; further, Congress could have, but did not, carve out a securities law exception to § 1404(a)."). *But see Michael v. Haralson*, 586 F.Supp. 169, 172 (E.D.Pa.1983) (citing *Lemberger, 1976 WL 834, at *5*); *S-G Sec. Inc. v. Fuqua Inv. Co.*, 466 F.Supp. 1114, 1121-22 (D.Mass.1978) (citing *Lemberger, 1976 WL 834, at *5*) ("[The plaintiff's choice of forum is a] particularly strong [consideration] in an action brought under the [1934 Act] since the venue provision of the Act is designed to serve the underlying federal policy of allowing the plaintiff the widest possible choice of forums."). [FN8]

> FN8. Moreover, even if Plaintiffs' choice of venue under § 78aa is to be afforded added deference, the cases on which Plaintiffs rely are sufficiently distinguishable as to offer little by way of support. For example, in *Lemberger*, although the court denied defendants' transfer motion and gave particular weight to plaintiff's choice of forum because of 15 U.S.C. § 78aa, it also found that the defendants' claims of inconvenience were undercut by the fact that they maintained a major corporate office in New York City. *Lemberger, 1976 WL 834, at *5*. Also, in *Zorn*, the court found that the inconvenience of the parties was equally balanced and that, in light of the "broad venue statutes in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:08-cv-02423-BSJ-JCF    Document 14-2    Filed 06/17/2008    Page 37 of 49

various Acts regulating securities," this would not justify disturbing the plaintiff's choice of forum. *Zorn, 263 F.Supp. at 749.* Here, because the applicable factors heavily weigh in favor of Defendants, Plaintiffs' choice of forum, even if exceptionally important in securities fraud cases, does not change the calculus in favor of transfer.

\*9 Thus, while Plaintiffs may be permitted to file this case in the Southern District of New York, where there are minimal connections between this district and the operative facts, Plaintiffs' choice properly is given less deference. However, even assigning Plaintiffs' choice of forum substantial weight, the balance of the factors heavily favors transfer of this case to the District of Wyoming.

### Trial Efficiency and the Interests of Justice

For trial efficiency and in the interests of justice, this case should be transferred to the District of Wyoming. As the above analysis demonstrates, this Court has no connection to this action. Instead, the "center of gravity" of this litigation is in Wyoming. Almost all of the Defendants, and all of the non-party witnesses and the relevant and voluminous documents, are in or near Wyoming. The Defendant company's headquarters are in Wyoming and the alleged misrepresentations and omissions, which are at the heart of Plaintiffs' case, all occurred in Wyoming. In sum, the balance of factors tilts heavily in favor of transferring this case to the District of Wyoming.

### III. Conclusion

For the reasons set forth above, the motion to transfer is granted. The parties' standstill agreement will remain in effect until such time as the transferee court directs otherwise. The Clerk will transfer the case to the United States District Court for the District of Wyoming.

SO ORDERED.

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21087953 (S.D.N.Y.)
(Cite as: 2003 WL 21087953 (S.D.N.Y.))

Page 1

C
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re STILLWATER MINING CO. SECURITIES
LITIGATION
No. 02 Civ. 2806(DC).

May 12, 2003.

Consolidated class action securities fraud cases
were brought against a mining company and several
of its current and former officers, who were ac-
cused of making false and misleading statements
about the company's ore reserve estimates to artifi-
cially inflate the price of the company's stock. On
the company's motion to transfer the action and to
dismiss, the District Court, Chin, J., held that the
cases would be transferred to the District of
Montana.

Motion to transfer granted.

West Headnotes

**Federal Courts** 112
170Bk112 Most Cited Cases
Consolidated class action securities fraud cases
brought against a mining company and several of
its current and former officers would be transferred
to the District of Montana for convenience of
parties and witnesses, and in the interest of justice;
Montana was where the allegedly false and mis-
leading
statements were made, the company's headquarters
were located, and nearly all the witnesses and docu-
mentary evidence were located. 28 U.S.C.A. §
1404(a).

Milberg Weiss Bershad Hynes & Lerach LLP, By:
Elaine S. Kusel, Susan M. Greenwood, New York,
New York, Abraham Rappaport, Maya Saxena,
Boca Raton, Florida, for Plaintiffs.

