# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

R.S. BASSMAN, Derivatively on Behalf of
FREDDIE MAC a/k/a Federal Home Loan
Mortgage Corporation and its shareholders,

        Plaintiff,

    v.

RICHARD F. SYRON, PATRICIA L. COOK,
ANTHONY S. PISZEL, EUGENE M. McQUADE,
RICHARD KARL GOELTZ, STEPHEN A. ROSS,
SHAUN F. O'MALLEY, ROBERT R. GLAUBER,
BARBARA T. ALEXANDER, WILLIAM M.
LEWIS, JR., JEFFREY M. PEEK, GEOFFREY T.
BOISI, RONALD F. POE, WASHINGTON
MUTUAL, INC.,
PRICEWATERHOUSECOOPERS, LLP, KERRY
K. KILLINGER, ANTHONY R. MERLO, JR.,
FIRST AMERICAN CORPORATION, FIRST
AMERICAN EAPPPRAISEIT, COUNTRYWIDE
FINANCIAL CORPORATION, COUNTRYWIDE
HOME EQUITY LOAN TRUST, COUNTRY-
WIDE BANK, FSB , COUNTRYWIDE HOME
LOANS, INC.,  LANDSAFE, INC., and ANGELO
R. MOZILO,

        Defendants,

    and

FREDDIE MAC a/k/a Federal Home Loan
Mortgage Corporation,

        Nominal Defendant.

**Case No. 08-cv-2423-BSJ-JCF**

## PLAINTIFF'S APPLICATION TO TAKE DISCOVERY, AND,
## IN THE ALTERNATIVE, OPPOSITION TO NOMINAL DEFENDANT
## <u>FREDDIE MAC'S MOTION TO TRANSFER OR STAY</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................... 1

STATEMENT OF FACTS ..................................................... 3

PROCEDURAL HISTORY.................................................... 6

ARGUMENT ...................................................................... 8

    I.      TRANSFER OF THIS ACTION IS NOT WARRANTED................................. 8

            A.    The Legal Standards Governing Transfer Motions Militate Against
                Transfer. .................................................................. 8

                  1.    Freddie Mac Has Failed To Show That The Convenience
                        Of The Witnesses And Parties Supports Transfer, And
                        Transfer May Be Denied On This Basis Alone. .......................... 10

                  2.    The Location Of Relevant Documents And The Relative
                        Access To Sources Of Proof Does Not Warrant Transfer. .......... 13

                  3.    The Locus Of Operative Facts Does Not Warrant Transfer. ....... 14

                  4.    Availability Of Process To Compel The Attendance Of
                        Unwilling Witnesses Does Not Warrant Transfer. ...................... 16

                  5.    The Relative Means Of The Parties Does Not Warrant
                        Transfer. .................................................................. 16

                  6.    The Competing Venues' Familiarity With Governing Law
                        Does Not Warrant Transfer........................................... 17

                  7.    The Deference Due To Plaintiff's Chosen Forum And The
                      Interests Of Justice And Efficiency All Counsel Against
                      Transfer. .................................................................. 17

    II.    ANY FURTHER DELAY OF THIS ACTION BY THE SLC'S
          ALLEGED INVESTIGATION IS UNJUSTIFIED............................................. 19

            A.    Freddie Mac's Board Ignored Plaintiff's Demands, And The
                 Evidence That It Has Commenced A Review And Evaluation Of
                 the Allegations In This Case, Through The SLC, Is Insufficient. ........... 19

            B.    The SLC Already Has Had Sufficient Time To Review And
                 Evaluate Plaintiff's Allegations. ....................................... 21

            C.    The SLC Is Not Disinterested In This Litigation. .................... 21

            D.    Freddie Mac's Recent History Counsels Against Allowing Further
                 Delay. ..................................................................... 23

**TABLE OF CONTENTS**
**(continued)**

**Page**

III.    THE COURT MAY AUTHORIZE DISCOVERY TARGETED AT DETERMINING WHETHER TRANSFER OR A STAY IS APPROPRIATE.................................................................................. 24

CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

Page

## CASES

*Abella v. Universal Leaf Tobacco Co., Inc.*
546 F. Supp. 795 (E.D. Va. 1982) ....................................................................... 22

*Astor Holdings, Inc. v. Roski*
No. 01 Civ. 1905, 2002 WL 72936 (S.D.N.Y. Jan. 17, 2002) .................................. 13, 14, 17

*Auerbach v. Bennett*
419 N.Y.S. 2d 920 (1979) ................................................................................... 22

*Berman v. Informix Corp.*
30 F. Supp. 2d 653 (1998) .................................................................................. 18

*Cartier v. D & D Jewelry Imports*
510 F. Supp. 2d 344 (S.D.N.Y. 2007) .................................................................. 19

*Coker v. Bank of America*
984 F. Supp. 757 (S.D.N.Y. 1997) ...................................................................... 13

*Crawford-El v. Britton*
523 U.S. 574 (1998) ........................................................................................... 24

*Excelsior Designs, Inc. v. Sheres*
291 F. Supp. 2d 181 (E.D.N.Y. 2003) ................................................................. 15, 16

*Factors Etc., Inc. v. Pro Arts, Inc.*
579 F.2d 215 (2d Cir. 1978) ................................................................................ 10, 13

*Foster v. Litton Indus., Inc.*
431 F. Supp. 86 (S.D.N.Y. 1977) ....................................................................... 18

*George v. Kraft Foods Global, Inc.*
No. 06 Civ. 798, 2006 WL 3842169 (S.D. Ill. Dec. 22, 2006) ............................ 24

*Hernandez v. Graebel Van Lines*
761 F. Supp. 983 (E.D.N.Y. 1991) ..................................................................... 9, 10

*In re Bank of New York Deriv. Litig.*
No. 99 Civ. 9977, 2000 WL 1708173 (S.D.N.Y. Nov. 14, 2000) ..................... 22, 23

*In re Stillwater Min. Co. Sec. Litig.*
No. 02 Civ. 2806, 2003 WL 21087953 (S.D.N.Y. May 12, 2003) ..................... 19

*In re Take-Two Interactive Software, Inc. Deriv. Litig.*
No. 06 Civ. 5279, 2007 WL 1875660 (S.D.N.Y. June 29, 2007) ...................... 21

*In re Terrorist Attacks on September 11, 2001*
349 F. Supp. 2d 765 (S.D.N.Y. 2005) ................................................................ 24

*In re Warrick*
70 F.3d 736 (2d Cir. 1995) ................................................................................. 18

*Koster v. Lumbermen's Mut. Co.*
330 U.S. 518 (1947) ........................................................................................... 18

## TABLE OF AUTHORITIES
### (continued)

Page

*Laborers Local 100 & 397 Pension Fund v. Bausch & Lomb, Inc.*
    No. 06 Civ. 1942, 2006 WL 1524590 (S.D.N.Y. June 5, 2006)........................................... 19

*Orb Factory, Ltd. v. Design Science Toys, Ltd.*
    6 F. Supp. 2d 203 (S.D.N.Y. 1998)........................................................................ 9, 10, 11, 16

*Pall Corp. v. PTI Technologies, Inc.*
    992 F. Supp. 196 (E.D.N.Y. 1998) ...................................................................................... 16

*Peyser v. General Motors Corp.*
    158 F. Supp. 526 (S.D.N.Y. 1958)........................................................................................ 9

*PI, Inc. v. Valcour Printed Papers*
    465 F.Supp. 1218 (S.D.N.Y. 1979)..................................................................................... 24

*Price v. Stossel*
    No. 07 Civ. 11364, 2008 WL 2434137 (S.D.N.Y. June 4, 2008) ...................................... 15

*Promuto v. Waste Mgmt., Inc.*
    44 F. Supp. 2d 628 (S.D.N.Y. 1999)................................................................................. 9, 10

*Prudential Sec. Inc. v. Norcom Dev., Inc.*
    No. 97 Civ. 6308, 1998 WL 397889 (S.D.N.Y. July 16, 1998) ........................................ 17

*Ravenswood Investment Co. v. Bishop Capital Corp.*
    No. 04 Civ. 9266, 2005 WL 236440 (S.D.N.Y. Feb. 1, 2005) ...................................... 18, 19

*Riso Kagaku Corp. v. A. B. Dick Co.*
    300 F. Supp. 1007 (S.D.N.Y. 1969)............................................................................. 9, 10, 11

