# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| R.S. BASSMAN, Derivatively on Behalf of FREDDIE MAC a/k/a Federal Home Loan Mortgage Corporation and its shareholders,<br><br>        Plaintiff,<br><br>  v.<br><br>RICHARD F. SYRON, PATRICIA L. COOK, ANTHONY S. PISZEL, EUGENE M. McQUADE, RICHARD KARL GOELTZ, STEPHEN A. ROSS, SHAUN F. O'MALLEY, ROBERT R. GLAUBER, BARBARA T. ALEXANDER, WILLIAM M. LEWIS, JR., JEFFREY M. PEEK, GEOFFREY T. BOISI, RONALD F. POE, WASHINGTON MUTUAL, INC., PRICEWATERHOUSECOOPERS, LLP, KERRY K. KILLINGER, ANTHONY R. MERLO, JR., FIRST AMERICAN CORPORATION, FIRST AMERICAN EAPPPRAISEIT, COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME EQUITY LOAN TRUST, COUNTRY-WIDE BANK, FSB , COUNTRYWIDE HOME LOANS, INC.,  LANDSAFE, INC., and ANGELO R. MOZILO,<br><br>        Defendants,<br><br>  and<br><br>FREDDIE MAC a/k/a Federal Home Loan Mortgage Corporation,<br><br>        Nominal Defendant. | **Case No. 08-cv-2423-BSJ-JCF** |

## DECLARATION OF DANIEL P. CHIPLOCK IN SUPPORT OF PLAINTIFF'S APPLICATION TO TAKE DISCOVERY, AND, IN THE ALTERNATIVE, OPPOSITION TO NOMINAL DEFENDANT <u>FREDDIE MAC'S MOTION TO TRANSFER OR STAY</u>

I, Daniel P. Chiplock, declare, under penalty of perjury, the following:

1.      I am a partner of the law firm of Lieff, Cabraser, Heimann & Bernstein, LLP ("Lieff Cabraser"), counsel for Plaintiff R.S. Bassman ("Plaintiff").  I submit this

Declaration in support of Plaintiff's Application to Take Discovery, and, In the Alternative, Opposition to Nominal Defendant Freddie Mac's Motion to Transfer or Stay.

2.     Following, on information and belief, based on Plaintiff's counsel's searches of public records and databases, is a list of the cities and states of residence for each of the Director Defendants named in this action and/or the related action pending in this District, *Esther Sadowsky Testamentary Trust v. Syron, et al.*, No. 1:08-cv-05221-BSJ-JCF (S.D.N.Y.) (the "Related Action") (names with asterisks are identified only in the Related Action):

| Name | City/State of Residence |
|------|------------------------|
| Richard K. Goeltz | New York, NY |
| Stephen A. Ross | New Haven, CT |
| Shaun F. O'Malley | Philadelphia, PA |
| Robert R. Glauber | Brookline, MA |
| Barbara T. Alexander | Dana Point, CA |
| William M. Lewis, Jr. | New York, NY |
| Jeffrey M. Peek | New York, NY |
| Geoffrey T. Boisi | Locust Valley, NY |
| Ronald F. Poe | Armonk, NY |
| Michelle D. Engler* | McLean, VA |
| Nicholas P. Retsinas* | Providence, RI |
| Thomas S. Johnson* | New York, NY |

3.     Following, on information and belief, based on Plaintiff's counsel's searches of public records and databases, is a list of the cities and states of residence for each of

the Officer Defendants named in this action and/or the Related Action pending in this District

(names with asterisks are identified only in the Related Action):

| Name | City/State of Residence |
|------|------------------------|
| Richard F. Syron | Chestnut Hill, MA |
| Patricia L. Cook | Washington, D.C. |
| Anthony S. Piszel | Great Falls, VA |
| Eugene M. McQuade | East Greenwich, RI |
| Martin Baumann* | Manhasset, NY |

4.      Following is a list of the states of incorporation and headquarters for the

corporations named as Defendants in this action besides Freddie Mac:

| Name | Incorporated in | Headquartered in |
|------|-----------------|------------------|
| PricewaterhouseCoopers LLP ("PwC") | DE | NY |
| Washington Mutual, Inc. ("WaMu") | WA | WA |
| Countrywide Financial Corp. ("Countrywide") | DE | CA |
| First American Corp. ("First American") | CA | CA |
| eAppraiseIT | DE | MA/CA |
| Landsafe, Inc. ("Landsafe") | DE | TX |

5.      Following, on information and belief, based on Plaintiff's counsel's

searches of public records and databases, is a list of the cities and states of residence for each of

the officers of WaMu, eAppraiseIT, and Countrywide that are named in this action:

| Name | City/State of Residence |
|------|------------------------|
| Kerry K. Killinger (CEO of WaMu) | Shoreline, WA |
| Anthony R. Merlo (President of eAppraiseIT) | Temecula, CA |

Angelo R. Mozilo (CEO of Countrywide)                 Thousand Oaks, CA

6.      Freddie Mac has offices in this District, located at 122 East 42nd Street, 4th Floor, New York, New York  10168.

7.      Attached hereto as Exhibit A is a true and correct excerpt of the Reply Memorandum in Further Support of Federal Home Loan Mortgage Corporation's Motion for Transfer and Coordination or Consolidation Pursuant to 28 U.S.C.§ 1407 ("MDL Reply") filed by Freddie Mac in *In re Federal Home Loan Mortgage Corp. Sec. & Deriv. Litig. (No. II)*, MDL No. 1584 on November 17, 2003.  On page 12, footnote 7, of the MDL Reply, Freddie Mac stated the following:  "Freddie Mac will not oppose transfer [of these cases] to the Southern District of New York, in light of the District's special expertise in securities matters, the convenience of New York City generally, the presence of a Freddie Mac office in the city and the location of counsel for Freddie Mac within the Southern District of New York."

8.      Attached hereto as Exhibit B is a true and correct copy of the Transfer Order by the Judicial Panel on Multidistrict Litigation ("JPML"), dated February 18, 2004, ordering the cases in *In re Federal Home Loan Mortgage Corp. Sec. & Deriv. Litig. (No. II)*, MDL No. 1584 centralized and transferred to the Southern District of New York.

9.      Approximately eighty depositions were taken and six million or more pages of documents were produced on CD-ROM during the course of discovery in *In re Federal Home Loan Mortgage Corp. Sec. & Deriv. Litig. (No. II)*, MDL No. 1584, which was resolved by way of settlement in this District in early 2007.

10.      On information and belief, the mortgage-backed securities in which Freddie Mac heavily invested, as well as those that were bundled and sold by Freddie Mac, were predominantly purchased and sold "over-the-counter" ("OTC") at trading desks in New York.

11.     Attached hereto as Exhibit C is a true and correct copy of an article by Martin Crutsinger, entitled "Treasury: Support for Mortgage Giants Needed," published in washingtonpost.com on July 22, 2008.

12.     Attached hereto as Exhibit D is a true and correct copy of an article by Martin Mayer, entitled "Mortgaged to the World," published in The New York Times Online on July 29, 2008.

13.     Attached hereto as Exhibit E is a true and correct copy of an editorial entitled "A Time for Urgency," published in The New York Times Online on July 23, 2008.

14.     Attached hereto as Exhibit F is a true and correct excerpt of Freddie Mac's Proxy Statement and Notice of Annual Meeting of Stockholders, dated April 29, 2008 ("Proxy Statement").  On page 18, the Proxy Statement describes the Special Derivative Litigation Committee (or "SDLC") as having been created in December 2003 to "investigate allegations and claims relating to Freddie Mac's financial restatements made in stockholder derivative litigation against certain current and former executive officers of the company," and indicates that the SDLC was dissolved in April 2007.  On information and belief, the SDLC never intervened or produced a report or recommendations in *In re Federal Home Loan Mortgage Corp. Sec. & Deriv. Litig. (No. II)*, MDL No. 1584.  Page 19 of the Proxy Statement identifies the members of the now-disbanded SDLC, which was Chaired by Michelle Engler ("Engler").

