UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| R.S. BASSMAN, Derivatively on Behalf of FREDDIE MAC a/k/a Federal Home Loan Mortgage Corporation and its shareholders,<br><br>        Plaintiff,<br><br>   v.<br><br>RICHARD F. SYRON, PATRICIA L. COOK, ANTHONY S. PISZEL, EUGENE M. McQUADE, MARTIN BAUMANN, RICHARD KARL GOELTZ, STEPHEN A. ROSS, SHAUN F. O'MALLEY, ROBERT R. GLAUBER, BARBARA T. ALEXANDER, WILLIAM M. LEWIS, JR., JEFFREY M. PEEK, GEOFFREY T. BOISI, RONALD F. POE, MICHELLE ENGLER, THOMAS S. JOHNSON, NICHOLAS P. RETSINAS, WASHINGTON MUTUAL, INC., PRICEWATERHOUSECOOPERS, LLP, KERRY K. KILLINGER, ANTHONY R. MERLO, JR., FIRST AMERICAN CORPORATION, FIRST AMERICAN EAPPPRAISEIT, COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME EQUITY LOAN TRUST, COUNTRY-WIDE BANK, FSB , COUNTRYWIDE HOME LOANS, INC., LANDSAFE, INC., and ANGELO R. MOZILO,<br><br>        Defendants,<br><br>   and<br><br>FREDDIE MAC a/k/a Federal Home Loan Mortgage Corporation,<br><br>        Nominal Defendant. | Case No. 08-cv-2423-BSJ-JCF<br><br><br>__AMENDED COMPLAINT__ |

## I.    THE NATURE OF THE CASE

1.    Plaintiff, R.S. Bassman ("Plaintiff"), a shareholder of the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "the Company"), brings this derivative action on behalf of the Company and its shareholders against certain current and former officers and directors of Freddie Mac and third parties to recover the massive losses to the Company caused by, *inter alia*, defendants' breaches of fiduciary duty, waste of the Company's assets, and/or conspiracy to deceive and defraud. Freddie Mac's reckless investment and participation in the subprime financing described herein by or under the purported oversight of the members of the Company's Board of Directors and senior officers has cost Freddie Mac billions of dollars, and will continue to impact negatively on its financial and operating condition long into the future.

2.    The concealed and systemic failure of risk management and lax credit standards in the Company's activities in subprime financing resulted in a record net loss for the third and fourth quarters of 2007 of $2.0 billion (i.e., $3.29 per diluted share) and $2.5 billion (i.e., $3.97 per diluted share), respectively, a decrease in the fair value of net assets attributable to common stockholders, before capital transactions, of approximately more than $10 billion, total mark-to-market losses (recorded pursuant to generally accepted accounting principles or "GAAP") of more than $5 billion, and a provision for credit losses of more than $2 billion due to significant deterioration of mortgage credit resulting from continued weakness in the housing market (almost four times the second-quarter amount).

3.    At a conference call with analysts on February 28, 2008, Freddie Mac, through its senior management, defendants Syron, Cook and Piszel, discussed the Company's 2007 year-end results and purported to explain away Freddie Mac's disastrous performance by pointing to the deteriorated housing market rather than the breaches of fiduciary duty of the Company's Board of Directors and senior officers described herein. While admitting that there

1

would be further recognition of losses in the months ahead, Freddie Mac's management did not even remotely disclose the magnitude of what lay ahead for Freddie Mac. Due to the misconduct described herein, and notwithstanding the foregoing partial acknowledgement of its deteriorated circumstances, the Company is subject to future damages in the billions of dollars, as well as massive legal and other expenses of defending against and resolving claims made against Freddie Mac by purchasers of its securities and by government regulators.

4.     In sum:

a.     Freddie Mac's Board of Directors and senior management failed to implement sufficient risk management controls to protect the Company from acquiring billions of dollars worth of mortgages with lax and/or non-existent underwriting standards, causing it to have acquired an untenable amount of high-risk loans.

b.     Freddie Mac's Board of Directors and senior management failed to have in place and/or implement adequate controls to ensure that appraisals were done appropriately and to prevent collusion between lenders, appraisers and rating agencies, increasing the risk of defaults and loss to the Company.

c.     Freddie Mac's Board of Directors and senior management failed to have in place and/or implement sufficient risk management controls to protect the Company from guaranteeing billions of dollars worth of subprime mortgages sold to others. This failure included risks from taking on billions of dollars in items including ill-advised loan terms such as those of exotic types of adjustable rate mortgages, and risks from disregarding market signals such as by increasing holdings of mortgage-backed securities while other lenders instead heeded the fall of the ABX index.

779143.1

d.      Freddie Mac's Board of Directors and senior management failed to put in place and/or implement internal controls and adopt business methods capable of managing, identifying and guarding against massive losses in connection with the Company's investments and loan guarantees.

e.      Freddie Mac's Board of Directors and senior management failed to adequately reserve for uncollectible loans, which failure was aided, abetted and facilitated by the Company's purportedly independent auditor, defendant PricewaterhouseCoopers, LLP.

f.      Freddie Mac's Board of Directors and senior management repeatedly and falsely assured the Company's stockholders and the public that the Company did not have substantial investments or significant financial exposure in the subprime financing market, and that any weaknesses of the Company's risk management and internal controls were minor and being remedied.

g.      Freddie Mac's Board of Directors and senior management, despite the fact that they knew or should have known that the subprime mortgage industry was rife with abuse and conflicts of interest, did nothing to tighten the Company's underwriting standards and, *inter alia*, continued to utilize its "Loan Prospector" computerized loan approval system and other forms of lax or non-existent underwriting processes to accept high-risk mortgages.

h.      Using false and inflated appraisals, mortgage lenders such as defendant Washington Mutual, Inc. and Countrywide Financial Corporation and its affiliates, (assisted by defendants LSI, First American Corporation and First American eAppraiseIT, and their respective senior officers), took advantage of Freddie Mac's lax or non-existent loan underwriting standards, and funneled into the Company billions of dollars of questionable and/or otherwise high-risk mortgages which they knew or should have known would lead to defaults.

5.    By letter dated December 6, 2007, in compliance with Rule 23.1 of the Federal Rules of Civil Procedure, Plaintiff, through his counsel, made a demand on the Freddie Mac Board of Directors ("the Board") to, *inter alia*, pursue through litigation, the claims alleged in this action and name as defendants those identified above, among others responsible for the wrongdoing as alleged herein.  A copy of such letter is attached hereto as Exhibit "A."  Freddie Mac's Board of Directors did not respond to that letter before ninety (90) days had elapsed and this action was initiated, and to date has not taken any of the actions demanded by Plaintiff in that letter.  According to Freddie Mac's public filings, the Board claims to have appointed a "Special Committee" ("SLC") to investigate shareholder complaints, but this SLC consists of three non-disinterested directors who were on the Board during the time period of the alleged activities underlying this Complaint and who are also named as defendants in this litigation.  The SLC appears designed to create the appearance of activity virtually identical in purpose to one created in response to the Company's earlier financial debacle (that committee having done nothing of substance in three years of existence).[1]  Accordingly, Plaintiff's demand to sue the defendants named herein was effectively rejected by the Board.

## II.    JURISDICTION AND VENUE

6.    This Court has jurisdiction over the subject matter of this action pursuant to 12 U.S.C. § 1452(f).

---

[1]  In December 2003, Freddie Mac formed a Special Derivative Litigation Committee ("SDLC") to allegedly investigate the claims asserted in the shareholder demands and ensuing derivative litigation that had been commenced against many of the Company's directors and senior officers related to a multi-billion dollar accounting fraud and resulting financial restatement that caused multi-hundred million dollar damages to the Company.  The consolidated shareholder litigation was captioned *In re Federal Home Loan Mortgage Corp. Sec. & Deriv. Litig. (No. II)*, MDL No. 1584.  The SDLC retained the same law firm, Hunton & Williams, that is purportedly advising the SLC.  The SDLC was also chaired by the same Board member (Defendant Engler) who is chairing the SLC.  The SDLC did not seek to intervene in the prior litigation, and never produced a report after more than three years of existence.  The SDLC was disbanded in 2007.

7.      This action was not brought collusively to confer jurisdiction on a court of the United States that would not otherwise have jurisdiction.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because, among other things, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district.  Freddie Mac and one or more of the other corporate defendants maintain offices in this district, and a number of the Officer and Director Defendants (defined below) reside in this district and received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

9.      Plaintiff brings this action derivatively on behalf of nominal defendant Freddie Mac and its shareholders.  No claims are asserted against Freddie Mac.  Plaintiff will adequately and fairly represent the interests of Freddie Mac and its shareholders in enforcing and prosecuting their rights.

III.    **THE PARTIES**

A.      **Plaintiff**

10.     Plaintiff R.S. Bassman is a New Jersey domiciliary who owns and has owned common stock of Freddie Mac at all times relevant hereto.

B.      **Nominal Defendant**

11.     Nominal defendant Freddie Mac (NYSE:FRE) is a federally chartered, stockholder-owned corporation established by Congress in 1970 to support home ownership and rental housing.  After its sister Government-sponsored agency, Fannie Mae, Freddie Mac is the country's second-largest buyer and guarantor of home mortgages and provides additional liquidity for banks and mortgage lenders by purchasing residential mortgages and mortgage-related securities from them.  Under management's guidance, supposedly in order to dilute risk, the Company purchased subprime and other questionable mortgage loans bundled into securities,

the top tranches or slices of which were rated AAA by rating agencies.  The Company has

financed these purchases primarily by issuing mortgage-related securities and debt instruments in

the capital markets.  Its principal place of business is located at 8200 Jones Branch Drive,

McLean, Virginia.  For most of the time period relevant to this action, the Company was

nominally regulated by the Office of Federal Housing Enterprise Oversight ("OFHEO"), which

by its own admission provided insufficient oversight of the Company, contributing to the debacle

described herein, and prompting Congress to recently pass legislation establishing a new and

more powerful overseeing body for Freddie Mac, the Federal Housing Finance Agency

("FHFA").

       **C.**    **Officer Defendants**

       12.    Defendant Richard F. Syron ("Syron") has served as Chairman and Chief

Executive Officer ("CEO") of the Company since December 2003.  Syron received total 2006

compensation of $14.73 million.  As Chairman of the Board and Chief Executive Officer,

Syron's primary responsibilities included overseeing the overall success or failure of the

Company; providing leadership for the formulation and achievement of the Company's vision,

mission, strategy, financial objectives and goals; ensuring that effective and qualified

management were retained by the Company; ensuring that the Company established and

maintained appropriate internal and disclosure controls, policies and procedures that were

adequate to protect corporate assets; and directing the conduct and affairs of the Company in

furtherance of its safe and sound operation.  Defendant Syron, along with the other officers and

directors of Freddie Mac named as defendants herein, was responsible for ensuring the accuracy

of Freddie Mac's public financial reports and other public statements.  Defendant Syron publicly

commented on the Company's financial performance through press releases, interviews with the

media, and letters to shareholders.  Defendant Styron also personally attested to and certified the

6

accuracy of Freddie Mac's reported financial results at all relevant times.  From April 1, 2006 to

June 5, 2007, Syron, based upon his knowledge of material non-public information regarding the

Company, sold 65,660 shares of Freddie Mac common stock, garnering proceeds of

$4,273,750.96.  Defendant Syron resides in Massachusetts.

13.     Defendant Patricia Cook ("Cook") has served as Executive Vice President

and Chief Business Officer of the Company since 2007.  Prior to that, Defendant Cook served as

Executive Vice President, Investment and Capital Markets, of the Company since 2004.

Defendant Cook received total 2006 compensation of $4.89 million.  Defendant Cook, along

with the other officers and directors of Freddie Mac named as defendants herein, was responsible

for ensuring the accuracy of Freddie Mac's public financial reports and other public statements.

Defendant Cook publicly commented on the Company's financial performance in press releases

issued and in investor conference calls.  From May 6, 2006 to August 2, 2007, Cook, based upon

her knowledge of material non-public information regarding the Company, sold 22,185 shares of

Freddie Mac common stock garnering proceeds of $1,412,032.30.  Defendant Cook resides in

Washington, D.C.

14.     Defendant Anthony "Buddy" Piszel ("Piszel") has served as the

Company's Executive Vice President and Chief Financial Officer ("CFO") since November

2006.  Defendant Piszel received total 2006 compensation of $3.65 million.  As CFO, defendant

Piszel was responsible for ensuring the accuracy of Freddie Mac's public financial reports and

other public statements concerning the performance of the Company.  Defendant Piszel publicly

commented on the Company's financial performance through press releases and interviews with

the media.  Defendant Piszel also personally attested to and certified the accuracy of Freddie

Mac's reported financial results at all relevant times.  On December 7, 2007, Piszel, based upon

his knowledge of material non-public information regarding the Company, sold 8,234 shares of Freddie Mac common stock garnering proceeds of $292,636.36. Defendant Piszel resides in Virginia.

15.    Defendant Eugene M. McQuade ("McQuade") was President and Chief Operating Officer ("COO") of the Company from September 1, 2004 until his resignation on September 1, 2007. McQuade also served as a director of the Company from September 2004 through September 2007. Defendant McQuade received total 2006 compensation of $7.64 million. Defendant McQuade, along with the other officers and directors of Freddie Mac named as defendants herein, was responsible for ensuring the accuracy of Freddie Mac's public financial reports and other public statements. Defendant McQuade publicly commented on the Company's financial performance, condition, and results during the relevant time. From May 6, 2006 to September 1, 2007, McQuade, based upon his knowledge of material non-public information regarding the Company, sold 47,509 shares of Freddie Mac common stock garnering proceeds of $3,034,051.17. Defendant McQuade resides in Rhode Island.

16.    Defendant Martin Baumann ("Baumann") joined the Company in April 2003 as Executive Vice President of Finance, became Chief Financial Officer in June 2004, and resigned on March 21, 2006. As CFO, Baumann was responsible for ensuring the accuracy of Freddie Mac's public financial reports and other public statements concerning the performance of the Company. Defendant Baumann publicly commented on the Company's financial performance through press releases and interviews with the media. Defendant Baumann also personally attested to and certified the accuracy of Freddie Mac's reported financial results during his tenure as CFO. Defendant Baumann resides in Manhasset, New York.

17.     Defendants Syron, Cook, Piszel, McQuade and Baumann are collectively referred to herein as the "Officer Defendants."

### D.     Director Defendants

18.     Defendant Richard Karl Goeltz ("Goeltz") has served as a member of the Board of Directors of Freddie Mac since December 2003, and has served as Chairman of the Audit Committee of the Freddie Mac Board of Directors ("Audit Committee") since March 31, 2004.  The Audit Committee was responsible for (a) ensuring that the Company had adequate and proper guidelines and policies governing the processes for assessing and managing the Company's risks, (b) ensuring that the Company had adequate and proper internal controls and disclosure procedures, and (c) overseeing the integrity and accuracy of Freddie Mac's financial statements and disclosures.  Defendant Goeltz was determined by the Board to be an "audit committee financial expert" as defined by Securities and Exchange Commission ("SEC") regulations.  Goeltz has also served as a member of both the Finance and Capital Deployment Committee of the Board (the "Finance Committee") and the Governance, Nominating and Risk Oversight Committee of the Board (the "Risk Oversight Committee") since at least March 31, 2004.   The Finance Committee was responsible for the oversight of (a) the funding, investment, and hedging activities associated with Freddie Mac's retained and sold portfolios, with the credit risk arising from the guarantee portfolio, and with the mortgage and non-mortgage investment portfolios, (b) the content and implementation of Freddie Mac's Asset/Liability Management Policy and Plan, (c) management of Freddie Mac's capital, and (d) management of Freddie Mac's credit risk, market risk, and operational risk.  The Risk Oversight Committee was responsible for Freddie Mac's risk framework and oversight of Freddie Mac's risk exposures, including credit risk, market risk, liquidity risk, model risk, strategic risk, reputation risk, legislative risk, and operational risk.  Defendant Goeltz resides in New York City.

19.     Defendant Stephen A. Ross ("Ross") has served as a member of the Board of Directors of Freddie Mac since September 1998, as a member of the Audit Committee since at least 2004, as Chairman of the Finance Committee since 2005, and as a member of the Risk Oversight Committee since at least 2005.  Defendant Ross resides in New Haven, Connecticut.

20.     Defendant Shaun F. O'Malley ("O'Malley") served as a member of the Board of Directors of Freddie Mac from March 2001 until June 6, 2008 and as Lead Director from 2003 to June 6, 2008.  Defendant O'Malley was the Chairman of the Risk Oversight Committee from 2006 to 2008, and served on the Audit Committee from at least 2004 to 2008, and as a member of the Compensation and Human Resources Committee of the Board (the "Compensation Committee") from at least 2004 to 2008.  Defendant O'Malley, a certified public accountant, was, for many years, a partner and CEO of Freddie Mac's purportedly independent auditing firm, PricewaterhouseCoopers, LLP.  Defendant O'Malley resides in Philadelphia, Pennsylvania.

21.     Defendant Robert R. Glauber ("Glauber") has served as a member of the Board of Directors of Freddie Mac since March 15, 2006 and as a member of the Audit Committee, Finance Committee, and Risk Oversight Committee since 2006.  Glauber also serves as a member of the SLC.  Defendant Glauber resides in Massachusetts.

22.     Defendant Barbara T. Alexander ("Alexander") has served as a member of the Board of Directors of Freddie Mac since November 2004, and as a member of the Finance Committee from November 2004 to January 2008.  Defendant Alexander resides in California.

23.     Defendant William M. Lewis, Jr. ("Lewis") has served as a member of the Board of Directors of Freddie Mac and the Finance Committee since November 2004.  Defendant Lewis resides in New York City.

24.     Defendant Jeffrey M. Peek ("Peek") served as a member of the Board of Directors of Freddie Mac from January 2006 to September 7, 2007, and as a member of the Finance Committee from 2006 to 2007.  Defendant Peek resides in New York City.

25.     Defendant Geoffrey T. Boisi ("Boisi") has served as a member of the Board of Directors of Freddie Mac since November 2004, as Chairman of the Compensation Committee since 2004, and as a member of the Risk Oversight Committee since 2006. Defendant Boisi resides in Locust Valley, New York.

26.     Defendant Ronald F. Poe ("Poe") served as a member of the Board of Directors of Freddie Mac from February 1990 to June 2007, and as a member of the Compensation Committee from at least 2004 to 2007 and the Risk Oversight Committee from at least 2005 to 2007.  From April 26, 2006 to June 1, 2007, Poe, based upon his knowledge of material non-public information regarding the Company, sold 20,595 shares of Freddie Mac common stock, garnering proceeds of $1,284,831.95.  Defendant Poe resides in Armonk, New York.

27.     Defendant Michelle Engler ("Engler") has served on the Board of Directors of Freddie Mac since June 2001, and now serves as Chair of the SLC.  Engler previously served on the Audit Committee from at least 2004 until June 2005, and as Chair of the SDLC.  Defendant Engler resides in Virginia.

28.     Defendant Thomas S. Johnson ("Johnson") has served on the Board of Directors of Freddie Mac since June 2004 and as Lead Director since June 2005.  Johnson has also served as a member of the Compensation Committee and the Audit Committee since June 2005, and the Risk Oversight Committee since 2007.  Johnson also previously served as a member of the SDLC.  Defendant Johnson resides in New York City.

29.    Defendant Nicholas P. Retsinas ("Retsinas") has served on the Board of Directors of Freddie Mac and as a member of the Finance Committee since June 2007. Retsinas also serves on the SLC. Defendant Retsinas resides in Rhode Island.

30.    Defendants Syron, McQuade, Goeltz, Ross, O'Malley, Glauber, Alexander, Lewis, Peek, Boisi, Poe, Engler, Johnson and Retsinas are collectively referred to herein as the "Director Defendants."

31.    The Officer Defendants and the Director Defendants are referred to collectively herein as the "Officer and Director Defendants."

### E.    **Additional Defendants**

32.    Defendant PricewaterhouseCoopers, LLP ("PwC"), is an international certified public accounting firm that served as Freddie Mac's purportedly independent auditor during the period of the wrongdoing described herein. Its actions and inactions in conjunction with those of the named defendants and others are at the core of this litigation. PwC is incorporated in Delaware and headquartered in New York.

33.    Defendant Washington Mutual, Inc. ("WaMu") is the country's largest savings and loan, with reported assets of approximately $346 billion. WaMu is one of the nation's largest originators of so-called subprime mortgages and the 14th largest provider of loans to Freddie Mac, totaling $7.8 billion in loans in 2007. At its peak, WaMu operated approximately 350 home loan centers, sales offices, and loan processing call centers. In late 2007, the Securities & Exchange Commission ("SEC") and the Office of Thrift Supervision launched inquiries of WaMu's mortgage lending practices. The inquiry is focused on whether WaMu accurately disclosed to investors of mortgage-backed securities how its loans were appraised, as well as whether the company properly accounted for its loans in financial disclosures to investors of the company. This inquiry followed charges by New York Attorney

General Andrew Cuomo that WaMu had colluded with an appraisal company and its corporate

parent (Defendants First American and eAppraiseIT, described below) in providing inflated

property values to justify high-priced mortgage loans, many of which were then sold to Freddie

Mac. WaMu is incorporated and headquartered in the State of Washington.

34.     Defendant Kerry K. Killinger ("Killinger") was, at all relevant times,

WaMu's Chairman and Chief Executive Officer and the architect of its plan and scheme to

originate and, *inter alia*, sell off to Freddie Mac and others, substantial amounts of subprime and

other questionable mortgage loans originated by WaMu. Defendant Killinger caused WaMu to

initiate his plan and scheme in order to rejuvenate WaMu after three years of failing performance

and declining per share profits, all of which was caused by poor execution of his exponential

growth plans, bad branch locations and problems with integrating acquisitions. Defendant

Killinger resides in the State of Washington.

35.     Defendant Countrywide Financial Corporation and its subsidiaries and/or

affiliates, defendants Countrywide Home Loans, Inc. ("CHL"), Countrywide Home Equity Loan

Trust ("CHELT"), Countrywide Bank, FSB ("CFSB") (collectively "Countrywide"), is one of

the nation's largest originators of so-called subprime and other mortgages and one of the largest

providers of loans to Freddie Mac. At its peak, Countrywide was the largest residential finance

lender, originating more than $450 million in mortgages annually, or about 20% of all home

loans. Its "servicing portfolio" of mortgage loans exceeds $1 trillion. The Company also held in

its so-called "retained portfolio" securities issued by CHELT with a purported "fair value" of

$3.3 billion, which represented 11.5% of Freddie Mac's reported shareholders' equity at

December 31, 2006. Countrywide has been sued by the states of Connecticut, California and

Illinois for allegedly duping borrowers into taking mortgages they could not afford – many of

which were then sold to Freddie Mac.  In March 2008, media reports disclosed that the Federal

Bureau of Investigation had launched an investigation into Countrywide and other mortgage

industry members concerning mortgage origination fraud, conflicts of interest and undisclosed

relationships with appraisers such as Defendant LandSafe, Inc., as well as the practices used to

package mortgage-backed securities for sale to investors.  Countrywide was acquired by Bank of

America Corporation ("BOA") earlier this year.  Countrywide is incorporated in Delaware and

headquartered in California.

