**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

R.S. BASSMAN, Derivatively on Behalf of FREDDIE
MAC a/k/a Federal Home Loan Mortgage Corporation
and its shareholders,

                                    Plaintiff,

        v.

RICHARD F. SYRON, PATRICIA L. COOK,
ANTHONY S. PISZEL, EUGENE M. McQUADE,
RICHARD KARL GOELTZ, STEPHEN A. ROSS,
SHAUN F. O'MALLEY, ROBERT R. GLAUBER,
BARBARA T. ALEXANDER, WILLIAM M. LEWIS,
JR., JEFFREY M. PEEK, GEOFFREY T. BOISI,
RONALD F. POE, WASHINGTON MUTUAL, INC.,
PRICEWATERHOUSECOOPERS, LLP, KERRY K.
KILLINGER, ANTHONY R. MERLO, JR., FIRST
AMERICAN CORPORATION, FIRST AMERICAN
EAPPRAISEIT, COUNTRYWIDE FINANCIAL
CORPORATION, COUNTRYWIDE HOME EQUITY
LOAN TRUST, COUNTRY-WIDE BANK, FSB,
COUNTRYWIDE HOME LOANS, INC., LANDSAFE,
INC., and ANGELO R. MOZILO

                              Defendants,

        and

FREDDIE MAC a/k/a Federal Home Loan Mortgage
Corporation,

                        Nominal Defendant.

ECF CASE

08-CV-02423 (BSJ) (JCF)

**FREDDIE MAC'S**
**MEMORANDUM OF LAW IN**
**OPPOSITION TO APPLICATION**
**TO TAKE DISCOVERY**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ...........................................................................................................................3

    I.     THIS COURT SHOULD DENY PLAINTIFF'S APPLICATION TO
          TAKE DISCOVERY RELATING TO VENUE ISSUES ....................................3

          A.    Courts Routinely Deny Motions To Take Discovery Relating To
                Motions To Transfer Venue .......................................................................3

          B.    Plaintiff's Proposed Discovery Is Not Probative Of Venue ......................5

    II.    THIS COURT SHOULD DENY PLAINTIFF'S APPLICATION TO
          TAKE DISCOVERY RELATING TO STAY ISSUES........................................7

          A.    Courts Do Not Permit Discovery Concerning An SLC Or Its
                Investigation While The SLC's Investigation Is Pending ..........................7

          B.    This Court Should Deny Plaintiff's Discovery Request Based
                Upon Virginia Law....................................................................................8

    III.   AS THE COURT ORDERED, THE APPLICATION TO TAKE
          DISCOVERY SHOULD BE DECIDED BEFORE FREDDIE MAC
          FILES A REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO
          TRANSFER OR STAY ...................................................................................10

CONCLUSION ......................................................................................................................11

## TABLE OF AUTHORITIES

### FEDERAL CASES

Alcoa Steamship Co. v. M/V Nordic Regent, 654 F.2d 147 (2d Cir. 1980) ..............................2, 3

Beekmans v. J.P. Morgan & Co., 945 F. Supp. 90 (S.D.N.Y. 1996) ...............................................6

Cartier v. D&O Jewelry Imports, 510 F. Supp. 2d 346 (S.D.N.Y. 2007) ......................................5

Firestone v. Wiley, 485 F. Supp. 2d 694 (E.D. Va. 2007) ..............................................................8

George v. Kraft Foods Global, Inc.,
    No. 06-cv-798, 2006 WL 3842169 (S.D. Ill. Dec. 22, 2006)...............................................4

In re Take-Two Interactive Software, Inc. Deriv. Litig.,
    No. 06 Civ. 05279, 2007 WL 1875660 (S.D.N.Y. June 29, 2007) .....................................9

In re Terrorist Attacks on Sept. 11, 2001,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005) ................................................................................4

Laborers Local 100 & 397 Pension Fund v. Bausch & Lomb, Inc.,
    No. 06 Civ. 1942, 2006 WL 1524590 (S.D.N.Y. June 5, 2006) .........................................5

PI, Inc. v. Valcour Printed Papers, 465 F. Supp. 1218 (S.D.N.Y. 1979) .......................................4

Silverman v. Wellington Mgmt. Co., 298 F. Supp. 877 (D.C.N.Y. 1969)......................................4

Strougo on Behalf of Brazil Fund, Inc. v. Padegs,
    986 F. Supp. 812 (S.D.N.Y. 1997) ....................................................................................7

Transunion Corp. v. PepsiCo, Inc., 811 F.2d 127 (2d Cir. 1987).................................................3

Varnelo v. Eastwind Transp., Ltd.,
    02-CV-2084, 2003 WL 230741 (S.D.N.Y. Feb. 3, 2003) ...................................................3

Wright v. Krispy Kreme Doughnuts, Inc.,
    No. 04 CV 00832, 2005 WL 1719927 (M.D.N.C. Apr. 4, 2005).......................................9

### STATE CASES

Curtis v. Nevens, 31 P.3d 146 (Colo. 2001)..............................................................................9, 10

In re infoUSA, Inc. S'holders Litig.,
    No. 1956-CC, 2008 WL 762482 (Del. Ch. Mar. 17, 2008)..............................................10

Katell v. Morgan Stanley Group, Inc., No. 12343,
    1993 WL 390525, 19 Del. J. Corp. L. 797 (Del. Ch. Sept. 27, 1993) ................................8

Pompeo v. Hefner, CIV. A. Nos. 6806, 6872,
    1983 WL 20284 (Del. Ch. March 23, 1983) ......................................................................8

Weiser v. Grace, 683 N.Y.S.2d 781 (N.Y. Sup. 1998).................................................................7

**STATUTES**

Va. Code Ann. § 13.1-672.1 .........................................................................................................8

Va. Code Ann. § 13.1-672.4 .........................................................................................................9

North Carolina General Statutes § 55-7-43 ................................................................................9

**MISCELLANEOUS**

Charles A. Wright & Arthur R. Miller,
    Federal Practice & Procedure § 3828 (2008) .....................................................................3

Model Business Corporation Act Ann., § 7.42 (4th ed. 2008) .....................................................8

## PRELIMINARY STATEMENT

### Plaintiff Has Failed To Comply With The Court's July 17, 2008 Order.

In Plaintiff's Application to Take Discovery, And, In The Alternative, Opposition To Nominal Defendant Freddie Mac's Motion To Transfer Or Stay (the "Application"), Plaintiff has attempted to subvert the schedule this Court set by order dated July 17, 2008 (the "Order"),[1] which provided for the orderly and efficient resolution of issues relating to Freddie Mac's pending Motion to Transfer Venue Or, Alternatively, Stay The Proceedings (the "Motion"). The Order states, in pertinent part:

> (1) By August 1, 2008, Plaintiffs shall serve and file any application to take discovery in connection with defendant's motion to transfer or stay. (2) Defendants shall answer the application by August 22, 2008. (3) Plaintiffs shall submit any reply by September 3, 2008. **(4) Within 45 days of a determination denying plaintiffs' discovery application or of the completion of any discovery permitted, plaintiffs shall answer defendants' motion to transfer or stay. (5) Within 30 days of plaintiffs' answer to the motion to transfer or stay, defendants shall submit any reply.**

Order (emphasis added.)

Instead of complying with the agreed upon schedule as set forth in the Order, Plaintiff has made an application for discovery and submitted an opposition to the motion to transfer or stay. Plaintiff's action makes little sense because it places the parties in the position of potentially having to submit two rounds of briefs on the merits of Freddie Mac's transfer request. Given the obvious inefficiency of Plaintiff's approach and the fact that it is contrary to the Order, Freddie Mac submits, in compliance with the Order, its arguments opposing Plaintiff's application for discovery. In accordance with the Order, Freddie intends to submit its reply brief supporting its motion to transfer or stay following either the denial of Plaintiff's request for discovery or the completion of any discovery that the Court grants to Plaintiff. In the event that this Court prefers that Freddie Mac file on some earlier date its reply brief supporting its motion to transfer or stay,

---

[1] That Order arose out of an agreement reached by the parties, in consultation with this Court, in the teleconference hearing held on July 17, 2008.

C:\Temp\Temporary Internet Files\OLK68\Freddie_Deriv -- opp to motion to compel FINAL (4).DOC

Freddie Mac respectfully requests that the Court amend the Order and set a new deadline for the submission of that brief.

**The Court Should Deny Plaintiff's Request For Discovery.**

Plaintiff has sought discovery relating to the transfer and stay issues.[2] This Court should refuse to allow any discovery into either of these matters.

Numerous cases hold that litigants are not entitled to discovery in connection with pending motions to transfer. See infra Part I.A. In fact, as the Second Circuit has observed, it is "well-established practice" in this Circuit for courts to decide venue motions on the basis of affidavits, even when the defendant seeks dismissal of an action on forum non conveniens grounds. Alcoa Steamship Co. v. M/V Nordic Regent, 654 F.2d 147, 158 (2d Cir. 1980), cert. denied, 449 U.S. 890 (1980). Discovery is even less appropriate here, because the Motion does not seek dismissal; it simply seeks transfer of venue to the Eastern District of Virginia where, among other things, Freddie Mac is headquartered and the vast majority of its employees are located. Furthermore, plaintiff's proposed discovery, though wide-ranging, is not germane to the allegations in the Complaint or to the convenience of the parties and witnesses.

It is equally well established that courts do not permit discovery concerning a corporate Special Litigation Committee ("SLC") while the SLC's investigation is ongoing. See infra Part II.A. Plaintiff's extraordinary and intrusive discovery request concerning the nominal defendant's SLC (e.g., Plaintiff seeks information about witnesses the SLC has interviewed, what their "planned testimony" at trial would be, and a 30(b)(6) deposition of Hunton & Williams LLP, the attorneys for the SLC) is inappropriate. As courts hold, the proper time for

---

[2] Plaintiff seeks discovery on, inter alia, the number of shareholders located in and around New York and Virginia, the dates and locations of meetings of Freddie Mac's Board of Directors, the home address of any Board members and senior officers, the number and states of origin of mortgages purchased by Freddie Mac, the amounts and the identities of any purchase or selling agents for any mortgage-backed securities purchased or sold by Freddie Mac, and the status and plan for completion of any purported investigation by the Special Litigation Committee. See Exhibits G and H to the Application.

the limited discovery concerning the SLC that is allowed under Virginia law would be if and when the SLC's recommendations concerning this litigation are before the Court.

For these reasons, as explained further below, Plaintiff's Application should be denied.

## ARGUMENT

I.  **THIS COURT SHOULD DENY PLAINTIFF'S APPLICATION TO TAKE DISCOVERY RELATING TO VENUE ISSUES.**

A.  **Courts Routinely Deny Motions To Take Discovery Relating To Motions To Transfer Venue.**

As Wright & Miller's civil practice treatise states: "[c]ourts normally will deny a plaintiff's motion for extensive discovery on a forum non conveniens motion and often will decide the issue on affidavits alone." 14D Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 3828 (2008). Indeed, requiring an investigation into the appropriate venue would defeat the purpose of a forum non conveniens motion. Id. at § 3828 n.18 (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235, 258 (1981)).

In the Second Circuit in particular, courts have decided motions to dismiss on forum non conveniens grounds based solely on affidavits. Transunion Corp. v. PepsiCo, Inc., 811 F.2d 127, 130 (2d Cir. 1987) (affirming dismissal and holding that trial court did not abuse discretion when it granted a protective order preventing discovery on forum non conveniens issues). In fact, "it is the well established practice in the Southern District of New York to decide such motions on affidavits." Alcoa Steamship Co., 654 F.2d at 158;[3] see also Varnelo v. Eastwind Transp., Ltd., No. 02-CV-2084, 2003 WL 230741, at *4 n.10 (S.D.N.Y. Feb. 3, 2003) (dismissing case on forum non conveniens grounds and noting that the court previously had denied related discovery).

---

[3] See also id. ("The district court took the motion to dismiss on submission, based on the pleadings, affidavits and briefs of the parties - a practice long recognized as acceptable and followed from time immemorial in the busy Southern District of New York in determining forum non conveniens motions.")

Freddie Mac, of course, seeks transfer, not dismissal.  Not surprisingly, courts are even less inclined to permit discovery on venue motions where the movant seeks only a transfer of venue.  See Silverman v. Wellington Mgmt. Co., 298 F. Supp. 877, 881 (D.C.N.Y. 1969) (denying discovery in connection with motion to transfer venue, and observing that plaintiffs were "not threatened with dismissal").  For this reason, denial of discovery is particularly appropriate here.

Plaintiff, on the other hand, is unable to come forward with any convincing authority for its position.  Plaintiff has cited only one decision in which a court allowed limited discovery in connection with a transfer motion, (see George v. Kraft Foods Global, Inc., No. 06-cv-798, 2006 WL 3842169 (S.D. Ill. Dec. 22, 2006)), and that decision, which is not even from this Circuit, contains no analysis of the propriety of allowing discovery in these circumstances and is contrary to this Circuit's long-standing precedent.  Moreover, the two cases from this Circuit that Plaintiff relies upon are in fact consistent with Freddie Mac's position that courts should decide motions to transfer on affidavits alone.  See In re Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765, 812-819 (S.D.N.Y. 2005) (motion to dismiss on personal jurisdiction grounds); PI, Inc. v. Valcour Printed Papers, 465 F. Supp. 1218, 1220 (S.D.N.Y. 1979) (motions to dismiss on personal jurisdiction and venue grounds).  In both cases, the moving party was seeking dismissal, not a change of venue, and the In re Terrorist Attacks case did not even involve venue, but rather personal jurisdiction.  In short, a wealth of authority supports the denial of Plaintiff's Application for transfer-related discovery.

**B.    Plaintiff's Proposed Discovery Is Not Probative Of Venue.**

Moreover, Plaintiff's proposed discovery is excessive and irrelevant.[4]  The gravamen of Plaintiff's Complaint is the alleged mismanagement by certain current and former officers and directors, including alleged failures to implement sufficient risk management controls and to tighten underwriting standards (see Compl., ¶¶ 4(a), 4(g)), as well as the issuance of allegedly false statements to the Company's stockholders and the public (see Compl., ¶ 4(f)).  As set forth in the Motion and accompanying Cole Affidavit, virtually all of this alleged wrongdoing would have occurred in Virginia, where Freddie Mac maintains its headquarters and most of its other offices, and where most of its employees work.

As set forth in the Motion, a non-exclusive list of factors that courts consider when determining the most appropriate venue includes:  (1) the convenience of witnesses; (2) the convenience and means of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of the operative facts; (5) trial efficiency and the interest of justice based on the totality of the circumstances; (6) a forum's familiarity with the governing law; and (7) plaintiff's choice of forum.  See Cartier v. D&D Jewelry Imports, 510 F. Supp. 2d 344, 346 (S.D.N.Y. 2007).  Courts routinely hold that the convenience of witnesses is the most important factor in the transfer of venue analysis.  See, e.g., Laborers Local 100 & 397 Pension Fund v. Bausch & Lomb Inc., No. 06 Civ. 1942, 2006 WL 1524590, at *5 (S.D.N.Y. June 5, 2006).  Plaintiff's proposed discovery is at best tangential to these factors.

For example, Plaintiff seeks to propound interrogatories concerning "the number of home mortgages originating" in New York and Virginia and the "lenders from whom Freddie Mac purchased home mortgages during the Relevant Time Period."  This information is irrelevant.

---

[4] Plaintiff's sincerity in its request for discovery is questionable.  By disregarding the Order and submitting a brief that addresses the merits of Freddie Mac's transfer request, Plaintiff obviously was able to provide at this time an extensive - - albeit unconvincing - - discussion of the reasons it opposes the transfer, without its requested discovery.

The Complaint alleges that Freddie Mac's "board of directors and senior management failed to implement sufficient risk management controls to protect the Company from acquiring billions of dollars worth of mortgages with lax and/or non-existent underwriting standards. . . ." Compl. ¶ 4a.  What is relevant for purposes of the Motion, therefore, is where Freddie Mac's alleged "failures" occurred, and where the witnesses and documents relative to Freddie Mac's "risk management controls" and "underwriting standards" are located:    Virginia.    Indeed, it is immaterial whether more loans were "originated" in New York than in Virginia since the allegations of the Complaint plainly relate to Freddie Mac's risk management with respect to its nationwide activities.  Compl. ¶ 30 ("Freddie Mac is a publicly traded company established by Congress in 1970 to stabilize the nation's residential mortgages markets…."); Plaintiff's App. at 15 (assuming that mortgages were originated "from more populous states such as New York, Florida and California, rather than Virginia").   As set forth in the Motion, Freddie Mac's operations with respect to its nationwide activities are <u>centralized</u> at its headquarters in Virginia and in other Virginia locations where the vast majority of its employees work.  Not incidentally, the very information that Plaintiff seeks concerning loan origination and risk management is created, compiled and maintained at Freddie Mac's headquarters in Virginia, as are the employees who would testify about such information.

By way of further example, Plaintiff's request for discovery concerning the volume of Freddie Mac debt obligations, issued through the Federal Reserve Bank, runs even farther afield.  Plaintiff's argument that the Federal Reserve Bank of New York acts as an "agent" for "foreign governments" purchasing Freddie Mac obligations has no bearing on any allegations of the Complaint, which makes no mention of the Federal Reserve Bank of New York or foreign governments in its lengthy purported description of "The Operations of Freddie Mac."  <u>See</u> <u>Beekmans v. J.P. Morgan & Co.</u>, 945 F. Supp. 90, 95 (S.D.N.Y. 1996) (granting motion to dismiss based on forum non conveniens and denying discovery where plaintiff did not show how

it "could affect the outcome of this motion" and the "limited connection" plaintiff sought to establish through discovery "would not outweigh the centrality" of the alternative venue).[5] Likewise, the Plaintiff has failed to show in any meaningful way how its discovery could change the outcome of the Motion.

## II.    THIS COURT SHOULD DENY PLAINTIFF'S APPLICATION TO TAKE DISCOVERY RELATING TO STAY ISSUES.

### A.    Courts Do Not Permit Discovery Concerning An SLC Or Its Investigation While The SLC's Investigation Is Pending.

Plaintiff seeks discovery purportedly "relating to the independence and conclusions of an SLC." Plaintiff's App. at 24. Thus, Plaintiff seeks the Court's permission to subject the SLC to interrogatories and to a deposition of the SLC's counsel concerning, among other things, the witness testimony the SLC has received to date, including the "substance" of what the so-called "planned testimony" would be at a trial of this matter. (See Exhibits G and H to the Application.) Discovery of this kind flouts well-established law, as Plaintiff himself appears to recognize. Indeed, he observes: "[S]uch discovery is typically conducted **after** an SLC has filed its report and recommendations," if granted by motion made at that time. Plaintiff's App. at 24 (emphasis added).

In fact, the principal case that Plaintiff relies upon in support of his Application on SLC-related discovery is a decision in which the court granted a motion to stay discovery, specifically rejecting a plaintiff's effort to take discovery concerning the independence of an SLC while the SLC's investigation was pending. See Strougo on Behalf of Brazil Fund, Inc. v. Padegs, 986 F. Supp. 812, 815 (S.D.N.Y. 1997). More specifically, in Strougo, the Court stated:

> The independence of the SLC is a factor which the Court would consider **when and if** it is faced with reviewing the SLC's recommendations. This issue, however, is more appropriate to address at that time, rather than now, when the

---

[5] Even if discovery were appropriate in these circumstances -- and it is not -- this Court should deny the broad discovery sought here.

C:\Temp\Temporary Internet Files\OLK68\Freddie_Deriv -- opp to motion to compel FINAL (4).DOC

full facts of the Committee's procedures and investigation would be available for
review."

986 F. Supp. at 815 (emphasis added).  In the only other case cited by Plaintiff to support his
argument, Weiser v. Grace, 683 N.Y.S.2d 781 (N.Y. Sup. 1998), the Court allowed limited
discovery **after** the SLC had filed a motion to dismiss the pending action, not before.  Id. at 118.

Indeed, the cases cited by Plaintiff are not the only ones in which courts have rejected
efforts to question the independence of an SLC prior to the SLC completing its investigation.
See Katell v. Morgan Stanley Group, Inc., No. 12343, 1993 WL 390525, at *2, 19 Del. J. Corp.
L. 797, 802 (Del. Ch. Sept. 27, 1993) ("[A] challenge to a special litigation committee's
independence is premature if it comes before the special litigation committee has made a
recommendation of dismissal to the proper judicial authority."); Pompeo v. Hefner, CIV. A. Nos.
6806, 6872, 1983 WL 20284 (Del. Ch. March 23, 1983) (refusing to consider independence of
special litigation committee prior to the committee's completion of its investigation).

**B.    This Court Should Deny Plaintiff's
        Discovery Request Based Upon Virginia Law.**

Plaintiff's application for discovery should be denied given the very authorities that
mandate a stay of all proceedings pending an SLC's investigation.   The Virginia Stock
Corporation Act, which is based on the Model Business Corporation Act, provides that "no
shareholder shall commence a derivative suit unless the shareholder makes a demand and:  (1) 90
days have passed; (2) the shareholder's demand is rejected within 90 days; or (3) the corporation
would suffer irreparable harm if the shareholder waited for the 90 days to expire.  Va. Code
Ann. § 13.1-672.1(B); see also Firestone v. Wiley, 485 F. Supp. 2d 694, 701 n.7 (E.D. Va. 2007)
(dismissing claims where plaintiff failed to make demand).  This demand rule is "intended to
give the derivative corporation itself the opportunity to take over a suit which was brought on its
behalf in the first place, and thus to allow the directors the chance to occupy their normal status
as conductors of the corporation's affairs."  2 Model Business Corporation Act Ann., § 7.42 (4th
ed. 2008) (internal quotations and citation omitted) (emphasis added).  Further, "deference to
directors' judgments may also result in the termination of meritless actions brought solely for

their settlement or harassment value." Id.

Virginia's Act further provides that "[i]f the corporation commences a review and evaluation of the allegations made in the demand or complaint, <u>the court may stay any derivative proceeding for such period as the court deems appropriate</u>." VA CODE ANN. § 13.1-672.1(C) (emphasis added). Like Virginia's demand requirement, the clear purpose of this provision is to give the corporation due opportunity to consider whether maintaining the suit is in the best interests of the corporation, on whose behalf the suit is brought.

Significantly, the SLC process provides a mechanism for the dismissal of a case in the event the SLC determines "that the maintenance of the derivative proceeding is not in the best interests of the corporation." VA CODE ANN. § 13.1-672.4. In essence, the statute provides that a court must dismiss a derivative complaint if a quorum of disinterested directors or a committee of disinterested directors appointed by a majority vote of disinterested directors: (1) conducted a review and evaluation -- adequately informed in the circumstances -- of the allegations; (2) determined in good faith that the claim is not in the corporation's best interests; and (3) submits in support of a motion to terminate a short and concise statement of its reasons for rejecting the demand. Id.

Upon receiving Plaintiff's demand letter, the Freddie Mac's Board of Directors created the SLC to, among other things, investigate the allegations in the demand letter - the same allegations that form the basis of the Complaint. In these circumstances, "[c]ourts normally grant a stay of proceedings for a reasonable period of time to permit an SLC to complete its investigation." In re Take-Two Interactive Software, Inc. Deriv. Litig., No. 06 Civ. 05279, 2007 WL 1875660, at *2 (S.D.N.Y. June 29, 2007).

For example, in Wright v. Krispy Kreme Doughnuts, Inc., No. 04 CV 00832, 2005 WL 1719927 (M.D.N.C. Apr. 4, 2005), the court granted a motion to stay under North Carolina's stay provision, North Carolina General Statutes § 55-7-43, which is identical to the Virginia provision. The court held that "because the findings of the Special Committee will play an important role in the outcome of the action, a stay is warranted." Id. at *1; see also In re Take-

Two Interactive Software, Inc., 2007 WL 1875660, at *2 (noting that "[c]ourts normally grant a stay of proceedings for a reasonable period of time to permit an SLC to complete its investigation" and citing cases, including one in which a court granted stay of twelve months from the time that the special litigation committee was formed); Curtis v. Nevens, 31 P.3d 146, 149 (Colo. 2001) ("Most courts grant a stay once an SLC has been appointed. . . . The reason for granting a stay in such cases is to allow the SLC time to finish its task, that is to determine whether it is in the best interests of the corporation to maintain the derivative suit.") (citations omitted).

Indeed, if a case is not stayed while "a duly authorized litigation committee was investigating whether or not it would be in the best interests of the corporation" -- precisely the type of "review and evaluation" referred to in Virginia's stay provision -- then "the very justification for creating the litigation committee in the first place might well be subverted." In re infoUSA, Inc. S'holders Litig., No. 1956, 2008 WL 762482, at *2 (Del. Ch. Mar. 17, 2008) (Chandler, C.) (granting stay under Delaware law). Likewise, as the court in Curtis v. Nevens explained:

> "[A] plaintiff's efforts to continue discovery at the same time as the special litigation committee conducts its investigation may impede the committee's mission to determine the best interests of the corporation. Thus, the right of the independent committee to investigate and report its findings must take priority over any entitlement of the plaintiff to go forward with the pending action."

Curtis, 31 P.3d at 154 -155.

In view of the foregoing case law, Plaintiff's Application to take discovery relating to the SLC should be denied. Numerous cases hold that derivative plaintiffs should not be entitled to discovery relating to an SLC's investigation prior to the completion of the investigation. In contrast, Plaintiff cites no cases -- **none** -- in which a court permitted discovery concerning an SLC's independence before the SLC had completed its investigation. Nor does Plaintiff identify any good reason for taking this discovery now, particularly where the discovery will impede the investigation and impose costs that may prove unnecessary.

10

**III.    AS THE COURT ORDERED, THE APPLICATION TO TAKE DISCOVERY SHOULD BE DECIDED BEFORE FREDDIE MAC FILES A REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO TRANSFER OR STAY.**

For the reasons discussed above, Plaintiff's Application does not comport with the framework established by the Court for the orderly disposition of the issues it addressed at the July 17, 2008 hearing and the Order issued that day.  Consistent with that Order, Plaintiff's application to take discovery should be decided before Freddie Mac is required to file a reply memorandum supporting its motion to transfer or stay.  In the event that the Court prefers that Freddie Mac submit its reply brief on some earlier date, Freddie Mac respectfully requests that the Court so inform the parties, amend the July 17, 2008 Order, and set a new deadline for the submission of that brief.

<div align="center">

**CONCLUSION**

</div>

For the foregoing reasons, Plaintiff's application for discovery should be denied.

Dated: New York, New York

August 22, 2008

**BINGHAM McCUTCHEN LLP**

By: /s/Kenneth I. Schacter_____
    Kenneth I. Schacter
    Eugenie Cesar-Fabian

399 Park Avenue
New York, NY 10022-4689
Tel: (212) 705-7000
Fax: (212) 752-5378
kenneth.schacter@bingham.com

-and-

Jordan D. Hershman
Jason D. Frank
**BINGHAM McCUTCHEN LLP**
One Federal Street
Boston, MA  02110-1726
(617) 951-8455
jordan.hershman@bingham.com

Attorneys for Nominal Defendant Federal Home Loan Mortgage Corporation

Westlaw.

Slip Copy                                                                                          Page 1
Slip Copy, 2006 WL 3842169 (S.D.Ill.)

**H** George v. Kraft Foods Global, Inc.
S.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. Illinois.
Gerald GEORGE, et al., individually and as
representatives of a class of similarly situated
persons, Plaintiffs.
v.
KRAFT FOODS GLOBAL, INC., et al., Defendants.
No. 06-cv-798-DRH.

Dec. 22, 2006.

Elizabeth J Hubertz, Jerome J. Schlichter, Schlichter,
Bogard Et Al., Generally Admitted, St. Louis, MO,
for Plaintiffs.
Ian H. Morrison, Ronald J. Kramer, Seyfarth, Shaw
Et Al., Chicago, IL, Larry E. Hepler, Hepler, Broom,
MacDonald, Hebrank, True & Noce LLP, Generally
Admitted, Beth A. Bauer, Burroughs, Hepler Et Al.,
Edwardsville, IL, for Defendants.

### MEMORANDUM & ORDER

HERNDON, District Judge.
*1 This case, which is a putative class action for
breach of fiduciary duty brought pursuant to the
Employee Retirement Income Security Act of 1974,
29 U.S.C. §§ 1001-1461 ("ERISA"), specifically,
ERISA § 502(a)(2) and (a)(3), 29 U.S.C. §
1132(a)(2) and (a)(3), is before the Court on four
motions. Defendants Kraft Foods Global, Inc., Kraft
Foods Global, Inc., Administrative Committee,
Benefits Investment Committee, Jim Dollive, Karen
May, Marc Firestone, and Pamela King, having
moved for transfer of this case to the United States
District Court for the Northern District of Illinois
pursuant to 28 U.S.C. § 1404, also have moved for a
stay of these proceedings pending resolution of
Defendants' transfer motion (Doc. 24). Plaintiffs
Gerald George, Cathy Dunn, Jeanette Burghy,
Timothy Streff, and Andrew Swanson in turn have
moved for an enlargement of time until February 24,
2007, to respond to Defendants' motion for transfer
so that Plaintiffs can conduct limited discovery with
respect to the issue of transfer (Doc. 26). Plaintiffs
also have moved that the Court toll the time for
responding to Defendants' transfer motion while

Plaintiffs' motion for transfer-related discovery is
pending (Doc. 29). Finally, Defendants have moved
for an enlargement of time to respond to Plaintiffs'
motion for class certification until the timetable for
Defendants' response to the class certification request
has been fixed following a scheduling and discovery
conference in this case pursuant to Local Rule 23.1
(Doc. 28).

Turning first to Defendants' motion for a stay of these
proceedings pending resolution of their motion for
transfer, the power to grant a stay is "incidental to the
power inherent in every court to control the
disposition of the causes on its docket with economy
of time and effort for itself, for counsel, and for
litigants." *Walker v. Merck & Co.*, No. 05-CV-360-
DRH, 2005 WL 1565839, at *2 (S.D. Ill. June 22,
2005) (quoting *Landis v. North Am. Co.*, 299 U.S.
248, 254 (1936)). The decision to grant a stay is
committed to a court's discretion; *see Brooks v.
Merck & Co.*, 443 F.Supp.2d 994, 997
(S.D.Ill.2006); *Rutherford v. Merck & Co.*, 428
F.Supp.2d 842, 845 (S.D.Ill.2006), though that
discretion must be exercised consistently with
principles of fairness and judicial economy. *See
Walker*, 2005 WL 1565839, at *2 (citing *Board of
Trs. of Teachers' Ret. Sys. of State of Ill. v.
WorldCom, Inc.*, 244 F.Supp.2d 900, 905-06
(N.D.Ill.2002)). Defendants offer no legitimate
reason for these proceedings to come to a complete
halt while the Court determines whether this action
should be adjudicated in this District or in the
Northern District of Illinois. Any discovery
conducted while Defendants' transfer motion is sub
judice will be useful in this case regardless of the
forum in which the case ultimately proceeds.
Similarly, there is no reason why motions filed in this
Court during the pendency of Defendants' transfer
motion should not be fully briefed in accordance with
the Local Rules, even if those motions ultimately are
decided in another court. Accordingly, Defendants'
request for a stay will be denied.

*2 Turning then to Plaintiffs' motion for an
enlargement of time until February 24, 2007, to
respond to Defendants' motion for transfer so that
Plaintiffs can conduct limited discovery with respect
to the propriety of transfer, this matter, like

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 2
Slip Copy, 2006 WL 3842169 (S.D.Ill.)

Defendants' request for a stay, is committed to the Court's discretion. *See Weeks v. Samsung Heavy Indus. Co.,* 126 F.3d 926, 943 (7th Cir.1997) ("District courts enjoy extremely broad discretion in controlling discovery."); *Indianapolis Colts v. Mayor & City Council of Baltimore,* 775 F.2d 177, 183 (7th Cir.1985) (quoting *United Presbyterian Church in the U.S.A. v. Reagan,* 738 F.2d 1375, 1382 (D.C.Cir.1984)) (noting that trial judges have "wide discretion with respect to discovery matters"; moreover, "a trial court's 'discovery rulings are reversed only on a clear showing of abuse, and ... it is unusual to find abuse of discretion in these matters.'"); *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U.A.,* 657 F.2d 890, 902 (7th Cir.1981) ("The district court has wide discretion within the rules to determine the manner and course of discovery."). The Court concludes that limited discovery will be helpful in making a fully-informed decision regarding transfer and therefore Plaintiffs' request will be granted. *See Worldwide Fin. LLP v. Kopko,* No. 1:03-CV-0428-DFH, 2004 WL 771219, at *1 (S.D.Ind. Mar. 18, 2004) (granting a motion for transfer following six months of discovery with respect to the transfer motion and a motion to dismiss for lack of personal jurisdiction); *PI, Inc. v. Valcour Imprinted Papers, Inc.,* 465 F.Supp. 1218, 1220 (S.D.N.Y.1979) (denying a motion for transfer following limited discovery on the question of transfer). In view of the Court's decision to grant Plaintiffs an enlargement of time until February 24, 2007, to respond to Defendants' motion for transfer, Plaintiffs' request that the Court toll the time for their response to Defendants' transfer motion during the pendency of Plaintiffs' request for transfer-related discovery will be denied as moot.

Finally, the Court addresses Defendants' motion for an enlargement of time to respond to Plaintiffs' motion for class certification pending a scheduling and discovery conference in this case pursuant to Local Rule 23. 1, which provides:

(a) Mandatory Scheduling and Discovery Conference. Proposed class actions pose complex scheduling and discovery issues which are not addressed by the standard "Joint Report of the Parties and Proposed Scheduling and Discovery Order." Accordingly, an initial scheduling and discovery conference with counsel for all parties

present is mandatory in all cases brought as proposed class actions.