Arkin Kaplan & Cohen LLP, By: Mark Cohen,

New York, New York, for Plaintiffs.

Mayer, Brown, Rowe & Maw, By: Dennis P. Orr,
Catherine J. Hertzig, New York, New York, Alan
N. Salpeter, Michele Odorizzi, Jonathan C. Medow,
Adrienne L. Hiegel, Chicago, Illinois, for Defend-
ants.

*MEMORANDUM DECISION*

CHIN, J.

\*1 In these consolidated class action securities
fraud cases, Stillwater Mining Company
("Stillwater") and several of its current and former
officers are accused of making false and misleading
statements about Stillwater's ore reserve estimates
to artificially inflate the price of the company's
stock. In particular, plaintiffs allege that Stillwater
failed to disclose that (1) it was having discussions
with the Securities Exchange Commission (the
"SEC") regarding Stillwater's method for estimating
probable ore reserves, (2) its methodology did not
comply with industry practice or SEC requirements,
and (3) as a result its estimates were inflated.
Plaintiffs assert a violation of Sections 10(b) and
20(a) of the Securities Exchange Act of 1934 and
Rule 10b-5.

Stillwater simultaneously moves to transfer this ac-
tion to the District of Montana pursuant to 28
U.S.C. § 1404(a) and to dismiss for failure to state
a claim pursuant to Fed.R.Civ.P. 12(b)(6). For the
reasons set forth below, the motion to transfer is
granted. I do not reach the motion to dismiss.

*BACKGROUND*

A. Facts

Stillwater mines palladium, platinum, and associ-
ated metals ("platinum group metals" or "PGMs")
from two mines in southern Montana--the Stillwater
mine and the East Boulder Mine. (Compl.¶¶ 2, 14).
Both mines are located on a 28-mile geological
formation known as the J-M Reef. (*Id.* ¶¶ 14, 30).
The J-M Reef consists primarily of mineralized ore,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21087953 (S.D.N.Y.)
(Cite as: 2003 WL 21087953 (S.D.N.Y.))

which varies in quality and quantity from place to place. (*Id.* ¶ 30).

A mining company's ore reserves are computed and reported according to guidelines promulgated by the SEC, which recognizes proven and probable reserves. (*Id.* ¶ 33). The calculation of ore reserves, particularly probable reserves, affects a company's value--the greater the probable reserves, the longer the life expectancy of the mine, and the greater the profit for investors. (*Id.* ¶¶ 35, 126).

Stillwater is accused of making false and misleading statements regarding its ore reserve estimates for the Stillwater mine in (1) its Form 10-Q quarterly reports for the first, second, and third quarters of 2001, filed on April 20, 2001, July 19, 2001, and October 26, 2001 respectively, (2) a November 14, 2001 conference call, (3) a February 11, 2002 press release, and (4) a February 11, 2002 conference call. (*Id.* ¶¶ 79-103). Plaintiffs bring this action on behalf of the class of persons who purchased or acquired Stillwater common stock between April 20, 2001 and April 1, 2002 (the "class period"). (*Id.* ¶ 1).

Stillwater's principal offices are located in Columbus, Montana. (*Id.* ¶ 14). All of Stillwater's offices, physical assets, and employees are located in Montana; none are located in New York. (Sabala Aff. ¶ 3). Defendant James A. Sabala, the Vice President and Chief Financial Officer of Stillwater, resides in Montana. (*Id.* ¶ 1). Defendant Frank McAllister, Chairman and Chief Executive Officer of Stillwater, resides in Montana. (*Id.* ¶ 2). Finally, defendant Harry C. Smith, Stillwater's former Chief Operating Officer, resides in Arizona. (*Id.*). Additionally, the majority of potential trial witnesses Stillwater has identified are located in Montana--eleven out of fifteen--and the balance are from Colorado or Arizona. No potential witnesses from New York have been identified. (*Id.* ¶ 7).

\*2 All records concerning Stillwater's probable reserve estimates are in Montana, either at the company's headquarters or near its mines. (*Id.* ¶ 4). No

documents are maintained in New York. (*Id.*). The Form 10-Q quarterly reports and press release in which Stillwater allegedly made its false and misleading statements were all drafted, prepared, and issued in Montana. (*Id.* ¶ 5-6). The two conference calls at issue were made from Stillwater's offices in Montana. (*Id.* ¶ 6). Finally, any decisions Stillwater made regarding its probable reserve estimates were made in Montana. (*Id.*).