*Royal & Sunalliance v. British Airways*
    167 F. Supp. 2d 573 (S.D.N.Y. 2001)............................................................................ 11, 18

*Rudolph v. Cummins*
    No. 06 Civ. 2671, 2007 WL 1189632 (S.D. Tex. Apr. 19, 2007) ...................................... 21

*Saperstone v. Kapelow*
    279 F. Supp. 781 (S.D.N.Y. 1968)...................................................................................... 18

*Silverstein v. Larson*
    No. 04 Civ. 3450, 2005 WL 435241 (D. Minn. Feb. 25, 2005) ......................................... 21

*Strougo ex rel. Brazil Fund, Inc. v. Padegs*
    986 F. Supp. 812 (S.D.N.Y. 1997)................................................................................. 21, 24

*Weiser v. Grace*
    683 N.Y.S.2d 782 (Sup.Ct. 1998) ...................................................................................... 25

*Wilshire Credit Corp. v. Barrett Capital Mgmt. Corp.*
    976 F. Supp. 174 (W.D.N.Y. 1997) ..................................................................................... 9

*Wolf v. Ackerman*
    308 F. Supp. 1057 (S.D.N.Y. 1969)..................................................................................... 18

*Zapata Corp. v. Maldonado*
    430 A.2d 779 (Del. 1981) .............................................................................................. 22, 23

**TABLE OF AUTHORITIES**
(continued)

Page

**STATUTES**

28 U.S.C.
    § 1404(a) ................................................................................................ passim

Fed. R. Civ. P.
    § 26.............................................................................................................. 24

Fed. R. Civ. P.
    § 42(a) ......................................................................................................... 2

Va. Code Ann.
    § 13.1-672.1(B)..................................................................................... 19, 20

Va. Code Ann.
    § 13.1-672.1(C)......................................................................................... 19

**PRELIMINARY STATEMENT**

Pursuant to the Court's Order dated July 17, 2008, Plaintiff R.S. Bassman ("Plaintiff") respectfully makes this application for leave to take discovery in connection with the Motion to Transfer or Stay (the "Motion") filed by Nominal Defendant Freddie Mac ("Freddie Mac" or the "Company"). It is well within the Court's discretion to authorize targeted discovery into the alleged facts attested to by Freddie Mac in support of its Motion. In the alternative, for the reasons set forth below, it would be appropriate for the Court to deny the Motion without any discovery.

Freddie Mac has failed to meet its burden of showing that transfer of this case under 28 U.S.C. § 1404(a) is appropriate. Indeed, when confronted with similar arguments several years ago that were prompted by Freddie Mac's last financial debacle, the Judicial Panel on Multidistrict Litigation ("JPML") transferred all pending cases against or involving Freddie Mac to this District. Both the facts alleged in the Declaration submitted by Freddie Mac in support of its Motion and the actual facts of this case – including the presence of numerous corporate and individual defendants *besides* Freddie Mac – militate against, rather than in favor of, transfer of this case from this District. To the extent the Court is not prepared to deny the Motion at this time, however, the Court should exercise its discretion to permit targeted discovery directed at testing Freddie Mac's factual assertions and determining if it actually is in the interests of justice and the convenience of the parties and witnesses to transfer this case.

The circumstances of this case also argue against a stay, for four primary reasons. First, to this day, Freddie Mac has not responded to Plaintiff's written demands that litigation be initiated to recover for the massive financial harm and other damages done to the Company as a result of the activities alleged in this case. The letter purportedly sent to Plaintiff's counsel that Freddie Mac has submitted in support of its Motion (a) post-dates the filing of the Complaint, (b) is not even responsive to Plaintiff's written demands, (c) refers to a prior purported response by Freddie Mac dated January 18, 2008 that Plaintiff never received (and appears not to exist) and (d) appears to be a "cut and paste" duplicate of a response to a letter submitted by another shareholder, on topics unknown to Plaintiff. Plaintiff cannot presently independently verify, therefore, that the special

committee ("SLC") referred to in Freddie Mac's letter is actually investigating the allegations made in Plaintiff's written demands or the Complaint.

Second, courts have generally held that a range of three to ten months from the time of an SLC's inception is a reasonable period of time for an SLC to complete an independent investigation and produce a report recommending that litigation be pursued or not. In this case, eight months have already elapsed since the SLC was purportedly established – and during the first half of its existence, the SLC met just *once*. By the time the Motion is decided, the SLC will have had nearly ten months to complete its task. The weight of authority in this District and elsewhere provides that the SLC has already had sufficient time to conduct an investigation of the allegations at issue.

Third, all three individuals who comprise the SLC were members of Freddie Mac's Board of Directors (the "Board") during the time of the wrongdoing alleged in the Complaint, and are also named as Defendants in either this action or the related derivative action pending in this District (or both).[1] Under applicable law, therefore, the SLC is not capable of rendering a "disinterested" conclusion as to whether this litigation is in the best interests of the Company. Accordingly, no purpose will be served by a stay of this litigation.

Fourth, Freddie Mac's recent track record in conducting internal investigations of the sort being allegedly undertaken by the SLC contradicts any claim that it will pursue this matter expeditiously. Less than five years ago, Freddie Mac appointed a Special Derivative Litigation Committee (the "SDLC") to purportedly investigate the allegations of a shareholder derivative lawsuit arising out of Freddie Mac's understatement of pre-tax earnings by more than $6 billion (leading to one of the largest financial restatements in corporate history). The SDLC retained the same law firm, Hunton & Williams, that is purportedly advising the SLC in this case. The SDLC was also chaired by the same Board member who is chairing the SLC. The SDLC did not seek to intervene in the prior case, and never produced a report after more than three years of existence.

---

[1] As stated at the last telephonic hearing, Plaintiff thinks it appropriate that the related cases be consolidated under Fed. R. Civ. P. 42(a), and intends to make that request unless the Court chooses to do so *sua sponte*.

The SDLC was disbanded in 2007 after the same litigation that it had been appointed to investigate had settled before Judge Sprizzo in this District.

For all of the above reasons, the Court should deny Freddie Mac's request for a stay while the SLC produces its report and recommendations.  Alternatively, the Court may authorize discovery to examine the extent and type of investigation that the SLC has undertaken up to this point, the claims being investigated, and the SLC's plan for completion of its investigation, particularly in light of the indefinite nature of the stay that Freddie Mac has requested.

## STATEMENT OF FACTS

Nominal Defendant Freddie Mac (NYSE:FRE) is a federally chartered, stockholder-owned corporation established by Congress in 1970 to support home ownership and rental housing.  *See* Complaint ("Compl."), ¶ 11.  Its principal place of business is in McLean, Virginia.  *Id.*  The Company has been nominally regulated by the Office of  Federal Housing Enterprise Oversight ("OFHEO").  *Id.*  Freddie Mac is the country's second-largest buyer and guarantor of home mortgages, and provides additional liquidity for banks and mortgage lenders by purchasing residential mortgages and mortgage-related securities from them.  *Id.*

During the relevant time period (most notably 2006-2007), consistent with the lax or non-existent risk management practices put into place by Freddie Mac's Board of Directors, management caused the Company to purchase "sub-prime" and other questionable mortgage loans bundled into securities.  *Id.*, ¶¶ 11, 51.  The Company financed these purchases, in turn, primarily by issuing mortgage-related securities and debt instruments in the capital markets, for which Freddie Mac assumed the credit risk (i.e., the principal and interest payments on the underlying mortgages).  *Id.*, ¶¶ 11, 33, 34.  At the speculative peak of housing prices and mortgage-backed securities in 2006 and 2007, fueled in large part by the Company's reckless extensions of financing to mortgage originators, Freddie Mac's Board and senior management disregarded many stark signals from the market against the Company's course of action, including a precipitous drop in the ABX index (which tracks the value of securities backed by sub-prime home loans), and continued to expand into this high-risk market (while other lenders were pulling back).  *Id.*, ¶ 51.  As a result,

Freddie Mac's share of the market for such securities, and the Company's exposure to risk, expanded geometrically. *Id.*