On page 18, the Proxy Statement also describes the Special Litigation Committee ("SLC") as having been formed in January 2008 to "conduct a review and evaluation of allegations and claims set forth in stockholder demand letters received in November and December 2007 in connection with the company's losses in the third quarter of 2007."  On page 19, the Proxy Statement identifies the members of the SLC as Engler (director since 2001 who

also Chaired the SDLC), Nicolas P. Retsinas ("Retsinas") (director since 2007), and Robert R. Glauber ("Glauber") (director since 2006), and indicates that the SLC did not meet in 2007 and met only once prior to April 23, 2008.

15.    Attached hereto as Exhibit G is a true and correct copy of Plaintiff's [Proposed] First Set of Interrogatories to Nominal Defendant Freddie Mac.

16.    Attached hereto as Exhibit H are true and correct copies of Plaintiff's [Proposed] Notices of Deposition under Fed. R. Civ. P. 30(b)(6) to (a) Nominal Defendant Freddie Mac and (b) Hunton & Williams (counsel to the SLC).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  August 1, 2008                    By:_____/s/ *Daniel P. Chiplock*_____
                                                              Daniel P. Chiplock (DC 1137)

# EXHIBIT A

MDL 1584

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV 1 7 2003

FILED
CLERK'S OFFICE



BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| | )     MDL Docket No. 1584 |
| FEDERAL HOME LOAN MORTGAGE CORP. | ) |
| SECURITIES LITIGATION II | ) |
| | ) |

REPLY MEMORANDUM IN FURTHER SUPPORT OF
FEDERAL HOME LOAN MORTGAGE CORPORATION'S MOTION FOR TRANSFER
AND COORDINATION OR CONSOLIDATION PURSUANT TO 28 U.S.C. § 1407

         In further support of its motion for transfer and coordination or consolidation

pursuant to 28 U.S.C. § 1407 and Rule 7.2 of the Rules of Procedure for the Judicial Panel on

Multidistrict Litigation ("the Panel"), Federal Home Loan Mortgage Corporation ("Freddie

Mac"), by its counsel, respectfully submits this reply memorandum of law in further support of

its motion to transfer five actions, pending in two federal district courts, to the United States

District Court for the Eastern District of Virginia and to consolidate or coordinate all pretrial

proceedings therein.

Preliminary Statement

         Freddie Mac faces five separate lawsuits (collectively, the "Lawsuits") in two

federal district courts: (1) a securities class action in the Southern District of Ohio (the "Ohio

OFFICIAL FILE COPY
IMAGED NOV 18 '03

Class Action"); (2) a securities class action in the Southern District of New York (the "New York Class Action"); (3) a shareholder derivative action in the Southern District of New York (the "Derivative Action"); (4) an ERISA class action in the Southern District of Ohio (the "Martin ERISA Class Action"); and (5) another ERISA action that was originally filed in the Eastern District of Virginia, but was subsequently withdrawn and re-filed in the Southern District of Ohio (the "Wilson ERISA Class Action").[1] Each of the Lawsuits alleges at length the same specific misconduct by Freddie Mac and/or certain of its officers and directors. It is likely that further suits will be brought based on the same allegations, as the recent filing of the ERISA Actions demonstrates. In fact, a shareholder demand was made on the Board of Directors of Freddie Mac on August 1, 2003, which will likely result in the filing of another shareholder derivative action in federal court. Both to avoid duplicative discovery and inconsistent pre-trial rulings and to conserve the resources of the parties and the courts, the Panel should transfer the Lawsuits to a single court for coordinated or consolidated pretrial proceedings. Neither the New York Class Action Plaintiffs nor the Derivative Action Plaintiffs oppose transfer and coordination.

Furthermore, as Freddie Mac's memorandum in support of its motion demonstrated, these cases belong in the Eastern District of Virginia. Originally, nine cases were pending against or on behalf of Freddie Mac in the Eastern District of Virginia, until the plaintiffs in those cases voluntarily dismissed them. In fact, the Wilson ERISA Class Action was originally filed in the Eastern District of Virginia, only to be dismissed and re-filed in the

---

[1] The Wilson ERISA Class Action was filed on October 10, 2003 and served on Freddie Mac on November 7, 2003, while the Martin ERISA Class Action was filed on November 5, 2003. A notice of both "tag-along" actions has been filed simultaneously with this Reply Brief.

In sum, everything about these lawsuits leads to the conclusion that the Eastern District of Virginia is the appropriate forum. The cases should be transferred and consolidated there for pre-trial purposes to avoid inconsistent rulings and a waste of resources, to the prejudice of the parties and the courts.[7]

### Conclusion

For the reasons set forth above and in Freddie Mac's memorandum in support of its motion, Freddie Mac respectfully requests that the Panel coordinate or consolidate the five cases before it and transfer them to the Eastern District of Virginia.

---

[7] Although the Eastern District of Virginia is, by every measure relevant to efficiency and justice, the most appropriate forum for the Lawsuits, Freddie Mac will not oppose transfer to the Southern District of New York, in light of the District's special expertise in securities matters, the convenience of New York City generally, the presence of a Freddie Mac office in the city, and the location of counsel for Freddie Mac within the Southern District of New York.

Dated: November 14, 2003

Respectfully submitted,

COVINGTON & BURLING

By: *C. William Phillips / JJ*
       C. William Phillips

J. Jay Lobell
Preethi Krishnamurthy
1330 Avenue of the Americas
New York, New York 10019
(212) 841-1000

Jay T. Smith
Julie L.B. Johnson
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 662-6000

Attorneys for Defendant Federal Home Loan
Mortgage Corporation

OF COUNSEL:

Diane M. Ennist
Dean S. Cooper
Hyacinth G. Kucik
Federal Home Loan Mortgage Corp.
McLean, Virginia 22101

# EXHIBIT B

A CERTIFIED TRUE COPY

FEB 1 8 2004

ATTEST _____
FOR THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 1 8 2004

FILED
CLERK'S OFFICE

*RELEASED FOR PUBLICATION*

*DOCKET NO. 1584*

03 Civ 4910

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE FEDERAL HOME LOAN MORTGAGE CORP. SECURITIES & DERIVATIVE LITIGATION (NO. II)

## BEFORE WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, BRUCE M. SELYA, D. LOWELL JENSEN, J. FREDERICK MOTZ AND ROBERT L. MILLER, JR., JUDGES OF THE PANEL

## TRANSFER ORDER

This litigation presently consists of three actions: two actions in the Southern District of New York and one action in the Southern District of Ohio.[1] Before the Panel is a motion, pursuant to 28 U.S.C. § 1407, by the Federal Home Loan Mortgage Corporation (Freddie Mac) to centralize these actions in the Eastern District of Virginia for coordinated or consolidated pretrial proceedings. Plaintiffs in the New York actions agree that centralization is appropriate, but suggest the Southern District of New York as transferee district. The Ohio plaintiffs (and lead plaintiff movants) – Ohio Public Employees Retirement System and State Teachers Retirement System of Ohio – oppose 1407 centralization; if the Panel deems centralization appropriate, they suggest the Southern District of Ohio as transferee district.

On the basis of the papers filed and hearing session held, the Panel finds that the actions in this litigation involve common questions of fact, and that centralization in the Southern District of New York will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. All actions share factual questions arising out of alleged accounting irregularities at Freddie Mac which resulted in its understating of earnings for fiscal years 2000 through 2003. Centralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary.

The Panel is persuaded that the Southern District of New York is an appropriate transferee district for this litigation. We note that i) two of the three actions now before the Panel are pending there; and ii) the New York district is readily accessible for parties and witnesses.

---

[1]  The Panel has been notified that three potentially related actions are pending in the following federal districts: two actions in the Southern District of Ohio and one action in the Eastern District of Virginia. These actions and any other related actions will be treated as potential tag-along actions. *See* Rules 7.4 and 7.5, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001).