36.     Defendant LandSafe, Inc. ("LSI") is an indirectly-owned subsidiary of

Countrywide and provided to Countrywide and its customers a variety of real estate closing

services including, *inter alia*, appraisal and collateral valuation services, credit reports and

title/escrow services.  LSI is incorporated in Delaware and headquartered in Texas.

37.     Defendant Angelo R. Mozilo ("Mozilo") was co-founder, Chairman and

Chief Executive Officer of Countrywide, and at all relevant times knew of, directed and/or

acquiesced in the mortgage-related activities carried out in its and LSI's names as described

herein.  Mozilo left Countrywide after BOA acquired it, giving up $36.4 million in severance pay

he could have received in that acquisition.  Defendants Countrywide and Mozilo have been

accused in shareholder litigation of having "misled investors by falsely representing that

Countrywide had strict and selective underwriting and loan origination practices, ample liquidity

that would not be jeopardized by negative changes in the credit and housing markets, and a

conservative approach that set it apart from other mortgage lenders."  In August 2008,

Countrywide received subpoenas from the SEC as part of a formal investigation into whether

Mozilo sold shares in the company before disclosing information about the company's finances.

Mozilo exercised Countrywide stock options that produced $121.5 million in gains in 2007 while Countrywide stock fell almost 80 percent.  Defendant Mozilo resides in California.

38.     Defendant First American Corporation ("First American") is, by its own description, "America's largest provider of business information" operating in five business sectors: title insurance and services, specialty insurance, mortgage information (including real estate appraisal services), property information, and risk mitigation and business services.  First American is incorporated and headquartered in California.

39.     Defendant First American eAppraiseIT ("eAppraiseIT") is a wholly-owned subsidiary of First American that provides real estate appraisal services to savings and loans, banks, and other lenders.  Defendant WaMu is the largest customer of eAppraiseIT's appraisal business.  First American and eAppraiseIT are both currently the target of a lawsuit filed by New York State Attorney General Andrew Cuomo related to eAppraiseIT's alleged practice of fraudulently inflating property appraisals in order to justify higher-priced mortgage loans offered by WaMu and other lenders, many of which were subsequently sold to Freddie Mac.  eAppraiseIT is incorporated in Delaware, with headquarters in Massachusetts and California.

40.     Defendant Anthony R. Merlo, Jr. ("Merlo") was President of eAppraiseIT from January 2005 to November 2007, and knew of, directed and acquiesced in the practices of eAppraiseIT as described herein.  Defendant Merlo resides in California.

## IV.     FREDDIE MAC'S MASSIVE EXPOSURE TO THE SUBPRIME MARKET

### A.     The Operations of Freddie Mac

41.     Freddie Mac is a publicly-traded company established by Congress in 1970 pursuant to the Federal Home Loan Mortgage Corporation Act, 12 U.S.C. §§ 1451-1459 (the "Act").  Freddie Mac's Charter sets forth the purpose of the Company:

779143.1

(1) to provide statiblity in the secondary market for residential mortgages;

(2) to respond appropriately to the private capital market;

(3) to provide ongoing assistance to the secondary market for residential mortgages (including activities related to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing; and

(4) to promote access to mortgage credit throughout the Nation (including central cities, rural areas, and underserved areas) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing.

42.     One of the ways in which Freddie Mac has historically provided stability and liquidity in the residential mortgage market has been through its activities in the secondary mortgage market.

43.     The secondary mortgage market involves a range of financial transactions that can occur to a mortgage after a lender has made the loan to a homebuyer.  Most commonly, mortgages are "securitized," that is, individual mortgages are sold to another entity that pools them and creates a beneficial interest in that pool of mortgages represented by a new security. The value of that mortgage-related security rests in large measure on the value of the underlying bundle of mortgages from which it was created.

44.     Freddie Mac participates in the secondary mortgage market by buying whole loans (individual mortgage loans that have not been securitized) and mortgage-related securities and retaining them in its own portfolio for investment purposes.

45.     Freddie Mac also participates in the secondary mortgage market by issuing mortgage-related securities – called "Participation Certificates" or "PCs" – that represent

16

undivided interests in pools of mortgages that the Company has purchased.  The principal and interest payments from the mortgages in the pool are passed through to the holders of the PCs by Freddie Mac on a monthly basis.  Freddie Mac typically guarantees the payment of the principal and interest from these mortgages.  That is, Freddie Mac assumes the credit risk of the underlying mortgages – the risk that the borrowers will default on their payment obligations.  Freddie Mac earns a fee for this guarantee and for administering these mortgage-related securities.

46.    In addition, Freddie Mac participates in the secondary mortgage market by issuing securities – called "Structured Securities" – representing beneficial interests in pools of PCs and certain other types of mortgage-related assets.  Freddie Mac also guarantees the payment of the principal and interest on most of the Structured Securities it issues.

47.    Freddie Mac's Charter also limits the Company's ability to purchase mortgages that have insufficient capitalization in order to insulate Freddie Mac against credit losses through foreclosure risk.  Specifically, the Charter states:

> No conventional mortgage[2] secured by a property comprising one-to four-family dwelling units shall be purchased under this section if the outstanding principal balance of the mortgage at the time of purchase exceeds 80 per centum of the value of the property securing the mortgage, unless (A) the seller retain a participation of not less than 10 per centum in the mortgage; (B) for such period and under such circumstances as the Corporation may require, the seller agrees to repurchase or replace the mortgage upon demand of the Corporation in the event that the mortgage is in default; or (C) that portion of the unpaid principal balance of the mortgage which is in excess of such 80 per centum is guaranteed or insured by a qualified insurer as determined by the Corporation.

48.    To assist Freddie Mac in achieving its mission, Congress has given Freddie Mac a favored status, by, among other things, exempting the Company from the

---

[2] The Act defines conventional mortgage as "a mortgage other than a mortgage as to which the Corporation has the benefit of any guaranty, insurance or other obligation by the United States or any of its agencies or instrumentalities."

registration and reporting requirements of the Securities Act of 1933 and of the Securities Exchange Act of 1934, giving Freddie Mac's securities favorable treatment under various investment laws and regulations, and exempting Freddie Mac from state and local taxes, except for taxes on real estate owned by Freddie Mac.

49.     In 2002-2003, Freddie Mac was rocked by a massive accounting scandal, leading to one of the largest financial restatements in corporate history, and forcing its regulator OFHEO to conclude that "Freddie Mac [had] engaged in conduct that does not conform with the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 ('Safety and Soundness Act'), OFHEO rules, guidances and standards, and the Federal Home Loan Mortgage Corporation Act and that such conduct has resulted in harm to [Freddie Mac]."

50.     In December 2003, OFHEO issued a 172-page "Report of the Special Examination of Freddie Mac," which concluded, *inter alia*, that "Freddie Mac cast aside accounting rules, internal controls, disclosure standards, and the public trust in the pursuit of steady earnings growth...Freddie Mac created and maintained reserve accounts that did not comply with GAAP and entered into transactions with little or no economic substance," including the creation of "an essentially fictional transaction with a securities firm" in the amount of approximately $30 billion.  "Getting the amortization numbers to fall within the range was sometimes an all-night process; according to one employee it was 'classic' for Freddie Mac to 'play with the numbers until they got the right one.'"  Indeed, Freddie Mac had "weak or nonexistent accounting policies" and "[t]he resulting accounting errors committed were pervasive and persistent."

51.    On December 9, 2003, Freddie Mac entered into a consent order (the "Consent Order") with the OFHEO stemming from the massive fraud that had occurred at the Company. The consent order required, among other things, the following:

Article II        Board of Directors and Senior Management

3.    Within 120 days from the date of this Order, the Board shall cause to be conducted a review of the Enterprise's bylaws in light of the factors contributing to the restatement and revision of the Enterprise's financial statements for 2000, 2001 and 2002. Based on this review, the Board shall cause such revisions to be made in the Enterprise's bylaws as the Board determines to be appropriate.

*        *        *

4.    Within 120 days from the date of this Order, the Board shall cause to be conducted a review of the Enterprise's codes of conduct for the Board and for employees in light of the factors contributing to the restatement and revision of the Enterprise's financial statements for 2000, 2001 and 2002, and shall cause such revisions to be made in those codes of conduct as the Board determines to be appropriate and such employee training programs to be developed and implemented as the Board determines to be appropriate.

*        *        *

5.    Within 180 days from the date of this Order, the Board shall cause to be prepared a succession plan for the Enterprise's senior management. . . (For purposes of this paragraph, senior management means the Enterprise's chief executive officer, chief operating officer, chief financial officer and general counsel, and the heads of the Investment & Capital Markets Division and the Mortgage Sourcing, Operations & Funding Division.)

6.    Within 120 days from the date of this Order, the Board shall cause to be conducted a review of its committee structure and shall determine what changes, if any, are appropriate to make in such committee structure. This review shall take into account the need for effective Board oversight of essential Enterprise functions, including management implementation of internal controls and operational risk planning.

*        *        *

7.      Within 150 days from the date of this Order, the Board shall cause to be reviewed the frequency of regular Board meetings, the Board's process (including amount of time allotted) for full Board consideration of Board committee reports, and the Board's processes for obtaining information from management with respect to both the Enterprise's ongoing operations and issues of special importance to the Enterprise.

Based on this review, the Board shall determine what revisions, if any, are appropriate to make in the frequency of regular Board meetings, in the board's process (including the amount of time allotted) for full Board consideration of Board committee reports, and in the Board's processes for obtaining information from management with respect to both the Enterprise's ongoing operations and issues of special importance to the Enterprise.

                        *        *        *

8.      Within 120 days from the date of this Order, the Board shall determine what limits, if any, to establish on the terms of the Board.

                        *        *        *

10.     At least once annually, the Board shall review, with appropriate professional assistance, the legal and regulatory requirements that are applicable to its activities and duties.

11.     At least once annually, the Enterprise's senior management shall review, with appropriate professional assistance, the legal and regulatory requirements applicable to their activities and duties.

                        *        *        *

13.     The Enterprise shall separate the position of Chairman and the position of Chief Executive Officer within a reasonable period of time.

14.     Within 180 days from the date of this Order, Enterprise shall submit to OFHEO an acceptable plan setting forth specific actions that Enterprise will take to foster a management culture in which appropriate consideration is given to operational stability and legal and regulatory compliance throughout the Enterprise, as essential elements of a management approach that seeks properly to address all relevant risks and to maximize the Enterprise's long term value. Such actions shall include appropriate training of the Enterprise's officers and employees, and steps to make the Enterprise's compensation system for executive officers consistent with fostering the management culture

contemplated under this paragraph.

Article III                    Internal Controls

                    *        *        *

17.      At lease once annually, the Enterprise's senior
management shall review the effectiveness of the internal controls
that are the subject of paragraphs 15-16, and shall report to the
Board, or an appropriate Board committee, on the results of the
its review. A copy of senior management's report shall be
submitted to the OFHEO.

18.      The Enterprise shall have established the position of chief
risk officer with responsibility for the Enterprise's risk
oversight function. Within 60 days of the date of this Order, the
Enterprise shall report to OFHEO on the functions of the chief risk
officer and to whom such officer shall report.

19.      The Enterprise shall have established the position of chief
compliance officer. Within 60 days of the date of this Order, the
Enterprise shall report to OFHEO on the functions of the chief
compliance officer and to whom such officer shall report.

                    *        *        *

Article VI        Risk Management Transactions

22. (a) Within 90 days after the date of this Order, the Enterprise
shall develop procedures with respect to:

          (i)        Appropriate management oversight that a
business purpose exists for unique transactions related to risk
management or where a business purpose is required under
generally accepted accounting principles for a transaction
relating to risk management.

          (ii)        Maintaining appropriate records of business
purpose of unique transactions relating to risk management
or where a business purpose is required under generally accepted
accounting principles for a transaction relating to risk management.

                    *        *        *

Article VII        Public Disclosures and Regulatory Reporting

23.      Within 90 days from the date of this Order, the Enterprise
shall submit to OFHEO an acceptable plan setting forth specific
actions that the Enterprise will take to address the adequacy of its
public disclosures practices and to have in place effective

ongoing management oversight of its public disclosure practices.

*    *    *

Article IX        Civil Monetary Penalty

29.      Within ten days from the date of this Order, the Enterprise shall transfer $125 million, in the manner specfied by the General Counsel of OFHEO, in the name of the United States Treasury. This amount shall constitute a civil money penalty imposed on the Enterprise pursuant to 12 U.S.C. § 4636.

52.      To be successful in its activities in the secondary mortgage market, to build long-term shareholder value in the Company, and to achieve its public mission, Freddie Mac requires prudent, attentive, and skilled management manifesting itself in internal controls and processes and in a corporate culture that can fully meet the demands and vicissitudes of the highly competitive, sophisticated, and volatile market in which it conducts its business. Freddie Mac itself has identified the standard of "financial management" it must meet: "To achieve our mission – to lower costs and increase access to quality housing for more of America's families – we must be the best. This means we need the best accounting practices, controls, and financial disclosures. Transparent and accurate financial information is the cornerstone of our commitment to support and expand America's housing system."

53.      Freddie Mac's current website sets out its own description of its "financial priorities" in fulfilling it mission:

> a.      "**Asset selection** is the process by which we evaluate mortgage debt outstanding and determine which assets meet our business objectives. It requires superior understanding of the many factors that affect the value of mortgages, including, prepayment behavior and credit characteristics. We maintain a high-quality mortgage portfolio in our investment and securitization businesses, and

22

we're well positioned to work with the broad array of mortgage loan products in the marketplace."  [Emphasis in original.]

b.    "**Risk management** is a core competency at Freddie Mac.  Our consistently low level of risk through many different interest-rate cycles demonstrates the durable risk management framework that lets us grow our investment business in a safe and sound manner.  This, in turn, lets us fulfill our public mission.  Since 1998, we have managed our risk effectively through six cycles where interest rates have moved between 150 and 250 basis points in a relatively short period of time.  Throughout these extreme interest rate moves, Freddie Mac's risk profile has remained low."  [Emphasis in original.]

54.    The need of the Company to meet this standard of "financial management" and achieve these "financial priorities" is even more acute when the secondary mortgage market in which Freddie Mac conducts its business rests on inherently highly risky subprime mortgage loans, such as those the Company began accepting in staggering amounts beginning in 2006, at the same time, as described below according to OFHEO, that its operations were dysfunctional and controls woefully inadequate.  Contrary to the Company's claims set out above, in its activities in the subprime market, Freddie Mac's management and Board displayed incompetent, even reckless, risk management and asset selection.  The financial debacle that has now fallen on the Company as the result of the errors and omissions of Freddie Mac's management and Board has painfully demonstrated that the claim that "Freddie Mac's risk

profile has remained low" is not true, and has not been true for some years, notwithstanding the assurances of Freddie Mac's management and Board.

55.     The performance of Freddie Mac's management and Board has been far from "the best."  Indeed, by their false assurances and concealment of the catastrophic risk exposure into which they lead the Company, Freddie Mac's management and Board appear to be acutely aware of how dramatically they have failed in their duties to the Company and its shareholders.  Some of these deficiencies have been pointed out to Freddie Mac's Board by OFHEO and, in other respects, OFHEO appears to have been woefully unaware of their magnitude and of the precarious condition of the Company.

56.     In September, 2005, Freddie Mac entered into an agreement with OFHEO on matters pertaining to subordinated debt, public disclosure of credit and interest-rate risks and liquidity management.  Specifically, the agreement required Freddie Mac to comply with, among other things, the following provisions:

2. Liquidity Management and Contingency Planning

[Freddie Mac] will comply with principle of sound liquidity management consistent with industry practice.  In addition, [Freddie Mac] will:

- Maintain a portfolio of highly liquid assets. The size of this liquid asset portfolio will be established by [Freddie Mac] and assessed by the OFHEO Examiner in Charge.

- Maintain a functional contingency plan providing for at least three months' liquidity (using internal forecasts) without relying upon issuance of unsecured debt.

- Periodically test the contingency plan in consultation with its OFHEO Examiner-in-Charge.

3. Public Disclosures

[Freddie Mac] will provide periodic public disclosures on its risks and risk management practices and will inform its OFHEO Examiner-in-Charge of the disclosures. (Footnote admitted). These disclosures for [Freddie Mac] will

include:

Subordinated Debt Disclosure

- Compliance of the corporation with the commitment regarding subordinated debt, including a comparison of the quantity of subordinated and total capital levels set forth above.

Liquidity Management Disclosure

- Compliance of the corporation with the plan for maintaining three months' liquidity and meeting the commitment for periodic testing.

Interest Rate Risk Disclosures

- Monthly averages of its duration gap. [Freddie Mac] will work with OFHEO to try to align its measures as much as practicable.

- Monthly disclosures of the impact on its financial condition of both a 50-basis point shift in rates and a 25-basis point change in the slope of the yield curve.

Credit Risk Disclosures

- Quarterly assessments of the impact on the corporation's expected credit losses from an immediate 5 percent decline in single-family home prices for the entire U.S.

- Impact will be reported in present value terms and measure losses to the corporation both before and after receipt of private mortgage insurance claims and other credit enhancements.

Public Disclosure of Risk Rating

- [Freddie Mac] will seek to obtain a rating that will be continuously monitored by at least one nationally recognized statistical rating organization.

- The rating will assess, among other things, the independent financial strength of "risk to the government" of the corporation operating under its authorizing legislation but without assuming a cash infusion or extraordinary support of the government in the event of a financial crisis.

57.    Just two months later, on November 8, 2005, Freddie Mac

announced that it would have to revise its previously announced earnings substantially

downward as a result of continuing internal control problems.  Specifically, the Company

and Defendant Baumann stated, in relevant part:

> Freddie Mac (NYSE:FRE) announced today that it will reduce net income for the first half of 2005 by approximately $220 million, resulting in reported net income for the first half of 2005 of $1.4 billion, compared with $1.6 billion previously reported in the company's August 31, 2005 press release.
>
> The revision reflects the correction of interest accruals recorded for certain mortgage-related securities stemming from miscalculations since 2001 in a legacy computer system. ***Management found and corrected the miscalculations in the course of its ongoing internal control enhancements.***  The correction represents lessthan one percent of the company's $36.1 billion of reported regulatory core capital as of June 30, 2005.
>
> "We've made enormous strides in fixing our financial infrastructure but, as we have previously disclosed, the effort is not yet complete," said Martin F. Baumann, Freddie Mac's chief financial officer. "When we found this error, we corrected it immediately. We are continuing to move forward to complete the job of producing timely, accurate financial reports early in 2006. We've also made great progress this year in our business –increasing our market share, building on our already strong capital position and maintaining excellence in risk management."
>
> Management has devoted substantial financial and personnel resources to improving Freddie Mac's internal controls and continues to remediate material weaknesses in controls over financial reporting. To provide greater assurance over the reliability of the company's financial reports, management has decided to accelerate a number of previously planned control initiatives into the fourth quarter of 2005.
>
> Freddie Mac expects that its timetable for beginning the registration process with the Securities and Exchange Commission (SEC) will not be significantly changed. The company also expects to release fourth quarter and full-year 2005 results and to begin filing timely, GAAP-compliant monthly capital reports with its regulator, the Office of Federal Housing Enterprise Oversight, no later than the end of March 2006. The company also expects to hold an investor conference call to discuss third quarter performance within the next 30 days. The company expects to release full third quarter financial results upon completing further control work.

779143.1

\*          \*

**Detail of Accrual Revision**

The miscalculation of interest income stemmed from an error in a legacy computer system used to compute interest on certain mortgage-related securities (primarily non-agency securities) that accrue interest on other than a calendar-month basis. The system over-accrued interest income beginning in the month of purchase, with over-accruals generally decreasing as the security paid down, and reversing in the month the security was sold or matured.

Freddie Mac expects to reduce previously reported net income for the first quarter of 2005 by $136 million to reflect the cumulative overstatement occurring in prior years and by a further $33 million to reflect the overstatement occurring in the first quarter of 2005. Freddie Mac also expects to reduce previously reported net income for the second quarter of 2005 by $51 million to reflect the overstatement occurring in that period.

58.     The preceding earnings press release was false and misleading, because

Freddie Mac failed to meet its self imposed timeline of "no later than the end of March

2006" for the release of the Company's fourth quarter and full-year 2005 results.  Instead the

Company did not announce the preceding financial results until May 30, 2006 in a press release

entitled "Freddie Mac Reports 2005 Financial Results," wherein the Company stated, in relevant

part:

McLean, VA – Freddie Mac (NYSE:FRE) today reported GAAP net income of $2.1 billion for 2005.

The decline in net income from $2.9 billion for 2004 was due primarily to approximately $600 million of costs associated with the recent agreement to settle the securities class action and shareholder derivative litigation, charges related to Hurricane Katrina and the net impact of certain accounting changes. Freddie Mac's regulatory core capital is estimated to have grown to $36.0 billion at December 31, 2005, with an estimated $3.5 billion in excess of the 30-percent target surplus. ***The company's interest-rate and credit risks remain near historic lows.***

\*\*\*\*\*\*\*

"2005 was a year of continued investment in the business capabilities, infrastructure and management team here at Freddie Mac," said Eugene M. McQuade, president and chief operating officer. "These investments position our company to achieve our long-term growth and return objectives, and to deliver long-term value to the market and our stockholders. As we execute on our 2006 priorities, we have a strong capital position, growing business momentum and a determination to resolve remaining financial infrastructure challenges. Dick [Syron] and I feel very good about the long-term prospects of this franchise."

******

**INTERNAL CONTROLS UPDATE**

Improving internal control over financial reporting and addressing the risks of material weaknesses and other control deficiencies have been priorities for us and will continue to be so in 2006. The company is pursuing a series of initiatives to improve our financial reporting infrastructure and remediate material weaknesses and other deficiencies in our internal control environment. Most significantly, these initiatives include an end-to-end assessment of the design and effectiveness of the company's internal control over financial reporting, and an initiative to improve information technology-related controls, together with remedial actions needed to address any issues identified in the course of these reviews. Additionally, we are scheduled to implement several planned system enhancements later in the year. A more complete discussion of the status of our remediation efforts is included in the Information Statement Supplement dated as of today and available on our Web site.

***Despite our ongoing challenges in these areas, we believe our interest-rate and credit risks remain well managed, as*** demonstrated by our reported risk metrics and results. [Emphases added.]