The purpose of the mandatory scheduling conference is for the Magistrate Judge to identify the length and scope of discovery necessary for the fair and expeditious determination of whether the case can proceed as a class action. Discovery prior to class certification must be sufficient to permit the court to determine whether the requirements of Federal Rule of Civil Procedure 23 are satisfied, including a preliminary inquiry into the merits of the case to ensure appropriate management of the case as a class action. However, in order to ensure that a class certification decision be issued as soon as practicable, priority shall be given to discovery on class issues.

*3 After the scheduling conference, the Magistrate Judge shall enter the appropriate scheduling and discovery order in light of these concerns. Either party may move to have a second scheduling and discovery order entered after resolution of the motion for class certification.

(b) Joint Report. Seven (7) days prior to the scheduling and discovery conference, the parties shall submit a Joint Report of the Parties and Proposed Scheduling and Discovery Order (Class Action) consistent with the model found in the Forms section of these Local Rules. In the event the parties are unable to agree on a joint scheduling and discovery plan, the parties should each submit their Proposed Scheduling and Discovery Order and a memorandum in support of said order, addressing the issues in dispute seven (7) days prior to the scheduling and discovery conference.

(c) Motion Practice. The timetable for responding to a motion for class certification shall be established at the mandatory scheduling and discovery conference.

S.D. Ill. Local R. 23.1.As subsection (c) of Local Rule 23.1 makes clear, one of the central matters to be addressed at a scheduling and discovery conference under the rule is the timetable for responding to a request for class certification. Although it is certainly within the Court's power to waive the Local Rules in appropriate instances, *see Carr v. Whittenburg,* No. 3:01-cv-625-DGW, 2006 WL 1207286, at *2 n. 1 (S.D.Ill. Apr. 28, 2006), Plaintiffs offer no sound reason for the Court to do so

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2006 WL 3842169 (S.D.Ill.)

in this case. Therefore, the Court will grant
Defendants' request that the time for their response to
Plaintiffs' motion for class certification be enlarged
until such time as a scheduling and discovery
conference under Rule 23.1 is conducted in this case
and a timetable for responding to Plaintiffs' class
certification motion is set by United States Magistrate
Judge Philip M. Frazier, who has been assigned
responsibility for non-dispositive pretrial matters in
this case.

To conclude, Defendants' motion for a stay of these
proceedings (Doc. 24) is **DENIED.**Plaintiffs' motion
for an enlargement of time until February 24, 2007,
to respond to Defendants' motion for transfer so that
Plaintiffs can conduct limited transfer-related
discovery (Doc. 26) is **GRANTED.**Plaintiffs' motion
for the Court to toll the time for Plaintiffs' response to
Defendants' motion for transfer of these proceedings
while Plaintiffs' motion for transfer-related discovery
is pending (Doc. 29) is **DENIED as
moot.**Defendants' motion for an enlargement of time
to respond to Plaintiffs' motion for class certification
until the timetable for responding to the class
certification request has been fixed following a
scheduling and discovery conference in this case
pursuant to Local Rule 23.1 (Doc. 28) is
**GRANTED.**

**IT IS SO ORDERED.**

S.D.Ill.,2006.
George v. Kraft Foods Global, Inc.
Slip Copy, 2006 WL 3842169 (S.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 762482 (Del.Ch.)

**H**In re InfoUSA, Inc. Shareholders Litigation
Del.Ch.,2008
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Re: In re INFOUSA, INC SHAREHOLDERS
LITIGATION.
**Civil Action No. 1956-CC.**

Submitted: March 7, 2008.
Decided: March 17, 2008.

Andre G. Bouchard, Joel Friedlander, Bouchard
Margules & Friedlander, P.A., Wilmington, DE.
Martin P. Tully, Jay N. Moffitt, Morris, Nichols,
Arsht & Tunnell LLP, Wilmington, DE.
Elizabeth M. McGeever, Laina M. Herbert, Prickett,
Jones & Elliott, P.A., Wilmington, DE.
Collins J. Seitz, Jr., Kevin F. Brady, Jeremy D.
Anderson, Connolly Bove Lodge & Hutz LLP,
Wilmington, DE.
R. Bruce McNew, Taylor & McNew LLP,
Wilmington, DE.
Brian C. Ralston, Potter Anderson & Corroon LLP,
Wilmington, DE.

WILLIAM B. CHANDLER III, Chancellor.
*1 Dear Counsel:

Before me are the motion to stay of the Special
Litigation Committee ("SLC") of the Board of
Directors of nominal defendant infoUSA and several
other motions regarding discovery. For reasons I
explain below, I hereby grant the SLC's motion and
stay this action until June 30, 2008. Consequently,
the other pending motions are held in abeyance until
then.

The long, sordid history of this case has been detailed
elsewhere, and in its most recent chapter I determined
that plaintiffs' amended complaint alleging waste and
breach of fiduciary duties was sufficient to withstand
defendants' motion to dismiss.[FN1] Since that time, the
vast leviathan of discovery in cases such as these has

sprung to life, and the quibbles and disputes attendant
to such a process have likewise arisen. On December
24, 2007, in response to the derivative litigation in
this Court and an informal investigation by the
Securities and Exchange Commission, the infoUSA
board decided to form a special committee to review
and analyze the facts and circumstances surrounding
the claims raised in plaintiffs' amended complaint.
About a month later, the SLC's authority was
broadened to include the SEC investigation.

> FN1.See In re infoUSA S'holders Litig., C.A.
> No.1956-CC, 2007 WL 3325921 (Del. Ch.
> Aug. 13, 2007).

The SLC is a five-member committee that includes
two directors the Court previously determined were
disinterested [FN2] and three newly appointed members
of the Company's board. The SLC has retained as
counsel the firms of Covington & Burling LLP and
Bouchard Margules & Friedlander, P.A., both of
which are familiar with representing special
committees. On January 30, 2007, the SLC moved to
stay this case for 150 days to allow it to investigate
the claims and issues and to determine what action is
in the best interests of the Company's shareholders.

> FN2.See id.

Plaintiffs oppose the stay. They argue that the SLC
was formed "too late" to now obtain a stay in this
case. Even if the SLC were properly formed,
plaintiffs contend, a stay should still be denied
because the SLC is advisory, because the SLC has
not acted independently, and because the SLC's
members are not independent.

It is well established that even in cases where demand
is excused, a committee of disinterested directors
may properly act for the board in the context of
derivative litigation.[FN3] Over twenty years ago,
Chancellor Brown explained the importance of
staying such litigation when a corporation forms an
SLC:

> FN3.See Zapata Corp. v. Maldonado, 430
> A.2d 779 (Del.1981); 1 EDWARD P.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 762482 (Del.Ch.)

WELCH, ANDREW J. TUREZYN, AND ROBERT S. SAUNDERS, FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 41.9 (5th ed.2007 supp.); *see also* *Kaufman v. Computer Assocs. Int'l, Inc.*, C.A. No. 699-N, 2005 WL 3470589, at *3 (Del. Ch. Dec. 13, 2005) ("A special litigation committee formed in accordance with the landmark decision in *Zapata Corp. v. Maldonado* has broad powers to control litigation filed nominally on behalf of a corporation. Once such a committee is formed and takes control of a derivative litigation, the committee typically moves for a stay of all proceedings to allow it to complete its investigation promptly and without undue interference."(footnotes omitted))

If *Zapata* is to be meaningful, then it would seem that such an independent committee, once appointed, should be afforded a reasonable time to carry out its function. It would likewise seem reasonable to hold normal discovery and other matters in abeyance during this interval. If a derivative plaintiff were to be permitted to depose corporate officers and directors and to demand the production of corporate documents, etc. at the same time that a duly authorized litigation committee was investigating whether or not it would be in the best interests of the corporation to permit the suit to go forward, the very justification for the creating of the litigation committee in the first place might well be subverted.[FN4]

FN4. *Abbey v. Computer & Commc'ns Tech. Corp.*, 457 A.2d 268, 375 (Del. Ch 1983).

*2 Thus, this Court has routinely granted reasonable stays to allow SLCs to complete their investigations.[FN5]

FN5. *E.g.*, *Chearal Inv. Co., Inc. v. Rockefeller*, C.A. No. 14397, 1995 WL 684869 (Del. Ch. Nov. 7, 1995).

Plaintiffs have not convinced me that this case presents an exception to the general rule. Plaintiffs' first argument-that the committee was somehow formed "too late"-misses the mark. The fact that I have already determined demand is excused

demonstrates why the board *must* act by means of a committee; it does not in any way explain why it cannot act through an SLC. The Supreme Court has explicitly noted that "even in a demand-excused case, a board has the power to appoint a committee of one or more independent disinterested directors to determine whether the derivative action should be pursued or dismissal sought."[FN6] Indeed, this Court has previously granted an SLC's motion to stay *after* determining that demand is excused.[FN7]

FN6. *Aronson v. Lewis*, 473 A.2d 805, 813 (Del.1984), *overruled on other grounds by* *Brehm v. Eisner*, 746 A.2d 244 (Del.2000).

FN7. *Compare* *Katell v. Morgan Stanley Group, Inc.*, C.A. No. 12343, 1993 WL 205033, at *1 (Del. Ch. June 8, 1993) (determining that plaintiffs alleged demand futility and were excused from making demand on the board), *with* *Katell v. Morgan Stanley Group, Inc.*, C.A. No. 12343, 1993 WL 390525 at *4 (Del. Ch. Sept. 27, 1993) (granting SLC's motion to stay proceedings).

Second, plaintiffs express concern that the board resolution empowering the SLC created merely an advisory committee with little or no actual power. I do not read the resolution to do so. The resolution affirms "that the SLC shall have the authority to investigate, review, and analyze the facts and circumstances that are the subject of the Derivative Litigation, as well as any additional facts and circumstances that may be at issue in any related governmental inquiry, investigation, or proceeding ...." The resolution further grants the SLC "full and exclusive authority to consider and determine whether or not the prosecution of the claims asserted in the Derivative Litigation ... is in the best interests of the Company and its shareholders, and to further consider and determine what action should be taken on behalf of the Company with respect to the Derivative Litigation and any related governmental inquiry, investigation, or proceeding...." This language is mandatory and vests the SLC with the "full and exclusive authority" to investigate the pending claims and to "determine" what course of action the Company should take. I am confident, therefore, that the SLC has the authority it needs to conduct its investigation and that the Company

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 762482 (Del.Ch.)

knows how unpleasant a forum this Court will become if it tries to impede or interfere with the SLC's work.

Finally, plaintiffs' challenge to the independence of the SLC is not appropriately considered at this time. Plaintiffs' allegations with respect to the independence of the committee's members and actions do not amount to the highly unusual circumstances present in *Biondi v. Scrushy*[FN8] and, therefore, I agree with Vice Chancellor Strine that "judicial economy is served by permitting [the independence] issue to be addressed after the committee has issued its report, because the court may then consider questions of committee independence at the same time it examines the reasonableness of the bases for the committee's conclusion."[FN9] I reiterate Vice Chancellor Lamb's admonition that "both the independence of the SLC and the good faith of its inquiry [will] be the subject of close scrutiny if the investigation result[s] in a recommendation that the litigation be dismissed."[FN10]

FN8. 820 A.2d 1148 (Del. Ch.2003).

FN9. *Id.* at 1164.

FN10. *Sutherland v. Sutherland*, C.A. No. 2399-VCL, 2008 WL 571253, at *1 (Del. Ch. Feb. 14, 2008).

*3 Consequently, as this Court "almost invariably" does, I hereby grant the SLC's motion to stay.[FN11] The SLC appears to have been properly formed, and the fact that it was formed after demand was excused does not render its formation "too late." Moreover, the SLC has been given adequate authority and power by the Company's board to conduct its investigation and determine what course of action is in the best interests of the shareholders. Because at present there are no "undisputed facts [that] will make it impossible for the court later to accept a decision of the special litigation committee to terminate the derivative litigation,"[FN12] the Court will defer its evaluation of the SLC's independence until the time the SLC moves to dismiss-should it ever do so. Moreover, because I am granting this stay, I need not rule on the pending discovery motions.

FN11. *Biondi*, 820 A.2d at 1164.

FN12. *Id.* at 1165.

IT IS SO ORDERED.

Very truly yours,

/s/ *William B. Chandler III*

William B. Chandler III

Del.Ch.,2008.
In re InfoUSA, Inc. Shareholders Litigation
Not Reported in A.2d, 2008 WL 762482 (Del.Ch.)

END OF DOCUMENT

Westlaw.

Not Reported in A.2d                                                                Page 1
Not Reported in A.2d, 1993 WL 390525 (Del.Ch.), 19 Del. J. Corp. L. 797

**H** Katell v. Morgan Stanley Group, Inc.
Del.Ch.,1993.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
Gerald KATELL and Desert Equities, Inc., Plaintiffs,

v.

MORGAN STANLEY GROUP, INC.; Morgan
Stanley & Co. Incorporated; Cigna Corp.; Morgan
Stanley Leveraged Equity Fund, L.P.; Cigna Capital
Advisors, Inc.; Cigna Leveraged Capital Fund, Inc.;
Morgan Stanley Leveraged Capital Fund, Inc.;
SIBV/MS Holdings, Inc.; Jefferson Smurfit Corp.;
Container Corporation of America; Silgan Holdings
Inc.; Silgan Corporation; Donald P. Brennan and
Alan E. Goldberg, Defendants.
CIV. A. No. 12343.

Submitted: Aug. 17, 1993.
Decided: Sept. 27, 1993.

**799** Joseph A. Rosenthal, of Rosenthal, Monhait,
Gross & Goddess, P.A., Wilmington, Harold E. Kohn
and Joanne Zack, of Kohn, Nast & Graf, P.C.,
Philadelphia, PA of counsel: Elwood S. Kendrick,
Law Office of Elwood S. Kendrick, Inc., and Nancy
Miller Bennett, Los Angeles, CA, for plaintiffs.
A. Gilchrist Sparks, III and David G. Thunhorst of
Morris, Nichols, Arsht & Tunnell, Wilmington, of
counsel: Lewis A. Kaplan, Allan J. Arffa, and Stuart
M. Cohert, of Paul, Weiss, Rifkind, Wharton &
Garrison, New York City for defendants Morgan
Stanley Group Inc., Morgan Stanley & Co. Inc.,
Morgan Stanley Leveraged Capital Fund, Inc., The
Morgan Stanley Leveraged Equity Fund, L.P.,
Donald P. Brennan and Alan E. Goldberg.
Peter J. Walsh, of Bayard, Handelman & Murdoch,
P.A., Wilmington, of counsel: Marc P. Cherno, and
Jane Wasman, of Fried, Frank, Harris, Shriver &
Jacobson, New York City, for defendants CIGNA
Corp., CIGNA Capital Advisers, Inc. and CIGNA
Leveraged Capital Fund, Inc.
Kevin G. Abrams, of Richards, Layton & Finger,
Wilmington, of counsel: Thomas A. Reynolds III,
David B. Love, and Frank H. Langrock, of Winston
& Strawn, Chicago, for defendants SIBV/MS

Holdings, Inc., Jefferson Smurfit Corp. and Container
Corp. of America.
Allen M. Terrell, Jr., of Richards, Layton & Finger,
Wilmington, of counsel Kenneth M. Kramer.
**800** Michael W. Jahnke, and James R. Warnot, Jr.,
of Shearman & Sterling, New York City, for
defendants Silgan Holdings, Inc. and Silgan Corp.

MEMORANDUM OPINION

CHANDLER, Vice Chancellor.
*1 In this derivative action initiated on behalf of The
Morgan Stanley Leveraged Equity Fund, L.P. (the
"Partnership"), two limited partners of the
Partnership ("plaintiffs") are alleging that the general
partners of the Partnership breached the fiduciary
duty they owed to the Partnership when they entered
into certain transactions. In response to the filing of
this suit, Morgan Stanley Leveraged Capital Fund
Inc. ("Morgan Stanley Capital") and CIGNA
Corporation ("CIGNA"), the two general partners of
the Partnership (collectively "defendants"), and
eighty percent in interest of the limited partners of the
Partnership designated a Special Litigation
Committee (the "Committee") to investigate the
allegations of the complaint. The Partnership granted
the Committee the authority to request to the
appropriate judicial authority, after such
investigation, prosecution or termination of the
action. Consequently, Morgan Stanley Capital and
CIGNA move that all proceedings in this action be
stayed pending the report of the Committee.

Previously, in *Katell v. Morgan Stanley Group, Inc.,*
Del.Ch., C.A. No. 12343, Chandler, V.C., slip op. at
5, I held that the *Zapata* special committee doctrine
can be extended to Delaware partnership law, on a
case-by-case basis, when partners "create[ ] a valid
special litigation committee in accordance with the
terms of their particular partnership agreement." In
that case, I found that the Partnership had not created
a valid special litigation committee because the
agreement purporting to create the litigation
committee (the "First Agreement") violated the
contract governing the Partnership, the Agreement of
Limited Partnership dated July 31, 1985 (the
"Partnership Agreement"). Specifically, I found that
the First Agreement violated the Partnership

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                 Page 2
Not Reported in A.2d, 1993 WL 390525 (Del.Ch.), 19 Del. J. Corp. L. 797

Agreement because the First Agreement was an amendment to the Partnership Agreement that was not duly approved by both general partners and more than fifty percent in interest of the limited partners. *See Katell, supra.*

Subsequent to this decision, Morgan Stanley Capital, CIGNA and eighty percent in interest of the limited partners consented to an amendment to the Partnership Agreement (the "Amendment") which purports to designate CIGNA as a special committee of the general partners for the purpose of investigating the claims in this **801 action and, after such investigation, requesting to the appropriate judicial authority, prosecution or termination of the action.

Unlike the First Agreement, the Amendment appears to be in accordance with the terms of the Partnership Agreement. Article XIV of the Partnership Agreement provides that the terms and provisions of the Partnership Agreement may be modified with the written consent of both general partners and those limited partners whose contributions constitute more than 50% of all capital contribution then made to the Partnership. The Amendment, because it is a modification of Section 3.1 of the Partnership Agreement,[FN1] requires approval by written consent of both general partners and more than fifty percent in interest of the limited partners. Both general partners, CIGNA and Morgan Stanley Capital, and nineteen limited partners whose contributions constitute eighty percent of all capital contributions of the partnership, consented to the Amendment. As a result, the Amendment creating the Committee complies with the provisions of the Partnership Agreement and consequently the *Zapata* special litigation committee doctrine can be applied to this situation.

> FN1. In *Katell, supra,* I found that the First Agreement modifies Section 3.1 of the Partnership Agreement because it allows one general partner to make determinations concerning the initiation and settlement of legal actions in direct contradiction of Section 3.1 of Partnership Agreement which provides that such determinations must be made by both general partners - acting together. Because the Amendment is an exact replica of the First Agreement, it, too,

is a modification of Section 3.1 of the Partnership Agreement.

*2 Plaintiffs, in fact, do not really challenge the above result. Rather, they assert that the Committee is not a proper special litigation committee under *Zapata* and its progeny. Plaintiffs contend that *Zapata* requires the establishment of an *independent* litigation committee. Subsequently, they assert that the Committee is not independent and that it is defendants' burden to prove the independence of the Committee.[FN2] I find plaintiffs' argument wholly misplaced.

> FN2. In fact, both plaintiffs and defendants spend the greater portion of their briefs arguing the independence, or lack thereof, of the special litigation committee.

At this point in time, alleged lack of independence of the special litigation committee "forms no basis to deny [the Partnership] of the *Zapata* advantage of utilizing the litigation committee approach." *Pompeo v. Hefner, Lewis v. Hefner,* Del.Ch., C.A. Nos. 6806, 6872, Brown, C., slip op. at 3 (March 23, 1983) (letter opinion). This is **802 true because a challenge to a special litigation committee's independence is premature if it comes before the special litigation committee has made a recommendation of dismissal to the proper judicial authority.

*Zapata* provides the steps by which a court must judge the recommendation of a special litigation committee. Among other things, a court should consider the independence of the committee and the bases upon which the committee's decision is based. But, a court does not look at these factors *until after* the special litigation committee has made a recommendation to dismiss the suit. Before such a recommendation is made, challenges to the committee's independence are simply inappropriate.

The *Hefner* cases cited above provide a near perfect example of the prematurity of plaintiffs' charge. There, shareholders of Playboy challenged the independence of the Playboy Board of Director's special litigation committee. In rejecting the shareholder's assertions, Chancellor Brown stated,

*Zapata* starts with the assumed premise that the

Not Reported in A.2d
Not Reported in A.2d, 1993 WL 390525 (Del.Ch.), 19 Del. J. Corp. L. 797

board, or a majority of it, is tainted by an alleged self-interest. This naturally gives rise to immediate common-sense suspicion as to the true independence of a new or untainted director who is appointed by the board as an independent committee to investigate the worthiness of the charges of wrongdoing made against the members of the appointing board.

Under *Zapata*, however, *the independence of the litigation committee does not take on critical significance until such time as the committee moves this Court to dismiss the derivative action based on the findings of its investigation.* At that point, under *Zapata*, it becomes the function of this Court to pass on the good faith and independence of the litigation committee together with the reasonableness of the basis for its dismissal recommendation. Should the litigation committee not recommend a dismissal, presumably its independence becomes a moot question insofar as the derivative plaintiff is concerned.

*Id.* at 3-4 (citations omitted) (emphasis added). Consequently, Chancellor Brown refused to address the independence of Playboy's special litigation committee.

*3 In *Hefner*, Chancellor Brown recognized the potential for inefficiency if a court declines to rule on a special litigation committee's **803 independence before the committee makes a recommendation to the court, but subsequently refuses to follow the committee's recommendation for dismissal because the committee lacks independence. Consequently, Chancellor Brown seemed to imply that if the constitution of a litigation committee gives rise to a conclusive presumption of lack of independence, it would serve to deprive the corporation's or partnership's power to use the *Zapata* procedure.[FN3] *Id.* at 6.

> FN3. Chancellor Brown stated, "There is nothing of record to indicate that [the appointer of the special litigation committee] has done anything to influence the activities of the Litigation Committee and I cannot conclude that [the appointer's] majority status does so. [Its] majority shareholder status is certainly an element to consider when and if the issue arises under the *Zapata* procedure. However, it is not of

itself a dispositive factor at this point such as, in practical effect, would serve to deprive Playboy's board in advance of the power to utilize the *Zapata* procedure." *Id.* at 5-6.

I find that such a conclusive presumption does not exist in this case. Plaintiffs charge that CIGNA cannot be an independent special litigation committee because it is a defendant in this suit, was a general partner at the time the transactions giving rise to this action took place and has been "controlled by" Morgan Stanley Capital in previous situations. Morgan Stanley Capital, on the other hand, alleges that CIGNA did not have a separate interest in the transactions at issue and is not currently involved in any other financial dealings with Morgan Stanley Capital. Contrary to plaintiffs' assertions, their allegations do not amount to a conclusive presumption of lack of independence; they merely show CIGNA's participation in the ongoing relationship of the Partnership. As a result, I cannot conclude that plaintiffs' allegations give rise to a conclusive presumption that CIGNA, as the special litigation committee, lacks independence.

Moreover, Plaintiffs' allegations in this case are not much different from those in *Zapata* and *Hefner*. In *Zapata*, the plaintiffs challenged the independence of the special litigation committee, asserting that the committee could never be independent because it owed its position and authority to those it was charged to investigate, the Board of Directors. There, the Supreme Court held that a special litigation committee's independence is to be tested judicially *when the committee moves the court to dismiss the action.* *Zapata v. Maldonado*, 430 A.2d 779, 787 (1981). Likewise, in the *Hefner* cases, the plaintiffs alleged that Playboy's special litigation committee lacked independence**804 because the special litigation committee consisted of one person who was appointed by and could be terminated by, and thus, conjectured the plaintiff, could be influenced by, the majority shareholder of Playboy. Following *Zapata*, Chancellor Brown stated that these allegations, if found to be true, were simply "additional evidentiary factor[s] to be considered in the event that [the special committee's] independence is put into issue by a motion of [it] to dismiss the suit." *Hefner*, slip op. at 5. In neither of these cases were the plaintiffs' allegations sufficient to give rise to a conclusive presumption that the committee lacked independence.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1993 WL 390525 (Del.Ch.), 19 Del. J. Corp. L. 797

Page 4

So too, here, plaintiffs have simply failed to show
that the facts of this case give rise to a conclusive
presumption that CIGNA lacks independence.

*4 Because I find that the Partnership's creation of a
special litigation committee complies with the
Partnership Agreement and that the Committee does
not conclusively lack independence, Delaware law
requires that all proceedings in this action be stayed
pending the Committee's investigation. *Kaplan v.
Wyatt,* Del.Ch. 457 A.2d 368 (1983), *aff'd* Del.Supr.
499 A.2d 1184 (1985); *Abbey v. Computer &
Communications Technology Corp.,* Del.Ch. 457
A.2d 368 (1983). The only question that remains is
the length of time the proceedings should be stayed.
According to *Abbey,* the length of the stay of
discovery must be related to the complexity of the
derivative action. *Abbey,* 457 A.2d at 376.
Defendants claim that a review of the two
transactions at issue, both multi-million dollar
transactions involving numerous parties, will take
approximately four to six months. Plaintiffs offer
nothing to dispute this contention. Accordingly, I
grant a stay of the proceedings for five months.
Because I have determined that plaintiffs' allegation
that the special litigation committee lacks
independence is premature, I deny plaintiffs' request
for limited discovery to brief this issue.

IT IS SO ORDERED.

Del.Ch.,1993.
Katell v. Morgan Stanley Group, Inc.
Not Reported in A.2d, 1993 WL 390525 (Del.Ch.),
19 Del. J. Corp. L. 797

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2006 WL 1524590 (S.D.N.Y.)

**C**Johnson v. Bausch & Lomb Inc.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Laborers Local 100 and 397 Pension Fund, On behalf
of Itself and All Others Similarly Situated, Plaintiffs,

v.

BAUSCH & LOMB INC., Ronald L. Zarella,
Stephen C. McCluski, John M. Loughlin, Dwain L.
Hahs, Angela J. Panzarella, Robert B. Stiles, Kamal
Sarbadhikari, Geoffrey F. Ide, and William H.
Waltrip, Defendants.
James Brannon, Individually and On Behalf of All
Others Similarly Situated, Plaintiffs,

v.

Bausch & Lomb Inc., Ronald L. Zarella, Stephen C.
McCluski, John M. Loughlin, Dwain L. Hahs,
Angela J. Panzarella, Robert B. Stiles, Kamal
Sarbadhikari, Geoffrey F. Ide, and William H.
Waltrip, Defendants.
Fred Badaracco, Individually and On Behalf of All
Others Similarly Situated, Plaintiffs,

v.

Bausch & Lomb Inc., Ronald L. Zarella, Stephen C.
McCluski, John M. Loughlin, Dwain L. Hahs,
Angela J. Panzarella, Robert B. Stiles, Kamal
Sarbadhikari, Geoffrey F. Ide, and William H.
Waltrip, Defendants.
Diane JOHNSON, On Behalf of Herself and All
Others Similarly Situated, Plaintiffs,

v.

Bausch & Lomb Inc., Ronald L. Zarella, Stephen C.
McCluski, John M. Loughlin, Dwain L. Hahs,
Angela J. Panzarella, Robert B. Stiles, Kamal
Sarbadhikari, Geoffrey F. Ide, Paul A. Friedman,
Jonathan S. Linen, David Nachbar, The Bausch &
Lomb Employee Benefits Administration Committee,
and John Does 1-30, Defendants.
Gaetano Rainone, Derivatively On Behalf of Bausch
& Lomb Incorporated, Plaintiffs,

v.

Ronald L. Zarella, William H. Waltrip, William M.
Carpenter, Stephen C. McCluski, John M. Loughlin,
Dwain L. Hahs, Angelina J. Panzarella, Robert B.
Stiles, Kamal K. Sarbadhikari, Geoffrey F. Ide, Ruth
R. McMullin, Kenneth L. Wolfe, Linda Johnson
Rice, Jonathan S. Linen, Domenico De Sole, Barry
W. Wilson, Paul A. Friedman, Alan M. Bennett, John

R. Purcell, Franklin E. Agnew, and Alvin W.
Trivelpiece, Defendants.
andBausch & Lomb Incorporated, a New York
corporation, Nominal Defendant.
Perry Brown, Derivatively On behalf of Bausch &
Lomb Incorporated, Plaintiffs,

v.

Ronald L. Zarella, William H. Waltrip, William M.
Carpenter, Stephen C. McCluski, John M. Loughlin,
Dwain L. Hahs, Angelina J. Panzarella, Robert B.
Stiles, Kamal K. Sarbadhikari, Geoffrey F. Ide, Ruth
R. McMullin, Kenneth L. Wolfe, Linda Johnson
Rice, Jonathan S. Linen, Domenico De Sole, Barry
W. Wilson, Paul A. Friedman, Alan M. Bennett, John
R. Purcell, Franklin E. Agnew, and Alvin W.
Trivelpiece, Defendants.
andBausch & Lomb Incorporated, a New York
corporation, Nominal Defendant.
Police and Fire Retirement System of the City of
Detroit, On Behalf of Itself and All Others Similarly
Situated, Plaintiffs,

v.

Bausch & Lomb Inc., Ronald L. Zarella, Stephen C.
Mccluski, John M. Loughlin, Robert B. Stiles, Kamal
Sarbadhikari, and Geoffrey F. Ide, Defendants.
**Nos. 06 Civ.1942(HB), 06 Civ.2025(HB), 06 Civ.
2659(HB), 06 Civ. 2916(HB), 06 Civ. 2918(HB), 06
Civ. 3106(HB), 06 Civ. 3653(HB).**

June 5, 2006.

David Avi Rosenfeld, Lerach, Coughlin, Stoia,
Geller, Rudman & Robbins, LLP, Samuel Howard
Rudman, Mario Alba, Jr., Melville, NY, for Plaintiffs
Laborers Local 100 and 397 Pension Fund.
Bradley P. Dyer, Eric James Belfi, Murray, Frank &
Sailer, L.L.P., New York, NY, Marc A. Topaz,
Richard A. Maniskas, Tamara Shvirsky, Schiffrin &
Barroway, L.L.P., Radnor, PA, for Plaintiffs James
Brannon
Jeffrey M. Norton, Robert I. Harwood, Wechsler,
Harwood, L.L.P., New York, NY, for Plaintiffs Fred
Badaracco.
Stephen John Fearon, Jr., Squitieri & Fearon LLP,
New York, NY, for Plaintiffs Diane Johnson.
Nadeem Faruqi, Faruqi & Faruqi, LLP, New York,
NY, for Plaintiffs Gaetano Rainone, Perry Brown.
Douglas M. McKeige, Gerald Harlan Silk, Jai Kamal

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy

Slip Copy, 2006 WL 1524590 (S.D.N.Y.)

Chandrasekhar, Bernstein, Litowitz, Berger & Grossmann, L.L.P., New York, NY, for Plaintiffs Police and Fire Retirement System of the City of Detroit.

HAROLD BAER, JR., District Judge.[FN1]

> FN1. William Pollack, a Summer 2006 intern in my Chambers and second-year law student at the University of Michigan School of Law, provided substantive assistance in the research for this Opinion.

*1 Plaintiffs in the above captioned cases filed several class action lawsuits that allege securities laws violations against Bausch & Lomb and its corporate officers (collectively "Defendants"). Lead plaintiff motions were filed by four parties in this action on May 12, 2006. Shortly thereafter, on May 15, 2006, the Defendants moved to transfer venue, pursuant to 28 U.S.C. § 1404(a), of the above-captioned cases from this Court to the United States District Court in the Western District of New York. I stayed my decision on a lead plaintiff pending the decision on this motion to transfer venue. For the reasons below, the motion to transfer venue is GRANTED.

## I. BACKGROUND

Plaintiffs' allegations, are in the main, concerned with what might be characterized as misleading press releases. The flavor of these allegations, while not pivotal to this motion, is captured by the following examples.

On January 27, 2005, Bausch & Lomb (also "Company") issued a press release that announced its financial results for 2004. This press release reported an 11 percent increase in worldwide sales to $2.23 billion and full-year earnings of $2.93 per share. The press release provided in relevant part that:

We surpassed the earnings per share expectations that we established at the beginning of the year and exited 2004 with increased momentum. We are well positioned for accelerated sales growth and continued strong financial performance in 2005.

(Brannon Compl. ¶ 27). A few months later and on April 19, 2005, the Company issued another press

release entitled "Bausch & Lomb Reports Solid First Quarter." The April 19, 2005 press release reported a six percent increase in total sales, which resulted in a 47 percent increase in earnings per share to $0.63, compared to $0.43 earnings per share in the first quarter of 2004. (Laborer's Local 100 & 397 Pension Fund Am. Compl. ¶ 27; Brannon Compl. ¶ 32). The stock price hovered between $75 and $76 per share in the days following this announcement. (Laborer's Local 100 & 397 Pension Fund Am. Compl. ¶ 34). Again on July 27, 2005, a press release entitled "Bausch & Lomb Earns 81 Cents Per Share on Seven-Percent Sales Gain Company Increases Full-Year Guidance by five Cents" surfaced that provided in relevant part that:

We were very satisfied with our second-quarter performance ... further share gains are expected to accelerate top-line growth in the second half of 2005.

(Id. ¶ 28) On August 1, 2005, the Defendant's stock sold at $84 a share. (Laborer's Local 100 & 397 Pension Fund Am. Compl. ¶ 34; Brannon Compl. ¶ 53).

It was only later that year that Bausch & Lomb acknowledged internal accounting errors at two of their foreign subsidiaries. Specifically, on October 26, 2005, the Company announced that in September 2005 they had begun an internal investigation of their Brazilian subsidiary. This investigation had unearthed several accounting errors. (Laborer's Local 100 & 397 Pension Fund Am. Compl. ¶ 29, Brannon Compl. ¶ 37). As a result of these errors, the Brazilian tax authorities claimed that Bausch & Lomb owed the Brazilian government $5 million in taxes as well as $21 million in penalties. (Brannon Compl. ¶ 37). Upon release of this news, shares of Bausch & Lomb fell $2.74 per share to close at $71.36 per share. (Id. ¶ 38). However, Plaintiffs allege that the Company's press release downplayed the seriousness of the accounting errors and as a result, Bausch & Lomb shares rebounded soon thereafter and sold at around $80 a share in December 2005. (Laborer's Local 100 & 397 Pension Fund Am. Compl. ¶ 31)

*2 On December 22, 2005, Defendants issued a press release that informed its stockholders of the Company's need to restate financial results for 2000 through the second quarter of 2005 in order to account for the misfeasance and mistakes of its

Slip Copy
Slip Copy, 2006 WL 1524590 (S.D.N.Y.)