### B. *Procedural History*

Plaintiffs PGM Associates LP and PGM Offshore Partners LP (together, "PGM LP") filed the first of these class actions on April 11, 2002. By order dated July 23, 2002, the following cases were consolidated: 02 Civ. 2806, 02 Civ. 3014, 02 Civ. 3089, 02 Civ. 3196, 02 Civ. 3270, 02 Civ. 3426, 02 Civ. 3484, 02 Civ. 3992, and 02 Civ. 4236; PGM LP and movant Hunter Hall Investment Management Ltd. were appointed lead plaintiffs; and Milberg Weiss Bershad Hynes & Lerach LLP was appointed lead counsel. Lead plaintiffs filed a consolidated amended complaint on September 23, 2002.

Stillwater moves to transfer the consolidated case to the District of Montana pursuant to 28 U.S.C. § 1404(a) and to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim.

### DISCUSSION

This action will be transferred to the District of Montana where the allegedly false and misleading statements were made, Stillwater's headquarters are located, and nearly all the witnesses and documentary evidence are located. Because I am granting the motion to transfer in this case, I do not reach defendants' motion to dismiss the consolidated amended complaint for failure to state a claim.

### A. *Applicable Law*

Under 28 U.S.C. § 1404, a court may transfer any civil action to any other district where the case might have been brought if the transfer serves "the convenience of parties and witnesses, [and is] in the

Not Reported in F.Supp.2d                                                                                 Page 3
Not Reported in F.Supp.2d, 2003 WL 21087953 (S.D.N.Y.)
(Cite as: 2003 WL 21087953 (S.D.N.Y.))

interest of justice." 28 U.S.C. § 1404(a); see *Van Dusen v. Barrack*, 376 U.S. 612, 616, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). The purpose of § 1404(a) is "to prevent waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense." ' *Trehern v. OMI Corp.*, No. 98 Civ. 0242(RWS), 1999 WL 47303, at *1 (S.D.N.Y. Feb.1, 1999) (quoting *Wilshire Credit Corp. v. Barrett Capital Mgmt. Corp.*, 976 F.Supp. 174, 180 (W.D.N.Y.1997) (internal quotations and citation omitted)).

"A party seeking to transfer venue must demonstrate that: (1) the action could have been brought originally in the transferee forum; (2) the transferee forum would be more convenient; and (3) transfer advances the interests of justice." *Prudential Sec. Inc. v. Norcom Dev., Inc.*, No. 97 Civ. 6308(DC), 1998 WL 397889, at *2 (S.D.N.Y. July 16, 1998); see also *Air-Flo M.G. Co. v. Louis Berkman Co.*, 933 F.Supp. 229, 233 (W.D.N.Y.1996) ("To prevail on the motion, defendant must make a 'clear showing' that the litigation in the proposed transferee district would be more convenient and would better serve the interests of justice.").

*3 The decision whether to transfer venue rests within the sound discretion of the district court. See *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 117 (2d Cir.1992) ("[M]otions for transfer lie within the broad discretion of the district court and are determined upon notions of convenience and fairness on a case-by-case basis."); *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 520 (2d Cir.1989); *Schwartz v. R.H. Macy's, Inc.*, 791 F.Supp. 94, 94 (S.D.N.Y.1992). In ruling on a motion to transfer venue, the trial judge is to give the plaintiff's choice of venue "substantial consideration," *Warrick v. Gen. Elec. Co.*, 70 F.3d 736, 741 (2d Cir.1995) (quoting *A. Olinick & Sons v. Dempster Bros., Inc.*, 365 F.2d 439, 444 (2d Cir.1966)), and venue "will not be disturbed unless the balance of factors weighs strongly in favor of granting the transfer." *Worldcom Techs., Inc. v. ICC Inteleca Communica-*

*tions, Inc.*, 37 F.Supp.2d 633, 638 (S.D.N.Y.1999) (internal quotations omitted) ("Defendant is required to show by clear and convincing evidence why the interests of justice require that this Court transfer venue....").