Compounding Freddie Mac's risk exposure was the combination of Freddie Mac's lax or non-existent loan underwriting standards (best exemplified by its "Loan Prospector" automated loan service which generated approvals used purportedly to "assess" loans for purchase by Freddie Mac every "15 to 20 seconds" ), sub-prime mortgages, and inflated appraisals for unqualified borrowers. *Id.*, ¶ 48. The Company's lax and/or non-existent loan underwriting standards and ineffective risk management made it easy for lenders or other mortgage originators such as Defendants Washington Mutual, Inc. ("WaMu") and Countrywide Financial Corp. ("Countrywide") to take advantage of Freddie Mac, which they did, packaging and funneling into the Company billions of dollars of sub-prime and other high-risk mortgages. *Id.*

Freddie Mac took on yet additional risks with ill-advised loan terms. *Id.*, ¶ 50. As of 2001, Freddie Mac had bought virtually no adjustable-rate mortgages or mortgage-backed securities that included adjustable-rate mortgages ("ARMs"). *Id.* By 2006, however, those items accounted for 18% of Freddie Mac's volume, with a similarly excessive level during early 2007, and a substantial amount of Freddie Mac's volume included particularly exotic, risky, and poorly managed types of loans, such as payment-option ARMs and interest-only loans. *Id.* One of the ARM-variants Freddie Mac took on in substantial quantities were "2/28 hybrid ARMs," which reset from an initial low or "teaser" rate after two years into a much higher long-term rate. *Id.* A 2/28 ARM was likely to leave the borrower no feasible alternative at the two-year end of the "teaser" other than sale or refinancing, or, as the market deteriorated, default and foreclosure. *Id.* Outside observers warned about the dangers of the enormous and ill-advised risk Freddie Mac undertook by not requiring lenders to qualify borrowers at the fully-indexed rate – warnings disregarded by Freddie Mac's Board and senior management. *Id.*

The severe risks of Freddie Mac's sub-prime lending activities, which were known or should have been known by its Board, senior management, and PricewaterhouseCoopers LLP ("PwC"), first began to be reflected publicly in late 2007, when a declining housing market and an

increasing mortgage delinquency rate caused a crisis in the mortgage market. *Id.*, ¶ 52. Freddie Mac's exposure to massive damages increased as the value of mortgage-related securities declined substantially, particularly those securities directly or indirectly tied to sub-prime lending. *Id.* Due to the control Freddie Mac's management and Board had over information concerning the Company's operations, the Company was able to successfully, but falsely, assure shareholders and the public that Freddie Mac did not have significant sub-prime exposure, that they were managing risks effectively, that they were continuing to improve their internal control procedures, and that they had adequate disclosure procedures in place. *Id.*, ¶¶ 53, 54.

Thus, for at least two years until late 2007, when the crushing impact on the Company of the high-risk lending and investment practices of the Board and senior management could no longer be disguised, Freddie Mac was caused to repeatedly claim, in press releases, interviews, reports, conference presentations, investor conference calls, and the like, directly and indirectly, that it "continue[d] to manage interest-rate and other risks prudently." *Id.*, ¶ 55. While the Company's senior management and the Board recognized the "challenge" of "getting current in our financials and strengthening our internal controls" – a task they never seemed to accomplish – they conveyed the notion that this was a matter of information reporting, and did not reflect any underlying mismanagement of the Company's risks. *Id.* All the while, both Freddie Mac's senior officers and directors, as well as PwC, knew or should have known that Freddie Mac's controls and risk management were materially deficient and that its financial statements were not prepared in accordance with generally accepted accounting principles ("GAAP"). *Id.* As Freddie Mac's 2006 Annual Report put it, "Freddie Mac must become the standard of excellence not only for managing mortgage risk, but for the accounting and internal controls associated with it." *Id.* Through such statements and others which concealed the magnitude and nature of the risks to which Freddie Mac was exposed, the Company's management and Board, as well as PwC, continued their obfuscation of the truth. *Id.*

On November 20, 2007, Freddie Mac was forced to disclose that it had $105.4 billion of securities backed by sub-prime mortgages, accounting for 15 percent of its holdings of mortgages

and related securities. *Id.*, ¶ 56. In light of the longstanding claims of excellent risk management by the Company's senior management and its Board, the disclosure of the disastrous consequences of that risk exposure was stunning. *Id.* On that day, Freddie Mac announced that it had lost $2 billion in the third quarter and would have to raise fresh capital to meet its regulatory requirements. *Id.* The Company posted negative revenue of $678 million, as it sustained losses under GAAP accounting of $3.6 billion in the quarter, compared with reported positive revenue of $1.1 billion in the previous quarter and $91 million a year earlier. *Id.* On that day, the Company also reported a provision for credit losses of $1.2 billion due to the significant deterioration of mortgage credit resulting from continued weaknesses in the housing market and a decrease in the fair value of net assets attributable to common stockholders, before capital transactions, of approximately $8.1 billion. *Id.* As a result, the Company's common stock fell 29 percent in one day – from $37.50 per share on November 19, 2007, to $26.74 per share on November 20, 2007. *Id.* As a direct consequence of the concealment of Freddie Mac's true condition, those who invested in its common stock sustained staggering losses which led, in turn, to the commencement of securities fraud litigation against the Company. *Id.* In the months since Plaintiff made his demand in December 2007, the Company, along with its sister, Fannie Mae, has been revealed to require massive federal governmental intervention and new financing simply to remain viable.

The purpose of this litigation is to recover Freddie Mac's damages from those who caused them and to obtain appropriate corporate governance changes and other relief for the Company, acts the Board cannot and will not undertake itself. *Id.*, ¶¶ 1-5, 61-62, 88-91.

## PROCEDURAL HISTORY

On December 6, 2007, Plaintiff's counsel sent a letter to Freddie Mac's Board demanding that it cause Freddie Mac commence legal proceedings against each member of the Board, the Company's officers, the Company's auditor (PwC), and other persons or entities who contributed to the Company's losses and its exposure to civil liability. Compl., ¶ 5. The Company's Board did

not respond to that letter or take any of the actions demanded by Plaintiff.  *Id.*[2]  Accordingly, on March 10, 2008, or more than ninety days after Plaintiff sent his written demands, Plaintiff commenced this action asserting claims on behalf of the Company.  The claims are for, *inter alia*, breach of fiduciary duty, negligence, unjust enrichment, and violations of the Sarbanes-Oxley Act against a number of the Company's senior officers and directors, as well as aiding and abetting, breach of contract, breach of warranty, and/or conspiracy against PwC, Countrywide (and several of its subsidiaries and/or affiliates), WaMu, First American Corporation ("First American"), First American eAppraiseIT ("eAppraiseIT"), LandSafe, Inc. ("LSI"), and several of these entities' senior officers.  *Id.*, ¶¶ 92-140.

On March 14, 2008, or four days after this action was filed, Freddie Mac allegedly wrote Plaintiff's counsel to "inform" him "of the action taken by Freddie Mac's Board of Directors in response to the November 21, 2007 [*sic*] demand letter that [Plaintiff's counsel] sent to Richard Syron [*sic*] on behalf" of Plaintiff.  *See* Exh. A to Decl. of Steven Cole ("Cole Decl.") (filed June 16, 2008).  Such action allegedly included the formation of "a special committee comprised of disinterested directors consistent with Virginia law to investigate the allegations set forth in your [*sic*] letter."  *Id.*

Plaintiff's counsel has no record of ever having received this letter.  More importantly, Freddie Mac's letter does not even appear to be responsive to Plaintiff's demands, erroneously referring to those demands as having been made on November 21, 2007 and addressed to Richard Syron ("Syron") (Freddie Mac's Chairman and CEO).  Plaintiff's written demands were actually made on December 6, 2007, and were addressed to the entire Board.  *See* Compl., Exh. A.  Freddie Mac's letter also purportedly claims to be "a follow-up" to a prior letter to Plaintiff's counsel dated "January 18, 2008."  *See* Cole Decl., Exh. A.  Plaintiff's counsel never received any such letter (and Freddie Mac has not produced it).

---

[2] Although the Board did not respond to Plaintiff's demands before this action was filed, Plaintiff alleged on information and belief, based on a media report, that the Board had appointed a "Special Committee" consisting of interested or culpable parties to create the appearance of activity in response to shareholder complaints.  *Id.*, ¶ 5.  That information and belief has been confirmed by Freddie Mac's subsequent public filings and letter of March 14, 2008.