- 2 -

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the action on the attached Schedule A pending in the Southern District of Ohio is transferred to the Southern District of New York and, with the consent of that court, assigned to the Honorable John E. Sprizzo for coordinated or consolidated pretrial proceedings with the actions pending there.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

# SCHEDULE A

<u>MDL-1584 -- In re Federal Home Loan Mortgage Corp. Securities & Derivative Litigation (No. II)</u>

### <u>Southern District of New York</u>

*Roger Sprigle, et al. v. Federal Home Loan Mortgage Corp., et al.*, C.A. No. 1:03-4261
*Esther Sadowsky Testamentary Trust, etc. v. Leland C. Brendsel, et al.*, C.A. No. 1:03-4910

### <u>Southern District of Ohio</u>

*Ohio Public Employees Retirement System, et al. v. Federal Home Loan Mortgage Corp., et al.*, C.A. No. 2:03-711

# EXHIBIT C

# washingtonpost.com

# Treasury: Support for mortgage giants needed

By MARTIN CRUTSINGER
The Associated Press
Tuesday, July 22, 2008; 8:59 AM

WASHINGTON -- Treasury Secretary Henry Paulson said Congress needs to quickly approve a support package for Fannie Mae and Freddie Mac to make sure the two mortgage giants maintain their critically important role in housing finance.

Paulson said Tuesday that the continued operations of Fannie and Freddie _ which guarantee or own almost half of the home mortgages in the country _ would be "central to the speed with which we emerge from this housing correction."

Paulson made his comments in a speech in New York in which he again sought to reassure Americans that despite the recent turmoil, the nation's banking system is fundamentally sound.

Treasury officials confirmed that bank examiners from both the Federal Reserve and the Office of the Comptroller are currently inspecting the books at both Fannie Mae and Freddie Mac. Paulson said in an interview published Tuesday in the New York Times that he believed the results of those examinations would provide an important signal of confidence for the markets.

Paulson spoke in advance of the release later Tuesday of a review by the Congressional Budget Office giving an estimate of the budgetary impact of the administration's request for new authority to provide support for Fannie Mae and Freddie Mac.

After a period of market turbulence in which fears grew about the fiscal soundness of both institutions, the administration on July 13 unveiled a plan to provide unlimited government loans to the two mortgage giants and also to purchase stock in the two companies if needed. Paulson has stressed that the proposal is a backup effort that would be in effect for 18 months as a way to calm investor fears.

Critics have charged that the open-ended offer of support exposes taxpayers to billions of dollars of losses, however.

The administration and leaders in both the House and Senate have been in negotiations over the plan. Paulson predicted in his speech that Congress would "act to complete work on this legislation this week." The House is expected to vote on the support plan as part of a larger housing rescue package on either Wednesday or Thursday.

Paulson said that Fannie and Freddie have issued $5 trillion in debt and mortgage backed securities. Of that amount more than $3 trillion is held by U.S. financial institutions and over $1.5 trillion is held by foreign institutions, making the stabilization of the two companies essential to the global economy.

"Because of their size and scope, Fannie and Freddie's stability is critical to financial market stability,"

Paulson told an audience at the New York Public Library. "Investors in our nation and around the world need to know that we understand how important these institutions are to our capital markets broadly and to the U.S. economy."

The effort to provide support to the two mortgage giants follows the government's involvement in dealing with the near-collapse of Bear Stearns in March when the Federal Reserve provided a $30 billion loan to facilitate the sale of Bear Stearns to JPMorgan.

Financial markets calmed down after the Bear Stearns episode in March only to become more turbulent in recent weeks as worries increased about mounting losses at financial institutions due to bad mortgage loans.

Paulson cautioned that the country should expect "additional bumps in the road. We have been experiencing more bumps recently and until the housing market stabilizes further we should expect some continued stresses in our financial markets."

In an effort to reassure Americans about the safety of their bank deposits, Paulson said that even with the failure earlier this month of savings and loan IndyMac Bank, no money was lost on deposits insured by the Federal Deposit Insurance Corp., which insures accounts up to $100,000.

"No one has or will lose a penny of insured deposits," Paulson said. "The American people have every reason to remain confident that the U.S. banking system is sound."

Paulson noted that of the nearly 8,500 insured banks and thrifts in the country, 99 percent are considered well-capitalized, meaning that they have sufficient reserves to protect against losses on loans. He said the failure of one thrift and four commercial banks this year was "hardly comparable" to the period of the savings and loan crisis during the 1980s when there were an average of 255 failures per year.

© 2008 The Associated Press

# EXHIBIT D

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY

☒

July 29, 2008

OP-ED CONTRIBUTOR

# Mortgaged to the World

**By MARTIN MAYER**

Shelter Island, N.Y.

CONGRESS has given the Bush White House yet another chance to operate outside the Constitution. Unsurprisingly, the administration has taken it. Treasury Secretary Henry Paulson now has the go-ahead for his two-part plan to salvage Fannie Mae and Freddie Mac, the government-sponsored mortgage companies — a blueprint that violates fundamental American principles in two worrisome ways.

First, the Treasury will be allowed to advance money to Fannie and Freddie (and even to buy their stocks) in unlimited quantities to keep them afloat — in any fashion Mr. Paulson sees fit. Yet the Constitution requires that "no money shall be drawn from the Treasury, but in consequence of appropriations made by law." Even in wartime, budgets for the military specify how much is to be spent for what purposes.

Second, as an alternative to increasing the national debt, Mr. Paulson wants to let the two mortgage lenders become preferred customers of the Fed's discount window, with the authority to pawn their own securities for cash. But only Congress has the constitutional power to borrow on the credit of the United States. Wright Patman, who headed the House Banking Committee from 1963 to 1975, liked to say that the Constitution gave Congress exclusive power to coin money and regulate its value, and that power was merely "farmed out" to the Federal Reserve.

It isn't a good idea to authorize the Treasury secretary to spend unlimited amounts of taxpayer money, even accepting the administration's argument that Mr. Paulson will probably never have to use it. Even worse is the notion that the Fed's portfolio of assets — assets that back our currency — should be polluted by the inferior stuff of collateralized mortgage obligations.

Fortunately, there might just be a way to bail out Fannie and Freddie without willfully ignoring the Constitution. Should the two mortgage firms need a cash infusion, Mr. Paulson could spare the Treasury and dip into a little-known pool of money called the Exchange Stabilization Fund.

A little history first. One reason the federal government is under an obligation to guarantee full payment of the debt instruments issued by Fannie Mae and Freddie Mac stems from a decision made at the Federal Reserve Bank of New York about a dozen years ago.

Historically, foreign central banks that found themselves with excess dollars as the result of the American trade deficit invested that money exclusively in Treasury notes and bills. As a service, the New York Fed made those investments for them, guaranteeing them the best current price and retaining legal custody of the paper as their agent.

However, by the mid-1990s the countries that had large trade surpluses with the United States — primarily in East Asia and the Persian Gulf — began to demand a better return on investment than that offered by Treasury paper. In response, the New York Fed began to buy them "federal agency" paper — including large amounts of obligations from Fannie and Freddie. This paid somewhat better interest, and while it was not officially guaranteed by the government in the way Treasury bills were — well, you know, if push came to shove, Washington could be counted on to do the right thing.

These foreign-government accounts now hold $985 billion worth of Fannie and Freddie paper. It explains why, in mid-July, Secretary Paulson (as well as Senator Chris Dodd, the Connecticut Democrat who heads the Senate Banking Committee) began giving press conferences about how sound the two firms really were, no need to worry. Behind the scenes, Treasury officials overseas made phone calls to the local central banks and finance ministries, stressing that the two mortgage giants would weather the storm.

But the truth is that nobody knows. Fannie and Freddie have financed several hundred billion dollars of doubtful mortgage paper that may or may not pay off enough to meet their debts, and they cannot predict whether they will have gains or losses from their gigantic exposures in the derivatives markets.