59.     Although OFHEO has stated that it believes that the Company has "implemented actions to meet the requirements of the September 2005 Agreement," in fact, the Company's Board and senior management have put form over substance in appearing to have done so.  Further, as of the date of this Complaint,  Freddie Mac still fails to make adequate,

appropriate and timely public disclosure of management's credit risk assessments, as required by the 2005 agreement with OFHEO.

60.    For instance, in a March 23, 2007 press release entitled "FREDDIE MAC REPORTS 2006 FINANCIAL RESULTS," the Company, and specifically Defendants Syron and Piszel, stated, in relevant part:

> McLean, VA – Freddie Mac (NYSE:FRE) today reported net income of $2.2 billion for 2006, up 4 percent compared to $2.1 billion in 2005. The company also reported an increase in the fair value of net assets attributable to common stockholders, before capital transactions, of approximately $2.5 billion for 2006, compared to an increase of $1.0 billion in 2005. Freddie Mac's regulatory core capital is estimated at $36.2 billion at December 31, 2006, with an estimated $2.6 billion in excess of the 30-percent mandatory target capital surplus set by the Office of Federal Housing Enterprise Oversight (OFHEO).

> During 2006, the company increased its common dividend payout by 22 percent to $1.3 billion or $2.00 per share on an annualized basis and returned $2.0 billion of capital to common stockholders in a preferred-for-common restructuring. All told, the company returned some $3.3 billion to common stockholders last year, the most in Freddie Mac history.

> Also, the company announced today that it plans to repurchase up to an additional $1 billion in common stock in conjunction with the issuance of up to $1 billion in preferred stock from time to time depending on market conditions.

> ["]Freddie Mac grew its business, strengthened its franchise and improved long-term value for its shareholders, despite a challenging year for housing and mortgage finance," said Richard F. Syron, chairman and chief executive officer. ***"In 2006, both net income and fair value return before capital transactions exceeded $2 billion, as we grew our guarantee business. We also maintained our low credit and interest-rate risk profiles, leaving us well-positioned to deal with a broad range of interest rate conditions, and with the value of our shareholders' equity well protected."***

> ******

> "Our plan to repurchase an additional $1 billion in common stock and our significant return of capital to common stockholders in

779143.1

2006 demonstrate Freddie Mac's progress in improving our capital structure," said Buddy Piszel, chief financial officer. "We've also made progress in our remediation efforts, as demonstrated by today's release of our 2006 annual report. We continue to make good strides towards returning to quarterly reporting later this year."

\*\*\*\*\*\*

The $0.09 increase in diluted earnings per common share for 2006 reflects the net effects of the increase in net income and the reduction in the diluted weighted average number of common shares outstanding, arising from the repurchase of approximately 32.7 million common shares during 2006, partially offset by an increase in preferred dividends associated with the company's issuance of $1.5 billion in new preferred stock. Pre-tax income declined by $0.5 billion to $2.1 billion in 2006 from $2.6 billion in 2005.

\*\*\*\*\*\*

Net interest income declined by $1.2 billion. During 2006, the unpaid principal balance (UPB) of the company's retained portfolio declined slightly to approximately $704 billion, as relatively tight mortgage-to-debt option-adjusted spreads (OAS) generally limited attractive investment opportunities and the company began managing the portfolio under a voluntary growth limit announced in August 2006.

\*\*\*\*\*\*

Management and guarantee income on PCs held by third parties increased to $1.7 billion in 2006 from $1.5 billion in 2005, as the contractual guarantee fee rate in basis points declined modestly and the average balance of outstanding PCs held by third parties increased by roughly 15 percent to $1,045 billion from $909 billion.

During 2006, the company's total credit guarantee portfolio increased by 10.6 percent to approximately $1.5 trillion. The company estimates that its share of government-sponsored enterprise (GSE) mortgage securitizations for 2006 was approximately 43 percent, compared to about 45 percent in 2005 and about 41 percent in 2004. All-in, Freddie Mac's 2006 activities provided mortgage funds for approximately 3.3 million families.

\*\*\*\*\*\*

*In 2006, Freddie Mac experienced a slight credit deterioration in*

*its portfolio of loans not impacted by the hurricane as more loans transitioned through delinquency to foreclosure and the expected severity of losses on a per-property basis increased.* As a result, the company recorded in 2006 a $297 million provision for credit losses as well as real estate owned expense of $60 million.

****** 

## Capital Management

Estimated regulatory core capital was $36.2 billion at December 31, 2006, with an estimated regulatory minimum capital surplus of $10.3 billion, and an estimated $2.6 billion in excess of the 30-percent mandatory target capital surplus set by OFHEO. During 2006, the company completed the repurchase of approximately $2.0 billion of outstanding shares of common stock (approximately 32.7 million shares) at an average price of $61.06 per share and issued non-cumulative, perpetual preferred stock in the amount of $1.5 billion.

During the first quarter of 2007, the company issued $1.1 billion of non-cumulative, perpetual preferred stock and redeemed $0.6 billion of higher-cost non-cumulative, perpetual preferred stock. These transactions effectively reduced the company's cost of capital. The company announced today its plan to repurchase up to $1 billion of common stock in conjunction with the issuance of preferred stock from time to time depending on market conditions.

******

During 2006, the company recognized a more significant mark-to-market decline in its existing book of business due to the effect of a deteriorating market view of credit and increased market risk premiums related to the company's guarantee obligation. In addition, the company estimates that the fair value of new business booked in 2006 was lower than the fair value of new business booked in 2005.

## Fourth Quarter 2006 Results

As a result of the interest-rate movements in the last quarter, Freddie Mac reported a net loss of $480 million in the fourth quarter of 2006, as realized losses and mark-to-market impacts on the company's credit guarantee portfolio, derivatives and administrative expenses more than offset net interest income and management and guarantee income.

Freddie Mac also reported a decrease in the fair value of net assets

attributable to common stockholders, before capital transactions, in the fourth quarter of 2006 of approximately $0.2 billion as the impact of OAS widening, the effect of credit deterioration on the guarantee obligation and administrative expenses more than offset the positive contributions from the company's investment and guarantee activities.

### Interest-Rate Risk Management

Managing the company's interest-rate risk is essential to maintaining a strong and durable capital base and continuous access to debt and equity markets. Consistent with its longstanding record, the company's interest-rate risk remained low. During 2006, the company reported that portfolio market value sensitivity (PMVS) and duration gap averaged one percent and zero months, respectively, unchanged from the prior year.

### Credit Risk Management

The company's mortgage credit risk, as measured by the current loan-to-value ratio (LTV) of its credit guarantee portfolio and other credit characteristics, remained low. The company estimates that the credit guarantee portfolio had a LTV of 57 percent as of December 31, 2006, compared with 56 percent for 2005, and the portfolio remains geographically well diversified. Long-term, fixed-rate mortgages constituted 82 percent of the credit guarantee portfolio, despite an increase in the purchase of variable-rate products, including non-traditional mortgage products, during 2006.

At December 31, 2006, the company's $704 billion retained portfolio included $238 billion of non-agency mortgage-related securities, 96 percent of which were rated AAA or equivalent.

***Included in this amount were $124 billion of non-agency mortgage-related securities backed by subprime loans, of which more than 99.9 percent were AAA rated.***

### Internal Controls

The company is continuing to make progress on the series of initiatives to improve its financial reporting infrastructure and remediate material weaknesses and other deficiencies in its internal controls. These activities are part of Freddie Mac's comprehensive plan for returning to quarterly financial reporting. The comprehensive plan includes mitigation and remediation of identified material weaknesses and significant deficiencies;

strengthening of the financial close process; implementing critical systems initiatives; and completion of a review of the company's system of internal controls related to the processing and recording of the company's financial transactions.  [Emphases added.]

61.    In its 2007 Report to Congress released April 10, 2007 ("2007 OFHEO Report"), OFHEO concluded that Freddie Mac "remain[s] a significant supervisory concern," notwithstanding the entry of the Consent Order nearly four years earlier.  Specifically, the 2007 OFHEO Report advised Congress that:

> . . . [w]hile efforts toward improvement are underway, [Freddie Mac's] senior management continues to revise plans and re-engineer processes to strengthen internal controls and remediate six material weaknesses and a number of significant deficiencies.  Leadership from the Board and senior management is challenged as they strive to reshape the corporate culture, publish accurate and timely financial statements, implement long-term sustainable processes, improve overall governance and risk management capabilities, enhance information technology controls and stabilize the organizational structure.  Intensive efforts by the Board and management have been made to address internal control weaknesses; however, several key initiatives to remediate the control environment have not progressed as planned.

62.    Moreover, the 2007 OFHEO Report identified several areas requiring immediate Board attention:

> **Key matters highlighted in this report requiring strong Board oversight are:**
>
> •    ***Internal Controls.*** The Board should continue to oversee management's progress toward remediating widespread internal control weaknesses to enable the release of accurate and timely financial statements, permit a return to controls-based auditing and build sustainable internal control governance processes.
>
> •    ***Information Technology.*** The Board should ensure that technology-related issues identified in this report are addressed. Key challenges include gaining a deeper understanding of the key application controls, improving general controls, implementing a systems development process, improving contingency planning and developing a

sustainable data and architecture strategy.

- **Credit Risk Management.** Continued dose monitoring of credit portfolio trends is necessary as higher volumes of non-traditional credit products were purchased during 2006. Although these credit products are within current limits, these products exhibit higher than historical credit risk

- **Corporate-wide Change Management.** The Board should continue to monitor management's efforts to: improve capabilities to effectively manage enterprise-wide change programs, gain a more in-depth understanding of the complexity of and resolution strategies for control weaknesses and support an environment that values strong internal controls and risk management functions.

- **Risk Oversight Functions.** The Enterprise Risk Management functions and the Internal Audit department made significant strides to strengthen their respective units and define appropriate governance structures. Continued Board support during the ongoing evolution of these functions and the implementation of the risk control self-assessment process will be necessary.

63.    In the 2007 Report, OFHEO also opined on Freddie Mac's operations and efforts in remediating material weaknesses identified in the Company's internal controls:

> *Operational risk is high and continues to be a primary supervisory concern. Throughout 2006, Freddie Mac was not able to produce accurate and timely quarterly financial statements. All internal control-related material weaknesses and significant deficiencies identified during 2005 or prior years' annual audits remain outstanding. The internal control structure remains fragmented, incomplete, and in some cases, undocumented.* In addition, current systems limitations did not permit an effective and reliable quarterly close process. Remediation of control weaknesses including independent testing is required (controls must be complete and documented) before management and OFHEO can opine on the effectiveness of the control structure.
>
> The Comprehensive Plan (the primary project to return the company to timely financial reporting, improve the control environment and permit reliance on internal controls over financial reporting by the external auditor) suffered during

2006 from ineffective planning and inconsistent execution. The original plan was submitted in April 2006 and continues to be revised. Aggressive time schedules, lack of independent quality assurance, inadequate management reporting, cultural issues of responsibility and accountability and project management deficiencies contributed to insufficient progress toward achieving the Plan's overall objectives. Although management and staff have worked hard to mitigate and remediate known control weaknesses, as of December 31, 2006, no remediation activity has been tested and verified to be effective.

The Comprehensive Plan includes: remediating known control weaknesses, the end-to-end business process review, close process improvements and information technology general control remediation. Since control weaknesses are widespread and pervasive across the Enterprise, identifying control gaps and remediating most of the known material weaknesses are linked to successful completion of the end-to-end business process review. At the same time, process improvements are needed to achieve a timely, sustainable financial close process compliant with regulatory requirements. In addition, Information Technology General Controls (ITGC) must be operating effectively before management can rely on automated information without time-consuming substantive review procedures and manual processes. The Comprehensive Plan requires continued Board and executive management involvement to ensure activities are properly sequenced, achieve plan objectives and resolve competition for resources, especially subject matter experts.

******

Although considerable efforts are under way to remedy weaknesses in internal controls related to financial reporting, additional control weaknesses may exist elsewhere in the Enterprise. Plans to identify, assess and strengthen non-financial controls are commencing. These controls may include, but are not limited to, business continuity planning business and risk performance measures and operating effectiveness metrics. [Emphasis added.]

64.    OFHEO also criticized Freddie Mac's failure to adequately

remediate material weaknesses and deficiencies in the Company's information technology

infrastructure stating "[w]eaknesses continue in information technology systems development

and delivery, information security, end-user computing systems, data quality, and change

management."

65.     Additionally, with respect to Freddie Mac's significant accounting

policies, OFHEO noted that "significant work remains to develop complete accounting policies

and procedures."

66.     Further, the 2007 OFHEO Report provided a detailed analysis of Freddie

Mac's asset quality and credit risk management, while noting the Company's aggressive

movement in the subprime market:

> Management has expanded the Enterprise's purchase and guarantee of
> higher-risk mortgages. In order to increase market share, meet mission goals,
> stay competitive and be responsive to sellers' needs, the Enterprise has increased
> the use of credit policy waivers and exceptions. Untested and alternative market
> products accounted for approximately 24 percent of 2006 new purchases and
> currently comprise 11 percent of the total single-family mortgage portfolio. Internal
> measures of credit quality reflect that the quality of incremental new purchases
> declined in 2006 as evidenced by a rise in expected default costs.

67.     With such increased level of historical credit risk, much of it coming from

the acceptance by Freddie Mac of staggering amounts of direct and indirect subprime debt, the

Company's Board and senior management were ill-equipped to even know what was going on

due to, *inter alia*, the previously noted lack of adequate controls.  Further, the Board did not, at

least through 2006 but certainly continuing thereafter, have accurate, fundamental facts that all

members of the Board and PwC knew or should have known.  As the OFHEO Report stated:

> Operational risk is high and continues to be a primary supervisory
> concern. Throughout 2006, Freddie Mac was not able to produce
> accurate and timely quarterly financial statements. All internal control-
> related material weaknesses and significant deficiencies identified
> during 2005 or prior years' annual audits remain outstanding. The
> internal control structure remains fragmented, incomplete, and in some
> cases, undocumented.

68.     Notwithstanding the foregoing, and reflecting OFHEO's inability to oversee the most critical aspects of Freddie Mac's business, the 2007 OFHEO Report nonetheless states, incorrectly, that the Company's "asset quality is strong. …Underwriting standards and credit administration practices are prudent…."

### B.     Freddie Mac and the Subprime Mortgage Market

69.     "Subprime" mortgages are different from "prime" mortgages in that they do not "conform" to the normal restrictions lenders put on home loans.  These restrictions commonly focus on "borrower quality characteristics" and the ratio of the amount of the loan to the underlying value of the home purchased by the borrower which is the collateral for the mortgage.  When money is loaned in a subprime, or non-conforming, mortgage, the borrower does not pass muster under the normal standards for evaluating whether he has the economic capability to pay back the loan.  Put another way, the borrower is not considered "credit-worthy" under normal lending standards; the risk of a subprime borrower defaulting on the loan because he cannot meet his loan payments is far higher than the similar risk on a conforming loan.

70.     This risk of a subprime mortgage is compounded by the fact that subprime mortgages have a higher loan-to-value ratio than conforming mortgages, with the subprime borrower commonly borrowing 90 percent of the value of his home.  This means that declining home prices can readily drive the value of the property below the amount borrowed, giving the borrower the economic incentive to simply abandon the property in foreclosure to the lender rather than pay back the loan.  The lender is then left with a property that it can sell, but only at a price below the balance due on the mortgage.  Such risk is further enhanced if, through lax underwriting standards or otherwise, the underlying homes have been "appraised" at excessive levels to obtain financing which would not support the mortgage loans applicable thereto.

71.    Evaluating the extent of these risks when making a subprime loan is a challenge, if not an outright gamble, with the best of information, but the difficulty of that task – or the size of that gamble – has been further magnified by the introduction of the "low documentation" loan.  As its name suggests, the "low doc" loan has the attraction of requiring less paperwork in the process of making a mortgage.  Yet cutting the paperwork means that the lender has far less information about the credit-worthiness of the borrower than the normal underwriting process would produce – often not even having rudimentary confirmation of the borrower's claims concerning his income and other assets.  The combination of Freddie Mac's lax or non-existent loan underwriting standards (best exemplified by its "Loan Prospector" automated loan service which generated approvals used purportedly to "assess" loans for purchase by Freddie Mac every "15 to 20 seconds"), subprime mortgages and inflated appraisals for unqualified borrowers generated a toxic combination for the Company.  Such lax and/or non-existent loan underwriting standards and the ineffective risk management made it easy for predatory lenders such as Defendants WaMu and Countrywide to take advantage of Freddie Mac, which they did, packaging and funneling into the Company billions of dollars of subprime and other high-risk mortgages.

72.    Freddie Mac's Board and senior management knew or should have known that the probability of default is many times higher for a subprime loan than for a prime loan.  As long ago as the third quarter of 2002, the Mortgage Bankers Association of America reported that the rate at which foreclosures were begun for subprime loans was more than 10 times that for prime loans.  As a senior economist at the Federal Reserve Bank of St. Louis and a financial economist at the Office of the Controller of the Currency put it in a 2006 article, "the propensity

of borrowers of subprime loans to fail as homeowners (default on the mortgage) is much higher than for borrowers of prime loans."

73.    During the period when Freddie Mac took on these heightened risks from lower borrower quality, higher loan-to-value ratio, low documentation loans, and inflated appraisals, it compounded these gambles by the ill-advised terms of the loans, as described below.

74.    A substantial fraction of Freddie Mac's volume of mortgages and mortgage-based securities included particularly exotic, risky, and poorly managed types of terms, such as payment-option adjustable-rate mortgages ("ARMs") and interest-only loans. By 2006, ARMs accounted for 18% of Freddie Mac's total investment volume, with a similar excessive level during early 2007. By way of comparison, in 2001, Freddie Mac had bought virtually no mortgages nor any mortgage-based securities that included ARMs.

75.    One of the ARM variants Freddie Mac took on in substantial quantities by 2006 were "2/28 hybrid ARMs," which reset from an initial low or "teaser" rate after two years into a much higher long-term rate. A 2/28 ARM was likely to leave the borrower no feasible alternative at the two-year end of the "teaser" other than sale or refinancing if these were possible, and, if market and personal conditions prevented these, default and foreclosure in ways ruinous to Freddie Mac. Outside observers warned about the dangers of these products and the enormity of the ill-advised risk Freddie Mac undertook by not requiring lenders to qualify borrowers at the fully indexed rate – warnings deliberately or, at a minimum, recklessly disregarded by Freddie Mac management.

76.    At the speculative peak of the bubble in housing prices, mortgages, and mortgage-backed securities in 2006 and 2007, Freddie Mac's Board and senior management

disregarded many stark signals from the market against the Company's course of action, including but not limited to precipitous declines in the ABX index.  The ABX is the index which tracks the value of securities backed by subprime home loans, which other lenders look to as a guidepost in determining values for their holdings.  As 2007 went on, the ABX declined precipitously, with some portions of it down as much as 79% during the year.

77.     In the course of 2006 and 2007, other lenders responded to market signals such as the ABX by pulling back on ownership of mortgage-backed securities that included subprime loans.  The attention that other lenders gave to the ABX was not matched at Freddie Mac, however.  Instead, Freddie Mac continued to acquire subprime mortgage based securities, and described them as having a market value above 90 cents on the dollar.  As a result, Freddie Mac's share of the market for mortgage-backed securities that included subprime loans expanded greatly.

78.     Although Freddie Mac's management claimed its exposure to subprime loans and related securities were necessary to provide liquidity, stability and affordability in the U.S. housing market, the real reason Freddie Mac increased its market share in these loans and securities was that it generated extra profits.  During periods relevant to this Complaint, mortgage credit in the U.S. was readily available, highly liquid and so affordable that mortgage credit risk was underpriced.  Further, observers such as the National Association of Affordable Housing Lenders demonstrated that Freddie Mac could have found better ways to accomplish the objective of financing affordable housing and better protect the Company's assets from loss.  If anything, Freddie Mac's injection of hundreds of billions of dollars into high risk mortgage markets fueled speculation that artificially inflated U.S. housing prices and *de*-stabilized credit markets.

779143.1

79.     The disastrous results of the risks presented by Freddie Mac's subprime investments and lending activities, which risks were known or should have been known by its Board, senior management, and by PwC at all relevant times, manifested themselves beyond the ABX in late 2007. Since that time, a declining housing market and an increasing mortgage delinquency rate has caused a crisis in the mortgage market, as the value of mortgage-related securities has declined substantially, particularly those securities directly or indirectly tied to subprime lending.

80.     Freddie Mac's operations, in large measure due to its special status as a Government Sponsored Enterprise (or "GSE"), have been shielded from the normal rigors of public disclosure imposed on other financial institutions. For example, even though Freddie Mac uses the capital markets, including the New York Stock Exchange, to raise and maintain capital, it has not been required to file its financial statements with the SEC. This cloak from public scrutiny has had serious consequences, as exemplified by Freddie Mac's 2003 accounting scandal, which forced the Company to restate $5 billion in formerly reported earnings.

81.     Due to the control Freddie Mac's management and Board had over information concerning its operations, the Company was able to successfully, though falsely, assure its shareholders and the public that Freddie Mac did not have significant subprime exposure, that they knew how to manage and were managing risks effectively, that they were continuing to improve their internal control policies and procedures, and that they had adequate disclosure policies and procedures in place.

82.     Thus, for at least two years until late 2007, when the crushing impact on the Company of management's high-risk lending and investment practices could no longer be disguised, Freddie Mac was caused to repeatedly claim, in press releases, interviews, reports,

conference presentations, investor conference calls, and the like, directly and indirectly, that

Freddie Mac "continues to manage interest-rate and other risks prudently." While the

Company's senior management and the Board recognized the "challenge" of "getting current in

our financials and strengthening our internal controls" – a task they never seemed to accomplish

– they conveyed the notion that this was a matter of information reporting, and did not reflect

any underlying mismanagement of the Company's risks. All the while, the Officer and Director

Defendants, as well as PwC, knew or should have known that Freddie Mac's controls and risk

management were materially deficient and that its financial statements were not prepared in

accordance with GAAP.

83.    As Freddie Mac's 2006 Annual Report put it, "Freddie Mac must become

the standard of excellence not only for managing mortgage risk, but for the accounting and

internal controls associated with it." Notwithstanding such statements, Freddie Mac's financial

statements concealed the magnitude and nature of the risks to which Freddie Mac was exposed,

and the Officer and Director Defendants, as well as PwC, continued their obfuscation of the

truth throughout most of 2007.

84.    For instance, on June 14, 2007, Freddie Mac announced financial

results for the first quarter of 2007 disclosing substantial losses and deteriorating credit quality

of the Company's assets. In a press release entitled "Freddie Mac Releases First Quarter 2007

Financial Results; Company Resumes Quarterly Reporting," the Company, and specifically

defendants Syron and Piszel, stated, in relevant part:

> McLean, VA — Freddie Mac (NYSE:FRE) today reported a net
> loss of $211 million, or $0.46 per diluted common share, in the
> first quarter of 2007, compared to net income of $2.0 billion, or
> $2.80 per diluted common share, for the same period in 2006.
> The company also reported a decline in fair value of net assets
> attributable to common stockholders, before capital transactions,

of approximately $300 million in the first quarter of 2007, compared to an increase of $1.0 billion for the same period a year ago. The declines in net income and fair value results were primarily due to losses on mark-to-market items.