Brazilian subsidiary. (*Id.* ¶ 32). This press release also announced the investigation of Bausch & Lomb's Korean subsidiary for improper sales and accounting practices. In response to these revelations, Bausch & Lomb shares fell from $79.07 to $67.20. (*Id.* ¶ 33). Plaintiffs further allege that throughout this period, the individual defendants' engaged in insider trading and thus, profited enormously from the artificially inflated stock price that resulted from their previous misstatements and nondisclosures. (Laborer's Local 100 & 397 Pension Fund Am. Compl. ¶ 34; Brannon Compl. ¶ 53).

In addition, the consolidated securities class action cases, *Laborers Local 100 & 397 Pension Fund v. Bausch & Lomb,* the related case, *Police and Fire Retirement Sys. of Detroit v. Bausch & Lomb, Inc,* and the ERISA case, *Johnson v. Bausch & Lomb,* include allegations that the Defendants concealed reports that the Company's contact lens solution, ReNu, had been associated with a high incidence of a potentially-blinding eye infection, fusarium keratitis. According to these complaints, as early as July 2005, Defendants received at least five reports of fusarium keratitiseye infections in consumers that used their product. (Johnson Am. Compl. ¶ 98).

On Feb 21, 2006 the Singapore Ministry of Health issued a press release identifying 39 cases of fusarium keratitiseye infections, 34 of which were diagnosed in ReNu users. (Johnson Am. Compl. ¶ 101). Soon thereafter, Bausch & Lomb suspended sales of ReNu in Singapore. (*Id.*).

Plaintiffs allege that despite the reports from Singapore, Defendants continued to market ReNu as a safe product in the United States and deny that it was a risk factor for fusarium keratitis. (*Id.* ¶ 102). On March 8, 2006, the Centers for Disease Control and Prevention ("CDC") launched an investigation into fusarium keratitis cases in the United States. (*Id.* ¶ 103). Plaintiffs claim that the Defendants continued to downplay the seriousness of these reported eye infections and did not suspend sales of ReNu in the United States until April 10, 2006. (*Id.* ¶ 109). Once the Company announced that this, Bausch & Lomb's stock price fell approximately $12 a share in two days and closed, on April 12, 2006, at $45.61 per share. (*Id.* ¶ 110).

## II. PROCEDURAL HISTORY

On March 13, 2006, Laborers Local 100 and 397 Pension Fund filed the first class action lawsuit against Bausch & Lomb pursuant to the Securities Exchange Act of 1934, §§ 10(b) and 20(a) as well as Rule 1 0b-5 in the Southern District of New York ("SDNY"). The Complaint alleged that Bausch & Lomb, along with present and former officers and directors of the Company, made materially false and misleading statements when they failed to disclose problems with the Brazilian and Korean subsidiaries, and thus, artificially inflated the stock price. The Complaint was later amended on May 5, 2006 to enlarge the relevant class period to include allegations that the Defendants failed to disclose reports that one of its contact lens products, ReNu, may cause eye infections among its users.

*3 The class was noticed pursuant to the Private Securities Litigation Reform Act ("PSLRA") and lead plaintiff motions were due on May 12, 2006. Four lead plaintiff motions were filed with this Court.

In the interim, six other cases have been filed in the SDNY that allege securities laws violations based on the same or substantially similar events. On consent of the parties, two of those cases, *Brannon v. Bausch & Lomb, Inc.* and *Badaracco v. Bausch & Lomb, Inc.*, were consolidated with *Local 100 and 397 Pension Fund v. Bausch & Lomb* by Order issued on April 21, 2006. These cases allege that Bausch & Lomb made false representations about the financial health of the Company and failed to disclose that the Company's Brazilian and Korean subsidiaries were engaged in fraudulent accounting practices. The Order provides that 30 days after appointment of lead plaintiff, the lead plaintiff shall file a Consolidated Complaint. Consolidated Order, ¶ 5. Furthermore, all other cases that arise out of the same or substantially the same events shall be governed by the Consolidated Order. Consolidated Order, ¶ 7.

I accepted the remaining cases. They were clearly related and mine was the lowest docket number.

At a pre-trial conference on May 16, 2006, where counsel for all plaintiffs and defendants were present, the parties agreed to an expedited briefing schedule with regard to the Defendants' motion to transfer venue of these cases to the Western District of New York ("WDNY").[FN2] Fully briefed motions were due

Slip Copy
Slip Copy, 2006 WL 1524590 (S.D.N.Y.)

in chambers by May 26, 2006.

> FN2. At this time, Defendants had only
> moved to transfer cases in the consolidated
> securities class actions but had expressed,
> both prior to and during the conference, their
> intent to transfer all cases in front of me to
> the WDNY.

## III. DISCUSSION

Defendants have filed three transfer of venue
motions-one with regard to the ERISA action,
another with regard to the two securities derivative
actions, and the last with regard to the three
consolidated securities fraud actions. Since the facts
are substantially similar in all of these cases, all three
transfer motions are analyzed together.

Pursuant to 28 U.S.C. § 1404(a), district courts may
transfer a civil case to another district if transfer
would be in the interest of justice and benefit "the
convenience of the parties and witnesses."The
decision to transfer a case is within the discretion of
the district judge. See also In re Cuyahoga Equip.
Corp., 980 F.2d 110, 117 (2d Cir.1992) ("[M]otions
for transfer lie within the broad discretion of the
district court."). Courts make a case-by-case
determination based on the particular facts of the case
and no single factor is determinative. See Red Bull
Assoc. v. Best Western Intern, Inc., 862 F.2d 963,
967 (2d Cir.1988) (stating that district courts have
"considerable discretion ... to adjudicate motions for
transfer according to an 'individualized, case-by-case
consideration of convenience and fairness.' ").

A two-step inquiry is required. First, courts establish
whether the case could have been filed in the
transferee district and if so, determine whether
convenience and the interests of justice favor
transfer. See, e.g., Fuji Photo Film Co., Ltd. v. Lexar
Media, Inc., 415 F.Supp.2d 370, 373 (S.D.N.Y.2006).
Courts consider the following in making this
determination: 1) plaintiff's choice of forum, 2)
location of operative facts, 3) convenience of parties
and witnesses, 4) location of documents and ease of
access to sources of proof, 5) relative means of the
parties, 6) forum's familiarity with the governing law,
7) trial efficiency, and 8) interests of justice. Id

*4 The plaintiff's choice of forum is generally

respected, unless the balance of factors clearly favors
transfer. See, e.g., Royal & Sunalliance v. British
Airways, 167 F.Supp.2d 573, 576 (S.D.N.Y.2001)
(internal citation omitted). The defendant bears the
burden of demonstrating that transfer is appropriate.
See, e.g., Toy Biz, Inc. v. Centuri Corp., 990
F.Supp.328, 330 (S.D.N.Y.1998).

### A. Proper Transferee Forum

At the outset, the parties do not dispute that these
cases could have been properly brought in the
Western District of New York. Pursuant to 15 U.S.C.
§ 78aa, venue is proper in securities cases in the
district "wherein the defendant is found or is an
inhabitant or transacts business."The same standard
applies in ERISA actions. See 28 U.S.C § 1132(e)(2)
(stating that an ERISA action can be brought in the
district "where a defendant resides or may be
found."). Defendant Bausch & Lomb is
headquartered in Rochester, New York, which is in
the jurisdiction of the WDNY.

### B. Transfer Factors

Thus, this motion turns on whether convenience and
the interests of justice warrant transfer of all of these
cases to the WDNY.

As a preliminary matter, it is beyond peradventure
that it is significantly more efficient to try all of these
cases together. Although the complaints allege
violations of different laws, they all deal with the
same or substantially the same events. None of the
parties dispute this point, as all of the plaintiffs with
cases in the SDNY have agreed to try their cases in
front of one Judge. Further, the defendants have
never suggested they would prefer to try these cases
in separate districts and, indeed, have moved to
transfer all of the cases to the WDNY.

### 1. Plaintiff's Choice of Forum

It is well-established that a plaintiff's forum choice
should not be disturbed "unless the balance of factors
weighs strongly in favor of transfer."Caville v
Malibu Toys, Inc. 2004 WL 1516799, * (S.D.N.Y.
July 7, 2004). Defendants argue, however, that courts
have accorded "little weight" to plaintiff's choice of
forum in securities class actions, due in large part to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2006 WL 1524590 (S.D.N.Y.)

the distribution of numerous plaintiffs across several districts in these cases. *See, e.g. In re AtherioGenics Sec. Litigation,* 2006 WL 851708, at *3.

Whether that's so or not here, the other factors are persuasive. For instance, neither the defendants nor the name plaintiffs, with the exception of the two plaintiffs in the derivative actions, reside in SDNY. The Company maintains no offices or employees in the SDNY and the Company's auditors, PricewaterhouseCoopers, are not here either. And even in the case of the derivative plaintiffs that reside here, their district of residence is not persuasive since those claims are brought on behalf of the Company, which is headquartered in the WDNY.

Further, the contacts between the SDNY and the events underlying plaintiffs' allegations are also limited. Courts have accorded less deference to a plaintiff's choice of forum if the case lacks material or significant contacts with that forum. *See, e.g., Orb Factory, Ltd. v. Design Science Toys, Ltd.,* 6 F.Supp.2d 203, 210 (S.D.N.Y.1998). Plaintiffs do not allege, nor can they, that any of the allegedly false or misleading statements were issued from anywhere within this forum. Although Plaintiffs correctly point out that Bausch & Lomb's stock is traded on the New York Stock Exchange ("NYSE"), which is located in the SDNY, and many of the analysts who follow Bausch & Lomb stock are located in New York City, these contacts don't do it. If they did, the SDNY would have even more business and every plaintiff that sued a NYSE firm could nestle in right here at 500 Pearl Street.

*5 For these reasons, I accord less deference to the plaintiff's choice of forum in this case.

### 2. Location of Operative Facts

Plaintiffs argue that this factor does not support transfer because the events underlying these cases occurred all over world. I disagree.

No one disputes that the key facts in this case involve the allegedly false and misleading statements issued by the Company from their Rochester headquarters. Plaintiffs concede as much. *See* Diane Johnson Memorandum of Law in Opposition at 6 ("In this case, the operative events at issue will be the false and misleading statements made by the Company.");

*See also* Gaetano Rainone Memorandum of Law in Opposition at 4 ("Although many of the operative facts giving rise to this litigation emanate from Bausch & Lomb's corporate headquarters in Rochester, New York, the Western District of New York is not the "center of gravity" as the Defendants would have this Court believe.").

Courts in this District have found that in securities fraud cases, misrepresentations and omissions are deemed to occur in the district from which they are transmitted or withheld, not where they are received. *In re AtheroGenics Sec. Litig.,* 2006 WL 851708, *3 (S.D.N.Y.)* (internal quotations and citations omitted). In this case, all of the press releases and corporate filings, as well as the alleged misstatements, originated at Bausch & Lomb headquarters in Rochester. Plaintiffs do not demonstrate that any other forum has more substantive contacts with the facts underlying these cases, although it may be true that relevant facts may also be found in Brazil, Korea, and New York City for that matter. For these reasons, this factor favors transfer to the WDNY.

### 3. Convenience of Parties

Only two of the name plaintiffs reside in the SDNY. The majority of the individual defendants reside near or in Rochester and the Company is headquartered there also. Geisel Decl. ¶¶ 16(a)-(e). There is no question that it would be more convenient for the Defendants to litigate the case in the forum in which they reside. Since few of the name plaintiffs live in the SDNY, it really does not matter to them whether its tried here, except perhaps for their lawyers. In fact, for the majority of the plaintiffs, they would have to travel to the forum state anyway, and the difference between a flight to New York City as compared to Rochester is hardly a cogent distinction.

As plaintiffs point out, it is true that it would not be a substantial burden for Defendants to litigate the case in the SDNY, given the proximity of the two Districts. However, plaintiffs failed to show that it is more convenient for them to litigate the case here. They simply opine that all the plaintiffs have expressed a preference to be here.

### 4. Convenience of Witnesses

Slip Copy
Slip Copy, 2006 WL 1524590 (S.D.N.Y.)

This factor is arguably the most important in deciding transfer motions, and in this case, weighs in favor transfer. *See AEC One Stop Group, Inc. v. CD Listening Bar, Inc.*, 326 F.Supp.2d 525, 529 (S.D.N.Y.2004) (internal citation omitted). This case involves, in large part, statements that were made in press releases issued by the Company. Thus, the key witnesses in this case will be those Bausch & Lomb employees that participated in creating and issuing these statements. Plaintiffs do not dispute that those individuals either are located at the Company headquarters in Rochester, N.Y. or do not reside in New York State at all. Further, the Plaintiffs have not even identified any witnesses, or more importantly, any that reside in the SDNY. For these reasons, this factor favors transfer.

*5. Location of Documents and Ease of Access to Sources of Proof.*

*6 Defendants argue that this factor favors transfer because the majority of relevant documents, if stored in New York State, will be found in Rochester. While doubtless true, given the relative ease with which documents can be transported today, I find that this factor is neutral.

*6 Relative Means of the Parties*

Neither party argues that their financial situation would affect their ability to conduct this trial in either forum, thus this factor is neutral.

*7. Forum's Familiarity with the Governing Law*

Since all of these cases are brought pursuant to federal law and Defendants seek transfer from one federal court to another, this factor must also be assessed neutral.

*8. Trial Efficiency and the Interests of Justice*

Plaintiffs argue that a comparison of the dockets of SDNY and WDNY judges, 689 and 786 cases respectively, favor keeping the case here. *See, e.g. AtheroGenics Sec. Litig.*, 2006 WL 851708, *5 (S.D.N.Y. Mar. 31, 2006) (internal citation omitted) (according docket congestion weight in transfer analysis). However, in the alternative, Defendants compare the median time for civil cases to move

from filing to disposition in the SDNY and the WDNY, 8.8 months and 10.2 months respectively. While these statistics may well be true, they do not mean much, but for the sake of argument, I'll credit them and call it a draw.

But, as mentioned at the outset, trial efficiency and the interests of justice militate in favor of trying these cases together. Therefore, if venue is not proper in the SDNY with regard to one case, judicial economy would favor transferring all of the cases.

Although raised at the eleventh hour in their reply papers,[FN3] Defendants argue, with regard to the two derivative securities actions, that venue is not proper in the SDNY. Although for our purposes here it not necessary to decide this matter, it is an open question, to say the least, whether plaintiffs allege enough contacts with the SDNY to vest venue here pursuant to 28 U.S.C. § 1391. This provision provides, in relevant part, that: [FN4]

> FN3. Defendants, rather than providing plaintiffs with notice of this argument before opposition papers were due-they had a week after the pre-trial conference to do this-instead elected to raise this novel argument in their reply.

> FN4. Neither side argues that any other section of 28 U.S.C. § 1391 would be applicable.

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in ... (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

28 U.S.C. § 1391(b)(2). In other words, plaintiffs in the derivative actions must allege that a substantial portion of the events with regard to the alleged misstatements occurred in the SDNY. Since I am skeptical that the derivative plaintiffs in fact do this, I find that this factor also favors transfer.

**IV. CONCLUSION**

On balance, since convenience as well as the interest

Slip Copy
Slip Copy, 2006 WL 1524590 (S.D.N.Y.)

of justice favor transfer of this matter to the Western
District of New York, this motion to transfer venue
for all of these cases is granted. The Clerk of the
Court is instructed to close this matter and remove it
from my docket.

**\*7 IT IS SO ORDERED.**

S.D.N.Y.,2006.
Laborers Local 100 and 397 Pension Fund v. Bausch
& Lomb Inc.
Slip Copy, 2006 WL 1524590 (S.D.N.Y.)

END OF DOCUMENT

Westlaw

Not Reported in A.2d
Not Reported in A.2d, 1983 WL 20284 (Del.Ch.)

Page 1

**H**Pompeo v. Hefner
Del.Ch.,1983.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
POMPEO
v.
HEFNER, et al.
LEWIS
v.
HEFNER, et al.
**CIV. A. Nos. 6806, 6872.**

Submitted March 14, 1983.
Decided March 23, 1983.

Jeffrey S. Goddess, Saul, Ewing, Remick & Saul,
Wilmington.
Robert K. Payson, Potter, Anderson & Corroon,
Wilmington.
A. Gilchrist Sparks, III, Morris, Nichols, Arsht &
Tunnell, Wilmington.

BROWN, Chancellor.
**\*1** In these two companion derivative suits initiated
on behalf of Playboy Enterprises, Inc., a special
Litigation Committee has been appointed by the
board of directors of the corporation to investigate
the allegations of the two complaints and to take
action to move the Court to dismiss the suits should
the investigation appear to warrant it in the opinion of
the Litigation Committee. In so doing the board of
Playboy has opted to take advantage of the new
procedures developed by our Supreme Court in
*Zapata Corp. v. Maldonado,* Del.Supr., 430 A.2d 799
(1981).

The Litigation Committee is a committee of one,
comprised of David B. Heller, a new and unaffiliated
director found "not unacceptable" by the Securities
and Exchange Commission. Mr. Heller was elected
as a director by the Playboy shareholders on
November 9, 1982 and was dubbed as the special
Litigation Committee on the same day with final and

unfettered authority to determine whether or not the
continued prosecution of the two derivative actions
would be in the best interests of Playboy. On
December 1, 1982 Mr. Heller engaged David S.
Ruder, Dean of the Northwestern University School
of Law, as special counsel to assist him in his efforts.
On December 15, 1982 the corporation, through its
counsel in these actions, moved for a stay of
discovery by the plaintiff through May 15, 1983 in
order to allow a reasonable time for the Litigation
Committee to complete its task.

Plaintiffs have opposed this application contending
that the sought-after stay is too long, that under the
circumstances no stay is warranted at all, and that at
the very least plaintiffs' counsel should be permitted
from this point onward to sit in on portions of the
investigation and review the documents and
information being reviewed by the Litigation
Committee in the interests of moving matters along.

The plaintiff Lewis argues that no stay is appropriate
here because the defendant Hefner owns 67% of the
outstanding stock of Playboy. Because of this Lewis
argues that there is no way that Mr. Heller, as a
committee of one, can be independent since (a) he
could not have been elected as a director without the
vote of Mr. Hefner, the primary defendant in the
suits, and (b) he can be removed as a director at any
time by Mr. Hefner, as majority shareholder, under
Delaware law.

While this may be true, it forms no basis to deny
Playboy of the *Zapata* advantage of utilizing the
litigation committee approach. This is because,
coming at this point, the challenge to Mr. Heller's
independence is premature. Under *Zapata* a board of
directors retains a degree of control over the fate of a
derivative action even where it is disqualified from
acting directly because of alleged conflicts of interest
set forth in the derivative actions pleadings. *Zapata*
starts with the assumed premise that the board, or a
majority of it, is tainted by an alleged self-interest.
This naturally gives rise to immediate common-sense
suspicion as to the true independence of a new or
untainted director who is appointed by the board as
an independent committee to investigate the
worthiness of the charges of wrongdoing made

Not Reported in A.2d
Not Reported in A.2d, 1983 WL 20284 (Del.Ch.)

Page 2

against the members of the appointing board. *Joy v. North* Fed.Sec.L.Rep., p. 2011 (2nd Cir., 1982).

*2 Under *Zapata,* however, the independence of the litigation committee does not take on critical significance until such time as the committee moves this Court to dismiss the derivative action based on the findings of its investigation. At that point, under *Zapata,* it becomes the function of this Court to pass on the good faith and independence of the litigation committee together with the reasonableness of the basis for its dismissal recommendation. Should the litigation committee not recommend a dismissal, presumably its independence becomes a moot question insofar as the derivative plaintiff is concerned.

I recognize the point that the plaintiff Lewis is attempting to make. He is saying that if it is apparent from the outset that the litigation committee is not independent, then we are all wasting a lot of time in holding up the progress of the derivative suit brought to benefit the corporation and its shareholders while the committee purportedly conducts an investigation. But the premise for this argument is that where those charged with wrongdoing are the ones who select the person to investigate the charges against them, that person, thus owing his position and authority to those whose activities he is charged to investigate, can never be truly independent. Yet this was the situation in *Zapata,* and the Supreme Court held that the independence of the litigation committee is to be tested by this Court when and in the event that the committee moves this Court to dismiss the case on the basis of its internal investigation.

Plaintiff Lewis is asking that this determination be made in advance of any finding and recommendation by the Litigation Committee here. As such, the application is premature as I understand the meaning of *Zapata.* The only difference between this situation and that in *Zapata* is that the defendant Hefner, in addition to being one of the defendant directors, is also the majority shareholder. Thus, he can arguably remove Heller as a director at any time without cause, which presumably the interested board could not do itself in *Zapata.* This, however, is simply an additional evidentiary factor to be considered in the event that Heller's independence is put into issue by a motion of the Litigation Committee to dismiss the suit. There is nothing of

record to indicate that Mr. Hefner has done anything to influence the activities of the Litigation Committee and I cannot conclude that his majority shareholder status gives rise to a conclusive presumption that his mere existence does so. His majority shareholder status is certainly an element to consider when and if the issue arises under the *Zapata* procedure. However, it is not of itself a dispositive factor at this point such as, in practical effect, would serve to deprive Playboy's board in advance of the power to utilize the *Zapata* procedure.

As to the request of the plaintiffs to take discovery pending the investigation, or to at least participate in the investigation of the Litigation Committee, I think the decision is controlled by *Abbey v. Computer & Communications Technology Corp.,* Del.Ch., --- A.2d --- (1983). In *Abbey* it was held that under *Zapata* the right of the derivative plaintiff to proceed with his suit must be placed in abeyance in deference to the underlying and ultimate power of the board of directors to control the fortunes of the corporation. Under *Zapata,* in a "member disqualification" situation this control is exercised through the independent litigation committee as the arm of the board of directors. But in this fashion, the control power of the board is still predominant over any right of the derivative shareholder plaintiff to act on behalf of the corporation. If this recognition of superior authority and control is to be honored, then the derivative plaintiff must wait, at least for a reasonable time. Consistent with this concept is the thought that the derivative plaintiff should not be permitted to intermeddle or act coextensively with the independent arm of the board of directors along the way.

*3 The benefit which the plaintiffs seek here is to save them time in the long run in their efforts to benefit the corporation. But the purpose of the *Zapata* procedure, as I understand it, is to benefit the board of directors-to give a board something it did not have heretofore-so as to retain for those elected to manage the affairs of the corporation the right in the first instance to pass upon that which is in the best interests of the corporation and its shareholders. The intended benefit thus being in recognition of the superior power of the board in the first instance, I see no basis for permitting a shareholder plaintiff to participate in the functions and deliberations of the legally appointed representative of the board in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1983 WL 20284 (Del.Ch.)

Page 3

process of exercising that superior power. Thus, I think all discovery by the plaintiff must be continued to be held in abeyance here.

Finally, as to the duration of the stay sought by Playboy, five months is indeed a lengthy period. However, the allegations of the complaints essentially charge mismanagement with regard to the loss of Playboy's gaming licenses and the sale of its gaming operations in Great Britain as well as with certain aspects of its gaming license applications in Atlantic City. Those matters do not involve isolated incidents. Mr. Heller's affidavit indicates that there are thousands of pages of testimony given by more than 170 witnesses before regulatory bodies to be considered, together with more than 500 exhibits offered during the course of such proceedings.

As noted in *Abbey*, the length of the stay of discovery to be granted in all such situations as this is necessarily related to the nature and complexity of the derivative cause of action asserted. Under the circumstances argued here, I am persuaded that a stay through May 15, 1983 is appropriate. I do think, however, that this is the maximum period that should be allowed for the purpose of the investigation and report of the Litigation Committee.

An appropriate form of order may be submitted.

Del.Ch.,1983.
Pompeo v. Hefner
Not Reported in A.2d, 1983 WL 20284 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2007 WL 1875660 (S.D.N.Y.)

**H**In re Take-Two Interactive Software, Inc.
Derivative Litigation
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
In re TAKE-TWO INTERACTIVE SOFTWARE,
INC. DERIVATIVE LITIGATION.
This Document Relates To: All Actions.
**Lead Case No. 1:06 Civ. 05279(LTS).**

June 29, 2007.

### ORDER

LAURA TAYLOR SWAIN, United States District
Judge.
*1 This case comes before the Court on a motion
filed by the Special Litigation Committee (the
"SLC") of the board of directors of Take-Two
Interactive Software, Inc. ("Take-Two"), a Delaware
corporation headquartered in New York. On June 4,
2007, the SLC moved to stay all proceedings for
three months to permit it to investigate the allegations
of this lawsuit and to act in accordance with the
findings of that investigation. As set forth below, the
Court grants the SLC's motion and stays this
litigation in its entirety until September 4, 2007.

Take-Two shareholder and Plaintiff Richard Lasky,
derivatively on behalf of Take-Two, filed his original
complaint on July 12, 2006. Take-Two shareholder
and Plaintiff Raeda Karadsheh, derivatively on behalf
of Take-Two, filed her original complaint on August
22, 2006. This Court consolidated the actions in an
order filed on November 27, 2006. The Plaintiffs
then filed their consolidated complaint on February 9,
2007. The complaint alleges, *inter alia*, that from
1997 to 2005, certain officers and directors caused
Take-Two to issue "backdated" stock options-that is,
options having an exercise price lower than the actual
trading price of the stock on the date of issuance. The
action asserts several claims for relief under various
common law theories, § 304 of the Sarbane-Oxley
Act, and §§ 14(a), 10(b) and 20(a) of the Securities
Exchange Act.

The SLC proffers, and Plaintiffs do not dispute, that

in March of 2006, the board of directors of Take-Two
created the SLC to investigate the allegations of
another lawsuit substantially unrelated to the instant
action. *See St. Clair Shores Gen. Employees
Retirement Sys. v. Eibeler,* No. 06 Civ. 688(SWK),
2006 U.S. Dist. LEXIS 72316 (S.D.N.Y. Oct. 4,
2006). In July and August 2006, the SLC additionally
began investigating the set of allegations put forth in
the original complaints in this case. Meanwhile, the
*St. Clair* investigation continued into October of
2006, when the SLC requested, and the district court
granted, a five-month stay in that case while the
investigations continued. *Id.* at *26.On January 17,
2007, the SLC presented certain factual findings
related to this case to the Take-Two Board; and on
January 30, 2007, the Board formally charged the
SLC to determine whether the claims asserted in this
derivative litigation should be pursued by Take-Two.
A few weeks later, the Plaintiffs filed the
aforementioned consolidated complaint. On June 4,
2007, the SLC filed this motion for a stay of three
months in order to conclude its investigation of this
case.

"[F]ederal courts should apply state law governing
the authority of independent directors to discontinue
derivative suits to the extent such law is consistent
with [federal law]."*Bruks v. Lasker,* 441 U.S. 471,
486, 99 S.Ct. 1861, 60 L.Ed.2d 404 (1979).
Therefore, the propriety of the SLC's requested stay
is a question to be resolved under the law of Take-
Two's state of incorporation, Delaware. *See, e.g.,
Stein v. Bailey,* 531 F.Supp. 684, 691-93
(S.D.N.Y.1982); *St. Clair,* 2006 U.S. Dist. LEXIS
72316, at *5.

*2 Courts normally grant a stay of proceedings for a
reasonable period of time to permit an SLC to
complete its investigation. *See, e.g., Abbey v.
Computer & Commc'ns Tech. Corp.,* 457 A.2d 368,
375-76 (Del. Ch.1983); *Pompeo v. Hefner,* C.A. No.
6806, 1983 Del. Ch. LEXIS 506, at *6-*8 (Del. Ch.
March 23, 1983).*See also St. Clair,* 2006 U.S. Dist.
LEXIS 72316, at *7 ("propriety of a stay is presumed
under Delaware law"); *Kaplan v. Wyatt,* 484 A.2d
501, 510 (Del. Ch.1984) (stay "must" be granted
because of "the inherent right of the board of
directors to control and look to the well-being of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 1875660 (S.D.N.Y.)

corporation in the first instance") (citing *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del.1981)).

Plaintiffs filed the consolidated complaint on February 9, 2007, so a three-month stay of proceedings until September 4, 2007, would give the SLC a total of approximately seven months to complete its investigation. Defendants argue such an amount of time is necessary in part because this case involves relatively novel and complex issues of law. *See Abbey*, 457 A.2d at 376 ("the length of the stay to be entered in any case will be dependent necessarily upon the particular facts and circumstances of that case"); *Ryan v. Gifford*, 918 A.2d 341, 350 (Del. Ch.2007) (February 6, 2007 decision noting that backdating stock option grants is "novel" issue); *Desimone v. Barrows*, 2007 Del. Ch. LEXIS 75, at *57-*81 (Del. Ch. June 7, 2007) (lengthy discussion of legal complexities of the stock option backdating issue).

Because this case involves relatively novel and complex issues of law, because the same SLC has concurrently been investigating claims in a separate lawsuit, and in light of the authorities both parties have cited, a three-month stay, which will give the SLC seven months from the filing of Plaintiffs' consolidated complaint to complete its investigation, is reasonable. *See, e.g., Wright v. Krispy Kreme Doughnuts, Inc.*, 231 F.R.D. 475, 477 (M.D.N.C.2005) (nine months from the board's rejection of the shareholders' demand to the end of granted stay); *Strougo ex rel. Brazil Fund v. Padegs*, 27 F.Supp.2d 442, 446 (S.D.N.Y.1998) (five month investigation); *Kavell v. Morgan Stanley Group*, 1993 Del. Ch. LEXIS 236, at *12 (Del. Ch. Sept. 27, 1993) (five month stay); *Pompeo*, 1983 Del. Ch. LEXIS 506, at *8-*9 (six months from SLC formation to end of granted stay); *St. Clair*, 2006 U.S. Dist. LEXIS 72316, at *27 (twelve months from SLC formation to end of granted stay).

For the foregoing reasons, the SLC's motion to stay proceedings for three months is granted. The motion for a stay was filed on June 4,2007. Accordingly, this action is hereby stayed in its entirety until September 4, 2007.

The initial pretrial conference in these consolidated cases will be held on November 2, 2007, at 10:00 a.m. The parties shall confer and shall prepare a submission in advance of that conference in accordance with the Initial Conference Order that was issued on or about July 25, 2006.

*3 SO ORDERED.

S.D.N.Y.,2007.
In re Take-Two Interactive Software, Inc. Derivative Litigation
Slip Copy, 2007 WL 1875660 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

Page 1

**H** Varnelo v. Eastwind Transport, Ltd.
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Helga VARNELO, as Personal Representative of the
Estate of Stanislav Varnelo, Deceased, Plaintiff,
v.
EASTWIND TRANSPORT, LTD., Charm
Navigation, Ltd., & Mayflower Ship Management
Corp., Defendants.
No. 02 Civ.2084(KMW)(AJP).

Feb. 3, 2003.

Widow of Russian seamen brought action against
owners or operators of a ship who allegedly
negligently caused seamen's death aboard ship while
in Chinese territorial waters. Upon one defendant's
motion to dismiss on forum non conveniens grounds,
the District Court, Peck, United States Magistrate
Judge, held that: (1) Russia was an adequate alternate
forum, and (2) private and public interest factors
favored dismissal on forum non conveniens grounds.

Motion granted.

West Headnotes

[1] Federal Courts 170B €═45

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(B) Right to Decline Jurisdiction;
Abstention Doctrine
            170Bk45 k. Forum Non Conveniens. Most
Cited Cases

Seamen 348 €═29(5.5)

348 Seamen
    348k29 Personal Injuries
        348k29(5.5) k. Jurisdiction and Venue. Most
Cited Cases
Forum non conveniens analysis applies to Jones Act
cases. Jones Act, 46 App.U.S.C.A. § 688.

[2] Federal Courts 170B €═45

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(B) Right to Decline Jurisdiction;
Abstention Doctrine
            170Bk45 k. Forum Non Conveniens. Most
Cited Cases

Seamen 348 €═29(5.5)

348 Seamen
    348k29 Personal Injuries
        348k29(5.5) k. Jurisdiction and Venue. Most
Cited Cases
For purposes of forum non conveniens analysis,
Russian widow's choice of New York forum was
entitled to "little deference" in action involving the
death of a Russian seaman, hired in Russia, on board
a Liberian ship in Chinese territorial waters; widow
conceded that her recovery in Russia would be, at
best, a small fraction of her recovery in New York
forum, and it was clear that defendants would be
amenable to suit in an alternative forum.

[3] Federal Courts 170B €═45

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(B) Right to Decline Jurisdiction;
Abstention Doctrine
            170Bk45 k. Forum Non Conveniens. Most
Cited Cases

Seamen 348 €═29(5.5)

348 Seamen
    348k29 Personal Injuries
        348k29(5.5) k. Jurisdiction and Venue. Most
Cited Cases
With respect to action involving the death of a
Russian seaman, hired in Russia, on board a Liberian
ship in Chinese territorial waters, treaty obligations
between Russia and the United States did not require
any greater deference to Russian widow's choice of
New York forum, for purposes of forum non
conveniens analysis, than she would be entitled to as

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

a U.S. citizen in similar situation.

**[4] Federal Courts 170B ⬡45**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(B) Right to Decline Jurisdiction;
Abstention Doctrine
            170Bk45 k. Forum Non Conveniens. Most
Cited Cases

**Seamen 348 ⬡29(5.5)**

348 Seamen
    348k29 Personal Injuries
        348k29(5.5) k. Jurisdiction and Venue. Most
Cited Cases
For purposes of forum non conveniens analysis,
Russia was an adequate alternate forum for action
involving the death of a Russian seaman, hired in
Russia, on board a Liberian ship in Chinese territorial
waters; Russian courts would likely exercise
jurisdiction over defendants on consent, and lower
size of seaman's widow's recovery in Russia did not
render Russia an inadequate forum.