The district court generally should disturb the plaintiff's choice of forum only if, on balance, the following factors clearly favor transfer: (a) the convenience of witnesses; (b) the convenience of the parties; (c) the locus of operative facts (that is, the place where the events at issue occurred); (d) the location of relevant documents and relative ease of access to sources of proof, (e) the availability of process to compel the attendance of unwilling witnesses; (f) the forum's familiarity with the governing law; (g) the relative financial means of the parties; (h) the weight afforded plaintiff's choice of forum; and (i) trial efficiency and the interests of justice generally. See *Seinfeld v. Bartz*, No. 00 Civ. 5195(DC), 2001 WL 611295, at *2 (S.D.N.Y. June 5, 2001); see also *Pfizer Inc. v. Perrigo Co.*, No. 95 Civ. 5072(DC), 1996 WL 233692, at *1 (S.D.N.Y. May 7, 1996); *Anadigics, Inc. v. Raytheon Co.*, 903 F.Supp. 615, 617 (S.D.N.Y.1995).

B. *Application*

1. *Proper Forum*

The threshold issue for the Court in a transfer motion is whether venue is proper in the chosen forum. *Adair v. Microfield Graphics, Inc.*, No. 00 Civ. 0629(MBM), 2000 WL 1716340, at *1 (S.D.N.Y. Nov.16, 2000). Here, venue is governed by Section 27 of the 1934 Act, codified at 15 U.S.C. § 78aa, which provides that venue is proper in any district in which an "act or transaction constituting a violation has occurred" or "where the defendant is found or is an inhabitant or transacts business." 15 U.S.C. § 78aa.

The District of Montana is where two of the three individual defendants reside, Stillwater is located, the allegedly false and misleading reports and press release were drafted, and the conference calls at is-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21087953 (S.D.N.Y.)
(Cite as: 2003 WL 21087953 (S.D.N.Y.))

Page 5

tend trial in New York, this potential difficulty would be substantially reduced if the case were tried in Montana.

The sixth factor is the forum's familiarity with the governing law. This is a federal securities fraud class action. Both the Southern District of New York and the District of Montana are equally capable of applying federal securities law to this action. This factor is therefore neutral.

Seventh, the parties agree that the relative financial means of the parties is another neutral factor in deciding the motion to transfer. (Defs.' Mem. at 7-8; Pls.' Opp'n at 8). As plaintiffs stated: "[N]o party to this litigation is without means to continue this action in either forum." (Pls.' Opp'n at 8).

Eighth, a plaintiff's choice of forum is normally accorded a substantial degree of weight in deciding motions to transfer venue unless the balance of factors strongly favors transfer. Where there is little material connection between the case and the chosen forum, however, a plaintiff's choice of forum carries less weight. *Seinfeld,* 2001 WL 611295, at *4; *Anadigics,* 903 F.Supp. at 617. In the instant case, one institutional investor meeting and the trading of Stillwater's stock on the New York Stock Exchange do not constitute material connections. *See, e.g., Adair,* 2000 WL 1716340, at *2. Additionally, a plaintiff's choice of forum is accorded less weight in a class action where the plaintiff may represent a "widely dispersed class." *O'Hopp v. Contifinancial Corp.,* 88 F.Supp.2d 31, 35 (E.D.N.Y.2000); *see Lewis v. C .R.I., Inc.,* No. 03 Civ. 651(MBM), 2003 WL 1900859, at *4 (S.D.N.Y. Apr.17, 2003); *In re Nematron Corp. Sec. Litig.,* 30 F.Supp.2d 397, 405-06 (S.D.N.Y.1998). In this class action, where there are minimal connections with the Southern District of New York, plaintiffs' choice of forum may be given less deference. Even according plaintiffs' choice of forum substantial weight, however, the balance of factors strongly favors transfer to the District of Montana.

Finally, in the interests of justice, this case should be transferred to the District of Montana. As the above analysis demonstrates, New York has little connection to this action, and the center of gravity of this litigation is in Montana. In short, the balance of factors weighs strongly in favor of transferring this action to the District of Montana.

## CONCLUSION

*6 For the reasons set forth above, defendants' motion to transfer venue is granted. I do not reach defendants' motion to dismiss. The Clerk of the Court is directed to transfer this case to the District of Montana.

SO ORDERED.

Not Reported in F.Supp.2d, 2003 WL 21087953 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1875660 (S.D.N.Y.)
(Cite as: 2007 WL 1875660 (S.D.N.Y.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re TAKE-TWO INTERACTIVE SOFTWARE,
INC. DERIVATIVE LITIGATION.
This Document Relates To: All Actions.
Lead Case No. 1:06 Civ. 05279(LTS).