On June 6, 2008, a second related, and partially duplicative, shareholder derivative complaint was filed on behalf of Freddie Mac in this District, naming a number of the same defendants (minus some of the aiders and abettors named in this action), with the addition of former Chief Financial Officer Martin Baumann ("Baumann") and Directors Michelle Engler ("Engler"), Thomas S. Johnson ("Johnson"), and Nicholas P. Retsinas ("Retsinas"). The related action is captioned *Esther Sadowsky Testamentary Trust v. Syron, et al.*, No. 1:08-cv-05221-BSJ-JCF (S.D.N.Y.) (the "Related Action").

On June 16, 2008, Freddie Mac filed its Motion, arguing that this case should be transferred to the Eastern District of Virginia under 28 U.S.C. § 1404(a) or, in the alternative, should be stayed pending completion of a purportedly ongoing investigation by the SLC. The Motion is silent as to the Related Action pending in this District.

In a telephone hearing on July 17, 2008, the Court ordered the parties to brief the issue of whether Plaintiff should be permitted to take discovery in connection with the Motion. This Application, and, in the alternative, Opposition to the Motion, follows from that Order.

## ARGUMENT

## I.    TRANSFER OF THIS ACTION IS NOT WARRANTED.

Freddie Mac argues that the transfer of this case to the Eastern District of Virginia is warranted because it would "promote. . .convenience and justice." *See* Freddie Mac's Mem. of Law in Support of its Motion to Transfer Venue or, Alternatively, Stay the Proceedings, filed June 17, 2008 ("Br.") at 6. Freddie Mac misstates the applicable legal standard and omits entirely from its discussion the heavy burden it must carry in order to demonstrate that transfer of this case is warranted. For the reasons discussed below, Freddie Mac's argument lacks merit.

### A.    The Legal Standards Governing Transfer Motions Militate Against Transfer.

28 U.S.C. § 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Motions to transfer brought under this statute "lie within the broad discretion of the courts and are determined upon notions of convenience and fairness on a

case-by-case basis." *Orb Factory, Ltd. v. Design Science Toys, Ltd.*, 6 F. Supp. 2d 203, 208 (S.D.N.Y. 1998) (citing cases). Importantly, however, the burden of demonstrating that transfer is appropriate lies with the moving party, and "a court should not disturb a plaintiff's choice of forum unless the defendants make a *clear and convincing* showing that the balance of convenience favors defendants' choice." *Id.* (citing cases) (emphasis added). Indeed, "*the movant's burden is a heavy one*. It must make a 'clear-cut showing that when all the interests are considered, trial would more conveniently proceed and the interests of justice would be better served in the other district.'" *Riso Kagaku Corp. v. A. B. Dick Co.*, 300 F. Supp. 1007, 1010 (S.D.N.Y. 1969) (quoting *Peyser v. General Motors Corp.*, 158 F. Supp. 526, 529 (S.D.N.Y. 1958)) (emphasis added); *see also Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 638 (S.D.N.Y. 1999) (holding that the "balance of . . . factors" must "weigh heavily in favor of transfer").

The inquiry on a motion to transfer is two-fold. First, the court must first determine whether the action sought to be transferred is one that "might have been brought" in the transferee court. *Orb Factory*, 6 F. Supp. 2d at 208. Second, the court must determine whether, considering the "convenience of parties and witnesses" and the "interest of justice," a transfer is appropriate. *Id.* For this latter inquiry, courts generally consider the following nine factors:

> (1) the convenience of witnesses, (2) the location of relevant documents and the relative ease of access to sources of proof, (3) the convenience of the parties, (4) the locus of operative facts, (5) the availability of process to compel the attendance of unwilling witnesses, (6) the relative means of the parties, (7) the forum's familiarity with the governing law, (8) the weight accorded the plaintiff's choice of forum, and (9) trial efficiency and the interest of justice, based on the totality of the circumstances.

*Id.* (citing *Wilshire Credit Corp. v. Barrett Capital Mgmt. Corp.*, 976 F. Supp. 174, 181 (W.D.N.Y. 1997)). A movant "must support the transfer application with an affidavit containing *detailed factual statements* relevant to the[se] factors." *Id.* (quoting *Hernandez v. Graebel Van Lines*, 761 F. Supp. 983, 987 (E.D.N.Y. 1991)) (emphasis added).

Plaintiff does not dispute that this action "might" have been brought in the Eastern District of Virginia. However, Freddie Mac falls far short of carrying its burden with respect to the second prong of the inquiry – namely, whether the convenience of the parties and witnesses, as well as the

interest of justice, would be better served by transfer of this case out of this District. Freddie Mac's motion to transfer accordingly should be denied, or, at the very least, the Court should permit discovery targeted at whether the interest of justice and the convenience of the parties and witnesses "clear[ly] and convincing[ly]" would be better served by a transfer of this case. *Id.*

       **1.**    <u>**Freddie Mac Has Failed To Show That The Convenience Of The**</u>
               <u>**Witnesses And Parties Supports Transfer, And Transfer May Be Denied**</u>
               <u>**On This Basis Alone.**</u>

Freddie Mac's argument that the convenience of the witnesses and parties would be better served by transfer of this case rests essentially on one broad assertion, i.e., that most of its employees work (or worked) in Virginia. *See* Cole Decl., ¶ 7. This argument both misstates the law and is misleading as to the relevant facts.

"The convenience of the parties and the convenience of the witnesses are generally considered the most important factors" in the determination of whether transfer is warranted. *Promuto*, 44 F. Supp. 2d at 638 (citing cases). Accordingly, a movant seeking transfer must "clearly specify" in its affidavit "the key witnesses to be called, along with a statement concerning the nature of their testimony." *Orb Factory*, 6 F. Supp. 2d at 208-209. This is the "primary element" of a movant's obligation under § 1404(a):

> . . . the primary element of an adequate presentation [in support of transfer] is the submission of affidavits detailing the names and location of the potential principal witnesses and the substance of their testimony, so that the Court may evaluate – not speculate upon – the actual probability of securing the asserted increased convenience offered by the proposed transferee district.

*Riso Kagaku Corp.*, 300 F. Supp. at 1010 (citing cases). Indeed, in *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir. 1978), *overruled on other grounds by Pirone v. MacMillan, Inc.*, 894 F.2d 579 (2d Cir. 1990), the Second Circuit held that "there could be no abuse of discretion in not granting transfer" under § 1404(a) where a defendant fails to "clearly specify the key witnesses to be called and . . . make a general statement of what their testimony will cover." Accordingly, "[v]ague generalizations and failure to clearly specify the key witnesses to be called, along with a statement concerning the nature of their testimony, are an insufficient basis upon which to grant a

change of venue" under § 1404(a). *Orb Factory*, 6 F. Supp. 2d at 208-209 (denying motion to transfer); *see also Riso Kagaku Corp.*, 300 F. Supp. at 1010-11 (same).

Freddie Mac's Declaration fails to clearly specify *any* key witnesses, much less the substance of their testimony. *See* Cole Decl., ¶ 7. Indeed, by merely reciting – in a single paragraph of its Declaration – that many of its unnamed employees "work in Virginia," and that the Officer Defendants[3] work or worked in Virginia, Freddie Mac relies on precisely the sort of "vague generalizations" that courts of this District have deemed fatal to a motion to transfer. *See, e.g., Riso Kagaku Corp.*, 300 F. Supp. at 1011; *Orb Factory*, 6 F. Supp. 2d at 209 ("without a specific list of the witnesses to be called from the movant . . . the balance of the evidence available to date does not require disruption of [Plaintiff's] choice of forum").[4]

Freddie Mac also misses the mark by emphasizing how many of its employees "work" in Virginia. In evaluating whether transfer is warranted, "courts must consider the materiality, nature, and quality of each witness, not merely the number of witnesses in each district." *Royal & Sunalliance v. British Airways*, 167 F. Supp. 2d 573, 577 (S.D.N.Y. 2001). Freddie Mac's Declaration fails to provide the Court with this information. Further, even if sheer "numbers" of parties or witnesses in any given location were dispositive, Freddie Mac's Declaration would still be deficient (and misleading), in that it fails to even mention that (a) the non-employee *Director* Defendants[5] far outnumber the Officer Defendants, and all (save one) live and work outside of

---

[3] The "Officer Defendants" include Syron, Patricia Cook ("Cook"), Anthony 'Buddy' Piszel ("Piszel"), and Eugene M. McQuade ("McQuade"). The Related Action also names former-CFO Baumann as a Defendant.