If the government had not guaranteed the full payments of principal and interest on their paper, the foreign governments that own so much of it might have had to show losses on their dollar-denominated accounts. To say the least, this would make them reluctant to continue to finance our trade deficit, our wars and the strength (such as it is) of our dollar. Our interest rates, and not just for mortgages, would soar.

So the debate about whether dishonest lenders and dumb borrowers should have been bailed out was really meaningless — the conclusion was foregone. The international position of the dollar had to be defended against even the hint of possible failure at Fannie and Freddie; they had to be saved at all costs.

This brings us to the Exchange Stabilization Fund, which could give the government the means to save Fannie and Freddie without ignoring the Constitution. The fund was started in 1934 as a place to set aside the profits credited to the government when President Franklin Roosevelt took possession of the nation's monetary gold. It's been used sparingly ever since, perhaps most notably when Treasury Secretary Robert Rubin used it to extend a $20 billion line of credit to Mexico in 1995.

The net wealth of the fund, most of which can be realized with the stroke of a pen, is about $41 billion. Among the uses specified when it was created was maintaining "orderly exchange arrangements and an orderly system of exchange rates." Nothing could be more disruptive of orderly exchange arrangements than even the hint of a default at Fannie and Freddie.

Just because Congress has given Mr. Paulson a blank check to dip into the Treasury doesn't mean he has to do it. Among the advantages of using the stabilization fund is that it comes with built-in Congressional oversight — a mandatory monthly review by Congress was written into the law in 1978. Should conditions worsen at Fannie and Freddie, Congress would have an early warning system.

We should all hope that Fannie Mae and Freddie Mac escape this jam on their own. Should they falter, however, it's only sensible for the Treasury and Congress to have a plan to step in. But the bailout bill that President Bush is expected to sign this week will give Secretary Paulson untested and unconstitutional powers. Why take that leap when there are proved alternatives like the Exchange Stabilization Fund?

*Martin Mayer is a guest scholar with the Brookings Institution.*

Copyright 2008 The New York Times Company

Privacy Policy | Search | Corrections | **RSS** | First Look | Help | Contact Us | Work for Us | Site Map

# EXHIBIT E

Editorial - A Time for Urgency - Editorial - NYTimes.com    http://www.nytimes.com/2008/07/23/opinion/23wed1.html?sq=fanni...

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY 

July 23, 2008

EDITORIAL

# A Time for Urgency

In the nearly two weeks since he announced a plan to rescue Fannie Mae and Freddie Mac from insolvency, if need be, Treasury Secretary Henry Paulson has insisted that it is vital for Congress to approve the proposal quickly, preferably, this week. To help ensure quick approval, it has been attached to a larger foreclosure prevention bill that Congress is finalizing.

Unfortunately, support for swift passage is mixed from one important quarter: Mr. Paulson's boss, President Bush.

On Monday, the White House renewed its threat to veto the foreclosure prevention bill if it contains a $4 billion block grant program for states to buy up foreclosed properties. The veto threat is misguided, first, on policy grounds. Mr. Bush wrongly portrays the grant as a handout to speculators when its main thrust actually is to protect communities from a destabilizing buildup of abandoned, unsold homes.

The veto threat also is a bad idea politically. Mr. Bush has not objected when the big firms and rich executives of Wall Street have been on the receiving end of federal assistance, but now he is threatening to block a measure to aid hard-hit neighborhoods filled with ordinary Americans. Worst of all, at this juncture in the year-old financial crisis, when perceived weakness of Fannie Mae and Freddie Mac threaten global financial upheaval, Mr. Bush's veto threat undermines the urgency that his treasury secretary is rightly seeking to convey. That complicates passage of the rescue plan and presents a picture of policy disarray to the rest of the world.

The purpose of the rescue proposal — which would allow the Treasury Department to use taxpayer dollars to buy obligations and securities of Fannie Mae and Freddie Mac, if needed, to keep the companies afloat — is to restore confidence in the United States' ability and commitment to contain the financial crisis. If Mr. Bush himself is a roadblock — and lawmakers, following his cue, find their own reasons to delay and finagle — confidence will be damaged, not bolstered.

Mr. Paulson must also acknowledge, more clearly than he has so far, that he is asking Congress to approve a plan that puts taxpayers at great risk. He has been playing down that risk to date, feeding public insecurity rather than reducing it.

In an interview on Tuesday with reporters and editors at The Times, Mr. Paulson said the risk of taxpayer loss was lessened because Fannie and Freddie had "good" collateral for any loans they may receive. But the audit of the two companies by federal regulators is not yet complete, and, in fact, questions remain about the quality of the assets the companies hold and guarantee.

On Tuesday, the Congressional Budget Office reported that 15 percent of their portfolios —$780 billion — is composed of assets that are subprime or Alt-A, the level just above subprime. The budget agency believes

that there's a better than 50 percent chance that the government would never have to step in to bailout the companies. But if it had to, the sums could be huge.

Mr. Paulson should be upfront with Americans about the risk and explain that the best way to deal with it is to develop a comprehensive response. He should also be frank about the far worse risks of delay and inaction. Foreign purchases of Fannie and Freddie obligations comprise a big chunk of the billions of dollars that the United States needs every day just to balance its books. Confidence in the companies is inseparable from confidence in the dollar itself.

The president must lead and Congress must act, and in a timely way. The nation's leaders bear enormous responsibility for their inaction as the financial crisis developed. They should not compound that sin by failing to take the necessary, if politically unpopular, steps to clean up the mess they helped to create. And they must take those steps soon.

Copyright 2008 The New York Times Company

# EXHIBIT F

# FEDERAL HOME LOAN MORTGAGE CORPORATION

## PROXY STATEMENT AND NOTICE OF
## ANNUAL MEETING OF STOCKHOLDERS

Our annual meeting of stockholders will be held on Friday, June 6, 2008, at 9:00 a.m. at the Freddie Mac office located at 8000 Jones Branch Drive, McLean, Virginia 22102, for the purposes of:

(1) electing 11 members to our Board of Directors, each for a term ending on the date of our next annual meeting;

(2) ratifying the appointment by the Audit Committee of our Board of Directors of PricewaterhouseCoopers LLP as our independent auditors for the fiscal year ending December 31, 2008;

(3) approving the amendment and restatement of the 2004 Stock Compensation Plan; and

(4) transacting any other business that may properly come before the meeting or any adjournment thereof.

---

### RECORD DATE

March 31, 2008 is the record date for the annual meeting. This means that owners of Freddie Mac common stock at the close of business on that date are entitled to receive notice of the meeting, and vote at the meeting or any meeting adjournment.

Stockholders of record on the record date will be admitted to the meeting with photo identification and proof of stock ownership (as described in "Annual Meeting Admission" below).

### WHO MAY ATTEND THE MEETING

Attendance is limited to stockholders, including persons holding proxies from stockholders, and one guest each. Invited representatives of the media may attend the meeting.

### ANNUAL MEETING ADMISSION

Registration begins at 8:00 a.m. A valid photo identification and proof of stock ownership must be presented in order to attend the meeting.

If your shares are registered in your name, you should bring the bottom half of the proxy card, which is your admission ticket. If you hold Freddie Mac stock in the name of a broker, trust, bank or other nominee ("street name"), you must bring a copy of an account statement reflecting your stock ownership as of the record date. If you plan to attend as the proxy of a stockholder, you must present valid proof of proxy. Cameras, recording devices and other electronic devices are not permitted at the meeting.

### WEBCAST OF THE MEETING

If you are not able to attend the meeting in person, you may listen to a live webcast of the meeting on the Internet by visiting http://www.freddiemac.com/investors at 9:00 a.m. on June 6, 2008. You will not be able to ask questions unless you attend the meeting in person.

### SECURITY AND PARKING AT THE MEETING

The annual meeting will be held at the Freddie Mac campus. The campus consists of several buildings, so please take note that 8000 Jones Branch Drive is the address of the building where the meeting will be held.