"Throughout the first quarter of 2007 Freddie Mac continued to build long-term shareholder value by strengthening and growing our core business. Our credit guarantee portfolio showed strong growth in the first quarter and we seized market opportunities to grow our retained portfolio prudently. While the full impact of the housing downturn has not been felt, our credit position has remained strong relative to our historical levels and the market as a whole," said Richard F. Syron, chairman and chief executive officer.

"Freddie Mac continued to serve its vital housing mission by providing stability and liquidity to a national housing finance system facing considerable challenges," Syron continued. ***"I'm particularly proud that our company took a leadership role in the subprime mortgage market, announcing new underwriting standards and products and committing to purchase up to $20 billion in mortgages to support subprime borrowers."***

"Earlier this year we promised to return to quarterly financial reporting in 2007, and with the release of our first quarter results today, we've done that," said Buddy Piszel, chief financial officer. "We're making measurable progress on our financial remediation program, and we are confident that we will be timely with our release of full year 2007 results within 60 days of year end. This positions us well to begin the SEC registration process in mid 2008. We're also pleased to have been able to continue returning capital to our shareholders through the repurchase of our common shares.

"While significant mark-to-market losses on our portfolio of derivatives, which are used to hedge our interest-rate risk, and on our credit guarantee activities have resulted in a GAAP loss, ***we remain encouraged with the underlying fundamentals of Freddie Mac's business,"*** Piszel continued.

Worsening expectations for mortgage credit risk had an adverse impact on the company's GAAP and fair value results. The majority of this effect was due to mark-to-market losses associated with wider credit spreads on mortgage assets in the company's guarantee portfolio. Overall, Freddie Mac's credit guarantee portfolio continued to exhibit credit characteristics that were better than historical averages as measured by current

delinquencies, loan-to-value ratio (LTV), and charge-offs.

Freddie Mac's regulatory core capital was estimated at $36.2 billion at March 31, 2007, which represented an estimated $2.0 billion in excess of the 30 percent mandatory target capital surplus set by the Office of Federal Housing Enterprise Oversight (OFHEO).

Fair value of net assets attributable to common stockholders was $25.4 billion at March 31, 2007.

******

Lower net income, year-over-year, was primarily due to higher mark-to-market losses on the company's portfolio of derivatives and on the company's single-family credit guarantee business. Revenues generated by the company's retained portfolio and credit guarantee portfolio declined modestly from first quarter 2006, as a decline in net interest income was partially offset by increased management and guarantee income. Expenses increased mainly as a result of higher administrative costs associated with improving the company's internal financial reporting and controls infrastructure, and higher credit costs.

During the first quarter of 2007, the unpaid principal balance of the company's retained portfolio increased at an annualized rate of 6.0 percent to approximately $714 billion, as liquidations slowed and wider net mortgage-to-debt option-adjusted spreads (OAS) generally increased investment opportunities. In August 2006, the company and OFHEO announced that effective July 1, 2006, the company would begin managing the retained portfolio under a voluntary growth limit. The carrying value of the retained portfolio was approximately $9 billion below the voluntary growth limit at March 31, 2007.

******

The company's total credit guarantee portfolio increased at an annualized rate of 16.1 percent to approximately $1.5 trillion at March 31, 2007. The company estimates that its share of government sponsored enterprise (GSE) mortgage securitizations for the first quarter of 2007 was approximately 46 percent, compared to approximately 45 percent for the first quarter of 2006.

Credit-related expenses, consisting of provision (benefit) for credit losses and real estate owned (REO) operations expense, were $193 million in the first quarter of 2007, compared to $60 million (excluding the reversal of Hurricane Katrina reserves of $84 million) in the first quarter of 2006. *The year-over-year change*

*primarily resulted from an increase in the company's provision for credit losses. This increase largely reflects deteriorating credit on 2006 mortgage purchases that have exhibited higher transition rates from delinquency to foreclosure and higher loan loss severities associated with slower home price appreciation and higher unpaid principal balances. Over time the company expects future charge-offs to increase from today's very low levels.*

Included in other non-interest expense are mark-to-market losses of $314 million compared to losses of $67 million in the first quarter of 2006. These increased losses reflect the impact of lower market prices on non-performing loans purchased out of guaranteed securities, as well as the impact of higher expected credit and other costs reflected in the market-based valuations of the guarantee obligation associated with new single-family mortgage securitizations.

A portion of these mark-to-market losses reflects market uncertainty in the pricing of mortgage credit at March 31, 2007, and accordingly implies higher credit losses than the company expects to ultimately incur.

**Capital Management**

Estimated regulatory core capital was $36.2 billion at March 31, 2007, which represented an estimated regulatory minimum capital surplus of $9.9 billion, and an estimated $2.0 billion in excess of the 30 percent mandatory target capital surplus set by OFHEO. During the first quarter of 2007, the company issued $1.1 billion of non-cumulative, perpetual preferred stock and redeemed $0.6 billion of higher-cost non-cumulative, perpetual preferred stock.

Following the release of the company's full year 2006 financials, Freddie Mac initiated the repurchase of common stock in accordance with its authorization to repurchase up to an additional $1 billion of common stock in conjunction with the issuance of up to an additional $1 billion of non-cumulative perpetual preferred stock. In April, the company issued $500 million of noncumulative perpetual preferred stock and through the end of May, repurchased approximately $750 million of additional common stock (approximately 11.9 million shares) at an average price of $63.23.

**Internal Controls**

Remediation of the material weaknesses and significant deficiencies in Freddie Mac's financial reporting process continues

to be a top corporate priority in 2007. The company is continuing to make progress on a series of initiatives to improve its financial reporting infrastructure and remediate material weaknesses and other deficiencies in its internal controls. These activities are part of Freddie Mac's comprehensive plan for returning to timely quarterly financial reporting. Efforts made to date have resulted in a strengthened control environment.

The company has made significant progress in addressing its internal control issues. For example, it has addressed the material weakness related to the adequacy of its staffing by adequately filling the company's critical vacancies in areas related to controls and financial reporting. Additionally, the company has addressed the significant deficiency related to governance over new products processes by redesigning the process and controls over the implementation of new products.  [Emphases added.]

85.    The Company appeared to make an abrupt turnaround in its second quarter.  In an August 30, 2007  press release entitled "Freddie Mac Releases Second Quarter 2007 Financial Results; Net Income of $764 million, Fair Value Increase of $800 Million," the Company stated, in relevant part:

McLean, VA – Freddie Mac (NYSE:FRE) today reported second quarter net income of $764 million, or $1.02 per diluted common share, compared to net income of $1.4 billion, or $1.93 per diluted common share, for the same period in 2006. The company also reported an increase in fair value of net assets attributable to common stockholders, before capital transactions, of approximately $800 million for the second quarter, compared to an increase of $1.4 billion for the same period a year ago. Compared to the first quarter of 2007, the company reported increases in both net income and growth in fair value primarily due to gains on mark-to-market items.

"Freddie Mac was created to provide liquidity, stability and affordability to the mortgage market in good times and bad," said Richard F. Syron, chairman and chief executive officer. "Rarely has that role been as important as it has been during this period of volatility in the U.S. housing and residential mortgage markets. Furthermore, we have been able to serve the market while maintaining a disciplined approach to risk."

"Our business volumes for the quarter were strong, with continued growth in our credit guarantee portfolio and improved commitments for our retained portfolio. And we are seeing a shift

in the market back to more traditional products, including larger volumes of fixed-rate mortgages," Syron continued. ***"On the credit front we are seeing weakening, but we are well positioned relative to the overall marketplace to weather the ongoing disruptions in the mortgage markets and emerge as an even stronger player. Most important, we are working with our regulator, our customers and others to do our part in developing a market oriented response that will help provide stability, liquidity and affordability to the national housing and mortgage markets."***

"In June, when Freddie Mac resumed quarterly financial reporting, we committed to continue to reduce the time it takes us to close our books and report our financial results," said Buddy Piszel, chief financial officer. "We have accelerated our second quarter release by two weeks compared to the first quarter and expect to release our third quarter results before Thanksgiving."

Freddie Mac's regulatory core capital was estimated at $36.3 billion at June 30, 2007, which represented an estimated $1.8 billion in excess of the 30 percent mandatory target capital surplus set by the Office of Federal Housing Enterprise Oversight (OFHEO).

Fair value of net assets attributable to common stockholders was $25.1 billion at June 30, 2007, compared to $25.4 billion as of March 31, 2007.

******

Lower net income, year-over-year, was primarily due to a higher provision for credit losses and mark-to-market losses on credit-related items. Within total revenues, net interest income was essentially flat when compared with the first quarter of 2007 and management and guarantee income continued to grow from prior period levels.

******

During the second quarter of 2007, the unpaid principal balance of the company's retained portfolio decreased at an annualized rate of one percent to approximately $712 billion, as liquidations increased and relatively tight mortgage-to-debt option-adjusted spreads (OAS) early in the quarter limited net growth in settled positions. Late in the second quarter, wider mortgage-to-debt OAS presented more attractive investment opportunities, resulting in an increase in net purchase commitments during the month of June. Freddie Mac continues to manage the retained portfolio within its

voluntary temporary growth limit.

The company's total credit guarantee portfolio increased at an annualized rate of 15 percent in the second quarter of 2007 to approximately $1.6 trillion at June 30, 2007. This compares to forecasted annual growth in total U.S. residential mortgage debt outstanding of approximately six percent in 2007.

Credit-related expenses, consisting of provision for credit losses and real estate owned (REO) operations expense, were $336 million for the second quarter of 2007, compared to $63 million for the second quarter of 2006. *The year-over-year increase primarily resulted from the recognition of a $320 million provision for credit losses during the second quarter of 2007. This increase largely reflects credit deterioration on 2006 and 2007 loan originations that have exhibited higher transition rates from delinquency to foreclosure and higher loan loss severities resulting from slower home price appreciation and higher unpaid principal balances.*

For the second quarter of 2007, other non-interest expense included losses on certain credit guarantees of $187 million, compared to losses of $52 million in the second quarter of 2006, primarily related to higher fair values of credit costs recognized on certain guarantees associated with new business activity. *Also included in other non-interest expense were losses on loans purchased of $205 million, compared to losses of $21 million in the second quarter of 2006, largely due to an increase in the volume of non performing loan purchases and a decline in the fair value prices of non performing loans purchased out of PC pools during the quarter.*

### Capital Management

Estimated regulatory core capital was $36.3 billion at June 30, 2007, which represented an estimated $9.8 billion in excess of the regulatory minimum capital requirement, and an estimated $1.8 billion in excess of the 30 percent mandatory target capital surplus set by OFHEO. In accordance with the previously announced authorization to repurchase up to $1 billion of common stock in conjunction with the issuance of up to $1 billion of non-cumulative perpetual preferred stock, the company repurchased $750 million of common stock (approximately 11.9 million shares) at an average purchase price of $63.23 per share and issued $500 million of non-cumulative, perpetual preferred stock during the three months ended June 30, 2007.

During the third quarter of 2007, the company completed its

repurchase plan, buying $250 million of common stock (approximately 4.2 million shares) at an average purchase price of $58.74 per share and issuing another $500 million of noncumulative, perpetual preferred stock.

******

**Internal Controls**

Remediation of the material weaknesses and significant deficiencies in Freddie Mac's financial reporting process continues to be a top corporate priority in 2007. ***The company is continuing to make significant progress on a series of initiatives to improve its financial reporting infrastructure and remediate material weaknesses and other deficiencies in its internal controls.*** These activities are part of Freddie Mac's comprehensive plan for returning to timely quarterly financial reporting. ***Efforts made to date have resulted in a strengthened control environment.*** [Emphases added.]

86.    In the next three weeks, two of Freddie Mac's directors, Defendants McQuade and Peek, resigned from the Board.

87.    Finally, on November 20, 2007, Freddie Mac shocked the market when it announced that it had lost $2 billion in the third quarter and would have to raise fresh capital to meet its regulatory requirements.  The Company posted negative revenue of $678 million, as it sustained losses under GAAP accounting of $3.6 billion in the quarter, compared with reported positive revenue of $1.1 billion in the previous quarter and $91 million a year earlier.  On that day, the Company also reported a provision for credit losses of $1.2 billion due to the significant deterioration of mortgage credit resulting from continued weaknesses in the housing market and a decrease in the fair value of net assets attributable to common stockholders, before capital transactions, of approximately $8.1 billion.  On that day, Freddie Mac also disclosed that it had $105.4 billion of securities backed by subprime mortgages, accounting for 15 percent of its holdings of mortgages and related securities.  In light of the longstanding claims of excellent risk

management by the Company's senior management and the Board, their disclosure of the

disastrous consequences of that risk exposure was stunning.

88.      As a result of the foregoing disclosures, the Company's common stock fell

29 percent in one day – from $37.50 per share on November 19, 2007, to $26.74 per share on

November 20, 2007.  As a direct consequence of the concealment of Freddie Mac's true

condition, those who invested in its common stock sustained staggering losses which led, in turn,

to the commencement of securities fraud litigation against the Company.

89.      Moreover, despite certain of the Officer and Director Defendants

continuing to defend their improper conduct, a December 7, 2007 *Washington Post* article

entitled "'Piggyback' Loans Allowed by Freddie Fed Mortgage Risks" correctly suggested that

Freddie Mac's loan policies during the subprime debacle violated the Company's Charter:

> Before the era of easy credit, home buyers were ordinarily required to come up with down payments, which gave them an equity stake in their property.
>
> That equity reduces the danger of foreclosure, and federal law prohibits Freddie Mac from buying mortgages that cover more than 80 percent of a home's value -- unless the loan comes with a safety net, such as an insurance policy that would kick in if the borrower defaults.
>
> However, in recent years, Freddie Mac permitted home buyers to borrow all or part of the remaining 20 percent by using second loans, called "piggyback" loans, with no safety net.
>
> As early as 2005, an industry group protested that the practice was designed to get around the law and should be stopped.
>
> Regulators allowed it to continue, and Freddie Mac's financial disclosures were silent on the subject until last month, when the company noted that such arrangements could leave borrowers more susceptible to foreclosure.
>
> "[A]s home prices increased during 2006 and prior years, many borrowers used second liens . . . thus avoiding requirements under our charter," Freddie Mac said in a quarterly financial report.

Nothing prohibited Freddie Mac from taking on uninsured piggyback loans, Patricia Cook, Freddie Mac's executive vice president and chief business officer, said in an interview yesterday.

"I don't think we viewed it as our role or responsibility to say to the market that seconds were inappropriate," Cook said.

\* \* \* \* \* \*

The purchase of piggyback loans is one of many factors that has left Freddie Mac exposed to potentially larger losses as a nationwide debt bubble deflates. The McLean company turns out to have been more vulnerable to a downturn in housing prices than it appeared.

Last month, Freddie Mac announced a $2 billion loss for the third quarter. Since early October, the company's stock has dropped 41.5 percent, erasing billions of dollars of shareholder wealth. At a time when some policymakers hoped it would help ease a credit crunch by serving as a loan buyer of last resort, Freddie Mac was selling mortgages to shore up its own financial condition. Last week, it cut the dividend it pays stockholders by half and borrowed $6 billion from investors to meet federal capital requirements.

\* \* \* \* \* \*

Freddie Mac's problems are similar to those weighing on many of the nation's largest financial institutions.  In pursuit of profit, and to retain market share, it invested in riskier loans. Some came with the option of low monthly payments that escalated over time. Some required no information about a borrower's income or assets. In many cases, the loans made it possible for people to buy homes they could not otherwise afford.

Now, borrowers are defaulting, foreclosures are mounting, home prices are falling, and easy credit is drying up, feeding a downward spiral.

\* \* \* \* \* \*

Freddie Mac's diversification into certain types of alternative loans took a big jump in 2005, well after a 2003 accounting scandal exposed deep flaws in the company's internal controls and a new chief executive, Richard F. Syron, was brought in to clean up the mess. In its annual report for 2005, the company said that it

expected the alternative loans to default more often than traditional loans and that it had factored in the risk.

******

This year, as the market deteriorated, Freddie Mac's investment in alternative loans grew. For the first nine months of 2007, nontraditional loans made up about a third of Freddie Mac's mortgage purchases, up from almost a quarter in the first nine months of 2006.

Unlike most other players in the mortgage business, Freddie Mac is required to operate under a congressional charter that imposes such restrictions as the 80 percent rule.

That requirement was meant to insulate the company from losses.

"Our principal safeguard against credit losses for mortgage loans" -- apart from insurance and the like -- "is provided by the borrowers' equity in the underlying properties," Freddie Mac said in its annual report for 2003.

The relationship between loan size and property value, known as the loan-to-value, or LTV, ratio, is a key measure of loan quality. The company features it in its financial reports, and Syron, the chief executive, cited it in his letter to shareholders for 2006. However, the ratios the company reported over the years did not reflect the combined total of multiple loans on the same property.

Cosgrove, the company spokesman, said they weren't required to.

The company described the potential impact of second loans last month, devoting three sentences to the subject in an 81-page report on its latest financial results.

*Including second loans, Freddie Mac estimated that about one in seven of the single-family mortgages it held on Sept. 30 had total loan-to-value ratios of more than 90 percent, compared with one in 20 if it excluded the piggyback loans.*

*"In general, higher total LTV ratios indicate that the borrower has less equity in the home at the time of origination and would thus be more susceptible to foreclosure in the event of a financial downturn," Freddie Mac said.*

*The company offered a reassuring note several months earlier in its annual report for 2006. Freddie Mac said loans with "lower levels of borrower equity" carried insurance or other financial backstops.*

*Freddie Mac executives said that point was framed in terms of the company's loan-to-value ratio, which excludes piggybacks, and not total loan-to-value, which includes them.*

*"I would chalk that up to less precision in the disclosure," Piszel said.*  [Emphasis added.]

90.     Defendant Piszel's statements in the preceding article are essentially an admission that the Company's financial disclosures had been false and misleading with respect to the loan-to-value ratios of mortgages guaranteed by the Company and/or contained in its "Retained Portfolio."

91.     On December 11, 2007, Goldman Sachs held a conference attended by Defendants Syron and Piszel where Syron essentially admitted the Company's mishandling of its credit risk.  Specifically, in response to the question "looking back at the Company's actions in '05, '06 and the first half of '07, when it was pretty clear that credit risk was being priced poorly from the standpoint of those who where purchasing it, and your portfolio was growing at mid to high teens' rates. You clearly made a strategic error. Can you talk about looking back on that time and how you might learn to do better in the future," Syron stated:

> Yes. I think that's a tough question, it's the right question. I think it is the right question. Now, it's a tough time. *We didn't do everything perfectly. To some extent, some of this we had control over, and some we didn't have control over. As you know, and I think everybody's got to take a look at this model, the way the industry works - the GSE industry - is that we give people a price sheet - a price grid, if you want - kind of a year in advance. And then we have a [pay or take] or whatever you want to call it. They deliver us the product. We've contracted that we'll already take that – we'll take that. So we can't in our flow business turn the spigot on and off every day and say, Gee - I don 't want that product. You could say, even a year before that, when those contracts were being established - Should we have tightened up on some things? I think the answer is yes, to some extent. It's tough, though. In '03, our market share dropped to 33%. It's pretty tough when the other guy [Fannie Mae] is twice your size.* We came back to

43%. We don't have to draw any lines in the sand. We're going to defend the market share at a certain price. But you don't want to drop to 20% or 25% either. And market pricing was crazy for us the whole sector. So some of this stuff, you would have had to turn the spigot a lot ahead of time.

***Where this is, I think, even more though, ability for criticism is some of the stuff we took in the bulk business . . . looking back, I wish we'd been more pressing and had tightened up on it, to be honest about it. And I think probably there were, at the margin, some mistakes, and we're committed to not do it again.*** [Emphases added.]

92.    In response to another analyst's question at the Goldman Sachs conference regarding the Company's projected losses arising from defaults and whether that would erode the $6 billion in capital that Freddie Mac raised from its preferred stock offering, Piszel stated:

Well, you think about timing in which this is going to emerge. And I said that we're trying to take some actions, because the big way that the credit emerged in the third quarter was on these marks. And some of the marks and some of the accounting we're trying to get out of because we don't think its representative of where, ultimately, the credit will come from and the way it should be emerging in the numbers. ***So, you're right. We said that we're expecting defaults in the $10 to $12 billion range overall. We've taken $4.5 billion through the first three quarters. So we're basically halfway there. We're assuming we're going to take the rest over the next couple of years.*** [Emphasis added.]

93.    On a December 6, 2007, Plaintiff's counsel sent a letter ("Plaintiff's Demand Letter", attached hereto as Exhibit "A" ) to Freddie Mac's Board of Directors, which states, in part:

Your errors and omissions, as well as those of senior management of the Company, come in the wake of Freddie Mac's restatement of its financial results for the years 2000 through 2002, the settlement of numerous shareholder suits in 2006, a $125 million fine by its regulator, OFHEO, the massive costs attributable to shareholder litigation and, as recently as September 27, 2007, the settlement of charges brought by the SEC, pursuant to which the Company agreed to pay a penalty of $50 million. Indeed, following the SEC settlement,

Freddie Mac Chairman and Chief Executive Officer, Richard F. Syron, said:

**"We take these charges seriously, and that's why the Freddie Mac of today is a very different company than the Freddie Mac of the past."**

This bold statement, while true in certain respects, was false and misleading insofar as the past was, in fact, repeating itself as acknowledged by management in the Company's November 20, 2007 press release. As you are well aware, when CEO Syron made that statement on September 27, you knew or should have known that the Company was about to announce for the quarter ending only 3 days later that its assets, earnings and fair value as of the end of the third quarter of 2007 had already deteriorated so materially. Even when you directed management to disclose, on November 20, 2007, massive write downs of the Company's assets and to substantially add to its reserves, you did so notwithstanding your serious doubts as to whether such write downs and increases in reserves were sufficient to reflect the reality that Freddie Mac had not "changed its stripes" but, once again, had engaged in  the artificial manipulation of the Company's reported earnings, including the material overstatement of its earnings, assets and the net worth.

By acting as such and permitting such manipulations and concealment to take place, you, senior management and the Company's auditor, PW, have caused Freddie Mac to violate federal disclosure laws and subjected it to litigation by those who purchased its securities during the period of such wrongdoing. In turn, this has subjected and will subject the Company to expenses of more than $1 billion to resolve the claims of such purchasers.