**[5] Federal Courts 170B ⬡45**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(B) Right to Decline Jurisdiction;
Abstention Doctrine
            170Bk45 k. Forum Non Conveniens. Most
Cited Cases

**Seamen 348 ⬡29(5.5)**

348 Seamen
    348k29 Personal Injuries
        348k29(5.5) k. Jurisdiction and Venue. Most
Cited Cases
Private and public interest factors favored dismissal,
on forum non conveniens grounds, of action
involving the death of a Russian seaman, hired in
Russia, on board a Liberian ship in Chinese territorial
waters; location and availability of witnesses strongly
favored trial in Russia, choice of law factor was
neutral, Russia had a strong interest in the dispute,
and action's connection to New York forum, where
defendant's offices were located, was far too

attenuated to justify burdening U.S. citizens with jury
duty.

## REPORT AND RECOMMENDATION

PECK, Magistrate J.

*1 Plaintiff Helga Varnelo, as personal representative
of the Estate of Stanislav Varnelo, deceased (the
"decedent"),[FN1] brought this action against defendants
Eastwind Transport, Ltd. ("Eastwind"), Charm
Navigation, Ltd. ("Charm"), and Mayflower Ship
Management Corp. ("Mayflower"), alleging that
defendants, as owners or operators of the ship
"Yellowstone," negligently caused Stanislav's death
aboard ship while in Chinese territorial waters. (Dkt.
No. 1: Compl. ¶¶ 2-18.) Eastwind has moved to
dismiss on forum non conveniens ("FNC") grounds.
(Dkt. No. 13.)

> FN1. To distinguish between Mr. and Mrs.
> Varnelo, the Court will refer to them by
> their first names; no disrespect is intended.

Stanislav Varnelo was, and Helga is, a Russian
citizen residing in Kaliningrad, Russian Federation.
Stanislav was hired in Kaliningrad. His accident took
place aboard ship in Chinese waters. All of the
relevant witnesses, including Stanislav's shipmates,
are Russian nationals. While Eastwind and possibly
the other defendants are located in New York, they
all have stipulated to suit in Russia. Further, no
evidence as to causation or damages appears to be
located in New York. In short, it would be unfair to
require New York's citizens to serve as jurors in an
action so lacking a connection to this forum. By
contrast, Russia has a strong interest in protecting its
own seamen hired in Russia, and their Russian
widows.

Accordingly, for the reasons set forth below,
Eastwind's motion to dismiss on forum non
conveniens grounds should be GRANTED.

## FACTS

*Stanislav Varnelo's Employment on the Yellowstone
and the Accident that Caused His Death*

Stanislav Varnelo was a Russian citizen residing in
Kaliningrad, Russian Federation, and died at the age

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

of 66. (Dkt. No. 14: Arralde 7/1/02 Aff. ¶ 2 & Exs. A & B.) His surviving wife, plaintiff Helga Varnelo, is now 65, a Russian citizen residing in Kaliningrad. (Arralde 7/1/02 Aff. ¶ 2 & Ex. A.)

Stanislav was employed as a "boatswain" or "bosun" aboard defendants' vessel Yellowstone. (Dkt. No. 1: Compl. ¶ 2; Dkt. No. 3: Answer ¶ 2; Dkt. No. 15: Lekkos 7/1/02 Aff. ¶ 4.) He was hired in Kaliningrad, Russian Federation, and employed pursuant to a "Service Agreement" dated March 3, 1999 between the ship's "crewing agent" ("Frost Crewing (Cyprus) Company", and "Reftransflot Crewing Ltd.") and Mayflower, the ship's "operator." (Dkt. No. 15: Lekkos 7/1/02 Aff. ¶ 4 & Ex. A; Compl. ¶ 12; Dkt. No. 34: Eastwind Resp. to Pl's Interrog. No. 1.)

It is undisputed that on October 17, 2001, Stanislav fell overboard and drowned while the Yellowstone was off the port of Shanghai, China. (Compl. ¶¶ 13-18; Dkt. No. 15: Lekkos 7/1/02 Aff. ¶ 7.) At the time of the accident, the ship's "pilot ladder" was being installed in order to take a Chinese river pilot aboard and proceed to Jiangjin, China. (Compl. ¶ 13; Lekkos 7/1/02 Aff. ¶ 7.)[FN1] Despite rescue efforts by the Yellowstone's crew and Chinese authorities, Stanislav's "body was never found." (Lekkos 7/1/02 Aff. ¶ 8.)[FN2]

> FN2. Both "Decedent and the ship's pilot fell into the sea."(Compl. ¶ 14; accord, Lekkos 7/1/02 Aff. ¶ 7.)

> FN3. Stanislav's Russian death certificate, issued on June 5, 2002 pursuant to a court proceeding in Kaliningrad, lists his date of death as October 17, 2001 in the city of Jiangyin, People's Republic of China. (Arralde 7/1/02 Aff. ¶ 5 & Ex. B; Lekkos 7/1/02 Aff. ¶ 9.)

*2 The parties, however, dispute the cause of the accident. Defendants assert that the accident was Stanislav's fault. (Dkt. No. 13: Eastwind Br. at 8; Dkt. No. 18: Eastwind Reply Br. at 5; Dkt. No. 19: Stearns 7/24/02 Aff. ¶ 6 (Stanislav may have fallen overboard "because of heart attack or other seizure or might even have jumped"); [FN4] 5/14/02 Stearns Letter to Judge Wood at 2.) The complaint, by contrast, asserts that (1) "[t]he vessel was unseaworthy in that the ... pilot ladder was not safe for its intended use";

(2) defendants "were negligent in not securing the pilot ladder in a safe manner"; (3) defendants "violated applicable safety regulations"; (4) defendants "failed to warn Decedent of danger"; (5) "rescue equipment was inadequate and not readily available"; and (6) "rescue efforts were negligently directed and enforced."(Compl.¶¶ 14-16.)

> FN4. Plaintiff and Eastwind both have submitted affidavits containing legal argument or other matter not based on the affiant's personal knowledge. (Dkt. No. 17: Edelman Aff.; Dkt. No. 19: Stearns 7/24/02 Aff.) The Court has disregarded such extraneous matter. See, e.g, Ugarte v. Johnson, 40 F.Supp.2d 178, 179 n. 1 (S.D.N.Y.1999) (collecting cases).

The Service Agreement, which was signed and accepted by Stanislav, provided for a base wage rate of $650 per month, and named plaintiff Helga Varnelo as Stanislav's beneficiary. (Dkt. No. 15: Lekkos 7/1/02 Aff. ¶¶ 4-5 & Exs. A-B.) The Service Agreement entitled Helga to a lump-sum payment of $49,000 for Stanislav's accidental death aboard ship. (Lekkos 7/1/02 Aff. ¶ 5 & Ex. A § 12; Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 1: Kargopolov 6/6/02 Aff. ¶¶ 5-6.)

The complaint alleged claims under the Jones Act, 28 U.S.C. § 688 et seq., the Death On the High Seas Act ("DOHSA"), 46 U.S.C. § 761 et seq., and "the General Maritime Law of the United States, and other applicable law."(Compl.¶ 1.) Claimed damages include: (1) $1 million for Helga's "personal losses as a dependent wife; loss of Decedent's support; loss of his society and other losses available under applicable laws"; and (2) $350,000 for "Decedent's pain and suffering prior to his death."(Compl.¶¶ 19, 22-23.)

*Jurisdictional Allegations Concerning Defendants*

The Yellowstone is registered in Liberia (Dkt. No. 15: Lekkos 7/1/02 Aff. ¶ 6; Dkt. No. 34: Eastwind Resp. to Pl's Interrog. No. 6.) and at the time of Stanislav's death was owned by Charm, a Liberian company (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 2: Pavlakis Aff. ¶ 3). Mayflower, the "operator" of the ship (and Stanislav's employer), is a Liberian company with offices in Piraeus, Greece. (Dkt. No

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

17; Edelman 7/15/02 Aff. Ex. 2; Pavlakis Aff. ¶ 3.) Eastwind is incorporated in Liberia with its principal place of business in this District. (Pavlakis Aff. ¶¶ 5-20; Edelman 7/15/02 Aff. Ex. 6 at 2; Eastwind Resp. to Pl's Interrog. No. 6.) Of the three defendants, only Eastwind concedes that it is subject to personal jurisdiction in this District. (See Dkt. No. 3: Answer ¶ 25.)

One of Helga's attorneys submitted a rambling, 17-page affidavit, asserting that: (1) the Yellowstone, though nominally owned by Charm with a Liberian "flag of convenience," is actually owned, controlled, and operated by Eastwind, headquartered in this District; (2) Mayflower is owned and controlled by Eastwind; (3) the ship was actually operated by Eastwind in New York, not Mayflower in Greece; and (4) the ship's "crewing agents" in Russia were owned, controlled, and operated by Eastwind. (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 2; Pavlakis Aff. ¶¶ 3-27; see also Dkt. No. 1: Compl. ¶¶ 3-12.) Defendants' answer denies, "upon information and belief," plaintiff's jurisdictional allegations. (Answer ¶¶ 3-12.) [FN5]

> FN5: It is nonsensical for defendants to deny, "upon information and belief," the complaint's jurisdictional allegations regarding the defendants (such as defendants' domiciles), since defendants clearly have access to such information. Moreover, certain of defendants' denials are contradicted by Eastwind's other submissions. For example, defendants deny "upon information and belief" that Mayflower "was Decedent's employer and had contracted for Decedent's employment aboard the B/C YELLOWSTONE."(Complaint ¶ 12; Answer ¶ 12.) Yet Eastwind submitted an affidavit averring that Stanislav "was employed pursuant to a Service Agreement between a crewing agent and the operator of M/V YELLOWSTONE, Mayflower...." (Dkt. No. 15: Lekkos 7/1/02 Aff. ¶ 4; see also Eastwind Resp. to Pl's Interrog. No. 1 (decedent "was employed pursuant to a company service agreement by Mayflower"). Similarly, defendants flatly deny the complaint's allegation that "[o]n or about 17 October 2001, while the vessel

[B/C Yellowstone] was off the port of Shanghai, China, the pilot ladder was placed over the side to take a river pilot aboard to proceed to Jiangin, China to discharge cargo" (Compl. ¶ 13; Answer ¶ 13), even though Eastwind's affidavit alleges virtually identical facts (Dkt. No. 15: Lekkos 7/1/02 Aff. ¶ 7 & Ex. D). Defense counsel must be more careful in future in preparing answers to avoid Rule 11 sanctions.

*Relevant Witnesses*

*3 According to Eastwind, all relevant evidence and witnesses are located in Russia "and perhaps China" (Dkt. No. 13: Eastwind Br. at 9-10), and "it is believed no witness who is available in New York has any knowledge concerning causation or damages" (Dkt. No. 31: Arralde 12/2/02 Aff. ¶ 13).

Eastwind asserts that the key liability witnesses are located in Russia, the Yellowstone was "manned exclusively by Russian nationals" at the time of Stanislav's death. (Dkt. No. 15: Lekkos 7/1/02 Aff. ¶ 6 & Ex. C; see Dkt. No. 31: Arralde 12/2/02 Aff. ¶ 7; Dkt. No. 13: Eastwind Br. at 10.) Of the crewmembers, Eastwind specifically names as potential witnesses the captain ("master" Vasily Larionov), the first mate ("chief officer" Andrey Bogdanov), and three "able-bodied seamen"-Miron Nuke, Sergey Gankevich, and Dmitry Naronovich. (Arralde 12/2/02 Aff. ¶¶ 6-7; Dkt. No. 18: Eastwind Reply Br. at 8.) [FN7] Larionov, Nuke, and Gankevich are currently working aboard ships operated by Mayflower, while Bogdanov and Naronovich are not. (Arralde 12/2/02 Aff. Ex. B: Lekkos 11/29/02 Aff. ¶¶ 4, 7.) [FN8] Eastwind asserts, moreover, that "[w]hen seamen are not aboard ship, Mayflower cannot require them to make an appearance in connection with a case because once their contract has terminated, Mayflower has no power to require the seamen [to] do anything."(Id. ¶ 3.) Further, Eastwind asserts that the ships on which Larionov, Nuke, and Gankevich currently work are "bulk carriers and are not in a regular liner service," so that each voyage has "different ports of call" (id. ¶ 4) presumably meaning that the ships do not predictably port in New York.

> FN6. Nuke and Stanislav allegedly were installing the pilot ladder together around

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

the time of the accident, but Nuke did not witness Stanislav's fall overboard. (Dkt. No. 15: Lekkos 7/1/02 Aff. Ex. E.) Unidentified "investigators" apparently took "statement[s]" from Nuke, the captain, and the first mate (Lekkos 7/1/02 Aff. ¶ 7 & Ex. E; Arralde 12/2/02 Aff. ¶ 6; Dkt. No. 36: Edelman 7/2/02 Letter), but only a portion of an unsworn written statement from Nuke has been submitted to this Court. (Lekkos 7/1/02 Aff. ¶ 7 & Ex. E.)

FN7. The affidavit submitted by Captain Lekkos of Mayflower fails to mention whether Bogdonov and Naronovich currently work on ships owned or controlled by defendants Eastwind or Charm. (Lekkos 11/29/02 Aff. ¶¶ 4, 7.)

Eastwind also contends that in order to assess Helga's damages, the jury would need to hear testimony from Russian witnesses regarding Stanislav's "health, state of mind or the sums he spent for personal consumption or instead contributed to his wife's support."(Dkt. No. 18: Eastwind Reply Br. at 5; see alsoDkt. No. 31: Arralde 12/2/02 Aff. ¶ 9.) However, other than plaintiff Helga, the only damages witness that Eastwind identifies is "A. Kozlov," formerly a representative of Yellowstone's crewing agent. (Arralde 12/2/02 Aff. ¶¶ 2, 8-9 & Ex. A.)

According to Eastwind, other relevant witnesses reside in or near Piraeus, Greece, including Captain Lekkos of Mayflower and Mayflower ship inspectors. (Dkt. No. 31: Arralde 12/2/02 Aff. Ex. B; Lekkos 11/29/02 Aff. ¶¶ 1, 6.) Eastwind does not specifically identify any witnesses located in China, although presumably testimony from the crewmembers of the Chinese search and rescue mission would be relevant to Helga's allegation (Dkt. No. 1: Com pl. ¶¶ 15-16) that the rescue was performed negligently. The Yellowstone itself was sold to interests in the People's Republic of China after the accident, and is believed to be currently limited to Chinese waters. (Arralde 12/2/02 Aff. Ex. C; Murray Aff. ¶ 2.)

*4 Plaintiff contends, by contrast, that because defendants concede that there were no "eye witnesses" [sic] to the accident, no Russian crew members could provide relevant testimony. (Dkt. No. 16: Pl. Br. at 1, 4, 7.) Further, plaintiff contends that

because defendants violated a treaty provision requiring that an officer supervise the rigging of pilot ladders, defendants are strictly liable for Stanislav's death. (Pl. Br. at 1, 7; seeDkt. No. 17: Edelman 7/15/02 Aff. at 2-3.) In plaintiff's view, therefore, testimony from Stanislav's shipmates regarding the details of his accident would be superfluous. (Id.)

Plaintiff further asserts that Stanislav's accident was caused by a decayed rope ladder. (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 9.) According to plaintiff, the jury will only need to hear testimony from an American expert on rope ladder negligence and a Russian sailor, identified by plaintiff, who is willing to travel here to testify that a ship similar to the Yellowstone had a defective pilot ladder. (Id.)[FN8] Finally, plaintiff asserts that, because defendants' shipping operations are based in New York, most of the relevant witnesses are located here. (Dkt. No. 16: Pl. Br. at 4-5.) Plaintiff, however, fails to identify any such witnesses or the nature of their testimony.

FN8. Plaintiff also claims to be tracking down "the Chinese pilot, or those on the Chinese pilot boat involved in the case, if he has any relevant information."(Dkt. No. 17: Edelman 7/15/02 Aff. at 15.)

*Procedural History:*

On May 16, 2002, Judge Wood referred this case to me for general pretrial supervision and for reports and recommendations on dispositive motions. (Dkt. No. 5.)

This Court held a May 31, 2002 status conference, at which plaintiff's counsel confirmed that he had never spoken to Helga, but rather had been "retained by other [foreign] lawyers" who control the case. (Dkt. No. 12: 5/31/02 Hearing Tr. at 19.)[FN9]The Court admonished plaintiff's counsel that if the case were going to remain in this District, plaintiff's counsel would have to speak directly with plaintiff, foregoing the "intermediary approach." (5/31/02 Hearing Tr. at 18.) At that conference, the Court stayed discovery to allow the parties to consider voluntarily moving the case to Russia or to brief the FNC motion. (Id. at 24.)[FN10]

FN9.See alsoDkt. No. 26: 10/24/02 Edelman Letter to Court Enc.; 10/23/02 Pavlakis Aff.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

¶¶ 1-2 (when Pavlakis was retained he hired Edelman on behalf of Helga); Dkt. No. 9: 6/7/02 Edelman Letter to Court ("I have now been in contact further with the Russian and Greek lawyers, who sent me this case. These lawyers have not authorized me to submit the case to a Russian court.").

FN10. The Court subsequently denied plaintiff's request for discovery on the forum non conveniens issue. "[I]t is the well established practice in the Southern District of New York to decide such motions on affidavits." *Alcoa S.S. Co. v. M/V Nordic Regent,* 654 F.2d 147, 158-59 (2d Cir.) (en banc), *cert. denied,* 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980), *see also e.g. Transunion Corp. v. PepsiCo, Inc.,* 811 F.2d 127, 130 (2d Cir.1987) ("Motions to dismiss for forum non conveniens may be decided on the basis of affidavits.... Indeed, as the Court noted in *Piper Aircraft,* 454 U.S. at 258, 102 S.Ct. at 267, '[r]equiring extensive investigation would defeat the purpose of [the] motion.'"); *Fitzgerald v. Texaco, Inc.,* 521 F.2d 448, 451 n. 3 (2d Cir.1975) ("[A] motion to dismiss for forum non conveniens does not call for a detailed development of the entire case; rather discovery is limited to the location of important sources of proof.... Nor did the district court in this case abuse its discretion, on this motion to dismiss for forum non conveniens, in failing to require detailed disclosure by the defendants of the names of their proposed witnesses and the substance of their testimony."), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 781 (1976); *Base Metal Trading S.A. v. Russian Aluminum,* 00 Civ. 9627, 2002 WL 987257 at *5 (S.D.N.Y. May 14, 2002) (denying "merits" discovery on FNC motion, except allowing deposition of Russian law expert); *Beekmans v. J.P. Morgan & Co.,* 945 F.Supp. 90, 95 (S.D.N.Y.1996) ("The fact that this motion is based on affidavits does not compel the conclusion that discovery should be granted.... A motion to dismiss for forum non conveniens does not call for a detailed development of the entire case through discovery....").

Upon the Court's order (5/31/02 Hearing Tr. at 15-16), and in an effort to convince plaintiff to bring her claims voluntarily in Russia, defendants' counsel forwarded to plaintiff's counsel a proposed stipulation, signed only by defendants:

IT IS HEREBY AGREED, by and between the parties hereto, that if Russian so [sic] law permits, a case will be brought by Helga Varnelo for claims arising from the death of her husband, Stanislav Varnelo, in a court whose territorial jurisdiction includes Kaliningrad, against [Eastwind, Charm, and Mayflower]. In such event, defendants will appear in said court in response to proper notification and will be responsible for payment of any judgment rendered therein and waive defenses of lack of that court's jurisdiction and statute of limitations.

(Dkt. No. 38: 6/7/02 Arraide Letter Enc.; 6/7/02 Stip.; *see* Dkt. No. 13: Eastwind Br. at 6.) Plaintiff, however, declined the invitation to commence suit in Russia. (*See* Dkt. No. 8: 6/17/02 Order.)

*5 Because defendants Mayflower and Charm dispute personal jurisdiction in this District (Dkt. No. 3: Answer ¶ 25), the forum non conveniens motion was brought solely on behalf of defendant Eastwind (Dkt. No. 13: Eastwind Motion). Any motion to dismiss for lack of personal jurisdiction as to Mayflower and Charm was deferred pending disposition of this FNC motion.

According to defendants, the Russian court would not issue a death certificate until six months from Stanislav's loss, at which time Stanislav would be presumed dead under Russian law. (5/31/02 Hearing Tr. at 6-8, 17-18, 24; *see* Dkt. No. 15: Lekkos 7/1/02 Aff. ¶ 9.) After Stanislav's death certificate was finally issued, on June 25, 2002 defendants delivered to plaintiff a certified check for $49,000, representing Helga's full death benefit under the Service Agreement. (Dkt. No. 37: 6/26/02 Letter Encl. 6/25/02 Receipt; Dkt. No. 13: Eastwind Br. at 5.) [FN11]

FN11. Plaintiff's counsel asserts that, in addition to the $49,000 check, defendants earlier paid $5,000 directly to Helga relating to Stanislav's death. (5/31/02 Hearing Tr. at 14; Pl. Br. at 5.) Demonstrating the indirect

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

relationship Helga has with New York counsel, the $49,000 check that defendants gave New York attorney Edelman was transmitted to attorney Pavlakis in Greece and from him to attorney Kargopolov in Lithuania and Kaliningrad, and from him to Helga. (SeeDkt. No. 26: 10/24/02 Edelman Letter Enc.; 10/23/02 Pavlakis Aff. ¶¶ 1-3; see alsoDkt. No. 28: 10/30/02 Edelman Letter Enc.; Helga Varnelo 10/25/02 Aff. ("I have received from my attorney Professor Stanislav Kargopolov the check ... for the sum 49,000.00 U.S. dollars."); Dkt. No. 25: 10/21/02 Edelman Letter Enc.; Edelman 10/21/02 Aff. at 2 ("As soon as the [$49,000] check was received by us, it was sent to Mr. Pavlakis ... [in Greece and he] sent [it] to Professor Kargopolov at his office in Lithuania, which is adjacent to Kaliningrad.").)

### ANALYSIS

While defendants Mayflower and Charm dispute personal jurisdiction, defendant Eastwind concedes jurisdiction and has brought this forum non conveniens motion. (See page 10 above.) The Second Circuit recently held that where defendants contest jurisdiction, a district court may bypass the question of jurisdiction and dismiss the action solely on forum non conveniens grounds.Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine, 311 F.3d 488, 497-98 (2d Cir.2002). The Court therefore turns to the forum non conveniens question.

### I. THE FORUM NON CONVENIENS STANDARD

The equitable doctrine of forum non conveniens ("FNC") permits a court to "resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute."Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947). "Through a discretionary inquiry, the court determines where litigation will be most convenient and will serve the ends of justice."PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 73 (2d Cir.1998); accord,e.g.,Murray v. British Broad. Corp., 81 F.3d 287, 290 (2d Cir.1996); Scottish Air Int'l, Inc. v. British Caledonian Group, PLC, 81 F.3d 1224, 1232 (2d Cir.1996); Ilusa v. Royal Dutch Petroleum Co., 96 Civ. 8386, 2002 WL

319887 at *29 (S.D.N.Y. Feb. 28, 2002, Wood, D.J.) ("The doctrine of forum non conveniens permits a federal court to decline to entertain a case over which it has jurisdiction if dismissing the action would serve the ends of justice or the convenience of the parties."); Potomac Capital Inv. Corp. v. KLM, 97 Civ. 8141, 1998 WL 92416 at *4 (S.D.N.Y. Mar.4, 1998) (Peck, M.J.) ("Under the forum non conveniens ['FNC'] doctrine, a district court has broad discretion to decline to exercise jurisdiction that is authorized by the general venue statute, where dismissal would best serve the convenience of the parties and the ends of justice.") (internal quotations omitted).

*6 The Court's "first level of inquiry" is determining the degree of deference to be accorded the plaintiff's choice of forum:

We ... understand the Supreme Court's teachings on the deference due to plaintiff's forum choice as instructing that we give greater deference to a plaintiff's forum choice to the extent that it was motivated by legitimate reasons, including the plaintiff's convenience and the ability of a U.S. resident plaintiff to obtain jurisdiction over the defendant, and diminishing deference to a plaintiff's forum choice to the extent that it was motivated by tactical advantage.

Iragorri v. United Tech. Corp., 274 F.3d 65, 73 (2d Cir.2001) (enbanc).[FN12]

> FN12.Accord, e.g.,Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine, 311 F.3d 488, 488 (2d Cir.2002); Aguinda v. Texaco, Inc., 303 F.3d 470, 476 (2d Cir.2002); DiRienzo v. Philip Servs. Corp., 294 F.3d 21, 28 (2d Cir.), cert. denied 537 U.S. 1028, 123 S.Ct. 556, 154 L.Ed.2d 442 (2002).

The Court must then engage in an additional two-step process:

First, the district court asks if there is an alternative forum that has jurisdiction to hear the case.... [In] the second step of the inquiry ... the district court determines the forum that will be most convenient and will best serve the ends of justice. In making this second determination, the court weighs a variety of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

private and public considerations, as set out in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947) (the *"Gilbert* factors")

*Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 46 (2d Cir.1996).[FN13]

> FN13.*Accord, e.g.,Aguinda v. Texaco, Inc.,* 303 F.3d at 476;*Iragorri v. United Tech. Corp.,* 274 F.3d at 73-74;*Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 100 (2d Cir.2000), *cert. denied,*532 U.S. 941, 121 S.Ct. 1402, 149 L.Ed.2d 345 (2001); *Alfadda v. Fenn,* 159 F.3d 41, 45-46 (2d Cir.1998); *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d at 73-74;*Murray v. British Broad Corp.,* 81 F.3d at 292-93;*Blanco v. Banco Indus. de Venezuela, S.A.,* 997 F.2d 974, 980 (2d Cir.1993); *R. Maganlal & Co. v. M.G. Chem. Co.,* 942 F.2d 164, 167 (2d Cir.1991); *Potomac Capital Inv. Corp. v. KLM* 1998 WL 92416 at *4 & n. 3 ( & cases cited therein).

> Prior to the *en banc* decision in *Iragorri v. United Tech. Corp.,* 274 F.3d at 73-74, the Second Circuit consistently described the forum non conveniens analysis as a two-step process. By adding an additional "first level of inquiry" regarding the deference to be accorded plaintiff's choice of forum, the *Iragorri* Court effectively converted the analysis into a three-step process.

In *Piper Aircraft Co. v. Reyno,* 454 U.S. 235; 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), the Supreme Court held that no one factor is determinative: "[i]f central emphasis were placed on any one factor, the forum non conveniens doctrine would lose much of the very flexibility that makes it so valuable."*Id* at 249-50, 102 S.Ct. at 263.[FN14]

> FN14.*Accord, e.g.,Scottish Air Int'l, Inc. v. British Caledonian Group, PLC,* 81 F.3d at 1234 ("Forum non conveniens is a doctrine that necessarily requires great flexibility."); *Murray v. British Broad. Corp.,* 81 F.3d at 292 ("Balancing the plaintiff's financial burdens as one of several relevant factors

serves the 'repeatedly emphasized ... need to retain flexibility' in the application of the forum non conveniens doctrine.")

"The decision to dismiss a case on forum non conveniens grounds 'lies wholly within the broad discretion of the district court and may be overturned only when ... that discretion has been *clearly abused.'"Iragorri v. United Tech. Corp.,* 274 F.3d at 72 (quoting *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC,* 81 F.3d at 1232).[FN15] There can be a "clear abuse of discretion" only if 'a court fails to carefully consider[ ] the *Gilbert* factors.'"*Peregrine Myanmar Ltd. v. Segal,* 89 F.3d at 46 (quoting *Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 1001 (2d Cir.), *cert. denied,*510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993)).[FN16]

> FN15.*Accord, e.g.,Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine,* 311 F.3d at 498;*Capital Currency Exch., N.V. v. National Westminster Bank PLC,* 155 F.3d 603, 609 (2d Cir.1998), *cert. denied,*526 U.S. 1067, 119 S.Ct. 1459, 143 L.Ed.2d 545 (1999); *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d at 46.

> FN16.*See, e.g.,DiRienzo v. Philip Serv. Corp.,* 294 F.3d at 27 (abuse of discretion if "district court fails to consider all the relevant factors or unreasonably balances those factors"); *Iragorri v. United Tech. Corp.,* 274 F.3d at 72 ("the district court must follow the governing legal standards").

## II. FORUM NON CONVENIENS ANALYSIS APPLIES TO JONES ACT CASES

[1] As a threshold matter, plaintiff contends that the Jones Act governs this maritime action, and that the Court therefore has no choice but to deny the forum non conveniens motion. (Dkt. No. 16: Pl. Br. at 12-14.) To the contrary, and as plaintiff's counsel Edelman well knows, the Second Circuit has squarely held that an action may be dismissed on forum non conveniens grounds even if the Jones Act applies. *SeeCruz v. Maritime Co. of Philippines,* 702 F.2d 47, 48 (2d Cir.1983) (per curiam) ("maritime choice of law principles are not involved in a forum non conveniens analysis and ... the district court's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

discussion on the subject was therefore unnecessary"); *see also* Alcoa S.S. Co. v. M/V Nordic Regent, 654 F.2d 147, 153-54, 158-59 (2d Cir.) (*en banc*) (The Second Circuit "consistently has applied the *Gilbert* standard in reviewing dismissals on the grounds of forum non conveniens in admiralty cases.... [I]t is in the field of admiralty that our federal courts have applied the doctrine of forum non conveniens most flexibly and over the longest period of time ... almost 180 years."), *cert. denied*, 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980).

*7 As have all other judges in this District to whom plaintiff's counsel, Mr. Edelman, made the argument, this Court also declines plaintiff's counsel's invitation to ignore *Cruz*. *See, e.g.*, *Ioannides v. Marika Mar. Corp.*, 928 F.Supp. 374, 377 & n. 5 (S.D.N.Y.1996) ("Plaintiffs invite this Court to 'reconsider' *Cruz*. It may not do so. Plaintiffs' argument would be addressed more properly to the Court of Appeals.") (plaintiff's counsel in *Ioannides* was Paul Edelman, counsel for plaintiff Varnelo); *Tsangaris v. Elite, Inc.*, 92 Civ. 7855, 1993 WL 267425 at *7 (S.D.N.Y. July 9, 1993) ("The Second Circuit has concluded that it will follow the *Gilbert* standard in all forum non conveniens motions. Even in cases brought under the Jones Act, this Court may properly apply the *Gilbert* forum non conveniens analysis.") (citations, including to *Cruz*, omitted) (Edelman was Tsangaris' counsel); *Gazis v. John S. Latsis (USA) Inc.*, 729 F.Supp. 979, 985 (S.D.N.Y.1990) (following *Cruz*, "a district court may dismiss a case on forum non conveniens grounds without first making a choice of law determination") (Edelman represented Gazis); *Doufexis v. Nagos S.S., Inc.*, 583 F.Supp. 1132, 1133 (S.D.N.Y.1983) (FNC dismissal in Jones Act case permitted under *Cruz*) (Edelman was Doufexis' counsel).

III. *DEFERENCE TO PLAINTIFF'S CHOICE OF FORUM*

"In weighing the *Gilbert* factors, the court starts with a presumption in favor of the plaintiff's choice of forum, especially if the defendant resides in the chosen forum, as here." *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 46 (2d Cir.1996). "[U]nless the balance [of interest factors] is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947).[FN17] "The defendant has the burden to establish that an adequate alternative forum exists and then to show that the pertinent factors 'tilt[ ] strongly in favor of trial in the foreign forum.'" *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d at 100 (quoting *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir.1991)).[FN18] In order to meet this burden, "defendants must provide enough information to enable the District Court to balance the parties' interests." *Piper Aircraft Company v. Reyno*, 454 U.S. at 258, 102 S.Ct. at 267. "The amount of information that the defendant must provide, in supporting affidavits or other evidence, depends on the facts of the individual case." *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 677 (D.C.Cir.1996).

FN17. *Accord, e.g.*, *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, 102 S.Ct. 252, 258, 70 L.Ed.2d 419 (1981) ("a plaintiff's choice of forum should rarely be disturbed"); *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 99, 101 (2d Cir.2000) ("a plaintiff's choice of forum is entitled to substantial deference and should only be disturbed if the factors favoring the alternative forum are compelling"), *cert. denied*, 532 U.S. 941, 121 S.Ct. 1402, 149 L.Ed.2d 345 (2001); *Murray v. British Broad. Corp.*, 81 F.3d 287, 290 (2d Cir.1996) ("There is ordinarily a strong presumption in favor of the plaintiff's choice of forum."); *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 1001 (2d Cir.) ("Although there is still a strong presumption in favor of a plaintiff's choice of forum, the Supreme Court has recognized that dismissal nevertheless may be appropriate where certain private and public interest factors point towards trial in an alternative forum."), *cert. denied*, 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993).

FN18. *Accord, e.g.*, *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 476 (2d Cir.2002) ("The defendant seeking [FNC] dismissal bears the burden as to both" whether the alternative forum is adequate and whether the private and public factors favor dismissal); *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 30 (2d Cir.) ("[P]laintiffs should not have been deprived of their choice of forum

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

except upon defendants' clear showing that a trial in the United States would be so oppressive and vexatious to them as to be out of all proportion to plaintiffs' convenience") (citing *Koster v. (American) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524, 67 S.Ct. 828, 832, 91 L.Ed. 1067 (1947), *cert. denied*,537 U.S. 1028, 123 S.Ct. 556, 154 L.Ed.2d 442 (2002); *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 71 (2d Cir.2001) (*enbanc* ) ("a court reviewing a motion to dismiss for forum non conveniens should begin with the assumption that the plaintiff's choice of forum will stand unless the defendant meets the burden of demonstrating" convenience factors); *Peregrine Myanmar Ltd v. Segal*, 89 F.3d at 46 ("The defendant has the burden of overcoming this presumption by establishing that the *Gilbert* factors 'tilt[ ] strongly in favor of' the alternative forum."); *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F.Supp.2d 722, 742 (S.D.N.Y.2001) ("The burden on the defendant in the forum non conveniens context is deliberately heavy ..."); *Rostropovich v. Koch Int'l Corp.*, 94 Civ. 2674, 1995 WL 104123 at *12 (S.D.N.Y. Mar.7, 1995) (Denying FNC dismissal to Russia: "defendants have not notified this Court of any particular necessary witnesses or documents that are not available in this forum. A party seeking to change forums must specify witnesses and documents requiring a more convenient forum.").