June 29, 2007.

ORDER
LAURA TAYLOR SWAIN, United States District
Judge.

*1 This case comes before the Court on a motion
filed by the Special Litigation Committee (the
"SLC") of the board of directors of Take-Two Inter-
active Software, Inc. ("Take-Two"), a Delaware
corporation headquartered in New York. On June 4,
2007, the SLC moved to stay all proceedings for
three months to permit it to investigate the allega-
tions of this lawsuit and to act in accordance with
the findings of that investigation. As set forth be-
low, the Court grants the SLC's motion and stays
this litigation in its entirety until September 4,
2007.

Take-Two shareholder and Plaintiff Richard Lasky,
derivatively on behalf of Take-Two, filed his ori-
ginal complaint on July 12, 2006. Take-Two share-
holder and Plaintiff Raeda Karadsheh, derivatively
on behalf of Take-Two, filed her original complaint
on August 22, 2006. This Court consolidated the
actions in an order filed on November 27, 2006.
The Plaintiffs then filed their consolidated com-
plaint on February 9, 2007. The complaint alleges,
*inter alia*, that from 1997 to 2005, certain officers
and directors caused Take-Two to issue "back-
dated" stock options--that is, options having an ex-
ercise price lower than the actual trading price of
the stock on the date of issuance. The action asserts
several claims for relief under various common law

theories, § 304 of the Sarbane-Oxley Act, and §§
14(a), 10(b) and 20(a) of the Securities Exchange
Act.

The SLC proffers, and Plaintiffs do not dispute, that
in March of 2006, the board of directors of Take-
Two created the SLC to investigate the allegations
of another lawsuit substantively unrelated to the in-
stant action. *See St. Clair Shores Gen. Employees
Retirement Sys. v. Eibeler,* No. 06 Civ. 688(SWK),
2006 U.S. Dist. LEXIS 72316 (S.D.N.Y. Oct. 4,
2006). In July and August 2006, the SLC addition-
ally began investigating the set of allegations put
forth in the original complaints in this case. Mean-
while, the *St. Clair* investigation continued into Oc-
tober of 2006, when the SLC requested, and the dis-
trict court granted, a five-month stay in that case
while the investigations continued. *Id.* at *26. On
January 17, 2007, the SLC presented certain factual
findings related to this case to the Take-Two Board,
and on January 30, 2007, the Board formally
charged the SLC to determine whether the claims
asserted in this derivative litigation should be pur-
sued by Take-Two. A few weeks later, the
Plaintiffs filed the aforementioned consolidated
complaint. On June 4, 2007, the SLC filed this mo-
tion for a stay of three months in order to conclude
its investigation of this case.

"[F]ederal courts should apply state law governing
the authority of independent directors to discontin-
ue derivative suits to the extent such law is consist-
ent with [federal law]." *Bruks v. Lasker,* 441 U.S.
471, 486, 99 S.Ct. 1861, 60 L.Ed.2d 404 (1979).
Therefore, the propriety of the SLC's requested stay
is a question to be resolved under the law of Take
Two's state of incorporation, Delaware. *See, e.g.,
Stein v. Bailey,* 531 F.Supp. 684, 691- 93
(S.D.N.Y.1982); *St. Clair,* 2006 U.S. Dist. LEXIS
72316, at *5.

*2 Courts normally grant a stay of proceedings for
a reasonable period of time to permit an SLC to
complete its investigation. *See, e.g., Abbey v. Com-*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                              Page 2
Not Reported in F.Supp.2d, 2007 WL 1875660 (S.D.N.Y.)
(Cite as: 2007 WL 1875660 (S.D.N.Y.))

_puter & Commc'ns Tech. Corp., 457 A.2d 368,_
_375-76 (Del. Ch.1983)_; *Pompeo v. Hefner*, C.A.
No. 6806, 1983 Del. Ch. LEXIS 506, at *6-*8 (Del.
Ch. March 23, 1983). *See also St. Clair*, 2006 U.S.
Dist. LEXIS 72316, at *7 ("propriety of a stay is
presumed under Delaware law"); _Kaplan v. Wyatt,_
_484 A.2d 501, 510 (Del. Ch.1984)_ (stay "must" be
granted because of "the inherent right of the board
of directors to control and look to the well-being of
the corporation in the first instance") (citing _Zapata_
_Corp. v. Maldonado, 430 A.2d 779 (Del.1981))_.