[4] Although one decision in this District has distinguished *Riso Kagaku* by holding that defendants moving for transfer "will not be held to the requirement of stating with precision each witness and document" where discovery has been previously stayed, that decision is inapposite. *Heyco, Inc. v. Heyman*, 636 F. Supp. 1545, 1549-50 (S.D.N.Y. 1986). There is no discovery stay in effect in this case, and the SLC has purportedly been "investigating" this matter for over seven months. Freddie Mac should be well aware by now who the relevant witnesses are, and what the substance of their testimony would be – or else it should not be moving for transfer at all.

[5] The "Director Defendants" include Richard Karl Goeltz ("Goeltz"), Stephen A. Ross ("Ross"), Shaun F. O'Malley ("O'Malley"), Robert R. Glauber ("Glauber"), Barbara T. Alexander ("Alexander"), William M. Lewis, Jr. ("Lewis"), Jeffrey M. Peek ("Peek"), Geoffrey T. Boisi

Virginia, (b) most of the Officer Defendants (including Baumann) reside in the northeastern United States, and (c) the significant corporate aiders and abettors named in this action (such as PwC, WaMu, Countrywide, First American, and LSI) are headquartered outside of Virginia, with many thousands of employees located far outside of Virginia and scattered in various parts of the country. *See* Declaration of Daniel P. Chiplock ("Chiplock Decl."), ¶¶ 2-6.

Indeed, of the twelve total Director Defendants named in this action and the Related Action, *one* resides in Virginia, and the vast majority reside in the northeastern United States – with *five of them actually residing in this District*. Chiplock Decl., ¶ 2.[6]  Additionally, more than half of the Officer Defendants – including CEO Syron – also reside in the northeastern United States. *Id.*, ¶ 3. Further, none of the corporate defendants in this action apart from Freddie Mac are based in Virginia, and one of them (PwC) is actually headquartered in this District. *Id.*, ¶ 4.  The senior officers of these companies also reside outside of Virginia. *Id.*, ¶ 5.  Freddie Mac also has offices in this District. *Id.*, ¶ 6.  In sum, the parties to this action with connections to this District and/or to the northeastern United States *significantly* outnumber those residing in or near Virginia. *Id.*, ¶¶ 2-6.

Finally, Freddie Mac's argument that the interests of "convenience" to the parties and witnesses would be better served by transfer of this case to the Eastern District of Virginia is undermined by Freddie Mac's own recent stance when faced with multiple lawsuits stemming from the massive financial fraud by Freddie Mac's most senior officers and directors in 2003-2004.  In that instance, shareholder derivative lawsuits were filed in both this District and the Eastern District of Virginia, and class litigation was filed in the Northern District of Ohio.  These cases were

---

("Boisi"), and Ronald F. Poe ("Poe").  As mentioned above, the Related Action also names Directors Engler, Johnson, and Retsinas as defendants.  Ultimately, it is the conduct of the Director Defendants, who not only oversee and are directly responsible for the governance of Freddie Mac, that lays the foundation for Plaintiff's breach of fiduciary duty claims.  Where these Defendants are located, to the extent geographic location is an issue, is of greater importance than unnamed "employees" of the Company.

[6] Engler is the *only* Director out of the *twelve* named in either this or the Related Action who resides in or *even near* Virginia.  *Id.*

centralized and coordinated as *In re Federal Home Loan Mortgage Corp. Sec. & Deriv. Litig. (No. II)*, MDL No. 1584. In briefing before the JPML, while arguing for transfer to the Eastern District of Virginia, Freddie Mac nonetheless averred:

> Freddie Mac will not oppose transfer [of these cases] to the Southern District of New York, in light of the District's special expertise in securities matters, the convenience of New York City generally, the presence of a Freddie Mac office in the city and the location of counsel for Freddie Mac within the Southern District of New York.

Chiplock Decl., ¶ 7 (and Exh. A thereto). The JPML accordingly ordered the litigation to be centralized and transferred to this District. *Id.*, ¶ 8 (and Exh. B thereto). Clearly, Freddie Mac agrees that New York City poses no special burden as a venue to Freddie Mac, and is in fact an efficient forum for complex litigation such as this case. Indeed, the earlier complex cases concerning Freddie Mac were litigated efficiently (approximately eighty depositions were taken) and proceeded to settlement in this District in three years. *Id.*, ¶ 9.

For all of these reasons, Freddie Mac's motion to transfer is fatally flawed, and should be denied. *Factors Etc., Inc.*, 579 F.2d at 218. This fact aside, the additional considerations below also argue against transfer of this case.

### 2. The Location Of Relevant Documents And The Relative Access To Sources Of Proof Does Not Warrant Transfer.

Freddie Mac argues that transfer is warranted, in part, because its electronic documents are stored on servers located in Northern Virginia, and "most" of its paper documents are located in or near Northern Virginia. *See* Cole Decl., ¶ 8. This argument lacks merit. "[T]he location of records is not a compelling consideration when records are easily portable." *Astor Holdings*, *Inc. v. Roski*, No. 01 Civ. 1905, 2002 WL 72936, *12 (S.D.N.Y. Jan. 17, 2002) (denying transfer); *see also Coker v. Bank of America*, 984 F. Supp. 757, 766 (S.D.N.Y. 1997) (holding that "[i]n today's era of photocopying, fax machines and Federal Express," the location of documents factor is neutral).

Electronic documents, by definition, are portable, being capable of electronic duplication and transmission. Indeed, in the earlier, now-settled Freddie Mac shareholder derivative litigation, some six million or more documents were produced on CD-ROMs cheaply and efficiently at the offices of all counsel. Chiplock Decl., ¶ 9. To the extent there are paper documents in Freddie

Mac's possession that are incapable of being produced electronically, Plaintiff's counsel may either travel to Northern Virginia to review them (indeed, one of Plaintiff's law firms has an office in nearby Washington, D.C.), or arrange for their shipping to this District. Lastly, Freddie Mac's argument fails to account for the many documents (electronic or otherwise) that are likely to be in the possession of PwC, Countrywide, WaMu, First American, and others, that are almost certainly not located in Virginia. For these reasons, the location of relevant documents and relative access to sources of proof does not warrant transfer from this District.

### 3.   The Locus Of Operative Facts Does Not Warrant Transfer.

Freddie Mac argues that "Virginia is the locus of operative facts" in this case since the Company conducts most of its business activities there. Cole Decl., ¶¶ 6, 9, 10. This argument lacks merit.

For venue to be proper in this District, it is sufficient that a substantial part of the events underlying Plaintiff's claims occurred here, "even if a greater part of the events occurred elsewhere." *Astor Holdings*, 2002 WL 72936 at *8. Plaintiff alleges that a number of the acts alleged in this case occurred in this District. Compl., ¶ 8. As noted above, most of Freddie Mac's Directors (and several officers, *including the CEO*) live in New York or the northeastern United States. Chiplock Decl., ¶¶ 2-3. Although Freddie Mac's Declaration is totally silent as to where the Director Defendants did any "work" on behalf of the Company, it stands to reason that Freddie Mac's Board of Director meetings at least occasionally took place in New York or the northeastern United States. If necessary, this issue may be further explored by way of discovery.

It should be noted that this litigation does not involve Freddie Mac's normal and routine day-to-day business activities that have been carried out successfully for many years. Rather, Plaintiff's claims are based upon the reckless decision-making at the Board and senior management level and acceptance by them of extraordinary risks. Further, on information and belief (also amenable to confirmation by discovery), the mortgage-backed securities in which Freddie Mac heavily invested, as well as those that were bundled and sold by Freddie Mac, were predominantly purchased and sold "over-the-counter" ("OTC") at trading desks in New York. *Id.*, ¶ 10.

Newspapers have reported that Freddie Mac and its sister agency, Fannie Mae, together have issued approximately $5 trillion in debt and mortgage-backed securities. *Id.*, ¶ 11 (and Exh. C thereto). The high-risk mortgage-backed securities that are at the core of the allegations of this case have been instrumental to Freddie Mac's current financial plight, since Freddie Mac (which guarantees mortgages) has been forced to pay off the holders of mortgage-backed securities when homeowners have no longer been able to make their loan payments. Compl., ¶¶ 31-34, 46-58.