Reserved parking will be available for annual meeting attendees. Security measures will require that photo identification and your admission ticket or proof of stock ownership (as described in "Annual Meeting Admission" above) be presented to the security guard in order to access the reserved parking area.

Our Board of Directors recommends that you vote **"FOR"** the election of directors, the ratification of the appointment of our independent auditors and the amendment and restatement of the 2004 Stock Compensation Plan.

Your vote is important. Please vote your proxy promptly so your shares can be represented at the annual meeting, even if you plan to attend the annual meeting. You can vote by Internet, by telephone, or by using the enclosed proxy card. Please see your proxy card for specific instructions on how to vote.

**Our proxy tabulator, Computershare Trust Company N.A., must receive any proxy that will not be delivered in person to the annual meeting by 11:59 p.m., eastern time, on Thursday, June 5, 2008.**

**Unless you will be voting your shares in person at the annual meeting, you have the power to revoke a proxy at any time until 11:59 p.m. eastern time, on Thursday, June 5, 2008 by giving the Corporate Secretary of Freddie Mac written notice of your revocation or by submitting a later dated proxy. You may also revoke your proxy by voting your shares in person at the annual meeting.**

The accompanying Proxy Statement contains information describing each matter we expect to be presented for action at the annual meeting.

By Order of the Board of Directors,

Robert E. Bostrom
*Executive Vice President, General Counsel and Corporate Secretary*

Dated: April 29, 2008
McLean, Virginia

# TABLE OF CONTENTS

About the Meeting ................................................................... 1
Corporate Governance ............................................................. 5
    Corporate Governance Guidelines .............................................. 5
    Director Independence ......................................................... 5
    Director Qualifications ......................................................... 6
    Audit Committee Financial Expert ............................................. 6
    Codes of Conduct ............................................................. 6
    Chairman of the Board ........................................................ 7
    Lead Director ................................................................. 7
    Contacting the Board .......................................................... 7
    Stock Ownership by Directors, Executive Officers and Greater than 5% Holders ..... 8
Proposal 1: Election of Directors ................................................... 11
    Director Nomination Process ................................................... 11
    Nominees for Election ......................................................... 11
    Meetings of the Board and Committees ......................................... 18
    Board Compensation .......................................................... 21
    Transactions with Institutions Related to Directors .............................. 26
    Policy Governing Related Person Transactions ................................... 27
Audit Committee Report ............................................................ 30
Executive Officers .................................................................. 32
Report of the CHRC ................................................................ 35
Compensation Discussion and Analysis .............................................. 35
Executive Compensation ............................................................ 61
Proposal 2: Ratification of Appointment of Independent Auditors ...................... 86
    Description of Fees ............................................................ 86
    Approval of Independent Auditor Services and Fees ............................. 86
Proposal 3: Approval of Amended and Restated 2004 Stock Compensation Plan ......... 88
Securities Authorized for Issuance Under Equity Compensation Plans .................. 99
Other Proposed Actions ............................................................ 99
Availability of Annual Report ....................................................... 99
Section 16(a) Beneficial Ownership Reporting ....................................... 99
Stockholder Proposals and Nominations for Next Annual Meeting of Stockholders ....... 100
Solicitation by Board; Expenses of Solicitation ...................................... 101
Appendix A: 2004 Stock Compensation Plan, as amended and restated ................. A-1



**MICHELLE ENGLER**                                    Director since 2001

Age 50

Ms. Engler is an attorney and is Trustee of the JNL Series Trust and the JNL Investor Series Trust, each an investment company, and has been a member of the board of managers of each of the JNL Variable Funds L.L.C. since 2000. From 1992 to 2000, she was of counsel to the law firm of Varnum, Riddering, Schmidt & Howlett, a Grand Rapids, Michigan-based law firm. Prior to that, she was a partner in the Houston law firm of Nathan, Wood & Sommers. Ms. Engler served on our Board as a Presidential appointee from 2001 through March 31, 2004, when she was elected to our Board by the stockholders.



**ROBERT R. GLAUBER**                                 Director since 2006

Age 69

Mr. Glauber is a Lecturer at Harvard's Kennedy School of Government. Prior to that, he served as Chairman and Chief Executive Officer of the National Association of Securities Dealers, or NASD, from September 2001 to September 2006, after becoming NASD's CEO and President in November 2000 and a member of NASD's board in 1996. Prior to becoming an officer at NASD, he was a Lecturer at the Kennedy School from 1992 until 2000, Under Secretary of the Treasury for Finance from 1989 to 1992 and, previous to that, a Professor of Finance at the Harvard Business School. Mr. Glauber served as Executive Director of the Task Force appointed by President Reagan to report on the 1987 stock market break ("Brady Commission"). He has served on the board of the Federal Reserve Bank of Boston, a number of Dreyfus mutual funds, the Investment Company Institute, and as president of the Boston Economic Club. Mr. Glauber also is a director of Moody's Corporation, where he is a member of the Audit Committee; and lead director of XL Capital Ltd. Mr. Glauber has been a Senior Advisor at Peter J. Solomon Co., an investment bank, since November 2006.

*Proposal 1: Election of Directors*



### NICOLAS P. RETSINAS                    Director since 2007

Age 61

Since 1998, Mr. Retsinas has been Director of Harvard University's Joint Center for Housing Studies, where Ms. Alexander is an Executive Fellow. He also is a lecturer in Housing Studies at the Graduate School of Design and the Kennedy School of Government, and is a lecturer in Real Estate at the Harvard Business School. Prior to his Harvard appointment, Mr. Retsinas served as Assistant Secretary for Housing — Federal Housing Commissioner at the United States Department of Housing and Urban Development from 1993 to 1998 and as Director of the Office of Thrift Supervision from 1996 to 1997. He served on the Board of the Federal Deposit Insurance Corporation from 1996 to 1997, the Federal Housing Finance Board from 1993 to 1998 and the Neighborhood Reinvestment Corporation from 1993 to 1998. Mr. Retsinas serves on the Board of Trustees for the National Housing Endowment and for Enterprise Community Partners and on the Board of Directors of the Center for Responsible Lending.



### STEPHEN A. ROSS                    Director since 1998

Age 64

Mr. Ross has been the Franco Modigliani Professor of Financial Economics at the Massachusetts Institute of Technology since 1998 and has been, and continues to be, a consultant to a number of investment banks and major corporations. He also has been Chairman and Chief Executive Officer of Compensation Valuation, Inc., a company specializing in the valuation of complex option contracts and option valuation services, since April 2003; a member of the Advisory Council of Taconic Capital Partners LLC, an event-driven hedge fund, since January 2004; a director of IV Capital Ltd., a London-based investment company, since May 1998; and Chairman of the Investment Advisory Board of IVC International since July 2004. Mr. Ross also was Co-Chairman of Roll and Ross Asset Management Corporation, an investment management company, from 1986 to July 2004. He previously was the Sterling Professor of Economics and Finance at Yale University from 1976 to 1998, and a Professor of Economics and Finance at the Wharton School of the University of Pennsylvania. Mr. Ross is a member of the Board of Trustees of the California Institute of Technology. He served as a CREF trustee from 1991 to 2004 and as a director of General Re Corporation from 1993 to 1998.

*Proposal 1: Election of Directors*



**RICHARD F. SYRON**                                    Director since 2003

Age 64

Mr. Syron was appointed Chairman of the Board and Chief Executive Officer of Freddie Mac in December 2003. Prior to joining Freddie Mac, Mr. Syron was the Executive Chairman of Thermo Electron Corporation from November 2002 to December 2003. Mr. Syron was named to the Board of Thermo Electron in 1997. He became Chairman in January 2000 and was Chief Executive Officer from June 1999 to November 2002. He also served as President of Thermo Electron from June 1999 to July 2000. Prior to joining Thermo Electron, he served as Chairman and Chief Executive Officer of the American Stock Exchange from 1994 to May 1999, President of the Federal Reserve Bank of Boston from 1989 to 1994, and President of the Federal Home Loan Bank of Boston from 1986 to 1989. Mr. Syron also is a director of Genzyme Corporation.