94.     Notwithstanding the fact that the Company had neither the tools nor the capabilities to expand into the subprime market, that expansion continued unabated from 2005 through 2007.  The highlighted statement made by defendant Syron quoted in the preceding paragraph was simply false, and Freddie Mac was not a "very different company."  Thus, Freddie Mac continued to conceal and misrepresent its true financial and operating condition to the public and, in particular, hid the extent that its supposed "risk management" procedures had failed.  Moreover, if any "credit risk management framework" had been put in place by management since OFHEO's 2006 Report to Congress, it was deliberately circumvented to

effect the Company's expansion into, *inter alia*, subprime lending and related activities.  As the

2007 OFHEO Report stated:

> Management has expanded [Freddie Mac's] purchase and guarantee of
> higher-risk mortgages.  In order to increase market share, meet mission
> goals, stay competitive and be responsive to sellers' needs, *[Freddie
> Mac] has increased the use of credit policy waivers and exceptions.*
> Untested and alternative market products accounted for approximately
> 24 percent of 2006 new purchases and currently comprise 11 percent of
> the total single-family portfolio.  Internal measures of credit quality
> reflect that the quality of incremental new purchases declined in 2006
> as evidenced by a rise in expected default costs.  [Emphasis added.]

95.    On February 7, 2008, in a statement before the Senate Banking,

Housing and Urban Affairs Committee, OFHEO Director James B. Lockhart III indicated that

he had warned the GSEs of credit risk concerns before the credit collapse stating "I

remember listing credit risk concerns in an early presentation I did to one of their Boards.  Some

members were mystified that I thought it was an issue given their track record.  I am afraid that

was a sign of the times." Lockhart also stated, in relevant part:

> The risks are beginning to take their toll. *Public disclosures
> indicate that Freddie Mac will report annual losses for the first
> time in its history* and Fannie Mae for the first time in 22 years.
>
> ******
>
> The Enterprises' Response
>
> What have the Enterprises been doing given these challenging
> market conditions? (Chart 2) They have been fulfilling their
> mission of providing stability and liquidity to the secondary
> conforming mortgage market. That has been very critical since
> early August. They have been securitizing almost a hundred
> billion dollars a month in mortgages as you can see in blue. *The
> green, which is their mortgage portfolios, has not grown
> because of their internal control and other operational
> problems and the related OFHEO imposed limits with
> respect to capital and portfolios. Given the market
> conditions and their progress, OFHEO loosened the
> portfolio limits in September of 2007. Despite that added*

*flexibility, the Enterprises have not increased their portfolios.* With accompanying capital they could increase their combined portfolios by over $100 billion for the next 6 months without violating the new limits.

As OFHEO directed, the Enterprises adopted the bank interagency guidances on non-traditional mortgages and subprime mortgages. The guidances were implemented in September last year. The guidances are not only for all mortgages that the Enterprises directly hold and guarantee, but also the underlying mortgages in private label securities (PLS) that they acquire. At the same time we gave portfolio cap flexibility, they agreed to enhance their programs to support the refinancing of subprime into less risky mortgages.

The Enterprises' Conditions

*****

Freddie Mac had earlier agreed to a consent agreement and the 30 percent extra capital requirement. In July of 2006, they voluntarily agreed to restrict the growth of their portfolio as well. In retrospect, those agreements and, especially, the growth restrictions and the capital requirements, were extremely important in reducing the credit losses at Fannie Mae and Freddie Mac and preventing major disruptions of the conforming loan market system.

*I am pleased to report that both Enterprises have made major progress on these operational remediation efforts, which required billions of dollars and many thousands of consultants, but significant issues remain.*

In OFHEO's 2007 Annual Report to Congress, both Enterprises were rated as having "significant supervisory concerns." They both published third quarter financials for the first time in over three years. The accomplishment was somewhat dampened by the $3.5 billion of losses that they reported for the third quarter. They have both stated that they expect to produce timely financials at the end of this month for 2007 results. Unfortunately, they expect to report significant losses for the fourth quarter.

Credit Risk. Another related change over the period was the growth of credit risk. Operational risk and to a lesser extent market risk had been the key focuses of the Enterprises and they still are extremely important with the volatility of the markets and heavy reliance on models for market and credit risk pricing. *I remember listing credit risk concerns in an early presentation*

*I did to one of their Boards. Some members were mystified that I thought it was an issue given their track record. I am afraid that was a sign of the times.*

*The Enterprises were then reporting credit losses of 1 to 2 basis points, a third of normal levels and now they are approaching double normal levels and climbing. Some of this growth in losses was because they lowered underwriting standards in late 2005, 2006, and the first half of 2007 by buying more non-traditional mortgages to retain market share and compete in the affordable market.* They also have very large counterparty risks including seller/servicers, mortgage insurers, bond insurers and derivative issuers.

*Basis points sound small, but they become important when you are leveraged the way Fannie Mae and Freddie Mac are…*

******

*For the first three quarters of 2007, they have each lost $8 to $9 billion in fair value of equity. Their combined fair value equity at the end of the third quarter was $58 billion compared to $5.1 trillion in mortgage exposure.* I should hasten to add in the fourth quarter they raised almost $14 billion in equity in the form of perpetual preferred stock and cut their dividends as well. That additional capital is critical as *both CEOs recently said at a Wall Street conference, they are going to have very tough fourth quarters and 2008s.*    [Emphases added.]

96.    On February 28, 2008, Freddie Mac announced further losses for the fourth fiscal quarter of 2007 with little hope of recovery in sight.  Specifically, in a press release entitled "Freddie Mac Releases Fourth Quarter 2007 Financial Results," the Company stated, in relevant part:

McLean, VA — *Freddie Mac (NYSE:FRE) today reported a net loss of $3.1 billion, or $5.37 per diluted common share, for the year ended December 31, 2007, compared to net income of $2.3 billion, or $3.00 per diluted common share, for 2006. For the fourth quarter of 2007, the net loss was $2.5 billion, or $3.97 per diluted common share, compared to a net loss of $401 million in the fourth quarter of 2006, or $0.73 per diluted common share.*

"Today's economy represents one of the most severe

housing downturns in American history, and our results reflect that difficult environment as well as Freddie Mac's steadfast commitment to its important mission of providing liquidity, stability and affordability to the U.S. housing finance system," said Richard F. Syron, Freddie Mac chairman and chief executive officer. "Throughout 2007, Freddie Mac worked tirelessly to protect distressed homeowners by stabilizing the conforming mortgage market and reducing mortgage foreclosures. In addition to leadership on behalf of homeowners, we are keenly focused on managing our business through this difficult cycle towards a stronger future. As a clear sign of our progress, we are gratified that today's release marks Freddie Mac's return to timely financial reporting, an accomplishment that would not have been possible without the terrific efforts of everyone on the Freddie Mac team."

Looking ahead to 2008, Syron commented, "We remain extremely cautious as we enter 2008. If the economy weakens substantially from here – a possibility for which we need to be prepared as a company – it will have a further negative effect on homeowners across the country and drive credit costs higher. However, we have taken the steps to add capital, tighten our management of credit risk and institute pricing policies that are more consistent with the risk we bear. These actions should help us build the business for the future."

"With our large capital raise in the fourth quarter, we boosted our surplus relative to OFHEO's 30 percent mandatory target capital surplus," said Buddy Piszel, chief financial officer. "In 2008, we will continue to prudently manage our capital, particularly given the outlook for continued weakening in the housing market."

"Likewise, today's release of our full-year 2007 financial results and annual report is significant as it marks Freddie Mac's return to timely financial reporting and is further evidence of the progress the company is making," Piszel said. "We have also enhanced our financial reporting to provide greater clarity and comparability through the adoption of new accounting policies and introduction of a supplemental non-GAAP financial metric, which we call Adjusted operating income. Today, we are presenting these enhancements – including detailed segment information on our Investments, Single-family Guarantee and Multifamily businesses – so as to provide investors with an expanded view of Freddie Mac's business performance."

Consistent with the company's efforts to improve the clarity and comparability of its financial reports, Freddie Mac has made two significant changes in its financial presentation – adoption of new

accounting policies and an introduction of a supplemental nonGAAP financial metric. For a more detailed discussion, see the Appendix accompanying this release.

While the accounting methods the company applied before the changes are acceptable, Freddie Mac believes that the newly adopted accounting methods are preferable in that they significantly enhance the transparency and understandability of the company's financial results, promote uniformity in the accounting model for the credit risk retained in its primary credit guarantee business and better align revenue recognition to the release from economic risk of loss under its guarantee.

*****

**Net loss** was $2.5 billion for the fourth quarter of 2007, compared to a loss of $1.2 billion for the third quarter of 2007. The majority of this increase in loss resulted from significant mark-to-market losses detailed below in the discussions of other non-interest loss and other non-interest expense. Without giving effect to the accounting changes for the company's guarantee obligation discussed above, the fourth quarter 2007 net loss would have been $3.7 billion.

The key components affecting the company's net loss for the fourth quarter of 2007 as compared to the third quarter of 2007 were:

**Net interest income** was $774 million for the fourth quarter, a slight increase from $761 million for the third quarter, primarily due to lower amortization expense, partially offset by lower average balances as the company managed the retained portfolio to the 30 percent mandatory target capital surplus.

**Management and guarantee income** on PCs and Structured Securities was $698 million for the fourth quarter, a slight decrease from $718 million for the third quarter, mainly driven by decreased amortization income.

**Other non-interest loss** increased to $2.1 billion in the fourth quarter, compared to a loss of $601 million for the third quarter. Included in the fourth quarter non-interest loss were mark-to-market losses of approximately $0.8 billion on the value of the company's credit guarantee asset and approximately $2.3 billion on the value of the company's derivatives portfolio, both due to the impact of declining long-term interest rates. The company expects to experience reduced volatility from mark-to-market effects on its guarantee asset and derivatives portfolio as a

result of the adoption of SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities, Including an amendment of FASB Statement No. 115" (SFAS 159) (see "Core Capital" below) and, to a lesser extent, the company's planned implementation of hedge accounting. See the Appendix for more detail on the adoption of SFAS 159.

**Administrative expenses** totaled $401 million for the fourth quarter, down from $428 million in the third quarter, primarily due to the reversal of previously accrued compensation expenses.

**Credit-related expenses,** consisting of provision for credit losses and real estate owned (REO) operations expense, were $912 million for the fourth quarter, compared to $1.4 billion for the third quarter. The provision for credit losses in the third and fourth quarter included amounts related to increased estimates of incurred losses on mortgage loans associated with higher default rates, an observed increase in delinquency rates and increases in severity of losses on a per-property basis, driven in part by the declines in home sales and home prices. The company expects credit-related expenses to remain high relative to recent periods and to vary from period to period as the U.S. housing market remains under pressure.

Total credit losses, consisting of net charge-offs plus REO operations expense, were $236 million for the fourth quarter, $126 million for the third quarter and $499 million for the full-year 2007. Realized credit losses were an annualized 5.4 basis points, 3.0 basis points and 3.0 basis points of the average total mortgage portfolio for the fourth quarter, the third quarter and full-year 2007, respectively. ***The company expects total credit losses to increase in 2008.***

***In addition, as a result of the continuing deterioration in the U.S. housing market, the company has revised its estimate of total credit losses for 2008 and 2009 to $2.2 billion and $2.9 billion, respectively.***

**Other non-interest expense** for the fourth quarter was $2.1 billion, compared to $1.2 billion for the third quarter. Fourth quarter non-interest expense included losses on certain credit guarantees of $1.3 billion, compared to $392 million for the third quarter, primarily related to higher expected future credit costs reflected in the market-based valuations of the guarantee obligation associated with newly-issued PCs. The company expects that price increases, including the delivery fee increase effective in March 2008, may mitigate a portion of the losses on certain credit guarantees.

Also included in other non-interest expense for the fourth quarter were losses of $736 million on loans purchased out of PC pools, compared to losses of $649 million in the third quarter, largely due to a decline in the estimated fair value and an increase in the average unpaid principal balance per loan of non-performing loans purchased out of PC pools. The company announced in December 2007 certain operational changes for purchasing delinquent loans from PC pools. This action is expected to reduce the losses on loans purchased out of PC pools and result in a higher provision for credit losses associated with our PCs and Structured Securities.

During the fourth quarter, the company recognized $273 million in other non-interest income associated with the recapture of previously recognized market value losses on purchased loans due to either borrower payoffs or property fair values upon foreclosure that exceeded the carrying basis of the loan.

******

## Core Capital

Estimated regulatory core capital was $37.9 billion at December 31, 2007, which represented an estimated $11.4 billion in excess of the company's regulatory minimum capital requirement, and an estimated $3.5 billion in excess of the 30 percent mandatory target capital surplus directed by the Office of Federal Housing Enterprise Oversight (OFHEO).

In order to manage to the 30 percent mandatory target capital surplus and improve business flexibility, during the fourth quarter of 2007, the company issued $6.0 billion of non-cumulative, perpetual preferred stock, reduced its common dividend by 50 percent and reduced the size of its cash and investments portfolio.

******

## Fair Value of Net Assets

The company's attribution of changes in fair value relies on models, assumptions, and other measurement techniques that evolve over time.

***At December 31, 2007, the fair value of net assets was $12.6 billion, reflecting a net after-tax reduction of $19.2 billion from the December 31, 2006 level of $31.8 billion.*** This change in fair value of net assets reflects the impact of net cash flows received from guarantee activities; core spread income received from investment activities; the payment of preferred and common stock dividends; other capital transactions, including the issuance of $6 billion in preferred stock during the fourth quarter

of 2007; and changes in fair value of assets and liabilities managed in the company's underlying businesses.

The company estimates that wider net mortgage-to-debt OAS resulted in a pre-tax reduction in fair value of $23.8 billion for the year ended December 31, 2007. In addition, the company estimates that a change in fair value of the net single-family guarantee asset and obligation resulted in a pre-tax reduction of $20.1 billion for the year ended December 31, 2007.

*****

## Internal Controls

Remediation of the known material weaknesses and significant deficiencies in Freddie Mac's financial reporting process was a top corporate priority during 2007 and continues into 2008. The company believes the measures it has implemented during 2007 to remediate the material weaknesses in internal control over financial reporting have had a positive impact on its internal control over financial reporting. From January 1, 2007 to date, the company has:

- Designed and implemented the controls it believes are necessary to remediate all known material weaknesses;

- Remediated, through demonstration of the operating effectiveness of the controls implemented by the company, material weaknesses around adequacy of staffing; IT general controls over access to data, security administration and change management, but identified certain new significant deficiencies in IT general controls in connection with testing the controls implemented by the company;

- Implemented new financial accounting applications for guarantee asset valuation in the fourth quarter of 2007 and for the company's entire mortgage-related securities portfolio and credit guarantees as of January 1, 2008;

- Made several changes in its accounting policies that simplified its accounting processes (see "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES" to the company's consolidated financial statements of its Information Statement and Annual Report dated February 28, 2008 for additional information on the company's accounting changes); and

- Substantially completed the business process design review through which the company assessed significant risks to the

business processes that are important to its financial
reporting process, identified the controls to mitigate those risks,
and identified for remediation any deficiencies in the design of
those controls.

97.    In spite of defendant Syron's suggestion in the preceding press release that

Freddie Mac's financial woes were the result of the Company simply living up to its

obligations in a crisis that was not of its making, it is quite clear that Freddie Mac's aggressive

acquisition of subprime mortgages over a multi-year period marked by debilitating internal

control deficiencies at the Company was the fault of the Officer and Director Defendants, who

caused massive damages to the Company by breaching their fiduciary duties. Moreover, the

enhanced financial reporting policies and accounting policies trumpeted by defendant Piszel

were too little and far too late, especially considering the Officer and Director Defendants'

knowledge of the Company's internal control deficiencies dating back to at least 2003.

98.    On April 15, 2008, OFHEO released its 2008 Report to Congress (the

"2008 OFHEO Report") which flagged Freddie Mac's poor financial performance, deteriorating

credit quality and internal control weaknesses and reiterated that the Company "remains a

significant supervisory concern."

99.    With regard to the Financial Performance at Freddie Mac, the 2008

OFHEO Report states:

> Financial results in 2007 were poor. Significant GAAP and fair value
> losses are linked to the rapid deterioration in credit performance,
> declines in long-term interest rates and derivative losses. The purchase
> of loans with weak underwriting, guarantee-fee pricing constraints,
> housing price declines and dislocation in the mortgage markets have
> impacted financial results, flexibility and overall strength of the
> Enterprise. Losses reduced capital levels, requiring the Enterprise to
> issue additional preferred stock, modify risk management and business
> practices, reduce dividends, control growth and actively manage
> balance sheet composition

****** 

A confluence of market and Enterprise-specific factors-deterioration in the housing and credit markets, substantial declines in interest rates in the second half of the year and replacement of lower-cost maturing debt-resulted in the Enterprise reporting a GAAP net loss of $3.1 billion.  Freddie Mac has never before reported an annual net loss.

Pretax income declined by $8 3 billion from year-end 2006, as a result of substantially higher credit-related expenses and valuation losses, higher losses on derivatives and lower net interest income, partially offset by higher guarantee fees and higher amortization income from the guarantee obligation.

****** 

The net loss in the third quarter and further declines in October and November depleted capital sufficiently for management to take action by selling assets, issuing preferred stock and reducing the common dividend.

****** 

Financial performance measured from a fair value perspective also suffered considerably.  The fair value of net assets declined by $19.2 billion to $12.6 billion in 2007, despite $6.5 billion of new preferred stock issuances, as substantial increases in option-adjusted spreads reduced the value of mortgage assets and weakening in the housing and credit markets increased expectations of future default costs.  The fair value of net assets attributable to common stockholders declined by $25.7 billion to $0.3 billion.

100.    The 2008 OFHEO Report details the decline in asset quality as well as the

inability of management information systems to timely monitor high risk assets.

Asset quality has deteriorated and overall credit risk has increased Deterioration in credit quality reflects both market developments and management's strategic decision to purchase and guarantee certain single-family mortgages originated in 2006 and 2007 with higher risk characteristics.  In addition, mortgage credit declines resulted in substantial deterioration in the fair value of the subprime and Alt-A and AAA securities portfolios Counterparty credit risk has increased. Management information systems have not kept pace with the deterioration in credit quality.  Credit management responsibilities and accountabilities can be defined more clearly within the Enterprise risk management function and the business and governance structure.

Designation of an Enterprise-wide Chief Credit Office is recommended
to ensure that an executive has direct authority and responsibility for
the credit strategy and credit results of the Enterprise.

101.    The 2008 OFHEO Report identified continued issues with internal control

weaknesses:

Internal controls are not fully effective.  While tangible progress has
been made during 2007 to remediate internal control weaknesses
related to financial reporting, continued efforts are necessary.

102.    The 2008 OFHEO Report identified numerous red flags pertaining to the

selection of accounting standards and implementation of Generally Accepted Accounting

Principals pertaining to the quality of capital at Freddie Mac.  The 2008 OFHEO Report states:

Management continues to develop and update its accounting policies.
However, OFHEO's reviews concluded that further work will be
required to develop complete accounting policies and procedures for
Freddie Mac to meet the standards articulated in OFHEO's *Accounting
Guidance*.  During the past year, to assess Freddie Mac's design and
implementation of its accounting policies, OFHEO performed several
targeted reviews: securities that have become impaired in value
(FAS115), the fair value option (FAS 159); and credit loss reserves
(FAS 5), as discussed below.

**Impaired Securities Accounting.**  During 2006 and the beginning of
2007, OFHEO reviewed Freddie Mac's accounting policies and
procedures for impairments in the values of its investment securities
OFHEO's findings, issued mid-2007, were that we believed Freddie
Mac's policies were appropriate as written.  However, OFHEO
identified that Freddie Mac's actual evaluation of securities for
impairment did not appear to be consistent with written policy, though
consistent with GAAP.  OFHEO will continue to monitor the
Enterprise's implementation of its impairment accounting policies in
the coming year to ensure safe and sound operations.

**Fair Value Option Implementation.**  Pursuant to FAS 159, The Fair
Value Option for Financial Assets and Financial Liabilities, as of
January 1, 2008, Freddie Mac reported a transition gain, under the fair
value option election, of approximately $1 billion, which OFHEO notes
provided an immediate boost to Freddie Mac's regulatory capital.  Most
of the transition gain is due to the election of securities for the change
to fair value accounting, which carried an unrealized gain rather than
losses in accumulated other comprehensive income . . . During the

coming year, OFHEO plans to further study Freddie Mac's application of the fair value option.

**Reserves for Credit Losses.** OFHEO began a limited review of the Enterprise's approach to the calculation of its reserves for credit losses Freddie Mac's applications for providing adequate reserves and related loss recognition in the income statement are generally.

103.    The 2008 OFHEO Report raised issues with the internal audit function at

Freddie Mac:

While the 2007 audit plan appropriately devoted significant resources to supporting the Comprehensive Plan, internal audit did not adhere to a normal rotation cycle. As work on the Comprehensive Plan continues, internal audit is not expected to return to a normal rotation cycle in 2008. The inability to complete a full rotation cycle for several years and the fact that management's internal control self-identification process remains in the implementation phase increase the risk that control weaknesses may not be identified in a timely manner.

104.    The 2008 OFHEO Report flagged concern over declining asset quality and

credit risk at Freddie Mac:

Credit risk is a supervisory concern. Asset quality has deteriorated and overall credit risk has increased. Increased credit risk is noted in the single-family guarantee portfolio, counterparties, nonagency asset-backed securities portfolio and multifamily business. The credit governance structure and some management information systems have not kept pace with the deterioration in credit quality. Key issues are as follows:

- Deterioration in Credit quality reflects market developments, pursuit of housing mission goals and management's strategic decision to purchase and guarantee certain single-family mortgages originated in 2006 and 2007 with higher-risk characteristics, including interest-only products, loans with secondary financing, mortgages with FICO scores less than 660 and loans with higher loan-to-value ratios. Evidence of increased risk layering also appeared.

- Substantial fair value declines in the value of nonagency private-label securities (PLS) portfolio occurred during 2007. While the Enterprise believes present subordination levels protect it from immediate loss of principal and interest, the subprime mortgages underlying these securities are experiencing high delinquency, foreclosures and severity rates.

Weakness in the financial strength of bond issuers providing additional loss protection is also evident.

- The rapid dislocation in the credit markets has also impacted the financial strength of a number of major counterparties, including seller/services, mortgage and bond insurers, and other financial counterparties

- Increased credit risk has caused operational risk to increase with the volume of current and forecasted loan workouts, foreclosures and Real Estate Owned (REO) properties

105. With regard to Freddie Mac's transactions in Single-Family mortgages, the 2008 OFHEO Report states:

> ***Throughout 2007 and at a level much higher than management's plan, the Enterprise continued to purchase and guarantee higher-risk mortgages. These purchases have performed more poorly than expected. The performance can be attributed to mortgages with high loan-to-value ratios, nonowner-occupied properties, low FICO scores, high debt-to-income ratios, limited or no documentation and underwriting through non-Freddie Mac lending systems. Evidence of risk layering is apparent, as a large number of loans share multiple risk attributes.***

* * *

> The credit guarantee business grew faster than planned-18 percent versus 11 percent-and exceeded overall mortgage debt originations as Freddie Mac was providing liquidity to the market. New higher-risk business coupled with declining house prices are reflected in deteriorating performance metrics-increasing serious delinquency rates, transition rates and loss severity rates-triggering increases to credit loss forecasts, provisions and reserves. Total credit related costs increased sharply during 2007. [Emphasis added.]