"Where a foreign plaintiff is concerned, however, its choice of forum is entitled to less deference."*Murray v. British Broad. Corp.*, 81 F.3d at 290 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. at 266);*accord e.g.,Monguasque de Reassurances S.A.M v. Nak Naftogay of Ukraine*, 311 F.3d 488, 498 (2d Cir.2002). As the Second Circuit explained:

*8 The Supreme Court has emphasized that this rule is not based on a desire to disadvantage foreign plaintiffs but rather on a realistic prediction concerning the ultimate convenience of the forum;

[w]hen the home forum has been chosen, it is reasonable to assume that this choice is convenient.

When the plaintiff is foreign, however, this assumption is much less reasonable. Because the central purpose of any forum non conveniens inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference.

*Murray v. British Broad. Corp.*, 81 F.3d at 290 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. at 255-56, 102 S.Ct. at 266 (fn omitted)); *accord, e.g.,R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d at 168. The Second Circuit has "cautioned that 'this reduced weight is not an invitation to accord a foreign plaintiff's selection of an American forum *no* deference since dismissal for forum non conveniens is the exception rather than the rule.'"*Murray v. British Broad. Corp.*, 81 F.3d at 290 (quoting *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d at 168). Thus, "some weight must still be given to a foreign plaintiff's choice of forum."*Murray v. British Broad. Corp.*, 81 F.3d at 290.

In *Iragorri v. United Tech. Corp.*, the Second Circuit *en banc* synthesized recent precedent to hold that "the degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations":

The Supreme Court explained in *Piper* that the reason we give deference to a plaintiff's choice of her home forum is because it is presumed to be convenient. *Id.* at 255-56, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419. ("When the home forum has been chosen, it is reasonable to assume that this choice is convenient.") In contrast, when a foreign plaintiff chooses a U.S. forum, it "is much less reasonable" to presume that the choice was made for convenience. *Id.* at 256, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419. In such circumstances, a plausible likelihood exists that the selection was made for forum-shopping reasons, such as the perception that United States courts award higher damages than are common in other countries. Even if the U.S. district was not chosen for such forum-shopping reasons, there is nonetheless little reason to assume that it is convenient for a foreign plaintiff.

Based on the Supreme Court's guidance, our understanding of how courts should address the degree of deference to be given to a plaintiff's choice of a U.S. forum is essentially as follows: The more it appears that a domestic or foreign plaintiff's choice of

Not Reported in F.Supp.2d                                          Page 11
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice. Stated differently, *the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for forum non conveniens.* Thus, factors that argue against forum non conveniens dismissal include the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense. On the other hand, *the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons-such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum-the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a forum non conveniens motion* by showing that convenience would be better served by litigating in another country's courts.

*9 *Iragorri v. United Tech Corp.*, 274 F.3d at 71-72 (emphasis added & fns. omitted).[FN19] The *Iragorri* Court concluded that:

> FN19. *Iragorri* concerned a plaintiff residing in the United States, but outside the district in which the action was filed, on a motion by defendants to dismiss on forum non conveniens grounds. *Id.* at 68-69. Nevertheless, the decision defined the appropriate analysis on a forum non conveniens motion.

[T]he greater the degree of deference to which the plaintiff's choice of forum is entitled, the stronger a showing of inconvenience the defendant must make to prevail in securing forum non conveniens dismissal. At the same time, a lesser degree of deference to the plaintiff's choice bolsters the

defendant's case but does not guarantee dismissal.... The action should be dismissed only if [plaintiff's] chosen forum is shown to be genuinely inconvenient and [defendant's] selected forum significantly preferable. In considering this point, the court furthermore must balance the greater convenience to the defendant of litigating in its preferred forum against any greater inconvenience to the plaintiff if the plaintiff is required to institute the suit in the defendant's preferred foreign jurisdiction.
*Id.* at 74-75.[FN20]

> FN20. *Accord,* e.g. *Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine,* 311 F.3d at 498; *see also,* e.g. *Wiwa v. Royal Dutch Petroleum Co.* 226 F.3d at 101 ("deference increases as the plaintiff's ties to the forum increase"); *Abdullahi v. Pfizer, Inc.,* 01 Civ. 8118, 2002 WL 31082956 at *10 (S.D.N.Y. Sept.17, 2002) ("[A]s foreign nationals with no significant ties to the Southern District, plaintiffs are not entitled to a strong presumption that their choice of forum is sufficiently convenient" under *Iragorri* standards.

The Court analyzes below: (A) whether the *Iragorri* factors, including the amenability of defendants to suit in this District, affect deference to plaintiff's choice of forum; and (B) whether deference to plaintiff's choice of this forum should be affected by treaty obligations between Russia and the United States. The Court notes, however, that the degree of deference analyses to some extent overlaps with the *Gilbert* private convenience factors, which the Court discusses in Point V.A. below.

**A. The Iragorri Factors Do Not Support Deference to Plaintiff's Forum Choice**

[2] Here, of course, plaintiff Helga Vamelo is a citizen and resident of Russia. (*See* page 2 above.) A finding of diminished deference based on plaintiff's overseas residence is only the beginning of the *Iragorri* deference analysis: the Court must also consider each of the other deference factors. *See* *Iragorri v. United Tech Corp.*, 274 F.3d 65, 71-73 (2d Cir.2001) (en banc ); accord, e.g. *Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine,* 311 F.3d 488, 498-99 (2d Cir.2002); *Abdullahi v. Pfizer, Inc.,* 01 Civ. 8118,

Not Reported in F.Supp.2d                                                                 Page 12
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

2002 WL 31082956 at *10 (S.D.N.Y. Sep.17, 2002); *Wiwoke v. Contrace Servs. Ltd.*, 00 Civ. 1188, 2002 WL 1560775 at *5-6 (S.D.N.Y. July 15, 2002).

First, plaintiff has pointedly conceded that her recovery in Russia would be, at best, a small fraction of her recovery in this forum [FN21] (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 1: Kargopolov 6/6/02 Aff. ¶¶ 5-6; Dkt. No. 16: Pl. Br. at 3.) One could hardly hope for a more forthright admission of forum shopping. "[T]he more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons–such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district ...-the less deference the plaintiff's choice commands...."*Iragorri v. United Tech Corp.*, 274 F.3d at 72 [FN22] This points to giving lesser deference to plaintiff's choice of this forum.

> FN21. The prospect of a lower recovery in the alternative forum is entitled to little weight in plaintiff's favor under the *Gilbert* factors. See, e.g.,*Alfadda v. Fenn*, 159 F.3d 41, 45 (2d Cir.1998); *see also* discussion at Point IV.B. below.

> FN22.*Accord, e.g.,In re Rezulin Prods. Liab. Litig.*, 214 F.Supp.2d 396, 400 (S.D.N.Y.2002) ("[P]laintiff seeks to justify litigating here in part by noting that Canada does not permit punitive damages ... a point immaterial to the forum non conveniens analysis but one that underscores the fact that plaintiff's suit here is the product of forum shopping.") (fn.omitted); *Ioannides v. Marika Mar. Corp.*, 928 F.Supp. 374, 378 (S.D.N.Y.1996) ("[P]laintiffs' presumed choice of this forum in pursuit of more liberal American attitudes toward damage awards is not entitled to substantial weight.").

*10 Second, it is highly unlikely that plaintiff chose this forum for "the availability of witnesses or evidence to the forum district."See*Iragorri v. United Tech Corp.*, 274 F.3d at 72. As explained below (see Point V.A.1.), the key witnesses, including Stanislav's shipmates on the Yellowstone and indeed plaintiff Helga Varnelo herself, all reside in Russia.

Plaintiff's assertion that employees of the defendants located in New York may possess evidence (see Point V.A.c. below) appears to be purely speculative. Again, this factor points to giving lesser deference to plaintiff's choice of forum.

Third, "the availability of appropriate legal assistance,"*Iragorri v. United Tech. Corp.*, 274 F.3d at 72, cannot be considered a factor favoring this forum, as plaintiff has had to employ no less than three sets of attorneys (Russian/Lithuanian, Greek, and American) to file suit here. (See pages 8-9 & n. 9 & page 10 n. 11 above.) Again, this factor points to giving lesser deference to plaintiff's choice of forum.

Fourth, given that this action involves the death of a Russian seaman, hired in Russia, on board a Liberian ship in Chinese territorial waters, one is hard put to argue the "lawsuit's bona fide connection to the United States."*Iragorri v. United Tech. Corp.*, 274 F.3d at 72. Moreover, as described in greater detail in Point V.B.1. below, the possibility that the Jones Act might apply to plaintiff's claim does not create a substantial connection to this forum. Again, this factor points to giving lesser deference to plaintiff's choice of forum.

Finally, the Second Circuit has consistently held that suit in a defendant's home forum supports deference to plaintiff's forum choice. [FN23] In this case, defendants Charm and Mayflower–the parties most clearly responsible for Stanislav's accident-dispute jurisdiction, as they are (at least nominally) based in Liberia and Greece, respectively. (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 2: Pavlakis Aff. ¶ 3.) Nevertheless, Eastwind is based in this district (e.g. Edelman 7/15/02 Aff. Ex. 6 at 5), and plaintiff asserts that Eastwind controls Charm and Mayflower, so that defendants' overall shipping operations–which include the ship at issue-are owned, controlled, and managed from this District (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 2: Pavlakis Aff. ¶¶ 3-27; see alsoDkt. No. 1: Compl. ¶¶ 3-12).

> FN23.See, e.g.,*Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 46 (2d Cir.1996) (finding "a presumption in favor of the plaintiff's choice of forum, especially if the defendant resides in the chosen forum, as here"); *Schertenleib v. Traum*, 589 F.2d 1156, 1164 (2d Cir.1978) ("We begin by noting that

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

plaintiff chose this forum and defendant resides here. This weighs heavily against dismissal. In this rare case, however, none of the relevant events occurred here, and none of the sources of proof are here."); *McLaughlin v. Bankers Trust Co.*, 97 Civ. 9312, 1998 WL 355419 at *3 (S.D.N.Y. July 2, 1998), *aff'd* 182 F.3d 900 (2d Cir.1999); *Mobil Sales & Supply Corp. v. Republic of Lithuania*, 97 Civ. 4045, 1998 WL 196194 at *9 (S.D.N.Y. Apr.23, 1998), *aff'd* 166 F.3d 1201 (2d Cir.1998); *Continental Pac. Shipping, Ltd. v. CIT Group/Equip. Fin., Inc.*, 96 Civ. 2646, 1996 WL 571855 at *7 (S.D.N.Y. Oct.7, 1996) ("[T]he presumption in favor of the plaintiff's choice of forum is particularly strong if the defendant resides in the chosen forum."); *Mutual Exp. Corp. v. Westpac Banking Corp.*, 742 F.Supp. 161, 163 (S.D.N.Y.1990) (fact that "plaintiff has chosen a forum in which the defendant maintains a substantial presence""weigh[ed] in favor of deferring to plaintiff's choice of forum").

Heightened deference to plaintiff's choice of U.S. forum is only reasonable, however, if it is unclear that defendants would be amenable to suit in an alternative forum such as plaintiff's home forum (here, Russia). The Second Circuit explained:

One of the factors that necessarily affects a plaintiff's choice of forum is the need to sue in a place where the defendant is amenable to suit. Consider for example a hypothetical plaintiff residing in New Jersey, who brought suit in the Southern District of New York, barely an hour's drive from the plaintiff's residence, because the defendant was amenable to suit in the Southern District *but not in New Jersey.* It would make little sense to withhold deference for the plaintiff's choice merely because she did not sue in her home district. Where a U.S. resident leaves her home district to sue the defendant where the defendant has established itself and is thus amenable to suit, this would not ordinarily indicate a choice motivated by desire to impose tactical disadvantage on the defendant. *This is all the more true where the defendant's amenability to suit in the plaintiff's home district is unclear.*

*11 *Iragorri v. United Tech Corp.*, 274 F.3d at 72-73

(emphasis added).

Here, it is undisputed that defendant Mayflower hired Stanislav, a Russian citizen, on Russian soil (see page 2 above), and plaintiff alleges that Mayflower regularly hires Russian crews on Russian soil. (*See* Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 7: Eastwind Website ("the Russian joint-venture vessels are managed by Mayflower, which provides training programs for Russian and FSU seafarers.").) The Court thus deems it reasonable to assume that at least Mayflower would be amenable to suit in Russia. Otherwise, shipowners and operators would be able to hire Russian crews on Russian soil without being subject to Russian jurisdiction, and that cannot possibly be the substance of Russian law.[FN24] Accordingly, because plaintiff Helga Varnelo could have sued at least Mayflower in her home forum, Russia, this factor does not support heightened deference for plaintiff's choice of forum.

FN24. Eastwind's expert on Russian law has stated that if Helga sued Mayflower either under the Service Agreement or under the Russian Civil Code for Stanislav's accidental death at sea, if Mayflower "does not contest the jurisdiction of the Russian Court ..., the [Russian] judge would have no reason not to find in Mrs. Varnelo's favor."(Dkt. No. 14: Arralde 7/1/02 Aff. Ex. C: Balakirev 7/1/02 Opinion Letter ¶¶ 5-8.) He conceded, however, that if the non-Russian defendant "refuse[d] to recognize the jurisdiction of the Russian Court, the [Russian] judge may decide not to entertain the case because of the difficulty in enforcing a judgment against a non-Russian company. But if a non-Russian company consents to the Russian Court's jurisdiction, there would be no reason for the [Russian] court not to hear the case."(*Id.* ¶ 6; *see also* ¶ 8.) Mayflower, Charm and Eastwind have consented to suit in Russia.

It is unclear whether defendant Charm has any Russian connections, and apparently Eastwind is connected to Russia only through subsidiaries or affiliates. However, jurisdiction in the New York forum over all three defendants is similarly dubious, as only Eastwind is

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

clearly located here.

Indeed, in the related context of the adequacy of the foreign forum (discussed further in Point IV below), the Second Circuit has held that "[o]nce defendants consent[ ] to suit in" the foreign forum, "there [is] no reason to determine whether defendants were initially subject to the compulsory jurisdiction of [the foreign forum]." *Farmanfarmaian v. Gulf Oil Corp.,* 588 F.2d 880, 882 (2d Cir.1978) (citing *Schertenleib v. Traum,* 589 F.2d at 1163) ("Plaintiff argues that this practice is unfair to him in that he first brought suit in allegedly the only place he could, and now, after he tries to sue defendant in Geneva, he may end up back here again, all at his inconvenience and expense. The answer to this is that a district court should not dismiss unless it justifiably believes that the alternative forum will take jurisdiction, if the defendant consents. Once that finding has been made, the remaining but unlikely possibility that the plaintiff may ultimately have to return to the inconvenient forum is a factor to be weighed in deciding whether to dismiss, ... but this kind of improbability should not automatically preclude the use of forum non conveniens.")).

In sum, based on this Court's analysis of the "sliding scale" factors described in *Iragorri v. United Tech. Corp.,* 274 F.3d at 71-72, plaintiff Helga Varnelo's choice of this forum is accorded "little deference." *Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine,* 311 F.3d at 499.

B. *Treaty Obligations Between Russia and the United States Do Not Change the Result*

[3] Although neither party raised the issue on this motion, this Court notes that relations between the United States and Russia appear to be governed by a treaty providing for equal access to each other's courts. *See* Agreement On Trade Relations Between the United States of America and the Union of Soviet Socialist Republics Entered into Force June 17, 1992, State Dept. No. 92-168, KAV No. 2609, 1992 WL 466079 (Treaty), Art. XII, § 1 ("Nationals, companies and organizations of either [Treaty] Party shall be accorded national treatment with respect to access to all courts and administrative bodies in the territory of the other Party, as plaintiffs, defendants or otherwise."). The Second Circuit has held that such treaty provisions prohibit courts from treating

foreign plaintiffs' forum choices with less deference than that accorded United States citizens:

*11 We have ruled ... that when a treaty with a foreign nation accords its nationals access to our courts equivalent to that provided American citizens, identical forum non conveniens standards must be applied to such nationals by American courts. Because such a treaty exists between the United States and Venezuela, no discount may be imposed upon the plaintiff's initial choice of a New York forum in this case solely because [plaintiff] is a foreign corporation.

*Blanco v. Banco Indus. de Venezuela, S.A.,* 997 F.2d 974, 981 (2d Cir.1993) (citations omitted).[FN25]

> FN25. *Accord, e.g. Irish Nat'l Ins. Co. v. Aer Lingus Teoranta,* 739 F.2d 90, 91-92 (2d Cir.1984) (Treaty of Friendship, Commerce and Navigation between the United States and Ireland providing for "national treatment with respect to ... having access to the courts of justice" required the district court to apply "the same forum non conveniens standards that it would have applied to a United States citizen"); *Farmanfarmaian v. Gulf Oil Corp.,* 588 F.2d 880, 882 (2d Cir.1978) ("Whatever the merits of [the] proposition generally" that "a foreign plaintiff's 'right to sue in the United States is clearly of a lesser magnitude than that of an American citizen', ... we think it has no application where, as here, a treaty between the United States and the foreign plaintiff's country allows nationals of both countries access to each country's courts on terms no less favorable than those applicable to nationals of the court's country."); *see also, e.g. Murray v. British Broad. Corp.,* 81 F.3d 287, 290-92 (2d Cir.1996) (discussing "access to courts" clause in FNC context; distinguishing particular treaty provision as not providing for equal access to courts); *Alcoa S.S. Co. v. M/V Nordic Regent,* 654 F.2d 147, 152-53 (2d Cir.1978) (*en banc* ) (same), *cert. denied,* 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980); *Flores v. Southern Peru Copper Corp.,* 00 Civ. 9812, 2002 WL 1587224 at *28-29 (S.D.N.Y. July 16, 2002) (Haight, D.J.) (convenience

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

factors favored dismissal even if foreign plaintiff's forum choice granted heightened deference under treaty cases). *Doe v. Hyland Therapeutics Div.*, 807 F.Supp. 1117, 1122-23 (S.D.N.Y.1992) ("Where an 'equal access to courts' provision exists in a treaty, the Second Circuit has held that a foreign plaintiff's right to sue in a United States forum is equal to that of a United States citizen."Declining to determine the degree of deference, as action would be dismissed even if greater deference granted.).

This line of treaty cases requiring "equal access" to foreign plaintiffs is, however, easily harmonized with the line of cases granting less deference to plaintiffs residing overseas. (*See* cases cited at page 17 above.) Foreign plaintiffs deserve less deference, not because they lack U.S. citizenship, but simply because their overseas residence vitiates any presumption that they would find the U.S. forum convenient. As the Second Circuit explained, U.S. residence is a "factor supporting the plaintiff's choice of a U.S. forum,""not because of chauvinism or bias in favor of U.S. residents," but

rather because the greater the plaintiff's ties to the plaintiff's chosen forum, the more likely it is that the plaintiff would be inconvenienced by a requirement to bring the claim in a foreign jurisdiction. Also, while our courts are of course required to offer equal justice to all litigants, *see* [*Alcoa S.S. Co. v. M/V Nordic Regent*], 654 F.2d at 152-53 (noting existence of treaties requiring "no less favorable" treatment of foreign nationals), a neutral rule that compares the convenience of the parties should properly consider each party's residence as a factor that bears on the inconvenience that party might suffer if required to sue in a foreign nation.

*Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 102 (2d Cir.2000), *cert. denied* 532 U.S. 941, 121 S.Ct. 1402, 149 L.Ed.2d 345 (2001).

Thus, a foreign plaintiff residing overseas should receive the same diminished degree of deference as would be accorded an expatriate U.S. citizen living abroad. *See* *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 73 n. 5 (2d Cir.2001) ("it would be less reasonable to assume that an "expatriate U.S. citizen residing permanently in a foreign country bring[ing]

suit in the United States" chose this forum "based on convenience"). This solution (1) satisfies this country's treaty obligations, by treating foreign plaintiffs the same as similarly situated U.S. citizens (*i.e.* similarly situated in that they reside overseas), and (2) respects convenience as the touchstone of the forum non conveniens analysis by giving deference solely to plaintiffs actually residing in this country.[FN25]*See* *In re Bridgestone/Firestone, Inc.*, 190 F.Supp.2d 1125, 1136-37 (S.D.Ind.2002) ("expatriate U.S. nationals and treaty nationals residing in their home countries are entitled to the same deference on their choice of forum, with the consideration that suing in a United States forum while residing in a foreign country is less likely to be convenient. This formulation accommodates a number of conflicting values, including protecting U.S. courts from a glut of foreign cases while continuing to respect our treaty obligations.... And, ultimately, it captures the main point of our analysis-convenience. Hence, we conclude that Plaintiffs here are entitled to the same deference as U.S. citizens *in similar situations*, with the understanding that suing in a United States court is sometimes, although not always, less likely to be convenient when the shared situation is residence in a foreign country."); *Doe v. Hyland Therapeutics Div.*, 807 F.Supp. at 1123 n. 9 ("the practice of according talismanic significance to a plaintiff's citizenship seems contrary to the rationale underlying forum non conveniens analysis"); *Oxley v. Wyeth Labs., Inc.*, No. Civ. A. 91-1285, 1992 WL 116308 at *3 (E.D.Pa. May 20, 1992) ("Pursuant to the terms of [Ireland-U.S.] Treaty, Irish plaintiffs are to be given the same deference to choice of forum as would be given to nonresident United States citizens.") Accordingly, because plaintiff Helga Vamelo resides in Russia, treaty obligations between Russia and the United States do not require any greater deference to her choice of this forum, and as discussed above, the *Iragorri* factors lead to giving her choice of forum lesser deference.

FN26. As a corollary, because the touchstone of forum non conveniens is the plaintiff's residence (and thus convenience) rather than citizenship, foreign nationals residing in the U.S. receive the same heightened deference as U.S. resident citizens. In all cases in which the Second Circuit has "deemed a plaintiff 'foreign' and accorded that plaintiff's choice of forum less deference. the plaintiffs involved were

Not Reported in F.Supp.2d                                                                                   Page 16
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

foreign corporations or foreign-national individuals residing abroad.... [The Second Circuit has] never accorded less deference to a foreign plaintiff's choice of a United States forum where that plaintiff was a U.S. resident."*Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d at 103;*accord Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah,* 184 F.Supp.2d 277, 302 (S.D.N.Y.2001) ("actions brought by residents of the United States who happen to be foreign citizens are entitled to a strong presumption against dismissal on forum non conveniens grounds"); *Byrne v. British Broad. Corp.,* 132 F.Supp.2d 229, 237-38 (S.D.N.Y.2001) ("courts should accord the choice of forum of foreign citizens who are legal residents of the United States the same deference as the choice of forum of United States citizens").

## IV. RUSSIA IS AN ADEQUATE ALTERNATE FORUM

*13 [4]"The requirement of an alternative forum is ordinarily satisfied if the defendant is amenable to process in another jurisdiction, except in 'rare circumstances' when 'the remedy offered by the other forum is clearly unsatisfactory.'"*Murray v. British Broad. Corp.,* 81 F.3d 287, 292 (2d Cir.1996) (quoting *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254 n. 22; 102 S.Ct. 252, 265 n. 22; 70 L.Ed.2d 419 (1981)); *accord, e.g. Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine,* 311 F.3d 488, 499 (2d Cir.2002); *Aguinda v. Texaco, Inc.,* 303 F.3d 470, 476-77 (2d Cir.2002); *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State Bank of Pak.,* 273 F.3d 241, 248 (2d Cir.2001); *Alfadda v. Fenn,* 159 F.3d 41, 45 (2d Cir.1998) ("An alternative forum is adequate if: (1) the defendants are subject to service of process there, and (2) the forum permits 'litigation of the subject matter of the dispute.'") (quoting *Piper Aircraft Co. v. Reyno,* 454 U.S. at 254 n. 22; 102 S.Ct. at 265 n. 22);*R. Maganlal & Co. v. M.G. Chem. Co.,* 942 F.2d 164, 167 (2d Cir.1991); *Potomac Capital Inv. Corp. v. KLM,* 97 Civ. 8141, 1998 WL 92416 at *4 (S.D.N.Y. Mar.4, 1998) (Peck, M.J.).[FN27]

FN27. *Accord, e.g. Skelton Fibres Ltd. v. Canas,* 96 Civ. 6031, 1997 WL 97835 at *4 n. 2 (S.D.N.Y. Mar.6, 1997) ("The Second Circuit has held that this prong of the test is not difficult to satisfy."); *Cabiri v. Assasie-Gyimah,* 921 F.Supp. 1189, 1199 (S.D.N.Y.1996) (FNC motion will be denied if the plaintiff shows that conditions in the foreign forum plainly demonstrate that "plaintiffs are highly unlikely to obtain basic justice" in the foreign forum).

Plaintiff asserts that Russia is an inadequate forum because: (A) Russian courts would not assert jurisdiction over defendants, even on defendants' consent; and (B) even assuming such jurisdiction, any recovery in Russia would be inadequate. (Dkt. No. 16: Pl. Br. at 3-5; Dkt. No. 17: Edelman Aff. Ex. 1: Kargopolov 6/6/02 Aff. ¶¶ 5-6 & 7/8/02 Aff. ¶¶ 3-5.)[FN28]Neither of these grounds has merit.

FN28. Plaintiff also asserts that even were a Russian court to entertain this action, it would be "slow, burdensome and costly," lasting "in practice" one year (and up to four years). (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 1: Kargopolov 6/6/02 Aff. ¶ 6.) Further, plaintiff asserts that the procedure for serving summonses upon foreign defendants is burdensome and time-consuming, and all documents would have to be translated into Russian and the translation certified by a notary public.(Id.) Such considerations, while perhaps relevant to the *Gilbert* balancing test discussed in Point V below, should not affect the adequacy of the Russian forum. *See Parex Bank v. Russian Sav. Bank,* 116 F.Supp.2d 415, 423 (S.D.N.Y.2000) ("comity requires that this Court abstain from adversely judging the quality of Russia's justice system unless [plaintiff] makes a showing of inadequate procedural safeguards."); *accord, e.g. Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine,* 311 F.3d 488, 499 (2d Cir.2002) (FNC dismissal in favor of litigation in the Ukraine, where plaintiff's "meager and conclusory" assertion that courts there were "biased" or "corrupt"); *Aguinda v. Texaco, Inc.,* 303 F.3d 470, 478 (2d Cir.2002) ("Plaintiffs point further to several respects in which Ecuadorian procedure is less efficient than U.S.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

Page 17

procedure. While Ecuador's judicial procedures may be less streamlined than ours, that does not make Ecuador's procedures ineffective or render Ecuador inadequate as an alternative forum."); *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir.1998) ("considerations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards, ... so such a finding is rare"); *Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 982 (2d Cir.1993) (" '[T]he unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate.' "); *Pavlov v. Bank of New York Co.*, 135 F.Supp.2d 426, 434-35 (S.D.N.Y.2001) (Russia adequate forum despite unavailability of pretrial discovery), *vacated on other grounds,* No. 01-7434, 25 Fed. Appx. 70, 2002 WL 63576 (2d Cir. Jan.14, 2002); *Potomac Capital Inv. Corp. v. KLM,* 1998 WL 92416 at *5 ("[W]ere a forum considered inadequate merely because it did not provide for federal style discovery, few foreign forums could be considered 'adequate'-and that is not the law.").

A. *Russian Courts Would Likely Exercise Jurisdiction Over Defendants On Consent*

Defendants have consented to jurisdiction in Russia:

IT IS HEREBY AGREED, by and between the parties hereto, that if Russian so [sic] law permits, a case will be brought by Helga Varnelo for claims arising from the death of her husband, Stanislav Varnelo, in a court whose territorial jurisdiction includes Kaliningrad, against [defendants Eastwind, Charm, and Mayflower]. In such event, defendants will appear in said court in response to proper notification and will be responsible for payment of any judgment rendered therein and waive defenses of lack of that court's jurisdiction and statute of limitations.

[Dkt. No. 38: 6/7/02 Arraide Letter Enclosure.] Such "[a]n agreement by the defendant to submit to the

jurisdiction of the foreign forum can generally satisfy [the adequate alternative forum] requirement."*DiRienzo v. Philip Servs. Corp.*, 232 F.3d 49, 57 (2d Cir.2000). *vacated on other grounds,*294 F.3d 21 (2d Cir.2002); *accord,e.g.,Aguinda v. Texaco, Inc.* 303 F.3d 470, 477 (2d Cir.2002); *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 75 (2d Cir.1998) ("the district court did not err by conditioning the [forum non conveniens] dismissal on [defendant's] consent to personal jurisdiction in Indonesia and any potential jurisdictional problem is avoided"); *In re Union Carbide Corp. Gas Plan Disaster,* 809 F.2d 195, 203 (2d Cir.) ("The emphasis placed by plaintiffs on [defendants] having its domicile here, where personal jurisdiction over it exists, is robbed of significance by its consent to Indian jurisdiction."), *cert. denied,*484 U.S. 871, 108 S.Ct. 199 (1987); *Abdullahi v. Pfizer, Inc.* 01 Civ, 8118, 2002 WL 31082956 at *7 (S.D.N.Y. Sep.17, 2002); *Abert Trading, Inc. v. Kipling Belgium N.V./S.A.,* 00 Civ, 0478, 2002 WL 272408 at *3 (S.D.N.Y. Feb.26, 2002); *Destin Songs LLC v. Wingspan Records,* 00 Civ. 8854, 2001 WL 799811 at *4 (S.D.N.Y. July 16, 2001); *Pavlov v. Bank of New York Co.,* 135 F.Supp.2d 426, 434 (S.D.N.Y.2001) (Russia adequate forum because defendant appears to be subject to jurisdiction there, but in any event, defendant "has offered to consent to jurisdiction in Moscow with respect to these claims, thus removing this objection.") (fn.omitted), *vacated on other grounds,* No. 01-7434, 25 Fed. Appx. 70, 2002 WL 63576 (2d Cir. Jan.14, 2002); *Skelton Fibres Ltd. v. Canas,* 96 Civ, 6031, 1997 WL 97835 at *4 (S.D.N.Y. Mar.6, 1997) (adequate alternative forum satisfied where defendants "consent[ed] to the jurisdiction of the Spanish courts."); *Beykmans v. J.P. Morgan & Co.,* 945 F.Supp. 90, 93 (S.D.N.Y.1996); *Doe v. Hyland Therapeutics Div.,* 807 F.Supp. 1117, 1123 (S.D.N.Y.1992).

*14 Plaintiff, however, asserts that because defendants are non-Russian, Russian courts would refuse to exercise jurisdiction even upon defendants' consent. (Dkt. No. 17 Edelman Aff. Ex. 1: Kargopolov 6/6/02 Aff. ¶ 6 & 7/8/02 Aff. ¶¶ 3-5.) The Court thus faces an issue of foreign law: whether a Russian court would exercise jurisdiction over plaintiff's claim on defendants' consent to jurisdiction.

This Court has the power to condition dismissal on

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

(1) defendants' consent to jurisdiction in Russia; (2) the Russian court accepting the case; and (3) a stay of the U.S. statute of limitations, protecting plaintiff in the event that the Russian court rejects the case. *See, e.g., PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d at 75 ("the district court did not err by conditioning the [FNC] dismissal on [defendant's] consent to personal jurisdiction in Indonesia and any potential jurisdictional problem is avoided"); *Blanco v. Banco Indus. de Venezuela, S.A.,* 997 F.2d 974, 984 (2d Cir.1993) ("[F]orum non conveniens dismissals are often appropriately conditioned to protect the party opposing dismissal."); *In re Union Carbide Corp. Gas Plant Disaster,* 809 F.2d at 203-04 (affirming FNC dismissal conditioned upon defendant's consent to personal jurisdiction in India and waiver of statute of limitations; such conditions "are not unusual and have been imposed in numerous cases where the foreign court would not provide an adequate alternative in the absence of such a condition").[32]

> FN29 *See also, e.g. Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.,* 145 F.3d 481, 491 (2d Cir.1998) (reversing FNC dismissal for, *inter alia,* district court's failure to "condition [FNC] dismissal on [defendant's] consent to jurisdiction in" foreign forum); *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224, 1235 (2d Cir.1996) (FNC granted on defendant's waiver of statute of limitations); *El-Fadl v. Central Bank of Jordan,* 75 F.3d 668, 679 (D.C.Cir.1996) ("If doubts about the availability of an alternative forum remain due to the difficulties in determining Jordanian law, the district court may dismiss for forum non conveniens, but only if conditioned on the defendants' submitting to jurisdiction in Jordan and on the Jordanian courts' acceptance of the case."); *Sussman v. Bank of Israel,* 990 F.2d 71, 71-72 (2d Cir.1993) (per curiam) (affirming district court's FNC dismissal conditioned upon defendants' partial waiver of limitations defense and undertaking from Israeli officials that plaintiff would not be detained if he went to Israel to initiate litigation there); *R. Maganlal & Co. v. M.G. Chem. Co.,* 942 F.2d 164, 167 (2d Cir.1991) (defendant agreed to FNC dismissal conditioned upon submission to jurisdiction

of foreign court); *Schertenleib v. Traum,* 589 F.2d 1156, 1166 (2d Cir.1978) (upholding FNC dismissal on condition that if foreign court refuses to exercise jurisdiction, plaintiff may reinstate action, and defendant waive statute of limitations defense).