Plaintiffs filed the consolidated complaint on Feb-
ruary 9, 2007, so a three-month stay of proceedings
until September 4, 2007, would give the SLC a total
of approximately seven months to complete its in-
vestigation. Defendants argue such an amount of
time is necessary in part because this case involves
relatively novel and complex issues of law. *See Ab-*
_bey, 457 A.2d at 376_ ("the length of the stay to be
entered in any case will be dependent necessarily
upon the particular facts and circumstances of that
case"); _Ryan v. Gifford, 918 A.2d 341, 350 (Del._
_Ch.2007)_ (February 6, 2007 decision noting that
backdating stock option grants is "novel" issue);
*Desimone v. Barrows*, 2007 Del. Ch. LEXIS 75, at
*57-*81 (Del. Ch. June 7, 2007) (lengthy discus-
sion of legal complexities of the stock option back-
dating issue).

Because this case involves relatively novel and
complex issues of law, because the same SLC has
concurrently been investigating claims in a separate
lawsuit, and in light of the authorities both parties
have cited, a three-month stay, which will give the
SLC seven months from the filing of Plaintiffs' con-
solidated complaint to complete its investigation, is
reasonable. *See, e.g., Wright v. Krispy Kreme*
_Doughnuts, Inc., 231 F.R.D. 475, 477_
_(M.D.N.C.2005)_ (nine months from the board's re-
jection of the shareholders' demand to the end of
granted stay); _Strougo ex rel. Brazil Fund v. Pade-_
_gs, 27 F.Supp.2d 442, 446 (S.D.N.Y.1998)_ (five
month investigation); *Katell v. Morgan Stanley*
*Group*, 1993 Del. Ch. LEXIS 236, at *12 (Del. Ch.

Sept. 27, 1993) (five month stay); *Pompeo*, 1983
Del. Ch. LEXIS 506, at *8-*9 (six months from
SLC formation to end of granted stay); *St. Clair*,
2006 U.S. Dist. LEXIS 72316, at *27 (twelve
months from SLC formation to end of granted
stay).

For the foregoing reasons, the SLC's motion to stay
proceedings for three months is granted. The mo-
tion for a stay was filed on June 4.2007. Accord-
ingly, this action is hereby stayed in its entirety un-
til September 4, 2007.

The initial pretrial conference in these consolidated
cases will be held on November 2, 2007, at 10:00
a.m. The parties shall confer and shall prepare a
submission in advance of that conference in accord-
ance with the Initial Conference Order that was is-
sued on or about July 25, 2006.

*3 SO ORDERED.

Not Reported in F.Supp.2d, 2007 WL 1875660
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                        Page 1
Not Reported in F.Supp.2d, 2005 WL 1719927 (M.D.N.C.)
(Cite as: 2005 WL 1719927 (M.D.N.C.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
M.D. North Carolina.
William Douglas WRIGHT and Judy Woodall,
Plaintiffs,
v.
KRISPY KREME DOUGHNUTS, INC., Scott A.
Livengood, Erskine, Bowles, Mary Davis
Holt, William T. Lynch, Jr., John N. McAleer,
James H. Morgan, Dr. Su Hua
Newton, Robert L. Strickland, Togo D. West, Jr.,
Steven D. Smith, John W. Tate,
Randy S. Casstevens, R. Frank Murphy, Joseph A.
McAleer, Jr., John A. McAleer,
Jr., John McAleer Orrell, North Texas Doughnuts,
L.P., Greater DFW Doughnuts,
Inc., Greater DFW Doughnuts, L.L.P., Arlington
Doughnut Company, L.L.C.,
Grapevine Doughnut Company, L.L.C., Frisco
Doughnut Company, L.L.C., Euless
Doughnut Company, L.L.C., Old Towne Doughnut
Company, L.L.P., Hulen St.
Doughnut Company, L.L.P., Dough-Re-Mi Com-
pany, Ltd., Defendants.
No. 1:04CV00832.

April 4, 2005.

Bruce G. Murphy, Vero Beach, FL, Eric J. Belfi,
Murray Frank & Sailer, LLP, New York, NY, for
Plaintiffs.