The importance of the New York connections in this case to both the national and *global* economies cannot be overstated. Of the debt and mortgage-backed securities issued by Freddie Mac and Fannie Mae, more than $3 trillion is held by U.S. financial institutions and over $1.5 trillion is held by foreign institutions (particularly Asian banks), making "the stabilization of the two companies essential to the global economy." Chiplock Decl., ¶ 11 (and Exh. C thereto). The majority of the Freddie Mac and Fannie Mae paper purchased for foreign government accounts since the mid-1990's (totaling $985 *billion*) has been done by the New York Federal Reserve, which did so in order to obtain better returns on investments for these foreign governments than ordinary Treasury paper. *Id.*, ¶ 12 (and Exh. D thereto). As *The New York Times* recently reported, "[f]oreign purchases of Fannie and Freddie obligations comprise a big chunk of the billions of dollars that the United States needs every day just to balance its books. Confidence in the companies is inseparable from confidence in the dollar itself." *Id.*, ¶ 13 (and Exh. E thereto).

Finally, where the "operative facts . . . are too spread out to clearly favor either venue" on a motion to transfer, the "locus of operative facts" consideration is rendered neutral. *Price v. Stossel*, No. 07 Civ. 11364, 2008 WL 2434137 (S.D.N.Y. June 4, 2008) (citing *Excelsior Designs, Inc. v. Sheres*, 291 F. Supp. 2d 181, 186 (E.D.N.Y. 2003) (denying transfer)). It is reasonable to assume (and, if the Court deems it necessary, amenable to confirmation through discovery) that the largest number of sub-prime mortgages that were financed by lenders like WaMu and Countrywide and then purchased by Freddie Mac came from more populous states such as New York, Florida and California, rather than Virginia. The "rigged" appraisals that allegedly led to many of these mortgages would also have taken place in these states, outside of Virginia. Indeed, the "locus of

operative facts" as to the aiders and abettors' activities, which gave rise to the sub-prime mortgages to which Freddie Mac became overly exposed, is quite literally national in scope. Freddie Mac accordingly cannot make out a clear and convincing case that the "locus of operative facts" warrants transfer of this case to Virginia, especially since its "Loan Prospector" processing of incoming mortgage loans is nothing more than computer software developed at the behest of the Board and senior management to avoid traditional underwriting and risk analysis. Compl., ¶ 48.

> **4.    Availability Of Process To Compel The Attendance Of Unwilling Witnesses Does Not Warrant Transfer.**

In determining whether a transfer motion is appropriate, courts may also examine the ability to compel the attendance of witnesses in competing venues. *Excelsior Designs*, 291 F. Supp. 2d at 187. Freddie Mac does not make any mention of this factor in its motion and, like the movant in *Excelsior Designs*, "fails to provide any affidavits of potential witnesses stating that such witnesses would not appear if the action remained in New York . . . [and] fails to identify any witnesses who will have to be compelled to testify at the trial in this case." *Id.* Accordingly, this factor does not weigh in favor of transfer. *Id.*[7]

> **5.    The Relative Means Of The Parties Does Not Warrant Transfer.**

On a motion to transfer, where disparity exists between the parties, such as an individual plaintiff suing a large corporation, the relative means of the parties may be considered. *Pall Corp. v. PTI Technologies, Inc.*, 992 F. Supp. 196, 200 (E.D.N.Y. 1998). Freddie Mac does not mention this factor in its motion. Accordingly, Freddie Mac fails to demonstrate that this factor tips in favor of transfer. *Id.* ("[s]ince the defendant offers no argument or financial data in this regard, the Court has no way to assess whether one party's means are more limited than the other's.")

---

[7] Further, "[w]hile it is true that in many situations the unavailability of compulsory attendance of key witnesses is a compelling reason to transfer the case, deposition testimony is an available alternative to live testimony," which can offset the reasons to transfer. *Orb Factory*, 6 F. Supp. 2d at 209 (citations omitted).

**6.    The Competing Venues' Familiarity With Governing Law Does Not Warrant Transfer.**

Freddie Mac argues, without citing any authority, that since "Virginia law will likely govern the substantive claims" in this action, and since "judges in the Eastern District of Virginia will be more familiar with Virginia law" than those in this District, then transfer is warranted. *See* Br. at 8. This argument lacks merit.

This Court "has routinely held that the 'governing law' factor is to be accorded little weight on a motion to transfer venue because federal courts are deemed capable of applying the substantive law of other states." *See Prudential Sec. Inc. v. Norcom Dev., Inc.,* No. 97 Civ. 6308, 1998 WL 397889, at *6 (S.D.N.Y. July 16, 1998) (citing cases); *see also Astor Holdings*, 2002 WL 72936 at *13.[8]  Freddie Mac ignores this line of authority, and also makes no attempt to demonstrate how Virginia law differs in any significant relevant respect from that of New York (or any other state).  Freddie Mac thus has not demonstrated clearly and convincingly that the "governing law" factor warrants transfer.  *See Astor Holdings*, 2002 WL 72936 at *13 ("[t]o the extent this factor could be held to have any weight, defendants have not persuasively argued that California law rather than New York law should apply to Plaintiffs' claims, nor that the two states' laws differ in any significant relevant respect.")  It bears noting, additionally, that this issue caused Judge Sprizzo no difficulty in the previous Freddie Mac derivative litigation.

**7.    The Deference Due To Plaintiff's Chosen Forum And The Interests Of Justice And Efficiency All Counsel Against Transfer.**

Freddie Mac argues that the interests of justice would be better served by transfer, and that the Plaintiff's choice of forum has "little weight" in the Court's decision, because (a) this is a shareholder's derivative suit, (b) Plaintiff does not reside in this District, and (c) this case has "virtually nonexistent" connections with New York.  *See* Br. at 8-10.  Freddie Mac's argument rests on faulty premises and inapposite case-law, and accordingly lacks merit.

---

[8] Indeed, the Court itself noted during the last telephonic hearing that it did not need a tutorial on Virginia's law as it relates to derivative suits and special litigation committees, being similar as it is to laws with which the Court is already quite familiar.

A plaintiff's choice of forum "is entitled to significant consideration and will not be disturbed unless other factors weigh *strongly* in favor of transfer."  *Royal & Sunalliance*, 167 F. Supp. 2d at 576 (emphasis added).  Although the significance of a plaintiff's choice of forum is lessened somewhat in a putative class or shareholder derivative action, the balance of factors favoring transfer must still heavily outweigh those against transfer in order for a movant to satisfy its burden under § 1404(a).  *See, e.g., In re Warrick*, 70 F.3d 736, 741 (2d Cir. 1995) (reversing transfer order in a class case that had been transferred from plaintiff's chosen forum); *Saperstone v. Kapelow*, 279 F. Supp. 781 (S.D.N.Y. 1968) (denying motion to transfer shareholder derivative case to Texas where some defendants and many shareholders resided in New York or the northeastern United States).[9]

In this case, as discussed above and demonstrated in the attached affidavit, the connections to this District are *at least* as strong as those to Virginia – particularly in view of the fact that the number of parties and witnesses from New York and the northeastern United States far outnumbers those from Virginia, and there is no related litigation underway in Virginia (but, rather, related litigation has been filed in this District).  *Cf. Berman*, 30 F. Supp. 2d at 660 (holding that "existence of similar litigation in the transferee district" is "one of the most important factors" when balancing efficiencies on a motion to transfer).  These facts readily distinguish this case from those on which Freddie Mac relies for the contentions that the interests of justice and efficiency would be better served by transfer, and that Plaintiff's choice of forum bears little or no significance.[10]

---

[9] *See also Berman v. Informix Corp.*, 30 F. Supp. 2d 653, 659 (1998) (holding that "[w]here the factors are equally balanced, the plaintiff is entitled to its choice," but granting transfer where multiple class actions had been filed in various fora); *cf. Ravenswood Investment Co. v. Bishop Capital Corp.*, No. 04 Civ. 9266, 2005 WL 236440, at *8 n. 7 (S.D.N.Y. Feb. 1, 2005) (declining to hold as a matter of law that plaintiff's choice of venue was diminished in a shareholder derivative action, and instead holding that plaintiff's choice was "simply outweighed by all the other factors that support transfer").

[10] *See, e.g., Foster v. Litton Indus., Inc.*, 431 F. Supp. 86 (S.D.N.Y. 1977) (transfer granted where even plaintiffs themselves were residents of the transferee district, and only one witness resided outside of the transferee district); *Wolf v. Ackerman*, 308 F. Supp. 1057 (S.D.N.Y. 1969) (transfer granted where related litigation was already well-advanced in transferee district); *Koster v. Lumbermen's Mut. Co.*, 330 U.S. 518 (1947) (affirming dismissal of case where related action was

In sum, absent a clear and convincing showing that the balance of factors weigh strongly in favor of transfer – one which Freddie Mac has failed to provide – Freddie Mac's motion for transfer should be denied.