## Meetings of the Board and Committees

The Board met 13 times in 2007 and 5 times during the period from January 1, 2008 through April 22, 2008. During 2007, each of the current directors attended at least 75% of the meetings of the Board and committees on which he or she served, and the non-employee directors met regularly in executive session without management.

The five current standing Board committees are the Audit Committee, the CHRC, the Finance and Capital Deployment Committee, the GNROC and the Mission, Sourcing and Technology Committee. The charters of the Finance and Capital Deployment Committee and the GNROC were last revised in March 2008, and the charters of each of the other current standing committees were last revised in March 2007. All the charters of the standing committees are available on our website at www.freddiemac.com/governance/bd_committees.html. Printed copies also are available to any stockholder upon request to the Corporate Secretary, at the address specified above under "Contacting the Board."

In addition to these standing committees, a Special Derivative Litigation Committee, or the SDLC, was created by the Board in December 2003 to investigate allegations and claims relating to the company's financial restatements made in stockholder derivative litigation against certain current and former executive officers and directors. The SDLC was dissolved by the Board in April 2007 because the 2003 stockholder derivative litigation had been resolved. In January 2008, the Board formed a Special Litigation Committee, or the SLC, to conduct a review and evaluation of allegations and claims set forth in stockholder demand letters received in November and December 2007 in connection with the company's losses in the third quarter of 2007. The letters demand that Freddie Mac commence legal proceedings against certain current and former directors and officers of Freddie Mac, Freddie Mac's independent auditors and other parties and that the company implement corrective measures. One of the stockholders who submitted these demand letters has subsequently filed a derivative action on behalf of Freddie Mac. In March 2008, the company received another stockholder derivative demand letter containing essentially the same allegations as those made in the November and December 2007 letters. The SLC will consider the claims raised in the derivative action and all three demand letters.

*Proposal 1: Election of Directors*

The membership of current Board members on each committee, along with the number of times each committee met in 2007 and during the period January 1, 2008 through April 22, 2008, is shown in the table below.

| Director | Audit | CHRC | Finance and Capital Deployment | GNROC | Mission, Sourcing and Technology | SDLC | SLC |
|---|---|---|---|---|---|---|---|
| B. Alexander[1] | | ✓ | | ✓ | Chair | | |
| G. Boisi | | Chair | | ✓ | ✓ | | |
| M. Engler | | ✓ | | | ✓ | Chair | Chair |
| R. Glauber | ✓ | | ✓ | | | | ✓ |
| R. Goeltz | Chair | | ✓ | ✓ | | | |
| T. Johnson | ✓ | ✓ | | ✓ | | ✓ | |
| W. Lewis | | | ✓ | | ✓ | | |
| S. O'Malley | ✓ | ✓ | | Chair | | | |
| N. Retsinas[2] | | | ✓ | | ✓ | | ✓ |
| S. Ross | ✓ | | Chair | ✓ | | ✓ | |
| R. Syron[3] | | | | | | | |
| 2007 Meetings[4] | 13 | 8 | 7 | 9 | 6 | 0 | 0[5] |
| 2008 Meetings[6] | 9 | 4 | 4 | 3 | 2 | 0[7] | 1 |

(1) Ms. Alexander became chairperson of the Mission, Sourcing and Technology Committee in June 2007 upon the retirement of Ronald F. Poe, a former director. She served on the Finance and Capital Deployment Committee until January 1, 2008 after which she joined the CHRC.
(2) Mr. Retsinas was elected to the Board at the annual meeting in June 2007.
(3) Mr. Syron is not a member of any committee.
(4) Includes one joint meeting of the Audit Committee and the Finance and Capital Deployment Committee.
(5) The SLC was not formed until January 2008 and therefore no meetings were held in 2007.
(6) Includes two joint meetings of the Audit Committee and the Finance and Capital Deployment Committee and one joint meeting of the Audit Committee and the CHRC.
(7) The SDLC was dissolved in April 2007 and therefore no meetings were held in 2008.

The following is a description of the current Board committees and their responsibilities:

***The Audit Committee's*** primary responsibility is to assist the Board in discharging its oversight responsibilities with respect to financial matters and compliance with laws and regulations. The committee's specific responsibilities with respect to its oversight of our independent auditors are: to appoint, evaluate, monitor the independence of, determine the compensation of, and, as the committee may deem it appropriate, terminate and replace our independent auditors; to review the independent auditors' report on the independent auditors' internal quality control procedures; and to pre-approve any audit services, and any non-audit services permitted under applicable law, to be performed by our independent auditors. Additional specific responsibilities with respect to the committee's oversight of financial matters include: to oversee the integrity of our financial reporting processes and disclosure, including systems of control regarding finance, accounting, compliance with legal and regulatory requirements and programs for the detection and prevention of fraud; to review management's policies and guidelines governing the processes for assessing and managing Freddie Mac's risks; and to meet in joint session with the Finance and Capital Deployment Committee to review Freddie Mac's major financial risk exposures and the steps management has

*Proposal 1: Election of Directors*

taken to monitor and control such exposures. The committee's specific responsibilities with respect to its oversight of our internal auditors include: to hire, determine the compensation of, evaluate the performance of and decide whether to retain our Senior Vice President — General Auditor; to approve and evaluate the annual plan, budget, organization and staffing for the internal auditors, including amendments to such plan or budget; and to assess, at least annually, the effectiveness of the internal auditors. The committee also conducts an annual evaluation of its own performance, including its oversight responsibilities described above.

The Audit Committee's purposes, duties and responsibilities under its charter include those specified in the NYSE Listed Company Manual for audit committees.

*The CHRC's* primary responsibility is to oversee our executive compensation program. The executive officers for whom the CHRC has compensation-setting authority include our Chief Executive Officer, Chief Financial Officer, principal accounting officer, any officer in charge of a principal business unit, division, or function, any other officer who performs a significant policy-making function, as determined by the CHRC, and any other officer at the level of Senior Vice President or above whose target total compensation exceeds $2 million. An independent compensation consultant, currently Hewitt Associates LLC ("Hewitt"), is retained by the CHRC to assist in the review and establishment of compensation for this group and reports directly to the CHRC on these matters.

The CHRC's specific responsibilities include: in consultation with senior management and the committee's independent consultant, to approve our executive compensation philosophy; to approve the compensation of our executive officers, including approving the goals and objectives relevant to determining the compensation of the Chief Executive Officer, evaluating the Chief Executive Officer's performance in light of those goals and objectives and such other factors as the CHRC deems relevant, and using that evaluation for purposes of determining the Chief Executive Officer's compensation; to approve cash incentive plans for non-executive officers; to review, approve, amend and/or terminate any stock-based compensation or benefit plan and any retirement plan, including our pension plan and thrift plan; to review the management of our human resources; to review plans, policies and procedures for management succession; and to conduct an annual evaluation of the CHRC's performance.

In addition, under the CHRC's charter, the CHRC Chair may approve any executive compensation action where competitive circumstances preclude delaying approval to the next CHRC meeting, provided that the Chair reports to the CHRC on such action at its next regularly scheduled meeting.

The CHRC's purposes, duties and responsibilities under its charter include those specified in the NYSE Listed Company Manual for compensation committees. For more information, see "Compensation Discussion and Analysis — Role of Executive Officers and the Compensation Consultant" below.

*The Finance and Capital Deployment Committee's* primary functions are: to review our capital requirements, management, allocation and plan; to recommend dividends on, and issuances and repurchases of, our common and preferred stock for approval by the Board; to monitor our debt and mortgage-related securities activities; to monitor our investment, funding, liquidity and hedging strategies and activities; to monitor our asset/liability management techniques; to monitor and approve certain enterprise risk metrics and limits; to meet in joint session with the Audit Committee

*Proposal 1: Election of Directors*

to review Freddie Mac's major financial risk exposures and the steps management has taken to monitor and control such exposures; and to conduct an annual evaluation of the committee's performance.