106. With regard to Freddie Mac's risk to capital and diminished capital position, the 2008 Report states:

> [r]isk to capital has increased dramatically, primarily because of market and credit risks, which directly impacted capital through reduced current and future earnings.

> On the basis of restated results in early 2008, Freddie Mac's surplus as a percentage of the OFHEO-directed requirement significantly declined from $2.1 billion, or 6.2 percent, for the fourth quarter 2006 to $0.9

billion, or 2.6 percent in the third quarter of 2007.  The surplus continued to decline through October and November, with Freddie Mac failing to meet the OFHEO-directed requirement on November 30, 2007, prior to year-end 2007 accounting adjustments.  Freddie Mac took action to return to capital compliance by issuing $6 billion in preferred stock in early December 2007.  Further erosion of capital in December resulted in a year-end 2007 surplus of $.3.5 billion, or 10.0 percent. . .

While the decline in capital surplus was primarily the result of dramatically higher credit loss providing and continued market volatility, especially in the later part of the year, during the first part of the year negative earnings, continued dividend payments and growth in MBS contributed to declines in the surplus.  Freddie Mac's expensive emergency corrective action in the fourth quarter emphasizes the need for permanently heightened attention to income forecasting, and more prudent capital management generally. . .

107.    The Officer and Director Defendants can no longer deny their shortcomings.  On May 22, 2008, in testimony before the Committee on Financial Services of the United States House of Representatives, Defendant Cook all but admitted that Freddie Mac had employed lax and substandard credit standards with respect to new mortgage originations.  Specifically, Cook stated:

I would also like to say a word about the price and credit quality of new mortgage originations, which I know has raised some concerns. To guard against the problems that led to the current crisis, in which risk was often seriously under-priced, almost every mortgage lender — not just the GSEs — has tightened credit standards and raised prices to better reflect the risks of lending mortgage money in uncertain times.

108.    Following Cook's testimony to Congress, in June and July of 2008, Freddie Mac's financial position deteriorated even further.

109.    On July 11, 2008, in a *New York Times* article entitled "U.S. Weighs Takeover of Two Mortgage Giants," the unthinkable was suggested - that Freddie Mac would be placed in conservatorship by the federal government, rendering the Company's shareholders' stock worthless:

69

*Alarmed by the growing financial stress at the nation's two largest mortgage finance companies, senior Bush administration officials are considering a plan to have the government take over one or both of the companies and place them in a conservatorship if their problems worsen, people briefed about the plan said on Thursday.*

The companies, Fannie Mae and Freddie Mac, have been hit hard by the mortgage foreclosure crisis. Their shares are plummeting and their borrowing costs are rising as investors worry that the companies will suffer losses far larger than the $11 billion they have already lost in recent months. Now, as housing prices decline further and foreclosures grow, the markets are worried that Fannie and Freddie themselves may default on their debt.

*Under a conservatorship, the shares of Fannie and Freddie would be worth little or nothing, and any losses on mortgages they own or guarantee — which could be staggering — would be paid by taxpayers.*

*****

*The markets showed fresh signs on Thursday of being nervous about the future of the companies. Their stock prices continued a weeklong slide, hitting their lowest level in 17 years. The debt markets, meanwhile, pushed up the two companies' cost of borrowing — their lifeblood for buying mortgages.*

The companies are by far the biggest providers of financing for domestic home loans. If they are unable to borrow, they will not be able to buy mortgages from commercial lenders. In turn, that would make it more expensive and difficult, if not impossible, for home buyers to obtain credit, freezing the United States housing market. Even healthy banks are reluctant to tie up scarce capital by offering mortgages to low-risk home buyers without Fannie and Freddie taking the loans off their books.

Together the two companies touch more than half of the nation's $12 trillion in mortgages by either owning them or backing them. They hold more than $1.5 trillion of the mortgages as securities. Others are sold to investors in the form of mortgage-backed bonds.

*In recent weeks, the companies have spiraled downward, undermined by declining confidence in their future and shaken b*ʸ *sham declines in their assets as the housing market, have continued to slide and foreclosures have risen.*

*In the last week alone, Freddie has lost 45 percent of its*

70

*value,* and Fannie is off 30 percent. Expectations of default at the companies have also risen; it costs three times as much today to buy insurance on a two-year Fannie bond as it did three years ago.

*Analysts expect the companies to announce a new round of write-downs and possibly be forced to raise capital by issuing additional shares, which would dilute their value for current shareholders.*

Despite repeated assurances from regulators about the financial soundness of the two institutions, financial markets have concluded that by some measures they are deeply troubled.

*Freddie, for instance, is technically insolvent under fair value accounting rules, in which the company puts a market value on assets as if it had to sell them now.*

\*\*\*\*\*\*

*Shares of Freddie Mac plunged more than 30 percent and Fannie Mae's more than 20 percent in the first hour of trading on Thursday. By the close of trading, Fannie shares had fallen nearly 14 percent, and Freddie shares had dropped 22 percent. It was the second straight day of declines for the companies.* [Emphases added.]

110.    On July 11, 2008, Freddie Mac's share price fell as low as $3.89, closing for the day at $7.75 per share. Two trading days later on July 15, 2008, Freddie Mac stock closed at a price of $5.26 per share. This precipitous decline represents a 92% reduction in value of the Company's stock price since June 5, 2007, when (as described below) a number of the Officer and Director Defendants sold Freddie Mac stock for millions of dollars in proceeds.

111.    Then, on July 18, 2008, the *Wall Street Journal*, in an article entitled "Mortgage Giant Freddie Mac Considers Major Stock Sale," reported that Freddie Mac was considering another sale of new shares of Freddie Mac stock, this time for $10 billion, in an effort to avoid a government bailout that would likely entail greater regulation of the Company. Specifically, the article stated, in relevant part:

*Mortgage giant Freddie Mac --* emboldened by emergency

regulatory actions that have triggered a two-day rebound in its battered stock -- *is considering raising capital by selling as much as $10 billion in new shares to investors, according to people familiar with the matter.*

The selling of new shares would have the potential to avoid a full-blown government rescue for Freddie Mac and Fannie Mae, twin keystones of the U.S. housing market. The publicly traded, government-sponsored companies own or guarantee about $5.2 trillion of home mortgages, or nearly half the total outstanding, and are at the center of government efforts to prop up the sagging housing market.

Shares of Freddie were up $1.19, or 14%, to $9.52 in midday trading Friday on the New York Stock Exchange.

**Freddie Makes Step Friday**

*In the latest development, Freddie filed a form with the Securities and Exchange Commission Friday morning that marks a final step toward registering its common stock with the agency. The filing of a Form 10 registration statement indicates that the shares could be registered as early as today.*

******

In 2002, after years of fighting off the idea, Freddie and Fannie had agreed to register their common stock with the SEC and subject themselves to that agency's filing requirements like normal corporations. Fannie met the registration requirements in 2003. Freddie was delayed by the need to overhaul its books and internal risk controls after findings in 2003 that it violated accounting rules.

**Worries About Mortgage Losses**

*Both companies' stock fell about 45% last week amid worry about whether they have enough capital to cover mortgage losses. The depth of their troubles spurred the Treasury Department on Sunday to unveil an unusual plan to temporarily extend an unspecified credit line to both companies — as well as buy stock in them if necessary.*

That plan quickly came under fire on Capitol Hill. Critics argue it could cost American taxpayers billions of dollars.

*For its part, Freddie would like to avoid the stricter government oversight that could accompany any rescue. Its moves come as new details emerge about its recent stumbles.*

The past two days have raised hopes at Freddie for a sale of shares to investors other than the Treasury. Freddie and Fannie shares both surged more than 29% on Wednesday, a day after the Securities and Exchange Commission set emergency rules limiting the ability of bearish investors to place aggressive bets that their stocks would keep falling.

A sale by Freddie of common and preferred stock could be tough to pull off. For starters, the preferred shares would require Freddie to offer a very high rate of return to attract buyers. The yield on one existing issue of Freddie's preferred stock, for example, is about 13.8%.

At that rate, even a $5 billion preferred-stock offering would entail a $690 million annual payout, on top of the $272 million Freddie paid out on its existing preferred shares in the first quarter. That would reduce the money available to common-stock shareholders, cutting the value of those holdings and potentially sending the stock price lower.

The main buyers for any new-stock issues are likely to be existing shareholders world-wide, according to one person involved in the discussion, adding that a definitive plan hasn't yet been determined.

In the short term, a sale of new shares might eliminate the need for the Treasury's help, but a government bailout might still be required later. "At the heart of this crisis of confidence is uncertainty about the true financial condition of the companies," says Armando Falcon Jr., their former regulator.

Analysts expect that Freddie and Fannie both will face significant losses in the months ahead as the housing crisis shows no signs of slowing. Both companies, which were originally chartered by acts of Congress, buy mortgages from lenders. They package those loans into securities for their own investment portfolios and for sale to investors world-wide.

The two companies -- which are rivals in the same business -- have reported a combined $11 billion of losses over the past three quarters, largely because of increasing defaults by homeowners on mortgages. When homeowners don't make mortgage payments, Fannie and Freddie must reimburse the holders of securities backed by those defaulting mortgages. At the same time, falling home prices cut the value of the collateral backing the loans, increasing losses for Fannie and Freddie.

Investors and analysts can only guess how bad the losses might be as several million American homes go through foreclosure.

*Analysts at Goldman Sachs Group Inc. this week estimated that Fannie faces default-related losses of $32 billion and Freddie $21 billion.* Those losses, expected to be mostly realized over the next few years, will be offset to some extent by growing revenues and higher fees the companies can now charge.

Freddie's board met Thursday to review options for selling new shares. Freddie Mac Chief Executive Officer Richard Syron has huddled frequently with investment bankers from Morgan Stanley and Goldman Sachs Group Inc. and has held two board meetings this week at Freddie's New York office. The proceeds of a sale are expected to be in the range of $5 billion to $10 billion, according to people close to the discussions.

One idea that has been raised is a "rights offering" of shares, in which existing shareholders get first dibs on the new stock. *Freddie, for its part, says it has plenty of cash for now and has hinted that it could resort to eliminating its dividend, for savings of $650 million a year.*

In an interview, Mr. Syron said Freddie's board has been discussing "the full array of options before us," declining to give specifics. He said it was too early to specify when Freddie would raise capital, adding: "We're not at the stage of talking about the exact when."

*The push to court private investors, rather than accept government money, illustrates how much Freddie Mac wants to avoid the potential for additional government controls. Congressional approval of a government bailout would likely entail new restraints on how it conducts business.*

For instance, if loans or investments are made with government money, lawmakers are weighing provisions to prevent the two companies from paying dividends to shareholders or issuing big paychecks to their management, says Rep. Barney Frank (D., Mass.), chairman of the House Financial Services Committee. Government assistance could require Fannie and Freddie to consult the government "before it can even pay its water bill for the toilet," Rep. Frank said in an interview. He supports what the Treasury has proposed, which is to provide money for the two companies if needed.

Mr. Syron said he hopes he won't need the government's help, or face the possible consequences, such as getting bills approved by the federal government. "I'm kind of partial to indoor plumbing," he quipped during an interview, in response to Rep. Frank's comment.

779143.1

The discussions come as both Freddie and its bigger rival, Fannie, continue to struggle to balance their shareholders' desire for big profits and the government's demand that they provide plenty of funding for home loans, even if that hurts their profits in the short term.

******

The government's proposal to offer a rescue if needed means that, for the time being, Freddie and Fannie are effectively wards of the state. As a result, taxpayers would pay the bill if either company were to fall apart.

**Growth at a Dizzying Pace**

The seeds of the companies' capital questions were sown in 1992. Lobbyists from Fannie and Freddie persuaded Congress they didn't need to hold much capital as a cushion against homeowner defaults, which were expected to be small.

Fannie and Freddie grew at a dizzying pace, raising their combined holdings of mortgages to $1.58 trillion in 2003 from $136 billion in 1990. They dominated their industry, providing funding or guarantees for 57% of all U.S. home mortgages in 2003, according to Inside Mortgage Finance, a trade publication.

***That control weakened a few years back amid accounting irregularities at Fannie and Freddie and aggressive lending by other financial firms, particularly in "subprime" and other risky mortgages to low-end borrowers. Eager to regain market share, Fannie and Freddie started buying riskier mortgages themselves.***

Still, when the credit crunch hit last year, Fannie and Freddie appeared to be in relatively good shape. They had avoided some of the worst lending practices, and their Wall Street rivals were on the ropes. The companies' market share shot up to 68% in this year's first quarter from 45% a year earlier.

As rivals faltered, Freddie last autumn put a note on its Web site titled "Shelter in a Storm," declaring: "Even when other lenders stop lending, we continue to provide a steady source of home funding."

But it turned out that Fannie and Freddie weren't safe from that storm. ***They stunned investors by reporting combined losses of about $3.5 billion in the third quarter of last year.***

That cut deeply into the small amounts of capital held by

75

Fannie and Freddie. Late last year, Fannie and Freddie scrambled to shore up their capital by selling a combined $13 billion of preferred shares. Selling those shares meant a big chunk of future profits would go to the preferred holders rather than the owners of common shares.

At an investor conference in December, Mr. Syron apologized to Freddie's holders of common shares: "We wanted to dilute common shareholders like we wanted to shoot ourselves in the head with a gun," he said.

The companies reported further losses in the following quarters. Treasury Secretary Henry Paulson and Fed Chairman Ben Bernanke began publicly exhorting them and other big financial companies to raise more capital, as quickly as possible, to cope with the avalanche of foreclosures ahead.

******

Freddie promised to raise $5.5 billion of its own. "It's better to go fast than slow," Freddie's chief financial officer, Buddy Piszel, urged Mr. Syron.

The company didn't move quickly enough. Fears about the mortgage giants reignited July 7, when Lehman analyst Bruce Harting released a report saying Freddie and Fannie might need to raise a combined $75 billion under a proposed accounting rule.

Even though it's unlikely the rule would even apply to the firm, investors began selling the shares of Freddie and Fannie. Others engaged in "short sales," or bets that the shares would decline. Both companies' shares went into a dive.

As of March 31, Freddie had "core capital" -- a measure of financial strength consisting of retained earnings and other items -- totaling $38.3 billion. That works out to 1.8% of the $2.15 trillion of mortgages Freddie owned or guaranteed as of that date.

***That's low compared with the requirements placed on other financial institutions, such as banks. Indeed, if Freddie were a bank, it would need about $91 billion to be considered well-capitalized,*** says Karen Petrou, managing partner at research firm Federal Financial Analytics in Washington. Her firm does consulting work for trade associations that are sometimes publicly critical of Fannie and Freddie.  [Emphases added.]

112.    Subsequently, on August 5, 2008, in an article entitled "At Freddie Mac, Chief Discarded Warning Signs," the *New York Times* reported that, according to "more than two dozen current and former high-ranking executives and others" from Freddie Mac, Defendant Syron rejected internal warnings that could have protected Freddie Mac from its current financial straits.  Specifically, in mid-2004, David A. Andrukonis, Freddie Mac's then-Chief Risk Officer, expressly warned Defendant Syron that Freddie Mac's participation in the high-risk mortgage market "would likely pose an enormous financial and reputational risk to the company and the country."  At that time, defendant Syron was also presented with a memorandum further warning that the Company's underwriting standards were becoming shoddier, and that the Company was becoming increasingly exposed to serious losses.  Defendant Syron dismissed these warnings and refused to consider possible courses of action to reduce these risks – instead increasing Freddie Mac's exposure to subprime loans and investments.  The article stated, in relevant part:

> In an interview, Freddie Mac's former chief risk officer, David A. Andrukonis, recalled telling Mr. Syron in mid-2004 that the company was buying bad loans that "would likely pose an enormous financial and reputational risk to the company and the country."
>
> Mr. Syron received a memo stating that the firm's underwriting standards were becoming shoddier and that the company was becoming exposed to losses, according to Mr. Andrukonis and two others familiar with the document.
>
> But as they sat in a conference room, ***Mr. Syron refused to consider possibilities for reducing Freddie Mac's risks***, said Mr. Andrukonis, who left in 2005 to become a teacher.
>
> ***"He said we couldn't afford to say no to anyone,"*** Mr. Andrukonis said. Over the next three years, Freddie Mac continued buying riskier loans.
>
> ******
>
> Mr. Andrukonis was not the only cautionary voice at Freddie Mac at the time. According to many executives, Mr. Syron was also warned that the firm needed to expand its capital cushion, but instead that safety net shrank. Mr. Syron was told to slow the firm's mortgage purchases. Instead, they accelerated.

Those and other choices initially paid off for Mr. Syron, who has collected more than $38 million in compensation since 2003.

But when housing prices began declining in 2006, choices at Freddie Mac and Fannie Mae proved disastrous. Stock prices at both companies have fallen by more than 60 percent since February, destroying more than $80 billion of shareholder value.

***More than two dozen current and former high-ranking executives at Freddie Mac, analysts, shareholders and regulators said in interviews that Mr. Syron had ignored recommendations that could have helped avoid the current crisis.***

Many of those interviewed were given anonymity for fear of damaging their careers by speaking publicly.

******

Mr. Syron and the Fannie Mae chief executive, Daniel H. Mudd, defended their choices, saying in interviews that they did not anticipate that the housing market would decline so quickly and that they were buffeted by conflicting pressures.

"This company has to answer to shareholders, to our regulator and to Congress, and those groups often demand completely contradictory things," Mr. Syron said in an interview.

Indeed, executives of both companies maintain that one of the reasons the firms hold so many bad loans is that Congress has leaned on them for years to buy mortgages from low-income borrowers to encourage affordable housing. In 2004, Freddie Mac warned regulators that affordable housing goals could force the company to buy riskier loans.

Others, however, dismiss that explanation. ***"Sure, it's hard to deal with the pressures of Congress and shareholders and regulators," said a former high-ranking Freddie Mac executive. "But that's why executives get paid so much. It's not acceptable to blame those pressures for making bad choices."***

******

For years, the companies collected rich profits. But some executives grew increasingly concerned.

***Mr. Andrukonis wrote his memo in 2004. At the time, he also briefed the risk oversight committee of the board of directors, but did not share his memo with them, he said. A member of that committee declined to return phone calls.***

Soon thereafter, ***Freddie Mac's head of capital compliance and oversight, Donald Solberg, counseled Mr. Syron to maintain a thick capital cushion, according to multiple people familiar with those discussions***. Mr. Solberg

continued making that recommendation until early 2007, when he left the company. Mr. Solberg declined to comment on his conversations.

Last year, Treasury Secretary Henry M. Paulson Jr. and the Federal Reserve chairman, Ben S. Bernanke, privately urged both companies to raise more money. At one point, Mr. Bernanke threatened to publicly scold the companies if they did not raise more cash.

Beginning in November, Fannie Mae raised $14.4 billion from shareholders over a six-month period.

But Mr. Syron was more resistant. ***Freddie Mac raised $6 billion in preferred stock last year, but at a March conference in New York, Mr. Syron combatively dismissed suggestions he would raise more simply because officials told him to.***

***"This company will bow to no one,"*** Mr. Syron told a room of investors and analysts. Despite promises, the company has delayed a planned $5.5 billion stock sale. ***Because of that delay, the effective cost of raising funds has skyrocketed as the company's share price has declined***.

****** 

In 2007, as home prices were falling and defaults rising in some areas, people at both firms urged their chief executives to scale back on mortgage purchases. Fannie Mae shrunk its mortgage portfolio slightly.

***Mr. Syron's Freddie Mac, however, increased its portfolio by $17 billion***.

That same year the companies posted combined losses of $5.2 billion. This year, they have announced losses of $2.4 billion, and analysts say they may lose an additional $24 billion or more.

Last month, after weeks of rumors and bad news, investors began dumping the companies' shares, driving their stock prices down almost 60 percent apiece. The selling did not subside until Mr. Paulson unveiled a rescue plan with powers to inject billions of taxpayer dollars into the companies. That plan has not been activated, but the law, signed by President Bush last week, also gives the government sweeping new regulatory control over the firms.

"It basically worked exactly as everyone expected — when things got bad, the government came to the rescue," said a second former high-ranking Freddie Mac executive. "But we didn't expect it would come at the cost of a new regulator who now has the power to burrow into our business forever." [Emphases added.]

113.     The dust has far from settled on Freddie Mac's latest crisis.  The billions of dollars of losses Freddie Mac may yet suffer going forward cannot at this point be estimated by Plaintiff.  Not only has the concealment of Freddie Mac's true financial condition and mismanagement already provoked litigation against the Company by aggrieved investors as referred to above, it will cause Freddie Mac to pay for the defense of such litigation and compensation for the damages caused.

114.     Freddie Mac's financial debacle was caused by a gross, systemic failure of risk management and lax credit standards during the last several years at the Board level and within senior management.  During that time, Freddie Mac falsely represented to OFHEO, its putative regulator, that it was "in the process of strengthening the credit risk management framework necessary to enable [Freddie Mac] to properly identify, measure, monitor, and control credit and operational risks inherent in subprime and nontraditional mortgage portfolios and related activities."

115.     Based on all of the foregoing, it is now clear that:

(a)     The Officer and Director Defendants, aided and abetted by PwC, failed to implement sufficient risk management controls to protect the Company from acquiring billions of dollars worth of mortgages granted with non-existent or poor underwriting standards and with insufficient means to monitor and account for them.  At all relevant times, the Officer and Director Defendants and PwC knew or should have known that the Company's internal controls and business practices were incapable of managing, identifying, guarding against, and accounting for, massive potential losses in connection with management's subprime investments and guarantee exposure, causing the Company to be subjected to unacceptable levels of risk.

(b)     The Officer and Director Defendants failed to implement controls to ensure that appraisals of underlying properties were done appropriately and without collusion between lenders and appraisers such as that which existed between and among defendants WaMu, First American and eAppraiseIT on the one hand, and Countrywide and LSI on the other, thereby increasing the risk of defaults, facts which were known or should have been known to PwC in connection with its audits of Freddie Mac's financial statements and otherwise.

(c)     The Officer and Director Defendants failed to adequately reserve for uncollectible loans and other risks of loss, aggravating the financial risk to which the Company was exposed and causing its financial results to be misleading, all of which was known or should have been known by PwC in connection with its audits of Freddie Mac's financial statements and otherwise.