In fact the Second Circuit has held that "[o]nce defendants consent[ ] to suit in" the foreign forum, "there [is] no reason to determine whether defendants were initially subject to the compulsory jurisdiction" of the foreign forum. *Farmanfarmaian v. Gulf Oil Corp.,* 588 F.2d 880, 882 (2d Cir.1978).

The Second Circuit, however, recently "clarif[ied]" the type of finding that the district court should make regarding the adequacy of an alternative foreign forum in a case in which foreign law or practice is at issue, and in which the case is dismissed conditionally only":

[T]he district court may dismiss on forum non conveniens grounds, despite its inability to make a definitive finding as to the adequacy of the foreign forum, if the court can protect the non-moving party by making the dismissal conditional ... does not, however, excuse the district court from engaging in a full analysis of those issues of foreign law or practice that are relevant to its decision, or from closely examining all submissions related to the adequacy of the foreign forum. If, in the end, the court asserts its "justifiable belief" in the existence of an adequate alternative forum, it should cite to evidence in the record that supports that belief. In doing so, the district court should keep in mind that it remains the movant's burden to demonstrate the existence of an adequate alternative forum.

Precisely how certain the court must be regarding the existence of an adequate alternative foreign forum will necessarily depend on how protective of the non-moving party the conditional dismissal will in fact be....

*15 ... Finally, we observe that while the conditional dismissal device can help to protect the non-moving party in circumstances where the district court remains concerned about the accuracy of its "justifiable belief" as to a foreign forum's adequacy, the mechanism is not a substitute for the initial "justifiable belief" of adequacy. Conditions cannot

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

Page 19

transform an inadequate forum into an adequate one.

*Bank of Credit & Commerce Int'l v. State Bank of Pak.*, 273 F.3d 241, 247-48 (2d Cir.2001) (fns.omitted). Accordingly, even in the face of the Court's power to protect plaintiff through a conditional dismissal, the Court must nevertheless determine whether a Russian court likely would exercise jurisdiction over this case. *Cf.Schertenleib v. Traum*, 589 F.2d at 1163 ("If the defendant consents to suit in the foreign alternate forum, and if that appears to be sufficient under the foreign law, why waste the litigants' money and the court's time in what is essentially an unnecessary and difficult inquiry into the further intricacies of foreign jurisdictional law.... If, moreover, contrary to the expert testimony apparently relied on by [the district court] in this case, [the foreign court] refuses jurisdiction notwithstanding defendant's consent, plaintiff is still protected by the conditional nature of the [FNC] dismissal. Thus further inquiry into foreign jurisdictional law really is needless since it is so easily obviated by use of the typical conditional dismissal device."); *In re Air Crash Off Long Island, N.Y.*, 65 F.Supp.2d 207, 215 (S.D.N.Y. Oct. 12, 1999).

The adequacy of the foreign forum and the substance of any relevant foreign law is usually established through expert affidavits or declarations. *See* 17 James W. Moore, *Moore's Federal Practice§* 111.92 (3d ed.2002). Rule 44.1 of the Federal Rules of Civil Procedure provides that "[t]he court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *Fed.R.Civ.P.* 44.1. It thus appears that the Court may consider unsworn statements by attorneys opining on foreign law. *See, e.g. Kalmich v. Bruno*, 553 F.2d 549, 555 n. 4 (7th Cir.), *cert. denied,*434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977); 9 James W. Moore, *Moore's Federal Practice* § 44.1.04[5]. The Court is not, however, bound by the parties' submissions, and may conduct its own investigation of foreign law. *See, e.g. Curley v. AMR Corp.* 153 F.3d 5, 13 (2d Cir.1998); *Finance One Public Co. v. Lehman Bros. Special Fin., Inc.*, 215 F.Supp.2d 395, 402-03 (S.D.N.Y.2002).

The parties have submitted conflicting opinions on the substance of Russian law. Eastwind submitted an unsworn "Attorney Letter of Opinion" by Alexander Balakirev, "an attorney duly authorized to practice law in Kaliningrad, Russia."(Dkt. No. 14: Arralde 7/1/02 Aff. ¶ 6 & Ex. C.) Mr. Balakirev asserts that "[p]laintiff, as a citizen and resident of Kaliningrad, Russia, could bring a case under Civil Processual Code of Russian Federation ('Russian Civil Code') in the court for Kaliningrad to recover a sum of money for the death of her husband...." (Arralde 7/1/02 Aff. Ex. C: Balakirev Opinion Letter ¶ 3.)

*16 Under Russian Civil Code, Mrs. Varnelo could ask the judge to enforce the contract service agreement, which according to its terms would pay her $49,000, in the event of the accidental death of her husband. If the ship management company who contracted for Mr. Varnelo's services, in this case Mayflower, does not contest the jurisdiction of the Russian Court and also does not dispute it is bound by the contract service agreement, the judge would have no reason not to find in Mrs. Varnelo's favor and award her the full amount due under the contract.

(*Id.* ¶ 5;*see also Id.* ¶ 6 ("[I]f a non-Russian company consents to the Russian Court's jurisdiction, there would be no reason for the court not to hear the case."); *id.* ¶¶ 7-8 (Mrs. Varnelo also could sue for seaman's accidental death, with the same jurisdictional issues).) In support, however, Eastwind cites to an incoherent translation of the Russian Civil Code, Chapter 1, Part 3, Clause 25, stating "The Courts also consider the suits with participation of foreign citizens, stateless persons, foreign companies and organizations...." (Balakirev Opinion Letter Ex. A, *see also*Dkt. No. 20: 7/24/02 Arralde Aff. Ex. A.)

In response, plaintiff submitted two "affirmations" (though not in a form complying with 28 U.S.C. § 1746) by plaintiff's Russian attorney, Professor Stanislav Kargopolov. (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 1: Kargopolov 6/6/02 & 7/8/02 Aff's.) Prof. Kargopolov's June 6, 2002 affirmation asserts, *ipse dixit*, that Russian courts are "extremely unwilling[ ]" to exercise jurisdiction over actions involving non-Russian defendants. (Kargopolov 6/6/02 Aff. ¶ 6: "Russian Courts insist that a Plaintiff should bring a lawsuit in that court, on which jurisdictional territory a Defendant is.") According to Prof. Kargopolov, because a Russian court would likely limit defendants to those entities located in Russia, plaintiff would be limited to suing only the

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

Page 20

"crewing agency," Smart Crewing. (*Id.* ¶¶ 3, 8.) Prof. Kargopolov's July 8, 2002 affirmation flatly asserts that, because defendants are non-Russian, no Russian court would exercise jurisdiction over this case, even if defendants conceded jurisdiction. (Kargopolov 7/8/02 Aff. ¶¶ 3-7.) In support, he references what he alleges to be a maritime injury case brought by a Russian seaman that a Russian court allegedly dismissed for lack of jurisdiction over the foreign defendant, despite defendant's consent to jurisdiction. (*Id.* ¶ 3.) Plaintiff's summary of the case did not state such key facts as whether the crewman was actually hired in Russia or whether the ship sailed from Russia. (*Id.*)

Both parties' submissions regarding Russian law are virtually incoherent.[FN30] The Court cannot determine foreign law based on garbled snippets of translated statutes or summaries of Russian court decisions.

> FN30. It is unclear whether the problem lies in the affiants' lack of English-language skills or lack of legal training.

It seems inconceivable to this Court that a Russian court would refuse to exercise jurisdiction simply because the defendants are not permanently based in Russia, given that defendants have conceded Russian jurisdiction. At least one Court in this District has found defendants' consent to Russian jurisdiction sufficient to render the Russian forum adequate. *See Pavlov v. Bank of New York Co.*, 135 F.Supp.2d 426, 434 (S.D.N.Y.2001) (Kaplan, D.J.) (Defendant "has offered to consent to jurisdiction in Moscow with respect to these claims, ... thus removing [plaintiff's] objection," as to the adequacy of the alternate forum, that defendant is not subject to jurisdiction in Russia), *vacated on other grounds*, No. 01-7434, 25 Fed. Appx. 70, 2002 WL 63576 (2d Cir. Jan.14, 2002).[FN31]

> FN31. *See also Parex Bank v. Russian Sav. Bank*, 116 F.Supp.2d 415, 423-25 (S.D.N.Y.2000) (Sweet, D.J.) ("Even if Russia employs different procedures than the United States courts, [defendant] has met its burden of proving that Russia's judicial system affords adequate procedural protections upon the face of its statutory provisions."). *Rusinku Joint Venture v. Williams*, No. Civ. 93 0132624, 1993 WL

383301 at *3 (Conn.Super.Ct. Sept.16, 1993) (granting FNC, as Russia is an adequate alternative forum).

*17 This case clearly implicates Russian interests, as Stanislav was a Russian citizen residing in Kaliningrad, hired by defendant Mayflower in Kaliningrad under a Service Agreement apparently signed in Kaliningrad, and leaving a widow (plaintiff Helga) also of Russian citizenship residing in Kaliningrad. (*See* page 2 above.) According to plaintiff, Mayflower regularly hires crews out of Kaliningrad (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 7), defendant Charm regularly sails (or sailed) its ships, including the Yellowstone, out of Kaliningrad, and both Mayflower and Charm are owned or controlled by defendant Eastwind (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 2; Pavlakis Aff. ¶¶ 3-26). Refusing Russian jurisdiction for such claims would leave an entire class of Russian seaman without an effective remedy. Thus, despite the parties' submissions, the Court "justifiably believes," *Bank of Credit & Commerce Int'l v. State Bank of Pak.*, 273 F.3d at 247-48, that a Russian court would exercise jurisdiction over Helga Varnele's claim, at least where, as here, defendants consent to such jurisdiction.

Moreover, as noted above (*see* pages 31-32), this Court may (and does) condition dismissal on (1) defendants' consent to Russian jurisdiction; (2) the Russian court's acceptance of the case; and (3) defendants' agreement to stay any United States statute of limitations pending the outcome of a Russian lawsuit. As such, there will be no harm if plaintiff returns to Russia and is rebuffed by a Russian court on jurisdictional grounds, and the Court may find the Russian forum adequate based even on a low degree of certainty without fear of harming plaintiff. *See, e.g. Bank of Credit & Commerce Int'l v. State Bank of Pak.*, 273 F.3d at 248 ("Precisely how certain the court must be regarding the existence of an adequate alternative foreign forum will necessarily depend on how protective of the non-moving party the conditional dismissal will in fact be....")[FN32]

> FN32. *See also, e.g. Red Rock Holdings, Ltd. v. Union Bank Trust Co.*, No. 98-9220, 181 F.3d 83 (table), 1999 WL 310482 at *1 (2d Cir. May 6, 1999) ("we direct that the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

judgment be modified to provide (1) that the dismissal is without prejudice to a motion for reinstatement of the present action based on a certification by [plaintiff] that, following the present forum non conveniens dismissal, [plaintiff] has made prompt and reasonable attempts to initiate action in Israel and has been unable to receive an adjudication under the laws of that country, such that there was no 'adequate alternative forum' within the meaning of the pertinent authorities, and (2) that upon such a motion, the district court will reassess the adequacy of the Israeli forum, and if it determines that there was not an adequate forum, it will grant the motion for reinstatement and deem any applicable statute of limitations to have been tolled by the initiation of the present action."), *In re Rezulin Prods. Liab. Litig.*, 214 F.Supp.2d 396, 401 (S.D.N.Y.2002) (FNC dismissal conditioned on consent to personal jurisdiction in foreign court, waiver of statute of limitations and other conditions); *Valarezo v. Ecuadorian Line, Inc.*, 00 Civ. 6387, 2001 WL 740773 at *5 (S.D.N.Y. June 29, 2001) (same); *Doe v. Hyland Therapeutics Div.*, 807 F.Supp. 1117, 1131-33 (S.D.N.Y.1992) (discussing the appropriate conditions to an FNC dismissal).

**B. *The Size of Plaintiff's Recovery in Russia Does Not Render Russia an Inadequate Forum***

Plaintiff Helga Varnelo asserts that because "Russian law does not provide for damages to the relatives for pain and suffering of deceased prior to his dying," and because Russian statutes are notably stingy in granting recovery for work-related injuries, plaintiff would have "little chance of success for a recovery in excess of the $49,000" already received under the Service Agreement. (Dkt. No. 17: Edelman Aff. Ex. 1 Kargopolov 6/6/02 Aff. ¶¶ 5-6.) [FN33]Defendant agrees that "it seems unlikely [plaintiff] would recover more than $49,000 at law in Russia."(Dkt. No. 13: Eastwind Br. at 8.)

FN33. Professor Kargopolov's affirmation, albeit less than clear, appears to assert that, although Russian law would award plaintiff damages of $49,000 under the Service

Agreement, plaintiff would also be entitled under Russian statutory law to total damages of: (1) $10,000 pursuant to a widow's right to recover three years' of Stanislav's salary, or (2) $871 under Russian labor insurance law. (*Id.* ¶ 5.) Plaintiff's brief seems to confirm this, stating: "[t]he widow would probably not receive any more than her contractual right and, at most, about $10,000."(Dkt. No. 16: Pl. Br. at 3.)

Under well-settled case law, however, lower recovery in Russia would not render that forum inadequate. The fact that "the substantive law that would be applied in the alternative forum is less favorable to the plaintiffs than that of the present forum ... should ordinarily not be given conclusive or even substantial weight in the forum non conveniens inquiry."*Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 247, 102 S.Ct. 252, 261, 70 L.Ed.2d 419 (1981); *accord, e.g., Alfadda v. Fenn*, 159 F.3d 41, 45 (2d Cir.1998); *Capital Currency Exch., N.V. v. National Westminster Bank PLC*, 155 F.3d 603, 610-11 (2d Cir.1998) ("[A] forum may be adequate even if it does not provide a plaintiff with causes of action that are identical to those plaintiff alleged in an American court.... Although it appears that plaintiffs might not be able to recover in England on some of their common law claims, the essential subject matter of the dispute can be adequately addressed by an English court."), *cert. denied* 526 U.S. 1067, 119 S.Ct. 1459, 143 L.Ed.2d 545 (1999); *Transunion Corp. v. PepsiCo, Inc.*, 811 F.2d 127, 130 (2d Cir.1987) (unavailability of RICO treble damages does not render forum inadequate); *Alcoa S.S. Co. v. M/V Nordic Regent*, 654 F.2d 147, 159 (2d Cir.1978) (en banc ) (Maximum recovery of $570,000 in foreign forum as opposed to $8 million in U.S. forum did not render foreign forum inadequate: "It is abundantly clear ... that the prospect of a lesser recovery does not justify refusing to dismiss on the ground of forum non conveniens."), *cert. denied* 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980). Indeed, the motion will be denied only if plaintiff's remedy in the foreign forum is "so clearly inadequate or unsatisfactory that it is no remedy at all."*Piper Aircraft Co. v. Reyno*, 454 U.S. at 254, 102 S.Ct. at 265;*accord, e.g.,Tsangaris v. Elite, Inc.*, 92 Civ. 7855, 1993 WL 267425 at *7 (S.D.N.Y. July 9, 1993) (Greek forum found adequate even though plaintiff would "not be able to obtain relief under the Jones Act there"); *Damigos v. Flanders Compania Naviera, S.A.*

Not Reported in F.Supp.2d                                                    Page 22
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

*Panama*, 716 F.Supp. 104, 109 (S.D.N.Y.1989) (Leval, D.J.) ("the seamen's hope to gain the benefits of the Jones Act is not a strong factor weighing against dismissal").

*18 Moreover, for better or worse, litigation-and demands for high damages-is increasing in Russia. *See, e.g.* Steven Lee Myers, *Russians Becoming Litigious: Survivors of Theater Siege Sue*, N.Y. Times 12/2/02 at A3 ("In post-Soviet Russia, civil suits seeking compensation for all manner of suffering, much of it economic, have proliferated, driven by an increasingly aggressive bar," and noting that theater siege victims are seeking $1 million each).

The remedy in Russia is not so inadequate that it is no remedy at all.

## V. ON BALANCING GILBERT'S PUBLIC AND PRIVATE INTEREST FACTORS, RUSSIA IS THE APPROPRIATE FORUM

### A. Gilbert's Private Interest Factors Strongly Support the Russian Forum

The "private interest factors" relating to "the convenience of the litigants" include " 'the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.'"*Iragorri v. United Tech. Corp.*, 274 F.3d 65, 73-74 (2d Cir.2001) (en banc) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947)); [FN33] *accord, e.g. Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n. 6, 102 S.Ct. 252, 258 n. 6, 70 L.Ed.2d 419 (1981); *Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 500 (2d Cir.2002); *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 479 (2d Cir.2002); *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 29-30 (2d Cir.2002); *Potomac Capital Inv. Corp. v. KLM*, 97 Civ. 8141, 1998 WL 92416 at *6 (S.D.N.Y. Mar. 4, 1998) (Peck, M.J.)."In considering these factors, the court is necessarily engaged in a comparison between the hardships defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would

suffer as the result of dismissal and the obligation to bring suit in another country."*Iragorri v. United Tech. Corp.*, 274 F.3d at 74.[FN33]

> **FN34.** The Supreme Court in *Gulf Oil Corp. v. Gilbert* also noted that "[t]here may also be questions as to the enforc[ea]bility of a judgment if one is obtained."*Gulf Oil Corp. v. Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843;*accord, e.g. Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1232 (2d Cir.1996); *Murray v. British Broad. Corp.*, 81 F.3d 287, 294 (2d Cir.1996).

> **FN35.** This analysis of the specific burdens of a trial in Russia appears to be entirely academic, given the parties' agreement that any recovery in a Russian trial would not materially exceed the $49,000 already paid to plaintiff. The Court has no choice, however, but to pursue this "legal charade." *See Irish Nat'l Ins. Co. v. Aer Lingus Teoranta*, 739 F.2d 90, 91 (2d Cir.1984) ("[T]he real issue before the district court was not whether the case should be tried in Ireland, but whether it would be tried at all. Nevertheless, ... the district court proceeded to weigh the merits of a trial in Ireland against a trial in America just as if the former were likely to occur. Although the procedure smacks somewhat of a legal charade, we will proceed on the same assumption.").

"Rather than simply characterizing the case as one in negligence, contract, or some other area of law, the court should focus on the precise issues that are likely to be actually tried, taking into consideration the convenience of the parties and the availability of witnesses and the evidence needed for the trial of these issues."*Iragorri v. United Tech. Corp.*, 274 F.3d at 74.[FN36]

> **FN36.** *See also, e.g.,R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 168 (2d Cir.1991); *Overseas Programming Cos. v. Cinematographische Commerz-Anstalt*, 684 F.2d 232, 235 (2d Cir.1982); *World Film Servs. Inc. v. RAI Radiotelevisione Italiana S.p.A.*, 97 Civ. 8627, 1999 WL 47206 at *9

(S.D.N.Y. Feb.3, 1999) (defendant "cannot rely on the location of witnesses with knowledge of the parties' unsuccessful licensing negotiations, since this matter is largely irrelevant to the claims asserted in the complaint").

[5] Private interests will favor dismissal where most of the relevant witnesses and other evidence are located in the foreign forum. See, e.g. *Murray v. British Broad. Corp.*, 81 F.3d at 294-95) (in copyright action arising out of contract, most of witnesses and physical and documentary evidence was located in England, such that private interests favored dismissal); *Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 982 (2d Cir.1993) (private interest factors strongly favor dismissal when most witnesses and physical and documentary evidence are located in other forum); *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 1001 (2d Cir.) ("since all of the Banks' allegedly fraudulent activity occurred in Australia, most relevant documents ... [and m]ost witnesses and other sources of proof are also located in Australia"), *cert. denied* 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993); *see also* cases cited below.

1. *The Location and Availability of Witnesses Strongly Favors Trial in Russia*

*19  "[T]he location of the witnesses [is] always a key factor in forum non conveniens cases...." *Manu Int'l, S.A. v. Avon Prods., Inc.*, 641 F.2d 62, 66 (2d Cir.1981) [FN] As detailed below, most of the key witnesses in this case are Russian nationals and there is little, if any, evidence that witnesses located in New York would provide relevant testimony. The location and availability of witnesses thus strongly favors trial in Russia.

FN37.Accord, e.g.*Schertenleib v. Traum*, 589 F.2d 1156, 1165 (2d Cir.1978) ("Perhaps the most significant problem is presented by the inability to bring plaintiff and his alleged co-conspirator here for live cross-examination before a factfinder, due to their incarceration in Switzerland."); *Potomac Capital Inv. Corp v. KLM*, 97 Civ. 8141, 1998 WL 92416 at *7 (S.D.N.Y. Mar.4, 1998) (Peck, M.J.) ("If the location of witnesses and sources of proof are

strongly in favor of one forum, the matter likely should be adjudicated there."); *Continental Pac. Shipping, Ltd. v. CIT Group/Equip. Fin., Inc.*, 96 Civ. 2646, 1996 WL 571855 at *6 (S.D.N.Y. Oct.7, 1996) (" 'The location of relevant witnesses is a 'key factor in forum non conveniens cases.'"); *Nippon Fire & Marine Ins. Co. v. M.V. Egasco Star*, 899 F.Supp. 164, 169 (S.D.N.Y.1995) ("when the greater number and more relevant witnesses are located in a foreign forum, common sense suggests that the litigation proceed in that forum"), *aff'd* 104 F.3d 351 (2d Cir.1996); *Studiengesellschaft Kohle MBH v. Shell Oil Co.*, 93 Civ. 1868, 1993 WL 403340 at *2 (S.D.N.Y. Oct.8, 1993) ("The convenience of both party and non-party witnesses may be the single most important factor in the [FNC] analysis...."); *Zweig v. National Mort. Bank of Greece*, 91 Civ. 5482, 1993 WL 227663 at *3 (S.D.N.Y. June 21, 1993) ("[T]he most significant factor is the convenience of party and non-party witnesses.").

a. *The Russian Residence of the Shipmate Witnesses Strongly Favors Trial in Russia*

Eastwind has identified five of Stanislav's Russian shipmates as potential witnesses-the captain, first mate, and three seamen. (*See* page 6 above.) A threshold issue is whether Stanislav's Russian shipmates could offer relevant testimony.

Plaintiff argues that because defendants have conceded that there were no "eye witnesses" to the accident,[FN] none of Stanislav's shipmates could provide relevant testimony. (Dkt. No. 16:Pl. Br. at 4, 7.) This is nonsense. The complaint asserts that, *inter alia*: (1) "[t]he vessel was unseaworthy in that the ... pilot ladder was not safe for its intended use"; (2) defendants "were negligent in not securing the pilot ladder in a safe manner"; (3) defendants "violated applicable safety regulations"; (4) defendants "failed to warn Decedent of danger"; (5) "rescue equipment was inadequate and not readily available"; and (6) "rescue efforts were negligently directed and enforced."(Dkt. No. 1, Compl. ¶¶ 14-16.) Even if Stanislav's shipmates did not actually see Stanislav fall overboard, they could testify regarding the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

conditions that allegedly contributed to his death, including: the duties of Stanislav and other crewmen; the ship's regular onboard procedures for boarding pilots; the state of the ship's equipment, including the pilot's ladder, at the time of the accident; the events leading up to and following the accident; Stanislav's health and mental state at the time of the accident; and the ship's rescue efforts. [*] Moreover, even assuming *arguendo* that [defendant's Russian]-based witnesses were not necessary, [plaintiff] has not identified a single New York-based witness."*Potomac Capital Inv. Corp. v. KLM*, 97 Civ. 8141, 1998 WL 92416 at *8 (S.D.N.Y. Mar.4, 1998) (Peck, M.J.)

> FN38. Defendants responded to an interrogatory as follows:
>
> > There were no witnesses to the alleged accident, although upon information and belief anyone who was aboard ship and/or was involved in search and rescue may have witnessed some of the events prior to and after the event.
>
> (Dkt. No. 34: Eastwind Resp. to Pl's Interrog. No. 21.)

Second, plaintiff argues that because, "as a matter of law," defendants are strictly liable for the accident that killed Stanislav, there is no need for trial testimony from witnesses to the accident. (Dkt. No. 16: Pl. Br. at 1-2, 7-8.) According to plaintiff, the International Convention for Safety of Life at Sea, 1974 ("SOLAS"), to which Russia, Liberia, and the United States are signatories, "provides that on the rigging of any pilot ladder, the rigging must be supervised by an *officer* with good visibility."(Pl. Br. at 7, citing Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 5: SOLAS Reg. 17.) In plaintiff's view, the ship *must* have violated SOLAS Regulation 17, because "the story provided by the deckhand in the vicinity [Miron Nuke], and adopted by the defense on this motion," indicates that no officer was on deck supervising the rigging of the Yellowstone's pilot ladder. (Pl. Br. at 7; *see* Edelman 7/15/02 Aff. at 2-3.) According to plaintiff, such a "violation would provide absolute liability and certainly would obviate any claim" that Stanislav was contributorily negligent. (*Id.*) Thus, in plaintiff's view, trial testimony from Stanislav's shipmates regarding the details of his accident would

be superfluous.

**\*20** Plaintiff's argument is meritless. Plaintiff cites decisions holding that in the absence of any showing of negligence, the Jones Act permits recovery for the injury or death of a seaman resulting from a violation of a statutory duty or Coast Guard regulation. (Dkt. No. 16: Pl. Br. at 7, citing *Kernan v. American Dredging Co.*, 355 U.S. 426, 433, 78 S.Ct. 394, 398, 2 L.Ed.2d 382 (1958), & *Fuszek v. Royal King Fisheries, Inc.*, 98 F.3d 514, 516-17 (9th Cir.1996), cert. denied 520 U.S. 1155, 117 S.Ct. 1334, 137 L.Ed.2d 494 (1997).) Yet even if the Court accepted that (1) the Jones Act governed this action, (2) violations of SOLAS Regulation 17 could form the predicate for strict liability recovery under the Jones Act, and (3) defendants violated the SOLAS regulation (all issues disputed by Eastwind, *see*Dkt. No. 18: Eastwind Reply Br. at 6-8), plaintiff nevertheless would recover nothing absent proof of causation. *See, e.g.,Kernan v. American Dredging Co.*, 355 U.S. at 432-33, 78 S.Ct at 398 ("In FELA cases based upon violations of [statutory duties], the Court has held that a violation of [the] statute creates liability under FELA if the resulting defect or insufficiency in equipment contributes in fact to the death or injury in suit, without regard to whether the injury flowing from the breach was the injury the statute sought to prevent."); *Fuszek v. Royal King Fisheries, Inc.*, 98 F.3d at 517 ("regulatory violation could amount to negligence *per se* under the Jones Act if five elements were met," including "causation"). In other words, the jury would have to find that defendants' alleged violation of SOLAS Regulation 17 (*i.e.,* failing to provide an officer to supervise the rigging of the pilot ladder) *caused* Stanislav's accident and death. Onboard witnesses to the circumstances of the accident and its aftermath therefore would be indispensable to any trial on this issue.[FN39]

> FN39. Assuming that both the Jones Act and the SOLAS regulations governed this action, the burden might be shifted to defendants to prove that defendants' alleged SOLAS violation did *not* cause Stanislav's accident. Compare*In re Seaboard Shipping Corp.*, 449 F.2d 132, 136 (2d Cir.1971) ("the burden is on a ship in violation of a safety statute ... to show 'not merely that her fault might not have been one of the causes, or

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

that it probably was not, but that it could not have been' "), *cert. denied* 406 U.S. 949, 92 S.Ct. 2038, 2039, 32 L.Ed.2d 337 (1972); & *Smith v. Mitlof*, 130 F.Supp.2d 578, 581 (S.D.N.Y.2001) (once plaintiff proved defendant violated navigational statute or Coast Guard regulation, defendant had burden of proof on causation); *with Wills v. Amerada Hess Corp.*, 98 Civ. 7126, 2002 WL 140542 at *16-17 (S.D.N.Y. Jan.31, 2002) (rule shifting burden of proof to defendant is limited to cases involving ship collisions, distinguishing *Seaboard Shipping* ). Even if the burden shifted to defendants, however, testimony on causation would still be necessary.

Third, plaintiff asserts (apparently in the alternative) that testimony from Stanislav's crewmates is unnecessary because a Kaliningrad resident named Andrej Nikitinskij is willing to travel here to testify that in September 2000, the "M/V Yarmouth," was inspected by the United States Coast Guard in "Douglas, USA," and found to have a "decayed" "storm-ladder" that broke when tested. (Dkt. No. 17: Edelman 7/15/02 Aff. at 9 & Ex. 9: Nikitinskij Statement.) Although Nikitinskij has no personal knowledge of the Yellowstone, he asserts in an unsworn statement, based on "conversations with other seaman who worked on m/v Yellowstone," that the "equipment and deck equipment on boards the both vessels were very similar."(*Id.*) Plaintiff thus intends to offer Nikitinskij's testimony along with Coast Guard witnesses and records to prove that defendants' negligence caused Stanislav's death. (Edelman 7/15/02 Aff. at 9.) Even assuming that plaintiff's theory has some basis (and that Nikitinskij's testimony was not impermissible hearsay), the jury would still require testimony from the Yellowstone's Russian crew as to the condition of the Yellowstone's pilot ladder. Evidence that another "similar" ship had a decayed ladder could not, by itself, prove that the Yellowstone's ladder was decayed as well.[FN40]

> FN40. Indeed, this entire line of evidence has little, if any, relevance to this case. Decay is not a type of product defect that one can presume to apply to all "similar" products. Moreover, Nikitinskij does not personally know the condition of the

Yellowstone's ladder, and even if he could testify, the fact that a Kaliningrad resident is (allegedly) willing to travel here hardly favors trial in this District rather than the witness' home forum.

> To the extent plaintiff would need an expert to tie this evidence together, the expert's location would be entitled to little weight on this motion. *E.g.,Potomac Capital Inv. Corp. v. KLM*, 1998 WL 92416 at *8 ( & cases cited therein); *Balaban v. Pettigrew Auction Co.*, 96 Civ. 3177, 1997 WL 470373 at *4 n. 1 (E.D.N.Y. June 27, 1997) ("it has repeatedly been held that '[t]he convenience of expert witnesses is of 'little or no significance' on a motion to transfer' ").

*21 Given the importance of the shipmates' testimony, their Russian location strongly favors trial in Russia. Forum non conveniens decisions in this District give great weight to the overseas location of seamen witnesses. *See Valarezo v. Ecuadorian Line, Inc.*, 00 Civ. 6387, 2001 WL 740773 at *4 (S.D.N.Y. June 29, 2001) (Granting FNC motion: "The two seamen who witnessed [plaintiff's] fall are citizens and residents of the Philippines.... The Port Captain for the vessel, Captain Achilles, is a resident of Ecuador, as is Captain N. Mancayo who assists in recruiting and placing crew members on board... In sum, none of the relevant witnesses are citizens or residents of the United States. On the other hand, six of the key witnesses are residents of Ecuador."); *Gazis v. John S. Latsis (USA) Inc.*, 729 F.Supp. 979, 989 (S.D.N.Y.1990) ("Witnesses to the event, the treating physicians and the other crewmembers aboard the [ship] are presumably still in the Netherlands, aboard ship, or in Greece. None of these witnesses are subject to the subpoena power of the court. Although the depositions of these witnesses could be substituted at trial, this is not the optimal way for a jury to decide a case."); *Bastas v. Atlantic Mar. Enter. Corp.*, No. Civ. A. 86-6962, 1988 WL 48547 at *2 (E.D.Pa. May 13, 1988) (Granting FNC motion: "As seamen are frequently out at sea, witnesses to the accident are more likely to be accessible in Greece, the vessel's home port."); *Cruz v. Maritime Co. of Philippines*, 549 F.Supp. 285, 290 (S.D.N.Y.1982) (Leval, D.J.) (Granting FNC motion:

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

"The six Philippine crewmen who the parties agree witnessed the accident are more likely to be available to testify in the Philippines than in New York (although it is possible that either forum would be required to take their testimony by deposition)."), *aff'd,* 702 F.2d 47 (2d Cir.1983) (per curiam).[FN41]

> FN41. In the context of venue transfer motions within the United States under 28 U.S.C. § 1404, in contrast, courts generally accord little, if any, weight to the availability and convenience of witnesses who are seaman, as they are likely to be at sea, and thus available only by deposition (at their home or on board ship) regardless of the U.S. trial forum. *See, e.g.,Lykes Bros. S.S. Co. v. Sugarman,* 272 F.2d 679, 682 (2d Cir.1959) ("In all probability the testimony of these witnesses who sail the high seas will have to be taken by deposition anyhow, on some occasion when they happen to be available on shore leave."); *Conlon v. Sea-Land Serv., Inc.,* 94 Civ. 0609, 1995 WL 20321 at *5 (S.D.N.Y. Jan.19, 1995) (Denying § 1404 transfer motion because, *inter alia,* since non-party witness residing outside this district "is in the merchant marine, it is quite possible in any event that his testimony would have to be taken by way of deposition since he presumably spends much of his time overseas."); *Garza v. Marine Trans. Lines, Inc.,* 84 Civ. 6610, 1985 WL 6150 at *1 (S.D.N.Y. Apr.8, 1985) (Denying § 1404 transfer motion because, *inter alia,*"several [witnesses] are seamen on active duty at sea who are usually deposed on the ship and only infrequently appear at trial to testify; thus, their location does not affect the choice of forum."); *Babbidge v. Apex Oil Co.,* 676 F.Supp. 517, 519-20 (S.D.N.Y.1987) (Denying § 1404 transfer motion in action by seaman under Jones Act regarding accident onboard ship: "A number of these witnesses, who are seamen, are not even in their home state [neither the transferor nor the transferee district], but on vessels traveling to different parts of the world.... It is likely that the testimony of many of the seamen in this case will be taken by deposition on their ships. Therefore, the residence of these witnesses should not affect plaintiff's choice of

forum."); *Drees v. Lykes Bros. S.S. Co.,* 500 F.Supp. 15, 17-18 (S.D.N.Y.1980) (Denying § 1404 transfer motion in Jones Act action for injury at sea: "When the testimony of seamen is required, ... the weight given to the convenience of the witnesses may be diminished in view of the fact that their testimony is often in the form of depositions.")