James Donald Cowan, Jr., Smith Moore, L.L.P.,
Cynthia Munk Swindlehurst, Kenneth J. Gumbiner,
Michael Scott Fox, Tuggle Duggins & Meschan,
P.A., Greensboro, NC, Joseph S. Allerhand, Paul
Ferrillo, Robert Carangelo, Stephen A. Radin, Weil
Gotshal & Manges, LLP, New York, NY, Dustin K.
Palmer, F. Joseph Warin, Wayne A. Schrader, Gib-
son Dunn & Crutcher, Washington, DC, Daniel
Alan M. Ruley, Kevin Guy Williams, William
Kearns Davis, Bell Davis & Pitt, P.A., Ronald R.
Davis, Womble Carlyle Sandridge & Rice, Win-

ston-Salem, NC, Carl N. Patterson, Jr., Heather Bell
Adams, Smith Anderson Blount Dorsett Mitchell &
Jernigan, Raleigh, NC, David Siegel, Martin Gel-
fand, Richard Zelichov, Irell & Manella, LLP, Los
Angeles, CA, Anthony R. Modd, Matthew D. Harp-
er, Eastman & Smith Ltd., Toledo, OH, Stuart C.
Gauffreau, Nexsen Pruet Adams Kleemeier, PLLC,
Greensboro, NC, for Defendants.

*ORDER*

OSTEEN, J.

*1 Pending before this court are several motions to
stay this action: (1) Motion by Nominal Defendant
Krispy Kreme Doughnuts, Inc. to Stay Proceedings
Pursuant to North Carolina General Statutes §
55-7-43[22], filed by Krispy Kreme Doughnuts,
Inc. ("Krispy Kreme"), acting through a Special
Committee of independent directors charged with
investigating and determining whether it is in the
best interests of Krispy Kreme to pursue this litiga-
tion; (2) Motion to Stay Proceedings Pursuant to
North Carolina Business Corporation Act § 55-7-
43[26] filed by Scott Livengood, Erskine Bowles,
Mary Davis Holt, William T. Lynch, Jr., John N.
McAleer, James H. Morgan, Dr. Su Hua Newton,
Robert L. Strickland, Togo D. West, Jr., John W.
Tate, Randy S. Casstevens, and R. Frank Murphy
(the "Director Defendants"); and (3) Motion to Stay
Proceedings Pursuant to N.C. Gen.Stat. §
55-7-43[29] filed by Steven D. Smith, Joseph A.
McAleer, Jr., John McAleer Orrell, Greater DFW
Doughnuts, Inc., Greater DFW Doughnuts, L.L.P.,
Arlington Doughnut Company, L.L.C., Grapevine
Doughnut Company, L.L.C., Frisco Doughnut
Company, L.L.C., Euless Doughnut Company,
L.L.C., Old Towne Doughnut Company, L.L.P.,
Hulen St. Doughnut Company, L.L.P. (the "Fran-
chise Defendants").

This court finds that because the findings of the
Special Committee will play an important role in
the outcome of the action, a stay is warranted. The
court also notes, however, that a substantial amount

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1719927 (M.D.N.C.)
(Cite as: 2005 WL 1719927 (M.D.N.C.))

of time has passed between Plaintiffs' demand on Krispy Kreme's Board of Directors, the appointment of a Special Committee, and current events. Thus, only a limited stay of 60 days is appropriate. In the event that substantial progress is being made toward completion of the Special Committee's report, Defendants may request a hearing to show why some additional time will be necessary. Therefore,

IT IS ORDERED that Motion by Nominal Defendant Krispy Kreme Doughnuts, Inc. to Stay Proceedings Pursuant to North Carolina General Statutes § 55-7-43[22] is GRANTED. The proceedings are stayed for sixty (60) days.

IT IS FURTHER ORDERED that Motion to Stay Proceedings Pursuant to North Carolina Business Corporation Act § 55-7-43[26] is GRANTED. The proceedings are stayed for sixty (60) days.

IT IS FURTHER ORDERED that Motion to Stay Proceedings Pursuant to N.C. Gen.Stat. § 55-7-43[29] is GRANTED. The proceedings are stayed for sixty (60) days.

Not Reported in F.Supp.2d, 2005 WL 1719927 (M.D.N.C.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.