## II.    ANY FURTHER DELAY OF THIS ACTION BY THE SLC'S ALLEGED INVESTIGATION IS UNJUSTIFIED.

Freddie Mac's request, in the alternative, for a stay of this litigation to permit the SLC "reasonable opportunity to review and evaluate Plaintiff's allegations" lacks merit for four reasons. *See* Br. at 10.  Taken together, these reasons justify denial of Freddie Mac's Motion outright.  At a minimum, they argue for targeted discovery into the activities and investigation plan of the SLC.

### A.    Freddie Mac's Board Ignored Plaintiff's Demands, And The Evidence That It Has Commenced A Review And Evaluation Of the Allegations In This Case, Through The SLC, Is Insufficient.

First, neither Freddie Mac's Board nor any representative of it responded to Plaintiff's written demands during the ninety days permitted under Virginia law.  *See* Va. Code Ann. § 13.1-672.1(B).  There is also insufficient evidence in the record to demonstrate that Freddie Mac has commenced any review and evaluation of the Complaint's allegations.  The Court *may* grant a stay *if* Freddie Mac has commenced such a review.  *See* Va. Code Ann. § 13.1-672.1(C) ("If the corporation commences a review and evaluation of the allegations made in the demand or complaint, the court *may* stay any derivative proceeding for such period as the court deems appropriate.") (emphasis added).

Freddie Mac asserts that it formed the SLC "[u]pon receiving Mr. Bassman's demand letter," to investigate the demands made in that letter as well as "the allegations that form the basis

---

pending in a different forum and plaintiff was "utterly silent as to any reason of convenience of himself or to witnesses" if the case proceeded in New York); *Cartier v. D & D Jewelry Imports*, 510 F. Supp. 2d 344 (S.D.N.Y. 2007) (transfer granted where only connection to New York was plaintiff's residence); *Laborers Local 100 & 397 Pension Fund v. Bausch & Lomb, Inc.*, No. 06 Civ. 1942, 2006 WL 1524590, at *4 (S.D.N.Y. June 5, 2006) (transfer granted where plaintiffs identified no witnesses or defendant parties that resided in or near this District); *In re Stillwater Min. Co. Sec. Litig.*, No. 02 Civ. 2806, 2003 WL 21087953 (S.D.N.Y. May 12, 2003) (transfer granted where no parties resided in this District and only connection to this District was fact that defendant's stock traded on the NYSE); *Ravenswood Investment Co.*, 2005 WL 236440 (transfer granted where principal defendant conducted no business and had no offices in New York, and no defendants were located here).

of the Complaint." Br. at 12. Freddie Mac submits, as evidence for this assertion, a letter dated March 14, 2008 that was allegedly sent to Plaintiff's counsel. *See* Cole Decl., Exh. A. As an initial matter, this letter was sent after the Complaint was filed, or more than ninety days after Plaintiff's demand.[11] Further, as stated above, Plaintiff's counsel has no record of having even received this letter. More importantly, this letter is, on its face, *not* responsive to Plaintiff's demand. Plaintiff sent his demands, addressed to Freddie Mac's *entire* Board of Directors, on December 6, 2007. *See* Compl., Exh. A. In its purported March 14, 2008 "response," however, Freddie Mac refers to Plaintiff's demands as having been made on November 21, 2007 and addressed to Syron personally. *See* Cole Decl., Exh. A. Freddie Mac also claims, in its March 14, 2008 letter, to be "follow[ing]-up" on an alleged prior letter to Plaintiff's counsel dated January 18, 2008 (or less than ninety days after Plaintiff's demand) – a letter that Plaintiff's counsel never received and (judging by Freddie Mac's failure to produce it) does not exist. *Id.*

The circumstances above suggest that, upon receiving notice of the Complaint and having realized that it had not responded to Plaintiff's demand, someone acting on behalf of Freddie Mac's Board (presumably a lawyer) "cut and pasted" a letter that it had sent to another shareholder who may or may not have sent a letter to Richard Syron on November 21, 2007, on topics unknown. It is also possible that Freddie Mac sent one of its other shareholders a letter on January 18, 2008. For all that Plaintiff is aware, however, based on the evidence presented and placed in the record by Freddie Mac, the demands and allegations that the SLC was formed to purportedly investigate were not those asserted by Plaintiff at all. Even if Freddie Mac were to be given the benefit of the doubt on this score, however, Freddie Mac's attempt to fabricate a paper record documenting its alleged "response" to Plaintiff's written demands is disturbing, and reflects negatively on the authenticity of the SLC as a disinterested investigative body. This, combined with the other factors set forth below, is sufficient basis for the Court, in its discretion, to deny Freddie Mac's request for a stay.

---

[11] Virginia law requires that a derivative proceeding not proceed until ninety days have expired from the date demand was made, unless the demand is rejected. Va. Code Ann. § 13.1-672.1(B)(2). Implicitly, Virginia law assumes 90 days will be ample time for a board of directors to determine whether it should reject a shareholder demand or cause the demanded actions to take place.

**B.**     **The SLC Already Has Had Sufficient Time To Review And Evaluate Plaintiff's Allegations.**

Second, assuming (as Freddie Mac claims) that the SLC was formed in January 2008 to review and evaluate the allegations made in Plaintiff's written demands made a month earlier, the SLC already has had sufficient time to complete its task.  The weight of authority provides that a range of six to ten months from the time of an SLC's creation is a reasonable time for an SLC to complete its investigation, even where novel and complex issues of law are concerned.  *See, e.g., Silverstein v. Larson*, No. 04 Civ. 3450, 2005 WL 435241 (D. Minn. Feb. 25, 2005) (collecting cases); *see also Strougo ex rel. Brazil Fund, Inc. v. Padegs*, 986 F. Supp. 812, 815 (S.D.N.Y. 1997) (six month investigation held to be reasonable "considering the complexity and seriousness of the allegations in the Complaint"); *In re Take-Two Interactive Software, Inc. Deriv. Litig.*, No. 06 Civ. 5279, 2007 WL 1875660, at *2 (S.D.N.Y. June 29, 2007) (granting stay of three months for SLC to conclude investigation involving "novel and complex issues of law").  Indefinite stays are inappropriate – particularly where the party opposing the stay "accuses the movant of using the SLC as a dilatory tactic."  *See Rudolph v. Cummins*, No. 06 Civ. 2671, 2007 WL 1189632, at *3 (S.D. Tex. Apr. 19, 2007) (granting 90-day stay); *see also* Compl., ¶ 5.

By the time Freddie Mac's Motion has been adjudicated (if discovery relevant to that motion is not allowed), the SLC will have had more than ten months to complete its purportedly ongoing investigation of the allegations in this case.  *See* Order, July 17, 2008.  This is more than sufficient time for the SLC to have completed its task, and is a sufficient basis on which to deny Freddie Mac's request for a stay of this litigation.

**C.**     **The SLC Is Not Disinterested In This Litigation.**

Third, under applicable law, the SLC is not "disinterested" in this litigation, and therefore unable to render conclusions that will pass muster under operative law.  Accordingly, a stay of this litigation to permit the SLC to ostensibly complete its investigation would not be worthwhile.

Freddie Mac has indicated that the SLC may recommend that this litigation be dismissed at the conclusion of its investigation.  Br. at 11.  Courts interpreting an SLC's power to dismiss derivative litigation under the Virginia Stock Corporation Act have adopted the reasoning of the

Delaware Supreme Court in *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981). *See Abella v. Universal Leaf Tobacco Co., Inc.*, 546 F. Supp. 795, 799-800 (E.D. Va. 1982). Under *Zapata*, a court must undertake a two-pronged inquiry to determine whether an SLC's recommendation of dismissal should be honored. First, the court should inquire into the independence and good faith of the SLC, and the bases supporting its conclusions. *Zapata*, 430 A.2d at 788-89. This independence is not presumed, but rather must be demonstrated. *Id.* Second, the court should apply its own independent business judgment as to whether the SLC's motion should be granted. *Id.* at 789; *see also Abella*, 546 F. Supp. at 800-02 (applying *Zapata* test to motion brought by SLC under Virginia law).