*The GNROC's* members are the chairs of each of the other standing committees and, if the Lead Director is not one of the committee chairs, the Lead Director, and any other directors designated by the Board. Its primary functions are: to oversee corporate governance matters generally, including reviewing and recommending changes in our bylaws, our Guidelines, and the independence standards and qualifications for Board membership set forth in the Guidelines; to conduct an annual evaluation of the committee's performance and to oversee the annual evaluation of the performance of the Board and each of its other committees; to identify individuals qualified to be members of the Board and to recommend Board nominees; to review and make recommendations concerning the independence of Board members and to review the application to Board members of membership qualifications under the Guidelines; to review and make recommendations concerning membership on Board committees and on committee structure and responsibilities; to recommend non-employee director compensation; to oversee enterprise-wide risk management strategies and governance, to review major enterprise risk exposures and to review the capabilities for and adequacy of resources allocated to enterprise risk management; to review management's proposed response to stockholder proposals submitted for inclusion in our Proxy Statement and make recommendations to the Board regarding responses to any such proposals; to oversee management of legislative and related matters; to review the activities of our political action committee; and to oversee our compliance with the consent order we have entered into with OFHEO.

The GNROC's purposes, duties and responsibilities under its charter include those specified in the NYSE Listed Company Manual for governance and nominating committees.

*The Mission, Sourcing and Technology Committee's* primary functions are: to review our mission-related activities; to review our mortgage purchase activities, including relationships with customers; to review significant mortgage purchase transactions; to review the management of risks associated with our mortgage purchase activities; to review the implementation of OFHEO's Mortgage Fraud Policy Guidance; to review enterprise-wide technology; and to conduct an annual evaluation of the committee's performance.

*The Special Litigation Committee's* primary function is to conduct a review and evaluation of allegations and claims set forth in the derivative action and in all three stockholder demand letters and derivative litigation and to determine what actions should be taken in connection with such allegations and claims.

## Board Compensation

Each year, the Board reviews compensation for our non-employee directors. The components of our non-employee director compensation are cash fees and stock awards. The Board believes that appropriate compensation levels help attract and retain superior candidates for Board service and that director compensation, supported by our non-employee director stock ownership guidelines, which are discussed in greater detail below, should be weighted toward stock-based compensation to enhance alignment with the interests of our stockholders. Stock-based compensation currently constitutes approximately 50% of director compensation. As of March 3, 2007, all stock-based

*Proposal 1: Election of Directors*

# EXHIBIT G

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT BASSMAN,<br>Derivatively on Behalf of FREDDIE<br>MAC a/k/a Federal Home Loan<br>Mortgage Corporation and its<br>shareholders,<br>        Plaintiffs,<br>        v.<br><br>RICHARD F. SYRON, et al.,<br><br>        Defendants. | ) CASE NO. 08-cv-02423<br>)<br>)<br>) **PLAINTIFF'S [PROPOSED]**<br>) **FIRST SET OF INTERROGATORIES**<br>) **TO NOMINAL DEFENDANT**<br>) **FREDDIE MAC**<br>)<br>)<br>)<br>) |

## PLAINTIFF'S [PROPOSED] FIRST SET OF INTERROGATORIES TO NOMINAL DEFENDANT FREDDIE MAC

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff R.S. Bassman hereby requests that Nominal Defendant respond to each of the following interrogatories within thirty (30) days of service thereof.

## INSTRUCTIONS

1.    Each and every answer to these interrogatories shall be in accordance with Rule 33 of the Federal Rules of Civil Procedure.

2.    In answering each interrogatory, your answer should identify each and every document relied upon that forms a basis for the answer given or in any way corroborates the answer given or the substance of the answer given. In identifying each such document, include the date, author, name and title of every addressee, including every recipient of copies, the title of the document and a brief description of its nature (e.g., letter, telegram) and the contents of each document.

776892.1

3.    Each interrogatory listed herein shall be construed to include any

supplemental information, knowledge, or data responsive to these interrogatories

which is later discovered, and the obligation to respond to these interrogatories is

intended to be of a continuing nature.

4.    With respect to any information or document that is withheld on the

ground of privilege, Plaintiffs request a privilege log containing all pertinent

information contemplated by the Federal Rules of Civil Procedure.  Please specify

the date of the information or document, author and addressee, every other person

who received or saw copies thereof or to whom the contents of the document were

communicated, each person present when the information was communicated, a

brief description of the subject matter of the document and the basis of the claim

of privilege.

5.    If you object to any interrogatory or part of any interrogatory, state

with specificity the basis of your objection.  No part of an interrogatory should be

left unanswered merely because an objection is interposed to another part of the

interrogatory.

6.    If any document identified in response to these interrogatories has

been in your possession, custody or control but has been destroyed or discarded,

state the date the document was so discarded or destroyed, the reasons therefore,

Plaintiffs First Set of Interrogatories to Freddie Mac
Bassman v. Syron et al..
Case No. 08-cv-02423

and identify the document to the best of your ability.

## **DEFINITIONS**

1.  The Uniform Definitions on Discovery Requests provided by Local Civil Rule 26.3 are incorporated by reference herein.

2.  "Freddie Mac" refers to the Federal Home Loan Mortgage Corporation.

3.  "Nominal Defendant" means Freddie Mac, including any and all of its agents, employees, attorneys, predecessors, successors, affiliates or subsidiaries as well as companies or entities commonly directed, controlled or owned by Nominal Defendant, or any other persons acting or purporting to act on its behalf.

4.  Unless otherwise noted, the "Relevant Time Period" means January 1, 2002 to the Present.

776892.1

3

Plaintiffs First Set of Interrogatories to Freddie Mac
Bassman v. Syron et al..
Case No. 08-cv-02423

## INTERROGATORIES

### INTERROGATORY NO. 1:

State the number of shareholders of record of Freddie Mac stock.

### INTERROGATORY NO. 2:

Identify, by state, the number of shareholders of record of Freddie Mac stock that have addresses in each of the following states:  Virginia, Connecticut, New Jersey and New York.

### INTERROGATORY NO. 3:

State the number of shares of Freddie Mac stock held by shareholders in each state covered by Interrogatory No. 2.

### INTERROGATORY NO. 4:

State the date and location of every meeting of the Board of Directors or Committee of the Board during the Relevant Time Period.

### INTERROGATORY NO. 5:

State the number of Freddie Mac employees located in the Southern District of New York.

### INTERROGATORY NO. 6:

Identify the home addresses of each of the persons who has served on Freddie Mac's  Board of Directors at any time during the Relevant Time Period.

Plaintiffs First Set of Interrogatories to Freddie Mac
Bassman v. Syron et al..
Case No. 08-cv-02423

## INTERROGATORY NO. 7:

Identify the home addresses of Richard F. Syron, Patricia L. Cook, Anthony S. Piszel, Eugene M. McQuade, and Martin F. Baumann.

## INTERROGATORY NO. 8:

Identify, by state, the number of home mortgages originating in (a) New York state and (b) the Commonwealth of Virginia that have been purchased or guaranteed by Freddie Mac during the Relevant Time Period.

## INTERROGATORY NO. 9:

Identify the lenders from whom Freddie Mac purchased home mortgages during the Relevant Time Period.

## INTERROGATORY NO. 10:

State the dollar amounts, and identify the underwriters, distributors, and purchase or selling agents, for any mortgage-backed securities either purchased or packaged for sale by Freddie Mac during the Relevant Time Period.

## INTERROGATORY NO. 11:

State the volume of Freddie Mac debt obligations, mortgage-backed securities, and other Freddie Mac securities issued through the Federal Reserve Bank of New York for each of the past five years.

776892.1

5

Plaintiffs First Set of Interrogatories to Freddie Mac
Bassman v. Syron et al..
Case No. 08-cv-02423

**INTERROGATORY NO. 12:**

Identify the date, duration, and location of any meetings of the Special Litigation

Committee of the Board of Directors ("SLC").