(d)     The Officer and Director Defendants failed to protect the Company from its guarantee exposure or to properly transfer that risk to credit-worthy mortgage insurers. Many of the Company's third-party mortgage insurers were not able to meet their insurance contracts – the very contracts that were supposed to protect sizeable portions of Freddie Mac's mortgage investment holdings and guarantee exposure.  Such contingent risk was not disclosed and inadequate reserves were taken to acknowledge Freddie Mac's exposure, all of which was known or should have been known by PwC in connection with its audits of Freddie Mac's financial statements and otherwise.

(e)     The Officer and Director Defendants concealed the fact that the Company had invested, for its own portfolio, in billions of dollars of high-risk, low-quality mortgages that carried extraordinarily high credit risks which the Company would eventually have to write off, causing losses and capital deficiencies, all of which was known or should have

779143.1

been known by PwC in connection with its audits of Freddie Mac's financial statements and otherwise.

(f)     The Officer and Director Defendants concealed the fact that the Company had guaranteed billions of dollars of subprime, high-risk mortgages sold to others, which the Company would eventually required to absorb the losses thereupon, all of which was known or should have been known by PwC in connection with its audits of Freddie Mac's financial statements and otherwise.

(g)     Freddie Mac's Board and the committees thereof utterly failed to meet their obligations to ensure the safety and soundness of the Company's management and operations, and to be justifiably satisfied that its financial statements and other public representations of its financial conditions were not inaccurate or misleading.

## V.     INSIDER SELLING BY CERTAIN OFFICERS AND DIRECTORS

116.    From April 1, 2006 to December 7, 2007, during the height of the subprime crisis, Defendants Syron, Cook, Piszel, McQuade, and Poe (the "Insider Selling Defendants"), while in possession of materially adverse non-public information regarding the Company's exposure to subprime mortgages and lack of adequate internal controls and procedures, sold more than $10 million in Freddie Mac stock on the basis of their knowledge of that materially adverse non-public information, as described below.

117.    Defendant Syron sold 65,660 shares of Freddie Mac stock for $4,273,750.96 in proceeds, as follows:  7,637 shares sold on April 1, 2006 for $61.92 per share; 7,860 shares sold on May 6, 2006 for $61.98 per share; 21,249 shares sold on December 31, 2006 for $67.90 per share; 7,979 shares sold on April 1, 2007 for $59.49 per share; 8,193 shares sold on May 6, 2007 for $66.31 per share; and 12,742 shares sold on June 5, 2007 for $66.94 per share.

779143.1

118.    Defendant Cook sold 22,185 shares of Freddie Mac stock for $1,412,032.30 in proceeds, as follows:  1,565 shares sold on May 6, 2006 for $61.98 per share; 3,705 shares sold on August 2, 2006 for $57.50 per share; 7,132 shares sold on January 3, 2007 for $68.20 per share; 1,993 shares sold on May 6, 2007 for $66.31 per share; 4,109 shares sold on June 5, 2007 for $66.94 per share; and 3,681 shares sold on August 2, 2007 for $56.61 per share.

119.    Defendant Piszel sold 8,234 shares of Freddie Mac stock on December 7, 2007 for $35.54 per share, for proceeds of $292,636.36.

120.    Defendant McQuade sold 47,509 shares of Freddie Mac stock for $3,034,051.17 in proceeds, as follows:  4,786 shares sold on May 6, 2006 for $61.89 per share; 14,037 shares sold on September 1, 2006 for $63.61 per share; 5,977 shares sold on May 6, 2007 for $66.31 per share; 9,290 shares sold on June 5, 2007 for $66.94 per share; and 13,419 shares sold on September 1, 2007 for $61.61 per share.

121.    Defendant Poe sold 20,595 shares of Freddie Mac stock for $1,284,831.95 in proceeds, as follows:  3,303 shares sold on April 26, 2006 for $60.49 per share; 2,000 shares sold on January 16, 2007 for $64.92 per share; 2,000 shares sold on February 1, 2007 for $65.25 per share; 2,000 shares sold on March 1, 2007 for $63.44 per share; 5,292 shares sold on April 4, 2007 for $59.19 per share; 2,000 shares sold on April 10, 2007 for $60.00 per share; 2,000 shares sold on May 1, 2007 for $65.31 per share; and 2,000 shares sold on June 1, 2007 for $66.98 per share.

122.    The Company's prohibition on the use of inside information as contained in the Company's Code of Conduct clearly demonstrates that the Insider Selling Defendants' stock sales, described above, were in violation of Freddie Mac's corporate policy:

## A. Inside Information

The use of inside, or non-public, material information in connection with the purchase or sale of Freddie Mac securities, including its debt and mortgage-related securities or another's securities, is unethical and is generally prohibited by law. Non-public material information includes information about Freddie Mac or another company that is obtained by virtue of your service on Freddie Mac's Board, which has not been effectively disclosed to the general public, and which could, if known, affect a reasonable investor's decision to buy or sell the securities of Freddie Mac or the other company. Rules pertaining to "insider trading" are set forth in Corporate Policy 7-145, Insider Trading and Related Conduct.

These rules apply both to trading in Freddie Mac securities, including mortgage-related and debt securities, for your own account and to causing another person or entity to trade our securities on behalf of that person or entity. In particular, these rules apply to the purchase and sale of Freddie Mac's securities and to the possession of non-public information with respect to those securities. Accordingly, corporate policy prohibits conduct by any Director that could result in, or appear to be the result of, insider trading in Freddie Mac securities. You must comply with this general prohibition and with specific provisions of applicable corporate policy.

## VI. PWC'S NEGLIGENCE AND FAILURE TO FULFILL ITS PROFESSIONAL OBLIGATIONS TO FREDDIE MAC

123. Defendant PwC, as Freddie Mac's purportedly independent auditor, had a duty, among others, to audit the Company's financial statements in accordance with generally accepted auditing standards ("GAAS"). Freddie Mac was one of its largest clients and, as such, in order to retain the patronage of the Company's senior management and Board, PwC was subject to the temptation to disregard GAAS in its purported audits of the Company's financial statements and that such statements were not prepared in accordance with GAAP. As such, PwC surrendered its obligation to be independent in order to retain the Company as a client.

124. PwC knew or recklessly disregarded the fact that Freddie Mac's financial statements were not prepared, and so not formally presented, in accordance with GAAP; that PwC's purported audits were not conducted in accordance with GAAS; that Freddie Mac's accounting policies and the Company's senior management and Board's application of those

policies did not comply with GAAP; and that Freddie Mac used accounting policies in the

preparation of publicly issued financial statements which did not comply with GAAP.

125.    Due to its lack of independence, PwC and its partners knowingly and

substantially participated in the issuance and dissemination of its false and misleading audit

opinions as to Freddie Mac's financial statements, all of which aided and abetted the Officer and

Director Defendants' breaches of fiduciary duty.

## VII.    THE ACTIVITIES OF WAMU, EAPPRAISEIT, FIRST AMERICAN, COUNTRYWIDE AND LSI HAVE DAMAGED FREDDIE MAC.

126.    The independence and integrity of the real estate appraisers who determine

the value of home loan collateral is of enormous importance.  Real estate appraisals are intended

to provide borrowers and lenders with an independent and accurate assessment of the value of a

home.  This ensures that a mortgage or home equity loan is not under-collateralized, which in

turn protects borrowers from being over-extended financially and lenders and investors from loss

of value in a foreclosure proceeding.

127.    A mortgage lender, as part of agreeing to loan funds, must ensure that the

borrower is able to repay the loan and that the loan is adequately collateralized in case the

borrower defaults.  The borrower and the lender have a common interest in accurately valuing

the underlying collateral because both want to be sure the borrower is not over-paying for the

property and would be able to meet the repayment terms, or that – in the event of default and

foreclosure – the property value can support the loan.

128.    The secondary mortgage market, as described above, has radically

transformed the incentives in the industry.  Rather than holding the mortgage loans it makes –

and so bearing the long-term consequences of poor loans – lenders commonly sell loans in the

secondary mortgage markets.  The loans are then pooled together, securitized, and sold as

mortgage-backed securities to investment banks and entities such as Freddie Mac. The money that the lender receives for the sale of the mortgage loans or bonds is then used to finance new mortgages, increasing the lender's profits and fulfilling one of Freddie Mac's mandates, which is to re-cycle funds to the marketplace.

129.    Thus, Freddie Mac and its shareholders have a vital interest in the accurate appraisal of the loans the Company buys and, in turn, re-packages for sale to others.

130.    The fact that original lenders such as WaMu and Countrywide hold far fewer mortgages in their portfolios than ever before has had the effect of making such lenders less vigilant against risky loans, since any risk is quickly transferred to the purchasers of the loans such as Freddie Mac. Moreover, as WaMu and Countrywide did not hold many of their residential mortgage loans in their portfolios, their interest in ensuring the accuracy of the purported appraisals backing such loans was severely diminished. Even worse, because the profits of WaMu and Countrywide were and are determined by the quantity of loans they successfully closed, and not the quality of those loans, there has been an incentive for WaMu, Countrywide and other mortgage originators to pressure appraisers such as First American, eAppraiseIT and LSI to reach values that will allow the loans originated by them to close, whether or not the appraisals accurately reflect the homes' values.

131.    Further jeopardizing the process, mortgage and real estate brokers as well as the lenders' loan production staffs (also known as "loan origination staffs") are almost always paid on commission. Thus, the income of these individuals depends on whether a transaction closes and on the size of the transaction. Accordingly, brokers and loan production staffs have strong personal incentives to pressure appraisers to value a home at the maximum possible amount, so that loans will close and generate maximum commissions, all of which facts were

known or should have been known by the Officer and Director Defendants as well as defendants PwC, Killinger, Merlo and Mozilo.

132.    For the foregoing reasons, mortgage and real estate brokers and lenders such as WaMu and Countrywide frequently subjected real estate appraisers to intense pressure to change values in appraisal reports and/or to inflate the purported "values" therein initially.  The Officer and Director Defendants, as well as PwC and Defendants Killinger, Merlo and Mozilo, knew or should have known about the circumstances prevailing in the mortgage industry over the past several years including, *inter alia*, the practices of WaMu, First American, eAppraiseIT, Countrywide and LSI as described herein.

133.    In this environment, Freddie Mac and its senior management operated its "Loan Prospector" automated underwriting service used purportedly to "assess" loans for purchase by Freddie Mac every "15 to 20 seconds."  WaMu (including defendant Killinger and its other senior officers), First American and eAppraiseIT (including defendant Merlo and its other senior officers) and Countrywide (including defendant Mozilo and its other senior officers) wrongfully and fraudulently took advantage of the "Loan Prospector" service and other lax or non-existent underwriting by the Company and its management.

134.    Freddie Mac's failure to have in place more deliberate and careful underwriting of these underlying loans (including honest and independent appraisals) or insist upon it from loan originators such as WaMu and Countrywide greatly contributed to its need to take mark-to-market losses of more than $5 billion as of December 31, 2007, which losses were derived from, *inter alia,* negligently extended credits  and related interest-rate expenses.  While Freddie Mac's senior management said on February 28, 2007 that such mark-to-market losses were dictated by GAAP accounting rules, they maintained that the losses would likely not, in

fact, be actually realized at such levels, notwithstanding the great uncertainty that still exists as to the quality of the Company's loan portfolios.

135.    Apart from the forces described above that drove up appraisals and thus the loans purchased by Freddie Mac, the Officer and Director Defendants themselves had a personal interest in not questioning – and in even inflating – the value of the loans Freddie Mac purchased.  In part to attempt to eradicate the stain on Freddie Mac's reputation of its prior financial debacle in 2003, which stemmed in part from "manufactured" earnings, the Officer and Director Defendants sought to aggressively grow the Company and increase its reported earnings at virtually any cost.  One of the ways to do this was to increase the paper value of the mortgage-backed securities sold by Freddie Mac.  The value of the loans purchased by Freddie Mac, as represented by their appraisals, serves as the basis for the value of the securities Freddie Mac creates by pooling these loans.  The higher the value of the loans closed, the greater the price for which the securities into which they are pooled are sold on the secondary market, and the higher the apparent performance of Freddie Mac as measured by its share of the market.

136.    Because of Freddie Mac's practice of guaranteeing the principal and interest on the mortgages underlying these securities, however, Freddie Mac was at increased risk for substantial losses in the event of foreclosures or defaults on the underlying loans. Unlike lenders such as WaMu and Countrywide who sell their loans to Freddie Mac, Freddie Mac typically guarantees the payment of the principal and interest of the mortgages it pools into new securities.  As a result, Freddie Mac retains the credit risk of the mortgages underlying the securities it sells.  Inflating the value of a mortgage exacerbates this risk, for if the real value of a property falls below the amount of its mortgage, the borrower has an incentive to simply walk away from the loan and allow foreclosure on the property.  Thus, by accepting sub-standard

mortgages from WaMu and Countrywide, based upon exaggerated and/or simply unreal "appraisals" from First American, eAppraiseIT and LSI, Freddie Mac was exposed to enormous damages – damages which were realized when the underlying borrowers could not pay the interest and principal when due and there was insufficient collateral to cover their obligations to the Company.

137.    Because of the importance of accurate appraisals in the home lending market, the Uniform Standards of Professional Appraisal Practice ("USPAP") requires appraisers to conduct their appraisals independently:  "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.  In appraisal practice, an appraiser must not perform as an advocate for any party or issue."  USPAP is incorporated into federal law.  *See* 12 C.F.R. § 34.44.

138.    Additionally, Federal law sets independence standards for appraisers involved in federally regulated transactions.  *See* 12 U.S.C. §§ 3331 *et seq.*  The Code of Federal Regulations provides that an in-house or "staff" appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property."  12 C.F.R. § 34.45.  For appraisers who are independent contractors or "fee" appraisers, the regulation states that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property transaction."  12 C.F.R. § 34.45.

139.    WaMu hired eAppraiseIT in the Spring of 2006, along with eAppraiseIT's top competitor, to oversee the appraisal process for its loans, many of which were passed on to Freddie Mac.  Since being hired by WaMu, eAppraiseIT and First American have made a

practice of violating professional and federal independence requirements with regard to appraisals performed for WaMu and, thus, indirectly for Freddie Mac.

140.    Initially, eAppraiseIT hired approximately 50 former WaMu employees as staff appraisers and Appraisal Business Managers ("ABMs") and – at WaMu's request – gave the ABMs the authority to override and revise the values reached by third-party appraisers.  One-third of eAppraiseIT's staff appraisers were former WaMu employees, and all of the ABMs were former WaMu employees.

141.    Almost from the beginning of eAppraiseIT's work for WaMu, WaMu's loan production staff began complaining that the appraisal values provided by eAppraiseIT's appraisers were too low.  It was clear, and eAppraiseIT and First American well understood, that WaMu's dissatisfaction was largely due to the fact that eAppraiseIT's staff and fee appraisers were not "hitting value," that is, were appraising homes at a value too low to permit loans to close and be passed along to Freddie Mac and others.

142.    During this period, First American was seeking additional business from WaMu in other areas.  WaMu, with the apparent knowledge of Defendant Killinger, expressly conditioned giving any future business to First American on success with eAppraiseIT appraisals.

143.    In February 2007, eAppraiseIT acceded to WaMu demands, under pressure generated by defendant Killinger, that eAppraiseIT stop using its usual panels of staff and fee appraisers to perform WaMu appraisals and instead use a "Proven Panel" of appraisers selected by WaMu's loan origination staff.  Appraisers on the Proven Panel were selected because they reliably "came in on value," that is, they provided high values, particularly in loans to be packaged for Freddie Mac and Fannie Mae.  In the words of eAppraiseIT's then-President,

90

Defendant Merlo, in a February 22, 2007 email to other executives of his company: "we have agreed to roll over and just do it."

144.    Due to the failure of the federal Office of Thrift Supervision, its purported regulator charged with overseeing its operations, to intercede, WaMu not only had complete control over eAppraiseIT's appraiser panel, but WaMu's loan officers at times also directly selected specific individual appraisers on the panel to conduct their appraisals. eAppraiseIT also permitted WaMu's loan origination staff to remove appraisers from the panel on the grounds that such appraisers consistently valued properties lower than WaMu's desired target amounts. Moreover, eAppraiseIT permitted WaMu loan officers to communicate directly with eAppraiseIT's ABMs and Appraisal Specialists by telephone and email to discuss appraisal values. At all such times, all such WaMu employees were subject to Defendant Killinger's oversight and direction.

145.    eAppraiseIT's management as well as WaMu (including Defendant Killinger) and the Officer and Director Defendants knew or should have known or otherwise understood that these arrangements with WaMu violated professional and federal appraiser independence rules and resulted in over-valued properties. As eAppraiseIT's Executive Vice President explained in an email to other members of senior management while discussing a particular reconsideration of an appraised value: "The original appraiser was a WAMU proven appraiser coming in $750,000 higher than the eAppraiseIT review appraiser. This is a good example of . . . our concerns about over-valued properties."

146.    eAppraiseIT's management repeatedly informed First American's senior management of their concerns regarding the illegal arrangements with WaMu. First American instructed eAppraiseIT's executives to continue its corrupt business relationship with WaMu, all

of which was known or could have been known with reasonable diligence by the Officer and

Director Defendants, as well as by PwC.

147.    Based on this wrongful conduct, the State of New York has sued First

American and eAppraiseIT for engaging in deceptive, fraudulent, and illegal businesses practices

under New York law.  In the wake thereof, Freddie Mac has reached an agreement with New

York Attorney General Andrew Cuomo, announced March 3, 2008, providing for, *inter alia,* the

appointment of  an independent examiner, the Independent Valuation Protection Institute, to

examine the appraisal practices cited in the Attorney General's complaint and provide greater

scrutiny of appraisals forming the basis for loans to be purchased  by the Company, such scrutiny

to be provided under the auspices of OFHEO beginning in January, 2009.  The agreement

provides for a code of conduct, the Home Valuation Protection Code, which bars lenders such as

WaMu from pressuring appraisers inflated estimates of property values, bars lenders from using

appraisals ordered by mortgage brokers and reinforces the notion that the appraisers be

independent of the lenders.  Plaintiff further believes that other investigations are underway

which will lead to enforcement or other actions against WaMu by federal banking regulators and

state actions against First American and eAppraiseIT.

148.    Similarly, although LSI was nominally a separate corporate entity from

Countrywide and its loan originating entities, upon information and belief, LSI accommodated

Countrywide's appraisal needs and generated artificially high and unjustified appraisals for, *inter

alia*, the mortgages packaged and sold to Freddie Mac, causing it substantial damages as

described herein.

149.    This wrongful conduct by WaMu, First American, eAppraiseIT,

Countrywide, LSI and their senior executives, including Defendants Killinger, Merlo and

Mozilo, has resulted in the over-valuation of an unknown volume of loans purchased by the Company from WaMu and Countrywide in Freddie Mac's portfolio and in the mortgage-backed securities Freddie Mac has sold and guaranteed, all of which has caused and will continue to cause the Company substantial damages.

150.    The Officer and Director Defendants knew, or should have known, of these wrongful practices by WaMu and Countrywide, lenders with which Freddie Mac had a significant and continuing business relationship and from which Freddie Mac purchased billions of dollars of loans.

## VIII.    THE NECESSITY OF THIS DERIVATIVE ACTION

151.    As indicated in ¶ 5, *supra*, on December 6, 2007, as required by Rule 23.1 of the Federal Rules of Civil Procedure and applicable Virginia law, Plaintiff, through his legal counsel, sent Plaintiff's Demand Letter to Freddie Mac's Board of Directors demanding that the Company, *inter alia*, institute this action against those responsible for Freddie Mac's damages and to recover the amount thereof.  The Board neither responded to that demand nor took the actions demanded.  As such, that demand is deemed rejected.

152.    Although chartered by Congress to oversee and regulate Freddie Mac and other government-sponsored enterprises, OFHEO as a matter of law does not have exclusive authority to protect the interests of Freddie Mac, its shareholders or otherwise address the wrongdoing at issue here.  OFHEO has never claimed for itself, nor acted as if it had, exclusive authority to protect the corporate interests of Freddie Mac or its shareholders in the face of conduct by its officers or directors that breach their duties to Freddie Mac and its shareholders. In fact, OFHEO has utterly failed in its oversight of Freddie Mac and it bears some of the responsibility for the debacle that ensued as a result of such failure.

153.    As a matter of fact, OFHEO has proven to be such a toothless and ineffectual regulator that bipartisan legislation has been passed in Congress abolishing OFHEO and replacing it with a stronger regulator with ample oversight powers, the FHFA.  The conduct described above occurred on OFHEO's watch, yet OFHEO not only failed to detect much of it, but in many cases acquiesced in the wrongdoing and/or made bland but unenforced recommendations to Freddie Mac's Board that remedial action was warranted.

154.    Accordingly, this derivative action is both legally proper and factually necessary.

## IX.    CAUSES OF ACTION

### COUNT I

### Breach of Fiduciary Duty by Officer and Director Defendants

155.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

156.    Each of the Officer and Director Defendants owed Freddie Mac and its shareholders the highest fiduciary duties of loyalty, honesty, and care in conducting the Company's affairs.  Each owed Freddie Mac and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

157.    As officers and directors of a publicly held company, the Officer and Director Defendants had and have a duty to exercise reasonable control and supervision over the officers, employees, agents, business and operations of Freddie Mac; to be and remain informed as to how Freddie Mac was operating and, upon receiving notice or information of an imprudent, questionable or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all remedial efforts; to conduct the affairs of Freddie Mac to provide the highest

quality services and maximize the profitability of the Company for the benefit of its

shareholders; and to promptly disseminate accurate and truthful information with regard to the

Company's revenue, margins, operations, performance, management, projections, forecasts as

well as other material facts bearing upon its operations and financial condition.

158.    As a result of the actions and omissions set out above, each of the Officer

and Director Defendants knowingly, intentionally, recklessly or negligently breached his or her

fiduciary and other duties owed to Freddie Mac and its shareholders and, thereby, caused the

Company to waste its assets, expend corporate funds, suffer from the effect of remedial measures

imposed and to be imposed upon the Company by regulators, and impair its reputation and

credibility for no legitimate business purpose, as a direct and proximate result of which Freddie

Mac has been and continues to be substantially damaged.  Further, Freddie Mac has been, and is,

exposed to substantial liability in connection with civil lawsuits caused by Defendants'

wrongdoing.

159.    The Officer and Director Defendants' acts and omissions described above

were not, and could not have been, exercises of good faith business judgment.

160.    Accordingly, Plaintiff, on behalf of Freddie Mac and its shareholders,

seeks from the Officer and Director Defendants monetary damages, injunctive remedies, and

other forms of equitable relief.

## COUNT II

### Breach of Fiduciary Duty By Insider Selling Defendants

161.    Plaintiff incorporates by reference and realleges each and every allegation

set forth above as though fully set forth herein.

162.    At the time of each of the stock sales set forth herein, each of the Insider

Selling Defendants knew, but did not disclose publicly, the material information described

herein.  Each of the Insider Selling Defendants made each of the stock sales alleged in ¶¶ 116-122 above on the basis of and because of their knowledge of the material non-public information described herein.