> Neither party has cited to the *Lykes* line of cases, and the Court has not found any cases applying these § 1404 cases regarding seamen witnesses in the FNC context. The seamen here are Russian and their testimony surely can be more easily obtained for use in a trial in Russia. Particularly in the absence of plaintiff's counsel's reliance on the *Lykes* line of cases, the Court will not consider their effect on this FNC decision.

Defendants claim that they currently employ only three of the five shipmate witnesses, and that defendants lack the power to compel even those three to attend a New York trial. (*See* pages 6-7 above.) The Court need not decide whether the seamen would be willing to voluntarily appear in New York or whether as a practical (as opposed to legal) matter defendants could "convince" them to testify here, since in any event the cost of transporting the shipmate witnesses to New York for trial would, in and of itself, strongly favor trial in Russia. *See, e.g.,Scottish Air Int'l, Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224, 1232-33 (2d Cir.1996) (affirming FNC dismissal based upon the considerable "difficulty, cost, and disruption of requiring the attendance of [British] witnesses in New York"); *Blanco v. Banco Indus. de Venezuela, S.A.,* 997 F.2d 974, 982 (2d Cir.1993) (affirming FNC dismissal based in part upon the "considerable expense" that would be entailed to compel the appearance of necessary witnesses from Venezuela if case were tried here); *Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 1001 (2d Cir.) (affirming FNC dismissal where "the [district] court also properly recognized that ... [t]he cost of bringing [foreign] witnesses to the United States for trial, assuming they are willing, would be prohibitive"), *cert. denied,*510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993); *Potomac Capital Inv. Corp. v.*

*KLM*, 1998 WL 92416 at *9 (cost of airline transporting witnesses from Netherlands to New York weighs in favor of FNC dismissal).[FN42]

FN42. *Accord, e.g. Beekmans v. J.P. Morgan & Co.*, 945 F.Supp. 90, 93 (S.D.N.Y.1996) (FNC dismissal where none of the witnesses reside in New York and "virtually all of the witnesses and other sources of proof are located in the Netherlands or the United Kingdom"); *Guimond v. Wyndham Hotels & Resorts*, 95 Civ. 0428, 1996 WL 281959 at *4 (S.D.N.Y. May 29, 1996) (costs of obtaining attendance of witnesses weighs in favor of trial in Jamaica where witnesses to accident were in Jamaica and none of plaintiff's witnesses reside in the United States); *Nippon Fire & Marine Ins. Co. v. M.V. Egasco Star*, 899 F.Supp. 164, 169 (S.D.N.Y.1995) ("when the greater number and more relevant witnesses are located in a foreign forum, common sense suggests that the litigation proceed in that forum"), *aff'd.*104 F.3d 351 (2d Cir.1996); *Gazis v. John S. Latsis (USA) Inc.*, 729 F.Supp. 979, 989 (S.D.N.Y.1990) (FNC dismissal based in part upon defendant's proffer that "it will cost approximately $30,000 to transport and lodge all of the [foreign] witnesses" if case was tried in New York.); *Pastor v. El-Al Israel Airlines, Ltd.*, 690 F.Supp. 1361, 1364 (S.D.N.Y.1988) (FNC dismissal where "[t]he potential witnesses ... will also be mainly from Israel and Geneva," and the "expense of bringing over and accommodating willing witnesses would involve a disruption of at least three days work in addition to transportation and lodging costs, and may therefore be prohibitive."); *Ocean Shelf Trading Inc. v. Flota Mercante Grancolombiana S.A.*, 638 F.Supp. 249, 252 (S.D.N.Y.1986) (cost of bringing willing and unwilling witnesses to New York "points toward trial in Colombia" because "[a]lthough witnesses would have to travel were this action tried in either Colombia or in New York, since considerably more of the witnesses are Colombian or Pakistani nationals and residents than are New York residents, the cost of transporting them would be less were [the] litigation adjudicated in Colombia.");

*Dragexis v. Nagos S.S., Inc.*, 583 F.Supp. 1132, 1134 (S.D.N.Y.1983).

b. *The Russian Residence of Any Damages Witnesses Also Favors Trial In Russia*

*22 Eastwind asserts that "all sources of proof on plaintiff's claim of pecuniary loss on account of her husband's past and to be expected future contribution to her support are located" in Kaliningrad, adding that plaintiff does not identify any witness in New York who possesses relevant information regarding Stanislav's "health, state of mind or the sums he spent for personal consumption or instead contributed to his wife's support."(Dkt. No. 18: Eastwind Reply Br. at 5.)

Plaintiff herself would likely provide much of the relevant damages testimony. Eastwind claims that trial in New York would be inconvenient to plaintiff, both because of plaintiff's travel expenses and the danger to plaintiff's frail health of traveling to New York. (Dkt. No. 13: Eastwind Br. at 4-5, 10.) The Court rejects this argument, as decisions have widely held that on a forum non conveniens motion, "defendants cannot rely on any inconvenience to plaintiff and witnesses whose expenses plaintiff will bear."*Manela v. Garantia Banking Ltd.*, 940 F.Supp. 584, 592 n. 12 (S.D.N.Y.1996); *accord, e.g. Jose Armando Bermudez & Co. v. Bermudez Int'l*, 99 Civ. 9346, 2000 WL 1225792 at *6 n. 6 (S.D.N.Y. Aug.29, 2000) ("Defendants rely in part on allegations of inconvenience to plaintiff, which should be disregarded."); *Royal Indus. Ltd. v. Kraft Foods, Inc.*, 926 F.Supp. 407, 417 (S.D.N.Y.1996) (Denying FNC motion to dismiss in favor of Russian forum: "nothing prevents a plaintiff from burdening itself with an inconvenient forum. The forum non conveniens doctrine is simply designed to relieve 'oppressiveness and vexation to a defendant,' not a plaintiff.... To apply the doctrine differently, and disturb a plaintiff's choice of forum based on that party's self-imposed inconvenience would be paternalistic, to say the least.");[FN43]

FN43.See also, e.g. In re Rezulin Prods. Liab. Litig., 214 F.Supp.2d 396, 400 (S.D.N.Y.2002) ("[T]he contention that litigation otherwise more appropriately located in plaintiff's home province should be retained here for the defendants'

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

Page 28

convenience does not lie easily in plaintiff's mouth. Surely it would be more convenient for plaintiff to litigate in Quebec than here ..."); *Close v. Holiday Inns of America, Inc.*, No. CIV-86-189, 1987 WL 8951 at *2 (W.D.N.Y. Apr. 3, 1987) ("The plaintiff has evidently calculated that it is worthwhile for her to bring the Ohio witnesses to New York. Because the evidentiary burden and the expense of bringing their proof to New York will be hers to bear, that calculation is hers to make unless the defendants are unduly prejudiced thereby. A defendant cannot rely on any inconvenience to the plaintiff or her witnesses to support its motion for change of venue based on forum non conveniens.").

In its original motion papers, Eastwind failed to identify any Russian damages witnesses other than plaintiff. (*See generally* Dkt. No. 13: Eastwind Br.) In its supplemental papers, however, Eastwind has averred that "A. Kozlov," formerly a representative of Yellowstone's crewing agent, would testify about Stanislav's retirement pension under Russian law, as well as the average working life of a Russian seaman. (Dkt. No. 31: Arralde 12/2/02 Aff. ¶ 9 & Ex. A: Kozlov 11/27/02 Aff. ¶ 3.) Even if Eastwind were able to compel Kozlov's attendance in New York, the cost-in time, money and disruption-of transporting Kozlov to New York would favor trial in Russia. (*See* cases cited at pages 49-50 & n. 42 above.)

The location of damages witnesses slightly favors trial in Russia.

*c. The Location of Defendants' Offices In New York Is Not a Significant Factor*

Plaintiff asserts that defendants' shipping operations are based in New York. (*See* page 8 above.) Even if plaintiff is correct, it is well settled that evidence and witnesses relevant to a particular controversy are not necessarily located at a defendant's headquarters. See e.g., *Transunion Corp. v. PepsiCo, Inc.*, 811 F.2d 127, 129 (2d Cir.1987) (upholding action despite fact that defendant was a New York corporation, certain of the alleged misrepresentations were made in New York, and certain witnesses and documents were in New York); *Potomac Capital Inv. Corp. v. KLM*, 97 Civ. 8141, 1998 WL 92416 at *10 (S.D.N.Y. Mar.4, 1998)

(Peck, M.J.) ("The fact that [defendant] ... has its American headquarters here is of no consequence [to FNC decision], since the tort and the resulting damage both occurred elsewhere."); *Beekmans v. J.P. Morgan & Co.*, 945 F.Supp. 90, 94 & n. 2 (S.D.N.Y.1996) ( "[T]he relevant private factors strongly lean toward dismissal in favor of a Dutch forum. The mere fact that [defendant] is headquartered in New York is simply not significant enough to justify the litigation of this action in the United States."); *Nippon Fire & Marine Ins. Co. v. M.V. Egasco Star*, 899 F.Supp. 164, 169 (S.D.N.Y.1995) (New York has no interest in "the claim of a foreign-owned subsidiary against an Egyptian shipper for subsequent damage to goods shipped from Louisiana to Egypt," even though plaintiff has a New York office which handles all of its U.S. claims), aff'd,104 F.3d 351 (2d Cir.1996); *Doe v. Hyland Therapeutics Div.*, 807 F.Supp. 1117, 1124-25 (S.D.N.Y.1992) ("[R]emarkably, plaintiffs have failed to point to the existence of any evidence within [the Southern District of New York] that is materially related to plaintiffs' causes of action. While defendants 'do business in New York,' it is evident that the places where they collect, test, heat treat, and process the blood products in question, as well as where they are incorporated, and maintain their principal places of business, are located elsewhere."); *Ocean Shelf Trading Inc. v. Flota Mercante Grancolombiana*, 638 F.Supp. 249, 253 (S.D.N.Y.1986) ("Although both parties maintain offices in New York, there is minimal local interest in this controversy.... All of the acts complained of occurred in Colombia, ... and all parties are foreign.... This points toward dismissal because courts should encourage trial of controversies in the localities in which they arise.")

*23 Nevertheless, plaintiff is also correct that in addition to the Yellowstone's crew, certain employees in defendants' management suite may possess relevant information. Plaintiff, however, has not identified who might have what information. Indeed, since it appears that defendant Mayflower, located in Piraeus, Greece, managed or "operated" the Yellowstone, its management would be most likely to possess relevant information about any ship defects. (*See, e.g.* Dkt. No. 15: Lekkos 7/1/02 Aff. ¶¶ 1, 7 & Exs. D-E; Dkt. No. 31: Arralde 12/2/02 Aff. Ex. B; Lekkos 11/29/02 Aff. ¶¶ 1,6.) [FN84] Importantly, plaintiff does not explain what particular evidence might be obtained from defendants' New York

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

employees. *See Suah v. Citibank, N.A.,* 00 Civ. 6784, 2001 WL 1382577 at *3 (S.D.N.Y. Nov.7, 2001) ("Plaintiffs argue that the Southern District is more convenient and appropriate because [defendant] is the true focus of this litigation and the key witnesses and documents will be found at [defendant's New York corporate headquarters]... However, Plaintiffs merely assert the existence of these documents and witnesses without any apparent factual backing.... [T]he location of witnesses and documents in this case actually favors dismissal ..."), *aff'd* No. 01-9417, 2002 WL 31317708 (2d Cir. Oct.16, 2002). Further, Eastwind's counsel has asserted in an affidavit that "it is believed no witness who is available in New York has any knowledge concerning causation or damages."(Dkt. No. 31: Arralde 12/2/02 Aff. ¶ 13).

> FN44. Mayflower's control over the Yellowstone's day-to-day operations is shown by the following (1) immediately after Stanislav's accident, the master of the Yellowstone sent a telex report of the accident to "Capt P. Lekkos" at Mayflower in Greece, with only a "cc" to Eastwind in New York (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 10); (2) Lekkos describes himself as the "ships' operator for Mayflower Ship Management Corporation, responsible for the M/V Yellowstone, when under management by above company" (Dkt. No. 15: Lekkos 7/1/02 Aff. ¶ 1); (3) a report on "Eastwind Transport Ltd." dated November 20, 2001 and submitted by plaintiff states "The Russian vessels are managed out of Piraeus [Greece] by Mayflower Ship Management."(Edelman 7/15/02 Aff. Ex. 6 at 1, 3); (4) excerpts from the website of Eastwind's parent company, submitted by plaintiff, state: "Technical ship management of the Eastwind fleet is provided by [*inter alia* ], Mayflower Ship Management of Piraeus. In particular, the Russian joint-venture vessels are managed by Mayflower, which provides training programs for Russian and FSU seafarers. Eastwind has also opened its own crew recruitment and training company in Kaliningrad."(Edelman 7/15/02 Aff. Ex. 7); (5) the Service Agreement under which Stanislav was employed states that the Yellowstone is "managed by Mayflower" (Lekkos 7/1/02 Aff. Ex. A: Service Agm't at 1); and (6) ship

inspectors employed by Mayflower all reside in or near Piraeus (Dkt. No. 31: Arralde 12/2/02 Aff. Ex. B: Lekkos 11/29/02 Aff. ¶ 6).

Accordingly, because the Court may not base its decision on speculation that New York-based witnesses *may* possess relevant information, the alleged existence of any New York-based witnesses will be deemed at best a neutral factor.[FN45] *See e.g. Scottish Air Int'l, Inc. v. British Caledonian Group P.L.C.,* 81 F.3d 1224, 1233 (2d Cir.1996) ("Plaintiff's contention that the district court ignored several potential U.S. witnesses is, on this record, more wishful than real."); *Ioannides v. Marika Mar. Corp.,* 928 F.Supp. 374, 379 (S.D.N.Y.1996) (FNC dismissal despite claim by plaintiff, represented by attorney Edelman, that ship actually owned by local owner: "There is no suggestion anywhere in plaintiff's voluminous papers that there is anyone with knowledge of any of these matters in the United States.... Insofar as the case turns on the condition of the ship at the time it was in Piraeus and what transpired there, the bulk of the evidence-including everyone with personal knowledge-is in Greece. While [alleged local owner and executives], as plaintiffs suggest, may have received reports from Piraeus ..., the bulk of the relevant evidence regarding the ship ... is in Greece.").

> FN45. Moreover, since any such witnesses would be Eastwind's employees and thus within Eastwind's control, this Court may condition a dismissal on defendants' agreement to make such witnesses available as required by a Russian court. *See Suah v. Citibank, N.A.,* No. 01-9417, 50 Fed. Appx. 467, 469, 2002 WL 31317708 at *2 (2d Cir. Oct.16, 2002) (affirming FNC dismissal based on condition that "defendant has agreed to make all witnesses and documents available to plaintiffs as required by an English court"); *In re Rezulin Prod. Liab. Litig.* 214 F.Supp.2d 396, 400 (S.D.N.Y.2002) ("First, as defendants have sought this dismissal in favor of litigation in Canada, it will be conditioned on, *inter alia,* their undertaking to produce in Quebec at their own expense any witnesses within their control whose presence is necessary for litigation there."); *Bastas v. Atlantic Mar.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

*Enter Corp.*, No. Civ. A. 86-6962, 1988 WL 48547 at *2 (E.D.Pa. May 13, 1988) ("Defendants have agreed to make persons within their control available in Greece, which eases any burden on plaintiff.").

d. *The Location of Witnesses in Greece or China Is a Neutral Factor*

As noted in the previous section, witnesses in Mayflower's Greek offices almost certainly possess relevant information. (*See* pages 53-54 & n. 44 above.) However, this is a neutral factor, as it is not clear, despite plaintiff's protestations, that this Court would be any more effective than a Russian court in obtaining discovery from Greek witnesses. Nevertheless, to alleviate any difficulty in obtaining such discovery, this Court will condition any dismissal order on defendants' agreement to make any relevant Greek witnesses they control, such as Captain Lekkos, available in the Russian forum. (*See* cases discussed at page 55 n. 45 above).

*24 The parties have also mentioned the possibility of calling Chinese witnesses, including the Chinese pilot (Dkt. No. 13: Eastwind Br. at 9; Dkt. No. 17: Edelman 7/15/02 Aff. at 15), and Eastwind asserts that the Yellowstone was inspected by "superintendents" or inspectors at various ports throughout the world (Dkt. No. 31: Arralde 12/2/02 Aff. Ex. B: Lekkos 11/29/02 Aff. ¶ 6). However, neither side seems to have taken any steps to determine the identity of such witnesses, much less their availability; indeed, the likelihood that such witnesses will ever be found seems slim. (*Id.*) And again, it is unclear that this forum's procedure would be more effective than the Russian forum's in obtaining such testimony.[FN46]

> FN46. For the same reasons, although neither party has raised the issue, the current location of the Yellowstone in China (Arralde 12/2/02 Aff. Ex. C: Murray Aff. ¶ 2) is a neutral factor. Further, to the extent the parties intend to rely on expert witnesses, the location of such witnesses "is entitled to little weight." *Potomac Capital Inv. Corp. v. KLM*, 97 Civ. 8141, 1998 WL 92416 at *8 (S.D.N.Y. Mar.4, 1998) (Peck, M.J.); *accord, e.g. Balahan v. Pettigrew Auction Co.*, 96 Civ. 3177, 1997 WL

470375 at *3 n. 1 (E.D.N.Y. June 27, 1997) ("it has repeatedly been held that '[t]he convenience of expert witnesses is of 'little or no significance' on a motion to transfer' "); *Brown v. Dow Corning Corp.*, 93 Civ. 5510, 1996 WL 257614 at *2 (S.D.N.Y. May 15, 1996) ("since an expert witness is paid for his or her time, 'the convenience of expert witnesses is of little or no significance on a motion to transfer' "); *Total Licensed Care, Inc. v. Aetna Life & Cas., Inc.*, 92 Civ. 4817, 1993 WL 410456 at *3 (S.D.N.Y. Oct.13, 1993); *Stahengesellschaft Kohle MBH v. Shell Oil Co.*, 93 Civ. 1868, 1993 WL 403340 at *3 (S.D.N.Y. Oct.8, 1993); *Bernat v. Du Pont de Nemours E.I. & Corp.*, 93 Civ. 1639, 1993 WL 378790 at *2 (S.D.N.Y. Sept.24, 1993); *Cento Group S.p.A. v. OroAmerica, Inc.*, 822 F.Supp. 1058, 1062 (S.D.N.Y.1993); *Babbidge v. Apex Oil Co.*, 676 F.Supp. 517, 520 (S.D.N.Y.1987).

2. *The Location of Documents is a Neutral Factor*

The ease of access to documentary proof is essentially a neutral factor. "The parties have not submitted any evidence regarding the difficulty involved in bringing the relevant documents to either forum."*Tsangaris v. Elite, Inc.*, 92 Civ. 7855, 1993 WL 267425 at *8 (S.D.N.Y. July 9, 1993). This does not appear to be a document-intensive case. Most of the relevant documents regarding the accident or the condition of the ship appear to be located on board the ship or at Mayflower's offices in Greece. To the extent any documents are located in New York, such documents would, in any event, be in defendants' hands, and could easily be produced in Russia. *See Hughes v. John E. Graham & Sons*, No. CIV. A. 93-303, 1993 WL 133814 at *4 (E.D.La. Apr.21, 1993) (Denying § 1404 transfer motion relating to action by seaman for injury aboard ship: "[T]his is not one of those cases where the location of books and records is of paramount importance. A personal injury action such as this does not fall into the category of cases where such numerous documents are expected to be produced that their production in another district could prove to be overly burdensome. The liability question in this case should not be much different than the typical negligent injury case, where liability is proven through the testimony of witnesses."); *see*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

*also* *Beekmans v. J.P. Morgan & Co.,* 945 F.Supp. 90, 94 (S.D.N.Y.1996) ("[Plaintiff's] assertion that the Memorandum may have passed through the hands of some individuals in [defendant's] New York office does not, on balance, outweigh the overwhelming inconvenience of continuing litigation in New York as compared to the Netherlands.").

### 3. Translation Costs Slightly Favor Russia

Translation costs can be an important, though not necessarily dispositive, factor in the forum non conveniens analysis.[FN47] The relative translation burdens in this case slightly favor Russia.

> FN47 *See, e.g., Blanco v. Banco Indus. de Venezuela, S.A.,* 997 F.2d 974, 982 (2d Cir.1993) ("[T]he documentary evidence is in the Spanish language, as would be trial or deposition testimony, requiring translation to English that would result in significant cost to the parties and delay to the court. This factor militates strongly in favor of Venezuela as a more appropriate forum for this litigation."); *Schertenleib v. Traum,* 589 F.2d 1156, 1165 (2d Cir.1978) ("Moreover, even if the documents and witnesses could be brought here, there is a serious problem of translation. The only record of [defendant's] allegedly defamatory testimony are French minutes dictated by the Swiss judge from the simultaneous French translation of [defendant's] testimony in English. More to the point, most of the pertinent documents relevant to the underlying dispute are in French. The expense of translation, which is potentially substantial, would be totally avoided if trial is in Geneva."); *Flores v. Southern Peru Copper Corp.,* 00 Civ. 9812, 2002 WL 1587224 at *26 (S.D.N.Y. July 16, 2002) ("The principal fact witnesses, including plaintiffs and the defendant's operating personnel, are in Peru; many of the witnesses, again including plaintiffs, speak only Spanish.... If this case were presented to a jury in this Court, the translation requirements alone, of testimony and documents, would double the length of the trial."); *Jose Armando Bermudez & Co. v. Bermudez Int'l,* 99 Civ. 9346, 2000 WL

> 1225792, at *5 (S.D.N.Y. Aug.29, 2000) ("While maintaining the action in this Court may require the translation of certain Spanish documents, the need for such translation 'is not a hardship of sufficient magnitude to justify dismissal.'"); *Tsangaris v. Elite, Inc.,* 92 Civ. 7855, 1993 WL 267425 at *8 (S.D.N.Y. July 9, 1993) ("Defendants, however, have noted that all documents relevant to this case are written in Greek and that translation of these documents would cause 'delays, expenses and difficulties in communication' if this action were to proceed in a New York forum.... Because of the time and expense involved in translation, presentation of documentary evidence would be easier in Greek courts than in this Court."); *Zweig v. National Mortg. Bank of Greece,* 91 Civ. 5482, 1993 WL 227663 at *8 (S.D.N.Y. June 21, 1993) ("Finally, the large amount of translation of documents and testimony that would be required if this litigation remained in New York far outweighs the amount that would be required if the action continues in Greece."); *Petcov v. MEGA BREEZE,* No. 91-CV-1387, 1992 WL 245587 at *4 (N.D.N.Y. Sept.16, 1992) ("Nonetheless, the cost of translation is but one of the many factors considered by this court in arriving at its final conclusion. In fact, the savings realized on translation costs by trying the action in this court could be offset by the expense of bringing the witnesses and documents to New York for depositions and trial."); *Karvelis v. Constellation Lines SA,* 608 F.Supp. 966, 972 (S.D.N.Y.1985) ("Defendants argue that time and money will have to be expended to translate testimony and documents from the Greek. This may be true, but it is not a hardship of sufficient magnitude to justify dismissal."), *aff'd* 806 F.2d 49 (2d Cir.1986), *cert. denied* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987).

Because Helga's affidavit submitted on this motion was translated from Russian into English (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 3), the Court assumes that her testimony would have to be translated. By contrast, "A. Kozlov," the crewing agent's representative, submitted an affidavit in English on

Not Reported in F.Supp.2d                                                                  Page 32
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

this motion, and thus would not seem to require an interpreter. (Dkt. No. 31: Arralde 12/2/02 Aff. Ex. A: Kozlov Aff.) It is unclear whether the remaining Russian-speaking witnesses would require translation. Although both the Master's initial telex report on the accident and Mr. Nuke's "statement" to investigators are in English (Dkt. No. 15: Lekkos 7/1/02 Aff. Exs. D & E), Kozlov asserts that the Master and First Mate "speak English within the scope of their profession, but not well enough to give testimony in English without the aid of an interpreter," and that Mr. Nuke and the other seamen "speaks only limited English" (Dkt. No. 31: Arralde 12/2/02 Aff. Ex. A: Kozlov Aff. ¶ 1).See*Petcor v. MEGA BREEZE*, 1992 WL 245587 at *4 ("[E]ven if all witnesses were willing to testify in New York, the defendant argues that language translation from Greek to English would be needed for not only the key witnesses, but also for many documents. The court, however, is hesitant to credit this position with the weight that the defendant argues it should be given. Indeed, the majority of the documents supplied to the court, with the exception of the vessel's log, are written in English. From this it can fairly be concluded that the drafters of such documents as well as those individuals who participated in the negotiations and performance thereof, ... are conversant in English and that translation would not be needed for these witnesses.").

*25 On the other side of the ledger, if the case were litigated in Russia, defendants' documents (including the Service Agreement, statements to investigators, etc.) and the testimony of defendants' New York and Greek employees would presumably have to be translated into Russian. (SeeDkt. No. 17: Edelman 7/15/02 Aff. at 10.) Although defendants-and specifically Mayflower-apparently do business in Kaliningrad on a regular basis, Eastwind has offered no evidence that defendants' back-office managers speak Russian fluently enough to testify in a Kaliningrad court without a translator. Indeed, Captain Lekkos averred that he speaks English and Greek but failed to mention Russian. (Dkt. No. 31:Arralde 12/2/02 Aff. Ex. B: Lekkos 11/29/02 Aff. ¶ 1.)

Because there are so few documents, and most of the witnesses are Russian, the overall cost of translations slightly favors the Russian forum. *See*In re Bridgestone/Firestone, Inc., 190 F.Supp.2d 1125,

1142 (S.D.Ind.2002) ("[T]he best course is to weigh the amount of evidence that must be translated if the trial remains in the U.S. forum against the amount of evidence to be translated if the trial is held in a foreign forum.").

*4. Russian Judgments are Enforceable in the U.S.*

Plaintiff's Russian legal expert asserts that it is "practically impossible" to enforce Russian judgments outside Eastern Europe and the former Soviet Union. (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. I: Kargopolov 6/6/02 Aff. ¶ 7.) Judge Kaplan recently rejected the identical argument:

[O]ne of plaintiffs' experts expresses concern that plaintiffs, were they to prevail in Russia, would be forced to "relitigate substantial portions of their case before a U.S. court would honor a Russian judgment against a U.S. bank in this matter."But plaintiffs' expert is a Russian lawyer with no discernable qualifications in U.S. law. The Uniform Foreign Country Money-Judgments Recognition Act, which has been adopted in New York, insofar as it is relevant here, would permit a court to refuse enforcement to a Russian money judgment only if it concluded that the Russian legal system "does not provide impartial tribunals or procedures compatible with the requirements of due process of law ..." In view of [defendant's] staunch assertion here that the Russian legal system provides an adequate alternative forum, it quite likely would be estopped to mount such a challenge to a Russian money judgment in this case. Moreover, at least one U.S. court has recognized and enforced a Russian custody decree. [*Bliss v. Bliss*, 733 A.2d 954 (D.C.App.1999).]

*Pavlov v. Bank of New York Co.*, 135 F.Supp.2d 426, 435 (S.D.N.Y.2001) (fns omitted), *vacated on other grounds*, No. 01-7434, 25 Fed. Appx. 70, 2002 WL 63516 (2d Cir. Jan. 14, 2002); *see also, e.g. AAOT Foreign Econ. Ass'n (VO) Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 139 F.3d 980, 982-83 (2d Cir.1998) (confirming Russian arbitration awards despite claims arbitral panel was corrupt tribunal); *In re Union Carbide Corp. Gas Plant Disaster*, 809 F.2d 195, 203-04 (2d Cir.) (Indian judgment would be enforceable in New York based on adoption of Uniform Foreign Money-Judgments Recognition Act), *cert. denied*,484 U.S. 871, 108 S.Ct. 199 (1987).

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

\*26 Thus, this factor favors transfer to Russia, or at least is a neutral factor.

*5. The Allegedly Burdensome Procedure in Russian Courts Does Not Favor the New York Forum*

Plaintiff's Russian law expert asserts that even were a Russian court to entertain this action, it would be "slow, burdensome and costly," lasting "in practice" one year (and up to four years). (Dkt No. 17: Edelman 7/15/02 Aff. Ex. 1: Kargopolov 6/6/02 Aff. ¶ 6.) The procedure for serving summonses upon foreign defendants is burdensome and time-consuming. (*Id.*) All documents would have to be translated into Russian and the translation certified by a notary public. (*Id.*) Further, Russian courts do not have subpoena power over witnesses (including defendants) or documents outside the jurisdiction. (*Id.* ¶¶ 6, 9.)

Plaintiff's argument is meritless. While Russian courts may or may not be "slow, burdensome and costly," this Court has no way of comparing the two systems in terms of efficiency or speed; we have, however, already deemed the Russian courts to be an adequate alternate forum (*see* Point IV above). As for the Russian court's subpoena power, the only relevant witnesses not located in the Russian jurisdiction appear to be employees of defendants. Dismissal here would be conditioned on defendants submitting to the jurisdiction of the Russian court and making their employees available for trial or deposition.

*6. On Balance, the Private Interest Factors Strongly Favor Dismissal*

On balance, and giving great weight to the Russian location of the key witnesses, the evidentiary center of gravity strongly favors trial in Russia. *See, e.g. Capital Currency Exch., N.V. v. National Westminster Bank PLC,* 155 F.3d 603, 611 (2d Cir.1998) (FNC granted where, *inter alia,* "most of the witnesses ... FNC dismissal where "Scotland offers superior access to documentary, physical and testimonial evidence, and consequently, a trial in Scotland is likely to be more efficient and less expensive than a comparable proceeding in New York"). [FN47]

FN48 *Accord, e.g. Becker v. Club Las Velas,* 94 Civ. 2412, 1995 WL 267025 at \*5 (S.D.N.Y. May 8, 1995) (FNC dismissal where all of defendant's witnesses are located in Mexico and plaintiff's only non-party witnesses are located in the United States outside the court's 100 mile radius subpoena power), *aff'd,* 101 F.3d 684 (2d Cir.1996); *Peony v. United Fruit Co.,* 869 F.Supp. 122, 130 (E.D.N.Y.1994) (FNC dismissal where "[v]irtually every significant source of proof ... will be found in England" and no relevant witnesses are located in New York); *Lindner Fund, Inc. v. Polly Peck Int'l PLC,* 811 F.Supp. 133, 136 (S.D.N.Y.1992) (FNC dismissal where "most of the key witnesses in [the] action ... are all located in England" and "[n]one of [plaintiff's] documents or witnesses are located in New York"); *Doe v. Hyland Therapeutics Div.,* 807 F.Supp. 1117, 1125 (S.D.N.Y.1992) (FNC dismissal where, although defendants do business in New York, the activities giving rise to plaintiffs' claims, and hence most evidence, occurred outside New York); *Sussman v. Bank of Israel,* 801 F.Supp. 1068, 1079 (S.D.N.Y.1992) (FNC dismissal where "[p]laintiffs have not shown that any witnesses with probative evidence to give reside in New York"), *aff'd,*990 F.2d 71 (2d Cir.1993); *Ocean Shelf Trading Inc. v. Flota Mercante Grancolombiana S.A.,* 638 F.Supp. 249, 252 (S.D.N.Y.1986) (FNC dismissal where "[a]ll evidence relating to liability [in the form of witnesses] is located outside New York, and nearly all of it is located outside of the United States").

**B. *Gilbert's* Public Interest Factors Also Favor Russia**

\*27 "The Supreme Court has outlined four public interest factors to be weighed in the forum non conveniens inquiry: (1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the 'local interest in having localized controversies decided at home;' and (4) avoiding difficult problems in conflict of laws and the application of foreign law."*DiRienzo v. Philip*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

Servs. Corp._, 294 F.3d 21, 31 (2d Cir.2002) (quoting _Gulf Oil Corp. v. Gilbert_ 330 U.S. 501, 508-09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947)); _accord, e.g._,_Piper Aircraft Co. v. Reyno_, 454 U.S. 235, 241 n. 6, 102 S.Ct. 252, 258 n. 6, 70 L.Ed.2d 419 (1981); _Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine_ 311 F.3d 488, 500 (2d Cir.2002); _Aguinda v. Texaco, Inc._ 303 F.3d 470, 480 (2d Cir.2002); _Iragorri v. United Tech. Corp._, 274 F.3d 65, 74 (2d Cir.2001)(_en banc_).

1. _The Choice of Law Factor Is Neutral_

The Supreme Court has counseled that:

The doctrine of forum non conveniens ... is designed in part to help courts avoid conducting complex exercises in comparative law. As we stated in _Gilbert_ the public interest factors point towards dismissal where the court would be required to "untangle problems in conflict of laws, and in law foreign to itself." 330 U.S., at 509, 67 S.Ct., at 843.

_Piper Aircraft Co. v. Reyno,_ 454 U.S. 235, 251, 102 S.Ct. 252, 263, 70 L.Ed.2d 419 (1981). Although "'the need to apply foreign law is not in itself a reason to apply the doctrine of forum non conveniens,'" and courts "must guard against an excessive reluctance to undertake the task of deciding foreign law," the need to apply foreign law is "relevant" to the forum non conveniens analysis. _Manu Int'l, S.A. v. Avon Prods. Inc.,_ 641 F.2d 62, 67-68 (2d Cir.1981) (citation omitted).[FN49]

> FN49. _Accord, e.g. Piper Aircraft Co. v. Reyno,_ 454 U.S. 235, 260 n. 29, 102 S.Ct. 252, 268 n. 29, 70 L.Ed.2d 419 (1981) ("[T]he need to apply foreign law ... alone is not sufficient to warrant dismissal...."); _Alnwick v. European Micro Holdings, Inc._, No. 01-7548, 29 Fed. Appx. 781, 784, 2002 WL 407940 at *2 (2d Cir. Mar.15, 2002) ("the District Court should keep in mind that '[t]he need to apply foreign law is not in itself a reason to apply the doctrine of forum non conveniens'") (quoting _Manu Int'l, S.A. v. Avon Prods. Inc._, 641 F.2d at 67);_Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.,_ 145 F.3d 481, 492 (2d Cir.1998) ("While reluctance to apply foreign law is a valid factor favoring dismissal under

_Gilbert_ standing alone it does not justify dismissal."); _CCS Int'l Ltd. v. ECI Telesystems, Ltd.,_ 97 Civ. 4646, 1998 WL 512951 at *12 (S.D.N.Y.1998) ("While the prospect of applying foreign law is not dispositive in favor of dismissal, ... it is relevant.") (citation omitted).