To pass the first prong of the *Zapata* test, an SLC must consist of "disinterested directors" – i.e., those who lack a financial or legal interest in the litigation. *Zapata*, 430 A.2d at 786; *see also Auerbach v. Bennett*, 419 N.Y.S. 2d 920, 927 (1979) (an SLC must "possess a disinterested independence and . . . not stand in a dual relation which prevents an unprejudicial exercise of judgment.") Directors who were on the board during the period complained of in the litigation, as well as those actually named as defendants in the litigation, are not "disinterested" under this analysis. Rather, an SLC should consist of board members who were not on the board during the allegedly wrongful activity, and/or were appointed to the board for the sole purpose of serving on the SLC. *See Abella*, 546 F. Supp. at 800-02; *see also In re Bank of New York Deriv. Litig.*, No. 99 Civ. 9977, 2000 WL 1708173, at *3 (S.D.N.Y. Nov. 14, 2000) (denying stay motion where SLC consisted of board members who were named as defendants and/or whose membership on the board preceded the filing of the lawsuits).

The SLC in this case consists of Defendant Glauber, along two other Directors (Engler and Retsinas) who are both named Defendants in the Related Action. Chiplock Decl., ¶ 14 (and Exh. F. thereto).[12] None of the SLC members were elected or appointed to Freddie Mac's Board for the special purpose of serving on the SLC – rather, all of the SLC members served on the Board before

---

[12] Since Freddie Mac did not identify the SLC members to the Court, Plaintiff has obtained this information from Freddie Mac's public filings.

this action was filed, and during the activities alleged in the Complaint. *Id.* Indeed, as described further below, the Chair of the SLC (Engler) is a veteran of Freddie Mac's last financial debacle, having chaired the SDLC that was appointed to allegedly investigate the claims asserted in the shareholder derivative claims that were filed in 2003 stemming from the accounting fraud by member of senior management and the Board that resulted in, *inter alia*, the Company's multi-billion dollar restatement, massive fines, and multi-hundred million dollar civil settlements. *Id.*

For all of the foregoing reasons, the SLC is not disinterested in this litigation, and any recommendation it makes at the conclusion of its purported investigation will not pass scrutiny under *Zapata*. Freddie Mac's motion for a stay accordingly should be denied. *In re Bank of New York Deriv. Litig.*, 2000 WL 1708173 at *3 (holding that "further delay for the SLC to investigate [the] matter is not warranted" where the SLC is not disinterested.)

### D.    Freddie Mac's Recent History Counsels Against Allowing Further Delay.

Fourth, recent history suggests that Freddie Mac may not be trusted to deal with this matter expeditiously. In December 2003, Freddie Mac formed the SDLC to allegedly investigate the claims asserted in the shareholder demands and ensuing derivative litigation that had been commenced against many of the Company's directors and senior officers related to their multi-billion dollar accounting fraud (now acknowledged by Freddie Mac) and resulting financial restatement that, *inter alia*, caused multi-hundred million dollar damages to the Company. The consolidated shareholder litigation was captioned *In re Federal Home Loan Mortgage Corp. Sec. & Deriv. Litig. (No. II)*, MDL No. 1584. Director Engler, who is the Chair of the SLC, also served as the Chair of the SDLC. Chiplock Decl., ¶ 14 (and Exh. F thereto). Even after Freddie Mac acknowledged the massive accounting fraud by its senior officers and directors, the impotent and apparently inactive SDLC never produced a report or recommendations concerning the allegations made in that litigation. *Id.* The SDLC was disbanded in April 2007 after the litigation settled.

In the present case, Freddie Mac's public filings indicate that the SLC met just *once* during the first four months of its existence (January through April 2008). *Id.* Plaintiff has not been able to locate information more recent than Freddie Mac's April 29, 2008 Proxy Statement that would

indicate whether or if the SLC has met over the last three months.  Since an SLC is typically permitted anywhere from three to ten months to *complete* its investigation, this lack of activity during the first four months of the SLC's lifespan is distressing, and is indicative of the dilatory intent Plaintiff has alleged in the Complaint.  Compl., ¶ 5.  This fact, in combination with those set forth above, argues for denial of Freddie Mac's motion for a stay.  Alternatively, the Court should exercise its discretion to permit targeted discovery to determine whether further delay of these proceedings (in the form of a stay) is warranted.

## III.    THE COURT MAY AUTHORIZE DISCOVERY TARGETED AT DETERMINING WHETHER TRANSFER OR A STAY IS APPROPRIATE

A trial judge has broad discretion, under Fed. R. Civ. P. 26, to "manage the discovery process to facilitate prompt and efficient resolution of [a] lawsuit."  *Crawford-El v. Britton*, 523 U.S. 574, 599 (1998).  Accordingly, in the absence of simply denying Freddie Mac's Motion, the Court may, in its discretion, authorize discovery targeted at determining whether transfer or a stay of this litigation is appropriate.

District courts have broad discretion to authorize discovery relating to jurisdiction and venue disputes.  *See, e.g., In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 811-12 (S.D.N.Y. 2005) (collecting cases); *George v. Kraft Foods Global, Inc.,* No. 06 Civ. 798, 2006 WL 3842169, at *2 (S.D. Ill. Dec. 22, 2006) ("The Court concludes that limited discovery will be helpful in making a fully-informed decision regarding transfer and therefore Plaintiffs' request will be granted."); *PI, Inc. v. Valcour Printed Papers,* 465 F.Supp. 1218, 1220 (S.D.N.Y. 1979) (motion to transfer denied after "discovery limited to the questions of jurisdiction and venue").  As illustrated above, Freddie Mac has failed to meet its burden to demonstrate that transfer of this case is warranted.  Should the Court not feel prepared to so rule at this juncture, however, Plaintiff submits that targeted discovery, including the interrogatories and deposition notices submitted herewith, would aid the Court in its determination.  *See* Chiplock Decl., Exh. G, H.

Additionally, courts routinely allow discovery relating to the independence and conclusions of an SLC prior to determining a motion to dismiss brought by that SLC.  *See, e.g., Strougo*, 986

F.Supp. at 812; *Weiser v. Grace,* 683 N.Y.S.2d 782 (Sup.Ct. 1998).  Although such discovery is typically conducted after an SLC has filed its report and recommendations, along with any motion to dismiss, there is no rule prohibiting targeted discovery of the kind proposed by Plaintiff in the form submitted herewith.  *See* Chiplock Decl., Exh. G, H.

Plaintiff's proposed discovery requests seek information directly relevant to whether transfer or a stay is warranted in this case, including, *inter alia*, the number of shareholders located in and around this District and Virginia, the dates and locations of meetings of the Board, the home addresses of any Board members and senior officers, the number and states of origin of mortgages purchased by Freddie Mac, the amounts and the identities of any purchase or selling agents for any mortgage-backed securities purchased or sold by Freddie Mac, and the status and plan for completion of any purported investigation by the SLC.  *Id.*  Plaintiff submits that the circumstances of this case warrant the limited discovery Plaintiff has proposed in the immediate term, should the Court not feel prepared to simply deny Freddie Mac's Motion at this juncture.

## CONCLUSION

For the reasons stated above, the Court may appropriately deny Freddie Mac's Motion.  In the alternative, the Court should exercise its discretion to permit discovery related to Freddie Mac's Motion, in the form submitted herewith, before deciding it.

Dated: August 1, 2008                    By:_____/s/ *Daniel P. Chiplock*_____
                                                            Daniel P. Chiplock

                                        LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                        Steven E. Fineman (SF 8481)
                                        Daniel P. Chiplock (DC 1137)
                                        780 Third Avenue, 48th Floor
                                        New York, NY 10017
                                        (212) 355-9500

                                        LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                        Richard M. Heimann
                                        275 Battery Street, 30th Floor
                                        San Francisco, CA 94111
                                        (415) 956-1000

CUNEO, GILBERT & LADUCA, LLP
Jonathan W. Cuneo (JC 1112)
Robert J. Cynkar (RC 5309)
David W. Stanley
507 C Street, N.E.
Washington, D.C. 20002
(202) 789-3960

GREENFIELD & GOODMAN, LLC
Richard D. Greenfield (RG 4046)
Marguerite R. Goodman
780 Third Avenue, 48th Floor
New York, New York 10017
(410) 320-5931

*Attorneys for Plaintiff*