**INTERROGATORY NO. 13**

Identify the witnesses interviewed by the SLC or its counsel, Hunton & Williams,

and the substance of their planned testimony should this litigation proceed to trial.

Dated: August __, 2008

By:
**CUNEO GILBERT & LADUCA, LLP**
Jonathan W. Cuneo (JC 1112)
Robert J. Cynkar
David W. Stanley
507 C Street, NE
Washington, DC 20002
(202)789-3960

**GREENFIELD & GOODMAN,LLC**
Richard D. Greenfield (RG 4046)
Marguerite R. Goodman
        780 Third Avenue 49th Floor
New York, NY 10017
(410)320-5931

**LIEFF, CABRASER, HEIMANN &
    BERNSTEIN, LLP**
Steven E. Fineman (SF 8481)
Daniel P. Chiplock (DC 1137)
780 Third Avenue, 48th Floor
New York, NY 10017
(212)355-9500

**LIEFF, CABRASER, HEIMANN &
    BERNSTEIN, LLP**
Richard M. Heimann
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000

Attorneys for Plaintiffs

Plaintiffs First Set of Interrogatories to Freddie Mac
Bassman v. Syron et al..
Case No. 08-cv-02423

# EXHIBIT H

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ROBERT BASSMAN, Derivatively on Behalf of FREDDIE MAC a/k/a Federal Home Loan Mortgage Corporation and its shareholders, | ) ) ) ) ) ) | CASE NO. 08-cv-02423 **[PROPOSED] NOTICE OF 30(b)(6) DEPOSITION OF NOMINAL DEFENDANT** |
| Plaintiffs, v. | ) ) ) ) ) | |
| RICHARD F. SYRON, et al., | ) ) ) | |
| Defendants. | ) | |

## [PROPOSED] NOTICE OF DEPOSITION

PLEASE TAKE NOTICE, that pursuant to Rule 30(b)(6) of the

Federal Rules of Civil Procedure, on September __, 2008 at 9:00 a.m., at the law

offices of Cuneo Gilbert & LaDuca, LLP, 507 C Street NE, Washington, DC

20002, Plaintiff will take the deposition by stenographic means of corporate

representatives of Nominal Defendant Federal Home Loan Mortgage

Corporation ("Freddie Mac").  Pursuant to Fed. R. Civ. P. 30(b)(6), Freddie Mac

is required to designate and fully prepare one or more of its officers, directors,

managing agents or other persons who consent to testify on its behalf, and whom

Freddie Mac will fully prepare to testify, regarding the following designated topics

and as to such information that is known or reasonably available to Freddie Mac:

1.    The actions undertaken by the Special Litigation Committee

("SLC") of Board of Directors of the Federal Home Loan Mortgage Corporation

("Freddie Mac") in response to any shareholder demands made on or after

November 2007.

776895.1

2.    The date, time, duration, and location of any meetings of the SLC.

3.    The identities of any witnesses, including expert witnesses, identified or interviewed by the SLC or its representatives in connection with the review and evaluation of the allegations made in the above-captioned action, and the substance of their testimony.

4.    The timeframe within which the SLC's review and evaluations of the allegations made in the above-captioned action is to be completed.

5.    The number of home mortgages originating in (a) New York state and (b) the Commonwealth of Virginia that have been purchased or guaranteed by Freddie Mac from January 1, 2002 to the present, and the lenders from whom the home mortgages were purchased.

6.    The identities of the underwriters, distributors, and purchase or selling agents for any mortgage-backed securities either purchased or packaged for sale by Freddie Mac from January 1, 2002 to the present.

7.    The volume of Freddie Mac debt obligations, mortgage-backed securities, and other Freddie Mac securities issued through the Federal Reserve Bank of New York for each of the past five years.

Dated: August__, 2008

By: _____

**CUNEO GILBERT & LADUCA, LLP**
Jonathan W. Cuneo (JC 1112)
Robert J. Cynkar
David W. Stanley
507 C Street, NE
Washington, DC 20002
(202)789-3960

**GREENFIELD & GOODMAN,LLC**
Richard D. Greenfield (RG 4046)
Marguerite R. Goodman
780 Third Avenue 49th Floor
New York, NY 10017
(410)320-5931

776895.1                                    2                    Plaintiffs Notice of 30(b)(6) Depositions
Bassman v. Syron et al..
Case No. 08-cv-02423

**LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP**
Steven E. Fineman (SF 8481)
Daniel P. Chiplock (DC 1137)
780 Third Avenue, 48th Floor
New York, NY 10017
(212)355-9500

**LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP**
Richard M. Heimann
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000

Attorneys for Plaintiffs

776895.1

3

Plaintiffs Notice of 30(b)(6) Depositions
Bassman v. Syron et al..
Case No. 08-cv-02423

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ROBERT BASSMAN, Derivatively on Behalf of FREDDIE MAC a/k/a Federal Home Loan Mortgage Corporation and its shareholders, | ) ) ) ) ) ) | CASE NO. 08-cv-02423 **[PROPOSED] NOTICE OF 30(b)(6) DEPOSITION OF HUNTON & WILLIAMS** |
| Plaintiffs, v. | ) ) ) | |
| RICHARD F. SYRON, et al., | ) ) | |
| Defendants. | ) ) | |

---

## [PROPOSED] NOTICE OF DEPOSITION

PLEASE TAKE NOTICE, that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, on September __, 2008 at 9:00 a.m., at the law offices of Cuneo Gilbert & LaDuca, LLP, 507 C Street NE, Washington, DC 20002, Plaintiff will take the deposition by stenographic means of corporate representatives of Hunton & Williams. Pursuant to Fed. R. Civ. P. 30(b)(6), Hunton & Williams is required to designate and fully prepare one or more of its officers, directors, managing agents or other persons who consent to testify on its behalf, and whom Hunton & Williams will fully prepare to testify, regarding the following designated topics and as to such information that is known or reasonably available to Hunton & Williams:

1.       The actions undertaken by the Special Litigation Committee ("SLC") of Board of Directors of the Federal Home Loan Mortgage Corporation ("Freddie Mac") in response to any shareholder demands made on or after November 2007.

2.       The number of hours billed by Hunton & Williams to Freddie Mac related to the review and evaluation of the allegations made in the above-captioned action.

3.    The date, time, duration, and location of any meetings of the SLC.

4.    The identities of any witnesses, including expert witnesses, identified or interviewed by Hunton & Williams or the SLC in connection with the review and evaluation of the allegations made in the above-captioned action, and the substance of their testimony.

5.    The timeframe within which the SLC's review and evaluations of the allegations made in the above-captioned action is to be completed.


Dated: August _, 2008                    CUNEO GILBERT & LADUCA, LLP
                                         Jonathan W. Cuneo


                                         By: _____

                                         **CUNEO GILBERT & LADUCA, LLP**
                                         Jonathan W. Cuneo (JC 1112)
                                         Robert J. Cynkar
                                         David W. Stanley
                                         507 C Street, NE
                                         Washington, DC 20002
                                         (202)789-3960

                                         **GREENFIELD & GOODMAN,LLC**
                                         Richard D. Greenfield (RG 4046)
                                         Marguerite R. Goodman
                                         780 Third Avenue 49th Floor
                                         New York, NY 10017
                                         (410)320-5931

                                         **LIEFF, CABRASER, HEIMANN &**
                                         **BERNSTEIN, LLP**
                                         Steven E. Fineman (SF 8481)
                                         Daniel P. Chiplock (DC 1137)
                                         780 Third Avenue, 48th Floor
                                         New York, NY 10017
                                         (212)355-9500

                                         **LIEFF, CABRASER, HEIMANN &**
                                         **BERNSTEIN, LLP**
                                         Richard M. Heimann
                                         275 Battery Street, 30th Floor
                                         San Francisco, CA 94111
                                         (415) 956-1000

                                         Attorneys for Plaintiffs


776894.1                                   2                    Plaintiffs Notice of 30(b)(6) Depositions
                                                                Bassman v. Syron et al..
                                                                Case No. 08-cv-02423