163.    At the time of their stock sales, each of the Insider Selling Defendants knew that when the material information described herein was publicly disclosed, the price of the Company's common stock would dramatically decrease.  The Insider Selling Defendants' sales of Freddie Mac common stock based on their knowledge of this material non-public information were a breach of their fiduciary duties of loyalty and good faith.

164.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any proceeds the Insider Selling Defendants obtained thereby.

## COUNT III

### Unjust Enrichment of Officer and Director Defendants

165.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

166.    Each of the Officer and Director Defendants was unjustly enriched by the payments made and/or payable to them as compensation and otherwise by the Company.

167.    Throughout the relevant period, each of the Director Defendants was paid substantial fees for attending meetings and otherwise occupying positions as directors of Freddie Mac.  Similarly, the Officer Defendants were being paid and will be paid substantial salaries and other compensation for their purported services to the Company.  All of such payments and fees were unearned and unjustified since the Officer and Director Defendants so utterly failed to fulfill their responsibilities for the management and governance of the Company.  Each of the

Officer and Director Defendants not only received and retained the funds unjustly received but also invested such funds, thereby receiving additional unjust enrichment. The Insider Selling Defendants were additionally unjustly enriched by their receipt of proceeds from their illegal sales of Freddie Mac common stock, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

168.    As a result of the foregoing unjust enrichment, each of the Officer and Director Defendants should be required to repay to Freddie Mac the respective amounts they were paid, plus interest based upon each of these Defendants' investment and retention of the proceeds of their unjust enrichment. All proceeds from the Insider Selling Defendants' illegal sales of Freddie Mac common stock should also be ordered disgorged to the Company.

<u>**COUNT IV**</u>

<u>**Indemnification From Officer and Director Defendants**</u>

169.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

170.    The Officer and Director Defendants, as fiduciaries and agents of Freddie Mac, breached their fiduciary and other duties to Freddie Mac and its shareholders, as set out above.

171.    Freddie Mac has suffered and will suffer significant and substantial injury as a direct result of these breaches of the fiduciary and other duties owed to it. Part of that injury suffered by Freddie Mac as a result of this wrongdoing by the Officer and Director Defendants may be liability to investors, OFHEO, FHFA and others.

172.    Accordingly, Plaintiff, on behalf of Freddie Mac and its shareholders, seeks from the Officer and Director Defendants complete and full indemnification to the extent

Freddie Mac is found liable for the wrongdoing of these defendants and those who acted

wrongfully together with them.

## COUNT V

### Aiding and Abetting Breach of Fiduciary Duty and Malpractice By PwC

173.    Plaintiff incorporates by reference and realleges each and every allegation

set forth above as though fully set forth herein.

174.    At all times relevant PwC purportedly conducted audits of Freddie Mac's

year-end financial statements and otherwise advised its management and the Audit Committee of

its Board of Directors as to, *inter alia*, whether the Company's financial statements were

prepared in accordance with GAAP and whether it properly accounted for the staggering risks it

had undertaken by having the lax underwriting standards.

175.    PwC not only failed to conduct its audits in conformity with GAAS but

was derelict in providing to Freddie Mac's Board in "management letters" and other reports the

material deficiencies that existed in, *inter alia*, financial controls and risk management at the

Company and otherwise. By not acting as it was obligated to do, PwC, with full knowledge of

the officer and director defendants' obligations to Freddie Mac and their breaches thereof, aided

and abetted their breaches of fiduciary duty and waste of the Company's assets.  By not

performing its audits of Freddie Mac's financial statements in accordance with GAAS, which it

was contractually bound to the Company to do and for which it was paid many millions of

dollars, it committed professional malpractice, all of which has damaged the Company in an

amount which cannot presently be calculated.

176.    Accordingly, Plaintiff, on behalf of Freddie Mac and its shareholders,

seeks from defendant PwC monetary damages, injunctive remedies, and other forms of equitable

relief.

## COUNT VI

## Breach of Contract by WaMu and Countrywide

177.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

178.    The contracts by which WaMu and Countrywide sold loans to Freddie Mac, which Plaintiff does not presently have available to attach hereto, either by implication or otherwise included representations and promises by WaMu and Countrywide, respectively, that the value of those loans had been determined by appraisals in compliance with professional and legal standards requiring the independence of appraisers from the lending, investment, and collection functions of a financial institution.  In fact, Countrywide and WaMu controlled the selection and assignment of appraisers to the loans that were ultimately sold to Freddie Mac in violation of these professional and legal standards.

179.    Moreover, in many cases, WaMu, Countrywide and/or their respective loan officers exerted pressure on appraisers to raise the appraised value of a home being used as collateral for a loan above what the appraiser, in his best professional judgment, had determined to be the value of that home.

180.    This conduct by WaMu and Countrywide constitutes a breach of their contracts with Freddie Mac that substantially damaged Freddie Mac in an amount which cannot presently be determined.

181.    Accordingly, Plaintiff, on behalf of Freddie Mac and its shareholders, seeks monetary damages from Defendants WaMu and Countrywide.

## COUNT VII

## Breach of Warranty by WaMu and Countrywide

182.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

183.     Freddie Mac requires all lenders from whom it purchases loans to "warrant[] that the appraisal services provided, whether by fee or staff appraisers, comply with the Uniform Standards of Professional Appraisal Practice (USPAP), applicable laws, and the requirements of [Freddie Mac's Servicer Guide]."   As described above, under USPAP, applicable laws, and Freddie Mac's requirements, appraisers must be independent of loan officers, and an appraisal must be impartial and unbiased.

184.     Consequently, with each sale of a loan to Freddie Mac, WaMu and Countrywide warranted that the appraisals underlying the loan was in full compliance with USPAP, applicable laws, and Freddie Mac's requirements.

185.     In fact, WaMu, Countrywide and their loan officers effectively controlled the selection of appraisers for their originated loans and in other ways manipulated the appraisal process, as described above, in violation of USPAP, applicable laws, and Freddie Mac's requirements.

186.     These violations of USPAP, applicable laws, and Freddie Mac's requirements governing the appraisal process constituted a breach of warranty by WaMu and Countrywide that has substantially damaged Freddie Mac in an amount which cannot presently be determined.

187.     Accordingly, Plaintiff, on behalf of Freddie Mac and its shareholders, seeks monetary damages from Defendants WaMu and Countrywide.

## COUNT VIII

## Conspiracy To Deceive and Defraud By WaMu, First American, eAppraiseIT, Countrywide, LSI, Killinger, Merlo, and Mozilo

779143.1                                          100

188.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

189.     Defendants WaMu, First American, and eAppraiseIT on the one hand and Countrywide and LSI on the other, agreed and conspired to allow WaMu and Countrywide loan officers, respectively, to effectively control the selection of appraisers for their originated loans and to manipulate the appraisal process so as to improperly, unprofessionally, and illegally increase the appraised value of the properties that were collateral for WaMu and Countrywide loans purchased by Freddie Mac. Defendants WaMu and Countrywide were thus able to earn profits on sales of higher-priced mortgage loans to Freddie Mac, while also passing off the risk of default on those loans to Freddie Mac, to Freddie Mac's detriment.

190.     The conspiracy by WaMu, First American, eAppraiseIT, Countrywide and LSI was known to be occurring by defendants Killinger, Merlo and Mozilo, respectively, and/or directed by them personally or through subordinates.

191.     In carrying out the conspiracy, Defendants WaMu, First American, eAppraiseIT, Countrywide, LSI, Killinger, Merlo and Mozilo acted intentionally, purposefully and without lawful justification.

192.     As a result of the purchase of WaMu and Countrywide loans valued through this corrupt appraisal process, Freddie Mac was substantially damaged in an amount which cannot presently be determined.

193.     Accordingly, Plaintiff, on behalf of Freddie Mac and its shareholders, seeks monetary damages from Defendants WaMu, First American, eAppraiseIT, Countrywide, LSI, Killinger, Merlo and Mozilo.

## COUNT IX

### Negligent Misrepresentation  By eAppraiseIT and First American

194.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

195.     Defendants eAppraiseIT and First American expressly represented to their customers, to Freddie Mac and to other investors in the secondary mortgage market that in providing appraisal services eAppraiseIT "adhere[s] to all guidelines established by USPAP, FNMA, FHLMC [Freddie Mac], and Federal and State Regulations."

196.     Defendants First American and eAppraiseIT further expressly represented to their customers, to Freddie Mac and to other investors in the secondary mortgage market that eAppraiseIT was "a value-added service [that]  . . . actively manages appraiser service levels and monitors quality and time sensitive documentation to ensure compliance with standard appraisal practices."

197.      These representations were false, as Defendants eAppraiseIT and First American surrendered control over the selection of appraisers to WaMu, giving  WaMu the ability to manipulate the appraisal process in reckless disregard of the ultimate accuracy of the appraisals of the value of the collateral for WaMu-originated mortgages, and of the reliance of investors in the secondary mortgage market who purchased WaMu -originated loans, including Freddie Mac, on the accuracy of those appraisals.

198.     Defendants eAppraiseIT and First American knew or should have known that their representations were not true due to the control over the selection of appraisers and the ability to manipulate the appraisal process First American and eAppraiseIT had given to WaMu.

199.     Defendants eAppraiseIT and First American's representations were material to investors in the secondary mortgage market such as Freddie Mac who purchased

home mortgage loans from WaMu since they were designed to lead, and did lead, such investors to believe that the home mortgage loans following from eAppraiseIT's appraisals were done in compliance with professional guidelines and federal and state laws and regulations, and so were good-faith, competent, and professionally objective appraisals of the value of the collateral for WaMu-originated mortgages.

200.     Investors in the secondary mortgage market who purchased WaMu loans, including Freddie Mac, reasonably relied on the foregoing representations that the appraisals underlying WaMu -originated mortgages done by eAppraiseIT were done in compliance with professional guidelines and federal and state laws and regulations, and so were good-faith, competent, and professionally objective appraisals of the value of the collateral for WaMu-originated mortgages.

201.     Defendants eAppraiseIT and First American intended for investors in the secondary mortgage market such as Freddie Mac, when purchasing WaMu loans, to rely on eAppraiseIT and First American's representations concerning the purportedly professionally objective quality of the appraisals of the value of the collateral for WaMu-originated mortgages.

202.     As a result of these Defendants' negligent misrepresentations, Freddie Mac was substantially damaged in an amount which cannot presently be determined.

203.     Accordingly, Plaintiff, on behalf of Freddie Mac and its shareholders, seeks monetary damages from defendants eAppraiseIT and First American.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays that the Court enter judgment against the defendants:

A.     declaring that the Officer and Director Defendants have breached their fiduciary and other duties owed to Freddie Mac and its shareholders as alleged herein;

B.    declaring that PwC has aided and abetted the Officer and Director defendants in their breaches of their fiduciary and other duties owed to Freddie Mac and its shareholders and committed professional malpractice as alleged herein;

C.    declaring that WaMu, First American, eAppraiseIT, Countrywide and LSI have breached their respective contractual and other duties owed to Freddie Mac and its shareholders as alleged herein and further declaring that defendants Killinger and Mozilo actively participated in such conduct;

D.    directing all defendants, jointly and severally, to account for all losses and damages sustained by Freddie Mac caused by reason of the acts and omissions complained of herein;

E.    awarding Freddie Mac money damages against all defendants, jointly and severally, for all losses and damages sustained and to be sustained by Freddie Mac and its shareholders as a result of the acts, omissions and transactions complained of herein;

F.    directing the Officer and Director Defendants to account for and to remit to Freddie Mac all profits and other benefits and unjust enrichment they have obtained and retained as a result of the acts and omissions complained of herein, including all salaries, bonuses, fees, stock awards, options, compensation and common stock sales proceeds together with the earnings upon such amounts by which the such defendants were unjustly enriched;

G.    ordering that the Officer Defendants and those under their supervision and control refrain from further misconduct as alleged herein and to implement corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence;

H.    ordering the Company to take all necessary actions to reform and improve its corporate governance and internal control procedures including, *inter alia*, establishing and

implementing effective underwriting standards and accounting for its operations and financial condition in compliance with GAAP;

      I.     awarding Freddie Mac pre-judgment and post-judgment interest as allowed by law;

      J.     awarding Freddie Mac punitive damages;

      K.     awarding Plaintiff's attorneys' fees, expert fees, consultant fees and other costs and expenses; and

      L.     granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial as to all issues so triable.

Dated: August 21, 2008

GREENFIELD & GOODMAN, LLC

By: _Richard D. Greenfield_ (DPC)

Richard D. Greenfield (RG 4046)
Marguerite R. Goodman
780 Third Avenue, 48th Floor
New York, NY 10017
(410) 320-5931

CUNEO GILBERT & LaDUCA, LLP
Jonathan W. Cuneo (JC 1112)
Robert J. Cynkar (RC 5309)
David W. Stanley
507 C Street, N.E.
Washington, DC 20002
(202) 789-3960

779143.1

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Steven E. Fineman (SF 8481)
Daniel P. Chiplock (DC 1137)
780 Third Avenue, 48th Floor
New York, NY 10017
(212) 355-9500


LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Richard M. Heimann
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415)956-1000

*Attorneys for Plaintiff*

106

# GREENFIELD & GOODMAN LLC
## ATTORNEYS AT LAW
### 7426 Tour Drive
### Easton, Maryland 21601

**(410) 745-4149**
**(410) 745-4158 (Fax)**

Richard D. Greenfield
*Also Admitted to the New York
and Pennsylvania Bars*

e-mail: *whitehatrdg@earthlink.net*

December 6, 2007

Board of Directors
Freddie Mac
8200 Jones Branch Drive MS204
McLean, VA 22102

VIA CERTIFIED MAIL 7007 1490 0002 8216 0735

Dear Members of the Board:

I am writing to you on behalf of Robert Bassman, the owner of shares of the common stock of Freddie Mac ("Freddie Mac" or "the Company") currently and at all relevant times. A copy of the relevant page of his brokerage statement is enclosed with this letter showing such ownership with unrelated information redacted therefrom.

This letter is being sent to you to demand that the Company commence legal proceedings to recover its damages from each of you, from Freddie Mac's senior management who have also been responsible for the wrongdoing referred to herein, against the accounting firm of PriceWaterhouseCoopers, LLP ("PW") and all those other persons or entities who have aided and abetted or otherwise participated in such wrongdoing. Shaun O'Malley, former Chairman of PW and Freddie Mac's Lead Director, has said that: "Through accountability comes trust." For the reasons set forth below, you and the others responsible for the Company's present circumstances as outlined below must be held accountable to it and its shareholders.

This letter is being sent to you in the context of, *inter alia*, the revelations over the past month of massive, multi-year mismanagement of the Company which has led to mark-to-market losses of at least $3.6 billion to date, an additional provision for credit losses of $1.2 billion and the deterioration of Freddie Mac's "fair value" of approximately $8.1 billion primarily due to, according to management, " widening of net mortgage-to-debt option-adjusted spreads and valuation losses on credit-related items." Based upon an analysis of the Company's financial statements as of September 30, 2007, it is believed that, even with the reduction of shareholders' equity of $8.1 billion, management understated such reduction in order to keep Freddie Mac's capital surplus higher than OFHEO's 30% mandatory target level.

# EXHIBIT "A"

This financial debacle was caused by a systemic failure of risk management and lax credit standards during the last several years at the Board level and within senior management, all of which has caused Freddie Mac to suffer billions of dollars in damages as described herein and untold billions going forward. In fact, each of you knew or should have known that, as presently structured, the Board was unable to properly supervise the Company's operations and management, reduce its financial exposure to risk and make sure that its publicly disseminated financial statements were prepared in compliance with Generally Accepted Accounting Principles ("GAAP"), which they were not. Indeed, the Company's press release of November 20, 2007 acknowledged "material weaknesses and significant deficiencies in Freddie Mac's financial reporting process," of which facts each of you was undoubtedly aware. You were also aware of such weaknesses and deficiencies when, in February 2007, the Company finally began to tighten lending standards, having previously eliminated what CEO Syron calls "tried and true underwriting standards."

The Company's damages have been magnified by the reckless application by it and cooperating lenders and mortgage brokerage firms of Freddie Mac's "Loan Prospector" automated underwriting service used purportedly to "assess" loans for purchase by Freddie Mac every "15 to 20 seconds." In fact, the Company's failure to have in place more deliberate and careful underwriting of these underlying loans or insist upon it from loan originators greatly contributed to its need to take mark-to-market losses of $3.6 billion as of September 30, 2007, which losses were derived from negligently extended credits and related interest-rate expenses. CEO Syron acknowledged as much in a speech he gave in Los Angeles on November 13, 2007, when he said that one of the causes of the current "tough times in the mortgage industry" has been: **"advances in technology and financial engineering that de-institutionalized the mortgage market … [and] separated the origination decision from the investment decision [and]…combined with other factors…were part of some very bad outcomes—and also have complicated resolving the situation."**

Each of you and senior management was aware of or should have been aware of the consequences to the Company of using the "financial engineering" provided by "Loan Prospector" and the damages it was likely to cause Freddie Mac. These massive damages, which are first beginning to surface, are likely to increase substantially as Freddie Mac is forced to acknowledge the reality of its contingent liabilities, highly questionable loan portfolio burdened with excessive credit risks and its off-balance sheet transactions. Also, due to the lowering of Freddie Mac's own credit ratings in the wake of the foregoing debacle, it will suffer additional damages as its cost of capital has risen and will rise further.

Your errors and omissions, as well as those of senior management of the Company, come in the wake of Freddie Mac's restatement of its financial results for the years 2000 through 2002, the settlement of numerous shareholder suits in 2006, a $125 million fine by its regulator, OFHEO, the massive costs attributable to shareholder litigation and, as recently as September 27, 2007, the settlement of charges brought by the SEC, pursuant to which the Company agreed to pay a penalty of $50 million. Indeed, following the SEC settlement, Freddie Mac Chairman and Chief

Executive Officer, Richard F. Syron, said: **"We take these charges seriously, and that's why the Freddie Mac of today is a very different company than the Freddie Mac of the past."**

This bold statement, while true in certain respects, was false and misleading insofar as the past was, in fact, repeating itself as acknowledged by management in the Company's November 20, 2007 press release. As you are well aware, when CEO Syron made that statement on September 27, you knew or should have known that the Company was about to announce for the quarter ending only 3 days later that its assets, earnings and fair value as of the end of the third quarter of 2007 had already deteriorated so materially. Even when you directed management to disclose, on November 20, 2007, massive write downs of the Company's assets and to substantially add to its reserves, you did so notwithstanding your serious doubts as to whether such write downs and increases in reserves were sufficient to reflect the reality that Freddie Mac had not "changed its stripes" but, once again, had engaged in the artificial manipulation of the Company's reported earnings, including the material overstatement of its earnings, assets and the net worth.

By acting as such and permitting such manipulations and concealment to take place, you, senior management and the Company's auditor, PW, have caused Freddie Mac to violate federal disclosure laws and subjected it to litigation by those who purchased its securities during the period of such wrongdoing. In turn, this has subjected and will subject the Company to expenses of more than $1 billion to resolve the claims of such purchasers.

As you know, the Company has adopted a Code of Conduct for Members of Freddie Mac's Board of Directors (the "Code"). With respect to it, CEO Syron said on June 27, 2005: **"Compliance with the literal words of the Code may not be sufficient to ensure compliance with its spirit. As a shareholder-owned, government-sponsored enterprise, our obligation to uphold principles of ethical conduct is greater than that of other companies. We have a position of public trust and must never compromise it. Our conduct must always be above reproach."**

The Code, when it was adopted, provides, *inter alia*, that the Company's directors:
  * "Act at all times in good faith, with due care, competence and diligence, and without misrepresenting facts or circumstances."
  * "Comply at all times with all laws, regulations and other legal requirements that apply to your Freddie Mac duties."

The Code goes on to state that: "It is Freddie Mac's policy that any report, document or other information that you or Freddie Mac files or causes to be filed with or submits or causes to be submitted to a government agency or discloses to the public shall be fair, timely and understandable given the circumstances under which it is used, filed, submitted or disclosed." By filing, causing to be filed or otherwise participating in the submission of Freddie Mac's false and misleading financial statements to the SEC, to OFHEO and to the Company's shareholders, among others, you have breached the above-quoted provisions of the Code.

On behalf of my client, I hereby demand that Freddie Mac commence legal proceedings to recover its damages from each present and former member of its Board of Directors who held such position at any time since the release of the Company's 2004 and subsequent financial

results; those senior officers of the Company who carried out and/or participated in the mismanagement referred to above and thereafter covered up such mismanagement and its consequences; and all those who aided or abetted the Company's officers and directors in carrying out the wrongdoing referred to above. These include, but are not limited to, various originators of high risk loans including Washington Mutual, Inc. ("WaMu") and its subsidiaries (the identities of others are not presently known), Freddie Mac's purportedly independent auditor, PW, and those firms which directly or indirectly provided so called "appraisals" upon which the Company and/or the originators of the loans referred to above relied, directly or indirectly, to the Company's detriment. Included among such firms is First American Corp.'s subsidiary, eAppraiseIt LLC, which appears to have aided and abetted WaMu and other originators of sub-standard loans in obtaining inflated appraisals in connection with such loans.

As you know, as a result of the misconduct of its officers and directors and other culpable persons, Freddie Mac has already sustained substantial damages and continues to be subject to further damages in the billions of dollars as well as the massive legal and other expenses of defending against and resolving claims made against the Company by purchasers of its securities.

Similarly, to the extent that any of the foregoing persons has been unjustly enriched at the expense of the Company, including those entities and persons who have received fees and/or other compensation that was excessive under the circumstances referred to above, I demand that Freddie Mac commence litigation against them seeking injunctive relief which, *inter alia*, requires them to account to it and repay any such unjust enrichment together with the earnings thereon. Included within such unjust enrichment are the proceeds of the exercise of any stock options by senior officers during the relevant period while in possession of material inside information, as well as any salaries and bonuses (such as the so-called "extension bonus" being paid to CEO Syron) received by such senior officers and, in the case of PW, fees paid to it during the relevant period for its purported audits of the Company's financial statements.

The demands made herein and the fact that they have been made should not be taken to mean that any of you is independent or can properly and objectively deal with such demands, which you cannot. These demands, which are undoubtedly futile under the circumstances, have been made pursuant to applicable Virginia law which requires that they be made. Each of you is personally implicated in the alleged wrongdoing by, *inter alia*, your failure to cause Freddie Mac to appropriately pursue all of its claims arising from the matters referred to herein. The demands have been made because, if they had not been, your counsel and/or counsel for the Company would seek to have dismissed any shareholder's derivative litigation that might be commenced.

I look forward to hearing from you or your counsel within thirty days.

Sincerely yours,


Richard D. Greenfield