Contrary to plaintiff's contention (_see_ Dkt. No. 16: Pl's Br. at 12-15), "a district court may dismiss a case on forum non conveniens grounds without first making a choice of law determination."_Gazis v. John S. Latsis (USA) Inc.,_ 729 F.Supp. 979, 985 (S.D.N.Y.1990) (citing _Cruz v. Maritime Co. of Philippines,_ 702 F.2d 47, 48 (2d Cir.1983) (per curiam) ("[M]aritime choice of law principles are not involved in forum non conveniens analysis and that the district court's discussion on the subject was therefore unnecessary.")). Although foreign choice of law is one factor favoring dismissal, "it is well established that a court considering a forum non conveniens motion should not engage in a complex conflict of laws inquiry."_PT United Can Co. v. Crown Cork & Seal Co._ 96 Civ. 3669, 1997 WL 31194 at *10 (S.D.N.Y. Jan.28, 1997), _aff'd,_138 F.3d 65 (2d Cir.1998) ("While the Court need not definitively resolve the choice of law issue at this point, the likelihood that foreign law will apply weighs against retention of the action."_Ioannides v. Marika Mar. Corp.,_ 928 F.Supp. 374, 379 (S.D.N.Y.1996); _accord, e.g._,_Abex Trading, Inc. v. Kipling Belgium N.V.S.A.,_ 00 Civ. 0478, 2002 WL 272408 at *6 (S.D.N.Y. Feb.26, 2002) ("While the prospect of applying foreign law is not dispositive in favor of dismissal, ... it is relevant.") (citation omitted); _Potomac Capital Inv. Corp. v. KLM_ 97 Civ. 8141, 1998 WL 92416 at *14 (S.D.N.Y. Mar.4, 1998) (Peck, M.J.) ("[A]t this stage of the proceedings, the Court need not definitively determine what law applies, _i.e._ whether maritime law applies."); _Karlitz v. Regent Int'l Hotels, Ltd._ 95 Civ. 10136, 1997 WL 88291 at *4 (S.D.N.Y. Feb.28, 1997); _Flynn v. General Motors, Inc._, 141 F.R.D. 5, 10 (E.D.N.Y.1992) (McLaughlin, C.J.) ("it is not immediately clear which forum's law will apply; nor is it necessary to determine this issue at this time."); _Bybee v. Oper der Standt Bonn,_ 899 F.Supp. 1217, 1223 (S.D.N.Y.1995) ("The need to apply foreign law is a factor that weighs in favor of dismissal."); _Damigos v. Flanders Compania Naviera, S.A. Panama,_ 716 F.Supp. 104, 108 (S.D.N.Y.1989) ("The necessity of conducting conflict of laws

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

analyses, and the likely need to apply Greek law points toward dismissal.").

**\*28** In *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), the Supreme Court set forth the factors that are now used in determining choice of law questions in admiralty and maritime cases. *See Romero v. International Terminal Operating Co.*, 358 U.S. 354, 382, 79 S.Ct. 468, 485, 3 L.Ed.2d 368 (1959) (providing that *Lauritzen* test applies to Jones Act as well as general maritime cases). According to *Lauritzen*, the following factors are to be balanced to determine which forum's law will apply to any given claim: (1) place of the wrongful act; (2) law of the flag; (3) allegiance or domicile of the injured seaman; (4) allegiance of the defendant shipowner; (5) place contract of employment was made; (6) inaccessibility of foreign forum; and (7) the law of the forum. *Lauritzen v. Larsen*, 345 U.S. at 583-90, 73 S.Ct. at 928-32. Later, in *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), the Supreme Court added to the list of factors consideration of the shipowner's base of operations. *See id.* at 309, 90 S.Ct. at 1734 (providing that "the list of seven factors in *Lauritzen* was not intended as exhaustive.... [T]he shipowner's base of operations is another factor of importance in determining whether the Jones Act is applicable; and there well may be others."). Ultimately, before applying the Jones Act, the Second Circuit requires evidence that the defendants had "substantial contact" with the United States. *See Sango v. Plovba*, 966 F.Supp. 229, 231 (S.D.N.Y.1997) ("Use of the Jones Act and the unseaworthiness doctrine is limited to 'suits in which the defendant has some substantial contact with the United States.'") (quoting *Koupetoris v. Konkar Intrepid Corp.*, 535 F.2d 1392, 1396 (2d Cir.1976)).

In this case, only two factors arguably favor application of the Jones Act: (1) the alleged ultimate American ownership of the vessel; and (2) defendants' alleged American "base of operations." (*See* page 5 above.) Of these two factors, plaintiff has a far better claim as to the first (American ownership) than the second (American base of operations).[FN50] If the fleet's "base of operations" is strictly defined as the location from which day-to-day operations are managed, then the base of operations for defendants' Russian fleet appears to be with Mayflower in Greece (see pages 53-54 & n. 44 above).*See Fogleman v.

*ARAMCO (Arabian American Oil Co.)*, 920 F.2d 278, 284 (5th Cir.1991) (for Jones Act purposes, look to day-to-day operations). If, however, base of operations is defined more broadly, then it might be located in New York. *See Guzis v. John S. Latsis (USA) Inc.*, 729 F.Supp. 979, 984 (S.D.N.Y.1990) ("Various factors determine the base of operations including the location of the shipowner's home office, the location where management and day-to-day operating decisions are made, the country where the ship most frequently calls or generates the most income, and the location of the ship's home port.").[FN51]

> **FN50.** Ultimate American ownership seems a strong possibility, as Charm, the nominally Liberian owner of the Yellowstone, is probably a shell corporation, and, indeed, Eastwind's parent lists the Yellowstone as an asset on its website. *See Carbotrade S.p.A. v. Bureau Veritas*, 99 F.3d 86, 92 (2d Cir.1996) ("[T]he domicile and base of operations of the shipowner-favors the application of Greek law. Although the nominal shipowner, Caribene, was a Gibraltar corporation, there is little doubt that Caribene was simply a shell corporation. The actual owners of the Star of Alexandria, as distinguished from its paper owner, were Greek. Both of Caribene's directors are Greek residents, and Palm Navigation, the company that operated the Star of Alexandria, is located in Greece. Therefore, the fifth *Lauritzen* factor weighs in favor of applying Greek law.") (fns.omitted), *cert. denied* 520 U.S. 1274, 117 S.Ct. 2454, 138 L.Ed.2d 212 (1997); *Sigalas v. Lido Mar., Inc.*, 776 F.2d 1512, 1518 (11th Cir.1985) (maritime choice of law analysis: disregarding fact that ship was nominally owned by Liberian corporation, as "over 80% of the stock in the relevant corporations is held by Greeks, who exercise complete control over the day-to-day management of the [vessel]").

> **FN51.** Plaintiff's counsel's proof here often resembles the wild accusations (by this same counsel) rejected by other courts in this district. *See Krimizis v. Panoceanic Navigation Corp.*, 83 Civ. 5667, 1985 WL

Not Reported in F.Supp.2d                                                                                          Page 36
Not Reported in F.Supp.2d, 2003 WL 23074! (S.D.N.Y.)

3834 at *3 (S.D.N.Y. Nov.14, 1985)
(rejecting "bald assertion" in Edelman
affidavit that American citizen related to
defendants "is the 'present head of the
shipping conglomerate;'" and the
conclusory statement that certain parties
were "alter-ego[s]"; plaintiff "fails to
establish the existence of evidence of control
or beneficial ownership by American
citizens or residents of Panoceanic, even
upon invoking the claim that Orion is the
'alter-ego' of the Goulandris fleet.").

*29 The "Second Circuit has suggested," without
actually holding, "that American ownership alone
may be sufficient to establish jurisdiction."See *Gazis
v. John S. Latsis (USA) Inc.*, 729 F.Supp. 979, 985 &
n. 2 (S.D.N.Y.1990) (citing *Antypas v. Cia. Maritima
San Basilio, S.A.*, 541 F.2d 307, 310 (2d Cir.1976)
("It appears that at least some of the stockholders of
the shipowner ... are American citizens. This contact,
in and of itself, has been held sufficient to support
jurisdiction under the Jones Act."), *cert. denied,* 429
U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977);
*Moncada v. Lemuria Shipping Corp.*, 491 F.2d 470,
473 (2d Cir.) ("In *Bartholomew* we suggested that
American ownership alone suffices to establish Jones
Act jurisdiction.... However, we need not rely upon
this ground alone, for there are here additional
contacts which, when added to American ownership,
make the sum of the contacts substantial."), *cert.
denied,* 417 U.S. 947, 94 S.Ct. 3072, 41 L.Ed.2d 667
(1974); *Bartholomew v. Universe Tankships, Inc.*,
263 F.2d 437, 443 n. 4 (2d Cir.), *cert. denied,* 359
U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959)).
Here, plaintiff has made colorable arguments for both
American ownership and American base of
operations. On the present record, therefore, the
Court concludes that the Jones Act may apply to this
case. *Cf.Gazis v. John S. Latsis (USA) Inc.*, 729
F.Supp. at 989-91 (even though FNC "private interest
factors point strongly toward dismissal," denying
dismissal to determine "the extent of the defendants'
shipping business in the United States and whether
the [vessel] has an American base of operations";
*Ioannides v. Marika Mar. Corp.*, 928 F.Supp. 374,
378-80 (S.D.N.Y.1996) (granting FNC motion
because private and public factors strongly favored
dismissal, even assuming American base of
operations, "there is at least a substantial possibility
that foreign law will govern," where "case [was]
brought on behalf of Greek seamen who shipped

aboard a Liberian vessel crewed by a Greek company
which, wherever its ownership lay, was engaged
exclusively in carrying cargos to and from non-U.S.
ports," parties had Greek forum and choice of law
clauses, and some claimants had already settled in
Greece); *Tsangaris v. Elite Inc.*, 92 Civ. 7855, 1993
WL 267425 at *8-9 (S.D.N.Y. July 9, 1993) (granting
FNC motion as private and public factors heavily
favored Greek forum; Greek forum selection clause
and choice of law clause in contract required Greek
law, so Jones Act would not apply; *Hellenic Lines*
was distinguishable because "plaintiffs have failed to
show that the defendant corporations mainly operate
out of New York or that any United States
domiciliary owns the defendant corporations.").

Accordingly, because it is unclear whether the law to
be applied in this case is foreign or U.S. maritime
law, the choice of law factor is essentially neutral.

*2. Russia Has a Strong Interest in This Action, While
New York's Interest Is Attenuated*

*30 Russia, and particularly Kaliningrad, has a strong
interest in this dispute: (1) Stanislav was a resident of
Kaliningrad; (2) Stanislav was hired in Kaliningrad;
(3) the ship apparently made home port in
Kaliningrad; (4) the ship had an all-Russian crew;
and (5) plaintiff Helga-Stanislav's widow and
beneficiary-resides in Kaliningrad. *See, e.g.Murray
v. British Broad. Corp.*, 81 F.3d 287, 293 (2d
Cir.1996) (FNC dismissal: "The crux of the matter,
therefore, involves a dispute between British citizens
over events that took place exclusively in the United
Kingdom.... The United States thus has virtually no
interest in resolving the truly disputed issues.");
*Valurezo v. Ecuadorian Line, Inc.*, 00 Civ. 6387,
2001 WL 740773 at *5 (S.D.N.Y. June 29, 2001)
("There is nothing local about [plaintiff's] claim and
this jurisdiction has no interest in it. Ecuador has a far
greater interest in adjudicating disputes between its
own seamen and a foreign-flagged vessel over an
incident that occurred on international waters.
Dismissal in favor of an Ecuadorian forum is also
favored by the burden this case will impose on this
court 'relative to the forum's minimal interest in the
controversy'"); *Tsangaris v. Elite, Inc.*, 92 Civ.
7855, 1993 WL 267425 at *9 (S.D.N.Y. July 9, 1993)
("Plaintiffs have not shown how this Court and the
United States have any interest in this action between
a Greek seaman and his Greek employer arising out

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

of an incident occurring on the high seas... Greek courts, unlike this Court, have much interest in resolving this dispute which partially involves interpreting a contract executed in Greece between Greek citizens and under Greek law and which determines whether a Greek citizen will be compensated for his injuries."); *Damigos v. Flandria Compania Naviera, S.A. Panama,* 716 F.Supp. 104, 109 (S.D.N.Y.1989) (Leval, D.J.) ("Greece has a strong interest in the well-being of Greek seamen and Greek vessels, generally, and in this action in particular... Conversely, the United States has no interest in adjudicating disputes involving Greek seamen employed on Greek flag vessels in foreign waters, and has no interest in this action"); *Doufexis v. Nagos S.S. Inc.* 583 F.Supp. 1132, 1134 (S.D.N.Y.1983) ("The decedent was Greek and was employed on a Greek flag ship at the time of his death. His widow and children are Greek. It is obvious that Greece has a more substantial interest in the resolution of this dispute.").

By contrast, the action's only connection to this forum is that the ship is allegedly owned by New York residents and defendants allegedly base their shipping operations here, although the Yellowstone appears to have been managed on a day-to-day basis from Greece. The fact that defendants may have their headquarters or base of operations here would ordinarily carry little weight, as the tort and the resulting damage both occurred elsewhere. *See* cases cited in Point V.B.1., above; *see also, e.g. Alfadda v. Fenn,* 159 F.3d 41, 46 (2d Cir.1998) ("This case involves a dispute between a Netherlands Antilles corporation and Saudi Arabian shareholders over the conduct of a French bank. Thus, France has a far greater interest in this litigation than the United States."); *Villar v. Crawley Mar. Corp.,* 782 F.2d 1478, 1483 (9th Cir.1986) (Jones Act suit by family members of a Philippine sailor who drowned in Saudi Arabian waters while working on a Philippines-flagged ship owned by Americans was dismissed for forum non conveniens. "[T]he Philippines has a powerful interest in deciding the controversy because of its strong contacts with both the decedent and the [plaintiffs], and [the] American jurors and court personnel have little interest in this controversy."); *Saab v. Citibank, N.A.,* 00 Civ. 6784, 2001 WL 1382577 at *5 (S.D.N.Y. Nov.7, 2001) (FNC dismissal: "Although [defendant's] headquarters are in New York, the other major players in this controversy are Lebanese businessmen and a Saudi

Arabian bank. The actions in dispute occurred throughout Europe and the Middle East; moreover, the witnesses are nearly all foreign... Though Plaintiff alleges that there are other, unknown witnesses, mere allegations are not sufficient to connect the community to litigation."), *aff'd.*No. 01-9417, 2002 WL 31317708 (2d Cir. Oct.16, 2002).[FN52]

> FN52.*See also, e.g.Blanco v. Banco Indus. de Venezuela, S.A.,* 997 F.2d 974 (2d Cir.1993) (upholding FNC dismissal in action between Venezuelan litigants in which the only connection to the local forum was the fact that payments were to be made in dollars in New York); *Abert Trading, Inc. v. Kipling Belgium N.V/S.A.,* 00 Civ. 0478, 2002 WL 272408 at *5-6 (S.D.N.Y. Feb.26, 2002) (FNC dismissal: "The Agreement was made for the distribution and sale of Belgium goods which were packed for shipment in Belgium... [and] shipped directly from Belgium to Central and South America... The fact that [plaintiff] is a New York corporation does not, by itself, vest this forum (and its jurors) with an interest in this litigation."); *Guimond v. Wyndham Hotels & Resorts,* 95 Civ. 0428, 1996 WL 281959 at *5 (S.D.N.Y. May 29, 1996) (FNC dismissal in case involving swimming pool accident in Jamaica, where "the Court is unable to find that New York has even the most attenuated connection to the instant action"); *Becker v. Club Las Velas,* 94 Civ. 2412, 1995 WL 267025 at *4 (S.D.N.Y. May 8, 1995) (FNC dismissal in case involving boating accident in Mexico where "New York has no real connection to the action" between New Jersey plaintiffs and Mexican defendant); *aff'd.*101 F.3d 684 (2d Cir.1996); *Noto v. CIA Secula di Armumento,* 310 F.Supp. 639, 647-48 (S.D.N.Y.1970) (Weinfeld, D.J.) (FNC dismissal in case involving the explosion of an Iranian oil tanker where "not a single contact within this district justifies the filing of these lawsuits here").

**\*31** The Court notes that plaintiff's counsel, Paul Edelman, often tries to bring in this Court maritime cases involving foreign plaintiffs injured or killed on foreign vessels in foreign waters; and that most such

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

cases have been dismissed on forum non conveniens grounds. It is useful to quote extensively from Judge Kaplan's decision in one such case brought by Mr. Edelman:

There is a final public interest consideration that bears more than passing mention. *This is a case brought on behalf of Greek seamen who shipped aboard a Liberian vessel crewed by a Greek company which, wherever its ownership lay, was engaged exclusively in carrying cargos to and from non-U.S. ports. There are fora and remedies available to plaintiffs under the law of their country of domicile.* Three of them already have settled their claims for sums which are substantial, even if they perhaps might seem low by American standards. *There seems little justification for opening the courts of the United States which are paid for by U.S. taxpayers and whose juries are composed of U.S. citizens asked to drop their everyday activities to serve to claims in these circumstances* even if, as plaintiffs stoutly argue, the ultimate base of operations of the vessel in question was the United States. *That no doubt is why judges of this Court repeatedly have dismissed cases like this one all brought by the same attorney [Edelman] in favor of Greek fora.* E.g. *Damigos,* 716 F.Supp. 104; *Tsangares v. Elite Inc.,* No. 92 Civ. 7855(RPP), 1993 WL 267425 (S.D.N.Y. July 9, 1993); *Gvrialis v. Westwind Africa Line, Ltd,* No. 84 Civ. 4310(DNE) (S.D.N.Y. Apr. 19, 1989); *Hatakis v. Trade Bulkers, Inc.,* 690 F.Supp. 260 (S.D.N.Y.1988); *Kassapas v. Arkon Shipping Agency, Inc.,* 578 F.Supp. 400 (S.D.N.Y.1984); *Doufexis v. Nagos S.S. Inc.,* 583 F.Supp. 1132 (S.D.N.Y.1983); *Krimizis v. Panoceanic Navigation Corp.,* No. 83 Civ. 5667(JFK), 1985 WL 3834 (S.D.N.Y. Nov.14, 1985).

*Rhoditis* is not to the contrary. The injury there in question occurred in the United States, and the vessel was engaged in carrying cargoes to and from U.S. ports. The interest of the United States in providing a remedy and a forum in that case was far greater than it is here, and it is important to note that the case did not even involve the question whether a forum non conveniens dismissal was appropriate. The public interest factors thus weigh heavily in favor of dismissal.

*Ioannides v. Marika Mar. Corp.,* 928 F.Supp. 374, 380 (S.D.N.Y.1996) (emphasis added). Here, too, the fact that Russia has a strong interest in this action, and any New York interest is attenuated at best, strongly favors FNC dismissal.

*3. The Court Administration Factor Favors Russia*

Considerations of court congestion favor neither party, as there is no evidence that this Court is more congested than Russian courts. *See, e.g. Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine,* 311 F.3d 488, 500 (2d Cir.2002) ("Court congestion is no more a problem in the Ukraine than it is here...."); *DiRienzo v. Philip Services Corp.,* 294 F.3d 21, 31 (2d Cir.2002) ("Ontario courts, like the Southern District of New York, suffer from congestion."); *Guidi v. Inter-Continental Hotels Corp.,* 224 F.3d 142, 147 n. 5 (2d Cir.2000) (The "criterion regarding the administrative and legal problems of the chosen court has no application here. Although the district court noted that the Southern District of New York is 'heavily overburdened,' the recent filling of all judicial vacancies and the resulting full complement of judges for the District makes this concern of little or no present significance.").[FN53]

> FN53 *Accord, e.g. Saab v. Citibank, N.A.,* 00 Civ. 6784, 2001 WL 1382577 at *5 (S.D.N.Y. Nov.7, 2001) ("Though it remains a factor to be considered, court congestion does not affect the analysis in this case."), *aff'd* No. 01-9417, 2002 WL 31317708 (2d Cir. Oct.16, 2002); *Ingram Micro, Inc. v. Airoute Cargo Express, Inc.,* 99 Civ. 12480, 2001 WL 282696 at *5 (S.D.N.Y. Mar.22, 2001) (finding relative court congestion to be neutral factor where defendant "offered no evidence that [Ontario courts are] any less busy" than courts of this district).

*32 Nevertheless, plaintiff's overseas location and multiple layers of representation are likely to cause pretrial and trial inefficiencies. Plaintiff is currently represented by three levels of counsel: Lithuanian/Russian, Greek, and American. (See pages 8-9 & n. 9 & page 10 n. 11 above.) Plaintiff's American counsel has admitted that he has never spoken directly to his "client," and was retained by overseas counsel. (Dkt. No. 12: 5/31/02 Hearing Tr. at 19.) Pretrial administration of this action is likely to be complicated by the fact that American counsel,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

in order to communicate with his client, will have to deal with several layers of intermediary lawyers.[FN54] Trial in Russia, involving only one plaintiff's lawyer, likely will be far more efficient.[FN55]

FN54. As an illustration, this Court recently learned that plaintiff did not receive her $49,000 benefit check until nearly two months after it was delivered to plaintiff's American counsel. Determining the cause of the delay required affidavits from three sets of attorneys. (*See* page 10 n. 11 above.) This does not bode well for an efficient pretrial management of this action. *Reading & Bates Corp.*, 577 F.Supp. 462, 466 (S.D.Tex.1983) (Choice of law analysis. "The Philippine courts are substantially more accessible to these Plaintiffs than are the courts of this nation. This fact has been strikingly illustrated in the present litigation by the apparent inability of attorney for Plaintiffs to communicate effectively with his clients ...."), *aff'd*,770 F.2d 1371 (5th Cir.1985).

FN55. The court administration factor is compounded by the fact that trial will require translation of a vast amount of testimony. *SeeTransunion Corp. v. Pepsico, Inc.* 640 F.Supp. 1211, 1216 (S.D.N.Y.1986) ("While certainly not decisive, language may be a barrier to swift adjudication in this District.... Many of the witnesses who reside in the Philippines speak Tagalog, a Philippines dialect, as their primary language."), *aff'd*,811 F.2d 127 (2d Cir.1987); *Flores v. Southern Peru Copper Corp.*, 00 Civ. 9812, 2002 WL 1587224 at *28 (S.D.N.Y. July 16, 2002) ("public interest factors strongly counsel dismissing this action in favor of Peru," because, *interalia*,"the testimony and documents would pose formidable translation requirements").

4. *The Jury Duty Factor Strongly Favors Russia*

As the Supreme Court observed in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has

no relation to the litigation." *Id.* at 508-09, 67 S.Ct. at 843. This action's connection to this forum is far too attenuated to justify burdening our citizens with jury duty. *See, e.g.,Trigano v. Bain & Co.*, No. 97-7475, 182 F.3d 901 (table), 1999 WL 464991 at *1 (2d Cir. June 29, 1999) (FNC dismissal upheld where contract executed in France and most witnesses were in France, not New York, and no actions were taken in New York; "[T]he interest in having local disputes settled locally, in avoiding complications of applying foreign law, and in avoiding burdening New York jurors with a case that has no impact on their community all weigh heavily against New York as a forum in this case."); *Alfadda v. Fenn*, 159 F.3d 41, 46-47 (2d Cir.1998) ("The interest in protecting jurors from sitting on cases with no relevance to their own community weighs heavily in favor of France. This suit involves ... plaintiffs' investment in a Netherlands Antilles holding company that owned a French-licensed bank.... Thus, French jurors have a more significant interest in this case than American jurors."); *Pavlov v. Bank of New York Co.* 135 F.Supp.2d 426, 437 (S.D.N.Y.2001) ("This is a private dispute about monetary loss allegedly suffered by depositors in a Russian bank. There is little justification for imposing it on U.S. courts and jurors."), *vacated on other grounds*, No. 01-7434, 25 Fed. Appx. 70, 2002 WL 63516 (2d Cir. Jan. 14, 2002); *Potomac Capital Inv. Corp. v. KLM*, 97 Civ. 8141, 1998 WL 92416 at *11 (S.D.N.Y. Mar.4, 1998) (Peck, M.J.); *Lan Assoc. XVIII, L.P. v. Bank of Nova Scotia*, 96 Civ. 1022, 1997 WL 458753 at *6 (S.D.N.Y. Aug.11, 1997) ("to require New York's citizens to serve as jurors merely because some wire transfers passed through [defendant's] New York branch would be inappropriate"); *MTS Secs., Inc. v. Creditanstalt-Bankverein*, No. 96-CV-0567L, 1997 WL 251482 at *6 (W.D.N.Y. May 1, 1997) ("because Austria has a far greater interest in [the] case than does the United States, the burdens of jury duty should fall upon Austrian citizens and the burdens of administering this case should fall on Austrian courts"); *Guimond v. Wyndham Hotels & Resorts*, 95 Civ. 0428, 1996 WL 281959 at *5 (S.D.N.Y. May 29, 1996) (Since "the Court is unable to find that New York has even the most attenuated connection to the instant action ... [,] it would be unjust to require New York's citizens to serve as jurors in an action so wholly devoid of local interest.").[FN56]

FN56.*Accord, e.g.,Beekman v. J.P. Morgan & Co.*, 945 F.Supp. 90, 95 (S.D.N.Y.1996)

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

("The Court and the jurors of this country ought not to be burdened with deciding a case with so little relation to the United States."); *Bell v. British Telecom*, 95 Civ.1972, 1995 WL 476684 at *3 (S.D.N.Y. Aug.9, 1995) ("The courts in this District, already laden with litigation, and the New York community, have no interest in settling a dispute between Nevada residents and a British corporation arising out of an incident that occurred in Scotland."); *Doe v. Hyland Therapeutics Div.*, 807 F.Supp. 1117, 1128 (S.D.N.Y.1992) ("[T]enuous contacts do not justify the significant administrative costs that stand to be levied upon this Court, or the burden of jury duty expected to be thrust upon a community substantially distanced from the controversy... That this Court sits in 'one of the busiest districts in the country,' ... is undeniable, making this one of the 'congested centers' of litigation referred to in *Gilbert*... The need to guard our docket from disputes with little connection to this forum is clear ....") (citations omitted), *Nota v. Cia Secula di Armamento*, 310 F.Supp. 639, 649 (S.D.N.Y.1970) ("The plaintiffs' asserted claims have no relationship to or contact with this district.... The doctrine of forum non conveniens protects not only the immediate defendant from harassing and vexatious litigation, but also other litigants and the community at large from unwarranted imposition upon the local courts' jurisdiction."); *Gazis v. John S. Latsis (USA) Inc.*, 729 F.Supp. 979, 989 (S.D.N.Y.1990) ("[T]he Supreme Court has severely discouraged the adjudication of disputes that have only a minimal contact with this country since it hampers the courts' ability to give speedy relief to those parties properly before them.").

*C. Balancing the Private and Public Interest Factors Strongly Favors Trial in Russia*

**\*33** The Court concludes that the private and public interest factors, balanced together, weigh strongly in favor of trial of this action in Russia.[FN57]

FN57. Indeed, the private convenience and public interest factors weigh so heavily in

favor of trial in Russia that the action should be dismissed even if, contrary to my recommendation, Judge Wood were to hold that the plaintiff's choice of forum should be granted strong, rather than diminished, deference.

*CONCLUSION*

Accordingly, Eastwind's forum non conveniens motion should be GRANTED and the case dismissed without prejudice on defendants' filing of the undertaking (consent to suit in Russia, waiver of statute of limitations defense, and agreement to make defendants' witnesses available in Russia) called for in this Report and Recommendation.

*FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Kimba M. Wood, 500 Pearl Street, Room 1610, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Wood. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.), *cert. denied*, 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

S.D.N.Y.,2003.
Varnelo v. Eastwind Transport, Ltd.
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 230741 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1719927 (M.D.N.C.)

**H** Wright v. Krispy Kreme Doughnuts, Inc.
M.D.N.C.,2005.
Only the Westlaw citation is currently available.
United States District Court,M.D. North Carolina.
William Douglas WRIGHT and Judy Woodall,
Plaintiffs,

v.

KRISPY KREME DOUGHNUTS, INC., Scott A.
Livengood, Erskine, Bowles, Mary Davis Holt,
William T. Lynch, Jr., John N. McAleer, James H.
Morgan, Dr. Su Hua Newton, Robert L. Strickland,
Togo D. West, Jr., Steven D. Smith, John W. Tate,
Randy S. Casstevens, R. Frank Murphy, Joseph A.
McAleer, Jr., John A. McAleer, Jr., John McAleer
Orrell, North Texas Doughnuts, L.P., Greater DFW
Doughnuts, Inc., Greater DFW Doughnuts, L.L.P.,
Arlington Doughnut Company, L.L.C., Grapevine
Doughnut Company, L.L.C., Frisco Doughnut
Company, L.L.C., Euless Doughnut Company,
L.L.C., Old Towne Doughnut Company, L.L.P.,
Hulen St. Doughnut Company, L.L.P., Dough-Re-Mi
Company, Ltd., Defendants.
**No. 1:04CV00832.**

April 4, 2005.

Bruce G. Murphy, Vero Beach, FL, Eric J. Belfi,
Murray Frank & Sailer, LLP, New York, NY, for
Plaintiffs.
James Donald Cowan, Jr., Smith Moore, L.L.P.,
Cynthia Munk Swindlehurst, Kenneth J. Gumbiner,
Michael Scott Fox, Tuggle Duggins & Meschan,
P.A., Greensboro, NC, Joseph S. Allerhand, Paul
Ferrillo, Robert Carangelo, Stephen A. Radin, Weil
Gotshal & Manges, LLP, New York, NY, Dustin K.
Palmer, F. Joseph Warin, Wayne A. Schrader,
Gibson Dunn & Crutcher, Washington, DC, Daniel
Alan M. Ruley, Kevin Guy Williams, William
Kearns Davis, Bell Davis & Pitt, P.A., Ronald R.
Davis, Womble Carlyle Sandridge & Rice, Winston-
Salem, NC, Carl N. Patterson, Jr., Heather Bell
Adams, Smith Anderson Blount Dorsett Mitchell &
Jernigan, Raleigh, NC, David Siegel, Martin Gelfand,
Richard Zelichov, Irell & Manella, LLP, Los
Angeles, CA, Anthony R. Modd, Matthew D. Harper,
Eastman & Smith Ltd., Toledo, OH, Stuart C.
Gauffreau, Nexsen PruetAdams Kleemeier, PLLC,
Greensboro, NC, for Defendants.

*ORDER*

OSTEEN, J.
*1 Pending before this court are several motions to
stay this action: (1) Motion by Nominal Defendant
Krispy Kreme Doughnuts, Inc. to Stay Proceedings
Pursuant to North Carolina General Statutes § 55-7-
43[22], filed by Krispy Kreme Doughnuts, Inc.
("Krispy Kreme"), acting through a Special
Committee of independent directors charged with
investigating and determining whether it is in the best
interests of Krispy Kreme to pursue this litigation; (2)
Motion to Stay Proceedings Pursuant to North
Carolina Business Corporation Act § 55-7-43[26]
filed by Scott Livengood, Erskine Bowles, Mary
Davis Holt, William T. Lynch, Jr., John N. McAleer,
James H. Morgan, Dr. Su Hua Newton, Robert L.
Strickland, Togo D. West, Jr., John W. Tate, Randy
S. Casstevens, and R. Frank Murphy (the "Director
Defendants"); and (3) Motion to Stay Proceedings
Pursuant to N.C. Gen.Stat. § 55-7-43[29] filed by
Steven D. Smith, Joseph A. McAleer, Jr., John
McAleer Orrell, Greater DFW Doughnuts, Inc.,
Greater DFW Doughnuts, L.L.P., Arlington
Doughnut Company, L.L.C., Grapevine Doughnut
Company, L.L.C., Frisco Doughnut Company,
L.L.C., Euless Doughnut Company, L.L.C., Old
Towne Doughnut Company, L.L.P., Hulen St.
Doughnut Company, L.L.P. (the "Franchise
Defendants").

This court finds that because the findings of the
Special Committee will play an important role in the
outcome of the action, a stay is warranted. The court
also notes, however, that a substantial amount of time
has passed between Plaintiffs' demand on Krispy
Kreme's Board of Directors, the appointment of a
Special Committee, and current events. Thus, only a
limited stay of 60 days is appropriate. In the event
that substantial progress is being made toward
completion of the Special Committee's report,
Defendants may request a hearing to show why some
additional time will be necessary. Therefore,

IT IS ORDERED that Motion by Nominal Defendant
Krispy Kreme Doughnuts, Inc. to Stay Proceedings
Pursuant to North Carolina General Statutes § 55-7-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1719927 (M.D.N.C.)

43[22] is GRANTED. The proceedings are stayed for sixty (60) days.

IT IS FURTHER ORDERED that Motion to Stay Proceedings Pursuant to North Carolina Business Corporation Act § 55-7-43[26] is GRANTED. The proceedings are stayed for sixty (60) days.

IT IS FURTHER ORDERED that Motion to Stay Proceedings Pursuant to N.C. Gen.Stat. § 55-7-43[29] is GRANTED. The proceedings are stayed for sixty (60) days.

M.D.N.C.,2005.
Wright v. Krispy Kreme Doughnuts, Inc.
Not Reported in F.Supp.2d, 2005 WL 1719927 (M.D.N.C.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.